1  ROGER I. TEICH
   California State Bar No. 147076
2  290 Nevada Street
   San Francisco, CA 94110
3  Telephone:  (415) 948-0045
   E-Mail Address:  rteich@juno.com
4

5  ROBERT F. KENNEDY, JR.
   MARY HOLLAND
6  Children's Health Defense
   1227 North Peachtree Parkway, Suite 202
7  Peachtree City, GA 30269
   Telephone:  (917) 743-3868
8  E-Mail Address:  mary.holland@childrenshealthdefense.org

9  Attorneys for Plaintiff
10 CHILDREN'S HEALTH DEFENSE

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13               SAN FRANCISCO DIVISION

14

15 CHILDREN'S HEALTH DEFENSE,
   a Georgia non-profit organization,
16
17              Plaintiff,                    Case No. _____
18                                            **VERIFIED COMPLAINT**
        v.
19                                            **1)  FIRST AND FIFTH AMENDMENTS**
20 FACEBOOK, INC., a Delaware corporation;        **(*BIVENS*);**
   MARK ZUCKERBERG, a California resident;   **2)  LANHAM ACT (15 U.S.C. § 1125(a));**
21 SCIENCE FEEDBACK, a French corporation;   **3)  RICO FRAUD (18 U.S.C. § 1962);**
   POYNTER INSTITUTE, a Florida corporation; **4)  DECLARATORY RELIEF.**
22 POLITIFACT, a Florida-corporation; and
   DOES 1-20,                                **JURY TRIAL DEMAND**
23
24              Defendants.
25
26
27
28
                                             **VERIFIED COMPLAINT**
                                             *Children's Health Defense v. Facebook* et al.

# **TABLE OF CONTENTS**

Page #

TABLE OF AUTHORITIES ...................................................................................... iii

VERIFIED COMPLAINT ............................................................................................ 1

INTRODUCTION .......................................................................................................... 2

JURISDICTION AND VENUE ................................................................................... 5

PARTIES AND RELATED ENTITIES .................................................................... 6

STATEMENT OF MATERIAL FACTS .................................................................. 8

    A.    CHD's Interest in Vaccine and 5G and Wireless Network Safety. ...................... 8

    B.    CHD's Facebook Page. ........................................................................................ 12

    C.    Defendant's Scheme to Defraud. ........................................................................ 14

        1.    Overview. ....................................................................................................... 14

        2.    Means and Methods of Defendants' Scheme. ............................................ 22

        3.    Falsely Disparaging Warning Label. ........................................................ 25

        4.    Materially Deceptive use of "Fact-Checkers." ......................................... 27

        5.    Disabling CHD's Fundraising and Ads. ................................................... 39

        6.    Disabling CHD's Right to "Appeal" These Actions. .............................. 40

        7.    Concealment of the Overall Scheme. ........................................................ 40

        8.    Continuing Injuries to CHD. ..................................................................... 48

    D.    Material Questions of Vaccine Safety. .............................................................. 50

    E.    Material Questions of 5G Network Safety. ...................................................... 55

    F.    Facebook's Adverse Motives. ............................................................................ 59

        1.    Zuckerberg's Corporate Biases. ................................................................ 59

        2.    Vaccine-Maker Ad Revenue. ..................................................................... 62

        3.    Vaccine Development. ................................................................................. 63

        4.    5G Networks. ............................................................................................... 65

FIRST CAUSE OF ACTION -

(FIRST AND FIFTH AMENDMENTS — *BIVENS* VIOLATIONS) ...................... 67

i

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

SECOND CAUSE OF ACTION -

(LANHAM ACT VIOLATIONS — 15 U.S.C. § 1125(a)) ........................................73

    A.    No Affirmative Defense of CDA "Immunity." ....................................86

    B.    The May 28, 2020 Executive Order....................................................86

THIRD CAUSE OF ACTION - (RICO — WIRE FRAUD VIOLATIONS)............................87

FOURTH CAUSE OF ACTION - (DECLARATORY RELIEF) .............................................92

DEMAND FOR JURY TRIAL ................................................................................................93

PRAYER FOR RELIEF ..........................................................................................................94

VERIFICATION .....................................................................................................................95

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

# TABLE OF AUTHORITIES

**Federal Cases**

*Abrams v. United States*,
   250 U.S. 616 (1919) ........................................................................... 4, 45

*Ashcroft v. Free Speech Coalition*,
   535 U. S. (2002) .................................................................................. 71

*Bass v. Facebook, Inc.*,
   394 F. Supp. 3d 1024 (N.D. Cal. 2019) ............................................... 3

*Batzel v. Smith*,
   333 F.3d 1018 (9th Cir. 2003) ............................................................. 86

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
   403 U.S. 388 (1971) ............................................................................ 68

*Blum v. Yaretsky*,
   457 U.S. 991 (1982) ............................................................................ 71

*Board of Regents of State Colleges v. Roth*,
   408 U.S. 564 (1972) ............................................................................ 72

*Bolger v. Youngs Drug Products Corp.*,
   463 U.S. 60 (1983) .............................................................................. 75

*Boston Chamber of Commerce v. Boston*,
   217 U.S. 189 (1910) ............................................................................ 73

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639 (2008) ................................................................. 45, 50, 90

*Bridges v. California*,
   314 U.S. 252 (1941) ............................................................................ 21

*Bruesewitz v. Wyeth LLC*,
   562 U.S. 223 (2011) ............................................................................ 50

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
   173 F.3d 725 (9th Cir. 1999) ............................................................... 74

*Continental Airlines, Inc. v. Intra Brokers, Inc.*,
   24 F.3d 1099 (9th Cir. 1994) ............................................................... 92

*Cook, Perkiss, and Liehe, Inc. v. N. Cal. Collection Serv.*,
    911 F.2d 242 (9th Cir. 1990) ............................................................. 75

*Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001) ............................................................................ 68

*Davis v. Passman*,
    442 U.S. 228 (1979) .......................................................................... 68

*Davis v. Wyeth Laboratories*,
    399 F.2d 121 (9th Cir. 1968) ............................................................ 50

*Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc.*,
    795 F.2d 1344 (7th Cir. 1986) .......................................................... 72

*Dodds v. Am. Broad. Co.*,
    145 F.3d 1053 (9th Cir. 1998) .................................................... 82, 84

*Elrod v. Burns*,
    427 U.S. 347 (1976) .......................................................................... 92

*Fair Hous. Council v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) (en banc) ...................................... 22, 86

*Fed. Agency of News LLC v. Facebook, Inc.*
    2020 U.S. Dist. LEXIS 6159 (N.D. Cal. 2020) ............................ 69, 70

*Fonda v. Gray*,
    707 F.2d 435 (9th Cir. 1983) ............................................................ 71

*Fraley v. Facebook*,
    830 F. Supp. 2d 785 (N.D. Cal. 2011) .......................................... 62, 86

*Franklin v. Fox*,
    312 F.3d 423 (9th Cir. 2002) ............................................................ 69

*Freedman v. Maryland*,
    380 U.S. 51 (1965) ............................................................................ 68

*Garrison v. Louisiana*,
    379 U.S. 64 (1964) ......................................................................... 4, 84

*Gorenc v. Salt River Project Agric. Improvement & Power Dist.*,
    869 F.2d 503 (9th Cir. 1989) ............................................................ 69

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

*Grasshopper House, LLC v. Clean & Sober Media LLC,*
    394 F. Supp. 3d 1073 (C.D. Cal. 2019) ...................................................... 74

*Grosjean v. American Press Co.,*
    297 U.S. 233 (1936) ...................................................................................... 2, 3

*Hanover Star Milling Co. v. Metcalf,*
    240 U.S. 403 (1916) ...................................................................................... 50

*Harmoni Int'l Spice, Inc. v. Hume,*
    914 F.3d 648 (9th Cir. 2019) ...................................................................... 91

*Harte-Hanks Communication, Inc. v. Connaughton,*
    491 U.S. 657 (1989) ...................................................................................... 84

*Herbert v. Lando,*
    441 U.S. 153 (1979) ...................................................................................... 84

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods. Liab. Litig.*
    295 F. Supp. 3d 927 (N.D. Cal. 2018) ...................................................... 91

*Jackson v. Metropolitan Edison Co.,*
    419 U.S. 345 (1974) ...................................................................................... 71

*Kaiser Foundation Health Plan, Inc. v. Pfizer, Inc. (In re Neurontin Mktg. & Sales Practices Litig.),*
    712 F.3d 21 (1st Cir. 2013) .......................................................................... 91

*Kelly v. United States,*
    140 S. Ct. 1565 (2020) .................................................................................. 50

*Knievel v. ESPN,*
    393 F.3d 1068 (9th Cir. 2005) .......................................................... 78, 79, 81

*Lexmark International, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118, 134 S. Ct. 1377 (2014) ...................................................... 50

*Lugar v. Edmondson Oil Co.,*
    457 U.S. 922 (1982) ...................................................................................... 69

*Manhattan Cmty. Access Corp. v. Halleck,*
    139 S. Ct. 1921 (2019) .................................................................................. 69

*Manufactured Home Communities, Inc. v. County of San Diego,*
    544 F.3d 959 (9th Cir. 2008) ...................................................................... 82

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* **et al.**

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991) ............................................................ 80, 82, 83, 84

*Mendoza v. Zirkle Fruit Co.*,
    301 F.3d 1163 (9th Cir. 2002) .......................................................... 91

*Metabolife Int'l Inc. v. Wornick*,
    264 F.3d 832 (9th Cir. 2001) ...................................................... 82, 85

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990) .............................................................. 77, 82, 83

*Nat'l Collegiate Athletic Ass'n. v. Tarkanian*,
    488 U.S. 179, 102 L. Ed. 2d 469, 109 S. Ct. 454 (1988) ...................... 71

*National Organization for Women, Inc. v. Schiedler*,
    510 U.S. 249 (1994) .................................................................. 88

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) .................................................................. 77

*Newton v. National Broadcasting Co., Inc.*,
    930 F.2d 662 (9th Cir. 1990) ........................................................ 84

*Packingham v. North Carolina*,
    137 S. Ct. 1730 (2017) ................................................................ 5

*Philadelphia Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986) .................................................................. 84

*Phillips v. Washington Legal Foundation*,
    524 U.S. 156 (1998) .................................................................. 72

*Rent-A-Ctr., Inc. v. Canyon TV and Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991) ........................................................ 92

*Resolute Forest Prods. v. Greenpeace Int'l.*,
    2019 U.S. Dist. LEXIS 10263 (N.D. Cal. 2019) ................................ 91

*Rice v. Fox Broad Co.*,
    33 F.3d 1170 (9th Cir. 2003) ........................................................ 74

*River City Mkts., Inc. v. Fleming Foods W., Inc.*,
    960 F.2d 1458 (9th Cir. 1992) ...................................................... 88

vi

*Sambreel Holdings LLC v. Facebook, Inc.*,
    906 F. Supp. 2d 1070 (S.D. Cal. 2016) ................................................... 22

*Speiser v. Randall*,
    357 U.S. 513 (1958) ............................................................................. 68

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) ............................................................................. 84

*Tsao v. Desert Palace, Inc.*,
    698 F.3d 1128 (9th Cir. 2012) .............................................................. 68

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
    933 F.3d 728 (D.C. Cir. 2019) ....................................................... 55, 56

*United States v. Reyes*,
    660 F.3d 454 (9th Cir. 2011) ................................................................ 89

*Villegas v. Gilroy Garlic Festival Ass'n*,
    541 F.3d 950 (9th Cir. 2008) (en banc) ................................................ 69

*Xcentric Ventures, LLC v. Borodkin*,
    798 F.3d 1201 (9th Cir. 2015) .............................................................. 91

**<u>California Cases</u>**

*Bently Reserve LP v. Papaliolios*,
    218 Cal. App. 4th 418 (2013) ............................................................... 79

*Carney v. Santa Cruz Women Against Rape*,
    221 Cal. App. 3d 1009 (1990) .............................................................. 77

*Couch v. San Juan Unified Sch. Dist.*,
    33 Cal.App.4th 1491 (1995) ................................................................. 82

*Ferlauto v. Hamsher*,
    74 Cal. App. 4th 1294 (1999) ............................................................... 79

*Gilbert v. Sykes*,
    147 Cal. App. 4th 13 (2007) ................................................................. 77

*Gomes v. Fried*,
    136 Cal. App. 3d 924 (1982) ................................................................ 78

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

*Graybill v. De Young*,
    140 Cal. 323 (1902) ................................................................. 85

*Hecimovich v. Encinal Sch. Parent Teacher Org.*,
    203 Cal. App. 4th 450 (2012) ................................................... 77

*MacLeod v. Tribune Publishing Co.*,
    52 Cal. 2d 536 (1959) ............................................................... 81

*Ringler Associates, Inc. v. Maryland Casualty Co.*,
    80 Cal. App.4th 1165 (2000) .................................................... 81

*Rosenberg v. J.C. Penney Co.*,
    30 Cal. App. 2d 609 (1939) ................................................ 82, 83

*Selleck v. Globe International, Inc.*,
    166 Cal. App. 3d 1123 (1985) ................................................. 79

*Slaughter v. Friedman*,
    32 Cal. 3d 149 (1982) ............................................................... 83

*Vedovi v. Watson & Taylor*,
    104 Cal. App. 80 (1930).......................................................... 79

**United States Constitution**

    First Amendment................................................................2, *passim*
    Fifth Amendment .........................................................5, 67, 68, 72, 73
    Fourth Amendment ....................................................................... 68

**Federal Statutes**

15 U.S.C.
    § 1125(a) ...............................................................................5, 73
    § 1125(a)(1)(B) ........................................................................ 73

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

18 U.S.C.
§ 1343 .......................................................................................................... 88, 89
§ 1951 .......................................................................................................... 90
§ 1951(2) ..................................................................................................... 90
§ 1961(1)(B) ................................................................................................ 88, 90
§ 1961(3) ..................................................................................................... 7
§ 1961(4) ..................................................................................................... 88
§ 1962(c) ..................................................................................................... 87, 88, 90
§ 1964(a) ..................................................................................................... 5, 67
§ 1964(c) ..................................................................................................... 5, 6, 67, 88, 91
§ 1965(a) ..................................................................................................... 5

26 U.S.C.
§ 501(c)(3) .................................................................................................. 6

28 U.S.C.
§ 1331 .......................................................................................................... 5, 68
§ 1332(a) ..................................................................................................... 5
§ 1391(b) ..................................................................................................... 5
§ 2201 .......................................................................................................... 5
§ 2201(a) ..................................................................................................... 92
§ 2202 .......................................................................................................... 5

42 U.S.C.
§§ 300aa-1 - 300aa-34 ............................................................................... 50
§ 300aa-11 ................................................................................................... 50
§ 300aa-12 ................................................................................................... 52
§ 300aa-27 ................................................................................................... 52
§ 300aa-27(a) .............................................................................................. 51
§ 1983 .......................................................................................................... 68

47 U.S.C.
§ 230 ............................................................................................................ 2, 20, 71, 86, 87
§ 230(c)(1) ................................................................................................... 18, 86
§ 230(c)(2)(A) ............................................................................................. 18, 86
§ 230(f)(3) ................................................................................................... 86

**California Statutes**

California Civil Code

§ 45 ....................................................................................................... 77
§ 45a ..................................................................................................... 77
§ 48a ..................................................................................................... 78
§ 48a (a) ................................................................................................ 85
§ 48a (d)(5) ........................................................................................... 85
§ 1668 ................................................................................................... 13
§ 659641.1 (f) ....................................................................................... 58

**Federal Rules of Civil Procedure**

Rule 9(b) ............................................................................................... 90

**Electronic and Web Sources**

*2019 Vaccines for Children*, State of Georgia, GOVERNMENT CONTRACTS AND BIDS, https://www.govcb.com/government-bids/vaccines-for-children-NBD00159022703927119.htm (last accessed Aug. 15, 2020) ............................................. 51

*2019 Vaccines for Children*, State of Georgia, GOVERNMENT CONTRACTS, https://www.governmentcontracts.us/government-contracts/opportunity-details/NBD00159991194385117.htm (last accessed Aug. 15, 2020) ................................ 51

*5G*, WIKIPEDIA, https://en.wikipedia.org/wiki/5G (last accessed Aug. 14, 2020) ..................... 56

*A Rationale for Biologically-based Public Exposure Standards for Electromagnetic Fields* (*Extremely Low Frequency and Radio Frequency*), BIO-INITIATIVE REPORT, https://bioinitiative.org/ ................................................ 56

*About A/B Testing*, Business Help Center, FACEBOOK FOR BUSINESS, https://www.facebook.com/business/help/1738164643098669?id=445653312788501 (last accessed Aug. 14, 2020) ................................................................ 43

*About*, 5G APPEAL, http://www.5gappeal.eu/about/ (last accessed Aug. 14, 2020) .................. 59

Adam Burt, *Can Facebook Ever Be Fixed?*, HARVARD BUSINESS REVIEW (April 8, 2019), https://hbr.org/2019/04/can-facebook-ever-be-fixed ............................................. 75

Alexis C. Madrigal & Robinson Meyer, *How Could the CDC Make That Mistake?*, THE ATLANTIC (May 21, 2020), https://www.theatlantic.com/health/archive/2020/05/cdc-and-states-are-misreporting-covid-19-test-data-pennsylvania-georgia-texas/611935/ ............................... 54

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

Andrew Ward, *Vaccines are among big pharma's best-selling products*, FINANCIAL TIMES (Apr. 24, 2016), https://www.ft.com/content/93374f4a-e538-11e5-a09b-1f8b0d268c39 ............................................................... 54

*Anonymous – Facebook*, PROJECT VERITAS (Apr. 6, 2020), https://www.projectveritas.com/news/anonymous-facebook/ ............................... 43

*Basic Documents*, WORLD HEALTH ORGANIZATION (49th Ed. 2020), https://apps.who.int/gb/bd/pdf_files/BD_49th-en.pdf#page=1 ..................... 20, 69

Belyaev I, Dean A, Eger H, et al., *EUROPAEM EMF Guideline 2016 for the prevention, diagnosis and treatment of EMF-related health problems and illnesses*, REV. ENVIRON HEALTH. 2016, 31(3), 363-397, https://pubmed.ncbi.nlm.nih.gov/27454111/ ....................................................... 56

Beth Snyder Bulik, *Bayer blazes new trails for pharma with Betaseron Facebook ad*, FIERCEPHARMA (Oct. 30, 2016), https://www.fiercepharma.com/marketing/bayer-s-first-facebook-ad-campaign-features-first-scrolling-isi-a-pharma-ad-facebook-ad .......................... 62

Bijan Khosravi, *Facebook's New Focus On 5G and Golden Opportunity for Entrepreneurs*, FORBES (Apr. 30, 2018), https://www.forbes.com/sites/bijankhosravi/2018/04/30/todays-black-clouds-over-facebook-will-part-look-at-their-golden-ideas-in-5g/#37c15fdd313b .......................................................... 65

*California Medical Association House of Delegates Resolution, Wireless Standards Reevaluation, 2014 Resolution 107*, CALIFORNIA MEDICAL ASSOCIATION (adopted Dec. 7, 2014), https://ecfsapi.fcc.gov/file/1092989731923/30-Attachment%2030-%20California%20Medical%20Association%20Resolution.pdf ......................... 58

Carl Elliott, *An Ethical Path to a Covid Vaccine*, NEW YORK REVIEW OF BOOKS (July 20, 2020), https://www.nybooks.com/articles/2020/07/02/ethical-path-covid-19-vaccine/ ...................................................................................................... 54

*CDC and WHO Corrupt Financial Entanglements with the Vaccine Industry* [and other articles], CHILDREN'S HEALTH DEFENSE, https://childrenshealthdefense.org/cdc-who/ (last accessed Aug. 14, 2020) ....................... 11

*CDPH Issues Guidelines on How to Reduce Exposure to Radio Frequency Energy from Cell Phones*, Office of Public Affairs, CALIF. DEPT. OF PUBLIC HEALTH, (Dec. 13, 2017), https://www.cdph.ca.gov/Programs/OPA/Pages/NR17-086.aspx ......................... 58

*Children's Health Defense* page, FACEBOOK,
https://www.facebook.com/ChildrensHealthDefense (last accessed Aug. 15, 2020) ........................................................................................................... 79

Christina D.Bethell, PhD, et al., *A National and State Profile of Leading Health Problems and Health Care Quality for US Children: Key Insurance Disparities and Across-State Variations*, ACADEMIC PEDIATRICS, Volume 11, Issue 3, Supplement, May–June 2011, pp. S22-S33, https://www.sciencedirect.com/science/article/pii/S1876285910002500 ............................ 53

Christopher Yasiejko & Sarah Frier, *Facebook's Augmented Reality Push Causes Leap in U.S. Patents*, BLOOMBERG (Jan. 14, 2020), https://www.bloomberg.com/news/articles/2020-01-14/facebook-s-leap-in-u-s-patents-hints-at-eye-on-virtual-reality ............................................................... 66

*Combatting Vaccine Misinformation*, FACEBOOK,
https://about.fb.com/news/2019/03/ combatting-vaccine-misinformation (last visited Aug 14, 2020)....................................................................... 19, 21, 40, 70

*Community Standards*, FACEBOOK,
https://www.facebook.com/communitystandards/ (last visited Aug. 14, 2020).................... 3

*CZI Announces the Chan Zuckerberg Biohub*, CHAN ZUCKERBERG INITIATIVE (Sept. 23, 2016), https://chanzuckerberg.com/newsroom/czi-announces-the-chan-zuckerberg-biohub/ ............................................................................... 64

D. Tachover, *CHD Statement on 5G and Coronavirus*, CHILDREN'S HEALTH DEFENSE (Apr. 10, 2020), https://childrenshealthdefense.org/news/chd-statement-on-5g-and-coronavirus/ ............................................................ 12

*Data & Statistics*, HEALTH RESOURCES & SERVICES ADMINISTRATION (May 1, 2019), https://www.hrsa.gov/sites/default/files/hrsa/vaccine-compensation/data/monthly-stats-may-2019.pdf.................................................... 53

Donie O'Sullivan & Brian Fung, *Mark Zuckerberg tries to explain his inaction on Trump posts to outraged staff*, CNN BUSINESS (Jun. 2, 2020), https://www.cnn.com/2020/06/02/tech/facebook-all-hands-trump/index.html.................. 61

Elizabeth Dwoskin, *Zuckerberg defends decisions on Trump as Facebook employee unrest grows*, WASHINGTON POST (Jun. 2, 2020), https://www.sfgate.com/news/article/Zuckerberg-defends-decisions-on-Trump-as-Facebook-15311764.php....................................................................... 61

Emily Atkin, *Facebook creates fact-checking exemption for climate deniers*, HEATED (Jun. 24, 2020), https://heated.world/p/facebook-creates-fact-checking-exemption .................................................................................. 24, 48

*Entire CNN April 16 Coronavirus Town Hall* [Video], CNN BUSINESS (Apr. 17, 2020), https://www.cnn.com/videos/business/2020/04/17/entire-april-16-coronavirus-town-hall-part-5-sot-vpx.cnn ............................................. 26, 29, 43

Eric Lipton, et al., *The CDC waited 'its entire existence for this moment.' What went wrong?*, NEW YORK TIMES (Jun. 2, 2020), https://www.sfgate.com/news/article/The-CDC-Waited-Its-Entire-Existence-for-This-15312642.php ....................................................................... 55

*Executive Order on Preventing Online Censorship*, Executive Orders, THE WHITE HOUSE (May 28, 2020), https://www.whitehouse.gov/presidential-actions/executive-order-preventing-online-censorship/ ................................. 87

*Facebook CEO Testimony Before House Financial Services Committee* [Video], C-SPAN (Oct. 23, 2019), https://www.c-span.org/video/?465293-1/facebook-ceo-testimony-house-financial-services-committee ................................. 60

*Facebook Is Changing News Feed (Again) to Stop Fake News*, WIRED (Apr. 10, 2019), https://www.wired.com/story/facebook-click-gap-news-feed-changes/ ................. 44

*Fact-Checking on Facebook*, Business Help Center, FACEBOOK FOR BUSINESS, https://www.facebook.com/help/publisher/182222309230722 (last accessed Aug. 14, 2020) ...................................................................................... 47

Falcioni L, Bua L, Tibaldi E, et al., *Report of final results regarding brain and heart tumors in Sprague-Dawley rats exposed from prenatal life until natural death to mobile phone radiofrequency field representative of a 1.8 GHz GSM base station environmental emission*, ENVIRON RES. 2018; 165:496-503, https://pubmed.ncbi.nlm.nih.gov/29530389/ .......................................... 57

*Frequently Asked Questions*, National Vaccine Injury Compensation Program, HEALTH RESOURCES & SERVICES ADMINISTRATION, https://www.hrsa.gov/vaccine-compensation/FAQ/index.html (last accessed Aug. 14, 2020) ...................................................................................... 52

*Hearing by Congress on "deepfakes" and artificial intelligence* [Video], GUARDIAN NEWS (June 13, 2019), https://www.youtube.com/watch?v=lArPEDS0GTA ...................................... 14

VERIFIED COMPLAINT
*Children's Health Defense v. Facebook* et al.

