SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

ARI HOLTZBLATT (*pro hac vice*)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com
ALLISON SCHULTZ (*pro hac vice*)
 Allison.Schultz@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
1875 Pennsylvania Ave, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Defendants*
FACEBOOK, INC. and
MARK ZUCKERBERG

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| CHILDREN'S HEALTH DEFENSE,<br><br>                    Plaintiff,<br><br>       v.<br><br>FACEBOOK, INC., ET AL.,<br><br>                    Defendants. | Case No.  3:20-cv-05787-SI<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hon. Susan Illston<br>Courtroom I – 17th Floor<br>Date: February 5, 2021<br>Time: 10:00 a.m. |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ................................................................- 1 -

STATEMENT OF REQUESTED RELIEF ...........................................................................- 1 -

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................- 1 -

BACKGROUND ...................................................................................................................- 3 -

    A.    Facebook Uses Third-Party Fact-Checkers To Identify Misinformation ................- 3 -

    B.    Facebook Labels and Demotes CHD Content Identified By Third-Party Fact-Checkers As Containing False Information ..............................................................- 5 -

ARGUMENT ..........................................................................................................................6

I.    CHD HAS NOT STATED A BIVENS CLAIM (COUNT I)...............................................- 6 -

    A.    The Complaint Does Not Plausibly Allege Federal Action.....................................- 6 -

    B.    Neither Facebook Nor Mark Zuckerberg Is A Proper Bivens Defendant ................- 8 -

    C.    The Bivens Claim Requires An Unwarranted Expansion Of Bivens Liability ........- 9 -

II.    THE FIRST AMENDMENT BARS THE REMAINDER OF CHD'S CLAIMS (COUNTS 2 & 3)..................................................................................................- 10 -

    A.    The First Amendment Protects Facebook's Statements And Content-Moderation Decisions ...............................................................................- 10 -

    B.    CHD Cannot Recover For Alleged False Statements Absent Actual Malice .........- 11 -

III.    THE CDA ALSO BARS CHD's LANHAM ACT AND CIVIL RICO CLAIMS (COUNTS 2 & 3)..................................................................................................- 13 -

IV.    CHD HAS NOT STATED A CLAIM UNDER THE LANHAM ACT (COUNT 2) ........- 14 -

    A.    CHD Lacks Standing Under The Lanham Act ......................................................- 15 -

    B.    The Complaint Does Not Identify A Promotional Statement ................................- 15 -

V.    CHD HAS NOT STATED A CIVIL RICO CLAIM (COUNT 3) ....................................- 17 -

    A.    CHD Lacks Statutory Standing To Bring A Civil RICO Claim ............................- 17 -

    B.    CHD Has Not Pleaded Any Predicate Acts Of Wire Fraud....................................- 18 -

        1.    Defendants did not obtain "money or property" from CHD......................- 18 -

        2.    None of the purported acts of "wire fraud" were fraudulent ....................- 19 -

VI.    CHD Fails To State Any Claim Against Mark Zuckerberg...............................................- 22 -

VII.   CHD Is Not Entitled To Declaratory Relief .............................................................- 23 -

CONCLUSION ...................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Animal Legal Defense Fund v. HVFG LLC,*
   939 F. Supp. 2d 992 (N.D. Cal. 2013) .................................................................................... 15

*Anza v. Ideal Steel Supply Corp.,*
   547 U.S. 451 (2006) ................................................................................................................. 18

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ..................................................................................................... 8, 12, 22

*Barnes v. Yahoo!, Inc.,*
   570 F.3d 1096 (9th Cir. 2009) ................................................................................................ 13

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,*
   403 U.S. 388 (1971) ................................................................................................................... 6

*Blum v. Yaretsky,*
   457 U.S. 991 (1982) ................................................................................................................... 7

*Canyon County v. Syngenta Seeds, Inc.,*
   519 F.3d 969 (9th Cir. 2008) .................................................................................................. 18

*Carlson v. Green,*
   446 U.S. 14 (1980) ..................................................................................................................... 9

*Chaiken v. VV Publishing Corp.,*
   119 F.3d 1018 (2d Cir. 1997) ................................................................................................. 13

*Coastal Abstract Services, Inc. v. First American Title Insurance Co.,*
   173 F.3d 725 (9th Cir. 1999) .................................................................................................. 15

*Correctional Services Corp. v. Malesko,*
   534 U.S. 61 (2001) .................................................................................................................. 6, 8

*County of Santa Clara v. Trump,*
   267 F. Supp. 3d 1201 (N.D. Cal. 2017) ................................................................................. 23

*Daniels-Hall v. National Education Ass'n,*
   629 F.3d 992 (9th Cir. 2010) .................................................................................................... 8

*Decker v. GlenFed, Inc.,*
   42 F.3d 1541 (9th Cir. 1994) (en banc) .......................................................................... 19, 20

*Dex Media West, Inc. v. City of Seattle,*
   696 F.3d 952 (9th Cir. 2012) .................................................................................................. 16

*Eastwood v. National Enquirer, Inc.*,
    123 F.3d 1249 (9th Cir. 1999) ...................................................................................12

*Edwards v. Marin Park, Inc.*,
    356 F.3d 1058 (9th Cir. 2004) ...................................................................................19

*Eller v. Equitrust Life Insurance Co.*,
    778 F.3d 1089 (9th Cir. 2015) .............................................................................18, 22

*FDIC v. Meyer*,
    510 U.S. 471 (1994).....................................................................................................8

*Federal Agency of News LLC v. Facebook, Inc.*,
    432 F. Supp. 3d 1107 (N.D. Cal. 2020) .................................................................8, 14

*Ferrari v. Mercedes-Benz USA, LLC*,
    2016 WL 7188030 (N.D. Cal. Dec. 12, 2016) ...........................................................23

*Franklin v. Fox*,
    312 F.3d 423 (9th Cir. 2002) .......................................................................................7

*Fyk v. Facebook, Inc.*,
    808 F. App'x 597 (9th Cir. 2020) ..............................................................................14

*Gordon & Breach Science Publishers, S.A. v. American Institute of Physics*,
    859 F. Supp. 1521 (S.D.N.Y. 1994)...........................................................................16

*Greater L.A. Agency on Deafness, Inc. v. CNN, Inc.*,
    742 F.3d 414 (9th Cir. 2014) .....................................................................................14

*Harte-Hanks Communications Inc. v. Connaughton*,
    491 U.S. 657 (1989)...................................................................................................12

*Holmes v. Securities Investor Protection Corp.*,
    503 U.S. 258 (1992)...................................................................................................18

*Hurley v. Irish American Gay, Lesbian & Bisexual Group of Boston*,
    515 U.S. 557 (1995)...................................................................................................11

*Jian Zhang v. Baidu.com Inc.*,
    10 F. Supp. 3d 433 (S.D.N.Y. 2014)..........................................................................11

*Kimzey v. Yelp, Inc.*,
    836 F.3d 1263 (9th Cir. 2016) ...................................................................................13

*Klayman v. Zuckerberg*,
    753 F.3d 1354 (D.C. Cir. 2014) .................................................................................13

*Knievel v. ESPN*,
    393 F.3d 1068 (9th Cir. 2005) .....................................................................................3

*La'Tiejira v. Facebook, Inc.*,
    272 F. Supp. 3d 981 (S.D. Tex. 2017) ..................................................................................11

*Langdon v. Google, Inc.*,
    474 Supp. 2d 622 (D. Del. 2007) .......................................................................................11

*Lewis v. Google LLC*,
    2020 WL 2745253 (N.D. Cal. May 20, 2020) ...................................................................15

*Lexmark International, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) .....................................................................................................14, 15

*Lugar v. Edmonson Oil Co.*,
    457 U.S. 922 (1982) .............................................................................................................6

*Makaeff v. Trump University, LLC*,
    715 F.3d 254 (9th Cir. 2013) .............................................................................................11

*Manhattan Community Access Corp. v. Halleck*,
    139 S. Ct. 1921 (2019) ......................................................................................................6, 9

*Mathis v. Pacific Gas & Electric Co.*,
    75 F.3d 498 (9th Cir. 1995) .................................................................................................7