Henry, C., *Facebook willing to invest in satellite user equipment*, SPACE NEWS (March 8, 2017 (https://spacenews.com/facebook-willing-to-invest-in-satellite-user-equipment/ ................................................................................. 66

*High Exposure to Radio Frequency Radiation Associated With Cancer in Male Rats*, NATIONAL INSTITUTE OF ENVIRONMENTAL HEALTH SCIENCES (Nov. 1, 2018), https://www.niehs.nih.gov/news/newsroom/releases/2018/november1/index.cfm ................................................................................................... 57

https://childrenshealthdefense.org ........................................................................ 6

*Indefinite Delivery Contract 75D30119D04518*, Federal Contract IDV Award, GOVTRIBE (Jun. 29, 2020), https://govtribe.com/award/federal-idv-award/indefinite-delivery-contract-75d30119d04518 ...................................... 51

*Infectious Disease Initiative*, CHAN ZUCKERBERG BIOHUB, https://www.czbiohub.org/projects/ infectious-disease/ (last accessed Aug. 15, 2020) ..................................................................................................... 64

*Information, Merrian-Webster.com*, https://www.merriam-webster.com/dictionary/information (last accessed Aug. 14, 2020) .................................... 21

Institute of Medicine, *Childhood Immunization Schedule and Safety: Stakeholder Concerns, Scientific Evidence, and Future Studies*, NATIONAL ACADEMIES PRESS (2013), pp. 5-6, https://doi.org/10.17226/13563 ...................................... 53

Jessi Hempel, *Inside Facebook's Ambitious Plan to Connect the Whole World*, WIRED (Jan. 19, 2016), https://www.wired.com/2016/01/facebook-zuckerberg-internet-org/ .................................................................................... 66

Joel M. Moskowitz, *We Have No Reason to Believe 5G Is Safe*, SCIENTIFIC AMERICAN (Oct. 17, 2019), https://blogs.scientificamerican.com/observations/we-have-no-reason-to-believe-5g-is-safe/ .............................................................................................. 57

Jon Russell, *Facebook is reportedly testing solar-powered internet drones again — this time with Airbus*, TECHCRUNCH (Jan. 21, 2019), https://techcrunch.com/2019/01/21/ facebook-airbus-solar-drones-internet-program/?guccounter=1 ........................................................................ 67

xiv

Josh Dawsey, Ashley Parker, Philip Rucker and Yasmeen Abutaleb, *As deaths mount, Trump tries to convince Americans it's safe to inch back to normal*, WASHINGTON POST (May 9, 2020), https://www.washingtonpost.com/politics/as-deaths-mount-trump-tries-to-convince-americans-its-safe-to-inch-back-to-normal/2020/05/09/bf024fe6-9149-11ea-a9c0-73b93422d691_story.html ........................................................... 55

K. Waddell, *A new attack on social media's immunity*, AXIOS (June 13, 2019), https://www.axios.com/social-media-immunity-section-230-f15ac071-32e9-4e33-81e6-4c7ebadaea5e.html ....................................................................... 14

Katie Collins, *Facebook and partners collaborate to bring 5G wireless internet to California homes*, CNET, https://www.cnet.com/news/facebook-brings-faster-than-fiber-5g-wireless-connectivity-to-california/ ...................................... 65

*Largest funders of Poynter*, POYNTER (last updated June 2020), https://www.poynter.org/major-funders/ ............................................................. 8

Leo Sun, *Will Facebook Redefine Augmented Reality With Stella and Orion*?, MOTLEY FOOL (Sept. 20, 2019), https://www.fool.com/investing/2019/09/20/will-facebook-redefine-augmented-reality-with-stel.aspx ........................................................ 66

*Letter to Facebook*, CHILDREN'S HEALTH DEFENSE (March 4, 2019), https://childrenshealthdefense.org/wp-content/uploads/FINAL-CHD-Letter-to-Facebook-1.pdf ............................................................................... 17

M. Fisher, *Inside Facebook's Secret Rulebook for Global Political Speech*, NEW YORK TIMES (Dec. 27, 2018), https://www.nytimes.com/2018/12/27/world/facebook-moderators.html .................... 45, 46

M. Zuckerberg, *Facebook's commitment to the Oversight Board*, FACEBOOK (Sept. 2019), https://about.fb.com/wp-content/uploads/2019/09/letter-from-mark-zuckerberg-on-oversight-board-charter.pdf ................................................. 24

Mark Harris, *Facebook May Have Secret Plans to Build a Satellite-Based Internet*, IEEE (May 2, 2018), https://spectrum.ieee.org/tech-talk/aerospace/satellites/facebook-may-have-secret-plans-to-launch-a-internet-satellite ................................................................................ 66

*Master Manipulator: The Explosive True Story of Fraud, Embezzlement, and Government Betrayal at the CDC*, Store, CHILDREN'S HEALTH DEFENSE, https://childrenshealthdefense.org/store/master-manipulator-the-explosive-true-story-of-fraud-embezzlement-and-government-betrayal-at-the-cdc/ (last visited Aug 14, 2020)................................................................................ 11

Mike Isaac, Sheera Frenkel & Cecilia Kang, *Now More Than Ever, Facebook Is a 'Mark Zuckerberg Production*,' NEW YORK TIMES (May 16, 2020), https://www.nytimes.com/2020/05/16/technology/zuckerberg-facebook-coronavirus.html ................................................................................ 46

Natasha Tiku, *Facebook has a prescription: More pharmaceutical ads*, WASHINGTON POST (Mar. 3, 2020), https://www.washingtonpost.com/technology/2020/03/03/facebook-pharma-ads/ ................................................................................ 63

*Non-ionizing Radiation, Part 2: Radiofrequency Electromagnetic Fields, IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Volume 102*, IARC Publications, INTERNATIONAL AGENCY FOR RESEARCH ON CANCER, WORLD HEALTH ORGANIZATION, https://publications.iarc.fr/126....................... 57

R. Cheng, *Facebook will use machine learning to fight fake news*, CNET (Aug. 3, 2017), https://www.cnet.com/news/facebook-will-use-machine-learning-to-fight-fake-news/ ................................................................................ 44

Rachel Sandler, *Zuckerberg Criticizes Twitter For Fact-Checking Trump Tweets*, FORBES (May 27, 2020), https://www.forbes.com/sites/rachelsandler/2020/05/27/zuckerberg-criticizes-twitter-for-fact-checking-trump-tweets/#2aec97616f7a ................................................................................ 60

*Reliable, Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/reliable (last accessed Aug. 15, 2020)........................................... 79

*Reliable, Merriam-Webster.com*, Thesaurus, https://www.merriam-webster.com/thesaurus/reliable (last accessed Aug. 15, 2020)........................................... 80

Research Articles and Opinion pieces, Children's Health Defense, https://childrenshealthdefense.org/ category/news/childrens-health/ ..................................... 6

*Research Resources and Critiques*, CHILDREN'S HEALTH DEFENSE, https://childrenshealthdefense.org/advocacy-policy/critiques/ (last accessed Aug. 14, 2020) ................................................................................ 9

xvi

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

S. Keach, *Facebook's 5G fake news poses 'risk of immediate physical harm',
Zuckerberg warns*, IRISH SUN (May 21, 2020),
https://www.thesun.ie/tech/5453017/ facebook-5g-fake-news-mark-
zuckerberg-physical-harm-masts-burning/ ........................................................... 21

*Schiff Sends Letter to Google, Facebook Regarding Anti-Vaccine
Misinformation*, News/Press Releases, CONGRESSMAN ADAM SCHIFF (Feb.
14, 2019), https://schiff.house.gov/news/press-releases/schiff-sends-letter-to-
google-facebook-regarding-anti-vaccine-misinformation ..................................... 14

*Scientists call for Protection from Non-ionizing Electromagnetic Field Exposure*,
EMF SCIENTIST, https://www.emfscientist.org/index.php/emf-scientist-appeal
(last accessed Aug. 14, 2020) ............................................................................... 58

*Stipulated Order*, U.S.D.C. S.D. N.Y. No. 18-cv-03215 (JMF) (filed Jul. 9, 2018)
& *Press Release*, INFORMED CONSENT ACTION NETWORK (ICAN) (Jul. 13,
2018), https://www.icandecide.org/wp-content/uploads/2019/09/Stipulated-
Order-copy-1.pdf .................................................................................................. 52

*Students with Disabilities*, NATIONAL CENTER FOR EDUCATION STATISTICS (May
2020), https://nces.ed.gov/programs/coe/indicator_cgg.asp ................................. 53

Sundeep Rangan, Theodore S. Rappaport & Elza Erkip, *Millimeter-Wave
Cellular Wireless Networks: Potentials and Challenges*, PROCEEDINGS OF
THE IEEE | Vol. 102, No. 3, March 2014,
https://ecfsapi.fcc.gov/file/60001013329.pdf ...................................................... 55

Susanna N. Visser, MS et al., *Trends in the Parent-Report of Health Care
Provider-Diagnosed and Medicated Attention-Deficit/Hyperactivity
Disorder: United States, 2003–2011*, JOURNAL OF THE AMERICAN ACADEMY
OF CHILD & ADOLESCENT PSYCHIATRY, Volume 53 Number 1 (January
2014), https://jaacap.org/article/S0890-8567(13)00594-7/fulltext ....................... 53

T. Staton, *The top 10 pharma companies in social media*, FIERCEPHARMA,
https://www.fiercepharma.com/special-report/top-10-pharma-companies-
social-media-0 (last accessed Aug. 14, 2020) ...................................................... 27

The 5G Crisis: Awareness & Accountability," CHILDREN'S HEALTH DEFENSE
(Dec. 21, 2019), https://childrenshealthdefense.org/video/the-5g-crisis-
awareness-accountability/ ...................................................................................... 12

*The Chan Zuckerberg Biohub*: *Seeking to Cure All Diseases*, BIOLEGEND BLOG,
https://www.biolegend.com/ja-jp/blog/the-chan-zuckerberg-biohub-seeking-
to-cure-all-diseases (last accessed Aug. 15, 2020) ............................................... 65

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

*The Internet of Things will thrive on 5G technology*, VERIZON (Jun. 12, 2018),
https://www.verizon.com/about/our-company/5g/internet-things-will-thrive-
5g-technology.................................................................................................................. 67

Tiffany Hsu & Cecilia Kang, "*Morally Impossible*": *Some Advertisers Take a
Timeout From Facebook*, NEW YORK TIMES (Jun. 9, 2020),
https://www.nytimes.com/2020/06/09/business/media/facebook-advertisers-
trump-zuckerberg.html?searchResultPosition=2 .................................................. 62

Tom Taulli, *Facebook AI (Artificial Intelligence): Will M&A Help?*, FORBES
(Feb. 15, 2020),
https://www.forbes.com/sites/tomtaulli/2020/02/15/facebook-ai-artificial-
intelligence-will-ma-help/#104eed427664 .......................................................... 67

*United States Patent No. 10,356,024*, Kanter et al. (Moderating content in an
online forum), USPTO Patent Full-Text and Image Database, UNITED STATES
PATENT AND TRADEMARK OFFICE (Jul 16, 2019),
http://patft.uspto.gov/netacgi/nph-
Parser?Sect2=PTO1&Sect2=HITOFF&p=1&u=/netahtml/PTO/search-
bool.html&r=1&f=G&l=50&d=PALL&RefSrch=yes&Query=PN/10356024
(last accessed Aug. 15, 2020) .............................................................................. 40

*Up-to-date, Merriam-Webster.com*, https://www.merriam-
webster.com/dictionary/up-to-date (last accessed Aug. 15, 2020) ....................... 80

*Up-to-date, Merriam-Webster.com*, Thesaurus, https://www.merriam-
webster.com/thesaurus/up-to-date (last accessed Aug. 15, 2020) ........................ 80

*Vaccine Injury Compensation Program: Addressing Needs and Improving
Practices, Sixth Report by the Committee on Government Reform*, Union
Calendar No. 575, 106th Congress, 2d Session, House Report 106–977,
HOUSE COMMITTEE ON GOVERNMENT REFORM HEARINGS (Oct. 12, 2000),
https:///www.congress.gov/106/crpt/hrpt977/CRPT-106hrpt977.pdf .................. 52

*Vaccine Misinformation: Statement by WHO Director-General on Facebook and
Instagram*, WORLD HEALTH ORGANIZATION (Sept. 4, 2019),
https://www.who.int/news-room/detail/04-09-2019-vaccine-misinformation-
statement-by-who-director-general-on-facebook-and-instagram ............................ 19, 25, 70

*Vaccines Market - Global Forecast to 2024*, MARKETSANDMARKETS (January
2020), https://www.marketsandmarkets.com/Market-Reports/vaccine-
technologies-market-1155.html .......................................................................... 54

*Vaccines Market Size, Share & Industry Analysis, 2020-2027*, FORTUNE
    BUSINESS INSIGHTS, https://www.fortunebusinessinsights.com/industry-
    reports/vaccines-market-101769 (last accessed Aug. 14, 2020)..........................54

Vann. R. Newkirk II, *Is the CDC Losing Control?*, THE ATLANTIC (Feb. 3,
    2018), https://www.theatlantic.com/politics/archive/ 2018/02/cdc-scandal-
    preparedness-budget/552200/ ..........................................................54

*Who pays for PolitiFact?*, POLITIFACT (last updated June 2020),
    https://www.politifact.com/who-pays-for-politifact/ ............................8

**Miscellaneous Authorities**

2 J. Story, Commentaries on the Constitution of the United States,
    § 1882 (5th ed. 1891) ..........................................................2

50 Am. Jur. 2d, § 455 ..........................................................84

Bill of Rights ..........................................................2

*Black's Law Dictionary* 1421 (5th ed. 1979) ............................76

Constitution of World Health Organization, Article 71 ....................19, 69

Executive Order on Preventing Online Censorship, § 2 (a) ..................86

F. Siebert, *Freedom of the Press in England* 1476-1776 (1965) ............2

Facebook's Terms of Service ..........................................................6
    ¶ 1 ..........................................................13
    ¶ 3(1) ..........................................................13
    ¶ 3(2)(1) ..........................................................13
    ¶ 3(2)(3) ..........................................................13
    ¶ 4(3) ..........................................................13
    ¶ 3(2)(1) ..........................................................13

Institute of Medicine, *Adverse Events Associated with Childhood Vaccines:
    Evidence Bearing on Causality* (1994) ............................50

L. Levy, *Emergence of a Free Press* 6 (1985) ............................2

RESTATEMENT (2D) OF TORTS § 563(d) ..........................................78

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

ROGER I. TEICH
California State Bar No. 147076
290 Nevada Street
San Francisco, CA 94110
Telephone:  (415) 948-0045
E-Mail Address:  rteich@juno.com

ROBERT F. KENNEDY, JR.
MARY HOLLAND
Children's Health Defense
1227 North Peachtree Parkway, Suite 202
Peachtree City, GA 30269
Telephone:  (917) 743-3868
E-Mail Address:  mary.holland@childrenshealthdefense.org

Attorneys for Plaintiff
CHILDREN'S HEALTH DEFENSE

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| CHILDREN'S HEALTH DEFENSE, a Georgia non-profit organization, | |
| Plaintiff, | Case No. _____ |
| v. | **VERIFIED COMPLAINT** |
| FACEBOOK, INC., a Delaware corporation; MARK ZUCKERBERG, a California resident; SCIENCE FEEDBACK, a French corporation; POYNTER INSTITUTE, a Florida corporation; POLITIFACT, a Florida-corporation; and DOES 1-20, | **1) FIRST AND FIFTH AMENDMENTS (*BIVENS*);** **2) LANHAM ACT (15 U.S.C. § 1125(a));** **3) RICO FRAUD (18 U.S.C. § 1962);** **4) DECLARATORY RELIEF.** |
| Defendants. | **JURY TRIAL DEMAND** |

1

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

Plaintiff Children's Health Defense, by and through its undersigned attorneys, sues defendants Facebook, Inc., Mark Zuckerberg, Science Feedback, Poynter Institute, Politifact, and Does 1-20, and for its Complaint alleges on personal information as to itself and on information and belief as to all other things:

## **INTRODUCTION**

1.      This is a case about how an officer and an agency within the U.S. Government "privatized" the First Amendment by teaming up with Facebook to censor speech which, under the Bill of Rights, the Government cannot censor. In February 2019, Democratic Congressman Adam Schiff (D-CA) threatened to introduce legislation to remove Facebook's immunity under Section 230 of the Communications Decency Act unless Facebook implemented algorithms to "distinguish" and suppress "vaccine misinformation" and advertising. The Centers for Disease Control and Prevention ("CDC") and, under its aegis, the World Health Organization ("WHO") then collaborated at length with Facebook to suppress vaccine safety speech with a "warning label" and other notices that appear to flag disinformation, but in reality censor valid and truthful speech, including speech critical of those agencies and their policies. A judicial remedy is urgently required to redress that system of prior restraint which will otherwise go unredressed.

2.      In 17th-century England, government controlled speech through its monopoly on printing presses. *See* L. Levy, *Emergence of a Free Press* 6 (1985). The first newspapers were also met by licensing prosecutions of unlicensed news-sheet printers and the power of the crown to grant privileges of monopoly. *See* F. Siebert, *Freedom of the Press in England* 1476-1776 (1965); *see also* 2 J. Story, Commentaries on the Constitution of the United States, § 1882 (5th ed. 1891). Indeed, "history discloses a persistent effort on the part of the British government to prevent or abridge the free expression of any opinion which seemed to criticize or exhibit in an unfavorable light, however truly, the agencies and operations of the government." *Grosjean v. American Press Co.*, 297 U.S. 233, 245 (1936).

3.      Here, government actors *actively partnered* with one of today's leading "printing presses" (Facebook) to censor Plaintiff's speech critical of government policy. The framers were familiar with the English struggle and enacted the First Amendment to establish and preserve the right of the People to full information about the doings or misdoings of their government. *Grosjean*, 297 U.S. at 247-49. This case mirrors the framers' concerns. The government cannot accomplish indirectly what the Constitution forbids it to do directly.

4.      This is also a case of corporate fraud against Facebook and its Chairman Mark Zuckerberg, *inter alia*, for their smear campaign against Plaintiff consisting of false content that Facebook itself created, as well as knowingly false suggestions, and other acts of fraud and deception on or concerning Plaintiff's Facebook page. At a time when the social media platform and its creator claim to be exponents of free expression and the scientific method for discovering truth, this case reveals the opposite: that they are indeed censors, and opponents of real science and open debate.

5.      Children's Health Defense ("CHD") and its founder Robert F. Kennedy, Jr. ("RFK, Jr.") have built CHD's good name and reputation as a public health advocate for complete candor as to both the risks of environmental toxins, vaccines, 5G and wireless networks, and the conflicts of interest in government oversight of those products and services. Plaintiff's online reputation is important to its standing as a preeminent leader in the health reform movement. CHD seeks $5 million or more in treble and punitive damages against the Facebook defendants for their deliberate use of the "known lie" to damage Plaintiff's reputation and organization.

6.      Facebook promotes itself as a social media website with 214 million users in the United States and 2.2 billion worldwide. Of course, Facebook is not cost-free. The user incurs the cost of having its information mined and shared. *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1037 (N.D. Cal. 2019). Less well-known are Facebook's efforts as a seller of pharmaceutical ads,  purveyor of global 5G and wireless networks and services, and developer of vaccines. Facebook promotes itself as a service for people "to talk openly about the issues that matter to them, even if some may disagree or find them objectionable." *Community*

*Standards*, FACEBOOK, https://www.facebook.com/communitystandards/ (last visited Aug. 14, 2020). It does not say that it will censor and falsely disparage opposing viewpoints of the health risks of *those products and technologies* through material misrepresentation and blatant falsehood. Here, defendants' big lie is that Plaintiff's page contains "false information" that poses a "risk of imminent violence or physical harm." Nothing could be further from the truth.

7.      This case arises in a pandemic when the need for public debate on health issues has never been greater. CHD's vision is a world free of childhood chronic health conditions caused by environmental exposures. Plaintiff highlights harms associated with the current vaccine program, pesticides, and deployment of 5G and other wireless technologies. Zuckerberg's professed "moon shot mission" is "to cure all disease on the planet within the Facebook chairman's children's lifetimes." Yet, defendants' first giant leap for humankind is to censor CHD's viewpoint which competes with Facebook's business plan for pharmaceutical ad revenue, vaccine development, and 5G and wireless networks. One may question on that basis the sincerity of their vision in this and all things.

8.      Since September 2019, Facebook and Zuckerberg have falsely denigrated CHD through a "warning label" on CHD's page, which conveys a classic false imputation of dishonesty in CHD's trade. Since March 2019, with increasing frequency, Facebook and its affiliated "fact-checkers" (their Orwellian term) have published "false information" tags on CHD's page, which materially misrepresent the accuracy of CHD's own content.

9.      CHD seeks a potent remedy as antitoxin to Facebook's toxic use of the "known lie [which is] at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected." *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964) ("calculated falsehood [is] no essential part of any exposition of ideas"); *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting) ("The ultimate good desired is better reached by free trade in ideas -- … the best test of truth is the power of the thought to get itself accepted in the competition of the market").

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

10.     In *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735-36 (2017), Justice Kennedy wrote of the potential harm that users of social media sites like Facebook can do, but his words ring true of the "mastermind" of that platform:

> In short, social media users employ these websites to engage in a wide array of protected First Amendment activity on topics "as diverse as human thought." [. . .] While we now may be coming to the realization that the Cyber Age is a revolution of historic proportions, we cannot appreciate yet its full dimensions and vast potential to alter how we think, express ourselves, and define who we want to be. [. . .] the Court must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks in that medium. [. . .] *For centuries now, inventions heralded as advances in human progress have been exploited by the criminal mind. New technologies, all too soon, can become instruments used to commit serious crimes.* [. . .] *So it will be with the Internet and social media.*

*Id.* at 1735-36 (emphases added). Now comes this case to fulfill Justice Kennedy's prediction, but with an unexpected twist. One of the titans of the internet age has exploited that new technology as an instrument to commit fraud and censorship.

## JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over all defendants because they conducted business with and injured Plaintiff in this District. Facebook itself is headquartered within the District, which is also where the individual and at least some of the Doe defendants reside.

12.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), § 1332(a) (complete diversity of the parties, and the amount in controversy exceeds $75,000), § 2201 (declaratory relief), and § 2202 (further relief). The action asserts continuing violations of the First and Fifth Amendments, 18 U.S.C. §§ 1964(a), (c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and 15 U.S.C. § 1125(a) (Lanham Act), and there is an actual case or controversy.

13.     Venue is proper under 18 U.S.C. §1965(a) and 28 U.S.C. § 1391(b) because defendants transacted a substantial portion of their affairs and caused damages in this district.

Moreover, Facebook's Terms of Service ("Terms") to which Plaintiff agreed require that disputes be resolved in this forum and that the laws of the State of California apply. Terms at ¶ 4(4).

## PARTIES AND RELATED ENTITIES

14.     Plaintiff Children's Health Defense is a not-for-profit 26 U.S.C. § 501(c)(3) membership organization incorporated under the laws of the State of Georgia, and headquartered at 1227 North Peachtree Parkway, Suite 202, Peachtree City, Georgia 30269. CHD was founded in 2015 (under a different name) to educate the public about the risks and harmful effects of chemical exposures upon prenatal and children's health, including from particular vaccines and environmental health hazards, such as 5G and wireless networks and products, and to advocate for social change both legislatively and through judicial action. The organization is run by RFK, Jr. and a team comprised largely of mothers whose children suffered serious adverse events after vaccination.

15.     As a publisher of information related to public health and reform, CHD operates the https://childrenshealthdefense.org website, and publishes, *inter alia*, a "weekly wrap up" with research articles and opinion pieces available at https://childrenshealthdefense.org/ category/news/childrens-health/. As set forth more fully *infra*, CHD and its founder and chairman Robert F. Kennedy, Jr. are not "anti-vaccine." Rather, they advocate for informed patient consent based on full disclosure of all relevant medical information. CHD receives all of its support from contributions, membership fees, and gross receipts from activities related to its tax-exempt functions. In Tax Year 2018, CHD reported $1,063,837 in gifts, grants, contributions, and membership fees received. CHD's primary sources of revenue derive from membership dues and donations that CHD solicits on its website and, formerly, on its Facebook page. In addition to that monetary interest, attracting visitors to the CHD website and its Facebook page enables CHD and RFK, Jr., CHD's contributors, and its readers to associate and engage in speech on matters of mutual concern. CHD has standing to bring suit as an injured "person" under 18 U.S.C. § 1964(c).

16.     Defendant Facebook, Inc. is a Delaware corporation, with its principal place of business in Menlo Park, California. Sometime in or around 2017, CHD executed Facebook's Terms in order to establish and maintain CHD's Facebook page as a central clearinghouse for CHD's public health newsgathering and advocacy activities, and as a fundraising platform.

17.     Defendant Mark Zuckerberg is a co-founder of Facebook, Inc., and at all times relevant hereto, has served as Facebook's chairman, chief executive officer, and controlling shareholder. He resides in the Northern District of California and is a "person" who may be sued under 18 U.S.C. § 1961(3).

18.     According to Facebook's 2017 Proxy Statement:

> Because Mr. Zuckerberg controls a majority of our outstanding voting power, we are a "controlled company" under the corporate governance rules of the NASDAQ Stock Market LLC (NASDAQ). Therefore, we are not required to have a majority of our board of directors be independent, nor are we required to have a compensation committee or an independent nominating function. In light of our status as a controlled company, our board of directors has determined not to have an independent nominating function and to have the full board of directors be directly responsible for nominating members of our board.

19.     According to its 2018 Proxy Statement, defendant Zuckerberg has the sole power to elect or remove any director from Facebook's Board, as he controls a majority (53.3%) of Facebook's total voting shares. Zuckerberg directs and controls Facebook's business and is personally responsible for the damages caused by his individual and controlled entities' misconduct as set forth herein. Facebook and its related "fact-checker" entities are also sued under principles of alter ego and *respondeat superior* liability.

20.     Defendant Science Feedback is a French non-profit organization to which Facebook donates, and which Facebook has specifically engaged as a "fact-checker" to flag selected content on CHD's Facebook page as "false information," insert oppositional articles in its place on CHD's page, and divert users from CHD's own content on that false basis.

21.     Defendants The Poynter Institute for Media Studies ("Poynter"), and its wholly-owned subsidiary Politifact, are Florida non-profit organizations which Facebook has engaged

as an additional "fact-checker" to flag selected content on CHD's Facebook page as "false information," insert oppositional articles in its place on CHD's page, and divert users from CHD's own content on that false basis. Facebook is a major donor to both Poynter and Politifact. *Largest funders of Poynter*, POYNTER (last updated June 2020), https://www.poynter.org/major-funders/; *Who pays for PolitiFact?*, POLITIFACT (last updated June 2020), https://www.politifact.com/who-pays-for-politifact/.

22.    The Facebook corporate and individual defendants conspired with one another, and others as yet unknown at Facebook, or elsewhere (the "Doe defendants") in an informal enterprise (the "content management enterprise") to accomplish their common purposes. Each of them was acting within the course and scope of that conspiracy, agency, partnership, or joint venture. The acts and conduct of each of the defendants were known to and authorized by, or ratified by, the other defendants.