*Miami Herald v. Tornillo*,
    418 U.S. 241 (1974) ...........................................................................................................11

*Midwest Grinding Co. v. Spitz*,
    976 F.2d 1016 (7th Cir. 1999) ...........................................................................................17

*Miller v. Yokohama Tire Corp.*,
    358 F.3d 616 (9th Cir. 2004) .............................................................................................20

*Monterey Plaza Hotel L.P. v. Local 483*,
    215 F.3d 923 (9th Cir. 2000) .......................................................................................18, 19

*Morse v. North Coast Opportunities, Inc.*,
    118 F.3d 1338 (9th Cir. 1997) ..........................................................................................6, 7

*National Organization for Women, Inc. v. Scheidler*,
    510 U.S. 249 (1994) ...........................................................................................................17

*NCAA v. Tarkanian*,
    488 U.S. 179 (1988) .............................................................................................................8

*New York State Board of Elections v. Lopez Torres*,
    552 U.S. 196 (2008) ...........................................................................................................10

*New York Times v. Sullivan*,
    376 U.S. 254 (1964) ...........................................................................................................12

*Nicosia v. De Rooy*,
    72 F. Supp. 2d 1093 (N.D. Cal. 1999) ................................................................12

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
    720 F.3d 490 (2d Cir. 2013).................................................................................10

*Openwave Systems, Inc. v. Fuld*,
    2009 WL 1622164 (N.D. Cal. June 6, 2009) ..................................................22, 23

*Ozeran v. Jacobs*,
    2018 WL 1989525 (C.D. Cal. Apr. 25, 2018), *aff'd*, 798 F. App'x 120 (9th Cir. 2020) ......18

*Partington v. Bugliosi*,
    56 F.3d 1147 (9th Cir. 1995) ...............................................................................10

*POM Wonderful LLC v. Coca-Cola Co.*,
    573 U.S. 102 (2014)..............................................................................................15

*POM Wonderful LLC v. Purely Juice, Inc.*,
    362 F. App'x 577 (9th Cir. 2009) ........................................................................22

*Prager University v. Google, LLC*,
    951 F.3d 991 (9th Cir. 2020) ...............................................................................17

*Resolute Forest Products, Inc. v. Greenpeace International*,
    302 F. Supp. 3d 1005 (N.D. Cal. 2017) ..............................................................12

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993)..............................................................................................22

*Rice v. Fox Broadcast Co.*,
    330 F.3d 1170 (9th Cir. 2003) .............................................................................17

*Royce International Broadcasting Corp. v. Field*,
    2000 WL 236434 (N.D. Cal. Feb. 23, 2000) .......................................................17

*Savage v. Council on Am.-Islamic Relations, Inc.*,
    2008 WL 2951281 (N.D. Cal. July 25, 2008).......................................................12

*Schreiber Distributing Co. v. Serv-Well Furniture Co.*,
    806 F.2d 1393 (9th Cir. 1986) .......................................................................19, 22

*Search King Inc. v. Google Technologies, Inc.*,
    2003 WL 21464568 (W.D. Okla. May 27, 2003)..................................................11

*Sheperd v. American Honda Motor Co.*,
    822 F. Supp. 625 (N.D. Cal. 1993) ................................................................17, 18

*Sikhs for Justice, Inc. v. Facebook, Inc.*,
    697 F. App'x 526 (9th Cir. 2017) ........................................................................14

*Sikhs for Justice ("SFJ"), Inc. v. Facebook, Inc.*,
    144 F. Supp. 3d 1088 (N.D. Cal. 2015) ........................................................13, 14

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ...........................................................................................10

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) .............................................................................21

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997) ...........................................................................15

*Sugarman v. Muddy Waters Capital LLC*,
    2020 WL 633596 (N.D. Cal. Feb. 3, 2020) .......................................................19

*Sybersound Records, Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008) ...........................................................................18

*ThermoLife International LLC v. American Fitness Wholesalers LLC*,
    2020 WL 122874 (D. Ariz. Jan. 10, 2020) ........................................................15

*Threshold Enterprises Ltd. v. Pressed Juicery, Inc.*,
    445 F. Supp. 3d 139 (N.D. Cal. 2020) .................................................................3

*TransFresh Corp. v. Ganzerla & Assoc., Inc.*,
    862 F. Supp. 2d 1009 (N.D. Cal. 2012) .............................................................22

*United States v. Lew*,
    875 F.2d 219 (9th Cir. 1989) .............................................................................18

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ...........................................................................................16

*Zeran v. America Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) .............................................................................13

*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017).........................................................................................9

## STATUTES, RULES, AND REGULATIONS

15 U.S.C. § 1127 ...........................................................................................................14

18 U.S.C. § 1964(c) .......................................................................................................17

47 U.S.C. § 230 ......................................................................................2, 9, 13, 14, 23

Fed. R. Civ. P. 12(b)(6)....................................................................................................1

# OTHER AUTHORITIES

135 Cong. Rec. H1216-17135 (Apr. 13, 1989) (statement of Rep. Kastenmeier)...........................16

*About WHO*, WORLD HEALTH ORGANIZATION,
    https://tinyurl.com/y5ltbeaf (last accessed Oct. 23, 2020)......................................................8

*Bickert, Monika, Combatting Vaccine Misinformation*, FACEBOOK (Mar. 7, 2019),
    https://tinyurl.com/yyazbumc ...............................................................................................4

*Fact-Checking on Facebook*, FACEBOOK FOR BUSINESS,
    https://tinyurl.com/y33wyhe2 (last accessed Oct. 23, 2020) ..................................................3

*How Our Fact-Checking Program Works*, FACEBOOK JOURNALISM PROJECT,
    https://tinyurl.com/y57sx6n3 (last accessed Oct. 23, 2020) ..................................................3

Restatement (Second) of Torts § 538A .........................................................................................20

*Terms of Service*, FACEBOOK,
    https://www.facebook.com/terms.php (last accessed Oct. 23, 2020) .....................................3

1

## NOTICE OF MOTION AND MOTION TO DISMISS

2        PLEASE TAKE NOTICE THAT, on February 5, 2021 at 10:00am or as soon thereafter as

3   the matter may be heard, in Courtroom I of the U.S. District Court for the Northern District of

4   California, San Francisco Division, at 450 Golden Gate Avenue, San Francisco, California, this

5   Motion to Dismiss filed by Facebook, Inc. and Mark Zuckerberg will be heard. Pursuant to

6   Federal Rule of Civil Procedure 12(b)(6), defendants move to dismiss the complaint on the

7   grounds that its claims are barred by both the First Amendment and Section 230 of the

8   Communications Decency Act, and that plaintiff has otherwise failed to state claims upon which

9   relief can be granted. Defendants' Motion to Dismiss is based on this Notice of Motion, the

10  Memorandum of Points and Authorities, and the supporting Declaration of Molly M. Jennings.

11

## STATEMENT OF REQUESTED RELIEF

12        Pursuant to Federal Rule of Civil Procedure 12(b)(6), Facebook and Mark Zuckerberg

13  request that the Court dismiss the complaint with prejudice.

14

## MEMORANDUM OF POINTS AND AUTHORITIES

15        This lawsuit asks the Court to step far outside its role as adjudicator of legal disputes and

16  instead become an arbiter of what science has, to date, established as definitively "true" or "false"

17  regarding vaccines. According to CHD, "[u]nvaccinated kids are healthier" than vaccinated

18  children, Compl. ¶ 71, and vaccines are responsible for infant deaths, *id.* ¶ 95. Facebook's third-

19  party independent fact-checkers designated several of CHD's vaccine-related posts as containing

20  false information and provided detailed explanations supporting those designations. Facebook

21  labeled those posts according to its fact-checkers' conclusions, and provided its users with the

22  fact-checkers' reasoning such that users could evaluate the conclusions for themselves. Facebook

23  also restricted CHD's ability to share information identified as false or partly false.

24        CHD now claims that Facebook's policies and actions violated its First Amendment rights,

25  injured its position in the "marketplace of ideas," Compl. ¶ 191, and constituted a RICO

26  enterprise. But CHD gets the First Amendment analysis exactly backward. The First Amendment

27  is a shield from government action—not a sword to be used against a private entity. In light of

28

CHD's skewed understanding of the fundamental principles implicated by its lawsuit, it is little surprise that the Complaint suffers from numerous fatal, independent, and incurable defects.