23.    The informal enterprise operated by defendants had an ascertainable structure separate and apart from the pattern of racketeering activity in which the defendants engage, and from Facebook, Science Feedback, Poynter or Politifact, which are joined as corporate defendants. The informal enterprise operated within one or both of those related structures as an "enterprise" with a common purpose, structure or organization, and open-ended lifespan necessary to accomplish their joint purposes to defraud CHD, destroy its reputation and fundraising, and blunt the impact of its public health education and advocacy efforts.

## STATEMENT OF MATERIAL FACTS

### A.    CHD's Interest in Vaccine and 5G and Wireless Network Safety.

24.    Robert F. Kennedy, Jr. is the founder and Chairman of the Board of CHD. For over three decades, RFK, Jr. has been one of the world's leading environmental advocates. He is the founder and past president of Waterkeeper Alliance, the umbrella group for 300 local waterkeeper organizations, in 34 countries, that track down and sue polluters. Under his leadership, Waterkeeper has grown to become the world's largest clean water advocacy organization. RFK, Jr. founded CHD, in part, to address a void in scientific studies of, and

1  reform advocacy about, the environmental causes of pediatric neuro-developmental disorders
2  and food allergies.

3      25.    Since its founding, CHD has become a leading independent child health
4  protection and advocacy group. CHD fulfills a vital mission to provide the public with timely
5  and accurate vaccine and 5G and wireless technology safety information, particularly in the
6  absence of any appreciable ongoing HHS or CDC research, any congressional oversight to
7  "reduce the risks of adverse reactions to vaccines," or any reliable pharmaceutical industry
8  research, or private tort remedy. *See infra*. CHD's reputation depends on the credibility of its
9  science-based research articles, which explore both the known and presently-unknown public
10  health risks of vaccines and 5G and wireless technology, in the quest for objective truth.

11     26.    CHD's mission is threefold: to end childhood epidemics by eliminating harmful
12  toxic exposures; to hold those accountable who knowingly allow children to be unnecessarily
13  exposed to dangerous toxins that destroy their health; and to establish greatly-needed
14  safeguards to prevent the devastation to children and families that these chronic illnesses cause.
15  CHD advocates for open and honest public debate on the efficacy and safety of the CDC's
16  entire Child and Adolescent Immunization Schedule. CHD helps the public navigate the
17  "clutter" of the internet age by posting reliable and up-to-date content for its web traffic
18  viewers. Specifically, CHD publishes articles on its website on a weekly (or more frequent)
19  basis, which describe current scientific research on the potential health risks posed by various
20  environmental toxins, new technologies, and vaccines.

21     27.    CHD's science-review articles contain hyperlinks to the referenced peer-
22  reviewed, published journals. See, generally, *Research Resources and Critiques*, CHILDREN'S
23  HEALTH DEFENSE, https://childrenshealthdefense.org/advocacy-policy/critiques/ (last accessed
24  Aug. 14, 2020). CHD prominently labels opinion pieces as such. CHD's website also contains
25  a drop-down menu under the tag "Research" with links to its "Science Library." CHD's
26  "Science Library" features a searchable database with hundreds of peer-reviewed, published
27  articles on environmental contaminants, inter alia, of commercial vaccines, some of which

28

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* **et al.**

have been implicated in the rise of chronic illnesses and developmental disorders among at-risk children. All abstracts are tagged with keyword links to cross-reference topics.

28.     CHD's website also prominently features an "Advocacy/Policy" section down its right-hand column with hyperlinks to seven headers, the first and most prominent of which reads "CDC – Corruption, Deceit, and Cover-Up." That header contains the following preamble:

> With the global vaccine market now at tens of billions of dollars, vaccine safety should be of utmost concern to the Centers for Disease Control (CDC). But instead, rather than testing and monitoring the health effects of vaccines and patient injuries truthfully to the American public and making critical and necessary corrections in the program, *the CDC has become a mouthpiece for industry and has protected the 'all vaccines for all children' policy despite peer-reviewed science to the contrary.*
>
> According to a UPI Investigative article written in the early 2000s, the CDC owned at least 28 vaccine patents. They are also in charge of vaccine promotion (getting the public to take vaccines) and vaccine safety. The CDC, like other large bureaucratic agencies, also has a revolving door to industry that comes with *inherent conflicts of interests.* Common sense should have told us that this system was doomed to fail.
>
> The documents below, some of which were obtained by the Freedom of Information Act (FOIA) show *a pattern of deceit* perpetrated by the CDC on the American public and world stage for over 25 years. *The Children's Health Defense believes that vaccine safety should be taken from the CDC.*

29.     CHD's website also contains hyperlinks to numerous articles that criticize the CDC and challenge its veracity, with illustrative titles such as: "CDC's Vaccine "Science" — A Decades-Long Trail of Trickery"; "Why You Can't Trust the CDC on Vaccines"; "CDC and WHO Corrupt Financial Entanglements with the Vaccine Industry"; "Dr. Brian Hooker's Official Statement Regarding Vaccine Whistleblower William Thompson"; "CDC & FDA Committee Members Have Financial Conflict of Interest with Vaccine Pharmaceuticals";

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

1    "OSC Calls for Further Review of Whistleblower Disclosures on Zika Testing"; "CDC Spider
2    Letter"; "CDC: Off Center"; "Real-Life Data Show that the CDC Vaccine Schedule is Causing
3    Harm"; "Don't Fall for the CDC's Outlandish Lies About Thimerosal"; "CDC and WHO
4    Corrupt Financial Entanglements with the Vaccine Industry"; "CDC Lies About, and Media
5    Repeats, Risk of Dying from Measles"; "CDC's 'Universal' Recommendations for Infant Hep
6    B Vaccine Not Based on Science, But Assumptions"; "CDC's Infant Hep B Vaccine
7    Recommendations—No Proof of Safety?" *See*, *e.g.*, *CDC and WHO Corrupt Financial*
8    *Entanglements with the Vaccine Industry* [and other articles], CHILDREN'S HEALTH DEFENSE,
9    https://childrenshealthdefense.org/cdc-who/ (last accessed Aug. 14, 2020).

10          30.     Before publishing its science review articles in its "Kennedy News & Views"
11   electronic weekly newsletter, CHD conducts an internal editorial process genuinely to fact-
12   check the text and confirm the cited sources, to ensure that every article cites sources for every
13   fact it asserts. Otherwise, CHD publishes the article as a clearly-labeled editorial or opinion
14   piece, where the opinions expressed are not necessarily the opinions of CHD. Once approved,
15   the article is slotted into the publishing schedule, with layout on the CHD website, image
16   design, and publication on the website in designated categories (e.g., child health, toxins), and
17   layout in the newsletter template for emailing subscribers. CHD checks the accuracy of the
18   article again before emailing it to CHD subscribers, then alerts its affiliated organizations that
19   the article has published, and finally, CHD posts the article on its Facebook page, Twitter,
20   Instagram, and YouTube (when applicable).

21          31.     The CHD website offers for sale through its online store, inter alia, copies of
22   James Ottar Grundvig's book, "Master Manipulator: The Explosive True Story of Fraud,
23   Embezzlement, and Government Betrayal at the CDC," which is described on CHD's website
24   as "a true story of fraud and betrayal, and an insider's view of what takes place behind the
25   closed doors of agencies and drug companies, and with the people tasked to protect the health
26   of American children. It's a cautionary tale of the dangers of blind trust in the government and
27   the health-care industry." *Master Manipulator: The Explosive True Story of Fraud,*
28   *Embezzlement, and Government Betrayal at the CDC*, Store, CHILDREN'S HEALTH DEFENSE,

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

1  https://childrenshealthdefense.org/store/master-manipulator-the-explosive-true-story-of-fraud-
2  embezzlement-and-government-betrayal-at-the-cdc/ (last visited Aug 14, 2020).

3      32.    Similarly, CHD's "5G and Wireless Harms Project" publishes links to articles
4  and videos on CHD's website, which describe the health risks of 5G and wireless networks and
5  products, and CHD's advocacy efforts to secure a moratorium on 5G development pending
6  further scientific research and consensus on that issue. *See, e.g.*, "The 5G Crisis: Awareness &
7  Accountability," Thermal and non-thermal health effects of low intensity non-ionizing
8  radiation: An international perspective ," "Resistance to 5G: Roadblock to a High Tech Future
9  or Warning of a Serious Health Risk?" "What You Should Know About 5G Satellites: How
10  Musk' Sci-Fi Dreams Are Becoming Our Living Nightmare," "5G AirGig: What is It and
11  Should You Be Worried?" "5G/Electromagnetic Fields / Wireless Technologies," "Scientists
12  warn of potential serious health effects of 5G," "Six Italian Courts Have Ruled that Cell
13  Phones Cause Brain Tumors," "The 5G Crisis: Awareness & Accountability," CHILDREN'S
14  HEALTH DEFENSE (Dec. 21, 2019), https://childrenshealthdefense.org/video/the-5g-crisis-
15  awareness-accountability/. CHD uses a review process comparable to that described *supra* to
16  fact-check these articles and publish them as peer-reviewed research or labeled opinion, where
17  appropriate. Significantly, CHD also publishes commentary debunking vaccine and 5G-
18  hypotheses for which CHD has found no credible scientific evidence. *See, e.g.*, D. Tachover,
19  *CHD Statement on 5G and Coronavirus*, CHILDREN'S HEALTH DEFENSE (Apr. 10, 2020),
20  https://childrenshealthdefense.org/news/chd-statement-on-5g-and-coronavirus/.

21      **B.    CHD's Facebook Page.**

22      33.    On or about November, 2017, CHD agreed to Facebook's Terms to create, and
23  has since actively maintained, its Facebook page. CHD did so to broaden its internet visibility
24  and reach, make its online library more widely-accessible, and increase its fundraising
25  platform. CHD has a current Facebook community of approximately 122,830 followers. CHD
26  uploads articles or video posts from the CHD website to its Facebook page on a daily (or more
27  frequent) basis, along with other articles or video posts, and hyperlinks to CHD's archived
28  articles of interest to its community. A follower or visitor to CHD's Facebook page can readily

VERIFIED COMPLAINT
*Children's Health Defense v. Facebook* et al.

search the "posts" archive and retrieve all of CHD's present and past articles concerning, inter alia, the CDC's conflicts, errors, and omissions.

34.     As set forth *infra*, CHD did not use its Facebook page to post any content that breached Facebook's terms or community standards or was otherwise "unlawful, misleading, discriminatory or fraudulent." Terms at ¶ 3(2)(1).

35.     Under Section 1 of its adhesion contract Terms, Facebook describes its products and services to include, inter alia, "[to] empower you to express yourself and communicate about what matters to you" and one of those ways to "express yourself" is "adding content to your profile." Of its many reserved rights, Facebook notably does *not* retain the right to create or add its own content to a user's page, except for a specified reservation for "ads, offers, and other sponsored content [. . .] which [o]ur partners pay us to show [] to you." In Section 3(1), Facebook reiterates that the user "own[s] the content that [the user] create[s] and share[s] on Facebook[.] [. . .] and nothing in these Terms takes away the rights that [user] have to [their] own content." In Section 4(3), Facebook reiterates that "[w]e do not control or direct what people and others do or say, and we are not responsible for their actions or conduct (whether online or offline) or any content that they share (including offensive, inappropriate, obscene, unlawful and other objectionable content.").

36.     With respect to "harmful conduct," Facebook's Terms permit it to "detect misuse of [its] Products, harmful conduct towards others and situations where [it] may be able to help support or protect [its] community." Facebook retains limited rights, e.g., "offering help, removing content, blocking access to certain features, disabling an account or contacting law enforcement[.] [and] shar[ing] data with other Facebook companies when [it] detect[s] misuse or harmful conduct[.]" Here, too, Facebook does not reserve or retain the right to create its own content on a user's page. Terms ¶¶ 1, 3(2)(3).

37.     Facebook's Terms purport to limit Facebook's liability "to the fullest extent permitted by applicable law." Terms ¶ 4(3). The "applicable law" is California Civil Code section 1668, which establishes that "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the

1  person or property of another, or violation of law, whether willful or negligent, are against the

2  policy of the law."

3  **C.   Defendant's Scheme to Defraud.**

4      **1.   Overview.**

5      38.   On February 14, 2019, Rep. Schiff wrote a public letter to defendant Zuckerberg

6  "[a]s a Member of Congress who is deeply concerned about declining vaccination rates around

7  the nation," pointedly asking that Facebook implement algorithms to identify, censor and

8  remove so-called "vaccine misinformation." *Schiff Sends Letter to Google, Facebook*

9  *Regarding Anti-Vaccine Misinformation*, News/Press Releases, CONGRESSMAN ADAM SCHIFF

10 (Feb. 14, 2019), https://schiff.house.gov/news/press-releases/schiff-sends-letter-to-google-

11 facebook-regarding-anti-vaccine-misinformation. The term "vaccine misinformation" (as Rep.

12 Schiff intended, and Facebook implemented it) is a euphemism for any expression of

13 skepticism toward government and industry pronouncements about vaccine safety and

14 efficacy, regardless of whether that expression is true or not. The term "vaccine

15 misinformation" does not, for example, include erroneous, misinformed or fraudulent

16 statements made by pharmaceutical companies, or the CDC, to promote vaccines.

17     39.   On information and belief, Zuckerberg met personally with Rep. Schiff

18 subsequently to discuss, *inter alia*, Facebook's response to Rep. Schiff's February 14, 2019

19 public letter and press release. At the same time and subsequently, in his role as Chairman of

20 the House Intelligence Committee, Rep. Schiff stated publicly that Congress could or should

21 "make changes to" the law that does not currently hold social media companies liable for third-

22 party content on their platforms. *See, e.g., Hearing by Congress on "deepfakes" and artificial*

23 *intelligence* [Video], GUARDIAN NEWS (June 13, 2019),

24 https://www.youtube.com/watch?v=lArPEDS0GTA. Rep. Schiff told reporters that, "if the

25 social media companies can't exercise a proper standard of care when it comes to a whole

26 variety of fraudulent or illicit content, then we have to think about whether that immunity still

27 makes sense. These are not nascent industries or companies that are struggling for viability;

28 they're now behemoths, and we need them to act responsibly." K. Waddell, *A new attack on*

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

1  *social media's immunity*, AXIOS (June 13, 2019), https://www.axios.com/social-media-
2  immunity-section-230-f15ac071-32e9-4e33-81e6-4c7ebadaea5e.html.

3      40.    On March 4, 2019, Lyn Redwood, CHD President, sent a 9-page letter to
4  defendant Zuckerberg in rebuttal of Representative Schiff's letter. Because it is so germane to
5  Plaintiff's claims, the letter is quoted extensively here, and attached to this Complaint as
6  Exhibit "A." CHD's letter explains its position with respect to vaccine safety and Facebook's
7  role as content moderator, as follows:

> We, too, are highly concerned that the public is being misinformed
> about vaccines, and we agree that Facebook could play a positive
> role in helping to resolve this problem. *But we strongly disagree
> that the means by which Facebook can do so is by preventing users
> from seeing information that calls into question government
> policies related to vaccinations. On the contrary, the means by
> which Facebook can help empower people to make an informed
> choice is to facilitate a free market of ideas and let users determine
> for themselves the value of content that appears in their newsfeeds.*
>
> [Representative Schiff's] true criterion for determining what
> information constitutes a "threat" is not whether it is truthful and
> accurate, but whether or not it accords with the goal of achieving
> high vaccination rates. [. . .] an implicit assumption underlying Mr.
> Schiff's criterion for determining what constitutes
> "misinformation" is that the CDC is infallible in its vaccine
> recommendations. We emphatically disagree and must reject this
> assumption as totally illogical and unscientific.
>
> Mr. Schiff would have you take steps to prevent "vaccine
> misinformation" from proliferating, but who is to decide what
> constitutes misinformation? Which party to the debate can claim a
> monopoly on truth? [. . .] Efforts to stifle discussion and debate
> about such an important issue constitute a serious threat to both our
> health and our liberty.
>
> The statement assumes that all vaccines are safe and effective for
> everybody, but what there is a scientific consensus about is that
> that is absolutely not true. Indeed, it is meaningless to treat
> "vaccines" as a product concept when speaking in terms of safety
> and effectiveness because each vaccine has a different profile.

15

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

There is a risk-benefit analysis that must be done for each one. Not all vaccines are considered safe. Not all are considered effective. In the scientific literature, there is a great deal of uncertainty and debate about the safety and effectiveness of individual vaccines, as well as their combined effects and the long-term consequences of vaccinating children according to the CDC's schedule.

[. . .]

*Increasingly, we are learning from scientific research that there are opportunity costs associated with vaccination.* [. . .] It is a great cause for concern that public health officials simply do not take such opportunity costs into consideration when formulating public vaccine policies.

In addition to disregarding the variable profile of each vaccine, Mr. Schiff's statement ignores the variability in children's responses to vaccinations. The risk-benefit must be conducted for each vaccine and for every individual child. Not every child is at the same risk from a given infectious disease. Not every child will have the same immune response to a vaccine intended to prevent that disease. And not every child is at the same risk of harm from the vaccine. That there are subpopulations of children who are at higher risk of being killed or permanently injured by vaccines is well recognized within the scientific community.

[. . .]

Unfortunately, the public health objective of achieving high vaccination rates is not necessarily conducive to the objective of improving public health, and the same cognitive dissonance evident in the FDA's remark is reflected in Mr. Schiff's objection to information being shared on Facebook that isn't conducive to the government's goal of persuading or coercing parents through mandates to strictly comply with the CDC's routine childhood vaccine schedule.

Certainly, to inform parents about this compensation program and the legal immunity for vaccine manufacturers might cause them to think twice about vaccinating their children. Contrary to Mr. Schiff's criterion, it does not follow that they shouldn't be informed.

16

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

[. . .]

The CDC itself is a leading purveyor of misinformation about vaccines. For example, a literature review by the prestigious Cochrane Collaboration on the safety and effectiveness of the influenza vaccine concluded that the fundamental assumptions underlying the CDC's universal flu shot recommendation are unsupported by the scientific evidence and, furthermore, that the CDC has deliberately misrepresented the science in order to support its policy.

[. . .]

So, if Facebook is going to start preventing the spread of vaccine misinformation, is it going to block links to pages from the CDC's website wherein such dangerously misleading claims are made?

[. . .]

To sum up, there is indeed a serious problem today with respect to the propagation of misinformation about vaccines, but there are no greater purveyors of vaccine misinformation than the government and corporate news media. *It is entirely inappropriate for elected government officials to be instructing media companies to censor criticism of entire categories of pharmaceutical products.*

[. . .]

Without prejudice to your company's right to determine your service's own terms of use, we believe that respect for this human right is the value that Facebook should be upholding, along with the right to informed consent, which is one of the most fundamental ethics in the practice of medicine.

A true and correct copy of the letter is attached as Exhibit "A" hereto. *Letter to Facebook*, CHILDREN'S HEALTH DEFENSE (March 4, 2019), https://childrenshealthdefense.org/wp-content/uploads/FINAL-CHD-Letter-to-Facebook-1.pdf (emphases added).

41. Nonetheless, Facebook conducted no investigation whatsoever to confirm or refute the material facts asserted in CHD's March 4, 2019 letter. Rather, Facebook determined

17

1    that the course of action Rep. Schiff actively encouraged – to act in concert with the CDC and

2    WHO -- would assist Facebook to avoid any legislative rollback of "service provider"

3    immunity from liability under the Communications Decency Act ("CDA"), 47 U.S.C.

4    § 230(c)(1). On March 7, 2019, Monika Bickert, Facebook's Vice President for Global Policy

5    Management, issued an online press release stating that:

6            We are working to tackle vaccine misinformation on Facebook by
             reducing its distribution and *providing people with authoritative*
7            *information on the topic.* We are starting by taking a series of steps:

8
             We will reduce the ranking of groups and Pages that spread
9            misinformation about vaccinations in News Feed and Search.
             These groups and Pages will not be included in recommendations
10           or in predictions when you type into Search.

11
             When we find ads that include misinformation about vaccinations,
12           we will reject them. We also remove related targeting options, like
             "vaccine controversies." For ad accounts that continue to violate
13           our policies, we may take further action, such as disabling the ad
             account.
14
             We won't show or recommend content that contains
15           misinformation about vaccinations on Instagram Explore or
16           hashtag pages.

17
             We are exploring ways to share educational information about
18           vaccines when people come across misinformation on this topic.

19
             **Update on April 26, 2019 at 10AM PT:** We may also remove
20           access to our fundraising tools for Pages that spread
21           misinformation about vaccinations on Facebook.

22
             How This Will Work
23
             Leading global health organizations, such as the World Health
24           Organization and the US Centers for Disease Control and
25           Prevention, have publicly identified verifiable vaccine hoaxes. If
             these vaccine hoaxes appear on Facebook, we will take action
26           against them.

27

28

18

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

> For example, if a group or Page admin posts this vaccine misinformation, we will exclude the entire group or Page from recommendations, reduce these groups and Pages' distribution in News Feed and Search, and reject ads with this misinformation.
>
> We also believe in providing people with additional context so they can decide whether to read, share, or engage in conversations about information they see on Facebook.We are exploring ways to give people more accurate information from expert organizations about vaccines at the top of results for related searches, on Pages discussing the topic, and on invitations to join groups about the topic. We will have an update on this soon.
>
> We are fully committed to the safety of our community and will continue to expand on this work.

*Combatting Vaccine Misinformation*, FACEBOOK, https://about.fb.com/news/2019/03/combatting-vaccine-misinformation (last visited Aug 14, 2020) (emphases added).

42.     On September 4, 2019, the WHO Director-General issued a public statement that it "welcomes the commitment by Facebook to ensure that users find facts about vaccines across Instagram, Facebook Search, Groups, Pages and forums where people seek out information and advice. *Facebook will direct millions of its users to WHO's accurate and reliable vaccine information in several languages, to ensure that vital health messages reach people who need them the most. The World Health Organization and Facebook have been in discussions for several months to ensure people can access authoritative information on vaccines and reduce the spread of inaccuracies on Facebook and Instagram.*" *Vaccine Misinformation: Statement by WHO Director-General on Facebook and Instagram*, WORLD HEALTH ORGANIZATION (Sept. 4, 2019), https://www.who.int/news-room/detail/04-09-2019-vaccine-misinformation-statement-by-who-director-general-on-facebook-and-instagram (emphases added).

43.     At all times relevant hereto, the United States was a member of the WHO, a United Nations specialized agency. Notably, under Article 71 of its Constitution, the WHO may only consult and cooperate with non-governmental national organizations *with the consent*

*of the Government concerned.  Basic Documents*, WORLD HEALTH ORGANIZATION (49th Ed. 2020), https://apps.who.int/gb/bd/pdf_files/BD_49th-en.pdf#page=1.

44.     The same day, September 4, 2019, that the WHO publicly lauded its close collaboration with Facebook to "ensure people can access authoritative information [] and reduce the spread of inaccuracies," Facebook published a "Warning Label" in bold black letters at the top of CHD's Facebook page, which states:

> **This Page posts about vaccines**
>
> **When it comes to health, everyone wants reliable, up-to-date information. The Centers for Disease Control (CDC) has information that can help answer questions you may have about vaccines.**
>
> **Go to CDC.gov**

45.     Both before and after September 4, 2019, Facebook also implemented a "fact-checking" campaign concerning content on Plaintiff's page, in further coordination with the CDC and WHO, designed to materially misrepresent Plaintiff's content. Thus, Facebook killed two birds with one stone: Facebook delivered what Rep. Schiff had forcefully requested — the "vaccine misinformation" campaign — which in turn would help it achieve the continued preservation of its desired Section 230 immunity. At the same time, Rep. Schiff's demand provided Facebook with cover for its own ulterior business motives, and pretext to launch its own fraudulent scheme to cause reputational harm and financial loss to CHD, and illicit gain to Facebook, by means of false representations and knowingly false suggestions. For Zuckerberg and the other defendants, this was a classic "win-win" proposition.

46.     In perpetrating its fraud scheme, Facebook's modus operandi was to treat any information that does not advance the CDC and WHO's policy goal of maintaining or increasing vaccination rates as "false," "fake," "misinformation," or "hoax," irrespective of its objective truth or the fact that it constitutes or qualifies as opinion. Facebook treats even the view that parents have a right to informed consent, one of the most fundamental ethics in medicine, as censorable "misinformation." Any information related to the risks of vaccination,

no matter how well-grounded in science, is labeled and censored as "misinformation." Facebook then trained its technical means and methods on identifying and eliminating all such content under the banner of "falsity." By contrast, Facebook broadly incorporates and promotes the CDC and WHO's policy pronouncements on these issues as established "fact." *Combatting Vaccine Misinformation*, FACEBOOK, *supra*, https://about.fb.com/news/2019/03/combatting-vaccine-misinformation.

47.    Merriam-Webster's Dictionary defines "misinformation" as "incorrect or misleading information," and defines "information" as "(1) knowledge obtained from investigation, study, or instruction; (2) intelligence, news; (3) facts, data." *Information, Merrian-Webster.com*, https://www.merriam-webster.com/dictionary/information (last accessed Aug. 14, 2020). Facebook's charge that Plaintiff's content is "false information" conveys to third-party users that it is demonstrably, provably false.

48.    Additionally, on May 21, 2020, Zuckerberg reportedly stated that "misleading conspiracy theories around 5G on Facebook pose a risk of immediate physical harm" and that his Facebook "team is working urgently to remove dangerous and deadly 'fake news' posts about 5G." He added that, "5G misinformation [] has led to some physical damage of 5G infrastructure. So we believe that that is leading to imminent risk of physical harm. We take down that content." S. Keach, *Facebook's 5G fake news poses 'risk of immediate physical harm', Zuckerberg warns*, IRISH SUN (May 21, 2020), https://www.thesun.ie/tech/5453017/facebook-5g-fake-news-mark-zuckerberg-physical-harm-masts-burning/. In other words, Facebook takes the position that incidents of protestors (who have no connection with CHD) burning telephone poles with 5G transmitters constitutes an "imminent risk of physical harm" sufficient to warrant blocking CHD's 5G safety content, irrespective of its truth. Thus, for Zuckerberg's own profit, caprice, or ill will, *see infra*, Facebook untethers the "clear and present danger" standard from any recognizable mooring in the First Amendment. *See, e.g.*, *Bridges v. California*, 314 U.S. 252, 263 (1941) (Black, J.) ("What finally emerges from the "clear and present danger" cases is a working principle that the substantive evil must be

*extremely serious* and the degree of imminence *extremely high* before utterances can be punished.").