*First*, the Complaint fails to state a *Bivens* claim because it does not plausibly allege federal action. Facebook and Mark Zuckerberg are private actors. Facebook exercised its own editorial discretion to reduce the visibility of posts identified as false or partially false. The Complaint does not plausibly allege that any federal actor was so intertwined with Facebook's decisions with respect to CHD's content that the federal government can be deemed responsible for them. And it does not plausibly allege that Mr. Zuckerberg was personally involved at all in those decisions.

*Second*, far from violating the First Amendment, Facebook's decisions to label and limit the visibility of CHD's content are themselves protected by the First Amendment. In this context, CHD must, at a minimum, plausibly allege that Facebook acted with actual malice, which it has not—and cannot—do.

*Third*, Section 230 of the Communications Decency Act ("CDA") shields Facebook from liability for restricting access to and/or demoting CHD's content.

*Fourth*, the Lanham Act claim fails because CHD does not have standing under that statute and because it does not allege any false promotional statement. CHD claims to compete with Facebook in the "marketplace of ideas"—but that is not a cognizable economic market. Moreover, the alleged false statements (i.e., that CHD's posts contain false or misleading information) are not promotional statements cognizable under the Act.

*Fifth*, CHD fails to state a claim under RICO because it has not suffered a sufficiently "direct" injury to confer statutory standing and has not adequately pleaded any predicate acts.

*Sixth*, the Complaint additionally fails to state a claim against Mark Zuckerberg because it does not plausibly allege that he was personally involved in any of the allegedly unlawful conduct.

These deficiencies cannot be cured by amendment. No amended allegations can convert Facebook and Mr. Zuckerberg into federal actors for purposes of *Bivens* or change the binding precedent that precludes expanding *Bivens* under circumstances present here. No amended allegations can alter the defenses accorded to Facebook and Mr. Zuckerberg under the First Amendment and Section 230 of the CDA. And no amended allegations could bring CHD's

1  Lanham Act claim within the zone of interests protected by that statute or turn Defendants' actions

2  here into an actionable RICO conspiracy. CHD's claims should be dismissed with prejudice.

3  **BACKGROUND**

4  **A.      Facebook Uses Third-Party Fact-Checkers To Identify Misinformation**

5  Facebook is a social media website with 2.2 billion users worldwide. Compl. ¶ 6.

6  Facebook users can maintain their own Facebook Pages; share status updates, photos, videos, and

7  stories on those Pages; and browse for content through their News Feed. *Terms of Service*,

8  FACEBOOK, https://www.facebook.com/terms.php (last accessed Oct. 23, 2020).[1]

9  As part of its "commit[ment] to fighting the spread of misinformation," Facebook has

10  developed a fact-checking program to identify false or misleading information on its platform.

11  *Fact-Checking on Facebook*, FACEBOOK FOR BUSINESS, https://tinyurl.com/y33wyhe2 (last

12  accessed Oct. 23, 2020) (Jennings Decl. Ex. 1 at 1).[2] Facebook has explained that it "rel[ies] on

13  independent fact-checkers"—like Science Feedback and PolitiFact, Compl. ¶¶ 119, 123—"to

14  identify and review potential misinformation" because it does "not believe that a private company

15  like Facebook should be the arbiter[] of truth." *How Our Fact-Checking Program Works*,

16  FACEBOOK JOURNALISM PROJECT, https://tinyurl.com/y57sx6n3 (last accessed Oct. 23, 2020)

17  (Jennings Decl. Ex. 2 at 2).[3] Facebook's third-party fact-checkers "are certified through the non-

18  partisan International Fact-Checking Network (IFCN)." Jennings Decl. Ex. 1 at 1. The fact-

19  checkers review potentially misleading information and rate it as false, altered, partly false,

20  missing context, satire, or true. *Id.*; Compl. ¶¶ 120, 123.

21  When users share content identified as containing false information, Facebook responds by

22  "surfacing fact-check articles to users … and showing labels on top of false stories." Jennings

---

[1] The Complaint incorporates the Terms of Service by reference; they therefore may be considered in deciding this Motion to Dismiss. *See* Compl. ¶¶ 34-37; *Knievel v. ESPN*, 393 F.3d 1068, 1076-77 (9th Cir. 2005) (considering website under "'incorporation by reference' doctrine").

[2] The Complaint also incorporates this webpage by reference. *See* Compl. ¶ 120.

[3] The Court may take judicial notice of this website for its existence and content. *See Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020). It cannot reasonably be disputed that Facebook made the quoted statement as that fact can be readily determined from sources whose accuracy cannot reasonably be disputed. *See id.* at 145.

Decl. Ex. 2 at 2. When a user shares a link that fact-checkers have identified as containing false information, the image previewing the link is covered by a transparent grey overlay identifying the link as containing "False" or "Partly False Information." *E.g.*, Compl. ¶¶ 71, 95. The grey overlays allow users to click to "See [the] Link" that fact-checkers identified as containing false information and also to click a button to "See Why" the link was so identified. *E.g.*, *id.* ¶ 71. Upon clicking "See Why," users see a summary from the factchecker identifying: the nature of the designation, such as "false" or "partly false"; a definition of that designation; the factchecker responsible for the designation; and a brief explanation. *See, e.g.*, *id.* ¶¶ 73, 81, 97. Users can click on the summary for greater detail. *E.g. id.* ¶ 75, 83, 98. Content rated as "False, Altered or Partly False[ ] will [also] appear lower in News Feed … and be featured less prominently in Feed and Stories." Jennings Decl. Ex. 1 at 2.

Facebook also takes action against Pages that repeatedly share information rated as "False" or "Altered." Jennings Decl. Ex. 1 at 2. Facebook may, for example, reduce the distribution of such Pages or remove their ability to advertise or solicit donations on the platform. *Id.*

As relevant here, Facebook announced in March 2019 that it would "reduce the ranking of groups and Pages that spread misinformation about vaccinations in News Feed and Search" and "remove access to our fundraising tools for Pages that spread misinformation about vaccinations." Bickert, *Combatting Vaccine Misinformation*, Facebook (Mar. 7, 2019), https://tinyurl.com/yyazbumc (Jennings Decl. Ex. 3 at 2-3).[4] Six months later, Facebook announced that it was "starting to roll out more ways to connect people with authoritative information about vaccines on Facebook," including links to the World Health Organization's ("WHO") website, "when people come across misinformation on this topic." *Id.*[5]

---

[4] The Complaint quotes this article at length, *see* ¶ 41, thereby incorporating it by reference.

[5] The Complaint devotes considerable space to questions of 5G network safety, Compl. ¶¶ 141-150, Facebook's efforts to remove misleading information about 5G networks, *id.* ¶ 48, and Facebook's alleged interest in promoting 5G networks, *id.* ¶¶ 163-170, but does not allege that Facebook labeled or demoted any CHD content relating to 5G networks.

### B.     Facebook Labels and Demotes CHD Content Identified By Third-Party Fact-Checkers As Containing False Information

CHD uses its Facebook Page to share articles and videos, including pieces concerning "the risks and harmful effects of chemical exposure upon prenatal and children's health, including from particular vaccines." Compl. ¶ 14.

Between January 15, 2019, and June 18, 2020, Facebook's fact-checkers labeled six CHD vaccine-related posts as containing false or partly false information, resulting in the application of various restrictions to the underlying content. Id. ¶¶ 60, 65, 69, 77, 89, 94-95.[6] For example, on May 28, 2020, Facebook applied a grey overlay with the text "**False Information** Checked by independent fact-checkers" to a link to an article CHD shared claiming to "Clarif[y] Health Outcome in Vaccinated versus Unvaccinated Children." Id. ¶ 71. Upon clicking the "See Why" button, users were informed that Science Feedback had identified the article as containing false information because "[v]accinated children do not have greater risk of adverse health outcomes in comparison to unvaccinated." Id. ¶ 73. Users could click on the summary to further read that Science Feedback identified the claim that "[v]accinated children are more likely to have adverse health outcomes" as "unsupported" because it is "based on a single study which used highly biased methods"; "failed to control for confounding factors in its comparison of vaccinated and unvaccinated children," such as "healthcare-seeking behavior"; and "used patient data from handpicked pediatric clinics only." Id. ¶ 75.