49.     Facebook has an undoubted right "to control its own product, and to establish the terms with which its users, application developers, and advertisers must comply in order to utilize this product." *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1076 (S.D. Cal. 2016). But, here, even Facebook cannot avoid liability for provable injury to Plaintiff's property rights and intangible assets based on fraud and misrepresentation. *See, e.g.*, *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1166 (9th Cir. 2008) (en banc) (service provider may be liable where it makes answering discriminatory questions a condition for doing business on its site).

50.     Thus, Facebook's ownership of its platform does not give it free rein to develop, create, and publish false and misleading content on CHD's page, or to create tags which mislead third-party users about the truthfulness of content on CHD's pages, or to drive traffic from CHD's page to the CDC, to advance Facebook's adverse business interests. Facebook's control over the manner in which its users view its website does not encompass the right to commit acts of censorship, false disparagement, and fraud.

51.     Over the past fifteen months or longer, defendants have carried out a fraudulent scheme to misrepresent, censor, and exclude CHD's viewpoint on vaccine and 5G network safety.

### 2.     Means and Methods of Defendants' Scheme.

52.     Since on or about January 15, 2019, defendants have engaged in a scheme, plan and artifice to disparage and defraud CHD, and cause it to lose money and goodwill, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, through three principal methods: (A) making materially false statements; (B) omitting to disclose material facts; and (C) creating a materially deceptive scheme. Defendants have created the false and misleading appearance to all third-party users that CHD is in violation of Facebook's Terms for publishing "false information" about vaccine and 5G network safety, and defendants have used that ruse to deactivate CHD's direct

fundraising and reject its paid advertisements, censor CHD's content and user posts, publish materially false or misleading content on CHD's page, "shadow ban" CHD and "sandbox" third-party users, i.e., deceptively limit the reach of other CHD content to those users whom Facebook psychologically profiles as "undecided," and conceal their methods and collaborators. In truth, as defendants are fully aware, CHD has not posted any false information, promoted any false content, or violated any fundraising or other terms of service.

53.    Defendants Facebook, Zuckerberg, Science Feedback, Poynter, Politifact, and others engaged in a scheme to defraud CHD by, among other conduct:

(A)    Misrepresenting as fact to CHD that CHD's fundraising function was deactivated because CHD violated its terms of service with Facebook by posting "false information" with respect to vaccines.

(B)    Misrepresenting as fact to CHD's outside ad agency that CHD's fundraising advertisements were rejected because CHD violated its terms of service with Facebook by posting "false information" with respect to vaccines. Facebook did not (nor can it) produce any evidence of actual falsity in such advertisements.

(C)    Misrepresenting as fact to all third-party Facebook users by means of a "warning label" on CHD's page that the CDC has "reliable, up-to-date information about vaccines," and that such users should "go to CDC.gov," and, by classic imputation of dishonesty, falsely suggesting that the vaccine-related content on CHD's page is not reliable, up-to-date information.

(D)    Misrepresenting as facts to all third-party Facebook users that particular enumerated CHD-, RFK, Jr.- and third party-content posted on the CHD page contains "False Information Checked by independent fact-checkers," and to "see why" users should instead accept the opposition content posted by Facebook's "fact-checkers" on CHD's page as "true" information on the same subjects.

(E)     Engaging deceptive mechanisms and machine-learning algorithms, which secretly demote, hide, and/or limit the visibility and reach of CHD vaccine- and 5G network-related content (practices known as "shadow-banning" or "deboosting") from third party users whom Facebook psychologically profiles as "undecided" (a practice known as "sandboxing") in order to hide content from those it might sway, while misrepresenting to CHD and all third-party Facebook users that no such artificial processes or limitations have occurred.

(F)     Misrepresenting as fact to all third-party Facebook users that Facebook relies upon "independent fact-checkers" to identify and tag "false information" on CHD's Facebook page based on a set of objectively-neutral, reliable, and up-to-date factual criteria, when the criteria that is actually applied is neither neutral, reliable, nor up-to-date, and the "fact-checkers" are in privity with, or controlled by Facebook. The absurdity of these misrepresentations hits home when one considers that Facebook and Science Feedback created a "fact-checking" exemption for climate science deniers by deeming climate disinformation ineligible for "fact-checking," because it is "opinion." Emily Atkin, *Facebook creates fact-checking exemption for climate deniers*, HEATED (Jun. 24, 2020), https://heated.world/p/facebook-creates-fact-checking-exemption.

(G)     Misrepresenting as fact to all third-party Facebook users that users such as CHD who have had content removed from or tagged on its platform, can appeal that decision either to Facebook's content moderator panel, or to an "independent" "Oversight Board," and that in making such determinations, Facebook does not have any conflicts of interest that compromise its judgment. M. Zuckerberg, *Facebook's commitment to the Oversight Board*, FACEBOOK (Sept. 2019), https://about.fb.com/wp-

content/uploads/2019/09/letter-from-mark-zuckerberg-on-oversight-board-charter.pdf.

(H)     Concealing the extent to which Facebook actively collaborated with Rep. Schiff, the CDC and WHO, inter alia, to implement their overall scheme.

(I)     Concealing their overall scheme by these and other deceptions, including false and disparaging statements about CHD to users of CHD's Facebook page, and to other third parties.

54.     Among the means and methods by which these defendants carried out the scheme to defraud Plaintiff were their transmission by means of wires in interstate commerce of the following telephone calls, emails and/or online communications that contained materially false and misleading information, and proximately caused damages, including (1) falsely disparaging "warning label"; (2) materially deceptive use of "fact-checkers"; (3) disabling CHD's fundraising and ads; (4) disabling CHD's right to "appeal"; and (5) concealment of the overall scheme.

**3.      Falsely Disparaging Warning Label.**

55.     As alleged *supra*, on September 4, 2019, after "several months of discussion" with the WHO (*Vaccine Misinformation: Statement by WHO Director-General on Facebook and Instagram*, *supra*, https://www.who.int/news-room/detail/04-09-2019-vaccine-misinformation-statement-by-who-director-general-on-facebook-and-instagram), Facebook published a Warning Label in bold black letters at the top of CHD's Page, which states:

This Page posts about vaccines

When it comes to health, everyone wants reliable, up-to-date information. The Centers for Disease Control (CDC) has information that can help answer questions you may have about vaccines.

Go to CDC.gov

1



2

3

4

5

6

7

8

9

10    56.

11    57.    Facebook re-publishes this disparaging falsehood every time a user uploads

12 CHD's Facebook page, as has occurred literally hundreds of thousands of times since

13 September 4, 2019.

14    58.    Facebook's warning label conveys in clear terms to any user that what they see

15 on CHD's page is not reliable and not up-to-date, and it directs the user instead to "go to

16 CDC.gov" for reliable and up-to-date "information" about vaccines. Any user visiting a

17 webpage scans the immediately-visible content before scrolling down to view the remainder of

18 the content. Consequently, the top banner space of any webpage is valuable "screen real-

19 estate" where prime content can be shown. Facebook's intended effect is to deprive CHD of

20 this screen space and to redirect users away from CHD's page to the CDC website. Zuckerberg

21 publicly boasts that his "warning labels" and "fact-checks" effectively divert 95% or more of

22 all users from clicking through to the actual content. *Entire CNN April 16 Coronavirus Town

23 Hall* [Video], CNN BUSINESS (Apr. 17, 2020),

24 https://www.cnn.com/videos/business/2020/04/17/entire-april-16-coronavirus-town-hall-part-

25 5-sot-vpx.cnn.

26    59.    On or about September 10, 2019, in response to Facebook's disparaging warning

27 label, CHD added text to the top of its Facebook page that states: "Read about CDC & WHO

28 corrupt financial entanglements with vaccine industry: childrenshealthdefense.org/cdc-who."

1

### 4.     Materially Deceptive use of "Fact-Checkers."

2      60.     On or about January 15, 2019 and thereafter, Facebook electronically blocked

3   CHD from displaying on CHD's Facebook page a videotape interview of RFK, Jr. discussing a

4   pending lawsuit against Merck & Co. In so doing, Facebook fraudulently misrepresented to all

5   third-party users of CHD's Facebook page that the videotape was "False Information Checked

6   by independent fact-checkers."



16      61.

17      62.     Facebook's warning label on RFK's January 15, 2019 videotape critical of

18   Merck, Inc. was materially deceptive, in that the videotape is accurate with respect to its

19   assertions of fact and is otherwise an expression of RFK, Jr.'s opinions, and not "False

20   Information" as Facebook claims. Facebook's warning label also omits material facts by

21   failing to disclose its advertising-client relationship with Merck, Inc. *See* T. Staton, *The top 10*

22   *pharma companies in social media*, FIERCEPHARMA, https://www.fiercepharma.com/special-

23   report/top-10-pharma-companies-social-media-0 (last accessed Aug. 14, 2020). Merck, Inc. is

24   one of the top 10 social media spenders among pharmaceutical companies and heavily

25   leverages Facebook as an advertising platform.

26      63.     On or about May 1, 2019 and thereafter, Facebook electronically blocked CHD

27   from displaying photographs of children receiving vaccines with needles on CHD's Facebook

28

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* **et al.**

1  page, and fraudulently misrepresented to CHD that the photographs were "violent," and

2  purported to have deleted them on that basis.

3      64.    On about May 1, 2019 and thereafter, Facebook posted the text of Wikipedia's

4  entry about CHD on CHD's Facebook page and refused to take it down, despite CHD's

5  objection that the Wikipedia entry is false and misleading. The Wikipedia entry states, inter

6  alia, that "[m]uch of the material put forth by the Organization involves manipulation of

7  information and anti-vaccine propaganda. [. . .] The group has been contributing to vaccine

8  hesitancy in the United States[.]"

9      65.    On or about May 26, 2020 and thereafter, Facebook and its Lead Stories "fact-

10  checker" blocked CHD from displaying a 45-minute Instagram videochat with RFK, Jr. in

11  which RFK, Jr. accurately detailed Dr. Anthony Fauci's past involvement with vaccine

12  manufacturers, and Facebook fraudulently misrepresented to all third-party users that the

13  interview was "Partly False Information Reviewed by independent fact-checkers." Instagram is

14  a Facebook-subsidiary photo and video-sharing social networking service.

15      66.



25      67.    Upon clicking the "See Why" button, this materially-misleading explanation

26  appears: "Independent Fact-Checkers Say This Is Partly False. The information in this post is a

27  mix of true and false claims or it could be misleading or incomplete." This "partly false"

28  designation would seem to concede that the information is at least partly true, while the

warning taints the entirety of the material – a highly unfair, overbroad and prejudicial approach.



68.

69.     On or about May 28, 2020 and thereafter, Facebook blocked CHD from displaying an article by Dr. Brian Hooker and Neil Miller concerning health outcomes in a small-sample study of vaccinated and unvaccinated children and fraudulently misrepresented to all third-party users that the article was "False Information Checked by Independent fact-checkers."

70.     Instead of sharing a normal preview, Facebook marks the content specifically with an overlay grey graphic and prominent warning "False Information Checked by Independent fact-checkers." This has the intended effect of reducing both click-throughs to the underlying content and shares. The net effect is to drastically reduce by 95% the traffic to Children's Health Defense website. *Entire CNN April 16 Coronavirus Town Hall* [Video], *supra*, https://www.cnn.com/videos/business/2020/04/17/entire-april-16-coronavirus-town-hall-part-5-sot-vpx.cnn.

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

1

2

3

4

5

6

7

8

9

10

11

12

13     71.



14     72.    Upon clicking the "See Why" button in the above screenshot, the user is shown

15 the following scroll which gives the notice, "The primary claims in the information are

16 factually inaccurate."

17

18

19

20

21

22

23

24

25

26     73.



27     74.    Clicking the Science Feedback preview graphic takes the user to Facebook's

28 purportedly "independent," i.e., objectively-neutral, Science Feedback "fact-check" opposition:



75.

76.     However, this purportedly neutral Science Feedback "fact-check" is itself a misrepresentation of material fact. Dr. Hooker, the author of the original study, disclosed in that study the small size of his study sample, the statistical methods he employed on that small sample, and the results he obtained, all of which is fully consistent with the scientific method. Any reasonable reader of the study would be fully empowered to interpret for himself or herself whether those statistical results have broader applicability, particularly in light of the author's conclusion that broader studies are warranted. Instead, Facebook holds out its "fact-checker's" opinion critical of the study methodology as conclusive "fact." Facebook's classification of the original study as factually "false" is deceptive and materially misleading.

77.     On June 2, 2020 and thereafter, Facebook and Science Feedback, its purportedly "independent fact-checker," blocked CHD from displaying Dr. Elizabeth Mumper's personal account of her medical practice experience evaluating children and families, and fraudulently

1   misrepresented to all third-party users that the post was "False Information Checked by

2   independent fact-checkers."

3      78.   Instead of sharing a normal preview, Facebook marks the content specifically

4   with an overlay grey graphic and a prominent warning "False Information Checked by

5   independent fact checkers." As discussed, *supra*, this has the intended effect of drastically

6   reducing (by 95%) both click-throughs to the underlying content and shares. Facebook deploys

7   this deceptive tactic in order to greatly reduce user traffic to CHD's Facebook page or website.



19      79.

20      80.   Upon clicking the "See Why" button in the above screenshot, the user is shown

21   the following scroll with the notice, "The primary claims in the information are factually

22   inaccurate." But, the only citation for this notice is Dr. Brian Hooker's small scale study

23   referenced *supra*. Dr. Hooker's study is cited by the article, but it is neither its "primary" claim

24   nor, in any event, is it false.

25

26

27

28

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* **et al.**



81.

82.     Clicking the Science Feedback preview graphic takes the user to a purported "fact-check" and oppositional article to Dr. Hooker's study, not Dr. Mumper's study which it labels "false."



83.

84.     Rather, Dr. Mumper's article "Mothers of Vaccine Injured Children: Modern Day Cassandras" details its author's medical practice history evaluating children and families and the systematic denial of the existence of vaccine injury by the public health system. The article contains links to peer reviewed, published research, and makes clear that it is Dr. Mumper's small-scale analysis and opinion, and that the interpretive value of her fact-based opinions should be viewed accordingly, that is, as an anecdotal but nonetheless significant

marker of disparities in health outcomes. That fully-disclosed caveat does not make Dr. Mumper's article any less relevant as a contribution to the scientific literature. Critically, Dr. Mumper's article is not factually inaccurate or misleading in any way, nor does Facebook or Science Feedback identify any actual inaccuracies.

85.     Dr. Mumper is a board-certified pediatrician with 40 years of experience as a clinical practitioner and pediatric faculty member. She served as Medical Director of the Autism Research Institute for five years and has lectured about medical problems of children with chronic disease in 20 countries. The clinical opinion Dr. Mumper expressed in her June 2, 2020 article was the product of her extensive clinical research and practice, and her conscientious reading of the medical literature. She has personally asked the CDC, National Institute of Health, and the American Academy of Pediatrics to conduct well-controlled studies comparing vaccinated to unvaccinated children. In the meantime, and in the absence of any such more definitive work, Dr. Mumper's small-scale comparative study and her opinions, within their expressed limits, have interpretive value and validity, and play a necessary and critical role in informing her fellow practitioners, patients, and the general public.

86.     In short, Facebook has misrepresented as fact to all third-party users that Dr. Mumper's article is "false," and that its "primary claims are factually inaccurate," when that is not the truth. Facebook has also misrepresented as fact to all third-party users that Facebook relied upon an "independent fact-checker," when the criteria that Science Feedback has actually applied is neither neutral, reliable, nor up-to-date, nor for that matter is Science Feedback "independent" of its contractual payor, Facebook.

87.     The CHD content in question illuminates the plausibility of risk in current public health policy, and this information allows third-party users to determine if additional investigation or mitigation is needed on their part. Facebook's deliberate conflation of open scientific controversy with "vaccine hoax" is a misrepresentation of fact. In short, closing down legitimate debate of matters in open controversy is not a public benefaction, but an abuse of power and something that is completely contrary to science.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



JUNE 02, 2020
## Mothers of Vaccine–Injured Children: Modern Day Cassandras



🖶 Print

**By Elizabeth Mumper, M.D., FAAP, The Rimland Center**

Some days I feel like Cassandra, the Greek woman who could see the future, but not articulate it in a way that gave her credibility. In the tragedy *Agamemnon*, Apollo promised Cassandra the gift of prophecy if she would be his lover. She accepted the gift, then rebuffed Apollo when he desired sexual favors. Apollo got revenge by ordaining her predictions would be rejected. She predicted the Trojan horse battle and Agamemnon's bloody death, but no one believed her.

Parents of children with complex chronic illness must also feel like Cassandras. Hundreds of times I have taken detailed histories from parents in which seemingly healthy children deteriorated or regressed within 24-48 hours of a vaccine, often ending up in the Emergency Department, only to be told that it was a "coincidence" and that the vaccine could not be the

88.

89.    On or about April 16, 2020 and thereafter, Facebook and Politifact, its purportedly "independent fact-checker," blocked CHD from displaying an article concerning a study in the journal Collective-Evolution.com which found a "significantly" greater risk of contracting coronavirus among individuals in the study who received the influenza vaccine, and Facebook and Politfact fraudulently misrepresented to all third-party users that the post was "False Information Checked by independent fact-checkers." Indeed, the very name "Politifact" suggests that the putative "fact-checking" here is more political than scientific.

19
20
21
22
23
24
25
26
27
28

35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



90.

21   91.   Upon clicking-through the "See Why" button, the user is presented with the

22  following purported "fact-check" by Politifact, a wholly-owned subsidiary of Poynter.

23
24
25
26
27
28

VERIFIED COMPLAINT
*Children's Health Defense v. Facebook* et al.





92.

93.     The Politifact "fact-check" misrepresents and fails to rebut two important aspects of the study: (1) coronaviruses existed in 2017-2018 in forms other than COVID-19; and (2) the study's conclusion that "vaccine derived virus interference was significantly associated with coronavirus and human metapneumovirus." Receiving the influenza vaccination may increase the risk of other respiratory viruses, a phenomenon known as viral interference.

94.     On or about June 18, 2020 and thereafter, Facebook blocked CHD from displaying an article concerning a sharp decline in infant death rates during the pandemic, matching a sharp decline in "well-baby visits" when vaccines are typically given. Facebook and Science Feedback, its purportedly "independent fact-checker," fraudulently misrepresented

37

1    to all third-party users that the post was "Partly False Information Checked by independent

2    fact-checkers."



16    95.

17    96.    Upon clicking-through the "See Why" button, the user is presented with a

18    purportedly factual opposition article by Science Feedback.



27    97.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18   98.

19   99.   Science Feedback's assertion that vaccines bear no "association" with sudden

20   child infant death is itself a misrepresentation of fact, as it contradicts, inter alia, the potential

21   adverse effect advisements formerly on many vaccine product inserts, customarily

22   administered to infants according to the CDC's 72-dose recommended vaccine schedule.

23   CHD's article advances a potential explanation for a decrease in sudden infant deaths during

24   the pandemic, as to which the public has a right to be informed. There is nothing "false" about

25   CHD's speculative inquiry into matters of causation in an open scientific controversy.

26   **5.   Disabling CHD's Fundraising and Ads.**

27   100.   On or about May 2, 2019 and thereafter, Facebook permanently deactivated the

28   fundraising function, or "donate" button, on CHD's Facebook page, in disregard of CHD's

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* **et al.**

501(c)(3) non-profit status. In its termination email to CHD, Facebook's "Charitable Giving Team" fraudulently misrepresented that it took this action because CHD's page was "in violation of [its] fundraising terms and conditions." *Combatting Vaccine Misinformation*, *supra*, https://about.fb.com/news/2019/03/combatting-vaccine-misinformation/.

101.    Also on or about May 2, 2019 and thereafter, Facebook blocked CHD and RFK, Jr., and subsequently Prizeo, their third-party advertising agency, from purchasing online ads to promote CHD, including most recently ads promoting its Summer 2020 fundraising drive. In its April 20, 2020 electronic notice rejecting the attempted transactions on behalf of CHD and RFK, Jr., Facebook fraudulently misrepresented to Prizeo that it took this action because CHD has "repeatedly posted content that has been disputed by third-party fact-checkers [for] promoting false content."

### 6.    Disabling CHD's Right to "Appeal" These Actions.

102.    On or about May 1, 2019, Facebook permanently disabled the "dispute" function on CHD's account so that neither CHD, RFK, Jr., nor Prizeo could challenge Facebook's actions through direct submission, and Facebook has ignored CHD's written requests over the past eighteen months that both its content and full functionality be restored to CHD's page.

### 7.    Concealment of the Overall Scheme.

103.    On or about May 1, 2019, Facebook began covertly to demote and/or ban content ("shadow-ban") that CHD posted to its Facebook page, effectively limiting its visibility and reach, and secondarily reducing ad revenue to CHD. Facebook owns a patent on social media shadowbanning. *See United States Patent No. 10,356,024*, Kanter et al. (Moderating content in an online forum), USPTO Patent Full-Text and Image Database, UNITED STATES PATENT AND TRADEMARK OFFICE (Jul 16, 2019), http://patft.uspto.gov/netacgi/nph-Parser?Sect2=PTO1&Sect2=HITOFF&p=1&u=/netahtml/PTO/search-bool.html&r=1&f=G&l=50&d=PALL&RefSrch=yes&Query=PN/10356024 (last accessed Aug. 15, 2020). The patent describes the mechanism by which shadowbanning is accomplished: In one embodiment, the social networking system blocks banned comments by analyzing the text of the comments. For example, if a comment includes a profane word, as

1   provided in a list of banned words, the social networking system will not display the comment
2   to other users of the social networking system.

3         104.   Additionally, in one embodiment, Facebook also performs a "sentiment analysis"
4   to identify whether a comment includes sentiment that is banned under Facebook's community
5   standards, e.g., derogatory racial epithets. Finally, Facebook's patent permits it to train a
6   machine learning classifier to block comments based on Facebook content moderators' actions
7   of manually deleting comments or unblocking comments in the online forum. In one
8   embodiment, the blocked comments are not displayed to the wider community of Facebook
9   users. However, the blocked comments are displayed to the commenting user and his or her
10  friends within the social networking system. As such, Facebook's software creates a
11  simulacrum in which the "offending" user — here CHD — is not aware that their comment or
12  content is not displayed to other users of the forum. Since May 2019, Facebook has utilized
13  this deceptive scheme in order to covertly limit or block CHD's content while misrepresenting
14  the visibility and reach of that content to CHD itself, and misrepresenting the totality of CHD's
15  content to all third-party users.

16        105.   Moreover, a "whistleblower" recently disclosed Facebook internal documents,
17  which reveal the extent of Facebook's sophisticated designs aimed at user behavior
18  modification in order to limit the spread of "undesirable" information. Facebook boasted
19  internally that it has employed these methods based on its psychological research
20  demonstrating their efficacy because nearly all third-party users (95%) will be dissuaded from
21  clicking through to the original content by the very design and trade dress elements of
22  Facebook's warnings. This Facebook design document shows a technical discussion of such
23  mechanisms:

24
25
26
27
28

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* **et al.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14   106.



**Seiji Yamamoto - Data Science Manager**
September 28, 2017

## Introducing friction via the Troll Twilight Zone will confuse and demoralize them.

### Tactic 1: Interfere with troll operations

- Troll Twilight Zone GK
    - 1. Find troll accounts and add them to a special GK
    - 2. When triggered, the users behind the Troll GK will experience the following
        - drastically limited bandwidth for a few hours
        - auto-logout every few minutes
        - auto-direct to home timeline every few minutes
        - comments and posts that they spend time crafting will magically fail to upload, then user will be logged out
    - 3. Trigger the "special features" when
        - Raids are detected, e.g. when known troll associates are simultaneously viewing the same content
        - User uploads a comment or post with a match on our bank of known troll munitions (see Appendix)
        - Leading up to important elections (pre-cautionary)
        - Just because it's Nov 4 (pre-cautionary)

15
16
17
18
19
20
21
22
23
24
25
26
27
28   107.



**Seiji Yamamoto - Data Science Manager**
September 28, 2017

## When a user does something egregious, warranting an account suspension or deletion, we should notify the friend network...

### Tactic 2: Notify friends when high-confidence account suspensions and deletions take place

- When a user does something egregious, warranting an account suspension or deletion, we should notify the friend network
    - "John Smith's account has been suspended for 7 days because he shared hate speech in the group Kekistani Special Forces"
    - "John Smith's account has been deactivated for community violations"
    - "Four of your direct friend connections were found to be fraudulent accounts so we have deactivated them.  Learn more about how to spot fake accounts here."
- Fear of being outed as a miscreant is what regulates behavior in real life and we should re-introduce that to the online world
- Notified users who accidentally befriended the offender might be more mindful of suspicious accounts, increasing overall herd immunity
- Notified users who are also offenders might curtail their own activities
- We don't necessarily need to do many of these to strike fear in the hearts of trolls, so these can be very high touch notifications
- This would provide clear public signaling that FB takes the issue seriously

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

108.    At an April 17, 2020, CNN "Global Town Hall," Zuckerberg boasted that "we work with independent fact-checkers [] and warning labels work. We know that because 95% of the time when someone sees a piece of information that has a fact-check on it, they don't click through and consume that information." *Entire CNN April 16 coronavirus town hall*, *supra*, https://www.cnn.com/videos/business/2020/04/17/entire-april-16-coronavirus-town-hall-part-5-sot-vpx.cnn.

109.    Indeed, Facebook has used "A/B testing" (testing users' response to variants) to achieve its intended psychological effect on user behavior. Essentially, similar demographic test-groups are shown two (or more) different behavior modification mechanisms, and the most effective mechanism is chosen based on statistical results in terms of which variant achieves the desired user behavior. *About A/B Testing*, Business Help Center, FACEBOOK FOR BUSINESS, https://www.facebook.com/business/help/1738164643098669?id=445653312788501 (last accessed Aug. 14, 2020).

110.    The "whistleblower" also described Facebook's use of "troll scores" that were assigned to accounts and used to assess what punitive actions it would take against the accountholder. There is no accountability or accountholder recourse, since Facebook compiles its punitive "troll scoring" without the holder's knowledge. *Anonymous – Facebook*, PROJECT VERITAS (Apr. 6, 2020), https://www.projectveritas.com/news/anonymous-facebook/.