In addition to action at the level of individual posts, Facebook also took action against CHD at the account level as a result of CHD's repeated violations of Facebook's policy against sharing misleading information, as identified by Facebook's fact-checkers. In May 2019, for example, Facebook deactivated the "donate" button on CHD's page. Compl. ¶ 100. And on September 4, 2019, Facebook published a warning at the top of CHD's Facebook Page, reading:

---

[6] This brief addresses only the defects in CHD's claims against Defendants Facebook and Mark Zuckerberg, but the claims against the fact-checker defendants are flawed for similar reasons.

**This Page posts about vaccines.**

**When it comes to health, everyone wants reliable, up-to-date information. The Centers for Disease Control (CDC) has information that can help answer questions you may have about vaccines.**

**Go to CDC.gov.**

*Id.* ¶ 44.

## ARGUMENT

## I.   CHD HAS NOT STATED A *BIVENS* CLAIM (COUNT I)

CHD claims that Facebook violated CHD's First Amendment rights by labeling as "false" and demoting its posts, Compl. ¶¶ 177, 184, and violated CHD's Due Process rights by disabling the "donate" button on CHD's Facebook Page, *id.* ¶ 185. CHD seeks damages for those alleged deprivations under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which created "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). CHD cannot overcome limitations on the *Bivens* doctrine that preclude its expansion to this novel context.

### A.   The Complaint Does Not Plausibly Allege Federal Action

To start, *Bivens* provides a remedy only against "individual *federal* officers." *Malesko*, 534 U.S. at 70 (emphasis added). It can be applied to private actors, such as Defendants, only where their conduct is so intertwined with that of federal actors that "it is fair to attribute the challenged actions" to the federal government. *Morse v. North Coast Opportunities, Inc.*, 118 F.3d 1338, 1343 (9th Cir. 1997). Distinguishing private from federal actors is no mere technicality; it is crucial to "preserv[ing] an area of individual freedom by limiting the reach of federal law and federal judicial power." *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 936 (1982). This is particularly so in the First Amendment context. Using the First Amendment to sanction private conduct, as CHD seeks to do, "could eviscerate certain private entities' rights to exercise editorial control over speech and speakers on their properties or platforms." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1932 (2019).

The Complaint tries, but fails, to allege federal action under a "joint action" theory. *See* Compl. ¶ 177. The "joint action" doctrine applies only where government "'officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights.'" *Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002). Mere "regulatory interest in a problem" does not "transform[] any subsequent private efforts to address the problem (even those expressly designed to obviate the need for regulation) into state action." *Mathis v. Pacific Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir. 1995). Rather, there must be a "substantial degree of [government] cooperation," *Franklin*, 312 F.3d at 446, such that the federal actors are "*responsible* for the specific conduct of which the plaintiff complains," *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

CHD attempts to establish joint action between Defendants and Representative Adam Schiff, the CDC, and the WHO. But the Complaint does not establish that any government official substantially cooperated in any of the conduct that CHD claims violated its First Amendment and Due Process rights. With respect to Representative Schiff, CHD points to a letter generally encouraging Facebook to take action related to vaccine misinformation, Compl. ¶ 38, and his statements exhorting Congress to take action to hold social media companies liable for third-party content, *id.* ¶ 39. But to transform private actions (like those challenged here, *see id.* ¶¶ 4, 60-99, 100, 111) into state action, the federal actor must provide the "substantive standard" that dictated the private actor's decisions. *Morse*, 118 F.3d at 1339. Because Representative Schiff's letter provided no substantive standard by which to identify "vaccine misinformation" or determine what action to take against it, the letter cannot establish state action. Neither can his general statement regarding what Congress "could or should" do. Compl. ¶ 39. As noted, mere "regulatory interest in a problem" does not convert private into state action. *Mathis*, 75 F.3d at 503. If it did, statements (or posts or tweets) from politicians or regulators, suggesting (or encouraging or urging) virtually any private conduct could lead to private liability under *Bivens*. The Complaint thus fails to plead joint action with respect to Representative Schiff.

As for the CDC and WHO, CHD alleges only that Facebook adopted the CDC's and WHO's definitions of "vaccine hoaxes" and, following discussions with the WHO, identified the CDC and WHO as authoritative sources of vaccine information, Compl. ¶¶ 179-180. But sharing

information does not establish joint action. *See Federal Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1125 (N.D. Cal. 2020). And in any event, the CDC did not even do that much; Facebook simply identified it as a source of information. Indeed, there is no allegation that the CDC actually did *anything*, let alone that it was "involved with the activity that caused the injury giving rise to the action." *Federal Agency of News LLC*, 432 F. Supp. 3d at 1125. And the WHO is not a federal actor; it is an international organization comprised of representatives from 194 member states.[7] Although the United States is a member of the WHO, a state's membership in a multilateral government body does not make that body's conduct state action. *See NCAA v. Tarkanian*, 488 U.S. 179, 183, 193 (1988). CHD therefore does not properly plead joint action with respect to either the CDC or WHO.

**B.     Neither Facebook Nor Mark Zuckerberg Is A Proper *Bivens* Defendant**

CHD's *Bivens* claim independently fails because Facebook and Mr. Zuckerberg are not proper *Bivens* defendants. *Bivens* is a remedy against individuals, not entities. *See FDIC v. Meyer*, 510 U.S. 471, 485 (1994). "The purpose of *Bivens* is to deter *individual federal officers* from committing constitutional violations." *Malesko*, 534 U.S. at 70 (emphasis added). Because claims against "corporate defendant[s]" do not serve that purpose, they are "foreclosed." *Id.* at 71. The claim against Facebook must therefore be dismissed.

As to Mr. Zuckerberg, the Complaint fails to plausibly allege that he, "through [his] own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (no vicarious liability under *Bivens*). Aside from wholly conclusory allegations regarding Mr. Zuckerberg's involvement, *see* Compl. ¶¶ 8, 114, 195, 199, the Complaint alleges only that he has a personal interest in vaccines, *id.* ¶¶ 7, 151, 160, 162; that he is aware of and involved at a very high level with Facebook's efforts to remove misinformation, *id.* ¶¶ 39, 48, 58, 108, 152; and that he has been personally involved in *some* decisions whether to remove content unrelated to

---

[7] *About WHO*, WORLD HEALTH ORGANIZATION, https://tinyurl.com/y5ltbeaf (last accessed Oct. 23, 2020). Judicial notice is appropriate because this information was provided by a government entity and is "capable of accurate and ready determination by resource to sources whose accuracy cannot reasonably be questioned." *Daniels-Hall v. National Educ. Ass'n*, 629 F.3d 992, 999 (9th Cir. 2010).

vaccines (i.e., a post by President Trump and a manipulated video of House Speaker Pelosi), *id.*
¶¶ 118, 155. Those allegations fall far short of establishing any reasonable inference of personal
constitutional liability.

### C.    The *Bivens* Claim Requires An Unwarranted Expansion Of *Bivens* Liability

The defects described above are separately dispositive of CHD's *Bivens* claim. But even if
they were not, CHD's claim also should be dismissed because it would require the Court to
expand *Bivens* liability in ways that would encroach on constitutional and statutory protections
that apply not only to Facebook, but to technology companies and private actors more broadly.

No court has applied *Bivens* to hold a private social-media platform liable for exercising its
editorial judgment. Applying *Bivens* here would therefore be "different in a meaningful way from
previous *Bivens* cases," *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1859 (2017), because it would raise
First Amendment concerns not addressed in previous *Bivens* cases. That is a significant problem
for CHD, because "expanding the *Bivens* remedy is now a 'disfavored' judicial activity," *id.* at
1857, and courts must decline to expand *Bivens* where "special factors counsel[] hesitation" and
"alternative remed[ies]" are available, *Carlson v. Green*, 446 U.S. 14, 18 (1980).