111.    The "whistleblower" also revealed Facebook's use of a "deboosting" score, which it uses to "deboost" content produced by the accountholder's page. Facebook deployed a similar, if not the same algorithm, to limit the visibility and reach of CHD content. As explained by the whistleblower and screenshots obtained by Project Veritas, the ActionDeboostLiveDistribution tag is designed to "deboost" content produced by the pages it is attached to, specifically suppressing the distribution of livestreams from that page. A current Facebook employee confirmed to Project Veritas that the code could reduce a "video's visibility in news feeds, remove sharing features, and disable interactive notifications."

112.    The "whistleblower's" account elaborates upon newspaper and magazine articles about internal and top-down biases in Facebook's content control processes. A "Wired"

magazine article reported on Facebook's use of a custom algorithm — "Click Gap" — specifically to limit the spread of whatever Facebook terms "fake news." Facebook deployed a similar, if not the same algorithm, to damage CHD, by covertly limiting the visibility and reach of its content. An April 18, 2019 "Wired" article explains: "Click-Gap, which Facebook is launching globally today, is the company's attempt to limit the spread of websites that are disproportionately popular on Facebook compared with the rest of the web. If Facebook finds that tons of links to a certain website are appearing on Facebook, but few websites on the broader web are linking to that site, Facebook will use that signal, among others, to limit the website's reach." *Facebook Is Changing News Feed (Again) to Stop Fake News*, WIRED (Apr. 10, 2019), https://www.wired.com/story/facebook-click-gap-news-feed-changes/.

113.    A CNET article reported that Facebook planned to use "updated machine learning" to detect more potential "hoaxes" and send them to third-party "fact-checkers." Facebook used the same or similar machine learning systems to detect and flag CHD content for sending to Facebook's "fact-checker" affiliates.  R. Cheng, *Facebook will use machine learning to fight fake news*, CNET (Aug. 3, 2017), https://www.cnet.com/news/facebook-will-use-machine-learning-to-fight-fake-news/.

114.    The Doe defendants comprise, inter alia, members of an enterprise with or withinFacebook working directly to label, suppress, and censor vaccine and 5G-network related content on CHD's Facebook page. The enterprise operates under the direct supervision and control of Facebook's corporate leadership and Zuckerberg. It includes individual Facebook officers or employees (known only to Facebook) responsible for key design elements that enable widespread AI-driven "fact-check" content suppression and manipulation. The enterprise manipulates technical processes to "shadow ban" CHD, i.e., deceive Plaintiff as to the reach and visibility of content on its Facebook page, and prevent its content from being disseminated. The enterprise also exploits internal marketing and psychometric data to "sandbox" users, i.e., selectively hide content from users based on their psychological profile, and ward off the possibility that alternative content may influence their views. "Sandbox" is an

apt term for isolating users in an echo chamber of like-minded viewpoints where existing views are reinforced, and alternative or opposing ideas are not considered.

115.    Facebook shows CHD's vaccine- and 5G network-safety content to CHD's already-"decided" users, but Facebook does not show it to any other "undecided" or "opposed" users. Thus, Facebook seeks to rigidify users' positions on matters of public concern, and foreclose public debate, or any possibility of the societal "ultimate good [] reached by free trade in ideas," (*see Abrams v. United States*, 250 U.S. at 630 (Holmes, J., dissenting)), while concealing its methods and effects. Facebook, with the government's assistance, blocks content critical of the CDC and WHO. The First Amendment protects against this new "privatized" form of governmental censorship. This is also a classic method of fraud concealment: if Plaintiff does not know what defendants are telling or showing third parties, Plaintiff is less likely to sue. *See*, *e.g., Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) ("suppose an enterprise that wants to get rid of rival businesses mails misrepresentations about them to their customers and suppliers, but not to the rivals themselves.").

116.    On December 27, 2018, New York Times reporter Max Fisher wrote that, based on his review of Facebook internal documents, Facebook's "closely-held rules" for moderating content on its website had "numerous gaps, biases and outright errors." Fisher characterized those errors as a byproduct of the over- and under-inclusive nature of binary rules when applied to "highly complex issues," plus the highly time-sensitive ("eight to 10 seconds per post") workload constraint Facebook puts on the decisions at issue. He quoted Facebook officer Bickert as saying, "we have billions of posts every day, we're identifying more and more potential violations using our technical systems. At that scale, *even if you're 99 percent accurate, you're going to have a lot of mistakes*" (emphasis added). (Here, Facebook's wrongdoing is deliberate, a form of decision-making which Bickert's reference to "mistakes" elides.) Fisher reported that, "By telling moderators to follow the rules blindly, Facebook hopes to guard against bias and to enforce consistency." But, "Facebook has little visibility into the giant outsourcing companies, which largely police themselves, and has at times struggled to control them." M. Fisher, *Inside Facebook's Secret Rulebook for Global Political Speech*,

NEW YORK TIMES (Dec. 27, 2018), https://www.nytimes.com/2018/12/27/world/facebook-moderators.html.

117.   Fisher further reported that, "[t]hough Facebook says its focus is protecting users, the documents suggest that other concerns come into play. [For example, Pakistan-related] guidelines warn moderators against creating a "PR fire" by taking any action that could "have a negative impact on Facebook's reputation or even put the company at legal risk. [. . .] And its decisions often skew in favor of governments, which can fine or regulate Facebook." *Id.*

118.   More recently, on May 16, 2020, New York Times reporters Mike Isaac, Sheera Frenkel and Cecilia Kang wrote in their article "Now More Than Ever, Facebook Is a 'Mark Zuckerberg Production'" that:

> [A]t Facebook, for more than a decade, Mark Zuckerberg was a product guy's product guy. In practice, this meant [. . .] he was comfortable delegating in areas that interested him less keenly — including [. . .] the realm of Facebook policy around what kind of speech was and was not permitted. Those subjects fell into a specific category: Too important to ignore, but not exactly what a young billionaire wants to spend all of his time on.
>
> [After the 2016 election] Mr. Zuckerberg resolved to take control of the global superpower in which he already dominated the voting. [In July 2018,] Mr. Zuckerberg called a meeting with his top lieutenants. [. . .] *Mr. Zuckerberg said he would be making more decisions on his own,* based on his instincts and vision for the company. [. . .] *Mr. Zuckerberg also began to participate more directly in meetings that had previously been Ms. Sandberg's domain — from the nitty-gritty of taking down disinformation campaigns,* to winding philosophical discussions on how Facebook ought to handle political ads. [. . .] Other board disagreements, specifically around political advertising and the spread of misinformation, always ended with Mr. Zuckerberg's point of view winning out. [. . .] To replace [departing board members], Mr. Zuckerberg picked [. . .] Peggy Alford, the former chief financial officer of the Chan Zuckerberg Initiative.

Mike Isaac, Sheera Frenkel & Cecilia Kang, *Now More Than Ever, Facebook Is a 'Mark*

1    *Zuckerberg Production*,' NEW YORK TIMES (May 16, 2020),

2    https://www.nytimes.com/2020/05/16/technology/zuckerberg-facebook-coronavirus.html

3    (emphases added).

4    119.    Facebook contracted with Science Feedback, a French organization which

5    Facebook funds, to "fact-check" CHD's content, and directed Science Feedback to deploy

6    Facebook's circular WHO and CDC definitions of "vaccine misinformation." Science

7    Feedback is wholly dependent upon Facebook, both financially and editorially. On information

8    and belief, neither Facebook nor Science Feedback makes any *genuinely* independent effort to

9    check the veracity of the censored or labeled CHD content.

10    120.    Instead, Facebook created a classification system that provides Science Feedback

11    with a limited set of nine pre-populated classifications to apply to a posting:

12             • False

13             • Partly False

14             • True

15             • False Headline

16             • Not Eligible

17             • Satire

18             • Opinion

19             • Prank Generator

20             • Not Related

21    *Fact-Checking on Facebook*, Business Help Center, FACEBOOK FOR BUSINESS,

22    https://www.facebook.com/help/publisher/182222309230722 (last accessed Aug. 14, 2020).

23    121.    Apparently, if Science Feedback decides that an article is not "false," "partly

24    false," or "false headline" but falls into any of the other six classifications (i.e., True, Not

25    Eligible, Satire, Opinion, Prank Generator, and Not Related), Facebook does not display (or

26    does not prominently display) a link to the "See Why" window or to Science Feedback's

27    oppositional article.

28

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

122.    Under this arrangement, Facebook pays Science Feedback to classify content, and Facebook flags content for Science Feedback to evaluate and classify as part of their partnership. Science Feedback is paid by Facebook to find false stories, and here willfully marked Plaintiff's content as "false" or "partly false" in order to generate traffic to its website through the warning and link, and to further its contractual partnership with Facebook. The "fact-checking" system Facebook created encourages this type of mislabeling. The Science Feedback fact-checkers have an obvious incentive to categorize a post as "False" rather than an accurate but less damaging classification of "Opinion," because that is the only way Facebook will insert the clear warning with a prominent link to Science Feedback's oppositional article. Facebook deceives its users by materially misrepresenting that its "fact-checkers" are "independent," contractually or editorially. Significantly, the arrangement also permits Facebook and Science Feedback to create categorical exemptions from "fact-checking" where it suits Zuckerberg's political or other biases, e.g., the "opinion" exemption for climate science deniers. Emily Atkin, *Facebook creates fact-checking exemption for climate deniers*, *supra*, https://heated.world/p/facebook-creates-fact-checking-exemption.

123.    As to each of the CHD and RFK, Jr. articles and video posts, which Facebook and Science Feedback, or Poynter/Politifact labeled "False Information" or "Partly False Information," *see supra*, Science Feedback and Politifact's opposition articles show, at most, that the specific matter asserted was the opinion of its authors on fully-disclosed limited facts, not that it was a "false" or "partly false" statements of fact. Nevertheless, Science Feedback designated the articles and videos as "False" or "Partly False," not "Opinion." Facebook then proceeded to gray out the articles and videos and placed its warnings over them. By using Facebook's pre-populated options to mislabel the articles and videos, Science Feedback and Facebook intentionally tell the public that Plaintiff is presenting false information, when they know that the information presented is, at most, opinion and *not* false fact.

### 8.    Continuing Injuries to CHD.

124.    CHD's primary source of revenue derives from membership dues and donations that CHD solicits on its website, through PayPal and Stripe, and formerly on its Facebook

page. In addition to that monetary interest, attracting visitors to the CHD Facebook page, and through it to CHD's website, enables CHD and RFK, Jr., their authors, and readers to associate and to engage in speech on matters of mutual concern. Prior to March 2019, CHD's Facebook page content generated significant third-party user traffic to CHD's website, and significant membership fees and donations to CHD.

125.    From January to May 2019, CHD generated $41,241 in user donations from its Facebook page. In May 2019 alone, CHD received $24,872, until Facebook deactivated CHD's donate function. CHD has not received any further donation revenue through Facebook.

126.    Facebook has exclusive possession, custody, and control of evidence to assess the full extent of the damages to Plaintiff's business and property interests which defendants' deceptions have proximately caused, e.g.: (1) how many visitors to CHD's page instead click through to "go to CDC.gov"; (2) how many are diverted from CHD's content due to "fact-check" labels; (3) how much has Facebook-wide traffic of such content decreased; (4) what are the daily click-through, cost-per-click, conversion, and cost-per-action rates for visitors to Plaintiff's Facebook page — all of which is information Facebook compiles in the ordinary course of its business operations of gathering, manipulating, and marketing psychometric and other data on users. Plaintiff lacks access to these missing pieces of the puzzle.

127.    As a result of defendants' actions, third-party user visits from CHD's Facebook page to CHD's website declined significantly since March 2019, while visits to CHD's website grew from other interactive computer services (e.g., Bing and DuckDuckGo) that have not implemented Facebook's smear campaign. CHD's Twitter account has grown by 80,000 followers during the past twelve months, while its Facebook account has grown by only 20,000 followers, despite the smear campaign.

128.    Additionally, CHD's trade reputation and "goodwill" are traditional property rights whose value defendants have diminished through their fraudulent misconduct. CHD's reputation for accurate and timely content is a source of its goodwill, and paramount to its operations and success. "[A] man's right to the continued enjoyment of his trade reputation and the good will that flows from it, free from unwarranted interference by others, is a property

right[.]" *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 413 (1916). Defendants targeted CHD, and the injuries to CHD's organizational trade and reputation were both foreseeable and intended. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008).

129.    CHD is the most direct victim of Facebook's "vaccine misinformation" smear campaign, and is best positioned to sue; its financial losses are provable, and far more than a "bit part in the scheme" (*Kelly v. United States*, 140 S. Ct. 1565, 1573 (2020)), and there is no risk of duplicative recoveries because no one else can recover CHD's losses. At the same time, Facebook controls the proof of that portion of claimed damages attributable to the defendants' unlawful conduct. *See Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 S. Ct. 1377, 1393 (2014) ("When a defendant harms a Plaintiff's reputation by casting aspersions on its business, the Plaintiff's injury flows directly from the audience's belief in the disparaging statements….").

## D.    Material Questions of Vaccine Safety.

130.    By 1986, the "litigation costs associated with claims of damage from vaccines had forced several companies to end their vaccine research and development programs as well as to stop producing already-licensed vaccines." Institute of Medicine, *Adverse Events Associated with Childhood Vaccines: Evidence Bearing on Causality*, at 2 (1994). In response, Congress enacted the National Childhood Vaccine Injury Act, codified at 42 U.S.C. §§ 300aa-1 through 300aa-34 (the "1986 Act"), which virtually eliminated economic liability for pharmaceutical companies for injuries caused by their vaccines. 42 U.S.C. § 300aa-11 ("No person may bring a civil action for damages in the amount greater than $1,000 or in an unspecified amount against a vaccine administrator or manufacturer in a State or Federal court for damages arising from a vaccine-related injury or death."); *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 243 (2011) ("we hold that the National Childhood Vaccine Injury Act preempts all design-defect claims against vaccine manufacturers brought by Plaintiffs who seek compensation for injury or death caused by vaccine side effects"); *cf. Davis v. Wyeth Laboratories*, 399 F.2d 121, 129-30 (9th Cir. 1968) (recipient of polio vaccine entitled to make

1    a "true choice judgment" whether to be inoculated with Sabin III vaccine, an "unavoidably
2    unsafe" product).

3           131.    By granting pharmaceutical companies immunity from actual or potential
4    liability from injuries caused by vaccines, Congress eliminated the market forces relied upon to
5    assure the safety of these typically mandatory consumer products. Recognizing that it
6    eliminated the financial incentive for pharmaceutical companies to assure the safety of their
7    vaccine products, Congress placed the responsibility for vaccine safety in the hands of the
8    Department of Health and Human Services ("HHS") and its agencies, most pertinently here,
9    the CDC. 42 U.S.C. § 300aa-27(a) ("Mandate for safer childhood vaccines") provides, inter
10   alia, that the Secretary of HHS "(1) shall promote the development of childhood vaccines that
11   result in fewer and less serious adverse reactions [. . .], and (2) make or assure improvements
12   in, and otherwise use the authorities of the Secretary with respect to . . . research on vaccines,
13   in order to reduce the risks of adverse reactions to vaccines."

14          132.    In executing their statutory duties, HHS and the CDC must avoid conflicts of
15   interest with pharmaceutical companies because these agencies are responsible for promoting
16   safe vaccines, and for defending against claims of vaccine injuries. Indeed, the CDC is the
17   single largest purchaser and distributor of vaccines (nearly forty percent of the total
18   administered) in the United States. In 2019 alone, the CDC entered into contracts to purchase
19   and distribute up to $5.1 billion of the three leading manufacturers' vaccine products.
20   *See 2019 Vaccines for Children*, State of Georgia, GOVERNMENT CONTRACTS,
21   https://www.governmentcontracts.us/government-contracts/opportunity-
22   details/NBD00159991194385117.htm (last accessed Aug. 15, 2020); *Indefinite Delivery*
23   *Contract 75D30119D04518*, Federal Contract IDV Award, GOVTRIBE (Jun. 29, 2020),
24   https://govtribe.com/award/federal-idv-award/indefinite-delivery-contract-75d30119d04518;
25   *2019 Vaccines for Children*, State of Georgia, GOVERNMENT CONTRACTS AND BIDS,
26   https://www.govcb.com/government-bids/vaccines-for-children-
27   NBD00159022703927119.htm (last accessed Aug. 15, 2020).

28

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

133.   . And, while HHS is obliged to report to Congress every two years on the actions HHS has taken to make and assure improvements in the licensing, manufacturing, adverse reaction reporting, research, safety and efficacy testing of vaccines in order to reduce the risk of adverse vaccine reactions, HHS apparently has never complied with that statutory obligation. *See Stipulated Order*, U.S.D.C. S.D. N.Y. No. 18-cv-03215 (JMF) (filed Jul. 9, 2018) & *Press Release*, INFORMED CONSENT ACTION NETWORK (ICAN) (Jul. 13, 2018), https://www.icandecide.org/wp-content/uploads/2019/09/Stipulated-Order-copy-1.pdf; 42 U.S.C. § 300aa-27.

134.   Under the 1986 Act, the CDC plays a central role in ensuring the safety of the *72 doses* of vaccines on the CDC's Child and Adolescent Immunization Schedule. Most of these vaccines, which are vigorously promoted by the CDC for injection into America's children, are manufactured and sold by four pharmaceutical companies -- GlaxoSmithKline ("GSK"), Sanofi S.A. ("Sanofi"), Pfizer, and Merck & Co. ("Merck").

135.   If a vaccine injures an individual, the injured individual must (pursuant to the 1986 Act) bring a claim in the National Vaccine Injury Compensation Program ("VICP"), administered in the Federal Court of Claims. In such actions, the Secretary of HHS is the respondent with the Department of Justice as its litigation counsel, and these government lawyers regularly and vigorously defend against any claim that a vaccine caused injury. (42 U.S.C. § 300aa-12; *Vaccine Injury Compensation Program: Addressing Needs and Improving Practices, Sixth Report by the Committee on Government Reform*, Union Calendar No. 575, 106th Congress, 2d Session, House Report 106–977, HOUSE COMMITTEE ON GOVERNMENT REFORM HEARINGS (Oct. 12, 2000), https:///www.congress.gov/106/crpt/hrpt977/CRPT-106hrpt977.pdf. As explained by HHS, which administers the program, listed injuries "are presumed to be caused by vaccines unless another cause is proven" if occurring within a given time frame post-vaccination. *Frequently Asked Questions*, National Vaccine Injury Compensation Program, HEALTH RESOURCES & SERVICES ADMINISTRATION, https://www.hrsa.gov/vaccine-compensation/FAQ/index.html (last accessed Aug. 14, 2020). Total compensation paid over the life of the VICP from FY 1988 through May 2019 is

VERIFIED COMPLAINT
*Children's Health Defense v. Facebook* et al.

approximately *$4.1 billion. Data & Statistics*, HEALTH RESOURCES & SERVICES ADMINISTRATION (May 1, 2019), https://www.hrsa.gov/sites/default/files/hrsa/vaccine-compensation/data/monthly-stats-may-2019.pdf.

136.   At the same time, the plight of America's children is that 54% (40 million) of them suffer from chronic illnesses such as deadly allergies, asthma, eczema, anxiety, depression, sensory abnormalities; 13% (9 million) are in special education; 11% (8 million) have Attention Deficit Hyperactivity Disorder ("ADHD"); 2.7% (2 million) have or will be diagnosed with Autism; 0.0035% (260,000) will be diagnosed with cancer by age 19; and 49.5% of teens aged 13 to 18 have (or have had) a mental health disorder. *See, e.g.*, Christina D.Bethell, PhD, et al., *A National and State Profile of Leading Health Problems and Health Care Quality for US Children: Key Insurance Disparities and Across-State Variations*, ACADEMIC PEDIATRICS, Volume 11, Issue 3, Supplement, May–June 2011, pp. S22-S33, https://www.sciencedirect.com/science/article/pii/S1876285910002500 [54% chronic illness]; *Students with Disabilities*, NATIONAL CENTER FOR EDUCATION STATISTICS (May 2020), https://nces.ed.gov/programs/coe/indicator_cgg.asp [13% special education]; Susanna N. Visser, MS et al., *Trends in the Parent-Report of Health Care Provider-Diagnosed and Medicated Attention-Deficit/Hyperactivity Disorder: United States, 2003–2011*, JOURNAL OF THE AMERICAN ACADEMY OF CHILD & ADOLESCENT PSYCHIATRY, Volume 53 Number 1 (January 2014), https://jaacap.org/article/S0890-8567(13)00594-7/fulltext [11% ADHD]. This level of chronic illness and disability among children is unprecedented in the United States.

137.   Significantly, no scientific studies have tested the entire immunization schedule or compared the differences in health outcomes between children vaccinated according to the CDC's full 72-dose vaccine schedule and children who have remained partially, or completely, unvaccinated. *See* Institute of Medicine, *Childhood Immunization Schedule and Safety: Stakeholder Concerns, Scientific Evidence, and Future Studies*, NATIONAL ACADEMIES PRESS (2013), pp. 5-6, https://doi.org/10.17226/13563. Simply put, no studies have refuted the biologically-plausible hypothesis that the CDC's vaccine schedule is contributing *in some degree* to the epidemic of chronic childhood illnesses.

138.     Vaccines are among the pharmaceutical industry's best-selling products. Andrew Ward, *Vaccines are among big pharma's best-selling products*, FINANCIAL TIMES (Apr. 24, 2016), https://www.ft.com/content/93374f4a-e538-11e5-a09b-1f8b0d268c39. According to two recent market research reports, the global vaccine market was over $41 billion in 2019, is projected to reach over $58 billion by 2024, and over $93 billion by 2026. *Vaccines Market - Global Forecast to 2024*, MARKETSANDMARKETS (January 2020), https://www.marketsandmarkets.com/Market-Reports/vaccine-technologies-market-1155.html; *Vaccines Market Size, Share & Industry Analysis, 2020-2027*, FORTUNE BUSINESS INSIGHTS, https://www.fortunebusinessinsights.com/industry-reports/vaccines-market-101769 (last accessed Aug. 14, 2020).

139.     Yet, as bioethics professor Carl Elliott wrote in a July 2, 2020 New York Review of Books article, "[I]t would also be a mistake to assume that drug makers will be honest and open about their research results. It is not just that many have repeatedly failed to publish unfavorable data. As the former editor of The British Medical Journal has written, many have simply designed their research studies to produce the results they want. Medical journal editors have been raising the alarm about this for over fifteen years now. Between 1991 and 2010, according to Public Citizen, the pharmaceutical industry was the leading defrauder of the federal government, as measured by penalties paid for violating the False Claims Act." Carl Elliott, *An Ethical Path to a Covid Vaccine*, NEW YORK REVIEW OF BOOKS (July 20, 2020), https://www.nybooks.com/articles/2020/07/02/ethical-path-covid-19-vaccine/.

140.     In recent years, The Atlantic Monthly among others has published stories critical of the CDC's "internal scandal and funding issues." *See*, *e.g.*, Vann. R. Newkirk II, *Is the CDC Losing Control?*, THE ATLANTIC (Feb. 3, 2018), https://www.theatlantic.com/politics/archive/2018/02/cdc-scandal-preparedness-budget/552200/. And, during the current COVID-19 pandemic, journalists and public officials alike have increasingly questioned whether the CDC is a truly reliable or up-to-date source of public health information. *See*, *e.g.*, Alexis C. Madrigal & Robinson Meyer, *How Could the CDC Make That Mistake?*, THE ATLANTIC (May 21, 2020), https://www.theatlantic.com/health/archive/2020/05/cdc-and-states-are-

1    misreporting-covid-19-test-data-pennsylvania-georgia-texas/611935/. On May 9, 2020, Dr.

2    Deborah Birx, the White House Coronavirus Response Coordinator, reportedly stated, "*There*

3    *is nothing from the CDC that I can trust.*" Josh Dawsey, Ashley Parker, Philip Rucker and

4    Yasmeen Abutaleb, *As deaths mount, Trump tries to convince Americans it's safe to inch back*

5    *to normal*, WASHINGTON POST (May 9, 2020), https://www.washingtonpost.com/politics/as-

6    deaths-mount-trump-tries-to-convince-americans-its-safe-to-inch-back-to-

7    normal/2020/05/09/bf024fe6-9149-11ea-a9c0-73b93422d691_story.html (emphasis supplied).

8    Similarly, on June 3, 2020, Dr. Ashish Jha, the director of the Harvard Global Health Institute,

9    stated, "*The CDC is no longer the reliable go-to place.*" Eric Lipton, et al., *The CDC waited*

10   *'its entire existence for this moment.' What went wrong?*, NEW YORK TIMES (Jun. 2, 2020),

11   https://www.sfgate.com/news/article/The-CDC-Waited-Its-Entire-Existence-for-This-

12   15312642.php.  CHD and RFK, Jr. have echoed many of their concerns, yet CHD has been

13   singled out for Facebook's misleading "fact-checks," and its falsely disparaging warning label

14   which trumpets the CDC "party line."

15         **E.    Material Questions of 5G Network Safety.**

16         141.   According to the FCC, "[w]ithin the next few years, 5G networks . . . will make

17   possible once-unimaginable advances, such as self-driving cars and growth of the 'Internet of

18   Things,'" i.e.,  the rapidly expanding collection of devices that collect, transmit and share data

19   via the internet. 5G networks "will increasingly need to rely on network densification, [which

20   entails] the deployment of far more numerous, smaller, lower-powered base stations or nodes

21   that are much more densely spaced." *United Keetoowah Band of Cherokee Indians in Okla. v.*

22   *FCC*, 933 F.3d 728, 739 (D.C. Cir. 2019).