Moreover, courts should not craft constitutional remedies where there are "sound reasons
to think Congress might doubt the efficacy or necessity" of such remedies. *Ziglar*, 137 S. Ct. at
1858. Here, there are two such reasons. For one, Congress chose to expressly preempt federal and
state claims that target decisions by companies like Facebook to remove or restrict access to
content like this. *See* 47 U.S.C. § 230(c). This Court should not create the remedy that Section 230
precludes. *See infra* pp. 13-14. Second, allowing *Bivens* suits against private parties based on
editorial decisions "could eviscerate certain private entities' rights to exercise editorial control
over speech and speakers on their properties or platforms." *Manhattan Cmty. Access Corp.*, 139 S.
Ct. at 1932. *See infra* p. 11.

## II.    THE FIRST AMENDMENT BARS THE REMAINDER OF CHD'S CLAIMS (COUNTS 2 & 3)

### A.    The First Amendment Protects Facebook's Statements And Content-Moderation Decisions

Alleging various harms to its position in the "marketplace of ideas," Compl. ¶ 191, CHD seeks to hold Facebook liable for publishing a warning label on its Facebook page, labeling several of its posts as containing false or partly false information, and using algorithms to limit the reach of CHD's content. Compl. ¶¶ 41, 111. But "[t]he First Amendment creates an *open* marketplace where ideas … may compete without government interference. It does not call on the federal courts to manage th[at] market … ." *New York State Bd. of Elecs. v. Lopez Torres*, 552 U.S. 196, 208 (2008). CHD asks this Court to do precisely what the First Amendment forbids.

As to the warning label and fact-checks, the speech here at issue lies within the core of the First Amendment's protections:  a "dialogue of ideas" on a "matter[] of public concern." *Snyder v. Phelps*, 562 U.S. 443, 452-453 (2011). CHD itself characterizes vaccine safety as a matter of "open scientific controversy" of interest to the public. Compl. ¶¶ 33, 87. It takes issue with certain conclusions related to that controversy that Facebook communicated (i.e. that its fact-checkers identified certain articles shared by CHD as containing false information) and the validity of the analyses underlying those conclusions, *see, e.g.*, Compl. ¶ 76; but sharing a conclusion together with "the factual basis for [that] conclusion … is protected by the First Amendment." *Partington v. Bugliosi*, 56 F.3d 1147, 1156 (9th Cir. 1995). Indeed, that is the fundamental process of public and scientific dialogue that the Constitution safeguards. And where speech is based on scientific inferences drawn from available information (*e.g.* Compl. ¶ 98 (fact-check concluding that post contained partly false information because it failed to account for data-collection problems with underlying data and other confounding variables), it is particularly beyond the ken of legal adjudication. "Scientific academic discourse" does not fit within the "fact-opinion paradigm of [the] First Amendment." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 496 (2d Cir. 2013). CHD asks this Court to moderate a self-described scientific controversy by deciding as a matter of law whose scientific inferences are true and whose are false. But this Court should not "undertake to referee such controversies." *Id.* at 497.

1    The First Amendment also protects Facebook's moderation decisions, including decisions

2    to reduce the distribution of certain content or restrict access to certain features by those who

3    repeatedly share misinformation. "Facebook[ has a] First Amendment right to decide what to

4    publish and want not to publish on its platform." *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d

5    981, 991 (S.D. Tex. 2017); *see also Miami Herald v. Tornillo*, 418 U.S. 241, 257-258 (1974)

6    (First Amendment protects a newspaper's right to "exercise editorial control and judgment," a

7    right that includes the "choice of material to go into the newspaper"). Accordingly, the decision to

8    filter or demote content is a protected editorial judgment. *See Jian Zhang v. Baidu.com Inc.*, 10 F.

9    Supp. 3d 433, 443 (S.D.N.Y. 2014) (First Amendment protects decision to block content from

10   search results); *accord Langdon v. Google, Inc.*, 474 Supp. 2d 622, 629-630 (D. Del. 2007)

11   (similar); *Search King Inc. v. Google Tech., Inc.*, 2003 WL 21464568, at *4 (W.D. Okla. May 27,

12   2003) (similar). The same is true of decisions to restrict access to advertising or fundraising tools.

13   Advertisements and fundraising solicitations carry messages—even if not always "narrow [and]

14   succinctly articulable"—and Facebook cannot be compelled to carry others' messages. *Hurley v.*

15   *Irish Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569-570 (1995). Like the parade

16   organizers in *Hurley*, Facebook's decision to exclude certain of CHD's messages is protected

17   speech.

18          **B.    CHD Cannot Recover For Alleged False Statements Absent Actual Malice**

19          Even if CHD (and this Court) could establish that Facebook's warnings and fact-checks

20   were false, those statements are nonetheless protected as CHD has failed to plausibly allege actual

21   malice. CHD's public involvement in the debate on vaccine safety makes it a limited-purpose

22   public figure as to that debate. CHD is a limited-purpose public figure because: (1) it alleges that a

23   public controversy regarding vaccine safety existed when the statements at issue were made, *see,*

24   *e.g.*, Compl. ¶¶ 7, 26, 130-140; (2) the alleged false statements related to CHD's participation in

25   that controversy, *see, e.g.*, Compl. ¶ 44; and (3) CHD voluntarily injected itself into that

26   controversy for the purpose of influencing its resolution, *see, e.g.*, Compl. ¶¶ 14-15. *See Makaeff*

27   *v. Trump Univ., LLC*, 715 F.3d 254, 266 (9th Cir. 2013) (laying out test).

28

1     Because CHD is a limited public figure, it cannot hold Facebook liable for alleged false

2  statements without plausibly alleging actual malice (i.e., knowledge that the warning and fact-

3  checks were false or reckless disregard for their truth or falsity). *See New York Times v. Sullivan*,

4  376 U.S. 254, 279-280 (1964). This standard applies to claims under the Lanham Act, *see*

5  *Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1250-1251 (9th Cir. 1999), and civil RICO,

6  *Savage v. Council on Am.-Islamic Relations, Inc.*, 2008 WL 2951281, at *12 (N.D. Cal. July 25,

7  2008). CHD therefore must allege with specificity that Facebook made the statements "with a

8  'high degree of awareness of … probable falsity' or must have 'entertained serious doubts as to

9  the truth of [the] publication.'" *Harte-Hanks Commc'ns Inc. v. Connaughton*, 491 U.S. 657, 667

10  (1989); *see also Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1108 (N.D. Cal. 1999) ("[A]ctual

11  malice must be pled with specificity."). CHD's attempts to provide more than "[t]hreadbare

12  recitals" of actual malice fall short of that minimum. *See Iqbal*, 556 U.S. at 678.

13     As to the warning label, CHD alleges that "Facebook was on notice that CHD was not

14  promoting 'misinformation' of any sort" and had "'obvious reasons to doubt the veracity' of its

15  warning label" in light of a letter CHD sent to Facebook in March 2019. Compl. ¶¶ 211-212. But

16  nothing in the letter—not its references to articles acknowledging that some ingredients used in

17  some vaccines can in some circumstances be harmful, *see* Compl. Ex. A at 8-9; not the fact that

18  *discontinued* vaccines were known to cause harm, *id.* at 4, 6; and not general statements that

19  conventional wisdom in medicine may be false, *id.* at 3—establishes that CHD does not post

20  misleading or out-of-date information to its Facebook Page. And in any event, the letter is

21  immaterial because CHD does not allege that it was read by "the individual responsible for

22  publication" of the warning. *Resolute Forest Prods. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005,

23  1018 (N.D. Cal. 2017). CHD also alleges that "defendants harbor an adverse motive to profit from

24  their unfettered development of vaccines." Compl. ¶ 214. But a publisher's motive alone "cannot

25  provide a sufficient basis for finding actual malice." *Harte-Hanks*, 491 U.S. at 665.

26     As to the fact-checks, CHD fails to allege with any specificity that Facebook either knew

27  they were false or harbored serious doubt as to their truth. Facebook's fact-checks relied on the

28  judgments of internationally certified independent fact-checkers. Absent any specific allegation of

contrary knowledge, "reli[ance] upon the integrity of a reputable [source]" defeats an allegation of malice. *See Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1032 (2d Cir. 1997). CHD therefore has not alleged actual malice by either Facebook or Mr. Zuckerberg.