23         142.   Cellular wireless services, including cellular phones and other forms of wireless

24   data transmission, use pulsed and modulated radio frequency signals to transmit the data

25   wirelessly. Wireless service in the United States has mostly depended on large "microcell"

26   radio towers to transmit cell signal. However, to provide sufficient bandwidth to support

27   wirelessly interconnecting tens of billions more devices (*see*, *e.g.*, Sundeep Rangan, Theodore

28   S. Rappaport & Elza Erkip, *Millimeter-Wave Cellular Wireless Networks: Potentials and*

1   *Challenges*, PROCEEDINGS OF THE IEEE | Vol. 102, No. 3, March 2014,

2   https://ecfsapi.fcc.gov/file/60001013329.pdf), companies offering the next generation of

3   wireless service — known as 5G — are in the process of adding hundreds of thousands of

4   densely-spaced, small, wireless facilities, or "small cells." *United Keetoowah Band of*

5   *Cherokee Indians in Okla. v. FCC*, 933 F.3d at 732. These "small cell" antennas are largely

6   being deployed on utility poles and sometimes only a few feet from homes and children's

7   bedrooms. Although small cells may use less power than big cell towers, because of their

8   proximity, the radiation exposure is exponentially higher.

9       143.    Due to their greater bandwidth, 5G networks can also be used as general internet

10  service providers for laptops and desktop computers, and thereby displace existing internet

11  service providers such as cable-internet. The increased speed is achieved partly by using

12  higher-frequency radio waves than current cellular networks. *5G*, WIKIPEDIA,

13  https://en.wikipedia.org/wiki/5G (last accessed Aug. 14, 2020).

14      144.    A number of scientific studies illustrate the potential risks of human exposure to

15  radiofrequency or wireless technology radiation and electromagnetic fields (EMFs) from 5G

16  networks. *See*, *e.g.*, *A Rationale for Biologically-based Public Exposure Standards for*

17  *Electromagnetic Fields* (*Extremely Low Frequency and Radio Frequency*), BIO-INITIATIVE

18  REPORT, https://bioinitiative.org/ ("bio-effects can occur … from just minutes of exposure")

19  (last accessed Aug. 16, 2020). Many studies show profound neurological effects including

20  clear evidence of adverse effects from RF/EMF during the prenatal period and childhood. For

21  example, studies show that prenatal exposure can permanently affect brain neuro-development,

22  memory and behavior and can lead to ADHD. RF/EMFs Exposure can cause various

23  neurological problems including headaches, ringing in the ears, heart palpitations, sleep

24  problems, cognitive and memory problems and nose bleeds. Belyaev I, Dean A, Eger H, et al.,

25  *EUROPAEM EMF Guideline 2016 for the prevention, diagnosis and treatment of EMF-related*

26  *health problems and illnesses*, REV. ENVIRON HEALTH. 2016, 31(3), 363-397,

27  https://pubmed.ncbi.nlm.nih.gov/27454111/. The studies also establish Oxidative Stress as a

28

1  clear causal mechanism of harm. The evidence of profound harms may also contribute to the

2  exponential increase in sickness in children referenced *supra*.

3      145.   In November 2018, the results of a $30 million study published by the U.S.

4  National Toxicology Program (NTP) found "clear evidence" that two years of exposure to cell

5  phone Radio Frequency Radiation (RFR) increased cancer in rats. In November 2019, the NTP

6  published further results that also showed DNA damage. The Ramazzini Institute in Italy

7  replicated the key finding of the NTP using much weaker exposure levels to cell phone

8  radiation over the life of the rats. *High Exposure to Radio Frequency Radiation Associated*

9  *With Cancer in Male Rats*, NATIONAL INSTITUTE OF ENVIRONMENTAL HEALTH SCIENCES

10  (Nov. 1, 2018), https://www.niehs.nih.gov/news/newsroom/releases/2018/november1/

11  index.cfm. Thus, the Ramazzini Institute study, a €6 million study, extended the results of the

12  NTP study to far lower levels of radiation exposure, comparable to levels of radiation from cell

13  towers and therefore relevant to 5G networks. Falcioni L, Bua L, Tibaldi E, et al., *Report of*

14  *final results regarding brain and heart tumors in Sprague-Dawley rats exposed from prenatal*

15  *life until natural death to mobile phone radiofrequency field representative of a 1.8 GHz GSM*

16  *base station environmental emission*, ENVIRON RES. 2018; 165:496-503,

17  https://pubmed.ncbi.nlm.nih.gov/29530389/; *see also* Joel M. Moskowitz, *We Have No Reason*

18  *to Believe 5G Is Safe*, SCIENTIFIC AMERICAN (Oct. 17, 2019),

19  https://blogs.scientificamerican.com/observations/we-have-no-reason-to-believe-5g-is-safe/.

20      146.   In 2011 the International Agency on Research on Cancer (IARC) of the WHO

21  classified RF radiation including radiation from cell towers as a "possible" (2B) carcinogen in

22  humans. In its 2013 Monograph, IARC stated that while there is epidemiological evidence of

23  increased cancer risk in humans, more animals' studies are needed for a higher classification.

24  *Non-ionizing Radiation, Part 2: Radiofrequency Electromagnetic Fields, IARC Monographs*

25  *on the Evaluation of Carcinogenic Risks to Humans Volume 102*, IARC Publications,

26  INTERNATIONAL AGENCY FOR RESEARCH ON CANCER, WORLD HEALTH ORGANIZATION,

27  https://publications.iarc.fr/126. The results of the NTP and the Ramazzini studies provide the

28

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

1   "missing link." Scientists including IARC and retired NTP/NIEHS scientists are calling for the

2   reclassification of RF as a "human carcinogen."

3       147.    In December 2017, the California Department of Public Health ("CDPH")

4   published guidelines in response to the available peer-reviewed scientific evidence that RFR

5   may cause DNA damage, reproduction harms, cancer and learning disabilities in humans,

6   among other effects. CDPH Director and State Public Health Officer Dr. Karen Smith stated

7   that "although the science is still evolving, there are concerns among some public health

8   professionals and members of the public regarding long-term, high use exposure to the energy

9   emitted by cell phones." *CDPH Issues Guidelines on How to Reduce Exposure to Radio*

10  *Frequency Energy from Cell Phones*, Office of Public Affairs, CALIF. DEPT. OF PUBLIC

11  HEALTH, (Dec. 13, 2017), https://www.cdph.ca.gov/Programs/OPA/Pages/NR17-086.aspx. *See*

12  *also* Cal. Gov. Code § 659641.1, subd. (f) (exempting wireless facilities on fire department

13  facilities from mandatory approval after some firefighters developed severe neurological

14  injuries from cell towers on their stations). In 2014 the California Medical Association passed

15  a resolution calling upon the FCC to update its health guidelines as the scientific evidence

16  showing profound adverse effects from wireless technologies. *California Medical Association*

17  *House of Delegates Resolution, Wireless Standards Reevaluation, 2014 Resolution 107*,

18  CALIFORNIA MEDICAL ASSOCIATION (adopted Dec. 7, 2014),

19  https://ecfsapi.fcc.gov/file/1092989731923/30-Attachment%2030-

20  %20California%20Medical%20Association%20Resolution.pdf.

21      148.    In 2015, over 200 scientists from 42 countries who collectively published over

22  2,000 peer-reviewed studies on RF/EMF, sent an appeal the "EMF Scientist Appeal" letter to

23  the United Nations and WHO, stating: "Based upon peer reviewed, published research, we

24  have serious concerns regarding the ubiquitous and increasing exposure to … wireless

25  devices." *Scientists call for Protection from Non-ionizing Electromagnetic Field Exposure*,

26  EMF SCIENTIST, https://www.emfscientist.org/index.php/emf-scientist-appeal (last accessed

27  Aug. 14, 2020).

28

149.    The 5G Appeal was prepared in 2017 by scientists and doctors who called on the European Union ("EU") to impose a moratorium on the roll out of 5G due to serious potential health effects from 5G technology. As of May 18, 2020, 377 scientists and medical doctors have signed the 5G Appeal. The 5G Appeal urges the EU to "take all reasonable measures to halt the 5G RF-EMF ["radio frequency-electromagnetic fields"] expansion until independent scientists can assure that 5G and the total radiation levels caused by RF-EMF (5G together with 2G, 3G, 4G, and WiFi) will not be harmful for EU citizens, especially infants, children and pregnant women, as well as the environment."

150.    According to the 5G Appeal, "RF-EMF has been proven to be harmful for humans and the environment." Effects include "increased cancer risk; cellular stress, increase in harmful free radicals, genetic damage, structural and functional changes of the reproductive system, learning and memory deficits, neurological disorders, and negative impacts on the general well-being in humans. Damage goes well beyond the human race, as there is growing evidence of harmful effects to both plant and animal life." The 5G Appeal concludes that an epidemic of sickness from this radiation already exists and "*inaction is a cost to society and is not an option anymore*." *About*, 5G APPEAL, http://www.5gappeal.eu/about/ (last accssed Aug. 14, 2020) (emphasis added).

F.    **Facebook's Adverse Motives.**

    1.    **Zuckerberg's Corporate Biases.**

151.    Zuckerberg has donated at least $25 million to the CDC Foundation.

152.    At an October 22, 2019 U.S. House Committee on Financial Services hearing, Congressman Bill Posey (R-FL) had the following exchange with Zuckerberg, which revealed a strikingly unscientific view of the scientific method with respect to vaccines:

> Representative Posey: I support vaccinations of children and adults, but I also support open and frank communication about the risks of vaccination. You testified that you believe in giving people a voice. Is Facebook able to assure us it will support users' fair and open discussions and communications about the risks as well as the benefits of vaccinations?

Mr. Zuckerberg: We do care deeply about giving people a voice and freedom ofexpression. At the same time, we hear consistently from our community that people want us to stop the spread of misinformation. So what we do is try to focus on misinformation that has the potential to lead to imminent or physical harm, and that can include especially misleading health advice.

Representative Posey: Are you 100% confident that vaccines pose no injury to any person on this planet?

Mr. Zuckerberg: *I don't think it would be possible for anyone to be 100 percent confident but my understanding of the scientific consensus is that it's important that people get their vaccines.*

Representative Posey: Shouldn't somebody have the opportunity to express an opinion different from yours?

Mr. Zuckerberg: If someone wants to post anti-vaccination content or they want to join a group where people are discussing that, we don't stop them from doing that. But […] we don't go out of our way to make sure our group recommendation systems show people or encourage people to join those groups. We discourage that.

*Facebook CEO Testimony Before House Financial Services Committee* [Video], C-SPAN (Oct. 23, 2019), https://www.c-span.org/video/?465293-1/facebook-ceo-testimony-house-financial-services-committee (emphasis added).

153.    Yet, by contrast, when it comes to "political speech," Zuckerberg claims to be a First Amendment absolutist. In a May 27, 2020 interview with Fox TV News anchor Dana Perino, Zuckerberg rebuked Twitter for its decision to tag two of President Donald Trump's tweets about mail-in voting with fact-check links. Zuckerberg said, "*I just believe strongly that Facebook shouldn't be the arbiter of truth of everything that people say online. Private companies probably shouldn't be, especially these platform companies, shouldn't be in the position of doing that.*" Rachel Sandler, *Zuckerberg Criticizes Twitter For Fact-Checking Trump Tweets*, FORBES (May 27, 2020), https://www.forbes.com/sites/rachelsandler/2020/05/27/zuckerberg-criticizes-twitter-for-fact-checking-trump-tweets/#2aec97616f7a (emphasis added). This is a very significant admission by Facebook's chairman even as he and

his company purport to "arbitrate the truth" of open scientific controversies when doing so advances their business interests.

154.    On June 2, 2020, Zuckerberg held a "town hall" with Facebook employees who believe the company should take action on a controversial post by President Trump that "when the looting begins, the shooting begins[,]" which many people interpreted as a call for violence in nationwide protests over the death of George Floyd. Twitter put a warning label over the tweet, flagging it as violent content that violated that company's policies, but the tweet was being left up because it was newsworthy. Facebook declined to take any action on a similar post on its site.

155.    At the "town hall," Zuckerberg defended his decision that the post did not constitute a policy violation, as he "personally walked employees through different interpretations of Trump's language." Zuckerberg's personal involvement in the decision is "characteristic of the way he has handled controversial policy choices over the last several years[.] [. . .] His leadership style contrasts with Twitter CEO Jack Dorsey, who tends to delegate policy decisions to his deputies. Zuckerberg also made the decision not to take down a video of House Speaker Nancy Pelosi that was manipulated to make her appear drunk. He made a personal call not to fact check political advertising, despite frustration from the public and from employees, according to a person familiar with the decision-making." Elizabeth Dwoskin, *Zuckerberg defends decisions on Trump as Facebook employee unrest grows*, WASHINGTON POST (Jun. 2, 2020), https://www.sfgate.com/news/article/Zuckerberg-defends-decisions-on-Trump-as-Facebook-15311764.php. Zuckerberg justified his decision not to act against the President's posts, citing his responsibility as the "leader of an institution committed to free expression." Donie O'Sullivan & Brian Fung, *Mark Zuckerberg tries to explain his inaction on Trump posts to outraged staff*, CNN BUSINESS (Jun. 2, 2020), https://www.cnn.com/2020/06/02/tech/facebook-all-hands-trump/index.html. Tellingly, Zuckerberg's professed commitment to "free expression" does not extend to truthful communication about vaccine safety or 5G network health risks.

VERIFIED COMPLAINT
*Children's Health Defense v. Facebook* et al.

2. **Vaccine-Maker Ad Revenue.**

156.     Facebook earns revenue primarily through the sale of targeted advertising that appears on members' Facebook pages. *See*, *e.g.*, *Fraley v. Facebook*, 830 F. Supp. 2d 785, 791 (N.D. Cal. 2011). Facebook generates 98 percent of its revenue through ads. It netted $17.4 billion from advertising in its most recent quarter. Tiffany Hsu & Cecilia Kang, "*Morally Impossible*": *Some Advertisers Take a Timeout From Facebook*, NEW YORK TIMES (Jun. 9, 2020), https://www.nytimes.com/2020/06/09/business/media/facebook-advertisers-trump-zuckerberg.html?searchResultPosition=2.

157.     Beginning as early as 2016, Facebook initiated programs to capture an ever greater share of the pharmaceutical direct-to-consumer advertising market. That year, Facebook unveiled a new feature enabling pharmaceutical companies to comply with regulatory restrictions on advertising by showing "important safety information," or ISI, in a scrolling section featured below the ad. Beth Snyder Bulik, *Bayer blazes new trails for pharma with Betaseron Facebook ad*, FIERCEPHARMA (Oct. 30, 2016), https://www.fiercepharma.com/marketing/bayer-s-first-facebook-ad-campaign-features-first-scrolling-isi-a-pharma-ad-facebook-ad. That feature has paid off hugely for Facebook.

158.     In a Washington Post article entitled "Facebook has a prescription: More pharmaceutical ads," dated March 3, 2020, journalist Natasha Tiku wrote:

> After years of avoiding social media, drug companies are growing bolder about advertising on Facebook and other social networks, according to interviews with advertising executives, marketers, health-care privacy researchers and patient advocates. That is exposing loopholes around the way data can be used to show consumers relevant ads about their personal health, even as both social networks and pharmaceutical manufacturers disavow targeting ads to people based on their medical conditions.
>
> Ads promoting prescription drugs are popping up on Facebook for depression, HIV and cancer. Spending on Facebook mobile ads alone by pharmaceutical and health-care brands reached nearly a billion dollars in 2019, nearly tripling over two years, according to Pathmatics, an advertising analytics company. Facebook offers

tools to help drug companies stay compliant with rules about disclosing safety information or reporting side effects.

But seeing an ad for a drug designed to treat a person's particular health condition in the relatively intimate setting of a social media feed — amid pictures of friends and links to news articles — can feel more intrusive than elsewhere online. The same opaque Facebook systems that help place an ad for a political campaign or a new shoe in a user's feed also can be used by pharmaceutical companies, allowing them to target consumers who match certain characteristics or had visited a particular website in the past.

[…]

The growing concern about targeted pharmaceutical ads is unfolding against an expansion at Facebook focusing more generally on health — including encouraging more groups, where community members gather to discuss certain topics, like the one Downing moderates. It's also been actively soliciting more health-care-focused ads.

[. . .]

Pfizer, Allergan, Merck and GlaxoSmithKline were among the top 10 spenders on Facebook mobile ads in 2019, along with fast-growing health start-ups such as SmileDirectClub and Roman, according to Pathmatics.

Natasha Tiku, *Facebook has a prescription: More pharmaceutical ads*, WASHINGTON POST (Mar. 3, 2020), https://www.washingtonpost.com/technology/2020/03/03/facebook-pharma-ads/.

159.   As alleged *supra*, Merck and GlaxoSmithKline are two of the four pharmaceutical manufacturers (Pfizer and Sanofi are the others) which control the United States vaccine market.

### 3.   Vaccine Development.

160.   In December 2015, Zuckerberg and his wife Dr. Priscilla Chan co-founded the Chan Zuckerberg Initiative, LLC, ("CZI"), a for-profit corporation, of which he is chairman,

1   chief executive officer, and co-managing member, with a pledge to "donate" (i.e., transfer) 99

2   percent of their Facebook shares, then valued at $45 billion. CZI and CZ Biohub, its wholly-

3   owned subsidiary, have set as their "moon shot mission" the goal "to cure all disease on the

4   planet within the Facebook executive's childrens' lifetimes." The CZI Infectious Disease

5   Initiative seeks to develop new drugs, diagnostic tests and vaccines that could aid the fight

6   against diseases like HIV, Ebola and newly emerging threats like Zika. *CZI Announces the*

7   *Chan Zuckerberg Biohub*, CHAN ZUCKERBERG INITIATIVE (Sept. 23, 2016),

8   https://chanzuckerberg.com/newsroom/czi-announces-the-chan-zuckerberg-biohub/. CZI

9   purports that "[o]ur scientists and engineers will apply the most advanced technologies

10   available today and work to invent new tools as well to support the global fight against

11   infectious diseases. The work will be clustered around four key areas: diagnostic tests, new

12   drugs, vaccines and rapid response."

13       161.   With respect to vaccines specifically, CZI's online statement purports that:

14           We're seeking new approaches to overcoming challenges that have
15           stymied vaccine development for diseases like HIV/AIDS and
16           tuberculosis. To push forward on vaccine development, we'll use
           recent advances emerging from structural biology, machine
17           learning and computer-assisted protein design to establish a new
18           approach for creating vaccine candidates. And we'll adopt
           "machine learning" strategies to develop powerful computer
19           programs that can sort through large volumes of scientific data for
20           insights.

21           We believe machine learning technology, now used for things like
           driverless car and threat assessments, could be particularly
22           effective for probing clinical trial data for insights existing
23           analytical methods fail to find.

24   *Infectious Disease Initiative*, CHAN ZUCKERBERG BIOHUB, https://www.czbiohub.org/projects/

25   infectious-disease/ (last accessed Aug. 15, 2020).

26       162.   In 2018, Zuckerberg purported to transfer 29 million of his Facebook shares,

27   worth $5.3 billion, to CZI. Overall, the CZ Biohub (CZB) is expected to receive a transfer of

28   $600 million over the course of ten years from Zuckerberg. The CZB provides $50 million in

funding for researchers based in the San Francisco area at UC Berkeley, Stanford University, and the University of California at San Francisco (UCSF). 750 researchers applied for the grants, and 47 were awarded cash grants of up to $1.5 million, presumably in exchange for patent ownership transfers to CZB, and thereby to Zuckerberg as controlling co-owner and co-manager. *The Chan Zuckerberg Biohub*: *Seeking to Cure All Diseases*, BIOLEGEND BLOG, https://www.biolegend.com/ja-jp/blog/the-chan-zuckerberg-biohub-seeking-to-cure-all-diseases (last accessed Aug. 15, 2020).

### 4.    5G Networks.

163.    Over the past five years, Facebook has made significant investments in developing 5G home systems, 60 GHz antenna infrastructure for cities ("Project Telegraph"), and 5G for rural areas ("Project Aries"), as well as satellites. Facebook purchased Inovi, a 5G company, which it used to build a trial 5G network in San Jose, California and on Facebook's "campus" to test the viability and cost-effectiveness of 5G for mass deployment. Facebook also spearheaded the Telecom Infrastructure Project ("TIP"). By building a network of companies focused on 5G, Facebook seeks to harmonize the technical and standardization challenges of rolling out the 5G network. Bijan Khosravi, *Facebook's New Focus On 5G and Golden Opportunity for Entrepreneurs*, FORBES (Apr. 30, 2018), https://www.forbes.com/sites/bijankhosravi/2018/04/30/todays-black-clouds-over-facebook-will-part-look-at-their-golden-ideas-in-5g/#37c15fdd313b.

164.    Facebook also collaborates with Common Networks, a United States company, to deliver ultra high-speed gigabit internet service to residential customers. Common Networks is using Facebook's Terragraph technology, which employs high-frequency radio waves to speed up networks in locations with dense populations, as a replacement for standard home broadband. Katie Collins, *Facebook and partners collaborate to bring 5G wireless internet to California homes*, CNET, https://www.cnet.com/news/facebook-brings-faster-than-fiber-5g-wireless-connectivity-to-california/.

165.    Facebook's subsidiary PointView Tech has designed an internet satellite (called "Athena") to provide broadband access to unserved and underserved areas throughout the

world. Facebook's designers intend that Athena will deliver data 10-times faster than SpaceX's Starlink satellites. Mark Harris, *Facebook May Have Secret Plans to Build a Satellite-Based Internet*, IEEE (May 2, 2018), https://spectrum.ieee.org/tech-talk/aerospace/satellites/facebook-may-have-secret-plans-to-launch-a-internet-satellite. To support this expansion, Facebook among other companies and governments have plans to launch collectively nearly 50,000 satellites to provide 5G and Wi-Fi services everywhere on Earth. *See*, *e.g.*, Henry, C., *Facebook willing to invest in satellite user equipment*, SPACE NEWS (March 8, 2017 (https://spacenews.com/facebook-willing-to-invest-in-satellite-user-equipment/.

166.     Facebook recently announced its plan to construct an undersea cable circling the African continent ("Project Simba"), to complement its transatlantic cable "Marea." Facebook intends that this global wifi infrastructure will support its "Free Basics" project, which provides cheap internet services to the developing world. It currently operates in 63 countries.

167.     The greater bandwidth and lower latency (delay) of 5G will allow Facebook to display more advertising content to its users at faster browsing speeds, generating ever more ad revenue for Facebook. It also stands to benefit financially from expanded global Internet access to its social media platform through expanding 5G networks. *See*, *e.g.*, Jessi Hempel, *Inside Facebook's Ambitious Plan to Connect the Whole World*, WIRED (Jan. 19, 2016), https://www.wired.com/2016/01/facebook-zuckerberg-internet-org/.

168.     Facebook also profits from expanded 5G networks, which can leverage other substantial investments it has made in new technologies. In 2014, Facebook acquired the virtual reality company Oculus for $2 billion, and since then, Facebook has filed a number of related patents in the field of augmented reality technology (AR, VR, and home hardware products). *See*, *e.g.*, Christopher Yasiejko & Sarah Frier, *Facebook's Augmented Reality Push Causes Leap in U.S. Patents*, BLOOMBERG (Jan. 14, 2020), https://www.bloomberg.com/news/articles/2020-01-14/facebook-s-leap-in-u-s-patents-hints-at-eye-on-virtual-reality (Zuckerberg opinion that "at some point in the 2020's, we will get breakthrough augmented reality glasses that will redefine our relationship with technology"); Leo Sun, *Will Facebook Redefine Augmented Reality With Stella and Orion*?, MOTLEY FOOL

(Sept. 20, 2019), https://www.fool.com/investing/2019/09/20/will-facebook-redefine-augmented-reality-with-stel.aspx (With respect to augmented reality, Facebook plans to manufacture "smartglasses" which it has 'codenamed' 'Stella," set to launch between 2023 and 2025, and a more advanced model it has 'codenamed' 'Orion.'). The success of these AR and other products depends to a significant extent (if not entirely) on Facebook's capacity to exploit 5G networks' increased bandwidth and speed.

169.    Additionally, Facebook has solidified its position as a leading developer of artificial intelligence ("AI") technology. 5G helps enable both AI and drone technology. Tom Taulli, *Facebook AI (Artificial Intelligence): Will M&A Help?*, FORBES (Feb. 15, 2020), https://www.forbes.com/sites/tomtaulli/2020/02/15/facebook-ai-artificial-intelligence-will-ma-help/#104eed427664. Facebook purportedly has also been developing solar-powered drone technology. Jon Russell, *Facebook is reportedly testing solar-powered internet drones again — this time with Airbus*, TECHCRUNCH (Jan. 21, 2019), https://techcrunch.com/2019/01/21/facebook-airbus-solar-drones-internet-program/?guccounter=1.

170.    Finally, Facebook stands to benefit from its investments in the "Internet of Things" infrastructure that depends on 5G. At present, roughly 8.4 billion 'things' make up this 'universe,' - from cars to appliances to wearable tech – which represents a 31% increase in the past four years. By the year 2025, that number may increase to 55 billion internet-enabled devices. *The Internet of Things will thrive on 5G technology*, VERIZON (Jun. 12, 2018), https://www.verizon.com/about/our-company/5g/internet-things-will-thrive-5g-technology. Facebook's business plan contemplates widespread exploitation of 5G networks across the globe to drive its platform's profitability.

## FIRST CAUSE OF ACTION

## (FIRST AND FIFTH AMENDMENTS — *BIVENS* VIOLATIONS)

**Defendants Facebook, Zuckerberg, Science Feedback, Poynter, Politifact, and Does 1-20**

171.    Paragraphs 1 through 170 are realleged and incorporated as if fully set forth herein.

VERIFIED COMPLAINT
*Children's Health Defense v. Facebook* et al.

172.     Plaintiff seeks an implied private damages remedy against private defendants who act jointly or in concert with federal government agencies or actors to deny Plaintiff's First Amendment speech and Fifth Amendment property rights. *Davis v. Passman*, 442 U.S. 228 (1979) (implied damages remedy under Fifth Amendment Due Process Clause); *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (Fourth Amendment). The private cause of action is implied under 28 U.S.C. § 1331 to vindicate constitutional rights which would otherwise go unredressed. By analogy to 42 U.S.C. § 1983, Plaintiff must show both (1) the deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of [federal] law. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138 (9th Cir. 2012).

173.     The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations, and the constitutional tort remedy against private entities is foreclosed only where claimant has other effective remedies. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 71 (2001); *cf. Davis v. Passman*, 442 U.S. at 245 ("For Davis, as for Bivens, it is damages or nothing."). Here, too, a private remedy should be implied because Plaintiff has no other recourse to right the wrongs of all defendants, corporate and individual.