## III.    THE CDA ALSO BARS CHD'S LANHAM ACT AND CIVIL RICO CLAIMS (COUNTS 2 & 3)

Section 230 of the CDA preempts claims that target decisions by services like Facebook to show or restrict access to content created by third parties. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009); *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). Section 230(c)(1) of the CDA applies whenever a claim would treat a "provider" of an "interactive computer service" as the "publisher" of content "provided by another information content provider." 47 U.S.C. § 230(c)(1). It therefore protects Facebook and Mr. Zuckerberg from claims based on their making available third-party fact-checks and their restriction of access to certain CHD-created content.  Accordingly, the CDA bars CHD's Lanham Act and civil RICO claims.

Facebook and Mr. Zuckerberg are each "provider[s]" of an "interactive computer service." The Facebook platform is an "interactive computer service" that Facebook, Inc. provides. *See, e.g.*, *Sikhs for Justice ("SFJ"), Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1093 (N.D. Cal. 2015). Mr. Zuckerberg likewise falls within the CDA because CHD seeks to hold him liable for "his role in making [an interactive computer service] available." *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357-1358 (D.C. Cir. 2014). CHD's allegations against Mr. Zuckerberg stem from his role in "direct[ing] and control[ing] Facebook's business." Compl. ¶ 19; *see also id.* ¶¶ 38-39, 58, 108. He is thus subject to the same CDA protections as Facebook itself.

Section 230(c)(1) bars both of CHD's primary theories. *First*, CHD cannot hold Facebook or Mr. Zuckerberg liable for the overlays, warnings, and explanations attached to particular CHD posts because those fact-checks were undisputedly performed by third parties. In making the results of those fact-checks available, Facebook did no more than aggregate information provided by others. As the Ninth Circuit has held (in the context of Yelp's star rating system), a "'neutral tool[]' operating on 'voluntary inputs' … [does] not amount to content development." *Kimzey v. Yelp, Inc.*, 836 F.3d 1263, 1269-1270 (9th Cir. 2016). Holding Facebook or Mr. Zuckerberg liable

for the content of third-party fact-checks would treat them as the "publisher[s]" of that third-party content, which Section 230(c)(1) expressly prohibits.

*Second*, neither Facebook nor Mr. Zuckerberg can be held liable for restricting user access to articles shared by CHD after fact-checkers identified them as containing false information. Those posts were created by either CHD or reposted by CHD from other websites, meaning they were created by "another information content provider." 47 U.S.C. § 230(c)(1); *see also Sikhs for Justice, Inc. v. Facebook, Inc.*, 697 F. App'x 526, 526 (9th Cir. 2017); *Fyk v. Facebook, Inc.*, 808 F. App'x 597, 598 (9th Cir. 2020); *Federal Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d at 1119-1120. And imposing liability for restricting access to CHD's posts would treat Facebook and Mr. Zuckerberg as the publisher of those posts: "[R]emoving content is something publishers do, and to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher." *Sikhs*, 144 F. Supp. 3d at 1095. It does not matter that CHD's content was not taken down in its entirety, but instead was restricting from appearing in many users' news feeds. Publishing is not all or nothing; a publisher does not lose protection simply because it publishes to some audiences and not others. In *Sikhs for Justice*, for example, the content at issue allegedly was only restricted from publication in India, yet Section 230(c)(1) still applied. 144 F. Supp. 3d at 1093; *see also Greater L.A. Agency on Deafness, Inc. v. CNN, Inc.*, 742 F.3d 414, 422 (9th Cir. 2014) (depublishing from deaf viewers). Facebook and Mr. Zuckerberg therefore cannot be held liable for actions that limited the reach of CHD's posts.

## IV.    CHD HAS NOT STATED A CLAIM UNDER THE LANHAM ACT (COUNT 2)

Even absent immunity, the Complaint fails to state a claim. CHD also cannot shoehorn an "ongoing scientific controversy" into a Lanham Act false advertising claim. The Lanham Act's exists to "protect persons engaged in … commerce against unfair competition." 15 U.S.C. § 1127. It regulates false *advertising* and *commercial speech* in the interest of fair competition between those engaged in commerce, not disputes over the veracity of public-health related claims between publishers and those who use their platforms. CHD fails to state a claim under the Lanham Act because its interests do not "fall within the zone of interests protected by the law," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014), and because it has not plausibly

alleged a promotional statement within the Act's scope.

### A.   CHD Lacks Standing Under The Lanham Act

The Lanham Act reaches only "competitive" injuries, that is, injuries "harmful to the plaintiff's ability to compete with the defendant." *ThermoLife Int'l LLC v. American Fitness Wholesalers LLC*, 2020 WL 122874, at *3 (D. Ariz. Jan. 10, 2020); *see also Lexmark Int'l*, 572 U.S. at 129, 131-132. CHD strains to fit its Lanham Act claims into this paradigm, claiming that it competes with Defendants "in the marketplace of ideas." Compl. ¶ 191. That allegation is insufficient. "No court has held that Lanham Act competitors may be other than *business* competitors. A theoretical educational competition for the 'hearts and minds' of consumers is insufficient to give [CHD] Lanham Act standing." *Animal Legal Defense Fund v. HVFG LLC*, 939 F. Supp. 2d 992, 1000 (N.D. Cal. 2013).

Indeed, CHD's claimed injury is really to its interests as Facebook's customer, not its competitor. *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014) (Lanham Act false advertising cause of action is "not [for] consumers"). In particular, CHD alleges it was injured because Facebook limited the "visibility and reach" of its Facebook Page, which in turn reduced its advertising revenue, website traffic, and goodwill. Compl. ¶¶ 103, 127, 128. But these alleged harms all purportedly resulted from Facebook's "enforcement of its policies to those who post on its website," and are therefore injuries "incurred by interacting with [Facebook] as a consumer, not as a competitor." *Lewis v. Google LLC*, 2020 WL 2745253, at *13 (N.D. Cal. May 20, 2020). CHD therefore lacks statutory standing under the Lanham Act.

### B.   The Complaint Does Not Identify A Promotional Statement

CHD independently fails to state a claim under the Lanham Act because it has not alleged the first element of a false advertising claim: "a false statement of fact by the defendant in a commercial advertisement about its own or another's product," *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997)—that is, a "promotion[al]" statement, *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999). To qualify as promotional, a statement must be "encompassed within the 'commercial speech' doctrine developed by the United States Supreme Court." *Gordon & Breach Science Pubs. S.A. v.*

1   *American Inst. of Physics*, 859 F. Supp. 1521, 1533-1534 (S.D.N.Y. 1994) (quoting 134 Cong.

2   Reg. 31,851 (Oct. 19, 1988) (statement of Rep. Kastenmeier)). This is a "constitutional

3   requirement" that prevents the Lanham Act from burdening "the type [of speech] which raise[s]

4   free speech concerns, such as … reviews … [and] misrepresentations made by interested groups

5   which may arguably disparage a company and its products." *Id.* at 1533, 1536 (second quoting

6   135 Cong. Rec. H1216-17135 (Apr. 13, 1989) (statement of Rep. Kastenmeier)) (emphasis

7   omitted).

8        The Complaint does not identify any purportedly false commercial speech. CHD attempts to

9   hang its Lanham Act claim on the "warning label and 'fact checks'" Facebook published on

10  CHD's Page, Compl. ¶ 190, but neither provides the constitutionally required commercial hook.

11  Commercial speech, at its core, is that which "does no more than propose a commercial

12  transaction." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425

13  U.S. 748, 762 (1976). But here, Facebook's warnings and fact checks do not propose commercial

14  transactions at all. Instead, they describe the content of CHD's Page, Compl. ¶ 44; direct viewers

15  to freely available information about vaccine safety, *id.*; and categorize various CHD posts as

16  containing "false" or "partly false" information, *e.g. id.* ¶¶ 61, 66, 68.