174.     The First Amendment protects Plaintiff's rights of free speech and association. Under the First Amendment, Americans have the right to hear all sides of every issue and to make their own judgments about those issues without government interference or limitations. Content-based restrictions on speech are presumptively unconstitutional, and courts analyze such restrictions under strict scrutiny. It is axiomatic that public agencies such as the CDC and WHO could not themselves directly censor or issue a prior restraint upon Plaintiff's online speech. *See*, *e.g.*, *Freedman v. Maryland*, 380 U.S. 51, 59 (1965) (motion picture exhibition censoring panel could prohibit screening of films only if it assured exhibitor "that the censor will, within a specified brief period, either issue a license or go to court to restrain showing the film"); *Speiser v. Randall*, 357 U.S. 513, 526 (1958) ("Where the transcendent value of speech is involved, due process certainly requires . . . that the State bear the burden of persuasion to show that the appellants engaged in criminal speech."). So, here, the judicial branch must

affirm a bedrock principle of liberty that governmental agencies cannot legally "sub-contract" or "privatize" the role of public censor to Facebook as an end-run around the Constitution. Facebook's actions, taken "under color of" federal law, *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 954 (9th Cir. 2008) (en banc), constitute a violation of Plaintiff's constitutional free speech rights.

175.   Defendants' deprivation of Plaintiff's federal rights is "fairly attributable" to the government, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982), as it was taken with significant encouragement from, and in close consultation with, governmental agencies and actors. *Franklin v. Fox*, 312 F.3d 423, 444-45 (9th Cir. 2002). Ultimately, joint action exists when the government has "'*so far insinuated itself into a position of interdependence with* [*the private entity*] *that it must be recognized as a joint participant in the challenged activity.*'" *Gorenc v. Salt River Project Agric. Improvement & Power Dist.*, 869 F.2d 503, 507 (9th Cir. 1989) (emphases added). Defendants' misconduct is a far cry from "merely hosting speech by others." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019); *Fed. Agency of News LLC v. Facebook, Inc.* 2020 U.S. Dist. LEXIS 6159, *26 (N.D. Cal. 2020).

176.   Specifically, the corporate and individual defendants have acted in concert with Rep. Schiff, federal officials at the CDC, and under their aegis, the WHO, a United Nations specialized agency acting with the consent of the federal government, to deprive Plaintiff of its constitutional free expression rights. At all times relevant hereto, the United States was a member of the WHO. Under Article 71 of its Constitution, the WHO may only consult and cooperate with non-governmental national organizations *with the consent of the Government concerned. Basic Documents*, WORLD HEALTH ORGANIATION, *supra*, https://apps.who.int/gb/bd/pdf_files/BD_49th-en.pdf#page=1 (emphasis added).

177.   Facebook willfully participated in joint action with Rep. Schiff, CDC and/or WHO officials or their agents to "police" CDC and WHO policies through Facebook's signature algorithms and machine learning to define, identify, label as "false news" and/or censor Plaintiff's speech with respect to vaccine-related speech. For *Bivens* purposes, the

WHO must be recognized as a public entity, particularly when its charter requires official consent for its involvement with Facebook.

178.    Rep. Schiff's February 14, 2019 public letter to Zuckerberg deployed the term "vaccine misinformation" as it has been used by the CDC and WHO, as a euphemism for any expression of skepticism toward government or pharmaceutical industry pronouncements about vaccine safety or efficacy, regardless of its truth. Rep. Schiff also forcefully encouraged Facebook to refer users to "authoritative" sources of information, i.e., the CDC and/or WHO.

179.    On March 7, 2019, with scant regard for CHD's nine-page letter rebuttal, Facebook publicly cited the CDC and WHO as *the* sources of Facebook's initiative to identify and "take action against verifiable vaccine hoaxes," including removing such content from its platform. Facebook also identified those governmental agencies as *the* sources of affirmative information which Facebook would instead provide to its members, by posting that content at the top of results for related searches, on pages discussing the topic, and on invitations to join groups about the topic. *Combatting Vaccine Misinformation*, FACEBOOK, *supra*, https://about.fb.com/news/2019/03/combatting-vaccine-misinformation/. The same day that Facebook published its Warning Label on CHD's page, the WHO publicly boasted that Facebook's effort was the product of "*several months of discussion*" between the two. *Vaccine Misinformation: Statement by WHO Director-General on Facebook and Instagram*, *supra*, https://www.who.int/news-room/detail/04-09-2019-vaccine-misinformation-statement-by-who-director-general-on-facebook-and-instagram (emphasis added). Unlike *Fed. Agency of News LLC v. Facebook, Inc.* 2020 U.S. Dist. LEXIS 6159 at *39, Facebook's consultation and joint action with the CDC and WHO predates and provides the template, if not the technical means, by which Facebook has injured Plaintiff.

180.    Moreover, defendants integrated WHO and CDC definitions of "vaccine hoax" into the algorithms and machine learning by which they have identified CHD's content, which is often flagged merely because it is critical of those same agencies as "biased", "unreliable", and "out-of-date." Science Feedback's "fact-checker" responses merely cite to those flawed CDC studies of which Plaintiff is justly critical. Essentially, the government furnished critical

information to Facebook, which Facebook then willfully used to effectuate its misinformation and agitprop scheme. Defendants' behavior qualifies as "state action" under the joint action test due to their active cooperation and interdependence with the CDC and WHO. On the public record, there is a "sufficiently close nexus" or symbiosis between the federal government and the challenged actions of defendants that the actions of the latter may be fairly treated as those of the government itself. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974). The CDC's and WHO's open and extensive coordination with Facebook shows "state action" in furtherance of an agreement between the government and a private party for purposes of Plaintiff's *Bivens* claim.

181.    Rep. Schiff also acted "under color of federal law" in issuing his pointed request to Facebook to censor and remove "vaccine misinformation" from its platform. Thus, Rep. Schiff's conditional notice to remove Facebook's Section 230 immunity also constitutes "significant encouragement, either overt or covert, that the [private actor's] choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

182.    It is well-established that, as a general rule, the government "may not suppress lawful speech as the means to suppress unlawful speech." *Ashcroft v. Free Speech Coalition*, 535 U. S., 234, 255 (2002). Facebook has closely coordinated with government actors in the design of its aims, and the technical means by which Facebook applies public agency definitions and literature to accomplish their jointly-held goals: to identify, warn against, purportedly "rebut," and censor so-called "vaccine hoax" speech. Facebook's actions in censoring CHD's protected speech amount to state action for purposes of the First Amendment. *See*, *e.g.*, *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983).

183.    In the typical case raising a state action issue, a private party has taken the decisive step that caused the harm to the Plaintiff, and the question is whether the State was *sufficiently involved* to treat that decisive conduct as state action. *Nat'l Collegiate Athletic Ass'n. v. Tarkanian*, 488 U.S. 179, 192, 102 L. Ed. 2d 469, 109 S. Ct. 454 (1988). Beyond the public record cited *supra*, the missing pieces of official "involvement" are within the Facebook defendants' possession, custody, and control. Plaintiff requires judicial process to obtain

1   defendants' records and recollections of the "who, what, when, where, why, and how" of
2   Facebook's collaboration with Rep. Schiff, the CDC and WHO, the CDC Foundation, and/or
3   others under their aegis, to design, implement, and monitor Facebook's "vaccine
4   misinformation" algorithm for identifying anti-CHD content, and/or to supervise or monitor
5   Facebook "fact-checkers" opposition articles.

6       184.   Facebook violated Plaintiff's First Amendment rights by labeling CHD's content
7   "False Information," and taking other steps effectively to censor or block content from users.
8   Facebook took these actions against Plaintiff in an effort to silence and deter its free speech
9   solely on account of their viewpoint. The case raises an urgent wrong that will go unredressed
10   absent a judicial remedy fitted to the high stakes of speech suppression in a free society.

11       185.   In addition, the Fifth Amendment provides that "[n]o person shall be . . .
12   deprived of . . . property, without due process of law; nor shall private property be taken for
13   public use, without just compensation." U.S. Const. amend. V. In May 2019, Facebook
14   permanently disabled the "donate" button on CHD's Facebook page, for and in which action
15   Facebook received significant encouragement from the government. *Cf. Del's Big Saver Foods,*
16   *Inc. v. Carpenter Cook, Inc.*, 795 F.2d 1344, 1346 (7th Cir. 1986) ("A state cannot avoid its
17   obligations under the due process clause by delegating to private persons the authority to
18   deprive people of their property without due process of law."). And, as Rep. Schiff requested,
19   Facebook also refused to carry CHD's advertising of its fundraising campaigns.

20       186.   Facebook misrepresented to CHD as its rationale that CHD had violated its
21   fundraising terms. But, in actuality, Facebook took these punitive actions to squelch CHD's
22   viewpoint by cutting off its donations. Defendants' actions amount to an unlawful deprivation
23   or "taking" of Plaintiff's property interests in its own fundraising functions.

24       187.   "[T]he existence of a property interest is determined by reference to 'existing
25   rules or understandings that stem from an independent source such as state law.'" *Phillips v.*
26   *Washington Legal Foundation*, 524 U.S. 156, 164 (1998) (*quoting Board of Regents of State*
27   *Colleges v. Roth*, 408 U.S. 564, 577 (1972)). Certainly, by that measure, the funding button is a
28   "thing of value" to CHD as its beneficial owner, and a valid property interest by means of

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

1   which CHD raised $41,241 in user donations from January to May 2019 alone. *See*, *e.g.*,
2   *Boston Chamber of Commerce v. Boston*, 217 U.S. 189, 195 (1910) (Holmes, J.) ("the question
3   is what has the owner lost, not what has the taker gained"). Indeed, it may be said that
4   Facebook's fundraising function is as much a lifeblood for CHD as it is for many other
5   501(c)(3) organizations, and that the power to remove it at the government's behest is the
6   power to destroy these charitable organizations.

7       188.   Facebook violated Plaintiff's Fifth Amendment rights by confiscating its
8   fundraising functions under color of law without just compensation or due process. Facebook
9   took these actions against CHD in order to snuff out CHD's ability to raise funds, solely on
10  account of CHD's viewpoint. Defendants' removal of the donate button is conduct suggesting
11  that CHD is unworthy of monetary contributions and, thus, the object of special opprobrium,
12  all damaging to CHD's reputation and its ability to sustain itself. This represents another
13  urgent wrong that will go unredressed absent a judicial remedy fitted to the high stakes of
14  officially sponsored viewpoint-suppression in a free society.

15

16          **SECOND CAUSE OF ACTION**

17      **(LANHAM ACT VIOLATIONS — 15 U.S.C. § 1125(A))**

18  **Defendants Facebook, Zuckerberg, Science Feedback, Poynter, Politifact, and Does 1-20**

19      189.   Paragraphs 1 through 188 are realleged and incorporated as if fully set forth
20  herein.

21      190.   The elements of a false promotion claim under the Lanham Act, 15 U.S.C.
22  § 1125(a)(1)(B), are: (1) in an advertisement or promotion, defendants made false statements
23  of fact about its own or another's services; (2) the promotion actually deceived or has the
24  tendency to deceive a substantial segment of their audience; (3) such deception is material, in
25  that it is likely to influence the purchasing decision; (4) defendants caused their falsely
26  promoted services to enter interstate commerce; and (5) Plaintiff has been or is likely to be
27  injured as the result of the foregoing either by direct diversion of sales from themselves to
28  defendants, or by lessening of the goodwill which its services enjoy with the buying public.

*Rice v. Fox Broad Co.*, 33 F.3d 1170, 1180 (9th Cir. 2003). Facebook's warning label and "fact-checks" on CHD's page violate the Lanham Act in that these are (1) commercial speech; (2) by defendants who or whose privities are in commercial competition with Plaintiff; (3) for the purpose of influencing consumers to buy defendants' goods or services, or to lessen the goodwill which CHD's services enjoy with the contributing public; and (4) disseminated sufficiently to the relevant purchasing public to constitute "promotion" within that industry. *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999). Facebook and the individual defendants made, authored, and published the warning label and "fact-checks" on CHD's page in order to deter Plaintiff's followers and other consumers from listening to, trusting, and relying on Plaintiff's content, and donating or contributing to Plaintiff. By warning consumers instead to "go to CDC.gov" for "reliable and up-to-date [vaccine] information," defendants intended to persuade consumers instead to follow the CDC's recommendations to get the vaccines produced by its major advertisers, Merck, GSK, Sanofi, and Pfizer, who buy $1 billion per annum in advertisements from Facebook.

191.    The Lanham Act is not strictly limited to conduct that is unfair to a direct competitor, if defendant is affiliated with a competitor. Here, it suffices that defendants have actively cooperated with the CDC and WHO, with whom Plaintiff competes in the marketplace of ideas concerning genuine scientific inquiry into vaccine safety, and that Plaintiff competes with defendants in that same marketplace with respect to 5G network safety. Facebook is engaged in promoting competitive products through its pharmaceutical manufacturer advertisers, and competitive services through its affiliation with the CDC and WHO. *See*, *e.g.*, *Grasshopper House, LLC v. Clean & Sober Media LLC*, 394 F. Supp. 3d 1073 (C.D. Cal. 2019) (finding liability where adverse reviewer was allied with competitor). Facebook's intention to lessen the goodwill which CHD's services enjoy is manifest from its false "warning label" and "fact-checks" and its disabling of CHD's fundraising function and advertising. Plaintiff has suffered a competitive injury under the Lanham Act.

192.    The false representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "'promotion." *Coastal Abstract Serv., Inc. v.*

1    *First Am. Title Ins. Co.*, 173 F.3d at 735. Facebook's "warning label" and "fact-checks" are

2    promotional in that these are all part of Facebook's ongoing "vaccine misinformation" public

3    relations campaign. *See, e.g.*, *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 77 (1983)

4    (mailing of informational pamphlets by non-profit organization can be classified as

5    commercial speech). Facebook's "community initiatives" are promotional by definition

6    because Facebook's business model is, always and in all things, to manufacture users' "trust"

7    in Facebook – so Facebook can collect, manipulate, and market more of those trusting users'

8    data. "Facebook's business model [] rests on the need to keep consumers engaged in its

9    services on the one hand and the need to monetize the data it gathers by targeting those users

10   with new services and advertising on the other. [. . .] Over the long term, Facebook's business

11   model must evolve to center around trust, which means making user privacy and data security

12   as important as monetization." Adam Burt, *Can Facebook Ever Be Fixed*?, Harvard

13   Business Review (April 8, 2019), https://hbr.org/2019/04/can-facebook-ever-be-fixed.

14        193.    Statements on websites are generally available to the public at large, and satisfy

15   the commercial speech requirement. In addition, defendants published the "warning label" and

16   "fact-checks" as part of its own promotional campaign to lobby government officials to

17   preserve its immunity under the CDA, and to persuade consumers that its content-management

18   process warrants their continued trust and patronage.

19        194.    The "warning label" and "fact-check" deceptions are "material" in that these are

20   likely to lessen the goodwill that CHD's services enjoy with the public and to influence

21   consumers' vaccine purchasing decisions. *Cook, Perkiss, and Liehe, Inc. v. N. Cal. Collection

22   Serv.*, 911 F.2d 242, 244 (9th Cir. 1990). By affixing the "warning label" and "fact-checks" to

23   CHD's Facebook page where these have been viewed hundreds of thousands of times since

24   September 4, 2019 by members of Facebook's global community, defendants effectively

25   disseminated their false statements widely within the relevant purchasing public.

26        195.    As alleged more specifically *infra*, on or about September 4, 2019 and

27   continuously since then, defendants Facebook and Zuckerberg have made, authored, and/or

28   published and circulated false and unprivileged statements about CHD in the form of

75

VERIFIED COMPLAINT
*Children's Health Defense v. Facebook et al.*

Facebook's Warning Label on CHD's Facebook page. A warning label is, by definition, the disclosure of facts concerning dangers inherent in the use of a product or service. *Black's Law Dictionary* 1421 (5th ed. 1979) ("The purpose of a 'warning' is to apprise a party of the existence of danger of which he is not aware to enable him to protect himself against it[.]" Facebook has perverted the consumer-safety protection of a manufacturer's "duty to warn" into a license to denigrate true speech where the truth conflicts with Facebook's economic interests, business model, and/or relations with government, or Zuckerberg's own perception of what is true or scientific fact.

196.   Facebook's warning label concerning CHD is false on its face and by clear implication. Defendants knew that their warning label was untrue and perpetuated it to divert users from CHD's Facebook page to the CDC's website. This was one of the tactics in defendants' RICO fraud enterprise to damage CHD financially and marginalize CHD's health advocacy work, and unjustly enrich themselves through their continued receipt of billions of dollars in pharmaceutical advertising revenue, and billions more in future vaccine and 5G network-related profits.

197.   Defendants' false statements have already harmed Plaintiff and likely will harm it in the future, especially within the large community of CHD followers, and among countless others who wish to be informed of true facts about vaccine safety risks. Plaintiff has been seriously damaged as a direct and proximate cause of the falsity of the defendants' warning label, in an amount to be determined at trial. The false statement attributes conduct, characteristics, and conditions incompatible with the proper exercise of Plaintiff's trade and professional duties. The false statements were intended to hold Plaintiff up to hatred, distrust, contempt, aversion, ridicule, and disgrace in the minds of a substantial number in that community, and were calculated to harm, and have harmed their business relationships and goodwill, and deterred others from associating or dealing with Plaintiff. Defendants' warning label constitutes egregious conduct constituting malice. Defendants' acts were willful and malicious. As such, in addition to compensatory damages and/or presumed damages, Plaintiff

1    demands punitive damages relating to defendants' making of the above-referenced false

2    statements and other willful misconduct, in an amount to be determined at trial.

3        198.    California defamation law provides a reference point for establishing defendants'

4    false promotion liability for willfully publishing its false "warning label" on Plaintiff's page:

5    (1) defendants published the statements; (2) the statements were about Plaintiff; (3) they were

6    false; and (4) defendants failed to use reasonable care to determine the truth or falsity. Cal.

7    Civ. Code § 45 (defining the tort of libel as a "writing" or "fixed representation," which

8    exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be

9    shunned or avoided, or *which has a tendency to injure him in his occupation*") (emphasis

10   added); *Hecimovich v. Encinal Sch. Parent Teacher Org.*, 203 Cal. App. 4th 450, 470 (2012).

11   Where Plaintiff is a public figure, the speech concerns a matter of public concern, *and*

12   defendants are media publishers, then Plaintiff must prove that defendants acted with "actual

13   malice." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 14 (1990). *Milkovich* left open the

14   question whether, in the case of a non-media publisher defendant, Plaintiff must show only that

15   defendants did not act with reasonable care "in checking on the truth or falsity of the

16   information before publishing it." *Carney v. Santa Cruz Women Against Rape*, 221 Cal. App.

17   3d 1009, 1016 (1990). By contrast, a public figure Plaintiff suing a media publisher defendant

18   must prove that defendant acted with "actual malice," which requires a showing that a

19   statement was made "with knowledge that it was false or with reckless disregard of whether it

20   was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964) (the "*New York*

21   *Times*" standard).

22       199.    Under California law, defamation is "the intentional publication of a statement of

23   fact which is false, unprivileged, and has a natural tendency to injure or which causes special

24   damages." *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 27 (2007). Facebook and Zuckerberg

25   "published" their Warning Label on CHD's Facebook page by inserting that "writing . . . or

26   other fixed representation to the eye" in a place of prominence of the page where it appears

27   every time a user opens the page, except where that user has previously seen it and deleted it.

28   California recognizes two types of libel (Cal. Civ. Code § 45a): libel per se, which is

defamatory on its face, when read *in context*, and libel per quod, which a reasonable reader would be able to recognize only by knowledge of specific facts and circumstances *extrinsic* to the publication. Libel per se permits recovery of general damages, including reputational harm and punitive damages, while libel per quod requires proof of "special damages" which are defined narrowly to encompass only economic damages. Cal. Civ. Code § 48a; *Gomes v. Fried*, 136 Cal. App. 3d 924, 939 (1982).

200.   The Second Restatement of Torts defines the "context" of a statement to "include all parts of the communication that are ordinarily read with it." RESTATEMENT (2D) OF TORTS § 563(d). For example, "the entire contents of a personal letter are considered as the context of any part of it because a recipient of the letter ordinarily reads the entire communication at one time." *Id.; Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (Ninth Circuit adopts the Second Restatement of Torts' distinction between "context" and "extrinsic circumstance."). Defendants' defamatory statement must be read and considered in the context of the other content of CHD's Facebook page where it appears, and to which it refers expressly and by necessary implication.

201.   Here, the context in which Facebook's Warning Label on CHD's page would ordinarily be seen and read includes: CHD's own mission statement on that same page that vaccine safety should be taken away from the CDC; CHD's message, "Read about CDC & WHO corrupt financial entanglements with vaccine industry, childrenshealthdefense.org/cdc-who"; and that context incorporates by reference numerous articles on CHD's page which call out and criticize the CDC's continued adherence to its "all vaccines for all children" policy. *See, e.g.*, "CDC Corruption, Deceit, and Cover-Up"; "CDC's Vaccine "Science"— A Decades Long Trail of Trickery"; "Why You Can't Trust the CDC on Vaccines"; "CDC and WHO Corrupt Financial Entanglements with the Vaccine Industry"; "Dr. Brian Hooker's Official Statement Regarding Vaccine Whistleblower William Thompson"; "CDC & FDA Committee Members Have Financial Conflict of Interest with Vaccine Pharmaceuticals"; "OSC Calls for Further Review of Whistleblower Disclosures on Zika Testing"; CDC Spider Letter"; "CDC: Off Center"; "Real-Life Data Show that the CDC Vaccine Schedule is Causing Harm"; "Don't

Fall for the CDC's Outlandish Lies About Thimerosal"; "CDC and WHO Corrupt Financial Entanglements with the Vaccine Industry"; "CDC Lies About, and Media Repeats, Risk of Dying from Measles"; "CDC's 'Universal' Recommendations for Infant Hep B Vaccine Not Based on Science, But Assumptions"; "CDC's Infant Hep B Vaccine Recommendations—No Proof of Safety?" *See Children's Health Defense* page, FACEBOOK, https://www.facebook.com/ChildrensHealthDefense (last accessed Aug. 15, 2020); *Knievel v. ESPN*, 393 F.3d at 1076-77 (considering surrounding web pages under the incorporation by reference doctrine). But, Plaintiff need not prove that the CDC is nefarious to make its point that the views of CHD are being unfairly misrepresented and censored, to the detriment of the public which deserves to be able to consider alternative views and make up its own mind.

202.    **"This page posts about vaccines."** Under California law, Plaintiff must show that the false statement was made "of and concerning" them, either by name or by "clear implication." *Ferlauto v. Hamsher*, 74 Cal. App. 4th 1294, 1404 (1999). The specific reference requirement is clearly met here as to CHD as an organization -- by the text of the first sentence ("*This page*"), by its large bolded font in the original, and, by its placement at the top of CHD's Facebook page. Libel exists where the words used can be shown to have referred to Plaintiff, and to have been so understood. *Vedovi v. Watson & Taylor*, 104 Cal. App. 80, 83 (1930).

203.    **"When it comes to health, everyone wants reliable, up-to-date information."** This sentence, read alone, is undoubtedly true. But, it tees up the falsity of the next sentence with which it should be read. "The publication in question […] must be read as a whole in order to understand its import and the effect that it was calculated to have on the reader[.]" *Selleck v. Globe International, Inc.*, 166 Cal. App. 3d 1123, 1131 (1985). The court applies a "totality of the circumstances test" and "puts itself in place of an average reader [to] determine the natural and probable effect of the statement." *Bently Reserve LP v. Papaliolios*, 218 Cal. App. 4th 418, 427-28 (2013).

204.    Merriam-Webster's Dictionary defines the adjective "reliable" as "suitable or fit to be relied on; dependable." *Reliable, Merriam-Webster.com*, https://www.merriam-

webster.com/dictionary/reliable (last accessed Aug. 15, 2020). Merriam-Webster's Thesaurus

lists synonyms for "reliable" to include "true, trustable, trusty, trustworthy, tried-and-true,

good, responsible, safe, secure, sure." *Reliable, Merriam-Webster.com*, Thesaurus,

https://www.merriam-webster.com/thesaurus/reliable (last accessed Aug. 15, 2020). Merriam-

Webster's Dictionary defines the adjective "up-to-date" as "(1) extending up to the present

time; including the latest information. (2) abreast of the times; modern." *Up-to-date, Merriam-*

*Webster.com*, https://www.merriam-webster.com/dictionary/up-to-date (last accessed Aug. 15,

2020). Merriam-Webster's Thesaurus adds the definition "having information especially as a

result of study or experience," and lists synonyms for "up-to-date" which include

"contemporary, current, modern, new, present-day, state-of-the-art, up-to-the-minute,

informed, knowledgeable, well-informed." *Up-to-date, Merriam-Webster.com*, Thesaurus,

https://www.merriam-webster.com/thesaurus/up-to-date (last accessed Aug. 15, 2020).

205.    **"The Centers for Disease Control (CDC) has information that can help**

**answer questions you may have about vaccines."** Read with the preceding "reliable, up-to-

date information" sentence to which it refers, and which together make its essential point, this

sentence is false, and provably so -- as CHD has devoted much of its organizational life to

showing. Read in context, the fair meaning of the sentence is to equate the word "information"

with "reliable and up-to-date information" in the preceding sentence. Any reasonable reader

would read the second "information" as shorthand for the first, and apply the "reliable, up-to-

date" modifiers to both. What else, if not the "reliable and up-to-date information," which

Facebook says "everyone wants," and which Facebook claims to be in a position to discern and

provide with respect to vaccines? By its terms of service and community standards

incorporated therewith, Facebook purports to be viewpoint-neutral except for limited instances

of speech, which poses an "imminent threat of harm or violence." Facebook's pretense of

neutrality only compounds the reputational harm of its libel to Plaintiff. *See Masson v. New*

*Yorker Magazine, Inc.*, 501 U.S. 496, 513 (1991) (New Yorker article which purported to be

non-fiction was actionable because it gave the reader no clue that fabricated quotations were

1  being used other than to allow the subject to speak for himself, which made them all the more

2  damning).