17       That Facebook allegedly published its warning and fact-checks as "part of [its] ongoing

18  vaccine misinformation public relations campaign," itself allegedly part of "Facebook's business

19  model" of "manufactur[ing] users' 'trust,'" Compl. ¶ 192, does not make them commercial in

20  nature. *First*, even if true that Facebook derived some financial benefit from the warning label and

21  fact-checks, "economic motive in itself is insufficient to characterize a publication as

22  commercial." *Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 960 (9th Cir. 2012). *Second*,

23  and in any event, the complaint does not identify anything in the warning label or fact-checks that

24  relate to Facebook's alleged business model of building trust regarding "user privacy and data

25  security." Compl. ¶192. The warning label and fact-checks communicate information about

26  CHD's posts, not Facebook own services. Faced with a similar claim regarding YouTube's

27  designation of videos for its "Restricted Mode," the Ninth Circuit held that neither YouTube's

28  statements about its content moderation policies nor its designation of certain videos for

"Restricted Mode" constituted promotional speech cognizable under the Lanham Act. *See Prager Univ. v. Google, LLC*, 951 F.3d 991, 999-1000 (9th Cir. 2020).

And to the extent the Complaint alleges that the warning label and fact-checks are promotional because they are part of the vaccination-misinformation campaign that Facebook promotes through other means—such as the public statements of Mr. Zuckerberg—that, too, fails. Speech is not itself promotional simply because it is a part of something that is promoted. For example, in *Rice v. Fox Broad. Co.*, 330 F.3d 1170 (9th Cir. 2003), the Ninth Circuit held the statement "tonight, for the first time on television …" beyond the Lanham Act's reach because it "was part of the show itself, and was not made in promotion or marketing of the [show]." *Id.* at 1181. Accordingly, CHD has failed to state a claim cognizable under the Lanham Act.

## V.   CHD HAS NOT STATED A CIVIL RICO CLAIM (COUNT 3)

The civil RICO statute "was enacted with a goal of eradicating organized, long-term criminal activity." *Royce International Broadcasting Corp. v. Field*, 2000 WL 236434, at *4 (N.D. Cal. Feb. 23, 2000) (quoting *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1999)) (alternation in original). This Court has therefore recognized that plaintiffs "try[] to fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions." *Id.* (quoting *Midwest Grinding*, 976 F.2d at 1025). And courts should be particularly wary of stretching civil RICO's "somewhat elastic" predicate acts to encompass "fully protected First Amendment activity." *National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 264 (1994) (Souter, J., concurring). That is precisely what CHD has attempted to do here, by transforming what is, at bottom, a complaint about Facebook's enforcement of its terms of service and Facebook's own protected First Amendment activity into a civil RICO claim subject to treble damages. Civil RICO cannot be stretched so far.

### A.   CHD Lacks Statutory Standing To Bring A Civil RICO Claim

To have statutory standing to bring a civil RICO claim, CHD must have been "injured in its business or property by reason of" its claimed RICO violations. 18 U.S.C. § 1964(c). This requirement "is not easily met," *Sheperd v. American Honda Motor Co.*, 822 F. Supp. 625, 629 (N.D. Cal. 1993); it requires "some *direct* relation between the injury asserted and the injurious

conduct alleged." *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 981 (9th Cir. 2008) (quoting *Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)) (emphasis added). CHD claims that the allegedly false statements dissuaded members of the public from reviewing posts on CHD's Facebook Page, which in turn decreased traffic to CHD's website, which in turn caused CHD to lose donations and membership fees. *See, e.g.,* Compl. ¶¶ 226, 234.[8] These types of indirect harms do not confer statutory standing, because they "could have resulted from factors other than [Defendants'] alleged acts of fraud," *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 459 (2006), including, for example: "the state of the economy," CHD's "quality of service," or "customer satisfaction and referrals," *Ozeran v. Jacobs*, 2018 WL 1989525, at *9 (C.D. Cal. Apr. 25, 2018), *aff'd*, 798 F. App'x 120 (9th Cir. 2020). Because "[b]usinesses lose and gain customers for many reasons … it would require a complex assessment to establish what portion" of CHD's lost donations and membership fees were the direct result of alleged fraud and which portion were due to other forces. *Anza*, 547 U.S. at 459. This Court should follow the many other courts that have held unspecified lost business cannot support a civil RICO claim. *See, e.g., Holmes*, 503 U.S. at 272-273; *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1148 (9th Cir. 2008).

### B.    CHD Has Not Pleaded Any Predicate Acts Of Wire Fraud

To plead a civil RICO claim, a plaintiff must identify "racketeering activity (known as predicate acts)." *Eller v. Equitrust Life Insurance Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015). CHD has not adequately pleaded its purported predicate acts of wire fraud.

#### 1.    Defendants did not obtain "money or property" from CHD

Pleading wire fraud requires a showing that the defendant "obtain[ed] money or property from the one who is deceived." *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989); *see also Monterey Plaza Hotel L.P. v. Local 483*, 215 F.3d 923, 926-927 (9th Cir. 2000). CHD alleges only that Defendants' actions reduced visits to CHD's website, reduced donations to CHD, and diminished CHD's "trade reputation and goodwill." Compl. ¶ 128. Putting aside whether any of

---

[8] CHD also claims that removing its "donate" button caused it to lose donations, but does not claim that Facebook committed wire fraud in doing so.

those count as "money or property," CHD cannot, as a logical matter, allege that Defendants took for themselves visits to CHD's website or CHD's reputation, or that its establishment of a fact-checking apparatus directed to vaccine misinformation evidenced any such intend. Nor has CHD alleged that Defendants intended to route donations intended for CHD to themselves. That alone defeats their civil RICO claims. *See Monterey Plaza Hotel*, 215 F.3d at 926-927. Moreover, the only people who Defendants allegedly defrauded are individual Facebook users and CHD's advertising agency. But no Defendant is alleged to have taken any money from those people—a fact which independently defeats CHD's attempts to plead wire fraud. *See Sugarman v. Muddy Waters Capital LLC*, 2020 WL 633596, at *3 (N.D. Cal. Feb. 3, 2020).

### 2. None of the purported acts of "wire fraud" were fraudulent

Wire fraud must be pleaded with specificity, *see Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065-1066 (9th Cir. 2004), requiring CHD to "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation," *Schreiber Distributing Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986), and to "set forth an explanation as to why the statement or omission complained of was false or misleading," *Decker v. GlenFed, Inc.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc). None of the allegedly false statements CHD has identified suffice.

"Warning label" on CHD's Facebook page: First, CHD claims that the banner placed on its Facebook page constituted wire fraud. Compl. ¶¶ 55-59. That banner says only that "This Page posts about vaccines. When it comes to health, everyone wants reliable, up-to-date information. The Centers for Disease Control (CDC) has information that can help answer questions you may have about vaccines. Go to CDC.gov." *Id.* ¶ 44. CHD does not dispute that it posts about vaccines, that people want reliable vaccine information, and that the CDC provides vaccine-related information. CHD alleges only that the statement is a "classic imputation of dishonesty," *id.* ¶ 53(C), because its "gist" is to convey that CHD's Page contains unreliable information, *id.* ¶ 210. Even if that "gist" were clear from the text of the statement, CHD fails to explain why it is false beyond the *ipse dixit* that its content is reliable. *Id.* CHD's judgment on what is reliable does not discharge its burden of identifying why the statement is false. *See Decker*, 42 F.3d at 1548.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>Statements About Specific CHD Posts</u>: CHD also complains that Defendants committed wire fraud by identifying certain articles shared by CHD as "False," "Partly False," or "False Headline." Compl. ¶¶ 60-99. Here, too, CHD has not shown that Defendants' statements were objectively false or misleading; at most, it has pleaded facts showing that some people disagree about whether specific CHD posts were "false." At bottom, CHD's complaint is that Defendants "deliberate[ly] conflate[d] open scientific controversy with 'vaccine hoax.'" *Id.* ¶ 87. But whether there is "open scientific controversy" concerning vaccines is itself a matter of opinion. The fact that CHD disagrees with Defendants' assessment of the clear weight of scientific authority does not give CHD a claim for fraud. *See, e.g., Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 621 (9th Cir. 2004) (opinion not actionable as fraud); *see* also Restatement (Second) of Torts § 538A.