3      206.  **"Go to CDC.gov."** Once more, the bolded and larger font size underscore that

4  Facebook has singled out Plaintiff's Facebook page for negative comment. The very existence

5  of Facebook's Warning Label on CHD's page, and its redirection link "Go to CDC.gov," are

6  well understood as a "black mark" on that page among Facebook's community of 2 billion

7  users worldwide. Facebook's highly-sporadic and selective exercise of its content-regulation

8  authority as community moderator underscores its audience's reasonable expectation that, in

9  this context, a Facebook warning label on a third party's page conveys an objective fact, not an

10 expression of Facebook's opinion, or an undisclosed commercial interest and ambition. *See*

11 *Knievel v. ESPN*, 393 F.3d at 1075 (analyzing the format, structure, the language used, and the

12 expectations that the target audience would have with regard to the type of information that

13 might be found in the context, and noting that such context might be "paramount," if not

14 "dispositive"). For any reasonable reader, the "gist" or "sting" of Facebook's "warning label"

15 misrepresentation is its unsubtle insinuation *as fact* that, in contrast with the CDC's

16 information, **"what you see below on CHD's page is *not* reliable, up-to-date information.**

17 **Rely on the CDC instead."** That is the only reasonable interpretation of Facebook's Warning

18 Label in light of its specific wording, prominent placement on CHD's page, and the context of

19 the CHD-created content on that page which features CHD's scathing factual exposé of the

20 CDC.

21     207.  Facebook's warning label on CHD's page states a classic imputation of CHD's

22 dishonesty in dealing with its users, and a lack of integrity about its trade in the sphere in

23 which it operates. That is how third-party readers understand it and, as such, it is falsely

24 disparaging under the Lanham Act. Defendants are liable for what is insinuated, as well as for

25 what is stated explicitly. *MacLeod v. Tribune Publishing Co.*, 52 Cal. 2d 536, 547 (1959).

26 Further, the determinative question is whether the 'gist or sting' of the statement is true or

27 false, benign or defamatory, in substance. *Ringler Associates, Inc. v. Maryland Casualty Co.*,

28 80 Cal. App.4th 1165, 1182 (2000). A statement is deemed false if it "would have a different

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

effect on the mind of the reader (or viewer) from that which the pleaded truth would have produced." *Metabolife Int'l Inc. v. Wornick*, 264 F.3d 832, 849 (9th Cir. 2001) (*quoting Masson v. New Yorker Magazine, Inc.*, 501 U.S. at 517). Facebook's warning label is "reasonably susceptible of an interpretation which implies a provably false assertion of fact," *Couch v. San Juan Unified Sch. Dist.*, 33 Cal. App. 4th 1491 (1995); *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1063-64 (9th Cir. 1998). Here, the conclusion that CHD's vaccine-related information is "unreliable and out-of-date" is sufficiently factual to be verifiable as true or false, *Milkovich v. Lorain Journal Co.*, 497 U.S. at 19, and indeed, it is false. *See also Manufactured Home Communities, Inc. v. County of San Diego*, 544 F.3d 959, 964 (9th Cir. 2008) (defendant's statements that accused Plaintiff of lying without expressly disclosing a factual basis for the statements could be defamatory).

208.    An old, but instructive case is *Rosenberg v. J.C. Penney Co.*, 30 Cal. App. 2d 609 (1939). There, in 1924, the Rosenberg retail store sold the Healdsburg high school's gym uniform, and a competitor across the street, the J.C. Penney Co. department store, wanted that business. So, a J.C. Penney manager created a window display that purported to compare samples of the respective stores' gym shorts. The comparison included a placard with these comments: "Decide for Yourself. This Garment is either a poorly-made second or prison-made merchandise. Seams crooked. Slovenly made. Long Loose Stitches." *Id.* at 613. On appeal, the California court affirmed that the window display placard was libelous per se because it was an imputation against the honesty and integrity of the merchant in the sale of its goods, and essentially accused it of fraud and deception, and unfair dealing with its customers. "The reputation of a tradesman in the sphere in which he earns his living is a valuable asset and is entitled to the protection of the law." *Id.* at 620.

209.    Now fast forward nearly a century, and recast that small town America window display libel by a giant and overreaching department store against its small cross-street rival to today's world where the libel is propagated online by a comparable Goliath on a global scale. That is, essentially, what Facebook has done. Like J.C. Penney's window display, Facebook's warning label on CHD's page draws an invidious comparison between the quality of the

health-related information offered by two rivals, the CDC and CHD, for the public's trust and attention. As alleged *infra*, Facebook has "skin in the game" because its controlling individual and his related entities are in the vaccine development business, competing with CHD's educational materials, emphasizing informed consent and safety. Like the Rosenberg retail store, the "business integrity of the company [CHD] is at stake." *Rosenberg v. J.C. Penney Co.*, 30 Cal. App. 2d at 627.

210.   Facebook's warning label implies a provably false assertion of fact, whether or not the words used are termed "fact" or "opinion." *Milkovich*, 497 U.S. at 18-19. The "gist" or "sting" of the disparagement — **that CHD's page conveys "unreliable and out-of-date information"** — is objectively false in light of the totality of the circumstances: CHD's page-content and the fact-checking process by which it creates and curates such content, distinguishes between known and unknown scientific facts, and labels expressions of opinion on its page as such. *See supra*. Certainly the pleaded truth — that CHD's page in fact contains "reliable and up-to-date information" while CDC's page does not — would produce an effect on the mind of the reader 180-degrees different than the effect produced by Facebook's warning label. *Masson*, 501 U.S. at 516-17. Third-party readers understood Facebook's warning label as Facebook intended, namely as a statement of fact that the information on CHD's Facebook page is neither reliable nor up-to-date. *See*, *e.g.*, *Slaughter v. Friedman*, 32 Cal. 3d 149, 154 (1982) (accusations of "excessive" fees or "unnecessary" work by professional dental plan administrators carry a "ring of authenticity" and reasonably might be understood as being based on fact). Facebook has sought after, and must answer for, its own "ring of authenticity."

211.   On March 4, 2019, in response to Representative Schiff's letter to Facebook, CHD sent Facebook a nine-page single-spaced letter providing CHD's detailed summary of the known and unknown scientific facts, and its most pressing concerns, with respect to vaccine safety. See Exhibit A. Thus, Facebook was on notice that CHD was not promoting "misinformation" of any sort.

212.     Yet, just three days later, on March 7, 2019, Facebook announced in its online press release that it would take steps to eliminate "vaccine misinformation" on Facebook by reducing its distribution and providing people with "authoritative information" on the topic, and then Facebook proceeded to falsely disparage CHD. *See*, *e.g.*, *Masson*, 501 U.S. at 521 (unlike "hot news" journalist, defendant author had both time and practical ability to fact-check tapes in her possession). Here, with CHD's detailed presentation in hand, Facebook had "obvious reasons to doubt the veracity" of its warning label, but instead engaged in "purposeful avoidance of the truth." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); *Harte-Hanks Communication, Inc. v. Connaughton*, 491 U.S. 657 (1989). By reasonable inference, Facebook conducted no investigation whatsoever to confirm or dispel the material facts in CHD's March 4, 2019 letter, and Facebook intended to convey or, at the very least, endorsed the defamatory false innuendo. *Newton v. National Broadcasting Co., Inc.*, 930 F.2d 662, 681 (9th Cir. 1990).

213.     *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767 (1986) left open the question whether non-media publisher defendants such as Facebook and Zuckerberg are entitled to the same level of protection that media publisher defendants receive under the *New York Times* standard. Either way, these defendants acted with the requisite mental state to be liable for defamation measured by the "actual malice" standard that they subjectively doubted the veracity of the statement or purposely avoided the truth, or by the negligence standard applicable to non-media defendants. *Dodds*, 145 F.3d at 1060; *St. Amant v. Thompson*, 390 U.S. at 731 (stating test as whether defendant "in fact entertained serious doubts as to the truth of [his] publication"); *Garrison*, 379 U.S. at 74 (whether defendant published the material while subjectively possessing a "high degree of awareness of the probable falsity of the publication").

214.     "Actual malice" can be shown by, inter alia, "subsequent defamations [and other] statements of defendants, circumstances indicating the existence of rivalry, ill will, or hostility between the parties, [and] facts tending to show a reckless disregard of the Plaintiffs' right[,]" *Herbert v. Lando*, 441 U.S. 153, 164 n.12 (1979) (quoting 50 Am. Jur. 2d, § 455), all of which

are strongly present. In particular, defendants harbor an adverse motive to profit from their unfettered development of vaccines and 5G networks, in furtherance of which they have committed multiple other predicate acts of misrepresentation amounting to wire-fraud for purposes of RICO enterprise liability. And, crucially, they knew their published warning label was false or acted with reckless disregard to its falsity.

215.    Zuckerberg's public statements to the CNN audience, to Congress, and to his investors are replete with boasts that he works with government officials to identify and suppress "vaccine misinformation," and redirect users to the government's authoritative "information," and that his "understanding of the scientific consensus is that it's important that people get their vaccines." He has also publicly boasted of his "outside interests in health." The three-day interval (March 4 to 7, 2019) from CHD's nine-page letter to Facebook's press release suggests that Zuckerberg willfully chose not to test his "understanding" against actual facts.

216.    Defendants have exclusive possession, custody and control of other evidence of falsity and/or Zuckerberg's actual malice, e.g., private records and testimony concerning when, with whom, how, and why Zuckerberg came to his "understanding" concerning "vaccine misinformation," which he confidently holds at "near 100%" certainty; his actual knowledge or serious doubt of the "warning label's" falsity; and what "deliberative process," if any, occurred. *See, e.g.*, *Metabolife*, 264 F.3d at 846 (ordering discovery of information within defendants' exclusive control which may be highly probative of falsity).

217.    Plaintiff has suffered general and special damages as enumerated below. It is hornbook law that in measuring damages, the Court may consider Facebook's influence and that of Plaintiff, and Facebook's global footprint, "for the greater the circulation, the greater the wrong, and the more reason why greater care should be exercised in the publication[.]" *Graybill v. De Young*, 140 Cal. 323, 330 (1902).

218.    No retraction demand was made nor required prior to filing this action under California Civil Code section 48a, subdivision (a), because Facebook is not a "daily or weekly news publication" as that term is defined in subsection (d)(5) of that statute.

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

## A.  No Affirmative Defense of CDA "Immunity."

219.   The Communications Decency Act (CDA) states: "No provider or user of an interactive computer shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The affirmative defense of Section 230 immunity has been broadly construed as to information provided by third parties and hosted on Facebook. However, if an entity is "responsible, in whole or in part, for the creation or development of information" that forms the subject matter of the lawsuit, it is itself a <u>content provider</u> and is not protected. 47 U.S.C. § 230(f)(3).

220.   In publishing its false "warning label" and "fact-checks," Facebook has acted, and continues to act, both as an interactive computer service provider and as "content provider." Section 230(f)(3) defines an information content provider as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." Under Ninth Circuit law, as to content that a website service provider creates itself, or is responsible in whole or in part for creating or developing, the website is also a content provider. *Fair Housing Council v. Roommates.com, LLC*, 521 F.3d 1157, 1162-63 (9th Cir. 2008) (en banc); *Fraley v. Facebook*, 830 F. Supp. 2d at 801-02. Under the CDA, 47 U.S.C. § 230(f)(3), Facebook's warning label and its other affirmative content-creation far exceed "a publisher's traditional editorial functions," *Batzel v. Smith*, 333 F.3d 1018, 1031 n.18 (9th Cir. 2003), and far exceed that content-creation of question-and-answer-sets which the Ninth Circuit found sufficient in the *Roommates.com* case. *See*, *e.g.*, *Roommates.com*, 521 F.3d at 1163 (Congress did not seek to immunize "the *creation* of content.") (emphasis added). Facebook has no immunity from liability for actionable harms arising from its fraudulent course of conduct.

## B.  The May 28, 2020 Executive Order.

221.   On May 28, 2020, President Donald J. Trump issued an Executive Order on Preventing Online Censorship. The Executive Order provides, in pertinent part:

> *Sec. 2.  Protections Against Online Censorship.* (a) [. . .] It is the policy of the United States to ensure that, to the maximum extent

86

permissible under the law, this provision [47 U.S.C. § 230] is not
distorted to provide liability protection for online platforms that —
far from acting in "good faith" to remove objectionable content —
instead engage in deceptive or pretextual actions (often contrary to
their stated terms of service) to stifle viewpoints with which they
disagree. [. . .] When an interactive computer service provider
removes or restricts access to content and its actions do not meet
the criteria of [47 U.S.C. § 230] subparagraph (c)(2)(A), it is
engaged in editorial conduct. It is the policy of the United States
that such a provider should properly lose the limited liability shield
of subparagraph (c)(2)(A) and be exposed to liability like any
traditional editor and publisher that is not an online provider.

*Executive Order on Preventing Online Censorship*, Executive Orders, THE WHITE HOUSE
(May 28, 2020), https://www.whitehouse.gov/presidential-actions/executive-order-preventing-online-censorship/.

222.    The Executive Order's free expression principles are consistent with this lawsuit,
and its statement of the policy of the United States may be informative for the Court. But, as
set forth *supra*, the Court need not rely upon the Executive Order to adjudicate this controversy
because CHD's claims for relief are fully viable and warrant extraordinary relief under existing
authorities.

223.    Plaintiff is entitled to injunctive relief and to recover their damages, including for
reputational harm and loss of business goodwill and revenue, and punitive damages resulting
from defendants' intentional acts of false designation and false promotion under the Lanham
Act.

## THIRD CAUSE OF ACTION
## (RICO — WIRE FRAUD VIOLATIONS)

**Defendants Facebook, Zuckerberg, Science Feedback, Poynter, Politifact, and Does 1-20**

224.    Paragraphs 1 through 223 are realleged and incorporated as if fully set forth
herein.

225.    18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act
("RICO") makes it illegal for any person associated with an alleged racketeering enterprise "to

VERIFIED COMPLAINT
*Children's Health Defense v. Facebook* et al.

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." To state a civil claim for violations of 18 U.S.C. § 1962(c), as authorized by 18 U.S.C. § 1964(c), Plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) that proximately causes (6) damages to the Plaintiff. Under 18 U.S.C. § 1961(1)(B), an act which is indictable under 18 U.S.C. § 1343 (relating to wire fraud) constitutes a predicate act. A "pattern" requires at least two related predicate acts that amount to or pose a threat of continued criminal activity. A pattern does not require multiple schemes or multiple victims. "Enterprise," as defined in 18 U.S.C. § 1961(4), broadly includes "any individual, partnership, corporation, association, or other legal entity, or any union or group of individuals associated in fact although not a legal entity." The definition of a RICO enterprise has wide reach and is liberally construed to effectuate its remedial purpose. Here, the "persons" were Facebook, Zuckerberg, Science Feedback, Poynter, Politifact, and Does 1 to 20, and the "enterprise" was that distinct group of persons who associated in fact (the Facebook "content management" team) as a coordinated group to effectuate their fraudulent scheme. *River City Mkts., Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458, 1461 (9th Cir. 1992) (concluding that "business relationship akin to a joint venture" was sufficient to establish an associated-in-fact RICO enterprise). As alleged *supra*, the Facebook content management team is an associated-in-fact enterprise in that it is an ongoing organization, formal or informal, and its various associates function as a continuing unit for a common purpose — to damage Plaintiff's trade and property interests, to divert users of their page to the CDC, and to unjustly enrich themselves – by fraudulent means.

226.   Defendants' motive to profit from vaccine ads and product development and 5G networks unconstrained by negative publicity on their platform is highly probative of their intent to commit RICO wire-fraud, even though economic motive itself is not an element of the claim. *See*, *e.g.*, *National Organization for Women, Inc. v. Schiedler*, 510 U.S. 249, 252 (1994) (rejecting the argument that "RICO requires proof either the racketeering enterprise or the predicate acts of racketeering were motivated by an economic purpose"). Essentially, the task

of the Facebook fraud enterprise was to "clear the field" of CHD's viewpoint for at least two market purposes that involve property or money, and lots of it: (1) brand protection for its vaccine maker ad buyers; and (2) its own future secured interest in vaccine patents and technical products and processes that depend on 5G-networks for their commercial viability. *See*, *e.g.*, *United States v. Reyes*, 660 F.3d 454, 463 (9th Cir. 2011) (admitting evidence that defendant made money on a fraudulent scheme). In addition, as alleged *infra*, CHD's followers and others relied upon defendant's misrepresentation in ways that caused CHD to lose donations and membership fees, and injured CHD in its organizational trade.

227.    For his part, in addition to all else, Zuckerberg was active in managing with his wife the day-to-day affairs of CZI and CZ-Biohub, and he exercised specific control over their vaccine development efforts. By his public statements, Zuckerberg was directly responsible for Facebook's false and misleading statements about Plaintiff's posted content. He participated in the ongoing associated-in-fact enterprise to develop his for-profit vaccine and 5G products unconstrained by any public scrutiny of that effort by Plaintiff.

228.    Thus, all named defendants both inside Facebook's formal structure (Zuckerberg, Does 1-10) and out (Science Feedback, Poynter, Politifact, Does 1-20) aided in one or another aspect of their common fraud scheme: to label Plaintiff's page "unreliable" and "out-of-date" and redirect users to the CDC; to label Plaintiff's speech-content  "False" when it is critical of vaccine or 5G network safety, accomplishing this censorship through the sham machinations of "content moderators" and "independent fact-checkers"; and to conceal their true purposes of profiting from vaccine manufacturer advertising and from their own vaccine and 5G network development, all of which would be adversely affected by Plaintiff's ongoing public health-related speech.

229.    The wire fraud statute, 18 U.S.C. § 1343, prohibits schemes to defraud or to obtain money or property, or cause financial loss to another, by means of "false or fraudulent pretenses, representations, or promises" if interstate wire or electronic communications are used to execute the scheme. The concept of a misrepresentation is broad, reaching not only false statements of fact, but also all of Facebook's misleading half-truths, deceptive omissions,

1   and knowingly false suggestions and promises as to the future. It is no defense that the

2   intended victim was too gullible or, on the other hand, was too sophisticated to be taken in by

3   the deception.

4        230.   Defendants also committed wire-fraud acts constituting "interference with

5   interstate commerce by threat" under 18 U.S.C. § 1951 in that the residual 0.05% of users who

6   — notwithstanding Facebook's false "warning label" and "fact-checks" — actually click-

7   through to view Plaintiff's actual content, suffer particular adverse consequences in terms of

8   "sandboxing," and other detriments to their accessible tools and information on Facebook. As

9   alleged *supra*, with respect to its active collaboration with government officers and agencies,

10  Facebook took such actions under "color of official right." 18 U.S.C. § 1951(2).

11       231.   Plaintiff further alleges that defendants caused a domestic injury to their business

12  or property. Where, as here, defendants specifically targeted their conduct at Plaintiff with the

13  aim of thwarting Plaintiff's rights in the United States, their activity results in a domestic

14  injury.

15       232.   Under Fed. R. Civ. P. 9(b), predicate acts of wire fraud must be alleged with

16  specificity as to the contents of the communications, who was involved, where and when they

17  took place, and why they were fraudulent. As alleged *supra*, defendants engaged in a scheme

18  to defraud and made use of electronic and internet transmissions, and/or telephone calls, emails

19  and texts in furtherance of the scheme, with the specific intent to deceive or defraud.

20       233.   Plaintiff reasonably relied on defendant Facebook to adhere to its terms of

21  service and community standards; not to engage in content creation on their Facebook pages;

22  and not to mislead them, their advertising agency, or the world of third-party users as to the

23  truth or falsity of content on their pages, or the visibility or reach of those pages. Plaintiff was

24  misled by defendants, and was derivatively injured by many third-party users' reliance on

25  defendants. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008) (Plaintiff

26  alleging a RICO violation may establish causation through first person or third-party reliance).

27       234.   As a direct and proximate result of defendants' predicate acts in violation of 18

28  U.S.C. §§ 1961(1)(B), 1962(c), Plaintiff has been and is continuing to be injured by harm to its

specific property interests and financial losses, including by defendants' denial of any third-party donations to Plaintiff's organization; their refusal to accept Plaintiff's advertising purchases aimed at promoting such third-party donations; and their concerted efforts to reduce the visibility and reach of Plaintiff's page, to reduce traffic to that page, and to reduce membership and speaker fees, and book and other sales that accrue to Plaintiff from such traffic. *See Xcentric Ventures, LLC v. Borodkin*, 798 F.3d 1201, 1203 (9th Cir. 2015) (loss of specific business opportunities are recoverable under RICO); and, finally, by publishing false and disparaging warning labels, and censoring of content, which have caused damage to Plaintiff's professional reputation and other valuable tangible and intangible property rights resulting in financial loss.

235.    Defendants' actions have already injured Plaintiff, and will have the effect of further injuring them by damaging its trade reputation and goodwill, and those of their authors, diverting traffic from its site, and further curtailing its revenue and donations. *See*, *e.g.*, *Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 653 (9th Cir. 2019) (Plaintiff's lost sales as a direct result of the defendants' predicate acts cognizable under RICO); *Kaiser Foundation Health Plan, Inc. v. Pfizer, Inc.* (*In re Neurontin Mktg. & Sales Practices Litig.*), 712 F.3d 21, 29-30 (1st Cir. 2013) (statistical link between fraudulent marketing and off-label prescribing, without proof of any particular doctor-patient prescription, cognizable under RICO); *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1166 (9th Cir. 2002) (fraud on the market for labor, in that wages were depressed when defendants hired undocumented workers, cognizable under RICO); *Resolute Forest Prods. v. Greenpeace Int'l.*, 2019 U.S. Dist. LEXIS 10263, *48 (N.D. Cal. 2019) (Plaintiffs lost customer revenue due to their reliance upon defendants' statements cognizable under RICO); *In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods. Liab. Litig*. 295 F. Supp. 3d 927, 961 (N.D. Cal. 2018) (statistical link between fraudulent marketing and Plaintiffs' overpayment may establish causation and injury to property).

236.    Under 18 U.S.C. § 1964(c), Plaintiff seeks to recover threefold the damages they have sustained, and the cost of this suit, including an award of their reasonable attorneys' fees.

## FOURTH CAUSE OF ACTION
## (DECLARATORY RELIEF)

**Defendants Facebook, Zuckerberg, Science Feedback, Poynter, Politifact, and Does 1-20**

237.    Paragraphs 1 through 236 are realleged and incorporated as if fully set forth herein.

238.    The Declaratory Judgment Act, codified in 28 U.S.C. § 2201(a), provides in pertinent part that, "[i]n a case of actual controversy within its jurisdiction [] any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

239.    An actual controversy has arisen and now exists between Plaintiff and defendants, concerning their respective rights and duties in that these defendants have published a false and misleading warning label on Plaintiff's Facebook page; have fraudulently misrepresented to third-party users of the page that Plaintiff has posted and is posting "false [factual] information" in violation of their terms of service; and refuse to permit Plaintiff to solicit donations or purchase advertisements on the social media platform. Defendants have used deceptive means to limit the reach and visibility of CHD's page. Finally, and within the past two months, Zuckerberg has threatened to ban, limit, warn, deboost, block or censor content regarding 5G network safety.

240.    Under Ninth Circuit law, "intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm," and weigh in favor of injunctive relief. *Continental Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099, 1105 (9th Cir. 1994); *Rent-A-Ctr., Inc. v. Canyon TV and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). Moreover, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Accordingly, Plaintiff has suffered – and continues to suffer – irreparable harm.

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

241.    Plaintiff seeks a judicial determination of its rights and remedies and a declaration as to the parties' respective rights and obligations with respect to CHD's Facebook page. A judicial declaration is necessary and appropriate at this time so that Plaintiff may ascertain its rights to publish content on those pages without any interference, censorship, warning labels, "shadowbanning," "deboosting," "sandboxing," or other deceptive means and methods employed by defendants, and with respect to other affirmative relief such as a public apology and entry on a First Amendment "shield list" by defendants.

242.    As a result of Facebook's unlawful conduct, Plaintiff has suffered substantial damages, including, but not limited to:

    a.    Plaintiff was deprived of freedom of speech;

    b.    Plaintiff was foreclosed from future opportunities to reach subscribers on Facebook;

    c.    Plaintiff lost status and prestige amongst Facebook followers, the general public and the journalistic community;

    d.    Plaintiff suffered reputational harm;

    e.    Plaintiff lost third-party donations to Plaintiff's organization, speaker fees, and book and other sales that would have accrued to Plaintiff but for defendants' misconduct; and,

    e.    These injuries are continuing in nature requiring injunctive relief.

WHEREFORE, Plaintiff CHD demands judgment against Facebook Inc. for damages and injunctive relief as set forth below.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

///

///

///

///

93

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Children's Health Defense respectfully requests:

A.  Compensatory damages in an amount to be determined by the Jury, but not less than $5,000,000.

B.  An award of treble damages to Plaintiff in an amount to be determined at trial.

C.  An injunction and declaratory judgment ordering Facebook to remove its warning labels and misclassification of all content on Plaintiff's Facebook page, and to desist from any further warnings or classifications.

D.  An award of attorneys' fees and costs to Plaintiff in an amount to be determined at trial.

E.  An award of punitive damages to Plaintiff in an amount to be determined at trial.

F.  An order requiring defendants to make a public retraction of their false statements.

G.  An award of such other and further relief as the Court may deem just and proper.

Date:  August 17, 2020

Respectfully submitted,

ROBERT F. KENNEDY, JR.
Founder and Chairman, Children's Health Defense

MARY S. HOLLAND
General Counsel, Children's Health Defense

ROGER I. TEICH

Counsel for Plaintiff
Children's Health Defense

94

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook et al.*

## **<u>VERIFICATION</u>**

I, MARY HOLLAND, declare under penalty of perjury as follows:

1.      I am the general counsel for Children's Health Defense, a non-profit organization and Plaintiff in this action.

2.      I have reviewed the foregoing Complaint and declare that the facts set out therein are true to the best of my knowledge and belief, except those matters stated as upon information and belief, which are true to the best of my belief.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this 17th day of August, 2020, in Rockland County, New York.

_____
MARY HOLLAND
General Counsel, Children's Health Defense

Attorney for Plaintiff
Children's Health Defense

**VERIFIED COMPLAINT**
*Children's Health Defense v. Facebook* et al.