In any case, for the posts that it claims Defendants falsely labeled, CHD has not pleaded with particularity that any statement at issue is false. For example, CHD complains that fact-checkers labeled a 45-minute video in which Robert F. Kennedy, Jr. talks about vaccines "Partly False," but never claims that the video was completely accurate; all it says is that "RFK Jr. accurately detailed Dr. Anthony Fauci's past involvement with vaccine manufacturers." Compl. ¶ 67. That conclusory statement falls short of the specificity Rule 9(b) requires. Elsewhere, CHD contends that Science Feedback was wrong to state in an article that "vaccines bear no association with sudden child infant death" because that statement "contradicts, inter alia, the potential adverse effect advisements formerly on many vaccine product inserts." *Id.* ¶ 99. But CHD does not explain what, specifically, was contained on vaccine product inserts, what vaccines those advisements applied to, or why those advisements contradict Science Feedback's conclusion that the scientific evidence does not support an association between vaccines and sudden infant death syndrome. That, too, does not satisfy Rule 9(b).

<u>Statements concerning removal of CHD's advertising and fundraising functions</u>: CHD also complains that Facebook defrauded it by telling CHD that its "donate" button was deactivated because CHD violated Facebook's terms of service "by posting 'false information' with respect to vaccines," Compl. ¶¶ 53(A), 100, and by telling CHD's advertising agency that CHD "had repeatedly posted content that has been disputed by third-party fact-checkers [for] promoting false

content," *id.* ¶ 101; *see also id.* ¶ 53(B). Even assuming these statements were pleaded with

particularity (they are not), they do not rise to the level of fraud. Fraudulent statements must have

a tendency to mislead, *see Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 941 (9th Cir. 2006), and CHD

has not suggested that anything Facebook told CHD misled it. Presumably CHD itself knew

whether it had violated Facebook's terms of service, and there is no allegation that Facebook

disabled the donate button for some other, undisclosed, reason. As for the statements to CHD's

advertising agency, CHD has not established they were false or misleading—nor can it. The

complaint itself alleges that, by April 2020 when the agency purportedly received this message

from Facebook, CHD had been informed multiple times that Facebook's third-party fact-checkers

disputed its posts. *See* Compl. ¶¶ 60-89.

    <u>Description of PolitiFact and Science Feedback as "Independent"</u>: CHD suggests that

Facebook was wrong to call its fact-checkers "independent." But again, CHD nowhere explains

why that label was inaccurate, beyond alleging that the fact-checkers were paid for providing fact-

checking services and that they filled out a Facebook-created form that allowed them to categorize

articles as one of "False," "False Headline," "Partly False," or several other options. *See* Compl.

¶ 122, 123. Moreover, whether someone is "independent" (without reference to any standard of

independence) is not an objective statement of fact capable of being proven false; it is a matter on

which reasonable minds, and their interpretation thereof, may differ. In any case, all of the facts

CHD claims made Facebook's description of the fact-checkers false were publicly disclosed,

including on pages incorporated by reference into the Complaint. *See supra* pp. 3-5. CHD can

hardly claim that Facebook misled anyone as to its relationship with its third-party fact-checkers.

    <u>Failure to disclose that CHD's posts were not available to all Facebook users</u>. Finally, CHD

complains that Facebook never told it that some of its posts were not being displayed to every

Facebook user (through processes it refers to as "shadowbanning" or "sandboxing"). Compl.

¶¶ 103-118. Judicially noticeable documents demonstrate that Facebook publicly announced that

"Once a fact-checker rates a piece of content as False, Altered, or Partly False, *it will appear*

*lower in News Feed, be filtered out of Explore on Instagram, and be featured less prominently in*

*Feed and Stories. This significantly reduces the number of people who see it.*" Jennings Decl. Ex.

1 at 2. That same page likewise informs Facebook users that "Pages and websites that repeatedly share misinformation rated False or Altered will have some restrictions, *including having their distribution reduced*." *Id.* And even if Facebook had not disclosed the impact having content rated "false," such an omission simply cannot support a wire fraud claim absent a duty to disclose arising out of either (1) a fiduciary relationship or similar relationship of trust, or (2) an explicit statutory duty. *Eller v. EquiTrust Life Insurance Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015). CHD has not alleged facts supporting either requirement.

## VI.   CHD FAILS TO STATE ANY CLAIM AGAINST MARK ZUCKERBERG

All else aside, the Complaint fails to state any claim against Mark Zuckerberg because it does not plausibly allege his personal involvement in any of the conduct at issue. Personal liability under each Count requires direct involvement in the allegedly unlawful conduct: under *Bivens*, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution," *Iqbal*, 556 U.S. at 676; the Lanham Act imposes individual liability on corporate officers only for conduct they "authorize[] or direct[] or in which [they] participate[]," *POM Wonderful LLC v. Purely Juice, Inc.*, 362 F. App'x 577, 581 (9th Cir. 2009); and individual liability under civil RICO requires that a defendant "participate[d] in the operation or management of the enterprise itself," *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). Moreover, as the Lanham Act and civil RICO claims sound in fraud, they must satisfy the heightened pleadings standards of Rule 9(b). *See Schreiber Distrib. Co.*, 806 F.2d at 1400-1401 (civil RICO claims predicated on wire fraud must satisfy Rule 9(b)); *TransFresh Corp. v. Ganzerla & Assoc., Inc.*, 862 F. Supp. 2d 1009, 1014, 1017-1018 (N.D. Cal. 2012) (allegations of false statements that violate Lanham Act must satisfy Rule 9(b)). And in addition to the time, place, and content of the alleged false statements, Rule 9(b) requires that plaintiffs "identify the role of each defendant in the alleged fraudulent scheme." *Openwave Sys. Inc. v. Fuld*, 2009 WL 1622164, at *5 (N.D. Cal. June 6, 2009).

The Complaint does not allege that Mr. Zuckerberg was personally involved in any of the allegedly unlawful conduct. *See supra* pp. 8-9. Accordingly, he cannot be personally liable under either *Bivens*, *see supra* pp. 8-9, or the Lanham Act, *see Openwave Sys., Inc.*, 2009 WL 1622164,

at *5. And to the extent the Complaint alleges that Mr. Zuckerberg has some involvement in Facebook's "content management" decisions, that does not demonstrate that he operated or managed the alleged RICO enterprise. The Complaint alleges only that Mr. Zuckerberg was personally involved in decisions whether to remove two instances of political speech wholly unrelated to CHD, *see* Compl. ¶ 155. Because there is no allegation that those decisions were unlawful, they cannot support RICO liability; personal involvement in decisions "separate and apart from any alleged racketeering acts" cannot establish individual RICO liability. *Ferrari v. Mercedes-Benz USA, LLC*, 2016 WL 7188030, at *3 (N.D. Cal. Dec. 12, 2016).

## VII.   CHD IS NOT ENTITLED TO DECLARATORY RELIEF

"[T]he Declaratory Judgment Act creates a remedy for litigants but is not an independent cause of action." *County of Santa Clara v. Trump*, 267 F. Supp. 3d 1201, 1215-1216 (N.D. Cal. 2017). As CHD has failed to state any claim, it is not entitled to declaratory relief. Count IV must be dismissed alongside CHD's other claims.

## CONCLUSION

The Complaint's numerous legal defects—including the absence of a federal actor as required for liability under Bivens, the lack of either an interest or statement cognizable under the Lanham Act, the absence of any false statement sufficient for RICO liability, and the Complaint's intrusion upon rights guaranteed to Facebook under the First Amendment and Section 230 of the Communications Decency Act—cannot be cured by amendment.  The Complaint should be dismissed with prejudice.


Dated: October 23, 2020                               WILMER CUTLER PICKERING, HALE AND
                                                                          DORR LLP

                                                              By:    */s/ Sonal N. Mehta*
                                                                          SONAL N. MEHTA

                                                                          *Attorney for Defendants*
                                                                          Facebook, Inc. and Mark Zuckerberg

1

## **CERTIFICATE OF SERVICE**

2          I hereby certify that on October 23, 2020, I electronically filed the above document with the

3   Clerk of the Court using CM/ECF which will send electronic notification of such filing to all

4   registered counsel.

5

6    Dated: October 23, 2020                    By:   */s/ Sonal N. Mehta*

7                                                       Sonal N. Mehta

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28