# EXHIBIT 1

ROGER I. TEICH
California State Bar No. 147076
290 Nevada Street
San Francisco, CA 94110
Telephone:  (415) 948-0045
E-Mail Address:  rteich@juno.com

ROBERT F. KENNEDY, JR.
MARY HOLLAND
Children's Health Defense
1227 North Peachtree Parkway, Suite 202
Peachtree City, GA 30269
Telephone:  (917) 743-3868
E-Mail Address:  mary.holland@childrenshealthdefense.org

Attorneys for Plaintiff
CHILDREN'S HEALTH DEFENSE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CHILDREN'S HEALTH DEFENSE, a Georgia non-profit organization, <br><br> Plaintiff, <br><br> v. <br><br> FACEBOOK, INC., a Delaware corporation; MARK ZUCKERBERG, a California resident; SCIENCE FEEDBACK, a French corporation; THE POYNTER INSTITUTE FOR MEDIA STUDIES, INC., a Florida corporation; and DOES 1-20, <br><br> Defendants. | Case No. 3:20-cv-05787-SI <br><br> **VERIFIED SECOND AMENDED COMPLAINT** <br><br> 1) **FIRST AND FIFTH AMENDMENTS (*BIVENS*);** <br> 2) **LANHAM ACT (15 U.S.C. § 1125(a));** <br> 3) **RICO FRAUD (18 U.S.C. § 1962);** <br> 4) **DECLARATORY RELIEF.** <br><br> **JURY TRIAL DEMAND** |

1

## **TABLE OF CONTENTS**

2

Page #

3   TABLE OF AUTHORITIES ...................................................................................... iii

4   VERIFIED SECOND AMENDED COMPLAINT ..................................................... 1

5   INTRODUCTION ...................................................................................................... 2

6   JURISDICTION AND VENUE ................................................................................. 6

7   PARTIES AND RELATED ENTITIES .................................................................... 7

8   STATEMENT OF MATERIAL FACTS ................................................................ 10

9      A.   CHD's Interest in Vaccine and 5G and Wireless Network Safety ..................... 10

10      B.   CHD's Facebook Page. ................................................................................. 14

11      C.   The CDC/Facebook Partnership .................................................................. 16

12      D.   Defendants' Scheme to Defraud. ................................................................. 23

13         1.   Overview. ............................................................................................ 23

14         2.   Means and Methods of Defendants' Scheme. ...................................... 33

15         3.   Falsely Disparaging Warning Label ................................................... 36

16         4.   Materially Deceptive use of "Fact-Checkers." ................................... 38

17            a.   Facebook/"Fact-Checker" Agency Relationship. .......................... 38

18            b.   Specific Facebook "Fact-Checks" Containing Material

19                 Falsity. .......................................................................................... 48

20         5.   Disabling CHD's Fundraising and Ads ............................................... 76

21         6.   Disabling CHD's Right to "Appeal" These Actions ............................ 77

22         7.   Concealment of the Overall Scheme. .................................................. 77

23         8.   Continuing Injuries to CHD. ............................................................... 86

24      D.   Material Questions of Vaccine Safety ........................................................... 87

25      E.   Material Questions of 5G Network Safety. .................................................... 93

26      F.   Facebook's Adverse Motives. ....................................................................... 99

27         1.   Zuckerberg's Personal Involvement and Biases. ................................ 99

28         2.   Vaccine-Maker Ad Revenue. ............................................................ 104

3. Vaccine Development. ...................................................................... 107

4. 5G Networks. ................................................................................... 108

G. No Affirmative Defense of CDA Section 230 Immunity. ................................ 111

H. Section 230 Immunity Plus Pressure Equals State Action. ............................... 112

I. The May 28, 2020 Executive Order. ..................................................... 113

FIRST CAUSE OF ACTION

(FIRST AND FIFTH AMENDMENTS — *BIVENS* VIOLATIONS) .......................... 114

SECOND CAUSE OF ACTION

(LANHAM ACT VIOLATIONS — 15 U.S.C. § 1125(a)) ......................................... 123

THIRD CAUSE OF ACTION

(RICO — WIRE FRAUD VIOLATIONS) ................................................................ 142

FOURTH CAUSE OF ACTION

(DECLARATORY RELIEF) ................................................................................... 147

DEMAND FOR JURY TRIAL ............................................................................................. 149

PRAYER FOR RELIEF ........................................................................................................ 150

VERIFICATION ................................................................................................................... 151

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

# TABLE OF AUTHORITIES

**Federal Cases**

*Abrams v. United States*,
    250 U.S. 616 (1919) ............................................................................................... 6, 82

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144 (1970) ................................................................................................... 119

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013) ..................................................................................................... 45

*Ashcroft v. Free Speech Coalition*,
    535 U. S. 234 (2002) ................................................................................................... 118

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) ............................................................................................. 112, 113

*Bass v. Facebook, Inc.*,
    394 F. Supp. 3d 1024 (N.D. Cal. 2019) ....................................................................... 4

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003) ................................................................................... 112

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
    403 U.S. 388 (1971) ................................................................................................... 114

*Blum v. Yaretsky*,
    457 U.S. 991 (1982) ................................................................................................... 118

*Board of Regents of State Colleges v. Roth*,
    408 U.S. 564 (1972) ................................................................................................... 120

*Boatmon v. Sec'y of Health & Human Servs.*,
    No. 13-611V, 2017 WL 3432329 (Fed. Cl. Spec. Mstr. July 10, 2017) ..................... 63

*Bolger v. Youngs Drug Products Corp.*,
    463 U.S. 60 (1983) ..................................................................................................... 124

*Boston Chamber of Commerce v. Boston*,
    217 U.S. 189 (1910) ................................................................................................... 120

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008) ....................................................................................... 82, 87, 145

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* **et al.; Case No. 3:20-cv-05787-SI**

*Bridges v. California,*
   314 U.S. 252 (1941) ................................................................. 33

*Bruesewitz v. Wyeth LLC,*
   562 U.S. 223 (2011) ................................................................. 87

*Burton v. Wilmington Parking Authority,*
   365 U.S. 715 (1961) ......................................................... 30, 119

*Carlin Communications Inc. v. Mountain States Tel. & Tel. Co.,*
   827 F.2d 1291 (9th Cir. 1987), *cert. denied,* 483 U.S. 1029 (1988)................ 119

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,*
   173 F.3d 725 (9th Cir. 1999) ......................................... 123, 124

*Continental Airlines, Inc. v. Intra Brokers, Inc.,*
   24 F.3d 1099 (9th Cir. 1994) .............................................. 148

*Cook, Perkiss, and Liehe, Inc. v. N. Cal. Collection Serv.,*
   911 F.2d 242 (9th Cir. 1990) .............................................. 127

*Corr. Servs. Corp. v. Malesko,*
   534 U.S. 61 (2001) ........................................................... 115

*Davis v. Passman,*
   442 U.S. 228 (1979)..................................................... 114, 115

*Davis v. Wyeth Laboratories,*
   399 F.2d 121 (9th Cir. 1968) ............................................... 88

*Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc.,*
   795 F.2d 1344 (7th Cir. 1986) ............................................ 120

*Dietrich v. John Ascuaga's Nugget,*
   548 F.3d 892 (9th Cir. 2008) .............................................. 122

*Dodds v. Am. Broad. Co.,*
   145 F.3d 1053 (9th Cir. 1998) ....................................... 134, 137

*Elrod v. Burns,*
   427 U.S. 347 (1976)........................................................ 148

*Fair Hous. Council v. Roommates.com, LLC,*
   521 F.3d 1157 (9th Cir. 2008) (en banc) ...................... 33, 40, 111, 112

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

*Fed. Agency of News LLC v. Facebook, Inc.*,
    432 F. Supp. 3d 1107 (N.D. Cal. 2020) ................................................................ 116, 117

*Fonda v. Gray*,
    707 F.2d 435 (9th Cir. 1983) ................................................................ 118

*Fraley v. Facebook*,
    830 F. Supp. 2d 785 (N.D. Cal. 2011) ................................................................ 104, 111

*Franklin v. Fox*,
    312 F.3d 423 (9th Cir. 2002) ................................................................ 116

*Freedman v. Maryland*,
    380 U.S. 51 (1965) ................................................................ 115

*Garrison v. Louisiana*,
    379 U.S. 64 (1964) ................................................................ 6, 137

*Gorenc v. Salt River Project Agric. Improvement & Power Dist.*,
    869 F.2d 503 (9th Cir. 1989) ................................................................ 116

*Grasshopper House, LLC v. Clean & Sober Media LLC*,
    394 F. Supp. 3d 1073 (C.D. Cal. 2019) ................................................................ 124

*Grosjean v. American Press Co.*,
    297 U.S. 233 (1936) ................................................................ 3

*Hanover Star Milling Co. v. Metcalf*,
    240 U.S. 403 (1916) ................................................................ 87

*Harmoni Int'l Spice, Inc. v. Hume*,
    914 F.3d 648 (9th Cir. 2019) ................................................................ 146

*Harte-Hanks Commc'ns Inc. v. Cunningham*,
    491 U.S. 657 (1989) ................................................................ 25, 136

*Herbert v. Lando*,
    441 U.S. 153 (1979) ................................................................ 137

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods. Liab. Litig.*
    295 F. Supp. 3d 927 (N.D. Cal. 2018) ................................................................ 146

*Jackson v. Metropolitan Edison Co.*,
    419 U.S. 345 (1974) ................................................................ 118

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

*Kaiser Foundation Health Plan, Inc. v. Pfizer, Inc.* (*In re Neurontin Mktg. & Sales Practices Litig.*),
712 F.3d 21 (1st Cir. 2013) ................................................................ 146

*Kelly v. United States*,
140 S. Ct. 1565 (2020) ....................................................................... 87

*Knievel v. ESPN*,
393 F.3d 1068 (9th Cir. 2005) ........................................... 130, 131, 133

*Lexmark International, Inc. v. Static Control Components, Inc.*,
572 U.S. 118, 134 S. Ct. 1377 (2014) ................................................ 87

*Lugar v. Edmondson Oil Co., Inc.*,
457 U.S. 922 (1982) .................................................................. 116, 119

*Manhattan Cmty. Access Corp. v. Halleck*,
139 S. Ct. 1921 (2019) ..................................................................... 116

*Manufactured Home Communities, Inc. v. County of San Diego*,
544 F.3d 959 (9th Cir. 2008) ........................................................... 134

*Masson v. New Yorker Magazine, Inc.*,
501 U.S. 496 (1991) ............................................... 133, 134, 135, 136

*Mendoza v. Zirkle Fruit Co.*,
301 F.3d 1163 (9th Cir. 2002) ......................................................... 146

*Metabolife Int'l Inc. v. Wornick*,
264 F.3d 832 (9th Cir. 2001) ................................................... 134, 142

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990) .................................................... 129, 134, 135

*Nat'l Collegiate Athletic Ass'n. v. Tarkanian*,
488 U.S. 179, 102 L. Ed. 2d 469, 109 S. Ct. 454 (1988) .................... 118

*National Organization for Women, Inc. v. Schiedler*,
510 U.S. 249 (1994) ......................................................................... 143

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ......................................................................... 129

*Newton v. National Broadcasting Co., Inc.*,
930 F.2d 662 (9th Cir. 1990) ........................................................... 136

*Philadelphia Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986) ............................................................................ 136

*Phillips v. Washington Legal Foundation*,
    524 U.S. 156 (1998) ............................................................................ 120

*Pinard v. Clatskanie Sch. Dist. 6J*,
    467 F.3d 755 (9th Cir. 2006) .............................................................. 121

*Pratt v. Rowland*,
    65 F.3d 802 (9th Cir. 1995) ................................................................ 123

*Rent-A-Ctr., Inc. v. Canyon TV and Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991) .............................................................. 148

*Resolute Forest Prods. v. Greenpeace Int'l.*,
    2019 U.S. Dist. LEXIS 10263 (N.D. Cal. 2019) ............................... 146

*Rice v. Fox Broad Co.*,
    33 F.3d 1170 (9th Cir. 2003) .............................................................. 123

*River City Mkts., Inc. v. Fleming Foods W., Inc.*,
    960 F.2d 1458 (9th Cir. 1992) ............................................................ 143

*Sambreel Holdings LLC v. Facebook, Inc.*,
    906 F. Supp. 2d 1070 (S.D. Cal. 2016) ............................................... 33

*Skinner v. Ry. Labor Executives' Ass'n*,
    489 U.S. 602 (1989) ............................................... 112, 113, 119

*Skoog v. County of Clackamas*,
    469 F.3d 1221 (9th Cir. 2006) ............................................................ 121

*Speiser v. Randall*,
    357 U.S. 513 (1958) ............................................................................ 115

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) ................................................................ 136, 137

*Tsao v. Desert Palace, Inc.*,
    698 F.3d 1128 (9th Cir. 2012) ............................................................ 115

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
    933 F.3d 728 (D.C. Cir. 2019) .............................................................. 93

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

*United States v. Halbert,*
  640 F.2d 1000 (9th Cir. 1981) ........................................................... 147

*United States v. Reyes,*
  660 F.3d 454 (9th Cir. 2011) ............................................................. 143

*United States v. Stockheimer,*
  157 F.3d 1082 (7th Cir. 1998) ........................................................... 146

*Villegas v. Gilroy Garlic Festival Ass'n,*
  541 F.3d 950 (9th Cir. 2008) (en banc) ........................................... 115

*Vinatieri v. Mosley,*
  787 F. Supp. 2d 1022 (N.D. Cal. 2011) *aff'd*, 532 Fed. Appx. 762 (9th Cir. 2013).......... 122

*Watison v. Carter,*
  668 F.3d 1108 (9th Cir. 2012) ........................................................... 123

*Xcentric Ventures, LLC v. Borodkin,*
  798 F.3d 1201 (9th Cir. 2015) ........................................................... 145

**California Cases**

*Bently Reserve LP v. Papaliolios,*
  218 Cal. App. 4th 418 (2013) ........................................................... 132

*Carney v. Santa Cruz Women Against Rape,*
  221 Cal. App. 3d 1009 (1990) ........................................................... 129

*Couch v. San Juan Unified Sch. Dist.,*
  33 Cal. App. 4th 1491 (1995) ........................................................... 134

*Ferlauto v. Hamsher,*
  74 Cal. App. 4th 1294 (1999) ........................................................... 131

*Gilbert v. Sykes,*
  147 Cal. App. 4th 13 (2007) ............................................................. 129

*Gomes v. Fried,*
  136 Cal. App. 3d 924 (1982) ............................................................. 130

*Graybill v. De Young,*
  140 Cal. 323 (1902) ......................................................................... 142

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* **et al.; Case No. 3:20-cv-05787-SI**

*Hecimovich v. Encinal Sch. Parent Teacher Org.*,
　203 Cal. App. 4th 450 (2012) ........................................... 129

*MacLeod v. Tribune Publishing Co.*,
　52 Cal. 2d 536 (1959) ..................................................... 133

*Ringler Associates, Inc. v. Maryland Casualty Co.*,
　80 Cal. App. 4th 1165 (2000) .......................................... 134

*Rosenberg v. J.C. Penney Co.*,
　30 Cal. App. 2d 609 (1939) ...................................... 134, 135

*Selleck v. Globe International, Inc.*,
　166 Cal. App. 3d 1123 (1985) .......................................... 131

*Slaughter v. Friedman*,
　32 Cal.3d 149 (1982) ...................................................... 135

*Vedovi v. Watson & Taylor*,
　104 Cal. App. 80 (1930)................................................... 131

**United States Constitution**

First Amendment.................................................... 1, *passim*
Fourth Amendment ....................................... 112, 113, 114
Fifth Amendment ............................... 1, 6, 7, 114, 120, 121

**Federal Statutes**

15 U.S.C.
　§ 1125(a) .................................................................. 7, 123
　§ 1125(a)(1)(B) ............................................................. 123

18 U.S.C.
　§ 1343............................................................... 142, 144
　§ 1951 ........................................................................ 144
　§ 1951(2) .................................................................... 145
　§ 1961(1)(B)....................................................... 142, 145
　§ 1961(3) ....................................................................... 8
　§ 1961(4) .................................................................... 143
　§ 1962(c) ........................................................... 142, 145
　§ 1964(a) ............................................ 6, 7, 114, 142, 145
　§ 1964(c) ............................................... 8, 142, 147
　§ 1965(a) ....................................................................... 7

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

26 U.S.C.
    § 501(c)(3) ................................................................................................................. 7

28 U.S.C.
    § 1331 ................................................................................................................... 6, 115
    § 1332(a) ..................................................................................................................... 6
    § 1391(b) ..................................................................................................................... 7
    § 2201 ......................................................................................................................... 7
    § 2201(a) ................................................................................................................. 147
    § 2202 ......................................................................................................................... 7

42 U.S.C.
    § 280e-11(a) .............................................................................................................. 16
    § 280e-11(b) .............................................................................................................. 16
    § 280e-11(h)(1) ......................................................................................................... 16
    § 280e-11(h)(2)(A) .................................................................................................... 16
    §§ 300aa-1 through 300aa-34 ................................................................................... 87
    § 300aa-11 ................................................................................................................. 87
    § 300aa-12 ................................................................................................................. 89
    § 300aa-27 ................................................................................................................. 89
    § 300aa-27(a) ............................................................................................................ 88
    § 1983 ...................................................................................................................... 115

47 U.S.C.
    § 230 ............................................................................................................... 2, *passim*
    § 230(c)(1) ................................................................................................. 28, 38, 111
    § 230(c)(2)(A) ................................................................................................. 112, 114
    § 230(f)(3) ......................................................................................................... 40, 111

**California Statutes**

Cal. Civ. Code
    § 45 ......................................................................................................................... 129
    § 45a ....................................................................................................................... 130
    § 48a ....................................................................................................................... 130
    § 48a (a) .................................................................................................................. 142
    § 48a (d)(5) ............................................................................................................. 142
    § 1668 ....................................................................................................................... 16

Cal. Gov. Code
    § 659641.1 (f) ........................................................................................................... 98

**Federal Rules of Civil Procedure**

Rule 9(b) ............................................................................................................ 145

**Electronic and Web Sources**

*2019 Vaccines for Children*, State of Georgia, GOVERNMENT CONTRACTS AND BIDS, https://www.govcb.com/government-bids/vaccines-for-children-NBD00159022703927119.htm (last accessed Aug. 15, 2020)............................................ 89

*2019 Vaccines for Children*, State of Georgia, GOVERNMENT CONTRACTS, https://www.governmentcontracts.us/government-contracts/opportunity-details/NBD00159991194385117.htm (last accessed Aug. 15, 2020) ................................ 88

*5G*, WIKIPEDIA, https://en.wikipedia.org/wiki/5G (last visited Aug. 14, 2020) ....................... 94

*A partnership against global health threats*, GLOBAL HEALTH SECURITY AGENDA, https://ghsagenda.org/ ................................................................................ 43

*About A/B Testing*, Business Help Center, FACEBOOK FOR BUSINESS, https://www.facebook.com/business/help/1738164643098669?id=445653312 788501 (last accessed Aug. 14, 2020) ..................................................................... 80

*About Vaccine Safety Net*, VACCINE SAFETY NET, https://www.vaccinesafetynet.org/vsn/vaccine-safety-net (last visited Nov. 12, 2020) ..................................................................................................................... 48

*About*, 5G APPEAL, http://www.5gappeal.eu/about/ (last visited Aug. 14, 2020)..................... 99

*About*, SCIENCE FEEDBACK, https://sciencefeedback.co/about/ (last visited Nov. 12, 2020) ..................................................................................................................... 47

Adam Burt, *Can Facebook Ever Be Fixed?*, HARVARD BUSINESS REVIEW (April 8, 2019), https://hbr.org/2019/04/can-facebook-ever-be-fixed.......................................... 125

*Adult Vaccination Resources*, Vaccines for Adults, CDC, https://www.cdc.gov/vaccines/hcp/adults/for-practice/reminder-sys.html (last visited Nov. 12, 2020)...................................................................................... 22

*Agency-Related Nonprofit Research Foundations and Corporations*, CRS Report, CONGRESSIONAL RESEARCH SERVICE (Dec. 9, 2019), https://fas.org/sgp/crs/misc/R46109.pdf ............................................................... 17

Alex Pasternack, *Facebook is quietly pressuring its independent fact-checkers to change their rulings*, FAST COMPANY (Aug. 20, 2020), https://www.fastcompany.com/90538655/facebook-is-quietly-pressuring-its-independent-fact-checkers-to-change-their-rulings (last visited Nov. 12, 2020) ................................................................................................ 39

Alexandra Kelley, *Zuckerberg says Facebook won't remove anti-vaccine posts amid coronavirus pandemic*, THE HILL (Sept. 10, 2020), https://thehill.com/changing-america/well-being/prevention-cures/515844-mark-zuckerberg-says-facebook-wont-remove-anti ........................................... 141

Alexi Mostrous, *How a Kennedy became a 'superspreader' of hoaxes on COVID-19, vaccines, 5G and more*, THE GLOBE AND MAIL (Sept. 16, 2020), https://www.theglobeandmail.com/world/article-robert-f-kennedy-jr-medical-misinformation/ .................................................................................. 100

Alexis C. Madrigal & Robinson Meyer, *How Could the CDC Make That Mistake?*, THE ATLANTIC (May 21, 2020), https://www.theatlantic.com/health/archive/2020/05/cdc-and-states-are-misreporting-covid-19-test-data-pennsylvania-georgia-texas/611935/ ............... 92

Andrew Ward, *Vaccines are among big pharma's best-selling products*, FINANCIAL TIMES (Apr. 24, 2016), https://www.ft.com/content/93374f4a-e538-11e5-a09b-1f8b0d268c39 ...................................................... 91

*Anonymous – Facebook*, PROJECT VERITAS (Apr. 6, 2020), https://www.projectveritas.com/news/anonymous-facebook/ ............................ 80

*AXIOS on HBO: Mark Zuckerberg on Misinformation* [Video], HBO, https://www.youtube.com/watch?v=E5yyInwI7tw (last visited Nov. 12, 2020) ............... 21

*Basic Documents*, WORLD HEALTH ORGANIZATION (49th Ed. 2020), https://apps.who.int/gb/bd/pdf_files/BD_49th-en.pdf#page=1 ................................... 30, 116

Belyaev I, Dean A, Eger H, et al., *EUROPAEM EMF Guideline 2016 for the prevention, diagnosis and treatment of EMF-related health problems and illnesses*, REV. ENVIRON HEALTH. 2016, 31(3), 363-397, https://pubmed.ncbi.nlm.nih.gov/27454111/ ............................................ 96

Beth Snyder Bulik, *Bayer blazes new trails for pharma with Betaseron Facebook ad*, FIERCEPHARMA (Oct. 30, 2016), https://www.fiercepharma.com/marketing/bayer-s-first-facebook-ad-campaign-features-first-scrolling-isi-a-pharma-ad-facebook-ad ...................... 104

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

Bijan Khosravi, *Facebook's New Focus On 5G and Golden Opportunity for Entrepreneurs*, FORBES (Apr. 30, 2018), https://www.forbes.com/sites/bijankhosravi/2018/04/30/todays-black-clouds-over-facebook-will-part-look-at-their-golden-ideas-in-5g/#37c15fdd313b .......................................................... 108

BIOINITIATIVE.ORG, https://bioinitiative.org/ ........................................................... 95

Blake Droesch, US Healthcare and Pharma Is Among the Fastest-Growing Digital Ad Spenders, eMarketer (Oct. 9, 2020), https://www.emarketer.com/content/us-healthcare-pharma-digital-ad-spending-outlook ................................................................................................ 106

Brandon Baily, *Facebook's Mark Zuckerberg makes $1 billion donation*, THE MERCURY NEWS (Dec. 19, 2013), https://www.mercurynews.com/2013/12/19/facebooks-mark-zuckerberg-makes-1-billion-donation/ ........................................................................... 41

*Breakdown of the IFCN's Annual Budgets Starting from 2017* at https://docs.google.com/spreadsheets/d/1dsBMOnG8Oh3W6JUv2maneoatnLfDXYeVhp9x60zXiu4/edit#gid=0 (last visited Nov. 19, 2020)........................... 43

*California Medical Association House of Delegates Resolution, Wireless Standards Reevaluation, 2014 Resolution 107*, CALIFORNIA MEDICAL ASSOCIATION (adopted Dec. 7, 2014), https://ecfsapi.fcc.gov/file/1092989731923/30-Attachment%2030-%20California%20Medical%20Association%20Resolution.pdf ......................................... 98

Carl Elliott, *An Ethical Path to a Covid Vaccine*, NEW YORK REVIEW OF BOOKS (July 20, 2020), https://www.nybooks.com/articles/2020/07/02/ethical-path-covid-19-vaccine/............................................................................................ 91

*CDC and WHO Corrupt Financial Entanglements with the Vaccine Industry* [and other articles], CHILDREN'S HEALTH DEFENSE, https://childrenshealthdefense.org/cdc-who/ (last accessed Aug. 14, 2020) ...................... 13

*CDC Foundation Launches Facebook Fundraiser To Benefit Coronavirus Response Efforts, Featuring $10 Million Facebook Match*, CDC FOUNDATION (Mar. 24, 2020) https://www.cdcfoundation.org/pr/2020/Facebook-fundraiser-supports-coronavirus-response (last visited Nov. 12, 2020)............................................... 19

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

*CDC Foundation Receives $25 Million Donation From Mark Zuckerberg And Dr. Priscilla Chan For Ebola Response*, CDC FOUNDATION (Oct. 14, 2014), https://www.cdcfoundation.org/pr/cdc-foundation-receives-25-million-donation-mark-zuckerberg-and-priscilla-chan-ebola-response (last visited Nov. 12, 2020) .......................................................................................... 18

*CDPH Issues Guidelines on How to Reduce Exposure to Radio Frequency Energy from Cell Phones*, Office of Public Affairs, CALIF. DEPT. OF PUBLIC HEALTH (Dec. 13, 2017), https://www.cdph.ca.gov/Programs/OPA/Pages/NR17-086.aspx ....................................... 97

*Children's Health Defense* page, FACEBOOK, https://www.facebook.com/ChildrensHealthDefense (last accessed Aug. 15, 2020) .................................................................................................................... 131

*Children's Health Defense* Website, https://childrenshealthdefense.org ...................................................................... 7

Christina D.Bethell, PhD, et al., *A National and State Profile of Leading Health Problems and Health Care Quality for US Children: Key Insurance Disparities and Across-State Variations*, ACADEMIC PEDIATRICS, Volume 11, Issue 3, Supplement, May–June 2011, pp. S22-S33, https://www.sciencedirect.com/science/article/pii/S1876285910002500 ........................... 90

Christopher Yasiejko & Sarah Frier, *Facebook's Augmented Reality Push Causes Leap in U.S. Patents*, BLOOMBERG (Jan. 14, 2020), https://www.bloomberg.com/news/articles/2020-01-14/facebook-s-leap-in-u-s-patents-hints-at-eye-on-virtual-reality ........................................................................ 109

Cindy L. Russell, *5G wireless telecommunications expansion: Public health and environmental implications*, ENVIRON RES. 2018 Aug;165:484-495. doi: 10.1016/j.envres.2018.01.016. Epub 2018 Apr 11. PMID: 29655646, https://pubmed.ncbi.nlm.nih.gov/29655646/ ................................................................. 95

*Combatting Vaccine Misinformation*, FACEBOOK, https://about.fb.com/news/2019/03/ combatting-vaccine-misinformation (last visited Aug 14, 2020) ....................................................................... 30, 32, 77, 117

*Community Standards*, FACEBOOK, https://www.facebook.com/communitystandards/ (last visited Nov. 12, 2020) ............. 5, 111

*Connecting People With Health Resources*, FACEBOOK, https://preventivehealth.facebook.com/ (last visited Nov. 12, 2020) ................................... 21

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

*Coronavirus Response Donors*, SILICON VALLEY COMMUNITY FOUNDATION,
     SVCF Coronavirus Response, https://www.siliconvalleycf.org/coronavirus-
     response-donors (last visited Nov. 12, 2020)........................................................ 41

*CrossFit Settles Lawsuit with HHS After Agency Releases Emails Showing
     Continued Efforts to Conceal Donations*, CROSSFIT (Nov. 23, 2019),
     https://www.crossfit.com/battles/crossfit-settles-lawsuit-with-hhs-after-
     agency-agrees-to-release-redacted-emails (last visited Nov. 11, 2020) ............... 17

*CZI Announces the Chan Zuckerberg Biohub*, CHAN ZUCKERBERG INITIATIVE
     (Sept. 23, 2016), https://chanzuckerberg.com/newsroom/czi-announces-the-
     chan-zuckerberg-biohub/ ................................................................................... 107

D. Tachover, *CHD Statement on 5G and Coronavirus*, CHILDREN'S HEALTH
     DEFENSE (Apr. 10, 2020), https://childrenshealthdefense.org/news/chd-
     statement-on-5g-and-coronavirus/ ....................................................................... 14

*Data & Statistics*, HEALTH RESOURCES & SERVICES ADMINISTRATION (May 1,
     2019), https://www.hrsa.gov/sites/default/files/hrsa/vaccine-
     compensation/data/monthly-stats-may-2019.pdf ................................................. 90

Donie O'Sullivan & Brian Fung, *Mark Zuckerberg tries to explain his inaction
     on Trump posts to outraged staff*, CNN BUSINESS (Jun. 2, 2020),
     https://www.cnn.com/2020/06/02/tech/facebook-all-hands-trump/index.html ................. 103

Elizabeth Dwoskin, *Zuckerberg defends decisions on Trump as Facebook
     employee unrest grows*, WASHINGTON POST (Jun. 2, 2020),
     https://www.sfgate.com/news/article/Zuckerberg-defends-decisions-on-
     Trump-as-Facebook-15311764.php ..................................................................... 103

Emer Scully, *British Army's Information Warfare Unit will be deployed to tackle
     anti-vaccine propaganda ahead of jab rollout*, DAILY MAIL (Nov. 28, 2020) ................... 44

Emily Atkin, *Facebook creates fact-checking exemption for climate deniers*,
     HEATED (Jun. 24, 2020), https://heated.world/p/facebook-creates-fact-
     checking-exemption ...................................................................................... 35, 85

*Entire CNN April 16 Coronavirus Town Hall* [Video], CNN BUSINESS (Apr. 17,
     2020), https://www.cnn.com/videos/business/2020/04/17/entire-april-16-
     coronavirus-town-hall-part-5-sot-vpx.cnn .................................................. 38, 53, 80

Eric Lipton, et al., *The CDC waited 'its entire existence for this moment.' What went wrong?*, NEW YORK TIMES (Jun. 2, 2020), https://www.sfgate.com/news/article/The-CDC-Waited-Its-Entire-Existence-for-This-15312642.php ......................................................................... 93

Executive Order 13747 of November 4, 2016, *Advancing the Global Health Security Agenda To Achieve a world Safe and Secure From Infectious Disease Threats*, Presidential Documents, FEDERAL REGISTER, Vol. 81, No. 217, https://www.govinfo.gov/content/pkg/FR-2016-11-09/pdf/2016-27171.pdf ..................... 43
§ 1 ................................................................................................................................. 43
§ 2(c)(i) ......................................................................................................................... 43
§ 3(a)(i) ......................................................................................................................... 43
§ 3(b) ............................................................................................................................. 43
§ 3(b)(vii) ...................................................................................................................... 43

*Executive Order on Preventing Online Censorship*, Executive Orders, THE WHITE HOUSE (May 28, 2020), https://www.whitehouse.gov/presidential-actions/executive-order-preventing-online-censorship/ ..................................................................................................... 114
§ 2 (a) ........................................................................................................................... 114

*Facebook CEO Testimony Before House Financial Services Committee* [Video], C-SPAN (Oct. 23, 2019), https://www.c-span.org/video/?465293-1/facebook-ceo-testimony-house-financial-services-committee ................................................... 102, 139

*Facebook Founder Announces $500 Million to Silicon Valley Community Foundation*, PND (Dec. 20, 2012), https://philanthropynewsdigest.org/news/facebook-founder-announces-500-million-to-silicon-valley-community-foundation ................................................................ 41

*Facebook Is Changing News Feed (Again) to Stop Fake News*, WIRED (Apr. 10, 2019), https://www.wired.com/story/facebook-click-gap-news-feed-changes/ .................. 81

*Facebook's $10 Million Match Helps CDC Foundation Fight Coronavirus*, CDC FOUNDATION (Mar. 24, 2020), https://www.cdcfoundation.org/blog/facebooks-10-million-match-helps-cdc-foundation-fight-coronavirus (last visited Nov. 12, 2020) .................................................. 19

*Facebook's Enforcement of Fact-Checker Ratings*, FACEBOOK FOR BUSINESS, Business Help Center, https://www.facebook.com/business/help/297022994952764?id=6730524799 47730&recommended_by=2593586717571940 (last visited Nov. 12, 2020)..................... 40

*Fact-Checking on Facebook*, Business Help Center, FACEBOOK FOR BUSINESS, https://www.facebook.com/help/publisher/182222309230722 (last accessed Aug. 14, 2020) ............................................................................................ 84

Falcioni L, Bua L, Tibaldi E, et al., *Report of final results regarding brain and heart tumors in Sprague-Dawley rats exposed from prenatal life until natural death to mobile phone radiofrequency field representative of a 1.8 GHz GSM base station environmental emission*, ENVIRON RES. 2018; 165:496-503, https://pubmed.ncbi.nlm.nih.gov/29530389/ ........................................................ 96

*Frequently Asked Questions*, National Vaccine Injury Compensation Program, HEALTH RESOURCES & SERVICES ADMINISTRATION, https://www.hrsa.gov/vaccine-compensation/FAQ/index.html (last accessed Aug. 14, 2020) ............................................................................................ 89

*Frequently Asked Questions*, NED.ORG, https://www.ned.org/about/faqs/ (last visited Nov. 19, 2020) ............................................................................... 42

*Fundraising In A Pandemic: Where To Pivot And Persist*, CCS FUNDRAISING, https://sftp.polsinelli.com/webinar/Fundraising-Webinar-6.10.20.pdf ................................ 41

*Gardasil, Highlights of Prescribing Information*, FDA, https://www.fda.gov/files/vaccines,%20blood%20&%20biologics/published/Package-Insert---Gardasil.pdf ........................................................... 64

*Grants*, CHAN ZUCKERBERG INITIATIVE, https://chanzuckerberg.com/grants-ventures/grants/ (last visited Nov. 12, 2020) ......................................... 42

*Grants: Where the Giving Goes*, SILICON VALLEY COMMUNITY FOUNDATION, Community Impact, https://www.siliconvalleycf.org/2015grantees (last visited Nov. 12, 2020) ....................................................................... 41, 42

*Guiding Principles For Partner Collaboration*, CDC FOUNDATION (2020), https://www.cdcfoundation.org/guiding-principles-partner-collaboration (last visited Nov. 11, 2020) ........................................................................ 17

*H. Rept. 109-510 - Amending the Public Health Service Act with Respect to the National Foundation for the Centers for Disease Control and Prevention*, 109th Congress (2005-2006), Committee Reports, CONGRESS.GOV, https://www.congress.gov/congressional-report/109th-congress/house-report/510/1 (last visited Nov. 11, 2020) ........................................................ 17

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook et al.; Case No. 3:20-cv-05787-SI*

*Health Feedback*, VACCINE SAFETY NET (updated Jan. 31, 2020), https://www.vaccinesafetynet.org/vsn/network/health-feedback (last visited Nov. 12, 2020) ........................................................................................................ 47

*Hearing by Congress on "deepfakes" and artificial intelligence* [Video], GUARDIAN NEWS (June 13, 2019), https://www.youtube.com/watch?v=lArPEDS0GTA ........................................... 24

*Hearings by Congress on "deepfakes" and artificial intelligence* [Video], GUARDIAN NEWS (June 13, 2019), https://www.youtube.com/watch?v=1ArPEDS0GTA ...................................... 140

Henry, C., *Facebook willing to invest in satellite user equipment*, SPACE NEWS (March 8, 2017 (https://spacenews.com/facebook-willing-to-invest-in-satellite-user-equipment/ ................................................................................. 109

*High Exposure to Radio Frequency Radiation Associated with Cancer in Male Rats*, NATIONAL INSTITUTE OF ENVIRONMENTAL HEALTH SCIENCES (Nov. 1, 2018), https://www.niehs.nih.gov/news/newsroom/releases/2018/november1/index.cfm ............................................................................................................ 96

*Igor Belyaev et al., 2012 Supplement, *Evidence for Disruption by Modulation*, BIOINITIATIVE.ORG (Sept. 2012), https://bioinitiative.org/wp-content/uploads/pdfs/sec15_2012_Evidence_Disruption_Modulation.pdf ......................... 94

*Indefinite Delivery Contract 75D30119D04518*, Federal Contract IDV Award, GOVTRIBE (Jun. 29, 2020), https://govtribe.com/award/federal-idv-award/indefinite-delivery-contract-75d30119d04518 ........................................ 88

*Infectious Disease Initiative*, CHAN ZUCKERBERG BIOHUB, https://www.czbiohub.org/projects/ infectious-disease/ (last accessed Aug. 15, 2020) ............................................................................................................. 108

*Information, Merrian-Webster.com*, https://www.merriam-webster.com/dictionary/information (last accessed Aug. 14, 2020) .................................... 32

Institute of Medicine, *Childhood Immunization Schedule and Safety: Stakeholder Concerns, Scientific Evidence, and Future Studies*, NATIONAL ACADEMIES PRESS (2013), pp. 5-6, https://doi.org/10.17226/13563 ....................................... 90

*International Appeal: Scientists call for Protection from Non-ionizing Electromagnetic Field Exposure*, EMFSCIENTIST.ORG, https://emfscientist.org/index.php/emf-scientist-appeal ....................................... 99

*International Fact-Checking Network Transparency Statement*, POYNTER.ORG,
   https://www.poynter.org/international-fact-checking-network-transparency-
   statement/ .................................................................................................................. 42

*International Fact-Checking Network*, POYNTER.ORG,
   https://www.poynter.org/ifcn/ (last visited Nov. 12, 2020) ..................................... 42

James Ottar Grundvig, *Master Manipulator: The Explosive True Story of Fraud,
   Embezzlement, and Government Betrayal at the CDC*, Store, CHILDREN'S
   HEALTH DEFENSE, https://childrenshealthdefense.org/store/master-
   manipulator-the-explosive-true-story-of-fraud-embezzlement-and-
   government-betrayal-at-the-cdc/ (last visited Aug 14, 2020) .............................. 13

Jeanne Lenzer, *Centers for Disease Control and Prevention: protecting the
   private good*? THEBMJ, BMJ 2015;350:h2362 (May 15, 2015),
   https://www.bmj.com/content/350/bmj.h2362 ...................................................... 18

Jessi Hempel, *Inside Facebook's Ambitious Plan to Connect the Whole World*,
   WIRED (Jan. 19, 2016), https://www.wired.com/2016/01/facebook-
   zuckerberg-internet-org/ ...................................................................................... 109

Joel M. Moskowitz, *We Have No Reason to Believe 5G Is Safe*, SCIENTIFIC
   AMERICAN (Oct. 17, 2019),
   https://blogs.scientificamerican.com/observations/we-have-no-reason-to-
   believe-5g-is-safe/ ................................................................................................ 96

Jon Russell, *Facebook is reportedly testing solar-powered internet drones again
   — this time with Airbus*, TECHCRUNCH (Jan. 21, 2019),
   https://techcrunch.com/2019/01/21/ facebook-airbus-solar-drones-internet-
   program/?guccounter=1 ...................................................................................... 110

Josh Dawsey, Ashley Parker, Philip Rucker and Yasmeen Abutaleb, *As deaths
   mount, Trump tries to convince Americans it's safe to inch back to normal*,
   WASHINGTON POST (May 9, 2020),
   https://www.washingtonpost.com/politics/as-deaths-mount-trump-tries-to-
   convince-americans-its-safe-to-inch-back-to-normal/2020/05/09/bf024fe6-
   9149-11ea-a9c0-73b93422d691_story.html ....................................................... 92

K. Waddell, *A new attack on social media's immunity*, AXIOS (June 13, 2019),
   https://www.axios.com/social-media-immunity-section-230-f15ac071-32e9-
   4e33-81e6-4c7ebadaea5e.html................................................................... 25, 140

Kathleen Chaykowski, *Zuckerberg Donates $200 Million To Silicon Valley Community Foundation As It Hires New CEO*, FORBES (Nov. 10, 2018), https://www.forbes.com/sites/kathleenchaykowski/2018/11/10/zuckerberg-donates-214-million-to-silicon-valley-community-foundation-as-it-hires-new-ceo/?sh=1897d9b4550d ........................................................................................ 41

Katie Collins, *Facebook and partners collaborate to bring 5G wireless internet to California homes*, CNET, https://www.cnet.com/news/facebook-brings-faster-than-fiber-5g-wireless-connectivity-to-california/ .................................................... 109

*Largest funders of Poynter*, POYNTER (last updated June 2020), https://www.poynter.org/major-funders/ ...................................................... 10, 41

*Lawmakers Sever Ties Between CDC and Big Pharma*, LAWYERS AND SETTLEMENTS (Aug. 21, 2006) https://www.lawyersandsettlements.com/legal-news/drugs-medical/CDC_Big_Pharma-00285.html ...................................................... 92

Leo Sun, *Will Facebook Redefine Augmented Reality With Stella and Orion?*, MOTLEY FOOL (Sept. 20, 2019), https://www.fool.com/investing/2019/09/20/will-facebook-redefine-augmented-reality-with-stel.aspx ...................................................... 110

*Letter to Facebook*, CHILDREN'S HEALTH DEFENSE (March 4, 2019), https://childrenshealthdefense.org/wp-content/uploads/FINAL-CHD-Letter-to-Facebook-1.pdf ...................................................... 28

Lucy Fisher & Chris Smyth, *GCHQ in cyberwar on anti-vaccine propaganda*, THE TIMES (Nov. 9, 2020), https://www.thetimes.co.uk/article/gchq-in-cyberwar-on-anti-vaccine-propaganda-mcjgjhmb2 ............................................... 44

M. Fisher, *Inside Facebook's Secret Rulebook for Global Political Speech*, NEW YORK TIMES (Dec. 27, 2018), https://www.nytimes.com/2018/12/27/world/facebook-moderators.html .................... 82, 83

M. Zuckerberg, *Facebook's commitment to the Oversight Board*, FACEBOOK (Sept. 2019), https://about.fb.com/wp-content/uploads/2019/09/letter-from-mark-zuckerberg-on-oversight-board-charter.pdf ...................................................... 36

Mark Harris, *Facebook May Have Secret Plans to Build a Satellite-Based Internet* (May 2, 2018), https://spectrum.ieee.org/tech-talk/aerospace/satellites/facebook-may-have-secret-plans-to-launch-a-internet-satellite ...................................................... 109

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

Mary Beth Griggs, *Facebook's new Preventive Health tool pushes people to advocate for their health*, THE VERGE (Oct. 28, 2019), https://www.theverge.com/2019/10/28/20936541/facebook-preventative-health-cancer-heart-disease-flu-tool ................................................................. 21

Mike Isaac, Sheera Frenkel & Cecilia Kang, *Now More Than Ever, Facebook Is a 'Mark Zuckerberg Production*,' NEW YORK TIMES (May 16, 2020), https://www.nytimes.com/2020/05/16/technology/zuckerberg-facebook-coronavirus.html ......................................................................... 83, 138

Natasha Tiku, *Facebook has a prescription: More pharmaceutical ads*, WASHINGTON POST (Mar. 3, 2020), https://www.washingtonpost.com/technology/2020/03/03/facebook-pharma-ads/ ........... 105

*Non-ionizing Radiation, Part 2: Radiofrequency Electromagnetic Fields, IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Volume 102*, IARC Publications, INTERNATIONAL AGENCY FOR RESEARCH ON CANCER, WORLD HEALTH ORGANIZATION, https://publications.iarc.fr/126....................... 97

Opinion in *Boatmon v. Secretary of Health & Human Services*, No. 18-2333, JUSTIA, U.S. Law (Fed. Cir. 2019), https://law.justia.com/cases/federal/appellate-courts/cafc/18-2333/18-2333-2019-11-07.html................................................................ 64

*Our Partners: Corporations*, CDC FOUNDATION, https://www.cdcfoundation.org/partner-list/corporations (last visited Nov. 12, 2020) ................................................................................ 19

*Our Partners: Foundations*, CDC FOUNDATION, https://www.cdcfoundation.org/partner-list/foundations (last visited Nov. 12, 2020) ................................................................................ 19

*Overview*, INFRAGARD NATIONAL, https://www.infragardnational.org/about-us/overview/ ......................................................................... 45

*Partnering with Third-Party Fact-Checkers*, FACEBOOK, Journalism Project (Mar. 23, 2020), https://www.facebook.com/journalismproject/programs/third-party-fact-checking/selecting-partners.......................................................... 46

Phil Plait, *Mark Zuckerberg: Pro-Vaxxer*, SLATE (Jan. 12, 2016), https://slate.com/technology/2016/01/mark-zuckerberg-publicly-supports-vaccination.html............................................................. 101

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook et al.; Case No. 3:20-cv-05787-SI*

*PolitiFact*, POYNTER.ORG, IFCN Code of Principles,
https://ifcncodeofprinciples.poynter.org/profile/politifact (last visited Nov.
12, 2020) ........................................................................................................................ 46

R. Cheng, *Facebook will use machine learning to fight fake news*, CNET (Aug. 3,
2017), https://www.cnet.com/news/facebook-will-use-machine-learning-to-
fight-fake-news/ ............................................................................................................. 81

R. Lazarus et al., *Grant Final Report: Electronic Support for Public Health –
Vaccine Adverse Event Reporting System* (*ESP:VAERS*),
https://digital.ahrq.gov/sites/default/files/docs/publication/r18hs017045-
lazarus-final-report-2011.pdf ........................................................................................ 72

Rachel Sandler, *Zuckerberg Criticizes Twitter For Fact-Checking Trump Tweets*,
FORBES (May 27, 2020), https://www.forbes.com/sites/rachelsandler/
2020/05/27/zuckerberg-criticizes-twitter-for-fact-checking-trump-
tweets/#2aec97616f7a .................................................................................................. 102

*Reliable, Merriam-Webster.com*, https://www.merriam-
webster.com/dictionary/reliable (lasted accessed Aug. 15, 2020) ................................ 132

*Reliable, Merriam-Webster.com*, Thesaurus, https://www.merriam-
webster.com/thesaurus/reliable (lasted accessed Aug. 15, 2020) ................................. 132

*Remarks of Chairman Wheeler on The Future of Wireless*, FEDERAL
COMMUNICATIONS COMMISSION (Jun. 20, 2016),
https://www.fcc.gov/document/remarks-chairman-wheeler-future-wireless ...................... 94

Research Articles and Opinion pieces, Children's Health Defense,
https://childrenshealthdefense.org/ category/news/childrens-health/ ................................... 7

*Research Resources and Critiques*, CHILDREN'S HEALTH DEFENSE,
https://childrenshealthdefense.org/advocacy-policy/critiques/ (last accessed
Aug. 14, 2020) ............................................................................................................... 11

*Reviewers*, HEALTH FEEDBACK, Community,
https://healthfeedback.org/community/ (last accessed Nov. 12, 2020) ............................... 47

Ronald L. Melnick, *Commentary on the utility of the National Toxicology
Program study on cell phone radiofrequency radiation data for assessing
human health risks despite unfounded criticisms aimed at minimizing the
findings of adverse health effects*, ENVIRON RES. 2019 Jan;168:1-6. doi:
10.1016/j.envres.2018.09.010. Epub 2018 Sep 20. PMID: 30243215,
https://pubmed.ncbi.nlm.nih.gov/30243215/ ...................................................................... 97

VERIFIED SECOND AMENDED COMPLAINT
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

Rudy Takala, *Mark Zuckerberg Says Facebook 'Balances' First Amendment Against 'Other Equities': 'There Should be Some Limits on Speech,'* MEDIAITE (Oct. 28, 2020), https://www.mediaite.com/news/mark-zuckerberg-says-facebook-balances-first-amendment-against-other-equities-there-should-be-some-limits-on-speech/.............................................................. 104

S. Keach, *Facebook's 5G fake news poses 'risk of immediate physical harm',* *Zuckerberg warns*, IRISH SUN (May 21, 2020), https://www.thesun.ie/tech/5453017/ facebook-5g-fake-news-mark-zuckerberg-physical-harm-masts-burning/ ........................................................ 32

*Schiff Sends Letter to Google, Facebook Regarding Anti-Vaccine Misinformation*, News/Press Releases, CONGRESSMAN ADAM SCHIFF (Feb. 14, 2019), https://schiff.house.gov/news/press-releases/schiff-sends-letter-to-google-facebook-regarding-anti-vaccine-misinformation ............................................. 23, 139

*Science Feedback partnering with Facebook in fight against misinformation*, SCIENCE FEEDBACK (May 14, 2019), https://sciencefeedback.co/science-feedback-partnering-with-facebook-in-fight-against-misinformation/ (last visited Nov. 12, 2020)............................................................................ 47

*Science Feedback*, POYNTER.ORG, IFCN Code of Principles, https://ifcncodeofprinciples.poynter.org/profile/science-feedback (last visited Nov. 12, 2020) ............................................................................ 47

*Scientists call for Protection from Non-ionizing Electromagnetic Field Exposure*, EMF SCIENTIST, https://www.emfscientist.org/index.php/emf-scientist-appeal (last visited Aug. 14, 2020)................................................................. 98

Sheila Kaplan, *Firm Pays Government to Challenge Pesticide Research*, TYPE INVESTIGATIONS (Mar. 1, 2011), https://www.typeinvestigations.org/investigation/2011/03/01/firm-pays-government-challenge-pesticide-research/ (last visited Nov. 11, 2020)............................. 17

Sheila Kaplan, *New C.D.C. Chief Saw Coca-Cola as Ally in Obesity Fight*, THE NEW YORK TIMES (Jul. 22, 2017), https://www.nytimes.com/2017/07/22/health/brenda-fitzgerald-cdc-coke.html .................. 18

*Social Media at CDC*, Guidelines & Best Practices / Facebook Guidelines and Best Practices, CDC, https://www.cdc.gov/socialmedia/tools/guidelines/facebook-guidelines.html. (last visited Nov. 12, 2020)....................................................................... 20

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* **et al.; Case No. 3:20-cv-05787-SI**

*Social Media at CDC*, Tools / Facebook, CDC,
  https://www.cdc.gov/socialmedia/tools/facebook.html (last visited Nov. 12,
  2020) .................................................................................................................... 20

*Social media giants agree package of measures with UK Government to tackle
  vaccine disinformation*, GOV.UK (Nov. 8, 2020),
  https://www.gov.uk/government/news/social-media-giants-agree-package-of-
  measures-with-uk-government-to-tackle-vaccine-disinformation........................ 22

*Stipulated Order Proving CDC Has No Studies To Support Claim That Vaccines
  Given in First 6 Months of Life Do Not Cause Autism*, ICAN (Mar. 5, 2020),
  https://www.icandecide.org/ican_lawsuits/stipulated-order-proving-cdc-has-
  no-studies-to-support-claim-that-vaccines-given-in-first-6-months-of-life-do-
  not-cause-autism/ ............................................................................................... 68

*Stipulated Order*, U.S.D.C. S.D. N.Y. No. 18-cv-03215 (JMF) (filed Jul. 9, 2018)
  & *Press Release*, INFORMED CONSENT ACTION NETWORK (ICAN) (Jul. 13,
  2018), https://www.icandecide.org/wp-content/uploads/2019/09/Stipulated-
  Order-copy-1.pdf................................................................................................. 89

*Students with Disabilities*, NATIONAL CENTER FOR EDUCATION STATISTICS (May
  2020), https://nces.ed.gov/programs/coe/indicator_cgg.asp ................................. 90

Sundeep Rangan, Theodore S. Rappaport & Elza Erkip, *Millimeter-Wave
  Cellular Wireless Networks: Potentials and Challenges*, PROCEEDINGS OF
  THE IEEE | Vol. 102, No. 3, March 2014,
  https://ecfsapi.fcc.gov/file/60001013329.pdf ...................................................... 93

Susanna N. Visser, MS et al., *Trends in the Parent-Report of Health Care
  Provider-Diagnosed and Medicated Attention-Deficit/Hyperactivity
  Disorder: United States, 2003–2011*, JOURNAL OF THE AMERICAN ACADEMY
  OF CHILD & ADOLESCENT PSYCHIATRY, Volume 53 Number 1 (January
  2014), https://jaacap.org/article/S0890-8567(13)00594-7/fulltext ....................... 90

T. Staton, *The top 10 pharma companies in social media*, FIERCEPHARMA,
  https://www.fiercepharma.com/special-report/top-10-pharma-companies-
  social-media-0 (last accessed Aug. 14, 2020)..................................................... 49

*The 5G Crisis: Awareness & Accountability*," CHILDREN'S HEALTH DEFENSE
  (Dec. 21, 2019), https://childrenshealthdefense.org/video/the-5g-crisis-
  awareness-accountability/ ................................................................................... 14

*The Anti-Vaxxers Movement and National Security*, THE INFRAGARD JOURNAL,
Volume 2, Issue 1 (June 2019), https://www.infragardnational.org/wp-
content/uploads/2019/07/InfraGard_June_2019_Article3.pdf ............................................... 45

*The Chan Zuckerberg Biohub*: *Seeking to Cure All Diseases*, BIOLEGEND BLOG,
https://www.biolegend.com/ja-jp/blog/the-chan-zuckerberg-biohub-seeking-
to-cure-all-diseases (last accessed Aug. 15, 2020) ............................................................ 108

*The code and the platforms*, POYNTER.ORG,
https://ifcncodeofprinciples.poynter.org/know-more/the-code-and-the-
platforms (last visited Nov. 12, 2020) ................................................................................ 46

*The Internet of Things will thrive on 5G technology*, VERIZON (Jun. 12, 2018),
https://www.verizon.com/about/our-company/5g/internet-things-will-thrive-
5g-technology.................................................................................................................... 110

*The Signatories*, 5G APPEAL, http://www.5gappeal.eu/signatories-to-scientists-
5g-appeal/........................................................................................................................... 98

Tiffany Hsu & Cecilia Kang, "*Morally Impossible*": *Some Advertisers Take a
Timeout From Facebook*, NEW YORK TIMES (Jun. 9, 2020),
https://www.nytimes.com/2020/06/09/business/media/facebook-advertisers-
trump-zuckerberg.html?searchResultPosition=2 ............................................................. 104

Tom Jefferson, *Influenza vaccination: policy versus evidence*, BMJ, v.333, p. 912
(Oct. 28, 2006), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1626345/...................... 70

Tom Taulli, *Facebook AI (Artificial Intelligence): Will M&A Help?*, FORBES
(Feb. 15, 2020),
https://www.forbes.com/sites/tomtaulli/2020/02/15/facebook-ai-artificial-
intelligence-will-ma-help/#104eed427664 ........................................................................ 110

*United States Patent No. 10,356,024*, Kanter et al. (Moderating content in an
online forum), USPTO Patent Full-Text and Image Database, UNITED STATES
PATENT AND TRADEMARK OFFICE (Jul 16, 2019),
http://patft.uspto.gov/netacgi/nph-
Parser?Sect2=PTO1&Sect2=HITOFF&p=1&u=/netahtml/PTO/search-
bool.html&r=1&f=G&l=50&d=PALL&RefSrch=yes&Query=PN/10356024 .................. 77

*Up-to-date, Merriam-Webster.com*, https://www.merriam-
webster.com/dictionary/up-to-date (last accessed Aug. 15, 2020) ................................... 132

*Up-to-date, Merriam-Webster.com*, Thesaurus, https://www.merriam-
webster.com/thesaurus/up-to-date (last accessed Aug. 15, 2020) .................................... 132

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

*Vaccinate with Confidence*, CDC (Oct. 11, 2019),
https://www.cdc.gov/vaccines/partners/downloads/Vaccinate-Confidently-2019.pdf ............................................................................................................ 20

*Vaccine development*, WEHI (The Walter and Eliza Hall Institute of Medical Research), https://www.wehi.edu.au/research/research-technologies/vaccine-development (last visited Nov. 12, 2020) ............................................................ 42

*Vaccine Injury Compensation Program: Addressing Needs and Improving Practices, Sixth Report by the Committee on Government Reform*, Union Calendar No. 575, 106th Congress, 2d Session, House Report 106–977, HOUSE COMMITTEE ON GOVERNMENT REFORM HEARINGS (Oct. 12, 2000), https:///www.congress.gov/106/crpt/hrpt977/CRPT-106hrpt977.pdf ................................. 89

*Vaccine Misinformation: Statement by WHO Director-General on Facebook and Instagram*, WORLD HEALTH ORGANIZATION (Sept. 4, 2019), https://www.who.int/news-room/detail/04-09-2019-vaccine-misinformation-statement-by-who-director-general-on-facebook-and-instagram ........................... 30, 36, 117

*Vaccines Market - Global Forecast to 2024*, MARKETSANDMARKETS (January 2020), https://www.marketsandmarkets.com/Market-Reports/vaccine-technologies-market-1155.html ............................................................................. 91

*Vaccines Market Size, Share & Industry Analysis, 2020-2027*, FORTUNE BUSINESS INSIGHTS, https://www.fortunebusinessinsights.com/industry-reports/vaccines-market-101769 (last accessed Aug. 14, 2020) .......................................... 91

Vann. R. Newkirk II, *Is the CDC Losing Control?*, THE ATLANTIC (Feb. 3, 2018), https://www.theatlantic.com/politics/archive/ 2018/02/cdc-scandal-preparedness-budget/552200/ ........................................................................ 92

*VSN Members*, VACCINE SAFETY NET, https://www.vaccinesafetynet.org/vsn/network (last visited Nov. 12, 2020) ....................... 48

*Who pays for PolitiFact?*, POLITIFACT (last updated June 2020), https://www.politifact.com/who-pays-for-politifact/ ............................................................. 10

**Miscellaneous Authorities**

2 J. Story, Commentaries on the Constitution of the United States, § 1882 (5th ed. 1891) ............................................................................................. 2

50 Am. Jur. 2d, § 455 ................................................................................................................ 137

Bill of Rights ................................................................................................ 2

*Black's Law Dictionary* 1421 (5th ed. 1979) ........................................... 128

Constitution of World Health Organization,
    Article 71 ...................................................................................... 30, 116

Edwin Black, *Wikipedia—The Dumbing Down of World Knowledge*, HISTORY
    NEWS NETWORK (April 19, 2010) ........................................................ 51

F. Siebert*, Freedom of the Press in England* 1476-1776 (1965) ................. 2

Facebook's "Preventive Health" App ........................................................ 21

Facebook's Terms of Service ...................................................................... 7
    ¶ 1 .................................................................................................. 15
    ¶ 3(1) .............................................................................................. 15
    ¶ 3.2 ...................................................................................... 121, 122
    ¶ 3(2)(1) .......................................................................................... 15
    ¶ 3(2)(3) .......................................................................................... 16
    ¶ 4(3) .............................................................................................. 15
    ¶ 4(4). ............................................................................................... 7

Institute of Medicine, *Adverse Events Associated with Childhood Vaccines:*
    *Evidence Bearing on Causality*, at 2 (1994) ...................................... 87

L. Levy*, Emergence of a Free Press* 6 (1985) ............................................ 2

Nason Maani Hessari, Gary Ruskin, and Martin McKee, et al., *Public Meets*
    *Private: Conversations Between Coca-Cola and the CDC*, THE MILBANK
    QUARTERLY, vol. 97, no. 1, pp. 74-90 (2019) ..................................... 18

Oliver Kamm, *Wisdom? More like dumbness of the crowds*, THE TIMES (August
    16, 2007) ............................................................................................. 51

RESTATEMENT (2D) OF TORTS
    § 563(d) ........................................................................................... 130

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* **et al.; Case No. 3:20-cv-05787-SI**

ROGER I. TEICH
California State Bar No. 147076
290 Nevada Street
San Francisco, CA 94110
Telephone: (415) 948-0045
E-Mail Address: rteich@juno.com

ROBERT F. KENNEDY, JR.
MARY HOLLAND
Children's Health Defense
1227 North Peachtree Parkway, Suite 202
Peachtree City, GA 30269
Telephone: (917) 743-3868
E-Mail Address: mary.holland@childrenshealthdefense.org

Attorneys for Plaintiff
CHILDREN'S HEALTH DEFENSE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CHILDREN'S HEALTH DEFENSE, a Georgia non-profit organization, | Case No. 3:20-cv-05787-SI |
| Plaintiff, | **VERIFIED SECOND AMENDED COMPLAINT** |
| v. | |
| FACEBOOK, INC., a Delaware corporation; MARK ZUCKERBERG, a California resident; SCIENCE FEEDBACK, a French corporation; THE POYNTER INSTITUTE FOR MEDIA STUDIES, INC., a Florida corporation; and DOES 1-20, | **1) FIRST AND FIFTH AMENDMENTS (*BIVENS*);** **2) LANHAM ACT (15 U.S.C. § 1125(a));** **3) RICO FRAUD (18 U.S.C. § 1962);** **4) DECLARATORY RELIEF.** |
| Defendants. | **JURY TRIAL DEMAND** |

Plaintiff Children's Health Defense, by and through its undersigned attorneys, sues defendants Facebook, Inc., Mark Zuckerberg, Science Feedback, the Poynter Institute for Media Studies, Inc., and Does 1-20, and for its Verified Second Amended Complaint alleges on personal information as to itself and on information and belief as to all other things:

## **INTRODUCTION**

1.      This is a case about how an officer and an agency within the U.S. Government "privatized" the First Amendment by teaming up with Facebook to censor speech which, under the Bill of Rights, the Government cannot censor. In February 2019, Democratic Congressman Adam Schiff (D-CA) threatened to introduce legislation to remove Facebook's immunity under Section 230 of the Communications Decency Act unless Facebook implemented algorithms to "distinguish" and suppress so-called "vaccine misinformation" and advertising. The Centers for Disease Control and Prevention ("CDC") and, under its aegis, the World Health Organization ("WHO") collaborated closely with Facebook to suppress vaccine safety speech by using a "warning label" and other similar types of notices which, while purporting to flag misinformation, in reality censor valid and truthful speech, including content posted by Plaintiff on its Facebook page regarding vaccines. A judicial remedy is urgently required to redress the damage to Plaintiff Children's Health Defense ("CHD") and the abridgement of its fundamental rights caused by Facebook and its Chairman Mark Zuckerberg's aggressive and illegal efforts, embarked upon in response to state pressure and in conjunction with state actors, to censor and suppress CHD's posting of material critical of those very state actors and voicing alternative views concerning the safety and efficacy of vaccines.

2.      In 17th-century England, government controlled speech through its monopoly on printing presses. *See* L. Levy, *Emergence of a Free Press* 6 (1985). The first newspapers were also met by licensing prosecutions of unlicensed news-sheet printers and the power of the crown to grant privileges of monopoly. *See* F. Siebert, *Freedom of the Press in England* 1476-1776 (1965); *see also* 2 J. Story, Commentaries on the Constitution of the United States, § 1882 (5th ed. 1891). Indeed, "history discloses a persistent effort on the part of the British

government to prevent or abridge the free expression of any opinion which seemed to criticize or exhibit in an unfavorable light, however truly, the agencies and operations of the government." *Grosjean v. American Press Co.*, 297 U.S. 233, 245 (1936).

3.      Here, government actors *actively partnered* with one of today's leading social media companies, Facebook — an organization whose reach and power vastly exceeds that of any "printing press" past or present — to censor Plaintiff's speech concerning important public health issues and government policy. The framers were familiar with the English struggle and enacted the First Amendment to establish and preserve the right of the People to full information about the doings or misdoings of their government. *Grosjean*, 297 U.S. at 247-49. This case mirrors the framers' concerns. The censorship of protected speech is not rendered legal because the government has used and acted in conjunction with Facebook and Zuckerberg to effect that censorship. On the contrary, the government cannot accomplish indirectly what the Constitution forbids it to do directly.

4.      This is also a case involving claims of corporate fraud against Facebook and Zuckerberg for, *inter alia*, their smear campaign against Plaintiff consisting of false and misleading content that Facebook itself created and developed (through surrogate "fact-checkers") and affixed directly to Plaintiff's Facebook page — all for the purpose of stigmatizing CHD and its content regarding vaccines, and discouraging users from accessing this content. Defendants engaged in multiple acts of fraud and deception in furtherance of their aggressive and heavy-handed campaign of censorship against Plaintiff's Facebook page. While Facebook and Zuckerberg proudly present themselves in public as avatars of free speech and open debate as the best method for approaching scientific truth, this case reveals the opposite: that they are indeed censors and opponents of real science and open debate who believe that they alone are in possession of "truth" and have the right to suppress anyone who disagrees.

5.      In order to determine this case it is not necessary for the Court to act, and the Court is not being asked to act, as the ultimate arbiter of scientific truth in the areas of vaccine safety and 5G technology. Facebook and Zuckerberg have arrogated that power to themselves, which is precisely what has given rise to their illegal conduct and the causes of action here. It

is the essence of the scientific method that conclusions drawn from research and empirical investigation are tentative and subject to revision.[1] It is Zuckerberg and Facebook that have weaponized the concept of scientific "fact" in an effort to shut down the differing conclusions and viewpoint that CHD attempts to voice, and which visitors to CHD's Facebook website have a right, and should be permitted, to hear and evaluate for themselves. In sum, it is Facebook's dogmatic conclusion (imprinted directly on CHD's Facebook page) that the vaccine and 5G issues are susceptible of being labelled definitively "true" or definitively "false" (by Facebook) that is itself false and misleading. In essence, CHD looks to the Court not to function as the ultimate arbiter of scientific "truth" or "fact," but to redress Facebook and Zuckerberg's illegal efforts to foreclose and censor what should be open scientific debate, and to malign and destroy CHD (their ultimate goal) in that effort.

6.     CHD and its founder Robert F. Kennedy, Jr. ("RFK, Jr.") have built CHD's good name and reputation as a public health advocate for complete candor as to the risks of environmental toxins, vaccines, 5G and wireless networks, and the conflicts of interest that have compromised government oversight of those products and services. Plaintiff's online reputation is essential to its standing as a preeminent leader in the health reform movement. CHD seeks $5 million or more in treble and punitive damages against the Facebook defendants for their deliberate engagement in a campaign based on false and misleading advertising and direct censorship in order to damage Plaintiff's reputation and organization.

7.     Facebook promotes itself as a social media website with 214 million users in the United States and 2.2 billion worldwide. Facebook is not cost-free. Its users incur the cost of having their information mined and shared. *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024,

---

[1]     The history of science and medicine are replete with examples, from Galileo to Semmelweis, of theories which were vilified and censored in their exponent's lifetimes, only to find widespread acceptance after their deaths. Such reevaluations and reappraisals are not uncommon. What is in one period treated as false, even heretical science, may eventually at a later time gain acceptance as scientific orthodoxy - perhaps, in turn, only to be modified or superseded by further discoveries and new ideas. The view that vaccines are not safe for all people at all times, despite official orthodoxy, is not too dangerous to air and be heard.

1037 (N.D. Cal. 2019). Facebook is sustained by, and its profits are largely due to, massive advertising — i.e., by selling the value of its users' attention to other companies that wish to persuade those users to buy the advertisers' goods and services. Less well-known, and directly relevant to this action, are Facebook's specific efforts as a seller of pharmaceutical ads, purveyor of global 5G and wireless networks and services, and developer of vaccines through Zuckerberg's separate entities. Facebook promotes itself as a service for people "to talk openly about the issues that matter to them, even if some may disagree or find them objectionable." *Community Standards*, FACEBOOK, https://www.facebook.com/communitystandards/ (last visited Nov. 12, 2020). It does not say that it will censor and falsely disparage opposing viewpoints or content that points out the health risks of *those products and technologies* through material misrepresentation and blatant falsehood. Here, defendants' deliberate falsehood is that Plaintiff's page contains "false information" that poses a "risk of imminent violence or physical harm." Nothing could be further from the truth.

8.      This case arises in a pandemic when the need for public debate on health issues has never been greater. CHD's vision is a world free of childhood chronic health conditions caused by environmental exposures. Plaintiff highlights harms associated with the current vaccine program, pesticides, and deployment of 5G and other wireless technologies. Although Zuckerberg's professed "moon shot mission" is "to cure all disease on the planet within the Facebook chairman's children's lifetimes," defendants' first giant leap for humankind is to censor CHD's viewpoint, which competes with Facebook's business plan for pharmaceutical ad revenue, vaccine development, and 5G and wireless networks.

9.      Since September 2019, Facebook's and Zuckerberg's aggressive censorship campaign — initiated in response to government pressure and executed in conjunction with government actors — has falsely denigrated CHD through a "warning label" on CHD's page, which conveys a classic false imputation of dishonesty in CHD's trade. Since March 2019, with increasing frequency, Facebook and its surrogate self-styled "independent  fact-checkers" (Facebook and Zuckerberg's Orwellian term for those it has retained, paid for, donated funds to, trained and directed) have created, developed, and published "false information" tags

directly on CHD's page, which materially misrepresent the accuracy of CHD's own content. These techniques of censorship culminated in even more aggressive and blatant acts of suppression by Facebook and Zuckerberg: the deactivation of CHD's funding button on its Facebook page, making it impossible for viewers to donate to CHD; the demotion of CHD's content on vaccines and 5G technology; and ultimately Facebook and Zuckerberg's actual removal of CHD's previously "fact-checked" content — an action taken only after this lawsuit was filed, and in apparent retaliation against CHD for having the temerity to resist Facebook's censorship by filing the lawsuit.

10.     CHD seeks a potent remedy as antitoxin to Facebook's toxic propagation of the "known lie [which is] at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected." *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964) ("calculated falsehood [is] no essential part of any exposition of ideas"); *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting) ("The ultimate good desired is better reached by free trade in ideas -- … the best test of truth is the power of the thought to get itself accepted in the competition of the market"). As explained below, defendants' conduct violates the First and Fifth Amendments, constitutes false advertising under the Lanham Act, and is in violation of the RICO statute. Nor are Zuckerberg or Facebook's actions shielded or rendered permissible by Section 230 of the Communications Decency Act. Zuckerberg and Facebook possess enormous power. In their deliberate, self-interested and self-serving censorship campaign directed at CHD, their abuse of that power has been egregious. The legal redress sought herein is fully warranted.

## JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over all defendants because they conducted business with and injured Plaintiff in this District. Facebook itself is headquartered within the District, which is also where the individual and at least some of the Doe defendants reside.

12.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332(a) (complete diversity of the parties, and the amount in

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

controversy exceeds $75,000), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (further relief). The action asserts continuing violations of the First and Fifth Amendments, 18 U.S.C. §§ 1964(a), (c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and 15 U.S.C. § 1125(a) (Lanham Act), and there is an actual case or controversy.

13.     Venue is proper under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) because defendants transacted a substantial portion of their affairs and caused damages in this District. Moreover, Facebook's Terms of Service ("Terms") to which Plaintiff agreed require that disputes be resolved in this forum and that the laws of the State of California apply. Terms at ¶ 4(4).

## PARTIES AND RELATED ENTITIES

14.     Plaintiff Children's Health Defense is a not-for-profit 26 U.S.C. § 501(c)(3) membership organization incorporated under the laws of the State of Georgia, and headquartered at 1227 North Peachtree Parkway, Suite 202, Peachtree City, Georgia 30269. CHD was founded in 2015 (under a different name) to educate the public about the risks and harmful effects of chemical exposures upon prenatal and children's health, including from particular vaccines and environmental health hazards, such as 5G and wireless networks and products, and to advocate for social change both legislatively and through judicial action. The organization is run by RFK, Jr. and a team comprised largely of mothers whose children suffered serious adverse events after vaccination.

15.     As a publisher of information related to public health and reform, CHD operates the https://childrenshealthdefense.org website, and publishes, *inter alia*, a "weekly wrap up" with research articles and opinion pieces available at https://childrenshealthdefense.org/category/news/childrens-health/. As set forth more fully *infra*, CHD and its founder and chairman Robert F. Kennedy, Jr. are not "anti-vaccine[2]." Rather, they advocate for informed

---

[2]     CHD and Robert F Kennedy Jr. are frequently smeared with the term "anti-vax," in an effort to marginalize them as proponents of "fringe-speech." In truth, they advocate for transparency and tighter safety standards, particularly given the influence of pharmaceutical

patient consent based on full disclosure of all relevant medical information. CHD receives all of its support from contributions, membership fees, and gross receipts from activities related to its tax-exempt functions. In Tax Year 2018, CHD reported $1,063,837 in gifts, grants, contributions, and membership fees received. CHD's primary sources of revenue derive from membership dues and donations that CHD solicits on its website and, formerly, on its Facebook page. In addition to that monetary interest, attracting visitors to the CHD website and its Facebook page enables CHD and RFK, Jr., CHD's contributors, and its readers to associate and engage in speech on matters of mutual concern. CHD has standing to bring suit as an injured "person" under 18 U.S.C. § 1964(c).

16.     Defendant Facebook, Inc. is a Delaware corporation, with its principal place of business in Menlo Park, California. (At times herein, where Facebook acted on behalf of all defendants, they are collectively referred to as "Facebook.") Sometime in or around 2017, CHD executed Facebook's Terms in order to establish and maintain CHD's Facebook page as a central clearinghouse for CHD's public health newsgathering and advocacy activities, and as a fundraising platform.

17.     Defendant Mark Zuckerberg is a co-founder of Facebook, Inc., and at all times relevant hereto, has served as Facebook's chairman, chief executive officer, and controlling shareholder. He also co-owns and is co-managing member of the Chan-Zuckerberg Institute, LLC ("CZI") and Chan-Zuckerberg Biohub, LLC ("CZB"), which are, *inter alia*, for-profit vaccine developers. He resides in the Northern District of California and is a "person" who may be sued under 18 U.S.C. § 1961(3). He is sued individually, and under theories of respondeat superior, alter ego, and agency liability.)

18.     According to Facebook's 2017 Proxy Statement:

> Because Mr. Zuckerberg controls a majority of our outstanding voting power, we are a "controlled company" under the corporate governance rules of the NASDAQ Stock Market LLC (NASDAQ).

---

companies with large financial interests, statutory immunity from tort liability for vaccine-injury, and a record of producing self-interested "research" studies on vaccine safety issues.

> Therefore, we are not required to have a majority of our board of directors be independent, nor are we required to have a compensation committee or an independent nominating function. In light of our status as a controlled company, our board of directors has determined not to have an independent nominating function and to have the full board of directors be directly responsible for nominating members of our board.

19.     According to its 2018 Proxy Statement, defendant Zuckerberg has the sole power to elect or remove any director from Facebook's Board, as he controls a majority (53.3%) of Facebook's total voting shares. Zuckerberg directs and controls Facebook's business and is personally and directly responsible for the damages caused by his individual actions, and by his controlled entities' misconduct as set forth herein. Facebook and its surrogate "fact-checker" entities are also sued under principles of alter ego and *respondeat superior* liability.

20.     Defendant Science Feedback is a French non-profit organization to which Facebook contributes an undisclosed amount over 5% of its resources, and which Facebook has engaged as one of its "fact-checker" agents to help Facebook mislead Facebook's users and divert them from CHD's page through a fraudulent scheme by which 1) Facebook flags selected truthful and interpretive content on CHD's Facebook page as "false information," 2) trains, finances, and directs fact-checkers to draft CDC/WHO-based oppositional articles, and 3) Facebook posts its agent's content with a grey overlay (like graffiti) over CHD's content on CHD's page.

21.     Defendant The Poynter Institute for Media Studies, Inc. ("Poynter") is a Florida non-profit organization to which Facebook donates both to the parent corporation (Poynter), and more than 5% of its "fact-checker" branded website's ("Politifact") revenue.[3] Facebook has contracted with Poynter/Politifact as an additional "fact-checker" surrogate under the same working collaboration described *supra*: Facebook identifies selected content on CHD's Facebook page as "false information"; instructs and delegates to Poynter to draft oppositional

---

[3]     On or about January 24, 2018, Poynter filed an application for registration of the fictitious name "Politifact" in the State of Florida.

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

articles referencing CDC/WHO publications as "authoritative," and Facebook maintains editorial control over those oppositional articles which it inserts on CHD's page under a "False Information" tag, in order to divert users from CHD's own content on that false basis. Facebook is a major donor to both Poynter and Politifact. *Largest funders of Poynter*, POYNTER (last updated June 2020), https://www.poynter.org/major-funders/; *Who pays for PolitiFact?*, POLITIFACT (last updated June 2020), https://www.politifact.com/who-pays-for-politifact/.

22. The Facebook corporate and individual defendants conspired with one another, and others as yet unknown at Facebook, or elsewhere (the "Doe defendants") in an informal enterprise (the "content management enterprise") to accomplish their common purposes. Each of them was acting within the course and scope of that conspiracy, agency, partnership, or joint venture. The acts and conduct of each of the defendants were known to and authorized by, or ratified by, the other defendants.

23. The informal enterprise operated by defendants had an ascertainable structure separate and apart from the pattern of racketeering activity in which the defendants engage, and from Facebook, Science Feedback, or Poynter, which are joined as corporate defendants. The informal enterprise operated within one or both of those related structures as an "enterprise" with a common purpose, structure or organization, and open-ended lifespan necessary to accomplish their joint purposes to defraud CHD, destroy its reputation and fundraising, and blunt the impact of its public health education and advocacy efforts.

## STATEMENT OF MATERIAL FACTS

### A.    CHD's Interest in Vaccine and 5G and Wireless Network Safety.

24. Robert F. Kennedy, Jr. is the founder and Chairman of the Board of CHD. For over three decades, RFK, Jr. has been one of the world's leading environmental advocates. He is the founder and past president of Waterkeeper Alliance, the umbrella group for 300 local waterkeeper organizations, in 34 countries, that track down and sue polluters. Under his leadership, Waterkeeper has grown to become the world's largest clean water advocacy organization. RFK, Jr. founded CHD, in part, to address a void in scientific studies of, and

reform advocacy about, the environmental causes of pediatric neuro-developmental disorders and food allergies.

25.     Since its founding, CHD has become a leading independent child health protection and advocacy group. CHD fulfills a vital mission to provide the public with timely and accurate vaccine and 5G and wireless technology safety information, particularly in the absence of any appreciable ongoing HHS or CDC research, any congressional oversight to "reduce the risks of adverse reactions to vaccines," or any reliable pharmaceutical industry research, or private tort remedy. *See infra*. CHD's reputation depends on the credibility of its science-based research articles, which explore both the known and presently-unknown public health risks of vaccines and 5G and wireless technology, in the quest for objective truth.

26.     CHD's mission is threefold: to end childhood epidemics by eliminating harmful toxic exposures; to hold those accountable who knowingly allow children to be unnecessarily exposed to dangerous toxins that destroy their health; and to establish greatly-needed safeguards to prevent the devastation to children and families that these chronic illnesses cause. CHD advocates for open and honest public debate on the efficacy and safety of the CDC's entire Child and Adolescent Immunization Schedule. CHD helps the public navigate the "clutter" of the internet age by posting reliable and up-to-date content for its web traffic viewers. Specifically, CHD publishes articles on its website on a weekly (or more frequent) basis, which describe current scientific research on the potential health risks posed by various environmental toxins, new technologies, and vaccines.

27.     CHD's science-review articles contain hyperlinks to the referenced peer-reviewed, published journals. *See generally Research Resources and Critiques*, CHILDREN'S HEALTH DEFENSE, https://childrenshealthdefense.org/advocacy-policy/critiques/ (last visited Aug. 14, 2020). CHD prominently labels opinion pieces as editorials. CHD's website also contains a drop-down menu under the tag "Research" with links to its "Science Library." CHD's "Science Library" features a searchable database with hundreds of peer-reviewed, published articles on environmental contaminants, *inter alia*, of commercial vaccines, some of which have been implicated in the rise of chronic illnesses and developmental disorders among

at-risk children. All abstracts are tagged with keyword links to cross-reference topics.

28.    CHD's website also prominently features an "Advocacy/Policy" section down its right-hand column with hyperlinks to seven headers, the first and most prominent of which reads "CDC – Corruption, Deceit, and Cover-Up." That header contains the following preamble:

> With the global vaccine market now at tens of billions of dollars, vaccine safety should be of utmost concern to the Centers for Disease Control (CDC). But instead, rather than testing and monitoring the health effects of vaccines and patient injuries truthfully to the American public and making critical and necessary corrections in the program, *the CDC has become a mouthpiece for industry and has protected the 'all vaccines for all children' policy despite peer-reviewed science to the contrary.*
>
> According to a UPI Investigative article written in the early 2000s, the CDC owned at least 28 vaccine patents. They are also in charge of vaccine promotion (getting the public to take vaccines) and vaccine safety. The CDC, like other large bureaucratic agencies, also has a revolving door to industry that comes with *inherent conflicts of interests.* Common sense should have told us that this system was doomed to fail.
>
> The documents below, some of which were obtained by the Freedom of Information Act (FOIA) show *a pattern of deceit* perpetrated by the CDC on the American public and world stage for over 25 years. *The Children's Health Defense believes that vaccine safety should be taken from the CDC.*

29.    CHD's website also contains hyperlinks to numerous articles that criticize the CDC and challenge its veracity, with illustrative titles such as: *CDC's Vaccine 'Science' — A Decades-Long Trail of Trickery*; *Why You Can't Trust the CDC on Vaccines*; *CDC and WHO Corrupt Financial Entanglements with the Vaccine Industry*; *Dr. Brian Hooker's Official Statement Regarding Vaccine Whistleblower William Thompson*; *CDC & FDA Committee Members Have Financial Conflict of Interest with Vaccine Pharmaceuticals*; *OSC Calls for Further Review of Whistleblower Disclosures on Zika Testing*; *CDC Spider Letter*; *CDC: Off Center*; *Real-Life Data Show that the CDC Vaccine Schedule is Causing Harm*; *Don't Fall for*

1   *the CDC's Outlandish Lies About Thimerosal*; *CDC and WHO Corrupt Financial*
2   *Entanglements with the Vaccine Industry*; *CDC Lies About, and Media Repeats, Risk of Dying*
3   *from Measles*; *CDC's 'Universal' Recommendations for Infant Hep B Vaccine Not Based on*
4   *Science, But Assumptions*; *CDC's Infant Hep B Vaccine Recommendations—No Proof of*
5   *Safety*?" *See*, *e.g.*, *CDC and WHO Corrupt Financial Entanglements with the Vaccine*
6   *Industry* [and other articles], CHILDREN'S HEALTH DEFENSE,
7   https://childrenshealthdefense.org/cdc-who/ (last visited Aug. 14, 2020).

8   30.   Before publishing its science review articles in its *Kennedy News & Views*
9   electronic weekly newsletter (recently changed to *The Defender*), CHD conducts an internal
10  editorial process genuinely to fact-check the text and confirm the cited sources, to ensure that
11  every article cites sources for every fact it asserts. Otherwise, CHD publishes the article as a
12  clearly-labeled editorial or opinion piece, where the opinions expressed are not necessarily the
13  opinions of CHD. Once approved, the article is slotted into the publishing schedule, with
14  layout on the CHD website, image design, and publication on the website in designated
15  categories (e.g., child health, toxins), and layout in the newsletter template for emailing
16  subscribers. CHD checks the accuracy of the article again before emailing it to CHD
17  subscribers, then alerts its affiliated organizations that the article has published, and finally,
18  CHD posts the article on its Facebook page, Twitter, Instagram, and YouTube (when
19  applicable).

20  31.   The CHD website offers for sale through its online store, *inter alia*, copies of
21  James Ottar Grundvig's book, *Master Manipulator: The Explosive True Story of Fraud,*
22  *Embezzlement, and Government Betrayal at the CDC*, which is described on CHD's website as
23  "a true story of fraud and betrayal, and an insider's view of what takes place behind the closed
24  doors of agencies and drug companies, and with the people tasked to protect the health of
25  American children. It's a cautionary tale of the dangers of blind trust in the government and the
26  health-care industry." James Ottar Grundvig, *Master Manipulator: The Explosive True Story of*
27  *Fraud, Embezzlement, and Government Betrayal at the CDC*, Store, CHILDREN'S HEALTH
28  DEFENSE, https://childrenshealthdefense.org/store/master-manipulator-the-explosive-true-

1   story-of-fraud-embezzlement-and-government-betrayal-at-the-cdc/ (last visited Aug 14, 2020).

2       32.    Similarly, CHD's "5G and Wireless Harms Project" publishes links to articles

3   and videos on CHD's website, which describe the health risks of 5G and wireless networks and

4   products, and CHD's advocacy efforts to secure a moratorium on 5G development pending

5   further scientific research and consensus on that issue. *See*, *e.g.*, *The 5G Crisis: Awareness &*

6   *Accountability*; *Thermal and non-thermal health effects of low intensity non-ionizing*

7   *radiation: An international perspective*; *Resistance to 5G: Roadblock to a High Tech Future or*

8   *Warning of a Serious Health Risk?*; *What You Should Know About 5G Satellites: How Musk'*

9   *Sci-Fi Dreams Are Becoming Our Living Nightmare*; *5G AirGig: What is It and Should You Be*

10  *Worried?*; *5G/Electromagnetic Fields / Wireless Technologies*; *Scientists warn of potential*

11  *serious health effects of 5G*; *Six Italian Courts Have Ruled that Cell Phones Cause Brain*

12  *Tumors*; *The 5G Crisis: Awareness & Accountability*, CHILDREN'S HEALTH DEFENSE (Dec. 21,

13  2019), https://childrenshealthdefense.org/video/the-5g-crisis-awareness-accountability/. CHD

14  uses a review process comparable to that described *supra* to fact-check these articles and

15  publish them as peer-reviewed research or labeled opinion, where appropriate. Significantly,

16  CHD also publishes commentary debunking vaccine and 5G-hypotheses for which CHD has

17  found no credible scientific evidence. *See*, *e.g.*, D. Tachover, *CHD Statement on 5G and*

18  *Coronavirus*, CHILDREN'S HEALTH DEFENSE (Apr. 10, 2020),

19  https://childrenshealthdefense.org/news/chd-statement-on-5g-and-coronavirus/.

20          **B.    CHD's Facebook Page.**

21      33.    On or about November, 2017, CHD agreed to Facebook's Terms to create, and

22  has since actively maintained, its Facebook page. CHD did so to broaden its internet visibility

23  and reach, make its online library more widely-accessible, and increase its fundraising

24  platform. CHD has a current Facebook community of approximately 122,830 followers. CHD

25  uploads articles or video posts from the CHD website to its Facebook page on a daily (or more

26  frequent) basis, along with other articles or video posts, and hyperlinks to CHD's archived

27  articles of interest to its community. A follower or visitor to CHD's Facebook page can readily

28  search the "posts" archive and retrieve all of CHD's present and past articles concerning, inter

1  alia, the CDC's conflicts, errors, and omissions.

2      34.     CHD's Facebook page is both reliable and up-to-date, as those terms are

3  commonly understood.  The articles and information that CHD shares with its followers and

4  the public are science-based and fact-checked before publication on its Facebook page.  The

5  facts cited in every article include linked citations to other published works. Articles submitted

6  that do not follow that protocol are not published as CHD articles, but rather as editorials

7  where the opinions expressed are not necessarily the opinions of CHD or *The Defender*.  CHD

8  works with content-writers who are known to CHD to be reliable and trustworthy. CHD's

9  editorial process for any article is as follows: idea; article request/written; article submitted,

10  edited, citations/sources/links checked; website layout; image assigned for article; publish on

11  website in designated categories (child health, toxins, etc.); article laid out in *The Defender*

12  newsletter template, then emailed to subscribers.  Finally, CHD adds the article to its social

13  media accounts on Facebook, Twitter, Instagram, and YouTube (if applicable), and emails it to

14  affiliated publishers. In short, CHD's internal fact-checking process ensures that all content

15  that CHD posts to its Facebook page is accurate and well-sourced from credible sources and

16  peer-reviewed studies.

17      35.     As set forth *infra*, CHD did not use its Facebook page to post any content that

18  breached Facebook's terms or community standards or was otherwise "unlawful, misleading,

19  discriminatory or fraudulent." Terms at ¶ 3(2)(1).

20      36.     Under Section 1 of its adhesion contract Terms, Facebook describes its products

21  and services to include, *inter alia*, "[to] empower you to express yourself and communicate

22  about what matters to you" and one of those ways to "express yourself" is "adding content to

23  your profile." Of its many reserved rights, Facebook notably does *not* retain the right to create

24  or add its own content to a user's page, except for a specified reservation for "ads, offers, and

25  other sponsored content [. . .] which [o]ur partners pay us to show [] to you." In Section 3(1),

26  Facebook reiterates that the user "own[s] the content that [the user] create[s] and share[s] on

27  Facebook[.] [. . .] and nothing in these Terms takes away the rights that [user] have to [their]

28  own content." In Section 4(3), Facebook reiterates that "[w]e do not control or direct what

people and others do or say, and we are not responsible for their actions or conduct (whether online or offline) or any content that they share (including offensive, inappropriate, obscene, unlawful and other objectionable content.").

37.    With respect to "harmful conduct," Facebook's Terms permit it to "detect misuse of [its] Products, harmful conduct towards others and situations where [it] may be able to help support or protect [its] community." Facebook retains limited rights, e.g., "offering help, removing content, blocking access to certain features, disabling an account or contacting law enforcement[.] [and] shar[ing] data with other Facebook companies when [it] detect[s] misuse or harmful conduct[.]" Here, too, Facebook does not reserve or retain the right to create its own content on a user's page. Terms ¶¶ 1, 3(2)(3).

38.    Facebook's Terms purport to limit Facebook's liability "to the fullest extent permitted by applicable law." Terms ¶ 4(3). The "applicable law" is California Civil Code section 1668, which establishes that "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

39.    On or about August 31, 2020, Facebook purported to amend its Terms ¶ 3.2, to provide that effective October 1, 2020, Facebook "can remove or restrict access to your content, services, or information if we determine that doing so is reasonably necessary to avoid or mitigate adverse legal or regulatory impacts to Facebook."

**C.    The CDC/Facebook Partnership.**

40.    In 1992, Congress authorized the establishment of the National Foundation for the Centers for Disease Control and Prevention ("the CDC Foundation") to support the CDC. The CDC Foundation was created as a nonprofit private corporation, purportedly not itself an expressly-designated agency or instrumentality of the Federal Government. 42 U.S.C. §§ 280e-11(a), (b) ("Public Health Services Act"). The CDC Director may accept and use, on behalf of the Federal Government, any gift or donation, or any voluntary services from the CDC Foundation for the purpose of aiding or facilitating the work of the CDC. 42 U.S.C. §§ 280e-

11(h)(1), (h)(2)(A). "The CDC Foundation's mission statement is to help CDC 'do more, faster by forging effective partnerships between CDC and others to fight threats to health and safety.'" *H. Rept. 109-510 - Amending the Public Health Service Act with Respect to the National Foundation for the Centers for Disease Control and Prevention*, 109th Congress (2005-2006), Committee Reports, CONGRESS.GOV, https://www.congress.gov/congressional-report/109th-congress/house-report/510/1 (last visited Nov. 11, 2020).

41.    The CDC Foundation also demands "deference to the CDC's final judgment on all matters of scientific findings, facts or recommendations" as a "characteristic for collaboration." *Guiding Principles For Partner Collaboration*, CDC FOUNDATION (2020), https://www.cdcfoundation.org/guiding-principles-partner-collaboration (last visited Nov. 11, 2020).

42.    The Congressional Research Service recently observed that "[I]t might be difficult for stakeholders to verify on an ongoing basis that the activities of a quasi-governmental entity, established by statute and vested with the power to carry out some public purpose, are directed to the public good rather than private gain without the routine accountability and transparency provided by this legal framework." *Agency-Related Nonprofit Research Foundations and Corporations*, CRS Report, CONGRESSIONAL RESEARCH SERVICE (Dec. 9, 2019), https://fas.org/sgp/crs/misc/R46109.pdf.

43.    At least one former CDC researcher has put it more bluntly, describing the quasi-governmental CDC Foundation as a "professional money-laundering facility" (Sheila Kaplan, *Firm Pays Government to Challenge Pesticide Research*, TYPE INVESTIGATIONS (Mar. 1, 2011), https://www.typeinvestigations.org/investigation/2011/03/01/firm-pays-government-challenge-pesticide-research/ (last visited Nov. 11, 2020), and others have alleged that the CDC Foundation turns pharmaceutical industry monies into recommendations favorable to that industry, all with the federal government's seal of approval. *CrossFit Settles Lawsuit with HHS After Agency Releases Emails Showing Continued Efforts to Conceal Donations*, CROSSFIT (Nov. 23, 2019), https://www.crossfit.com/battles/crossfit-settles-lawsuit-with-hhs-after-agency-agrees-to-release-redacted-emails (last visited Nov. 11, 2020). Still others have

questioned donations made by the Coca-Cola Company to the CDC Foundation for research and other activities associated with obesity and diet issues. (Sheila Kaplan, *New C.D.C. Chief Saw Coca-Cola as Ally in Obesity Fight*, THE NEW YORK TIMES (Jul. 22, 2017), https://www.nytimes.com/2017/07/22/health/brenda-fitzgerald-cdc-coke.html; Nason Maani Hessari, Gary Ruskin, and Martin McKee, et al., *Public Meets Private: Conversations Between Coca-Cola and the CDC*, THE MILBANK QUARTERLY, vol. 97, no. 1, pp. 74-90 (2019).

44.     According to May 15, 2015 staff editorial in the British Medical Journal ("BMJ"), "Despite the agency's disclaimer, the CDC does receive millions of dollars in industry gifts and funding, both directly and indirectly, and several recent CDC actions and recommendations have raised questions about the science it cites, the clinical guidelines it promotes and the money it is taking." The BMJ further described the CDC's relationship with private actors, as an example of those private actors' skill in transforming a regulator into the vehicle for their own "classic stealth marketing in which industry puts their message in the mouths of a trusted third party." Jeanne Lenzer, *Centers for Disease Control and Prevention: protecting the private good*? THEBMJ, BMJ 2015;350:h2362 (May 15, 2015), https://www.bmj.com/content/350/bmj.h2362.

45.     The BMJ editorial quotes UCLA Professor of Medicine Jerome R. Hoffman: "Most of us were shocked to learn the CDC takes funding from industry… it is outrageous that industry apparently is allowed to punish the CDC if the agency conducts research that has the potential to cut into profits." Jeanne Lenzer, *Centers for Disease Control and Prevention: protecting the private good*?, *supra*, THEBMJ, BMJ 2015;350:h2362, https://www.bmj.com/content/350/bmj.h2362.

46.     In 2014, Zuckerberg personally donated $25 million to the CDC Foundation's Global Disaster Relief Fund through Silicon Valley Community Foundation ("SVCF"), which runs a donor advised fund for CZI. *CDC Foundation Receives $25 Million Donation From Mark Zuckerberg And Dr. Priscilla Chan For Ebola Response*, CDC FOUNDATION (Oct. 14, 2014), https://www.cdcfoundation.org/pr/cdc-foundation-receives-25-million-donation-mark-zuckerberg-and-priscilla-chan-ebola-response (last visited Nov. 12, 2020). In 2020, "in

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

addition to our other donations," Zuckerberg announced that Facebook would donate $10 million to the CDC Foundation's Combat Coronavirus Fundraiser, and $10 million to the WHO. The CDC Foundation announced that it would use "the support of Facebook and its people to help fill gaps and mobilize resources to address fast emerging needs posed by the virus." *CDC Foundation Launches Facebook Fundraiser To Benefit Coronavirus Response Efforts, Featuring $10 Million Facebook Match*, CDC FOUNDATION (Mar. 24, 2020) https://www.cdcfoundation.org/pr/2020/Facebook-fundraiser-supports-coronavirus-response (last visited Nov. 12, 2020); *Facebook's $10 Million Match Helps CDC Foundation Fight Coronavirus*, CDC FOUNDATION (Mar. 24, 2020), https://www.cdcfoundation.org/blog/facebooks-10-million-match-helps-cdc-foundation-fight-coronavirus (last visited Nov. 12, 2020).

47.     Facebook is a corporate partner of the CDC Foundation and the Silicon Valley Community Foundation is a foundation partner as well. *Our Partners: Foundations*, CDC FOUNDATION, https://www.cdcfoundation.org/partner-list/foundations (last visited Nov. 12, 2020). The CDC Foundation also receives substantial contributions from the pharmaceutical industry.

48.     Facebook is listed as a "partner" on the CDC Foundation's website under the "partners" page, although the total amounts of its donations, and those of Zuckerberg individually or through SVCF, are not publicly-disclosed. *Our Partners: Corporations*, CDC FOUNDATION, https://www.cdcfoundation.org/partner-list/corporations (last visited Nov. 12, 2020).

49.     **CDC's "***Vaccine With Confidence"*** strategic initiative clearly identifies the use of social media partners to drive vaccine uptake.

1
2
3
4
5
6
7
8
9



10      50.

*Vaccinate with Confidence*, CDC (Oct. 11, 2019),

https://www.cdc.gov/vaccines/partners/downloads/Vaccinate-Confidently-2019.pdf.

51.     The CDC is using Facebook in particular to accomplish its goal of targeting

health information. "CDC encourages the strategic use of Facebook to effectively and

inexpensively reach individuals with personalized and targeted health information." *Social*

*Media at CDC*, Tools / Facebook, CDC, https://www.cdc.gov/socialmedia/tools/facebook.html

(last visited Nov. 12, 2020). "Facebook, as with other social media tools, is intended to be part

of a larger integrated health communications strategy or campaign developed under the

leadership of the Associate Director of Communication Science (ADCS) in the Health

Communication Science Office (HCSO) of CDC's National Centers, Institutes, and Offices

(CIOs)." *Social Media at CDC*, Guidelines & Best Practices / Facebook Guidelines and Best

Practices, CDC, https://www.cdc.gov/socialmedia/tools/guidelines/facebook-guidelines.html.

(last visited Nov. 12, 2020).

52.     Zuckerberg has stated publicly that Facebook is working with both the CDC and

the WHO: "We work with the [Centers for Disease Control and Prevention] and we work with

the [World Health Organization] and trusted health organizations to remove clear

misinformation about health-related issues that could cause an imminent risk of harm."

28

20      **VERIFIED SECOND AMENDED COMPLAINT**
        *CHD v. Facebook* **et al.; Case No. 3:20-cv-05787-SI**

1  *AXIOS on HBO: Mark Zuckerberg on Misinformation* [Video], HBO,

2  https://www.youtube.com/watch?v=E5yyInwI7tw (last visited Nov. 12, 2020).

3      53.    In mid-October 2020, Facebook updated its internal public health partnership

4  strategy. It is now working even more closely with the CDC to meet ostensible public health

5  goals including pushing for flu vaccine uptake, and laying the groundwork for pushing

6  COVID-19 vaccine uptake when available.

7      54.    For example, Facebook recently launched a new public health app, "*Preventive*

8  *Health*," which connects people to public health authority resources. Facebook acknowledges

9  it has partnered with the CDC in its development of the app.

10      55.    " 'Preventive Health' is a new tool on Facebook that connects people to health

11  resources and checkup recommendations from leading health organizations."

12
13
14
15  
16
17
18      56.

19  *Connecting People With Health Resources*, FACEBOOK, https://preventivehealth.facebook.com/

20  (last visited Nov. 12, 2020).

21      57.    Facebook's "Preventive Health" App will provide reminders to people to take

22  vaccines, and directly implements a public health strategy recommended by the CDC for

23  increasing vaccination coverage in adults. "Starting today, Facebook will let users choose to

24  get personalized reminders about health care tests and vaccines." Mary Beth Griggs,

25  *Facebook's new Preventive Health tool pushes people to advocate for their health*, THE VERGE

26  (Oct. 28, 2019), https://www.theverge.com/2019/10/28/20936541/facebook-preventative-

27  health-cancer-heart-disease-flu-tool. The reminder system was proposed by the CDC and

28  implemented by Facebook as a way to increase adult vaccination that can reach a large part of

21

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

the populace. Additionally, there is the potential for monetization as the app functions as a digital platform where new vaccines and FDA-approved treatments can be promoted to a wide audience. *Adult Vaccination Resources*, Vaccines for Adults, CDC, https://www.cdc.gov/vaccines/hcp/adults/for-practice/reminder-sys.html (last visited Nov. 12, 2020).

58.     This rollout furnishes additional evidence of a close and ongoing working relationship between the CDC and Facebook both to encourage universal vaccination, and by reasonable inference, to censor, flag, or demote contrary views. The CDC and (with the CDC's express consent) the WHO have worked closely with Facebook to determine what features would be appropriate on Facebook's platform, what information to censor, and which groups, such as CHD, to demonetize. CHD requires process to ascertain, *inter alia*, whether or to what extent the CDC and WHO themselves have flagged specific CHD content on Facebook's platform for Facebook to remove, demote, or fact-check. *See, e.g.*, *Social media giants agree package of measures with UK Government to tackle vaccine disinformation*, GOV.UK (Nov. 8, 2020), https://www.gov.uk/government/news/social-media-giants-agree-package-of-measures-with-uk-government-to-tackle-vaccine-disinformation (Facebook accepting direction and command – including content flagged to them by the government -- directly from U.K. public officials to censor critical information and publish approved information relating to Coronavirus vaccine).

59.     In these and other nonobvious ways, including with respect to Facebook's censorship of CHD's COVID-19-related posts, the CDC has entered into an ongoing symbiotic relationship with Facebook, which substantially benefits the government's and social media giant's policies and priorities. As alleged *infra*, the CDC has given Facebook its imprimatur to implement CDC/WHO-preclusive algorithms under a joint understanding to censor, flag, and/or demote CHD's posts critical of the CDC generally, and/or its vaccine recommendations specifically, and damage or destroy CHD's capacity to sustain itself financially.

///

///

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

**D.    Defendants' Scheme to Defraud.**

**1.    Overview.**

60.    On February 14, 2019, Rep. Schiff wrote a public letter addressed to Zuckerberg "[a]s a Member of Congress who is deeply concerned about declining vaccination rates around the nation," pointedly urging that Facebook implement specific algorithms to identify, censor and remove all so-called "vaccine misinformation," and reject all paid advertising from the sources of such "misinformation." *Schiff Sends Letter to Google, Facebook Regarding Anti-Vaccine Misinformation*, News/Press Releases, CONGRESSMAN ADAM SCHIFF (Feb. 14, 2019), https://schiff.house.gov/news/press-releases/schiff-sends-letter-to-google-facebook-regarding-anti-vaccine-misinformation.

61.    The term "vaccine misinformation" (as Rep. Schiff defined it, and as Facebook implemented it) is a euphemism for *any* expression of skepticism toward government and industry pronouncements about vaccine safety and efficacy, or of reasons why parents or their children's physicians might decline to follow the CDC's full "recommended vaccine schedule," regardless of whether those expressions are true or not. Thus, Rep. Schiff provided a substantive standard — deference to CDC/WHO pronouncements conclusively presumed to be "authoritative" — by which Facebook should identify and censor vaccine "misinformation" on its platform. The term "vaccine misinformation" does not, for example, include erroneous, misinformed or fraudulent statements made by pharmaceutical companies, or the CDC, to promote vaccines.

62.    Rep. Schiff wrote, "I acknowledge that it may not always be a simple matter to determine when information is medically accurate, nor do we ask that your platform engage in the practice of medicine." Yet, that is precisely what Rep. Schiff asked Facebook to do, and this case shows the resulting harms from government engaging with a social media platform to arbitrate scientific truth in that manner.

63.    Rep. Schiff ended his public letter to Zuckerberg:

Specifically, I request that you provide answers on the following questions:

(1)   Does content which provides medically inaccurate information about vaccines violate your terms of service?

(2)   What action(s) do you currently take to address misinformation related to vaccines on your platforms? Are you considering or taking additional actions?

(3)   Do you accept paid advertising from anti-vaccine activists and groups on your platforms? How much has been spent in the past year on advertising on this topic?

(4)   What steps do you currently take to prevent anti-vaccine videos or information from being recommended to users, either algorithmically or as a suggested search result?

I appreciate your timely response to these questions and encourage you to consider what additional steps you can take to address this growing problem. As more Americans rely on your services as their primary source of information, it is vital that you take that responsibility with the seriousness it requires, and nowhere more so than in matters of public health and children's health. Thank you for your attention to this important topic.

Id.

64.     Rep. Schiff's pointed questions and requests clearly express his own definite position on the science, and his expectation that Facebook and Zuckerberg would adhere to and implement policies consistent with that position. On information and belief, Zuckerberg met personally with Rep. Schiff subsequently to discuss, *inter alia*, Facebook's compliance with Rep. Schiff's February 14, 2019 public letter and press release, and those specific standards which were or would be used to identify and censor vaccine "misinformation." At the same time and subsequently, in his role as Chairman of the House Intelligence Committee, Rep. Schiff stated publicly that Congress could or should "make changes to" the law that does not currently hold social media companies liable for third-party content on their platforms. *See, e.g.*, *Hearing by Congress on "deepfakes" and artificial intelligence* [Video], GUARDIAN NEWS (June 13, 2019), https://www.youtube.com/watch?v=lArPEDS0GTA. Rep. Schiff told reporters that, "if the social media companies can't exercise a proper standard of care when it comes to a whole variety of fraudulent or illicit content, then we have to think about whether

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

1   that immunity still makes sense. These are not nascent industries or companies that are

2   struggling for viability; they're now behemoths, and we need them to act responsibly." K.

3   Waddell, *A new attack on social media's immunity*, AXIOS (June 13, 2019),

4   https://www.axios.com/social-media-immunity-section-230-f15ac071-32e9-4e33-81e6-

5   4c7ebadaea5e.html.

6       65.    On March 4, 2019, Lyn Redwood, CHD President, sent a 9-page letter addressed

7   to "Mark Zuckerberg, Chairman and Chief Executive Officer, Facebook Inc., 1 Hacker Way,

8   Menlo Park, CA 94025"  and offered in rebuttal of Representative Schiff's letter. From his

9   public statements and adverse motives, *see infra*, it may be reasonably inferred that Zuckerberg

10  was personally and directly involved in decisions and actions which Facebook took to censor

11  and/or "fact-check" CHD's individual posts, and knowingly mislead users about the

12  truthfulness of CHD's posts, and on the CHD account level, deliberately mislead users about

13  CHD's page's reliability, and remove its advertising and fundraising tools. Zuckerberg and/or

14  the Doe defendants responsible for those actions either read CHD's March 4, 2019 letter or

15  rejected it without reading, but in either event, they did no investigation of it and proceeded

16  within days to publish their warning label and "fact-checks" with a "high degree of awareness

17  of … probable falsity," "serious doubts," or "reckless disregard" as to [their] truth. *Harte-*

18  *Hanks Commc'ns Inc. v. Cunningham*, 491 U.S. 657, 667 (1989).

19      66.    Because it is highly relevant to Plaintiff's claims, the letter is quoted extensively

20  here, and attached to this Complaint as Exhibit "A." CHD's letter explains its position with

21  respect to vaccine safety and Facebook's role as content moderator, as follows:

22          We, too, are highly concerned that the public is being misinformed
             about vaccines, and we agree that Facebook could play a positive
23          role in helping to resolve this problem. *But we strongly disagree*
             *that the means by which Facebook can do so is by preventing users*
24          *from seeing information that calls into question government*
             *policies related to vaccinations. On the contrary, the means by*
25          *which Facebook can help empower people to make an informed*
             *choice is to facilitate a free market of ideas and let users determine*
26          *for themselves the value of content that appears in their newsfeeds.*

27

28

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

[Representative Schiff's] true criterion for determining what information constitutes a "threat" is not whether it is truthful and accurate, but whether or not it accords with the goal of achieving high vaccination rates. [. . .] an implicit assumption underlying Mr. Schiff's criterion for determining what constitutes "misinformation" is that the CDC is infallible in its vaccine recommendations. We emphatically disagree and must reject this assumption as totally illogical and unscientific.

Mr. Schiff would have you take steps to prevent "vaccine misinformation" from proliferating, but who is to decide what constitutes misinformation? Which party to the debate can claim a monopoly on truth? [. . .] Efforts to stifle discussion and debate about such an important issue constitute a serious threat to both our health and our liberty.

The statement assumes that all vaccines are safe and effective for everybody, but what there is a scientific consensus about is that that is absolutely not true. Indeed, it is meaningless to treat "vaccines" as a product concept when speaking in terms of safety and effectiveness because each vaccine has a different profile. There is a risk-benefit analysis that must be done for each one. Not all vaccines are considered safe. Not all are considered effective. In the scientific literature, there is a great deal of uncertainty and debate about the safety and effectiveness of individual vaccines, as well as their combined effects and the long-term consequences of vaccinating children according to the CDC's schedule.

[. . .]

*Increasingly, we are learning from scientific research that there are opportunity costs associated with vaccination.* [. . .] It is a great cause for concern that public health officials simply do not take such opportunity costs into consideration when formulating public vaccine policies.

In addition to disregarding the variable profile of each vaccine, Mr. Schiff's statement ignores the variability in children's responses to vaccinations. The risk-benefit must be conducted for each vaccine and for every individual child. Not every child is at the same risk from a given infectious disease. Not every child will have the same immune response to a vaccine intended to prevent that disease. And

VERIFIED SECOND AMENDED COMPLAINT
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

not every child is at the same risk of harm from the vaccine. That there are subpopulations of children who are at higher risk of being killed or permanently injured by vaccines is well recognized within the scientific community.

[. . .]

Unfortunately, the public health objective of achieving high vaccination rates is not necessarily conducive to the objective of improving public health, and the same cognitive dissonance evident in the FDA's remark is reflected in Mr. Schiff's objection to information being shared on Facebook that isn't conducive to the government's goal of persuading or coercing parents through mandates to strictly comply with the CDC's routine childhood vaccine schedule.

Certainly, to inform parents about this compensation program and the legal immunity for vaccine manufacturers might cause them to think twice about vaccinating their children. Contrary to Mr. Schiff's criterion, it does not follow that they shouldn't be informed.
[. . .]

The CDC itself is a leading purveyor of misinformation about vaccines. For example, a literature review by the prestigious Cochrane Collaboration on the safety and effectiveness of the influenza vaccine concluded that the fundamental assumptions underlying the CDC's universal flu shot recommendation are unsupported by the scientific evidence and, furthermore, that the CDC has deliberately misrepresented the science in order to support its policy.

[. . .]

So, if Facebook is going to start preventing the spread of vaccine misinformation, is it going to block links to pages from the CDC's website wherein such dangerously misleading claims are made?

[. . .]

To sum up, there is indeed a serious problem today with respect to the propagation of misinformation about vaccines, but there are no

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

greater purveyors of vaccine misinformation than the government and corporate news media. *It is entirely inappropriate for elected government officials to be instructing media companies to censor criticism of entire categories of pharmaceutical products.*

[. . .]

Without prejudice to your company's right to determine your service's own terms of use, we believe that respect for this human right is the value that Facebook should be upholding, along with the right to informed consent, which is one of the most fundamental ethics in the practice of medicine.

A true and correct copy of the letter is attached as Exhibit "A" hereto. *Letter to Facebook*, CHILDREN'S HEALTH DEFENSE (Mar. 4, 2019), https://childrenshealthdefense.org/wp-content/uploads/FINAL-CHD-Letter-to-Facebook-1.pdf (emphases added).

67.     Nonetheless, Facebook conducted no investigation whatsoever to confirm or refute the material facts asserted in CHD's March 4, 2019 letter. Rather, Facebook and Zuckerberg personally determined that the course of action Rep. Schiff actively encouraged — to work and act in concert with individuals or officers at the CDC and WHO, to implement algorithms to identify any posts critical to CDC/WHO-pronouncements — would assist Facebook to avoid any legislative rollback of "service provider" immunity from liability under the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c)(1). The close sequence of events which followed closely upon Rep. Schiff's letter to Zuckerberg suggest that Schiff's pointed requests had an immediate effect on Facebook and that Zuckerberg had determined that it was in Facebook's interests to cooperate with the government.

68.     On March 7, 2019, Monika Bickert, Facebook's Vice President for Global Policy Management, issued an online press release stating that:

We are working to tackle vaccine misinformation on Facebook by reducing its distribution and *providing people with authoritative information on the topic.* We are starting by taking a series of steps: We will reduce the ranking of groups and Pages that spread misinformation about vaccinations in News Feed and Search.

These groups and Pages will not be included in recommendations or in predictions when you type into Search.

When we find ads that include misinformation about vaccinations, we will reject them. We also remove related targeting options, like "vaccine controversies." For ad accounts that continue to violate our policies, we may take further action, such as disabling the ad account.

We won't show or recommend content that contains misinformation about vaccinations on Instagram Explore or hashtag pages.

We are exploring ways to share educational information about vaccines when people come across misinformation on this topic.

**Update on April 26, 2019 at 10AM PT:** We may also remove access to our fundraising tools for Pages that spread misinformation about vaccinations on Facebook.

How This Will Work

Leading global health organizations, such as the World Health Organization and the US Centers for Disease Control and Prevention, have publicly identified verifiable vaccine hoaxes. If these vaccine hoaxes appear on Facebook, we will take action against them.

For example, if a group or Page admin posts this vaccine misinformation, we will exclude the entire group or Page from recommendations, reduce these groups and Pages' distribution in News Feed and Search, and reject ads with this misinformation.

We also believe in providing people with additional context so they can decide whether to read, share, or engage in conversations about information they see on Facebook.We are exploring ways to give people more accurate information from expert organizations about vaccines at the top of results for related searches, on Pages discussing the topic, and on invitations to join groups about the topic. We will have an update on this soon.

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

1
2

> We are fully committed to the safety of our community and will
> continue to expand on this work.

3   *Combatting Vaccine Misinformation*, FACEBOOK, https://about.fb.com/news/2019/03/

4   combatting-vaccine-misinformation (last visited Aug 14, 2020) (emphases added).

5       69.    On September 4, 2019, the WHO Director-General issued a public statement that

6   it "welcomes the commitment by Facebook to ensure that users find facts about vaccines

7   across Instagram, Facebook Search, Groups, Pages and forums where people seek out

8   information and advice. *Facebook will direct millions of its users to WHO's accurate and*

9   *reliable vaccine information in several languages, to ensure that vital health messages reach*

10  *people who need them the most. The World Health Organization and Facebook have been in*

11  *discussions for several months to ensure people can access authoritative information on*

12  *vaccines and reduce the spread of inaccuracies on Facebook and Instagram*." *Vaccine*

13  *Misinformation: Statement by WHO Director-General on Facebook and Instagram*, WORLD

14  HEALTH ORGANIZATION (Sept. 4, 2019), https://www.who.int/news-room/detail/04-09-2019-

15  vaccine-misinformation-statement-by-who-director-general-on-facebook-and-instagram

16  (emphases added). The WHO Director-General's public statement strongly suggests that the

17  WHO has been directly involved in defining what constitutes "vaccine misinformation" for

18  Facebook. It also implies that the WHO has provided input regarding what exact features may

19  be most effective. The CDC's active, if "nonobvious" involvement in Facebook's conduct may

20  be reasonably inferred. CHD requires process to identify the government officials who

21  participated in these pre-roll out discussions with Facebook, and the standards and practices

22  which they discussed or agreed upon, and other facts and circumstances of the "non-obvious

23  involvement of the State in private conduct" of Facebook and Zuckerberg. *Burton v.*

24  *Wilmington Parking Authority*, 365 U.S. 715, 722 (1961). At all times relevant hereto, the

25  United States was a member of the WHO, a United Nations specialized agency. Notably, under

26  Article 71 of its Constitution, the WHO may only consult and cooperate with non-

27  governmental national organization*s with the consent of the Government concerned. Basic*

28  *Documents*, WORLD HEALTH ORGANIZATION ($^{49\text{th}}$ Ed. 2020),

1   https://apps.who.int/gb/bd/pdf_files/BD_49th-en.pdf#page=1.  In light of their public

2   statements and close affiliation on matters relating to vaccines, it is reasonable to infer that the

3   CDC was the responsible federal agency which gave the WHO its consent on behalf of the

4   U.S. Government to actively collaborate with Facebook. Plaintiff requires process to confirm

5   that the CDC gave its consent to the WHO's formation of its private-public partnership with

6   Facebook, and that the CDC itself participated in other non-obvious ways.

7       70.     The same day, September 4, 2019, that the WHO publicly lauded its close

8   collaboration with Facebook to "ensure people can access authoritative information [] and

9   reduce the spread of inaccuracies," Facebook synchronously published a "Warning Label" in

10  bold black letters at the top of CHD's Facebook page, which states:

11          **This Page posts about vaccines**

12
13          **When it comes to health, everyone wants reliable, up-to-date**
            **information. The Centers for Disease Control (CDC) has**
14          **information that can help answer questions you may have**
            **about vaccines.**
15
16          **Go to CDC.gov**

17      71.     Both before and after September 4, 2019, Facebook also implemented a "fact-

18  checking" campaign concerning content on Plaintiff's page, in further coordination with the

19  CDC and WHO, designed to materially misrepresent Plaintiff's content. Thus, Facebook killed

20  two birds with one stone: Facebook delivered what Rep. Schiff had forcefully requested — the

21  "vaccine misinformation" campaign — which in turn would help it achieve the continued

22  preservation of its desired Section 230 immunity. At the same time, Rep. Schiff's demand

23  provided Facebook with cover for its own ulterior business motives, and pretext to launch its

24  own fraudulent scheme to cause reputational harm and financial loss to CHD, and illicit gain to

25  Facebook, by means of false representations and knowingly false suggestions. For Zuckerberg

26  and the other defendants, this was a classic "win-win" proposition.

27      72.     In perpetrating its fraud scheme, Facebook's modus operandi was to treat any

28  information that does not advance the CDC and WHO's policy goal of maintaining or

31

increasing vaccination rates as "false," "fake," "misinformation," or "hoax," irrespective of its objective truth or the fact that it constitutes or qualifies as opinion. Facebook treats even the view that parents have a right to informed consent, one of the most fundamental ethics in medicine, as censorable "misinformation." Any information related to the risks of vaccination, no matter how well-grounded in science, is labeled and censored as "misinformation." Facebook then trained its technical means and methods on identifying and eliminating all such content under the banner of "falsity." By contrast, Facebook broadly incorporates and promotes the CDC and WHO's policy pronouncements on these issues as established "fact." *Combatting Vaccine Misinformation*, Facebook, *supra*, https://about.fb.com/news/2019/03/combatting-vaccine-misinformation.

73.     The Merriam-Webster Dictionary defines "misinformation" as "incorrect or misleading information," and defines "information" as "(1) knowledge obtained from investigation, study, or instruction; (2) intelligence, news; (3) facts, data." *Information, Merrian-Webster.com*, https://www.merriam-webster.com/dictionary/information (last visited Aug. 14, 2020). Facebook's charge that Plaintiff's content is "false information" conveys to third-party users that it is demonstrably, provably false.

74.     Additionally, on May 21, 2020, Zuckerberg reportedly stated that "misleading conspiracy theories around 5G on Facebook pose a risk of immediate physical harm" and that his Facebook "team is working urgently to remove dangerous and deadly 'fake news' posts about 5G." He added that, "5G misinformation [] has led to some physical damage of 5G infrastructure. So we believe that that is leading to imminent risk of physical harm. We take down that content." S. Keach, *Facebook's 5G fake news poses 'risk of immediate physical harm', Zuckerberg warns*, Irish Sun (May 21, 2020), https://www.thesun.ie/tech/5453017/facebook-5g-fake-news-mark-zuckerberg-physical-harm-masts-burning/. In other words, Facebook takes the position that incidents of protestors (who have no connection with CHD) burning telephone poles with 5G transmitters constitutes an "imminent risk of physical harm" sufficient to warrant blocking CHD's 5G safety content, irrespective of its truth. Thus, for Zuckerberg's own profit, caprice, or ill will, *see infra*, Facebook untethers the "clear and

present danger" standard from any recognizable mooring in the First Amendment. *See, e.g.*, *Bridges v. California*, 314 U.S. 252, 263 (1941) (Black, J.) ("What finally emerges from the 'clear and present danger' cases is a working principle that the substantive evil must be *extremely serious* and the degree of imminence *extremely high* before utterances can be punished.").

75.     Facebook has an undoubted right "to control its own product, and to establish the terms with which its users, application developers, and advertisers must comply in order to utilize this product." *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1076 (S.D. Cal. 2016). But, here, even Facebook cannot avoid liability for provable injury to Plaintiff's property rights and intangible assets based on fraud and misrepresentation. *See, e.g.*, *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1166 (9th Cir. 2008) (en banc) (service provider may be liable where it makes answering discriminatory questions a condition for doing business on its site).

76.     Thus, Facebook's ownership of its platform does not give it free rein to develop, create, and publish false and misleading content on CHD's page, or to create tags which mislead third-party users about the truthfulness of content on CHD's pages, or to drive traffic from CHD's page to the CDC, to advance Facebook's adverse business interests. Facebook's control over the manner in which its users view its website does not encompass the right to commit acts of censorship, false disparagement, and fraud.

77.     Over the past fifteen months or longer, defendants have carried out a fraudulent scheme to misrepresent, censor, and exclude CHD's viewpoint on vaccine and 5G network safety.

## 2.     Means and Methods of Defendants' Scheme.

78.     Since on or about January 15, 2019, defendants have engaged in a scheme, plan and artifice to disparage and defraud CHD, and cause it to lose money and goodwill, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, through three principal methods: (A) making materially false statements; (B) omitting to disclose material facts; and (C) creating a materially deceptive

scheme. Defendants have created the false and misleading appearance to all third-party users that CHD is in violation of Facebook's Terms for publishing "false information" about vaccine and 5G network safety, and defendants have used that ruse to deactivate CHD's direct fundraising and reject its paid advertisements, censor CHD's content and user posts, publish materially false or misleading content on CHD's page, "shadow ban" CHD and "sandbox" third-party users, i.e., deceptively limit the reach of other CHD content to those users whom Facebook psychologically profiles as "undecided," and conceal their methods and collaborators. In truth, as defendants are fully aware, CHD has not posted any false information, promoted any false content, or violated any fundraising or other terms of service.

79.     Defendants Facebook, Zuckerberg, Science Feedback, Poynter, , and others engaged in a scheme to defraud CHD by, among other conduct:

(A)     Misrepresenting as fact to CHD that CHD's fundraising function was deactivated because CHD violated its terms of service with Facebook by posting "false information" with respect to vaccines.

(B)     Misrepresenting as fact to CHD's outside ad agency that CHD's fundraising advertisements were rejected because CHD violated its terms of service with Facebook by posting "false information" with respect to vaccines. Facebook did not (nor can it) produce any evidence of actual falsity in such advertisements.

(C)     Misrepresenting as fact to all third-party Facebook users by means of a "warning label" on CHD's page that the CDC has "reliable, up-to-date information about vaccines," and that such users should "go to CDC.gov," and, by classic imputation of dishonesty, falsely suggesting that the vaccine-related content on CHD's page is not reliable, up-to-date information.

(D)     Misrepresenting as facts to all third-party Facebook users that particular enumerated CHD-, RFK, Jr.- and third party-content posted on the CHD page contains "False Information Checked by independent fact-checkers,"

and to "see why" users should instead accept the opposition content posted by Facebook's "fact-checkers" on CHD's page as "true" information on the same subjects.

(E)   Engaging deceptive mechanisms and machine-learning algorithms, which secretly demote, hide, and/or limit the visibility and reach of CHD vaccine- and 5G network-related content (practices known as "shadow-banning" or "deboosting") from third party users whom Facebook psychologically profiles as "undecided" (a practice known as "sandboxing") in order to hide content from those it might sway, while misrepresenting to CHD and all third-party Facebook users that no such artificial processes or limitations have occurred.

(F)   Misrepresenting as fact to all third-party Facebook users that Facebook relies upon "independent fact-checkers" to identify and tag "false information" on CHD's Facebook page based on a set of objectively-neutral, reliable, and up-to-date factual criteria, when the criteria that is actually applied is neither neutral, reliable, nor up-to-date, and the "fact-checkers" are in privity with, or controlled by Facebook. The absurdity of these misrepresentations hits home when one considers that Facebook and Science Feedback created a "fact-checking" exemption for climate science deniers by deeming climate disinformation ineligible for "fact-checking," because it is "opinion." Emily Atkin, *Facebook creates fact-checking exemption for climate deniers*, HEATED (Jun. 24, 2020), https://heated.world/p/facebook-creates-fact-checking-exemption.

(G)   Misrepresenting as fact to third-party Facebook users that CHD's 5G-related content was demoted because it poses an "imminent risk of physical harm," when Facebook took this action solely to advance its own economic interests in 5G development and deployment.

(H)    Misrepresenting as fact to all third-party Facebook users that users such as CHD who have had content removed from or tagged on its platform, can appeal that decision either to Facebook's content moderator panel, or to an "independent" "Oversight Board," and that in making such determinations, Facebook does not have any conflicts of interest that compromise its judgment. M. Zuckerberg, *Facebook's commitment to the Oversight Board*, FACEBOOK (Sept. 2019), https://about.fb.com/wp-content/uploads/2019/09/letter-from-mark-zuckerberg-on-oversight-board-charter.pdf.

(I)    Concealing the extent to which Facebook actively collaborated with Rep. Schiff, the CDC and WHO, inter alia, to implement their overall scheme.

(J)    Concealing their overall scheme by these and other deceptions, including false and disparaging statements about CHD to users of CHD's Facebook page, and to other third parties.

80.    Among the means and methods by which these defendants carried out the scheme to defraud Plaintiff were their transmission by means of wires in interstate commerce of the following telephone calls, emails and/or online communications that contained materially false and misleading information, or made use of the wires in furtherance thereof, and proximately caused damages, including

(1) falsely disparaging "warning label"; (2) materially deceptive use of "fact-checkers"; (3) disabling CHD's fundraising tools, donate button, and ads; (4) demoting CHD's 5G-related posts in bad faith;  (5) disabling CHD's right to "appeal"; and (6) concealment of the overall scheme.

### 3.    Falsely Disparaging Warning Label.

81.    As alleged *supra*, on September 4, 2019, after "several months of discussion" with the WHO (*Vaccine Misinformation: Statement by WHO Director-General on Facebook and Instagram*, *supra*, https://www.who.int/news-room/detail/04-09-2019-vaccine-

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* **et al.; Case No. 3:20-cv-05787-SI**

misinformation-statement-by-who-director-general-on-facebook-and-instagram), Facebook

published a Warning Label in bold black letters at the top of CHD's Page, which states:

> This Page posts about vaccines
>
> When it comes to health, everyone wants reliable, up-to-date information. The Centers for Disease Control (CDC) has information that can help answer questions you may have about vaccines.
>
> Go to CDC.gov



82.

83.    Facebook re-publishes this disparaging falsehood every time a user uploads CHD's Facebook page, as has occurred literally hundreds of thousands of times since September 4, 2019.

84.    Facebook's warning label conveys in clear terms to any user that what they see on CHD's page is not reliable and not up-to-date, and it directs the user instead to "go to CDC.gov" for reliable and up-to-date "information" about vaccines. Any user visiting a webpage scans the immediately-visible content before scrolling down to view the remainder of the content. Consequently, the top banner space of any webpage is valuable "screen real-estate" where prime content can be shown. Facebook's intended effect is to deprive CHD of this screen space and to redirect users away from CHD's page to the CDC website. Zuckerberg

publicly boasts that his "warning labels" and "fact-checks" effectively divert 95% or more of all users from clicking through to the actual content. *Entire CNN April 16 Coronavirus Town Hall* [Video], CNN BUSINESS (Apr. 17, 2020), https://www.cnn.com/videos/business/2020/04/17/entire-april-16-coronavirus-town-hall-part-5-sot-vpx.cnn.

85.     Facebook's use of the warning label effectively reduces third party user traffic to CHD's page in at least three ways: First, it redirects a certain percentage of users (known only to Facebook) toward "authoritative sources," who will not return to view the material deemed "misinformation." Second, it directly targets seekers of information (the most important target audience) with the information that governmental authorities want them to see. Third, it intentionally and by necessary implication undermines the credibility and message of the source (CHD's page) where the pop-up warning feature is placed. As customary and usual Silicon Valley practice, such features are heavily tested using A/B testing for effectiveness prior to widespread deployment.

86.     On or about September 10, 2019, in response to Facebook's disparaging warning label, CHD added text to the top of its Facebook page that states: "Read about CDC & WHO corrupt financial entanglements with vaccine industry: childrenshealthdefense.org/cdc-who."

### 4.     Materially Deceptive use of "Fact-Checkers."

#### a.     Facebook/"Fact-Checker" Agency Relationship.

87.     Facebook and Zuckerberg personally developed their "fact-checker" apparatus in a concerted effort to cloak Facebook's censorship activities with Section 230(c)(1) immunity for hosting content nominally "created" by third parties. But, in reality, Facebook maintains supervision and control over many, if not all, aspects of the "fact-checker" processes connected to CHD's posts. By its own engagement with those overlays, warnings, and "fact-check" explanations, Facebook and Zuckerberg had knowledge of their material falsity, or acted in reckless disregard for the truth.

88.     First, Facebook deployed its own employees and artificial intelligence ("AI") machine-learning mechanisms to identify and flag the CHD posts at issue (including any CHD

posts which were originally flagged for Facebook by the CDC or WHO) which Facebook then directed to its "fact-checkers" — Science Feedback, a French entity, and Poynter — to review. The AI machine learning models developed to detect misinformation signals are owned and were originally trained by Facebook's selection of inputs. Machine learning models rely upon training and need to be trained upon a set of inputs, which Facebook itself selects. Thus, the validation and deployment of the machine learning models by which vaccine "misinformation" is directed to "fact-checkers" is wholly controlled by Facebook.

89. <u>Second</u>, Facebook's Trust and Safety Division provided these "fact-checkers" with training manuals and other materials with which to review CHD's posts, and Facebook's set of prepopulated screening options. Facebook's materials evidently referenced "authoritative" CDC/WHO sources for the "fact-checkers" to cite. Facebook helps develop and create the "fact-checkers" content. (We cannot know at this time whether Facebook also translates Science Feedback's posts from French into English. Facebook posted Corrrectiv's untranslated German fact-check over a CHD post.)

90. <u>Third</u>, Facebook evidently directed its Science Feedback and Poynter "fact-checkers" to bypass the "opinion" prepopulated screening option because that option does not result in a "fact-check" overlay. (As discussed *infra*, at least some of the CHD posts at issue should have been classified as "Opinion" based on fully-disclosed facts.) As has been documented elsewhere, Facebook can and does pressure its "fact-checkers" to change ratings. "In some cases, Facebook has reevaluated fact-check labels or penalties after fact-checkers had acted, often in the wake of political, financial, and PR pressures." Alex Pasternack, *Facebook is quietly pressuring its independent fact-checkers to change their rulings*, Fast Company (Aug. 20, 2020), https://www.fastcompany.com/90538655/facebook-is-quietly-pressuring-its-independent-fact-checkers-to-change-their-rulings (last visited Nov. 12, 2020).

91. <u>Fourth</u>, Facebook provides a substantial portion of the "fact-checkers'" operating budgets which is at least 5% (the actual amount is not disclosed), and gives the "fact-checkers" more compensation on a post-by-post basis when the "fact-checkers" label posts "false" or

"partly false," with resulting opposition content-development, than when posts are labeled protected "opinion" instead.

92.     **Fifth**, Facebook retains final control over the "fact-checker"- developed content. The technology that displays fact-checking posts on CHD pages is owned by Facebook. Control over the CHD page graphical elements (the grey overlay which obscures CHD's content and labels it "false information checked by independent fact-checkers") is exercised by Facebook, not its "fact-checkers." The technology to limit visibility as a result of "fact-checking" rating is controlled by Facebook. *Facebook's Enforcement of Fact-Checker Ratings*, FACEBOOK FOR BUSINESS, Business Help Center, https://www.facebook.com/business/help/297022994952764?id=673052479947730&recommended_by=2593586717571940 (last visited Nov. 12, 2020).  Facebook decides whether to publish "fact-checker" posts in whole or in part, and — crucially — Facebook posts them to CHD's page, not to the "fact-checkers'" pages. Context is everything. Facebook's posting of its "fact-checker" content directly to CHD's page wrongly presumes that CHD has no beneficial right or interest in its page, or in being free of Facebook's deliberate falsehoods as a condition of doing business on Facebook. *See, e.g.*, *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d at 1166 (CDA Section 230 immunity did not protect website which made answering discriminatory questions, which violated the Fair Housing Act, a "condition of doing business" on the site). Facebook is also responsible for the technology that handles consequences of fact-checking rating, including reduced distribution, share warning pop-ups, sharing notifications, misinformation labels, and reducing the distribution of CHD's other posts, and demonetizing CHD's page.

93.     In these, and other nonobvious ways, Facebook and Zuckerberg have established an elaborate and intricate agency relationship with Science Feedback and Poynter, their designated vaccine "misinformation" "fact-checkers." Facebook the corporation and Zuckerberg the individual are both "responsible, in whole or in part, for the creation or development of information" under 47 U.S.C. § 230(f)(3) which information Facebook falsely purports to have been "independently" created and developed in whole by its nominally-third-

party "fact-checkers."

94.    Moreover, the web of other interrelationships between these defendants and various other entities, named and unnamed as parties herein, demonstrate the lack of independence between these organizations and the bias of these organizations against vaccine safety advocates such as CHD. For example, the Silicon Valley Community Foundation ("SVCF") is another of Poynter's major funders (besides Facebook). *Largest funders of Poynter, supra*, POYNTER.ORG, https://www.poynter.org/major-funders/. SVCF granted over $256,000 to Poynter in 2018. *Grants: Where the Giving Goes*, SILICON VALLEY COMMUNITY FOUNDATION, Community Impact, https://www.siliconvalleycf.org/2015grantees (last visited Nov. 12, 2020). Zuckerberg has donated substantial funds to SVCF: $500 million in 2012, $1 billion in 2013, and $214 million in 2018, all in Facebook stock. *Facebook Founder Announces $500 Million to Silicon Valley Community Foundation*, PND (Dec. 20, 2012), https://philanthropynewsdigest.org/news/facebook-founder-announces-500-million-to-silicon-valley-community-foundation; Brandon Baily, *Facebook's Mark Zuckerberg makes $1 billion donation*, THE MERCURY NEWS (Dec. 19, 2013), https://www.mercurynews.com/2013/12/19/facebooks-mark-zuckerberg-makes-1-billion-donation/; Kathleen Chaykowski, *Zuckerberg Donates $200 Million To Silicon Valley Community Foundation As It Hires New CEO*, FORBES (Nov. 10, 2018), https://www.forbes.com/sites/kathleenchaykowski/2018/11/10/zuckerberg-donates-214-million-to-silicon-valley-community-foundation-as-it-hires-new-ceo/?sh=1897d9b4550d.

95.    More recently, both Facebook and CZI donated to SVCF (particularly to its Coronavirus Response). *Coronavirus Response Donors*, SILICON VALLEY COMMUNITY FOUNDATION, SVCF Coronavirus Response, https://www.siliconvalleycf.org/coronavirus-response-donors (last visited Nov. 12, 2020). Recently, 25% of SVCF's grants has fallen into the "health" category. *Fundraising In A Pandemic: Where To Pivot And Persist*, CCS FUNDRAISING, https://sftp.polsinelli.com/webinar/Fundraising-Webinar-6.10.20.pdf. Despite its name, which suggests local Silicon Valley focus, SVCF is a leading international granting foundation and makes grants worldwide. For example, in 2019 SVCF granted $200,000 to the

1   Walter and Eliza Hall Institute of Medical Research in Australia, which, among other things,

2   works in vaccine development. *Vaccine development*, WEHI (The Walter and Eliza Hall

3   Institute of Medical Research), https://www.wehi.edu.au/research/research-

4   technologies/vaccine-development (last visited Nov. 12, 2020); *Grants: Where the Giving*

5   *Goes*, SILICON VALLEY COMMUNITY FOUNDATION, Community Impact,

6   https://www.siliconvalleycf.org/grantees. Grantees in the United States include Children's

7   Hospital of Philadelphia, PATH, and the Chan Zuckerberg BioHub, Inc. for which the

8   following 2019 transactions were noted:

| Chan Zuckerberg Biohub, Inc. | CA | Health | Donor Advised | 2019 | 2,498,721 |
| Chan Zuckerberg Biohub, Inc. | CA | Health | Donor Advised | 2019 | -55,000,000 |

12      96.

13      97.    The Chan Zuckerberg Initiative also makes grants through entities including the

14   Chan Zuckerberg Initiative Donor-Advised Fund (DAF) at the SVCF. *Grants*, CHAN

15   ZUCKERBERG INITIATIVE, https://chanzuckerberg.com/grants-ventures/grants/ (last visited Nov.

16   12, 2020).

17      98.    Poynter founded the International Fact-Checking Network ("IFCN") in 2015.

18   IFCN is a unit of Poynter. Its purpose is to bring together "fact-checkers" on an international

19   level and, in Poynter's own words, to "help[ ] surface common positions among the world's

20   fact-checkers." *The International Fact-Checking Network*, POYNTER.ORG,

21   https://www.poynter.org/ifcn/ (last visited Nov. 12, 2020). Poynter lists among its major

22   funders the National Endowment for Democracy, which "receives an annual appropriation

23   from the U.S. Congress through the Department of State." This appropriation accounts for a

24   substantial portion of NED's funding, and NED is dependent upon this funding. *Frequently*

25   *Asked Questions*, NED.ORG, https://www.ned.org/about/faqs/ (last visited Nov. 19, 2020). The

26   U.S. Department of State is also a direct funder of IFCN, contributing, in combination with the

27   NED, 10% of IFCN's budget in 2019. See *International Fact-Checking Network Transparency*

28   *Statement*, POYNTER.ORG, https://www.poynter.org/international-fact-checking-network-

transparency-statement/, esp. the linked *Breakdown of the IFCN's Annual Budgets Starting from 2017* at

https://docs.google.com/spreadsheets/d/1dsBMOnG8Oh3W6JUv2maneoatnLfDXYeVhp9x60 zXiu4/edit#gid=0 (last visited Nov. 19, 2020). Notably, Rep. Schiff serves on NED's permanent advisory board. NED's appropriation of funds to Poynter/IFCN is consistent with Rep. Schiff's "vaccine misinformation" campaign.

99.    On November 4, 2016, President Obama issued Executive Order 13747. Section 1 of that Order declares that it is the policy of the United States to advance the Global Health Security Agenda ("GHSA"), described in the Order as a "multifaceted, multi-country initiative." Executive Order 13747 of November 4, 2016, *Advancing the Global Health Security Agenda To Achieve a world Safe and Secure From Infectious Disease Threats*, Presidential Documents, FEDERAL REGISTER, Vol. 81, No. 217, https://www.govinfo.gov/content/pkg/FR-2016-11-09/pdf/2016-27171.pdf; *A partnership against global health threats*, GLOBAL HEALTH SECURITY AGENDA, https://ghsagenda.org/. Under Sections 2(c)(i) and 3(a)(i), the State Department is one of the government departments directed to make implementation of the GHSA a "high priority." Section 3(b) delegates principal responsibility to the Secretary of State for implementing the GSHA. Section 3(b)(vii) specifically directs the Secretary of State to "coordinate, in conjunction with other relevant agencies, the United States Government relationship with foreign and domestic GHSA nongovernmental stakeholders, *including the private sector*, nongovernmental organizations, and foundations, and develop, with consensus from the Council, an annual GHSA nongovernmental outreach strategy." *Id.* (emphasis added).

100.    Consistent with the high priority it gives to "bio-security" in U.S. foreign policy, the GHSA seeks to build alliances between government and the private sector, *inter alia*, to improve immunization rates, strengthen real-time bio-surveillance, and establish a global health security workforce. In short, Executive Order 13747 authorized the State Department to recruit private corporations -- including social media platforms and their enablers, such as

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

Facebook and Poynter/Science Feedback -- to suppress speech such as Plaintiff's solely because it is critical of GHSA's agenda, or the risks that agenda poses to public health.

101.    The WHO's January 2019 announcement declaring "vaccine hesitancy" to be a major threat to global health was a byproduct of the State Department's GHSA "bio-security" agenda. Within 12 months, over 120 nations around the world passed laws mandating forced vaccination and launched massive censorship drives.  Rep. Schiff's March 2019 public letter to Facebook, *see supra*, was made as Chair of the Senate Intelligence Committee, and in furtherance of the public-private "partnership" at the core of the GHSA. The State Department made its donations (including through NED) to Poynter and its IFCN to induce "fact-checker" censorship of criticism by Plaintiff, among others, of government policies respecting the GHSA and its goals of mandatory universal immunization. Thus, at least one of the defendants (Poynter) receives direct government funding as part of the complex web of public/private relationships evidently at work here.

102.    On November 9, 2020, the U.K. newspaper *The Times* reported that the British Government - *acting in conjunction with the U.S. Government* - has recently undertaken "cyber-warfare operations" to take down or disrupt the online content of websites which publish purportedly foreign state-sponsored COVID-19 "anti-vaccine propaganda." Lucy Fisher & Chris Smyth, *GCHQ in cyberwar on anti-vaccine propaganda*, THE TIMES (Nov. 9, 2020), https://www.thetimes.co.uk/article/gchq-in-cyberwar-on-anti-vaccine-propaganda-mcjgjhmb2. On November 30, 2020, the U.K. newspaper *The Daily Mail* quoted a Cabinet Office spokesman as saying, "As we edge closer to a [COVID-19] vaccine we continue to work closely with social media companies and other organizations to anticipate and mitigate *any* emerging anti-vax narratives and promote authoritative sources of information." Emer Scully, *British Army's Information Warfare Unit will be deployed to tackle anti-vaccine propaganda ahead of jab rollout*, DAILY MAIL (Nov. 28, 2020), https://www.dailymail.co.uk/news/article-8997437/British-Armys-information-warfare-unit-deployed-tackle-anti-vaccine-propaganda.html (emphasis added). Thus, it appears that the U.K.-U.S. Government censorship campaign is *not* limited to websites promoting "state-

1  sponsored propaganda," but instead targets _any_ content — even from a legitimate 501(c)(3)

2  entity such as Plaintiff — which raises well-founded concerns about the safety or efficacy of

3  experimental COVID-19 vaccines, or the lack of unbiased regulatory or pharmaceutical

4  company oversight.

5      103.    It also appears that the U.S. government, through its Federal Bureau of

6  Investigation ("FBI") public-private partnership, actively encourages Facebook's participation

7  in that censorship campaign. In 1996, the FBI's Office of Private Sector formed "InfraGard" to

8  serve as a "partnership between the FBI and members of the private sector for the protection of

9  U.S. Critical Infrastructure. Through seamless collaboration, InfraGard connects owners and

10  operators within critical infrastructure to the FBI, to provide education, information sharing,

11  networking, and workshops on emerging technologies and threats." _Overview_, INFRAGARD

12  NATIONAL, https://www.infragardnational.org/about-us/overview/. Facebook is a member of

13  InfraGard. Notably, a June 2019 _InfraGard Journal_ white paper asserts that the American anti-

14  vaccine movement is being orchestrated by Russian government-aligned organizations seeking

15  to "sow discontent and distrust in topics and initiatives that serve U.S. interests," and that

16  "[t]he biggest threat in controlling an outbreak comes from those who categorically reject

17  vaccination." _The Anti-Vaxxers Movement and National Security_, THE INFRAGARD JOURNAL,

18  Volume 2, Issue 1 (June 2019), https://www.infragardnational.org/wp-

19  content/uploads/2019/07/InfraGard_June_2019_Article3.pdf. The InfraGard Journal authors

20  conclude that "[w]e also need social media companies to continue to refine the algorithms that

21  power their services to better distinguish quality information from deceptions or otherwise

22  misleading information." (_Id._)

23      104.    Plaintiff requires process to discover in greater detail the precise means by which

24  the U.S. Government – including, inter alia, through its GHSA funding of Poynter/IFCN, its

25  Infragard FBI/private "partnership," and/or its U.K. "cyberwar" collaboration - implements,

26  requires, or actively encourages Facebook's censorship at issue, particularly in light of the high

27  priority that the U.S. Government, through the above named and other programs, assigns to the

28  task of shaping the public debate on vaccine safety issues. _See, e.g._, _Agency for Int'l Dev. v._

1   *Alliance for Open Soc'y Int'l, Inc.,* 570 U.S. 205 (2013) (government requirement that non-

2   governmental recipients of anti-HIV/AIDS funding explicitly agree with government policy to

3   oppose prostitution violates the First Amendment). On information and belief, Zuckerberg

4   himself is under direct and severe pressure from the above named or other U.S. government

5   actors to censor any criticism of government "bio-security" policies on his social media

6   platform. In addition to these allegations, Plaintiff requires process to prove the non-obvious

7   role of the U.S. government in defendants' specific conduct at issue – precisely *because* its role

8   is concealed from public scrutiny.

9       105.    All Facebook "fact-checking" partners must be "certified" through IFCN.

10  *Partnering with Third-Party Fact-Checkers*, FACEBOOK, Journalism Project (Mar. 23, 2020),

11  https://www.facebook.com/journalismproject/programs/third-party-fact-checking/selecting-

12  partners.

13      106.    IFCN's own website features its relationship with Facebook:



22      107.

23  *The code and the platforms*, POYNTER.ORG, https://ifcncodeofprinciples.poynter.org/know-

24  more/the-code-and-the-platforms (last visited Nov. 12, 2020).

25      108.    The IFCN certification of Poynter's own branded unit "PolitiFact" expired on

26  June 20, 2020. Further, as shown by IFCN's website, PolitiFact scored low in a number of

27  categories assessed in the certification process, including transparency of sources,

28  nonpartisanship and fairness, and transparency of methodology. *PolitiFact*, POYNTER.ORG,

IFCN Code of Principles, https://ifcncodeofprinciples.poynter.org/profile/politifact (last visited Nov. 12, 2020).

109.    Defendant Science Feedback also is certified by and a signatory to Poynter's IFCN. *Science Feedback*, POYNTER.ORG, IFCN Code of Principles, https://ifcncodeofprinciples.poynter.org/profile/science-feedback (last visited Nov. 12, 2020). Though a French entity, Science Feedback delivers its work-product to Facebook's offices and committed other acts in furtherance of the defendants' fraudulent scheme in this District.

110.    Science Feedback describes itself as "the only organization dedicated to verifying information in scientific fields by empowering the scientific community to take an active part in this endeavour to make the Internet a more credible place." *Science Feedback partnering with Facebook in fight against misinformation*, SCIENCE FEEDBACK (May 14, 2019), https://sciencefeedback.co/science-feedback-partnering-with-facebook-in-fight-against-misinformation/ (last visited Nov. 12, 2020).

111.    Science Feedback has partnered with Facebook since at least April 2019 to fact check Facebook content. *Id.*, *Science Feedback partnering with Facebook in fight against misinformation, supra*, SCIENCE FEEDBACK, https://sciencefeedback.co/science-feedback-partnering-with-facebook-in-fight-against-misinformation/.

112.    Health Feedback contributors include numerous pro-vaccine scientists and vaccine patent holders, including Ian Frazer, Neal Halsey, Walter A. Orenstein, and Beate Kampmann, among others. *Reviewers*, HEALTH FEEDBACK, Community, https://healthfeedback.org/community/ (last accessed Nov. 12, 2020). This list of contributors demonstrates that Science Feedback's and Health Feedback's "commitment to objectivity" is a veneer.

113.    Science Feedback is the parent company of Health Feedback, which is a member of WHO's Vaccine Safety Net. *About*, SCIENCE FEEDBACK, https://sciencefeedback.co/about/ (last visited Nov. 12, 2020); *Health Feedback*, VACCINE SAFETY NET (updated Jan. 31, 2020), https://www.vaccinesafetynet.org/vsn/network/health-feedback (last visited Nov. 12, 2020). Vaccine Safety Net vigorously opposes challenges raised by vaccine safety advocates and

1 others. *About Vaccine Safety Net*, VACCINE SAFETY NET,

2 https://www.vaccinesafetynet.org/vsn/vaccine-safety-net (last visited Nov. 12, 2020).

3    114.    The WHO's Vaccine Safety Net membership includes the American Academy of

4 Pediatrics, the CDC, GAVI, Global Advisory Committee on Vaccine Safety ("GACVS"),

5 PATH's Vaccine Resource Library, Vaccinate Your Family, the Vaccine Education Center at

6 the Children's Hospital of Philadelphia, the Immunization Action Coalition, the Sabin Vaccine

7 Institute, and the Vaccine Knowledge Project. *VSN Members*, VACCINE SAFETY NET,

8 https://www.vaccinesafetynet.org/vsn/network (last visited Nov. 12, 2020).

9          **b.    Specific Facebook "Fact-Checks" Containing Material Falsity.**

10    115.    On or about June 9, 2019 and thereafter, Facebook electronically blocked CHD

11 from displaying on CHD's Facebook page a videotape interview of RFK, Jr. discussing a

12 pending lawsuit against Merck & Co. In so doing, Facebook fraudulently misrepresented to all

13 third-party users of CHD's Facebook page that the videotape was "False Information Checked

14 by independent fact-checkers."



28    116.

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI



117.

118.

119.    Facebook's warning label on RFK's May 15, 2019 videotape critical of Merck, Inc. was materially deceptive, in that the videotape is accurate with respect to its assertions of fact and is otherwise an expression of RFK, Jr.'s opinions, and not "False Information" as Facebook claims. Facebook's warning label also omits material facts by failing to disclose its advertising-client relationship with Merck, Inc. *See* T. Staton, *The top 10 pharma companies in social media*, FIERCEPHARMA, https://www.fiercepharma.com/special-report/top-10-pharma-companies-social-media-0 (last visited Aug. 14, 2020). Merck, Inc. is one of the top 10 social media spenders among pharmaceutical companies and heavily leverages Facebook as an advertising platform.

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

120.    Science Feedback's "fact-check" is deliberately false and misleading, and tries to silence an important discussion about the influence of pharmaceutical companies on vaccine trial data and outcomes. Science Feedback does not address the crux of the piece – RFK, Jr.'s criticism about fraud at Merck, and how trial data was manipulated. Merck has a well-documented history of fraudulent behavior. It intentionally withheld scientific data about Vioxx's adverse cardiovascular side effects resulting in settlements and fines above $4.8 billion for causing at least 60,000 deaths from sudden heart attacks and over 120,000 serious medical injuries. Defendants were aware, or acted in reckless disregard of, these and other specific falsities in the Science Feedback opposition "fact-check," but posted it nonetheless on CHD's page, in furtherance of their fraudulent scheme.

121.    In citing studies that the HPV vaccine has been proven safe and effective, Science Feedback deliberately omits studies that have had a different outcome, and attempts to deflect scrutiny of the pharmaceutical companies, and their manipulation of study outcomes. Richard Horton, the Editor in Chief of the esteemed medical journal "Lancet" was recently quoted as saying the influence wielded by big Pharma to influence publications is "criminal."

122.    On or about May 1, 2019 and thereafter, Facebook electronically blocked CHD from displaying photographs of children receiving vaccines with needles on CHD's Facebook page, and fraudulently misrepresented to CHD that the photographs were "violent," and purported to have deleted them on that basis. Facebook's stated reason was a pretext for its actual motive: to inflict damage on CHD.

123.    On about May 1, 2019 and thereafter, Facebook posted the text of Wikipedia's entry about CHD on CHD's Facebook page and refused to take it down, despite CHD's objection that the Wikipedia entry is false and misleading. The Wikipedia entry states, *inter alia*, that "[m]uch of the material put forth by the Organization involves manipulation of information and anti-vaccine propaganda. [. . .] The group has been contributing to vaccine hesitancy in the United States[.]" Defendants were aware, or acted in reckless disregard of, these and other specific falsities in the Science Feedback opposition "fact-check," but posted it on CHD's page nonetheless, in furtherance of their fraudulent scheme.

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

124.    Wikipedia's reliability has been questioned by organizations such as the Hoover Institute, Encyclopedia Britannica and MIT. In *Wikipedia: The Dumbing Down of World Knowledge* (2010), journalist Edwin Black characterized the content of articles as a mixture of "truth, half-truth, and some falsehoods." Edwin Black, *Wikipedia—The Dumbing Down of World Knowledge*, History News Network (April 19, 2010). Archived from the original on September 9, 2016.) In *Wisdom? More like Dumbness of the Crowds* (2007), Oliver Kamm wrote that articles usually are dominated by the loudest and most persistent editorial voices or by an interest group with an ideological "axe to grind". Oliver Kamm, *Wisdom? More like dumbness of the crowds*, The Times (August 16, 2007). The Wikipedia post smears CHD by asserting that "the organization involves misinformation on vaccines and anti-vaccine propaganda." If Facebook were truly concerned with reliable information, it would not use Wikipedia as a weapon against CHD on CHD's own page.

125.    On or about May 26, 2020 and thereafter, Facebook and its Lead Stories "fact-checker" blocked CHD from displaying a 45-minute Instagram videochat with RFK, Jr. in which he accurately detailed Dr. Anthony Fauci's past involvement with vaccine manufacturers, and Facebook fraudulently misrepresented to all third-party users that the interview was "Partly False Information Reviewed by independent fact-checkers." Instagram is a Facebook-subsidiary photo and video-sharing social networking service.



126.

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

1

2

3

4

5

6

7

8

9

10

**Independent Fact-Checkers
Say This Is Partly False**

The information in this post is a
mix of true and false claims or it
could be misleading or incomplete.

 **Fact-Checker:** Lead Stories
**Conclusion:** Partly False
**More Information:** Partly False:
There is a reporting lag on
death-certificate based
statistics compared to direct
reports from states etc.

You can **send them an email** if
you think there was a mistake.

**Learn more** about how Instagram is working
with independent fact-checkers to reduce
false information.

127.

128.   Upon clicking the "See Why" button, this materially-misleading explanation appears: "Independent Fact-Checkers Say This Is Partly False. The information in this post is a mix of true and false claims or it could be misleading or incomplete." This "partly false" designation appears to concede that the information is at least partly true, while the warning taints the entirety of the material – a highly unfair, overbroad and prejudicial approach. In actuality, RFK Jr.'s interview consisted of completely factual representations and statements of opinion derived from disclosed facts. Defendants were aware, or acted in reckless disregard of, these and other specific falsities in the Lead Stories opposition "fact-check," but posted it on CHD's page nonetheless, in furtherance of their fraudulent scheme.

129.   On or about May 28, 2020 and thereafter, Facebook blocked CHD from displaying an article by Dr. Brian Hooker and Neil Miller concerning health outcomes in a small-sample study of vaccinated and unvaccinated children and fraudulently misrepresented to all third-party users that the article was "False Information Checked by Independent fact-checkers."

130.   Instead of sharing a normal preview, Facebook marks the content specifically with an overlay grey graphic and prominent warning: "False Information Checked by Independent fact-checkers." This has the intended effect of reducing both click-throughs to the underlying content and shares. The net effect is to drastically reduce by 95% the traffic to

1    Children's Health Defense website. *Entire CNN April 16 Coronavirus Town Hall* [Video],

2    *supra*, https://www.cnn.com/videos/business/2020/04/17/entire-april-16-coronavirus-town-

3    hall-part-5-sot-vpx.cnn.



15    131.

16    132.    Upon clicking the "See Why" button in the above screenshot, the user is shown

17    the following scroll which gives the notice, "The primary claims in the information are

18    factually inaccurate."

28    133.

134.    Clicking the Science Feedback preview graphic takes the user to Facebook's purportedly "independent," i.e., objectively-neutral, Science Feedback "fact-check" opposition:



135.

136.    However, this purportedly neutral Science Feedback "fact-check" is itself a misrepresentation of material fact. Dr. Hooker, the author of the original study, disclosed in that study the small size of his study sample, the statistical methods he employed on that small sample, and the results he obtained, all of which is fully consistent with the scientific method. Any reasonable reader of the study would be fully empowered to interpret for himself or herself whether those statistical results have broader applicability, particularly in light of the author's conclusion that broader studies are warranted. Instead, Facebook holds out its "fact-checker's" opinion critical of the study methodology as conclusive "fact." Facebook's classification of the original study as factually "false" is deceptive and materially misleading.

137.    Looking beyond the veneer of the "fact-checker" label, one sees a patent effort to deceive rather than to educate the reader. Science feedback's primary criticism of the Hooker and Miller 2020 study was the use of a convenience sample which refers to a cohort of 2,047 children, whose data the authors studied from three separate pediatric practices in the United States. However, convenience samples are used routinely in epidemiology, and also form the basis for the FDA's approval of drugs and biologics.

138.    For example, Science Feedback relies upon as its source, Dr. David Gorski, a blogger who states, "Basically, no matter how you analyze a convenience sample, you can't generalize it to the larger population." This is false and misleading. The CDC's own studies, some of which are cited in the "fact-checking" article, are almost exclusively based on convenience samples. The study presented by Destefano et al. in the 2004 journal *Pediatrics* on the timing of the MMR vaccine and autism was completed using a convenience sample of approximately 2,400 children in public school districts in Metropolitan Atlanta. This was not a representative sample of the U.S. population as the percentage of African American children in the study was 35.4% compared to that of the U.S. at the time at 16%. Yet, this sole study is the CDC's basis for denying a causal link between the MMR vaccine and autism in the U.S. Defendants were aware, or acted in reckless disregard of, these and other specific falsities in the Science Feedback opposition "fact-check," but posted it on CHD's page nonetheless, in furtherance of their fraudulent scheme.

139.    On June 2, 2020 and thereafter, Facebook and Science Feedback, its purportedly "independent fact-checker," blocked CHD from displaying Dr. Elizabeth Mumper's personal account of her medical practice experience evaluating children and families over many decades, and fraudulently misrepresented to all third-party users that the post was "False Information Checked by independent fact-checkers."

140.    Instead of sharing a normal preview, Facebook marks the content specifically with an overlay grey graphic and a prominent warning "False Information Checked by independent fact checkers." As discussed, *supra*, this has the intended effect of drastically

reducing (by 95%) both click-throughs to the underlying content and shares. Facebook deploys this deceptive tactic in order to greatly reduce user traffic to CHD's Facebook page or website.



141.

142.    Upon clicking the "See Why" button in the above screenshot, the user is shown the following scroll with the notice, "The primary claims in the information are factually inaccurate." But, the only citation for this notice is Dr. Brian Hooker's small scale study referenced *supra*. Dr. Hooker's study is cited by the article, but it is neither its "primary" claim nor, in any event, is it false.

143.

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

144.    Clicking the Science Feedback preview graphic takes the user to a purported "fact-check" and oppositional article to Dr. Hooker's study, not Dr. Mumper's study, which it labels "false."



145.

146.    Rather, Dr. Mumper's article, *Mothers of Vaccine Injured Children: Modern Day Cassandras*, details its author's medical practice history evaluating children and families and the systematic denial of the existence of vaccine injury by the public health system. The article contains links to peer reviewed, published research, and makes clear that it is Dr. Mumper's small-scale analysis and opinion, and that the interpretive value of her fact-based opinions should be viewed accordingly, that is, as an anecdotal but nonetheless significant marker of disparities in health outcomes. That fully-disclosed caveat does not make Dr. Mumper's article any less relevant as a contribution to the scientific literature. Critically, Dr. Mumper's article is not factually inaccurate or misleading in any way, nor does Facebook or Science Feedback identify any actual inaccuracies.

147.    Dr. Mumper is a board-certified pediatrician with 40 years of experience as a clinical practitioner and pediatric faculty member. She served as Medical Director of the Autism Research Institute for five years and has lectured about medical problems of children

with chronic disease in 20 countries. The clinical opinion Dr. Mumper expressed in her June 2, 2020 article was the product of her extensive clinical research and practice, and her conscientious reading of the medical literature. She has personally asked the CDC, National Institute of Health, and the American Academy of Pediatrics to conduct well-controlled studies comparing vaccinated children to unvaccinated children. In the meantime, and in the absence of any such more definitive work, Dr. Mumper's small-scale comparative study and her opinions, within their expressed limits, have interpretive value and validity, and play a necessary and critical role in informing her fellow practitioners, patients, and the general public.

148.    In short, Facebook has misrepresented as fact to all third-party users that Dr. Mumper's article is "false," and that its "primary claims are factually inaccurate," when that is not the truth. Facebook has also misrepresented as fact to all third-party users that Facebook relied upon an "independent fact-checker," when the criteria that Science Feedback has actually applied is neither neutral, reliable, nor up-to-date, nor for that matter is Science Feedback "independent" of its contractual payor, Facebook.

149.    The CHD content in question illuminates the plausibility of risk in current public health policy, and this information allows third-party users to determine if additional investigation or mitigation is needed on their part. Facebook's deliberate conflation of open scientific controversy with "vaccine hoax" is a misrepresentation of fact. In short, closing down legitimate debate of matters in open controversy is not a public benefaction, but an abuse of power and something that is completely contrary to science. Defendants were aware, or acted in reckless disregard, of these and other specific falsities in the Science Feedback opposition "fact-check," but posted it on CHD's page nonetheless, in furtherance of their fraudulent scheme.



JUNE 02, 2020

## Mothers of Vaccine–Injured Children: Modern Day Cassandras



🖶 Print

**By Elizabeth Mumper, M.D., FAAP, The Rimland Center**

Some days I feel like Cassandra, the Greek woman who could see the future, but not articulate it in a way that gave her credibility. In the tragedy *Agamemnon*, Apollo promised Cassandra the gift of prophecy if she would be his lover. She accepted the gift, then rebuffed Apollo when he desired sexual favors. Apollo got revenge by ordaining her predictions would be rejected. She predicted the Trojan horse battle and Agamemnon's bloody death, but no one believed her.

Parents of children with complex chronic illness must also feel like Cassandras.  Hundreds of times I have taken detailed histories from parents in which seemingly healthy children deteriorated or regressed within 24-48 hours of a vaccine, often ending up in the Emergency Department, only to be told that it was a "coincidence" and that the vaccine could not be the

150.

151.    On or about April 16, 2020 and thereafter, Facebook and Poynter/PolitiFact, its purportedly "independent fact-checker," blocked CHD from displaying an article concerning a study in the journal *Collective-Evolution.com* which found a "significantly" greater risk of contracting coronavirus among individuals in the study who received the influenza vaccine, and Facebook and Poynter fraudulently misrepresented to all third-party users that the post was "False Information Checked by independent fact-checkers." Indeed, the very name "PolitiFact" suggests that the putative "fact-checking" here is more political than scientific.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



20    152.

21    153.    Upon clicking-through the "See Why" button, the user is presented with the

22  following purported "fact-check" by PolitiFact, which is a fictitious name registered by

23  Poynter.

24
25
26
27
28

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18





154.

155.    The Poynter/PolitiFact "fact-check" misrepresents and fails to rebut two important aspects of the study: (1) coronaviruses existed in 2017-2018 in forms other than COVID-19; and (2) the study's conclusion that "vaccine derived virus interference was significantly associated with coronavirus and human metapneumovirus." Receiving the influenza vaccination may increase the risk of other respiratory viruses, a phenomenon known as viral interference. Defendants were aware, or acted in reckless disregard, of these and other specific falsities in the Poynter/PolitiFact opposition "fact-check," but posted it on CHD's page nonetheless, in furtherance of their fraudulent scheme.

156.    On or about June 18, 2020 and thereafter, Facebook blocked CHD from displaying an article concerning a sharp decline in infant death rates during the pandemic,

matching a sharp decline in "well-baby visits" when vaccines are typically given. Facebook and Science Feedback, its purportedly "independent fact-checker," fraudulently misrepresented to all third-party users that the post was "Partly False Information Checked by independent fact-checkers."



157.

158.    Upon clicking-through the "See Why" button, the user is presented with a purportedly factual opposition article by Science Feedback.



159.

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI



160.

161.    Science Feedback's assertion that vaccines bear no "association" with sudden infant death is itself a misrepresentation of fact, as it contradicts, *inter alia*, the potential adverse effect advisements formerly on many vaccine product inserts, customarily administered to infants according to the CDC's 72-dose recommended vaccine schedule. In 2017, the U.S. Court of Federal Claims Special Master ruled there was "preponderant evidence" that vaccines caused or substantially contributed to a 2011 SIDS death. The Special Master also determined that that fatality could not be attributed to non-vaccine related factors. *Boatmon v. Sec'y of Health & Human Servs.*, No. 13-611V, 2017 WL 3432329 (Fed. Cl. Spec. Mstr. July 10, 2017). The U.S. Court of Federal Claims (over one dissent) reversed because the theory was at best "medically plausible," and did not meet petitioner's burden of proof.

Opinion in *Boatmon v. Secretary of Health & Human Services*, No. 18-2333, JUSTIA, U.S. Law (Fed. Cir. 2019), https://law.justia.com/cases/federal/appellate-courts/cafc/18-2333/18-2333-2019-11-07.html. Nonetheless, CHD's article advances a potential explanation (expressly stated as such) for a decrease in sudden infant deaths during the pandemic, as to which the public has a right to be informed. There is nothing "false" about CHD's speculative inquiry into matters of causation in an open scientific controversy. Defendants were aware, or acted in reckless disregard, of these and other specific falsities in the Science Feedback opposition "fact-check," but posted it on CHD's page, in furtherance of their fraudulent scheme, nonetheless.

162.   On March 4, 2020 CHD posted a link to an article by Dr. Brownstein in Newsmax which examined some of the serious health issues that have surfaced with respect to the HPV vaccines. Facebook darkened the post overlaying the text "False Information Checked by Independent Fact Checkers" with a See Why button. The See Why button led to a screen where Science Feedback asserted the information was false and provided a link to a page for its "fact-checked" article which states that the HPV vaccine has an "excellent safety record."

163.   Dr. Brownstein writes that since the HPV vaccine's first approval, there have been reports linking Gardasil (the trade name for the HPV vaccine) to autoimmune illnesses. In order to see if there was an association, scientists used an epidemiological assessment of the vaccine adverse event reporting system database (VAERS) looking for adverse events with Gardasil from 2006 to 2014, and found several increases in auto-immune adverse events. Among several things, the scientists "found a 4.6-fold increase risk of serious autoimmune adverse events outcomes of gastroenteritis, a 7.6- fold increase lupus, 5.6-fold increase in rheumatoid arthritis." The authors of the study concluded, "Confirmatory epidemiological studies in other databases should be undertaken and long-term clinical consequences of HPV-linked [serious autoimmune events] should be examined."

164.   Science Feedback does not address two facts which undermine its opinion: (1) auto-immune medical conditions are found in the HPV vaccine warning insert itself (*see Gardasil, Highlights of Prescribing Information*, FDA,

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* **et al.; Case No. 3:20-cv-05787-SI**

1  https://www.fda.gov/files/vaccines,%20blood%20&%20biologics/published/Package-Insert---

2  Gardasil.pdf) and (2) the study cited by Dr. Brownstein found that there were <u>increased</u>

3  autoimmune adverse event findings in data from VAERS which warranted further study.

4  Instead, Science Feedback labels CHD's post "false fact" based on its own bare bones <u>opinion</u>

5  that no "association"  (a term which Science Feedback doesn't define) between the HPV

6  vaccine and any of the medical conditions mentioned in this claim has been found.

7      165.    Defendants were aware, or acted in reckless disregard, of these and other specific

8  falsities in the Science Feedback opposition "fact-check," but posted it on CHD's page

9  nonetheless, in furtherance of their fraudulent scheme.

10      166.



25      167.

26      168.    On April 9, 2020, CHD posted an RFK, Jr. editorial entitled *Gates's Globalist*

27  *Vaccine Agenda, a Win-Win for Pharma and Mandatory Vaccination*, which expressed RFK,

28  Jr.'s criticisms of Bill Gates' involvement with vaccine development and deployment in the

1  third world. Facebook superimposed a fact-check claiming "False Information" with a link to

2  *Correctiv*, a German fact checking website with a fact-check written in German. On June 13,

3  2020, CHD attempted to post the editorial again. It received a link to the same German

4  language "fact-check" with a warning that "pages and websites that repeatedly publish false

5  news will see their overall distribution reduced and restricted in other ways." Out of concern

6  that their Facebook page would be taken down entirely, CHD did not attempt to repost the

7  article.

8       169.    Fact-checking an English language editorial post with a German language post as

9  the basis for threatening punitive actions is arbitrary and capricious. In doing so, Facebook

10  showed that its interest lies in labeling CHD opinion articles as "false fact," and censoring

11  CHD on that false basis. Defendants were aware, or acted in reckless disregard, of these and

12  other specific falsities in the *Correctiv* German language opposition "fact-check," but posted it

13  on CHD's page nonetheless, in furtherance of their fraudulent scheme.

14       170.



28       171.

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



172.

16    173.    On September 28th, 2020, CHD attempted to post a link to an article about breastfeeding and coronavirus, adding the header: *New research suggests there may be yet another health benefit associated with breastfeeding.* Facebook blocked this post and stated that the article went against Community Standards. They wrote, "We have these standards because misinformation that could cause physical harm can make some people feel unsafe on Facebook."

174.    At no point did Facebook identify any misinformation in the article or indicate what harm it threatened to cause. The article discussed research in Beijing on the effect of human breast milk on cells exposed to the Sars-CoV-2 virus in which most living virus strains were killed by the milk. That this article could actually contravene any genuine set of "Community Standards" is difficult to fathom considering that the WHO official stance is that mothers should continue to breastfeed even if they have Covid-19.  Given the historical suppression of the health benefits of breastfeeding influenced by financially interested parties

1   such as the infant formula industry, this censorship is particularly outrageous. Out of concern

2   that their Facebook page would be taken down entirely, CHD did not attempt to repost the

3   article. Defendants were aware, or acted in reckless disregard, of these and other specific

4   falsities in their "Community Standards" notice, but posted it on CHD's page nonetheless, in

5   furtherance of their fraudulent scheme.



17      175.

18      176.    On March 3, 2020, CHD posted a link to an article from *The Epoch Times*

19   webpage regarding the results of a federal lawsuit by ICAN. *Stipulated Order Proving CDC*

20   *Has No Studies To Support Claim That Vaccines Given in First 6 Months of Life Do Not Cause*

21   *Autism*, ICAN (Mar. 5, 2020), https://www.icandecide.org/ican_lawsuits/stipulated-order-

22   proving-cdc-has-no-studies-to-support-claim-that-vaccines-given-in-first-6-months-of-life-do-

23   not-cause-autism/.)

24      177.    The lawsuit requested that the CDC produce all studies for several specific

25   vaccines on the CDC-schedule which prove that such vaccines do <u>not</u> cause autism. CDC

26   produced 20 studies, but only <u>one</u> of them pertained to the vaccines for which ICAN requested

27   information, and does not even support that conclusion.

28

178.    This discovery was a watershed moment. Yet Science Feedback's "fact-check" misrepresents the facts by repeating the trope that "numerous studies show that vaccines don't cause autism" — even though this statement clearly cannot reasonably be considered valid in light of the CDC's production in the ICAN lawsuit. Indeed, at a minimum, the phrase, "vaccines don't cause autism," cannot include all vaccines in the CDC's 72-childhood vaccine dose schedule (16 separate vaccines), as there are simply <u>no</u> studies to address, much less verify, that claim for the entire schedule. Science Feedback's "fact-check" is deceptive and misleading. Defendants were aware, or acted in reckless disregard of, these and other specific falsities in the Science Feedback opposition "fact-check," but posted it on CHD's page nonetheless, in furtherance of their fraudulent scheme.



179.

180.    On September 2, 2020, CHD posted an article about University of California campuses requiring online students to get a flu shot and CHD's decision to sue. Facebook darkened the post and superimposed text that stated, "This post mentions COVID-19. For more info and resources, go to the COVID-19 information center," and included a link to the center.

181.    The darkened screen with text overlay creates the impression that the information CHD is posting is not reliable or trustworthy, and intentionally diverts and discourages users from clicking through to read it. Defendants were aware, or acted in reckless disregard of, this specific imputation of falsity in its grey overlay and warning label, but posted it on CHD's page nonetheless, in furtherance of their fraudulent scheme.

182.    In actuality, the CHD article cites several studies that show an increase in respiratory infections associated with the flu vaccine.  Given the recent mandates around the flu vaccine, making this post less accessible goes against public health. The public has a right to know about these studies. That is especially so since a Cochrane Vaccines Field analysis, which evaluated studies measuring the benefits of flu vaccination and was published in the *BMJ*, concluded: "The large gap between policy and what the data tell us (when rigorously assembled and evaluated) is surprising .... Reasons for the current gap between policy and evidence are unclear, but given the huge resources involved, a re-evaluation should be urgently undertaken." Tom Jefferson, *Influenza vaccination: policy versus evidence*, BMJ, v.333, p. 912 (Oct. 28, 2006), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1626345/.)



183.

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

184.     On September 14, 2020, Facebook and Science Feedback labeled CHD's post on CoVID-19 Testing PCR by Bose Ravenel, M.D., F.A.A.P as "False Information Found on Children's Health Defense." The "fact-check" placed over the post leads to an opposition article by Science Feedback that claims that a "misinterpreted New York Times report leads to a false claim that the number of COVID-19 cases in the US is inflated up to 90%." This "fact-check" is deceptive because, while the New York Times article is quoted in Dr. Ravenel's piece, it is merely one of several articles referenced by the author, and is not "misinterpreted" at all. Defendants were aware, or acted in reckless disregard of, these and other specific falsities in the Science Feedback opposition "fact-check," but posted it on CHD's page nonetheless, in furtherance of their fraudulent scheme.



185.

186.     On or about October 10, 2019, CHD posted a link to an editorial by RFK, Jr. about vaccine injuries. The article referenced studies such as the 2010 U.S. Health and Human

Services (HHS) pilot study by the Federal Agency for Health Research Quality (AHRQ) that looked at the prevalence of vaccine injuries reported to VAERS.  R. Lazarus et al., *Grant Final Report: Electronic Support for Public Health – Vaccine Adverse Event Reporting System (ESP:VAERS)*, https://digital.ahrq.gov/sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf.

187.   Science Feedback's false and misleading "fact-check" asserts that the data captured from VAERS does not "prove" vaccines caused any adverse event. Yet, the data that RFK, Jr. references (2.6% of injuries, or 1 in 39) is taken directly from the study. Defendants were aware, or acted in reckless disregard, of these and other specific falsities in the Science Feedback opposition "fact-check," but posted it on CHD's page nonetheless, in furtherance of their fraudulent scheme. Currently, the post is no longer visible on CHD's Facebook page and appears to have been taken down by Facebook.



188.

189.   On April 16, 2020, CHD posted a link to an editorial in the journal *Jewish Voice*, stating that "Nobel Prize Winner Dr. Luc Montagnier has unique insights regarding COVID-19." Facebook labeled the post "False Information." The article reported that Dr. Luc Montagnier's work showed that the "coronavirus genome contained sequences of another virus, … the HIV virus (AIDS virus), but he was forced to withdraw these findings because "the pressure from the mainstream was too great." Science Feedback's "fact-check" is an

attempt to censor a debate on the open question of the origins of COVID-19. Defendants were aware, or acted in reckless disregard, of these and other specific falsities in the Science Feedback opposition "fact-check," but posted it on CHD's page nonetheless, in furtherance of their fraudulent scheme. The post can no longer be found on the CHD Facebook page and appears to have been removed.



190.

191.    On September 3, 2020 and thereafter, CHD posted a link to an article on their website about oral polio vaccines causing polio outbreaks in Africa. Facebook posted a grey overlay with the flag that CHD's post was "fact-checked" by Science Feedback, with a link to a Science Feedback opposition article which characterizes yet another article in the Journal, *21st Century Wire* as "Inaccurate and Lacks Content." Science Feedback's "fact-check" is false and misleading in that it does not specifically address CHD's article. Moreover, Science Feedback's key point — that the oral polio vaccine contains a live but weakened form of the poliovirus which does not cause infection — is patently false. The CHD article cites several cases and studies, and quotes health officials who flatly state the opposite. Defendants were

1   aware, or acted in reckless disregard, of these and other specific falsities in the Science

2   Feedback opposition "fact-check," but posted it on CHD's page, in furtherance of their

3   fraudulent scheme, nonetheless.



09/03/20

## Polio Vaccine Causing Polio Outbreaks in Africa, WHO Admits

*By the Children's Health Defense Team   A year ago, news outlets briefly shone a light on the fact (a fact that makes public health officials squirm) that oral polio vaccines are causing polio outbreaks. With reports streaming in throughout 2019 regarding the circulation of vaccine-derived polioviruses in numerous African and Asian countries, a CDC [...]*

By the Children's Health Defense Team

192.



193.

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

194.   On September, 20, 2020, Facebook labeled an editorial tribute to Ruth Bader Ginsburg ("RBG") as "Missing Context" and added a USA Today "fact-check" notice to the post taking issue with the term, "Medical Freedom." In CHD's editorial post entitled *RIP RBG – Medical Freedom and Environmental Champion*, RFK, Jr. writes that "Justice Ginsburg was a champion for safe vaccines" and lists her opinions and dissents which support his assertion. This application of "fact-checking" to editorial opinion is false and misleading. RFK, Jr.'s opinion is not "missing context" at all. RFK, Jr. also hails RBG as an "Environmental Champion," and lists her written opinions which support why he believes this to be true – i.e., the same sort of evidence of RBG's pedigree as he uses to support his "Medical Freedom Champion" assertion. Defendants were aware, or acted in reckless disregard of, these and other specific falsities in the Science Feedback opposition "fact-check," but posted it on CHD's page nonetheless, in furtherance of their fraudulent scheme.



195.

196.   On or about May 29, 2020, CHD attempted to "boost" (i.e., pay Facebook for wider distribution) of an article entitled *Electromagnetism and Human Health: WiFi and Cell*

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

*Phones*. CHD received a notification from Facebook that the article had reached 5,014 users, and that the boost button was "unavailable." This is the only open instance — although there have been many more surreptitious ones — in which Facebook either constrained, demoted or shadowbanned CHD's 5G content, making it available only to CHD's principals or a highly-limited number of CHD members, while misrepresenting to CHD and to its members that the content is more widely-available, and can be redistributed by them across Facebook's platform. Over the past year or longer, the numbers of likes/shares of CHD's 5G posts have decreased significantly from their numbers before Facebook began its fraudulent scheme. Facebook's fundamental duplicity here is found both in its use of surreptitious methods and in its pretextual reasons for banning or demoting content which threatens its profit interests in global 5G deployment.



197.

### 5.   Disabling CHD's Fundraising and Ads.

198.   On or about May 2, 2019 and thereafter, Facebook permanently deactivated the fundraising function, or "donate" button, on CHD's Facebook page, in disregard of CHD's 501(c)(3) non-profit status. In its termination email to CHD, Facebook's "Charitable Giving

Team" fraudulently misrepresented that it took this action because CHD's page was "in violation of [its] fundraising terms and conditions." *Combatting Vaccine Misinformation*, *supra*, https://about.fb.com/news/2019/03/combatting-vaccine-misinformation/.

199.    Also on or about May 2, 2019 and thereafter, Facebook blocked CHD and RFK, Jr., and subsequently Prizeo, their third-party advertising agency, from purchasing online ads to promote CHD, including most recently ads promoting its Summer 2020 fundraising drive. In its April 20, 2020 electronic notice rejecting the attempted transactions on behalf of CHD and RFK, Jr., Facebook fraudulently misrepresented to Prizeo that it took this action because CHD has "repeatedly posted content that has been disputed by third-party fact-checkers [for] promoting false content."

### 6.    Disabling CHD's Right to "Appeal" These Actions.

200.    On or about May 1, 2019, Facebook permanently disabled the "dispute" function on CHD's account so that neither CHD, RFK, Jr., nor Prizeo could challenge Facebook's actions through direct submission, and Facebook has ignored CHD's written requests over the past eighteen months that both its content and full functionality be restored to CHD's page.

### 7.    Concealment of the Overall Scheme.

201.    On or about May 1, 2019, for pretextual reasons alleged *infra*, Facebook began covertly to demote and/or ban content ("shadow-ban") that CHD posted to its Facebook page, both vaccine- and 5G-related, effectively limiting its visibility and reach, and secondarily reducing ad revenue to CHD. Facebook owns a patent on social media shadowbanning. *See United States Patent No. 10,356,024*, Kanter et al. (Moderating content in an online forum), USPTO Patent Full-Text and Image Database, UNITED STATES PATENT AND TRADEMARK OFFICE (Jul 16, 2019), http://patft.uspto.gov/netacgi/nph-Parser?Sect2=PTO1&Sect2=HITOFF&p=1&u=/netahtml/PTO/search-bool.html&r=1&f=G&l=50&d=PALL&RefSrch=yes&Query=PN/10356024 (last visited Aug. 15, 2020). The patent describes the mechanism by which shadowbanning is accomplished: In one embodiment, the social networking system blocks banned comments by analyzing the text of the comments. For example, if a comment includes a profane word, as provided in a list of

banned words, the social networking system will not display the comment to other users of the social networking system.

202.   Additionally, in one embodiment, Facebook also performs a "sentiment analysis" to identify whether a comment includes sentiment that is banned under Facebook's community standards, e.g., derogatory racial epithets. Finally, Facebook's patent permits it to train a machine learning classifier to block comments based on Facebook content moderators' actions of manually deleting comments or unblocking comments in the online forum. In one embodiment, the blocked comments are not displayed to the wider community of Facebook users. However, the blocked comments are displayed to the commenting user and his or her friends within the social networking system. As such, Facebook's software creates a simulacrum in which the "offending" user — here CHD — is not aware that their comment or content is not displayed to other users of the forum. Since May 2019, Facebook has utilized this deceptive scheme in order to covertly limit or block CHD's content while misrepresenting the visibility and reach of that content to CHD itself, and misrepresenting the totality of CHD's content to all third-party users.

203.   Moreover, a "whistleblower" recently disclosed Facebook internal documents, which reveal the extent of Facebook's sophisticated designs aimed at user behavior modification in order to limit the spread of "undesirable" information. Facebook boasted internally that it has employed these methods based on its psychological research demonstrating their efficacy because nearly all third-party users (95%) will be dissuaded from clicking through to the original content by the very design and trade dress elements of Facebook's warnings. This Facebook design document shows a technical discussion of such mechanisms:



**Seiji Yamamoto - Data Science Manager**

September 28, 2017

## Introducing friction via the Troll Twilight Zone will confuse and demoralize them.

### Tactic 1: Interfere with troll operations

- Troll Twilight Zone GK
    - 1. Find troll accounts and add them to a special GK
    - 2. When triggered, the users behind the Troll GK will experience the following
        - drastically limited bandwidth for a few hours
        - auto-logout every few minutes
        - auto-direct to home timeline every few minutes
        - comments and posts that they spend time crafting will magically fail to upload, then user will be logged out
    - 3. Trigger the "special features" when
        - Raids are detected, e.g. when known troll associates are simultaneously viewing the same content
        - User uploads a comment or post with a match on our bank of known troll munitions (see Appendix)
        - Leading up to important elections (pre-cautionary)
        - Just because it's Nov 4 (pre-cautionary)

204.



**Seiji Yamamoto - Data Science Manager**

September 28, 2017

## When a user does something egregious, warranting an account suspension or deletion, we should notify the friend network...

### Tactic 2: Notify friends when high-confidence account suspensions and deletions take place

- When a user does something egregious, warranting an account suspension or deletion, we should notify the friend network
    - "John Smith's account has been suspended for 7 days because he shared hate speech in the group Kekistani Special Forces"
    - "John Smith's account has been deactivated for community violations"
    - "Four of your direct friend connections were found to be fraudulent accounts so we have deactivated them. Learn more about how to spot fake accounts here."
- Fear of being outed as a miscreant is what regulates behavior in real life and we should re-introduce that to the online world
- Notified users who accidentally befriended the offender might be more mindful of suspicious accounts, increasing overall herd immunity
- Notified users who are also offenders might curtail their own activities
- We don't necessarily need to do many of these to strike fear in the hearts of trolls, so these can be very high touch notifications
- This would provide clear public signaling that FB takes the issue seriously

205.

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* **et al.; Case No. 3:20-cv-05787-SI**

206.    At an April 17, 2020, CNN "Global Town Hall," Zuckerberg boasted that "we work with independent fact-checkers [] and warning labels work. We know that because 95% of the time when someone sees a piece of information that has a fact-check on it, they don't click through and consume that information." *Entire CNN April 16 coronavirus town hall*, *supra*, https://www.cnn.com/videos/business/2020/04/17/entire-april-16-coronavirus-town-hall-part-5-sot-vpx.cnn.

207.    Indeed, Facebook has used "A/B testing" (testing users' response to variants) to achieve its intended psychological effect on user behavior. Essentially, similar demographic test-groups are shown two (or more) different behavior modification mechanisms, and the most effective mechanism is chosen based on statistical results in terms of which variant achieves the desired user behavior. *About A/B Testing*, Business Help Center, FACEBOOK FOR BUSINESS, https://www.facebook.com/business/help/1738164643098669?id=445653312788501 (last visited Aug. 14, 2020).

208.    The "whistleblower" also described Facebook's use of "troll scores" that were assigned to accounts and used to assess what punitive actions it would take against the accountholder. There is no accountability or accountholder recourse, since Facebook compiles its punitive "troll scoring" without the holder's knowledge. *Anonymous – Facebook*, PROJECT VERITAS (Apr. 6, 2020), https://www.projectveritas.com/news/anonymous-facebook/.

209.    The "whistleblower" also revealed Facebook's use of a "deboosting" score, which it uses to "deboost" content produced by the accountholder's page. Facebook deployed a similar, if not the same algorithm, to limit the visibility and reach of CHD content. As explained by the whistleblower and screenshots obtained by Project Veritas, the ActionDeboostLiveDistribution tag is designed to "deboost" content produced by the pages it is attached to, specifically suppressing the distribution of livestreams from that page. A current Facebook employee confirmed to Project Veritas that the code could reduce a "video's visibility in news feeds, remove sharing features, and disable interactive notifications."

210.    The "whistleblower's" account elaborates upon newspaper and magazine articles about internal and top-down biases in Facebook's content control processes. A *Wired*

magazine article reported on Facebook's use of a custom algorithm — "Click Gap" — specifically to limit the spread of whatever Facebook terms "fake news." Facebook deployed a similar, if not the same algorithm, to damage CHD, by covertly limiting the visibility and reach of its content. An April 18, 2019 *Wired* article explains: "Click-Gap, which Facebook is launching globally today, is the company's attempt to limit the spread of websites that are disproportionately popular on Facebook compared with the rest of the web. If Facebook finds that tons of links to a certain website are appearing on Facebook, but few websites on the broader web are linking to that site, Facebook will use that signal, among others, to limit the website's reach." *Facebook Is Changing News Feed (Again) to Stop Fake News*, WIRED (Apr. 10, 2019), https://www.wired.com/story/facebook-click-gap-news-feed-changes/.

211.    A CNET article reported that Facebook planned to use "updated machine learning" to detect more potential "hoaxes" and send them to third-party "fact-checkers." Facebook used the same or similar machine learning systems to detect and flag CHD content for sending to Facebook's "fact-checker" affiliates.  R. Cheng, *Facebook will use machine learning to fight fake news*, CNET (Aug. 3, 2017), https://www.cnet.com/news/facebook-will-use-machine-learning-to-fight-fake-news/.

212.    The Doe defendants comprise, *inter alia*, members of an enterprise with or within Facebook working directly to label, suppress, and censor vaccine and 5G-network related content on CHD's Facebook page. The enterprise operates under the direct supervision and control of Facebook's corporate leadership and Zuckerberg. It includes individual Facebook officers or employees (known only to Facebook) responsible for key design elements that enable widespread AI-driven "fact-check" content suppression and manipulation. The enterprise manipulates technical processes to "shadow ban" CHD, i.e., deceive Plaintiff as to the reach and visibility of content on its Facebook page, and prevent its content from being disseminated. The enterprise also exploits internal marketing and psychometric data to "sandbox" users, i.e., selectively hide content from users based on their psychological profile, and ward off the possibility that alternative content may influence their views. "Sandbox" is an

1  apt term for isolating users in an echo chamber of like-minded viewpoints where existing

2  views are reinforced, and alternative or opposing ideas are not considered.

3      213.   Facebook shows CHD's vaccine- and 5G network-safety content to CHD's

4  already-"decided" users, but Facebook does not show it to any other "undecided" or "opposed"

5  users. Thus, Facebook seeks to rigidify users' positions on matters of public concern, and

6  foreclose public debate, or any possibility of the societal "ultimate good [] reached by free

7  trade in ideas" (*see Abrams v. United States*, 250 U.S. at 630 (Holmes, J., dissenting)), while

8  concealing its methods and effects. Facebook, with the government's assistance, blocks content

9  critical of the CDC and WHO. The First Amendment protects against this new "privatized"

10  form of governmental censorship. This is also a classic method of fraud concealment: if

11  Plaintiff does not know what defendants are telling or showing third parties, Plaintiff is less

12  likely to sue. *See*, *e.g., Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) ("suppose

13  an enterprise that wants to get rid of rival businesses mails misrepresentations about them to

14  their customers and suppliers, but not to the rivals themselves").

15      214.   On December 27, 2018, New York Times reporter Max Fisher wrote that, based

16  on his review of Facebook internal documents, Facebook's "closely-held rules" for moderating

17  content on its website had "numerous gaps, biases and outright errors." Fisher characterized

18  those errors as a byproduct of the over- and under-inclusive nature of binary rules when

19  applied to "highly complex issues," plus the highly time-sensitive ("eight to 10 seconds per

20  post") workload constraint Facebook puts on the decisions at issue. He quoted Facebook

21  officer Bickert as saying, "we have billions of posts every day, we're identifying more and

22  more potential violations using our technical systems. At that scale, *even if you're 99 percent*

23  *accurate, you're going to have a lot of mistakes*" (emphasis added). (Here, Facebook's

24  wrongdoing is deliberate, a form of decision-making which Bickert's reference to "mistakes"

25  elides.) Fisher reported that, "By telling moderators to follow the rules blindly, Facebook

26  hopes to guard against bias and to enforce consistency." But, "Facebook has little visibility into

27  the giant outsourcing companies, which largely police themselves, and has at times struggled

28  to control them." M. Fisher, *Inside Facebook's Secret Rulebook for Global Political Speech*,

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

NEW YORK TIMES (Dec. 27, 2018), https://www.nytimes.com/2018/12/27/world/facebook-moderators.html.

215.   Fisher further reported that, "[t]hough Facebook says its focus is protecting users, the documents suggest that other concerns come into play. [For example, Pakistan-related] guidelines warn moderators against creating a "PR fire" by taking any action that could "have a negative impact on Facebook's reputation or even put the company at legal risk. [. . .] And its decisions often skew in favor of governments, which can fine or regulate Facebook." *Id.*

216.   More recently, on May 16, 2020, New York Times reporters Mike Isaac, Sheera Frenkel and Cecilia Kang wrote in their article *Now More Than Ever, Facebook Is a 'Mark Zuckerberg Production'* that:

> [A]t Facebook, for more than a decade, Mark Zuckerberg was a product guy's product guy. In practice, this meant [. . .] he was comfortable delegating in areas that interested him less keenly — including [. . .] the realm of Facebook policy around what kind of speech was and was not permitted. Those subjects fell into a specific category: Too important to ignore, but not exactly what a young billionaire wants to spend all of his time on.

> [After the 2016 election] Mr. Zuckerberg resolved to take control of the global superpower in which he already dominated the voting. [In July 2018,] Mr. Zuckerberg called a meeting with his top lieutenants. [. . .] *Mr. Zuckerberg said he would be making more decisions on his own,* based on his instincts and vision for the company. [. . .] *Mr. Zuckerberg also began to participate more directly in meetings that had previously been Ms. Sandberg's domain — from the nitty-gritty of taking down disinformation campaigns,* to winding philosophical discussions on how Facebook ought to handle political ads. [. . .] Other board disagreements, specifically around political advertising and the spread of misinformation, always ended with Mr. Zuckerberg's point of view winning out. [. . .] To replace [departing board members], Mr. Zuckerberg picked [. . .] Peggy Alford, the former chief financial officer of the Chan Zuckerberg Initiative.

Mike Isaac, Sheera Frenkel & Cecilia Kang, *Now More Than Ever, Facebook Is a 'Mark*

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

1   *Zuckerberg Production*,' NEW YORK TIMES (May 16, 2020),

2   https://www.nytimes.com/2020/05/16/technology/zuckerberg-facebook-coronavirus.html

3   (emphases added).

4       217.    Facebook contracted with Science Feedback, a French organization which

5   Facebook funds, to "fact-check" CHD's content, and directed Science Feedback to deploy

6   Facebook's circular WHO and CDC definitions of "vaccine misinformation." Science

7   Feedback is wholly dependent upon Facebook, both financially and editorially. On information

8   and belief, neither Facebook nor Science Feedback makes any *genuinely* independent effort to

9   check the veracity of the censored or labeled CHD content.

10       218.    Instead, Facebook created a classification system that provides Science Feedback

11   with a limited set of nine pre-populated classifications to apply to a posting:

12           • False

13           • Partly False

14           • True

15           • False Headline

16           • Not Eligible

17           • Satire

18           • Opinion

19           • Prank Generator

20           • Not Related

21   *Fact-Checking on Facebook*, Business Help Center, FACEBOOK FOR BUSINESS,

22   https://www.facebook.com/help/publisher/182222309230722 (last visited Aug. 14, 2020).

23       219.    Apparently, if Science Feedback decides that an article is not "false," "partly

24   false," or "false headline" but falls into any of the other six classifications (i.e., True, Not

25   Eligible, Satire, Opinion, Prank Generator, and Not Related), Facebook does not display (or

26   does not prominently display) a link to the "See Why" window or to Science Feedback's

27   oppositional article.

28

84       **VERIFIED SECOND AMENDED COMPLAINT**
         *CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

220.     Under this arrangement, Facebook pays Science Feedback to classify content, and Facebook flags content for Science Feedback to evaluate and classify as part of their partnership. Science Feedback is paid by Facebook to find false stories, and here willfully marked Plaintiff's content as "false" or "partly false" in order to generate traffic to its website through the warning and link, and to further its contractual partnership with Facebook. The "fact-checking" system Facebook created encourages this type of mislabeling. The Science Feedback fact-checkers have an obvious incentive to categorize a post as "False" rather than an accurate but less damaging classification of "Opinion," because that is the only way Facebook will insert the clear warning with a prominent link to Science Feedback's oppositional article. Facebook deceives its users by materially misrepresenting that its "fact-checkers" are "independent," contractually or editorially. Significantly, the arrangement also permits Facebook and Science Feedback to create categorical exemptions from "fact-checking" where it suits Zuckerberg's political or other biases, e.g., the "opinion" exemption for climate science deniers. Emily Atkin, *Facebook creates fact-checking exemption for climate deniers*, *supra*, https://heated.world/p/facebook-creates-fact-checking-exemption.

221.     As to each of the CHD and RFK, Jr. articles and video posts, which Facebook and Science Feedback, or Poynter/PolitiFact labeled "False Information" or "Partly False Information," *see supra*, Science Feedback and Poynter/PolitiFact's opposition articles show, at most, that the specific matter asserted was the opinion of its authors on fully-disclosed limited facts, not that it was a "false" or "partly false" statements of fact. Nonetheless, Facebook directed its surrogate "fact-checkers" to label these posts "false" or "partly false," as a pretext for Facebook to publish the grey overlay with those "false" or "partly false information" labels over CHD's posts, and to publish links to their opposition content. The "fact-checker" surrogates complied because it was in their financial interests to do so.  Hence, Science Feedback designated the articles and videos as "False" or "Partly False," not "Opinion." Facebook then proceeded to gray out the articles and videos and placed its warnings over them. By using Facebook's pre-populated options other than "opinion," to mislabel the articles and videos, Science Feedback and Facebook intentionally tell the public

1   that Plaintiff is presenting false information, when they know that the information presented is,
2   at most, opinion and *not* false fact.

3   ### 8.   Continuing Injuries to CHD.

4   222.   CHD's primary source of revenue derives from membership dues and donations
5   that CHD solicits on its website, through PayPal and Stripe, and formerly on its Facebook
6   page. In addition to that monetary interest, attracting visitors to the CHD Facebook page, and
7   through it to CHD's website, enables CHD and RFK, Jr., their authors, and readers to associate
8   and to engage in speech on matters of mutual concern. Prior to March 2019, CHD's Facebook
9   page content generated significant third-party user traffic to CHD's website, and significant
10  membership fees and donations to CHD.

11  223.   From January to May 2019, CHD generated $41,241 in user donations from its
12  Facebook page. In May 2019 alone, CHD received $24,872, until Facebook deactivated CHD's
13  donate function. CHD has not received any further donation revenue through Facebook.

14  224.   Facebook has exclusive possession, custody, and control of evidence to assess
15  the full extent of the damages to Plaintiff's business and property interests which defendants'
16  deceptions have proximately caused, e.g.: (1) how many visitors to CHD's page instead click
17  through to "go to CDC.gov"; (2) how many are diverted from CHD's content due to "fact-
18  check" labels; (3) how much has Facebook-wide traffic of such content decreased; (4) what are
19  the daily click-through, cost-per-click, conversion, and cost-per-action rates for visitors to
20  Plaintiff's Facebook page — all of which is information Facebook compiles in the ordinary
21  course of its business operations of gathering, manipulating, and marketing psychometric and
22  other data on users. Plaintiff lacks access to these missing pieces of the puzzle.

23  225.   As a result of defendants' actions, third-party user visits from CHD's Facebook
24  page to CHD's website declined significantly since March 2019, while visits to CHD's website
25  grew from other interactive computer services (e.g., Bing and DuckDuckGo) that have not
26  implemented Facebook's smear campaign. CHD's Twitter account has grown by 80,000
27  followers during the past twelve months, while its Facebook account has grown by only 20,000
28  followers, despite the smear campaign.

226.   Additionally, CHD's trade reputation and "goodwill" are traditional property rights whose value defendants have diminished through their fraudulent misconduct. CHD's reputation for accurate and timely content is a source of its goodwill, and paramount to its operations and success. "[A] man's right to the continued enjoyment of his trade reputation and the good will that flows from it, free from unwarranted interference by others, is a property right[.]" *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 413 (1916). Defendants targeted CHD, and the injuries to CHD's organizational trade and reputation were both foreseeable and intended. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. at 658.

227.   CHD is the most direct victim of Facebook's "vaccine misinformation" smear campaign, and is best positioned to sue; its financial losses are provable, and far more than a "bit part in the scheme" (*Kelly v. United States*, 140 S. Ct. 1565, 1573 (2020)), and there is no risk of duplicative recoveries because no one else can recover CHD's losses. At the same time, Facebook controls the proof of that portion of claimed damages attributable to the defendants' unlawful conduct. *See Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 S. Ct. 1377, 1393 (2014) ("When a defendant harms a Plaintiff's reputation by casting aspersions on its business, the Plaintiff's injury flows directly from the audience's belief in the disparaging statements….").

### D.   Material Questions of Vaccine Safety.

228.   By 1986, the "litigation costs associated with claims of damage from vaccines had forced several companies to end their vaccine research and development programs as well as to stop producing already-licensed vaccines." Institute of Medicine, *Adverse Events Associated with Childhood Vaccines: Evidence Bearing on Causality*, at 2 (1994). In response, Congress enacted the National Childhood Vaccine Injury Act, codified at 42 U.S.C. §§ 300aa-1 through 300aa-34 (the "1986 Act"), which virtually eliminated economic liability for pharmaceutical companies for injuries caused by their vaccines. 42 U.S.C. § 300aa-11 ("No person may bring a civil action for damages in the amount greater than $1,000 or in an unspecified amount against a vaccine administrator or manufacturer in a State or Federal court for damages arising from a vaccine-related injury or death."); *Bruesewitz v. Wyeth LLC*, 562

1  U.S. 223, 243 (2011) ("we hold that the National Childhood Vaccine Injury Act preempts all

2  design-defect claims against vaccine manufacturers brought by Plaintiffs who seek

3  compensation for injury or death caused by vaccine side effects"); *cf. Davis v. Wyeth*

4  *Laboratories*, 399 F.2d 121, 129-30 (9th Cir. 1968) (recipient of polio vaccine entitled to make

5  a "true choice judgment" whether to be inoculated with Sabin III vaccine, an "unavoidably

6  unsafe" product).

7        229.    By granting pharmaceutical companies immunity from actual or potential

8  liability from injuries caused by vaccines, Congress eliminated the market forces relied upon to

9  assure the safety of these typically mandatory consumer products. Recognizing that it

10  eliminated the financial incentive for pharmaceutical companies to assure the safety of their

11  vaccine products, Congress placed the responsibility for vaccine safety in the hands of the

12  Department of Health and Human Services ("HHS") and its agencies, most pertinently here,

13  the CDC. 42 U.S.C. § 300aa-27(a) ("Mandate for safer childhood vaccines") provides, *inter*

14  *alia*, that the Secretary of HHS "(1) shall promote the development of childhood vaccines that

15  result in fewer and less serious adverse reactions [. . .], and (2) make or assure improvements

16  in, and otherwise use the authorities of the Secretary with respect to . . . research on vaccines,

17  in order to reduce the risks of adverse reactions to vaccines."

18        230.    In executing their statutory duties, HHS and the CDC must avoid conflicts of

19  interest with pharmaceutical companies because these agencies are responsible for promoting

20  safe vaccines, and for defending against claims of vaccine injuries. Indeed, the CDC is the

21  single largest purchaser and distributor of vaccines (nearly forty percent of the total

22  administered) in the United States. In 2019 alone, the CDC entered into contracts to purchase

23  and distribute up to $5.1 billion of the three leading manufacturers' vaccine products.

24  *See 2019 Vaccines for Children*, State of Georgia, GOVERNMENT CONTRACTS,

25  https://www.governmentcontracts.us/government-contracts/opportunity-

26  details/NBD00159991194385117.htm (last visited Aug. 15, 2020); *Indefinite Delivery*

27  *Contract 75D30119D04518*, Federal Contract IDV Award, GOVTRIBE (Jun. 29, 2020),

28  https://govtribe.com/award/federal-idv-award/indefinite-delivery-contract-75d30119d04518;

1   *2019 Vaccines for Children*, State of Georgia, GOVERNMENT CONTRACTS AND BIDS,

2   https://www.govcb.com/government-bids/vaccines-for-children-

3   NBD00159022703927119.htm (last visited Aug. 15, 2020).

4       231.   And, while HHS is obliged to report to Congress every two years on the actions

5   HHS has taken to make and assure improvements in the licensing, manufacturing, adverse

6   reaction reporting, research, safety and efficacy testing of vaccines in order to reduce the risk

7   of adverse vaccine reactions, HHS apparently has never complied with that statutory

8   obligation. *See Stipulated Order*, U.S.D.C. S.D. N.Y. No. 18-cv-03215 (JMF) (filed Jul. 9,

9   2018) & *Press Release*, INFORMED CONSENT ACTION NETWORK (ICAN) (Jul. 13, 2018),

10  https://www.icandecide.org/wp-content/uploads/2019/09/Stipulated-Order-copy-1.pdf; 42

11  U.S.C. § 300aa-27.

12      232.   Under the 1986 Act, the CDC plays a central role in ensuring the safety of the *72*

13  *doses* of vaccines on the CDC's Child and Adolescent Immunization Schedule. Most of these

14  vaccines, which are vigorously promoted by the CDC for injection into America's children, are

15  manufactured and sold by four pharmaceutical companies -- GlaxoSmithKline ("GSK"),

16  Sanofi S.A. ("Sanofi"), Pfizer, and Merck & Co. ("Merck").

17      233.   If a vaccine injures an individual, the injured individual must (pursuant to the

18  1986 Act) bring a claim in the National Vaccine Injury Compensation Program ("VICP"),

19  administered in the Federal Court of Claims. In such actions, the Secretary of HHS is the

20  respondent with the Department of Justice as its litigation counsel, and these government

21  lawyers regularly and vigorously defend against any claim that a vaccine caused injury. (42

22  U.S.C. § 300aa-12; *Vaccine Injury Compensation Program: Addressing Needs and Improving*

23  *Practices, Sixth Report by the Committee on Government Reform*, Union Calendar No. 575,

24  106th Congress, 2d Session, House Report 106–977, HOUSE COMMITTEE ON GOVERNMENT

25  REFORM HEARINGS (Oct. 12, 2000), https:///www.congress.gov/106/crpt/hrpt977/CRPT-

26  106hrpt977.pdf. As explained by HHS, which administers the program, listed injuries "are

27  presumed to be caused by vaccines unless another cause is proven" if occurring within a given

28  time frame post-vaccination. *Frequently Asked Questions*, National Vaccine Injury

Compensation Program, HEALTH RESOURCES & SERVICES ADMINISTRATION, https://www.hrsa.gov/vaccine-compensation/FAQ/index.html (last visited Aug. 14, 2020). Total compensation paid over the life of the VICP from FY 1988 through May 2019 is approximately *$4.1 billion. Data & Statistics*, HEALTH RESOURCES & SERVICES ADMINISTRATION (May 1, 2019), https://www.hrsa.gov/sites/default/files/hrsa/vaccine-compensation/data/monthly-stats-may-2019.pdf.

234.    At the same time, the plight of America's children is that 54% (40 million) of them suffer from chronic illnesses such as deadly allergies, asthma, eczema, anxiety, depression, sensory abnormalities; 13% (9 million) are in special education; 11% (8 million) have Attention Deficit Hyperactivity Disorder ("ADHD"); 2.7% (2 million) have or will be diagnosed with Autism; 0.0035% (260,000) will be diagnosed with cancer by age 19; and 49.5% of teens aged 13 to 18 have (or have had) a mental health disorder. *See, e.g.*, Christina D.Bethell, Ph.D. et al., *A National and State Profile of Leading Health Problems and Health Care Quality for US Children: Key Insurance Disparities and Across-State Variations*, ACADEMIC PEDIATRICS, Volume 11, Issue 3, Supplement, May–June 2011, pp. S22-S33, https://www.sciencedirect.com/science/article/pii/S1876285910002500 [54% chronic illness]; *Students with Disabilities*, NATIONAL CENTER FOR EDUCATION STATISTICS (May 2020), https://nces.ed.gov/programs/coe/indicator_cgg.asp [13% special education]; Susanna N. Visser, MS et al., *Trends in the Parent-Report of Health Care Provider-Diagnosed and Medicated Attention-Deficit/Hyperactivity Disorder: United States, 2003–2011*, JOURNAL OF THE AMERICAN ACADEMY OF CHILD & ADOLESCENT PSYCHIATRY, Volume 53 Number 1 (January 2014), https://jaacap.org/article/S0890-8567(13)00594-7/fulltext [11% ADHD]. This level of chronic illness and disability among children is unprecedented in the United States.

235.    Significantly, no scientific studies have tested the entire immunization schedule or compared the differences in health outcomes between children vaccinated according to the CDC's full 72-dose vaccine schedule and children who have remained partially, or completely, unvaccinated. *See* Institute of Medicine, *Childhood Immunization Schedule and Safety: Stakeholder Concerns, Scientific Evidence, and Future Studies*, NATIONAL ACADEMIES PRESS

(2013), pp. 5-6, https://doi.org/10.17226/13563. Simply put, no studies have refuted the biologically-plausible hypothesis that the CDC's vaccine schedule is contributing *in some degree* to the epidemic of chronic childhood illnesses.

236.     Vaccines are among the pharmaceutical industry's best-selling products. Andrew Ward, *Vaccines are among big pharma's best-selling products*, FINANCIAL TIMES (Apr. 24, 2016), https://www.ft.com/content/93374f4a-e538-11e5-a09b-1f8b0d268c39. According to two recent market research reports, the global vaccine market was over $41 billion in 2019, is projected to reach over $58 billion by 2024, and over $93 billion by 2026. *Vaccines Market - Global Forecast to 2024*, MARKETSANDMARKETS (January 2020), https://www.marketsandmarkets.com/Market-Reports/vaccine-technologies-market-1155.html; *Vaccines Market Size, Share & Industry Analysis, 2020-2027*, FORTUNE BUSINESS INSIGHTS, https://www.fortunebusinessinsights.com/industry-reports/vaccines-market-101769 (last visited Aug. 14, 2020).

237.     Yet, as bioethics professor Carl Elliott wrote in a July 2, 2020 New York Review of Books article, "[I]t would also be a mistake to assume that drug makers will be honest and open about their research results. It is not just that many have repeatedly failed to publish unfavorable data. As the former editor of The British Medical Journal has written, many have simply designed their research studies to produce the results they want. Medical journal editors have been raising the alarm about this for over fifteen years now. Between 1991 and 2010, according to Public Citizen, the pharmaceutical industry was the leading defrauder of the federal government, as measured by penalties paid for violating the False Claims Act." Carl Elliott, *An Ethical Path to a Covid Vaccine*, NEW YORK REVIEW OF BOOKS (July 20, 2020), https://www.nybooks.com/articles/2020/07/02/ethical-path-covid-19-vaccine/.

238.     Criticism of the CDC, discussion of conflicts of interest within the organization and their effect on vaccine safety were open topics among the public and lawmakers not long ago. In 2006, Reps. Dr. Dave Weldon (R-FL), and Carolyn Maloney (D-NY), introduced a bill that would give responsibility for vaccine safety to an independent agency within DHHS, and

remove most vaccine safety research from the CDC. While the bill did not pass, it was openly recognized that there were conflicts of interest.

239.    There was bipartisan scrutiny of the CDC. On February 22, 2006, a letter to Dr David Schwartz, Director of the National Institute of Environmental Health Sciences, signed by U.S. Senators Joe Lieberman (D-Conn) and Debbie Stabenow (D-Mich), and members of the House Representatives including, Dr Dave Weldon, (R-Fla) Chris Smith, (R-NJ), Carolyn Maloney, (D-NY), Dan Burton, (R-Ind), Joseph Crowley, (D-NY), and Maurice Hinchey, (D-NY) stated, "If the federal government is going to have a study (regarding the flu vaccine) whose results will be broadly accepted, such a study cannot be led by the CDC." Evelyn Pringle, *Lawmakers Sever Ties Between CDC and Big Pharma*, LAWYERS AND SETTLEMENTS (Aug. 21, 2006) https://www.lawyersandsettlements.com/legal-news/drugs-medical/CDC_Big_Pharma-00285.html. At the time, Dr Weldon stated, "There's an enormous inherent conflict of interest within the CDC and if we fail to move vaccine safety to a separate independent office, safety issues will remain a low priority and public confidence in vaccines will continue to erode."

240.    In recent years, The Atlantic Monthly among others has published stories critical of the CDC's "internal scandal and funding issues." *See*, *e.g.*, Vann. R. Newkirk II, *Is the CDC Losing Control?*, THE ATLANTIC (Feb. 3, 2018), https://www.theatlantic.com/politics/archive/2018/02/cdc-scandal-preparedness-budget/552200/. And, during the current COVID-19 pandemic, journalists and public officials alike have increasingly questioned whether the CDC is a truly reliable or up-to-date source of public health information. *See*, *e.g.*, Alexis C. Madrigal & Robinson Meyer, *How Could the CDC Make That Mistake?*, THE ATLANTIC (May 21, 2020), https://www.theatlantic.com/health/archive/2020/05/cdc-and-states-are-misreporting-covid-19-test-data-pennsylvania-georgia-texas/611935/. On May 9, 2020, Dr. Deborah Birx, the White House Coronavirus Response Coordinator, reportedly stated, "*There is nothing from the CDC that I can trust.*" Josh Dawsey, Ashley Parker, Philip Rucker and Yasmeen Abutaleb, *As deaths mount, Trump tries to convince Americans it's safe to inch back to normal*, WASHINGTON POST (May 9, 2020),

https://www.washingtonpost.com/politics/as-deaths-mount-trump-tries-to-convince-americans-its-safe-to-inch-back-to-normal/2020/05/09/bf024fe6-9149-11ea-a9c0-73b93422d691_story.html (emphasis supplied). Similarly, on June 3, 2020, Dr. Ashish Jha, the director of the Harvard Global Health Institute, stated, "*The CDC is no longer the reliable go-to place.*" Eric Lipton, et al., *The CDC waited 'its entire existence for this moment.' What went wrong?*, NEW YORK TIMES (Jun. 2, 2020), https://www.sfgate.com/news/article/The-CDC-Waited-Its-Entire-Existence-for-This-15312642.php.  CHD and RFK, Jr. have echoed many of their concerns, yet CHD has been singled out for Facebook's misleading "fact-checks," and its falsely disparaging warning label which trumpets the CDC "party line."

### E.    Material Questions of 5G Network Safety.

241.    According to the FCC, "[w]ithin the next few years, 5G networks . . . will make possible once-unimaginable advances, such as self-driving cars and growth of the 'Internet of Things,'" i.e.,  the rapidly expanding collection of devices that collect, transmit and share data via the internet. 5G networks "will increasingly need to rely on network densification, [which entails] the deployment of far more numerous, smaller, lower-powered base stations or nodes that are much more densely spaced." *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 739 (D.C. Cir. 2019).

242.    Cellular wireless services, including cellular phones and other forms of wireless data transmission, use pulsed and modulated radio frequency signals to transmit the data wirelessly. Wireless service in the United States has mostly depended on large "macro cell" towers to transmit cell signal. However, to provide sufficient bandwidth to support wirelessly interconnecting tens of billions more devices (*see*, *e.g.*, Sundeep Rangan, Theodore S. Rappaport & Elza Erkip, *Millimeter-Wave Cellular Wireless Networks: Potentials and Challenges*, PROCEEDINGS OF THE IEEE | Vol. 102, No. 3, March 2014, https://ecfsapi.fcc.gov/file/60001013329.pdf), companies offering the next generation of wireless service — known as 5G — are in the process of adding hundreds of thousands of densely-spaced, wireless facilities, or "small cells." *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d at 732. These "small cell" antennas are largely being

deployed in the public rights-of-way, on utility poles and lamp posts sometimes only a few feet from homes and children's bedrooms. Although small cells may use less power than big cell towers, because of their proximity, the radiation exposure may be exponentially greater.

243.    The evolution of cellular phone technology is represented by "Generations" ("G"), from 1G to 4G. 5G is different. It is not only cellular phone networks, but it describes a broader wireless infrastructure that will support the" Internet of Things," driverless cars, "smart cities," and other technologies that may not yet be in existence. *See*, *e.g.*, *Remarks of Chairman Wheeler on The Future of Wireless*, FEDERAL COMMUNICATIONS COMMISSION (Jun. 20, 2016), https://www.fcc.gov/document/remarks-chairman-wheeler-future-wireless. It is also used to provide internet services and thereby can displace existing wired internet services such as cable-internet.

244.    5G cellular networks operate in the same group of RF frequencies used for current wireless technologies. For example, currently, it is using low band frequencies around 600 MHz and mid band frequencies between 2.5-4.2 GHz. However, the increased bandwidth and speed for 5G is achieved partly by using higher RF frequencies (currently, between 24-47 GHz), known as "millimeter wave" frequencies. *5G*, WIKIPEDIA, https://en.wikipedia.org/wiki/5G (last visited Aug. 14, 2020). Wireless technology uses RF signals to carry data ("carrier wave"). The data is encoded on the carrier RF wave by pulsing and modulating the RF signal. The scientific evidence shows that the pulsation and modulation are biologically active. *See e.g.*, Igor Belyaev et al., 2012 Supplement, *Evidence for Disruption by Modulation*, BIOINITIATIVE.ORG (Sept. 2012)*,* https://bioinitiative.org/wp-content/uploads/pdfs/sec15_2012_Evidence_Disruption_Modulation.pdf.  5G is also using complex modulation schemes.

245.    Well over a thousand studies illustrate the biological and potential risks of exposure to non-thermal levels of pulsed and modulated radiofrequency radiation used for wireless technology.

246.    The BioInitiative Report is the most extensive review of the scientific evidence of the biological and adverse health effects of RFs and electromagnetic fields (EMFs). It was

originally published in 2007. In 2012 an updated version was published, and it has been continuously updated ever since, most recently in 2020. The report is authored by the BioInitiative Working Group, comprised of 29 independent world-leading scientists and public health experts on RFs and EMFs. The report aims to provide a "*Rationale for Biologically-based Public Exposure Standards for Electromagnetic Fields (Extremely Low Frequency and Radio Frequency).*" BIOINITIATIVE.ORG, https://bioinitiative.org/. The BioIniative concludes that "bio-effects can occur… from just minutes of exposure… Many of these bioeffects can reasonably be presumed to result in adverse health effects if the exposures are prolonged or chronic."

247.    The BioInitiative's recommended levels of exposure are based on "observed effects" found in humans in epidemiological studies. They are based on actual adverse effects observed in individuals living near cell towers and therefore highly relevant to the exposure from the "small cells" used for the 5G infrastructure. The recommended levels are well below the existing FCC guidelines. Furthermore, the BioInitiative recommends adopting guidelines that take into consideration the effects of pulsation and modulations.

248.    Since 5G is using the same group of RF frequencies, as well as pulsed and modulated signals, the existing body of science regarding the biological and health effects of current RF-based technologies is relevant to 5G. Furthermore, there is a growing body of evidence regarding the biological and adverse effects of millimeter waves. Effects shown include arrhythmias, heart rate variability, bacterial effects, antibiotic resistance, immune system effects, altered gene expression and cataracts. *See*, *e.g.*, Cindy L. Russell, *5G wireless telecommunications expansion: Public health and environmental implications*, ENVIRON RES. 2018 Aug;165:484-495. doi: 10.1016/j.envres.2018.01.016. Epub 2018 Apr 11. PMID: 29655646, https://pubmed.ncbi.nlm.nih.gov/29655646/.

249.    There are specific concerns regarding the exposure of children to RF based wireless technology and radiation. The BioInitiative report reviewed over 200 studies showing profound neurological effects showing clear evidence of adverse effects from RF/EMF including effects during the prenatal period and childhood. Studies show that prenatal exposure

can permanently affect brain neuro-development, memory and behavior and can lead to ADHD. RF/EMF exposure can also cause headaches, ringing in the ears, heart palpitations, sleep problems, cognitive and memory problems and nose bleeds. Belyaev I, Dean A, Eger H, et al., *EUROPAEM EMF Guideline 2016 for the prevention, diagnosis and treatment of EMF-related health problems and illnesses*, REV. ENVIRON HEALTH. 2016, 31(3), 363-397, https://pubmed.ncbi.nlm.nih.gov/27454111/. Over 200 studies also establish Oxidative Stress as a causal mechanism of harm. The evidence of profound harms associated with exposure to RFs suggests that wireless technology may also contribute to the exponential increase in sickness in children referenced *supra*.

250.    There is also strong evidence that RF radiation can cause cancer and DNA damage. In November 2018, the results of a $30 million study conducted by the U.S. National Toxicology Program (NTP) were published. The study found "clear evidence" that exposure to pulsed and modulated cell phone RF radiation caused cancer in rats. *High Exposure to Radio Frequency Radiation Associated with Cancer in Male Rats*, NATIONAL INSTITUTE OF ENVIRONMENTAL HEALTH SCIENCES (Nov. 1, 2018), https://www.niehs.nih.gov/news/newsroom/releases/2018/november1/ index.cfm. In November 2019, the NTP published further results showing DNA damage. The NTP's DNA findings confirm the results of dozens of other DNA studies.

251.    The Ramazzini Institute in Italy replicated the key finding of the NTP using much weaker exposure levels to cell phone radiation over the life of the rats. Thus, the Ramazzini Institute study, a €6 million study, extended the results of the NTP study to far lower levels of radiation exposure, comparable to levels of radiation from cell towers and therefore relevant to 5G networks. Falcioni L, Bua L, Tibaldi E, et al., *Report of final results regarding brain and heart tumors in Sprague-Dawley rats exposed from prenatal life until natural death to mobile phone radiofrequency field representative of a 1.8 GHz GSM base station environmental emission*, ENVIRON RES. 2018; 165:496-503, https://pubmed.ncbi.nlm.nih.gov/29530389/; *see also* Joel M. Moskowitz, *We Have No Reason to Believe 5G Is Safe*, SCIENTIFIC AMERICAN (Oct. 17, 2019),

https://blogs.scientificamerican.com/observations/we-have-no-reason-to-believe-5g-is-safe/.

252.    In 2011, the International Agency for Research on Cancer (IARC) of the WHO classified RF radiation including radiation from cell towers as a "possible" (2B) carcinogen in humans. In its 2013 Monograph, IARC stated that while there is epidemiological evidence of increased cancer risk in humans, more animal studies are needed for a higher classification. *Non-ionizing Radiation, Part 2: Radiofrequency Electromagnetic Fields, IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Volume 102*, IARC Publications, INTERNATIONAL AGENCY FOR RESEARCH ON CANCER, WORLD HEALTH ORGANIZATION, https://publications.iarc.fr/126. The results of the NTP and Ramazzini studies provide the "missing link." Scientists, including a retired NTP/NIEHS scientist who designed the NTP study, are calling for the reclassification of RF as at least a "probable" (2A) carcinogen, and some claim the evidence is sufficient for a 1A "human carcinogen." *See*, *e.g.*, Ronald L. Melnick, *Commentary on the utility of the National Toxicology Program study on cell phone radiofrequency radiation data for assessing human health risks despite unfounded criticisms aimed at minimizing the findings of adverse health effects*, ENVIRON RES. 2019 Jan;168:1-6. doi: 10.1016/j.envres.2018.09.010. Epub 2018 Sep 20. PMID: 30243215, https://pubmed.ncbi.nlm.nih.gov/30243215/.

253.    In 2012, Italy's Supreme Court found that cell phones cause acoustic neuroma-type brain tumors. Acoustic Neuroma is a Schwannoma tumor, the same type of tumor found in the NTP study. Since then, courts in three additional cases reached the same conclusion.

254.    In December 2017, the California Department of Public Health ("CDPH") published guidelines in response to the available peer-reviewed scientific evidence that RFR may cause DNA damage, reproduction harms, cancer and learning disabilities in humans, among other effects. CDPH Director and State Public Health Officer Dr. Karen Smith stated that "although the science is still evolving, there are concerns among some public health professionals and members of the public regarding long-term, high use exposure to the energy emitted by cell phones." *CDPH Issues Guidelines on How to Reduce Exposure to Radio Frequency Energy from Cell Phones*, Office of Public Affairs, CALIF. DEPT. OF PUBLIC

1    HEALTH (Dec. 13, 2017), https://www.cdph.ca.gov/Programs/OPA/Pages/NR17-086.aspx. *See*

2    *also* Cal. Gov. Code § 659641.1, subd. (f) (exempting wireless facilities on fire department

3    facilities from mandatory approval after some firefighters developed severe neurological

4    injuries from cell towers located on their stations).

5         255.    In 2014, the California Medical Association passed a resolution calling upon the

6    FCC to update its health guidelines as the scientific evidence showing profound adverse effects

7    from wireless technologies. *California Medical Association House of Delegates Resolution,*

8    *Wireless Standards Reevaluation, 2014 Resolution 107*, CALIFORNIA MEDICAL ASSOCIATION

9    (adopted Dec. 7, 2014), https://ecfsapi.fcc.gov/file/1092989731923/30-Attachment%2030-

10   %20California%20Medical%20Association%20Resolution.pdf.

11        256.    In 2015, over 200 scientists from 42 countries, who collectively published over

12   2,000 papers, reviews, commentaries, and letters in professional journals on different types of

13   non-ionizing EMF, sent the "International EMF Scientist Appeal" letter to the United Nations

14   and WHO, stating: "Based upon peer reviewed, published research, we have serious concerns

15   regarding the ubiquitous and increasing exposure to … wireless devices." *Scientists call for*

16   *Protection from Non-ionizing Electromagnetic Field Exposure*, EMF SCIENTIST,

17   https://www.emfscientist.org/index.php/emf-scientist-appeal (last visited Aug. 14, 2020).

18        257.    The 5G Appeal was prepared in 2017 by scientists and doctors who called on the

19   European Union ("EU") to impose a moratorium on the roll out of 5G due to serious potential

20   health effects from 5G technology. They expressed their "serious concerns" regarding the

21   ubiquitous and increasing exposure to EMF generated by electric and wireless devices already

22   before the additional 5G roll-out. As of August 27, 2020, 403 scientists and medical doctors

23   have signed the 5G Appeal. *The Signatories*, 5G APPEAL, http://www.5gappeal.eu/signatories-

24   to-scientists-5g-appeal/. The 5G Appeal urges the EU to "take all reasonable measures to halt

25   the 5G RF-EMF ["radio frequency-electromagnetic fields"] expansion until independent

26   scientists can assure that 5G and the total radiation levels caused by RF-EMF (5G together

27   with 2G, 3G, 4G, and WiFi) will not be harmful for EU citizens, especially infants, children

28   and pregnant women, as well as the environment."

258.    The 5G Appeal states that "RF-EMF has been proven to be harmful for humans and the environment." Quoting the *EMF Scientist,* it asserts "numerous recent scientific publications have shown that EMF affects living organisms at levels well below most international and national guidelines". Effects include increased cancer risk; cellular stress, increase in harmful free radicals, genetic damage, structural and functional changes of the reproductive system, learning and memory deficits, neurological disorders, and negative impacts on the general well-being in humans. Damage goes well beyond the human race, as there is growing evidence of harmful effects to both plant and animal life." *International Appeal: Scientists call for Protection from Non-ionizing Electromagnetic Field Exposure*, EMFSCIENTIST.ORG, https://emfscientist.org/index.php/emf-scientist-appeal.

259.    The 5G Appeal concludes that an epidemic of sickness from this radiation already exists and "*inaction is a cost to society and is not an option anymore*." *About*, 5G APPEAL, http://www.5gappeal.eu/about/ (last visited Aug. 14, 2020) (emphasis added).

**F.    Facebook's Adverse Motives.**

**1.    Zuckerberg's Personal Involvement and Biases.**

260.    It is highly probable that Zuckerberg has participated in, and personally directed "vaccine misinformation" policy decisions at Facebook which directly harmed CHD. It is also highly probable that Zuckerberg is directly involved with, and directing the philosophy of Facebook's public health agency partnership strategy. The decision to demonetize advertising and donations for organizations like CHD related to "vaccine misinformation" is a decision that Zuckerberg would likely have known about, and approved, given his historical prominence in decisions related to content management generally, and vaccine "misinformation" specifically. As CEO of Facebook, Zuckerberg would have known about Facebook's Preventive Health App, and most likely set the direction of its requirements in conjunction with public health agencies. Zuckerberg's commentaries on public health/Facebook collaborations, and his direct involvement in related efforts such as CZI's for-profit vaccine development, strongly suggest that he has exercised direct personal supervision and control of Facebook's corporate actions at issue here.

261.   There is substantial evidence that Zuckerberg, acting in his position as Facebook CEO and controlling shareholder, is personally involved with and directs its editorial decisions and policies with respect to what sorts of posts are and are not censored. It is more than likely Zuckerberg was substantially involved in the setting of vaccine "misinformation" policies and algorithms which Facebook deployed against CHD.

262.   CHD has been effective in spreading information that is threatening to Zuckerberg's financial interests in pharmaceutical ad revenue, 5G network deployment, and vaccine development. Independent media sources have verified that CHD was, prior to censorship, one of the top sources of purportedly "anti-vaccine" ads on Facebook.

263.   CHD started posting articles against 5G, the new telecom technology, in October, 2019. Currently, CHD posts anti-5G content once every seven days. These posts include science-based claims that 5G may cause significant damage to human DNA, may cause cancer, and is being installed in order to carry out mass surveillance. CHD and RFK, Jr.'s 5G-related posts have garnered more than 400,000 likes or other interactions.

264.   Similarly, RFK, Jr. and CHD only posted about Bill Gates twice prior to December, 2019, but since then have mentioned Mr. Gates about once every five days. CHD's highest-ever performing post was about Mr. Gates, and was flagged by Poynter/PolitiFact as false: It claimed that the Gates Foundation paralyzed 496,000 children in India when it tested a polio vaccine. He has also accused Mr. Gates of profiting from the pandemic, of wanting to "genetically modify" humanity, and of controlling not only the WHO, but also "the flow of global information." So far, RFK, Jr., and CHD's posts about Mr. Gates have achieved more than one million likes, shares and clicks. Alexi Mostrous, *How a Kennedy became a 'superspreader' of hoaxes on COVID-19, vaccines, 5G and more*, THE GLOBE AND MAIL (Sept. 16, 2020), https://www.theglobeandmail.com/world/article-robert-f-kennedy-jr-medical-misinformation/. Given Zuckerberg's close involvement and CHD's prominence in these issues, it is quite likely that Zuckerberg was personally aware of CHD and RFK, Jr.'s work.

265.   Zuckerberg's goal is to reduce anti-vaccine "sentiment" in the populace generally, in which Facebook's vaccine "misinformation" campaign plays a significant part.

He is less concerned with finding scientific truth than the pursuit of an ideology of universal vaccination. Given Zuckerberg's ideology and his position as CEO, Facebook policy cannot but mold itself to his whims. Thus, the modus operandi which Zuckerberg set in motion was to identify *any* information critical of vaccines in any way, and then attempt to see if "fact-checking" could be done on it. Facebook said that a variety of human "fact-checkers" and machine learning was used to do so.

266.    Zuckerberg has publicly stated his ideological belief in vaccinations numerous times. He has said, for example, that "[v]accination is an important and timely topic. The science is completely clear: vaccinations work and are important for the health of everyone in our community." Phil Plait, *Mark Zuckerberg: Pro-Vaxxer*, SLATE (Jan. 12, 2016), https://slate.com/technology/2016/01/mark-zuckerberg-publicly-supports-vaccination.html.

267.    As alleged *supra*, Zuckerberg has donated at least $25 million to the CDC Foundation.

268.    At an October 22, 2019 U.S. House Committee on Financial Services hearing, Congressman Bill Posey (R-FL) had the following exchange with Zuckerberg, which revealed a strikingly unscientific view of the scientific method with respect to vaccines:

> Representative Posey: I support vaccinations of children and adults, but I also support open and frank communication about the risks of vaccination. You testified that you believe in giving people a voice. Is Facebook able to assure us it will support users' fair and open discussions and communications about the risks as well as the benefits of vaccinations?

> Mr. Zuckerberg: We do care deeply about giving people a voice and freedom of expression. At the same time, we hear consistently from our community that people want us to stop the spread of misinformation. So what we do is try to focus on misinformation that has the potential to lead to imminent or physical harm, and that can include especially misleading health advice.

> Representative Posey: Are you 100% confident that vaccines pose no injury to any person on this planet?

Mr. Zuckerberg: *I don't think it would be possible for anyone to be 100 percent confident but my understanding of the scientific consensus is that it's important that people get their vaccines.*

Representative Posey: Shouldn't somebody have the opportunity to express an opinion different from yours?

Mr. Zuckerberg: If someone wants to post anti-vaccination content or they want to join a group where people are discussing that, we don't stop them from doing that. But […] we don't go out of our way to make sure our group recommendation systems show people or encourage people to join those groups. We discourage that.

*Facebook CEO Testimony Before House Financial Services Committee* [Video], C-SPAN (Oct. 23, 2019), https://www.c-span.org/video/?465293-1/facebook-ceo-testimony-house-financial-services-committee (emphasis added).

269.    Yet, by contrast, when it comes to "political speech," Zuckerberg claims to be a First Amendment absolutist. In a May 27, 2020 interview with Fox TV News anchor Dana Perino, Zuckerberg rebuked Twitter for its decision to tag two of President Donald Trump's tweets about mail-in voting with fact-check links. Zuckerberg said, "*I just believe strongly that Facebook shouldn't be the arbiter of truth of everything that people say online. Private companies probably shouldn't be, especially these platform companies, shouldn't be in the position of doing that.*" Rachel Sandler, *Zuckerberg Criticizes Twitter For Fact-Checking Trump Tweets*, FORBES (May 27, 2020), https://www.forbes.com/sites/rachelsandler/2020/05/27/zuckerberg-criticizes-twitter-for-fact-checking-trump-tweets/#2aec97616f7a (emphasis added). This is a very significant admission by Facebook's chairman even as he and his company purport to "arbitrate the truth" of open scientific controversies when doing so advances their business interests.

270.    On June 2, 2020, Zuckerberg held a "town hall" with Facebook employees who believe the company should take action on a controversial post by President Trump that "when the looting begins, the shooting begins[,]" which many people interpreted as a call for violence in nationwide protests over the death of George Floyd. Twitter put a warning label over the tweet, flagging it as violent content that violated that company's policies, but the tweet was

being left up because it was newsworthy. Facebook declined to take any action on a similar post on its site.

271.   At the "town hall," Zuckerberg defended his decision that the post did not constitute a policy violation, as he "personally walked employees through different interpretations of Trump's language." Zuckerberg's personal involvement in the decision is "characteristic of the way he has handled controversial policy choices over the last several years[.] [. . .] His leadership style contrasts with Twitter CEO Jack Dorsey, who tends to delegate policy decisions to his deputies. Zuckerberg also made the decision not to take down a video of House Speaker Nancy Pelosi that was manipulated to make her appear drunk. He made a personal call not to fact check political advertising, despite frustration from the public and from employees, according to a person familiar with the decision-making." Elizabeth Dwoskin, *Zuckerberg defends decisions on Trump as Facebook employee unrest grows*, WASHINGTON POST (Jun. 2, 2020), https://www.sfgate.com/news/article/Zuckerberg-defends-decisions-on-Trump-as-Facebook-15311764.php. Zuckerberg justified his decision not to act against the President's posts, citing his responsibility as the "leader of an institution committed to free expression." Donie O'Sullivan & Brian Fung, *Mark Zuckerberg tries to explain his inaction on Trump posts to outraged staff*, CNN BUSINESS (Jun. 2, 2020), https://www.cnn.com/2020/06/02/tech/facebook-all-hands-trump/index.html. Tellingly, Zuckerberg's professed commitment to "free expression" does not extend to truthful communication about vaccine safety or 5G network health risks.

272.   On an October 28, 2020, U.S. Senate Commerce Committee Hearing, Zuckerberg testified to his belief that free speech is an "equity" that should be weighed against other considerations, not a foundational freedom. Sen. Marsha Blackburn (R-TN) said in introducing her question that Facebook is "picking winners and losers," and that the company is "inserting itself" into issues of free speech. "Is the First Amendment a given right, or is that a competing equity?" she asked, referencing Zuckerberg's earlier commentary.

273.   "I believe strongly in free expression," Zuckerberg replied. "But I do think that, like all equities, it is balanced against other equities, like safety and privacy. Even people who

believe in the strongest possible interpretation of the First Amendment still believe there should be some limits on speech when it could cause an imminent risk of physical harm." Rudy Takala, *Mark Zuckerberg Says Facebook 'Balances' First Amendment Against 'Other Equities': 'There Should be Some Limits on Speech,'* MEDIAITE (Oct. 28, 2020), https://www.mediaite.com/news/mark-zuckerberg-says-facebook-balances-first-amendment-against-other-equities-there-should-be-some-limits-on-speech/.

## 2. Vaccine-Maker Ad Revenue.

274.    Facebook earns revenue primarily through the sale of targeted advertising that appears on members' Facebook pages. *See*, *e.g.*, *Fraley v. Facebook*, 830 F. Supp. 2d 785, 791 (N.D. Cal. 2011). Facebook generates 98 percent of its revenue through ads. It netted $17.4 billion from advertising in its most recent quarter. Tiffany Hsu & Cecilia Kang, "*Morally Impossible*": *Some Advertisers Take a Timeout From Facebook*, NEW YORK TIMES (Jun. 9, 2020), https://www.nytimes.com/2020/06/09/business/media/facebook-advertisers-trump-zuckerberg.html?searchResultPosition=2.

275.    Beginning as early as 2016, Facebook initiated programs to capture an ever greater share of the pharmaceutical direct-to-consumer advertising market. That year, Facebook unveiled a new feature enabling pharmaceutical companies to comply with regulatory restrictions on advertising by showing "important safety information," or ISI, in a scrolling section featured below the ad. Beth Snyder Bulik, *Bayer blazes new trails for pharma with Betaseron Facebook ad*, FIERCEPHARMA (Oct. 30, 2016), https://www.fiercepharma.com/marketing/bayer-s-first-facebook-ad-campaign-features-first-scrolling-isi-a-pharma-ad-facebook-ad. That feature has paid off hugely for Facebook.

276.    In a Washington Post article entitled *Facebook has a prescription: More pharmaceutical ads* dated March 3, 2020, journalist Natasha Tiku wrote:

> After years of avoiding social media, drug companies are growing
> bolder about advertising on Facebook and other social networks,
> according to interviews with advertising executives, marketers,
> health-care privacy researchers and patient advocates. That is
> exposing loopholes around the way data can be used to show
> consumers relevant ads about their personal health, even as both

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

social networks and pharmaceutical manufacturers disavow targeting ads to people based on their medical conditions.

Ads promoting prescription drugs are popping up on Facebook for depression, HIV and cancer. Spending on Facebook mobile ads alone by pharmaceutical and health-care brands reached nearly a billion dollars in 2019, nearly tripling over two years, according to Pathmatics, an advertising analytics company. Facebook offers tools to help drug companies stay compliant with rules about disclosing safety information or reporting side effects.

But seeing an ad for a drug designed to treat a person's particular health condition in the relatively intimate setting of a social media feed — amid pictures of friends and links to news articles — can feel more intrusive than elsewhere online. The same opaque Facebook systems that help place an ad for a political campaign or a new shoe in a user's feed also can be used by pharmaceutical companies, allowing them to target consumers who match certain characteristics or had visited a particular website in the past.

[…]

The growing concern about targeted pharmaceutical ads is unfolding against an expansion at Facebook focusing more generally on health — including encouraging more groups, where community members gather to discuss certain topics, like the one Downing moderates. It's also been actively soliciting more health-care-focused ads.

[. . .]

Pfizer, Allergan, Merck and GlaxoSmithKline were among the top 10 spenders on Facebook mobile ads in 2019, along with fast-growing health start-ups such as SmileDirectClub and Roman, according to Pathmatics.

Natasha Tiku, *Facebook has a prescription: More pharmaceutical ads*, WASHINGTON POST

(Mar. 3, 2020), https://www.washingtonpost.com/technology/2020/03/03/facebook-pharma-ads/.

277.   "While healthcare and pharma digital ad spending has grown faster in previous

years, its 2020 growth is substantial, as the total US digital ad market is expected to grow by

only 1.7%." Blake Droesch, US Healthcare and Pharma Is Among the Fastest-Growing Digital Ad Spenders, eMarketer (Oct. 9, 2020), https://www.emarketer.com/content/us-healthcare-pharma-digital-ad-spending-outlook.



278.

| | IMS Health Social Media Engagement Index | Score |
|---|---|---|
| 1 | Johnson & Johnson | 70 |
| 2 | GlaxoSmithkline | 25 |
| 3 | Novo Nordisk | 23 |
| 4 | Pfizer | 20 |
| 5 | Novartis | 18 |
| 6 | Boehringer Ingelheim | 18 |
| 7 | Bayer | 16 |
| 8 | Merck & Co | 13 |
| 9 | AstraZeneca | 10 |
| 10 | UCB | 9 |

279.

280.   As alleged *supra*, Merck & Co., Pfizer, and GlaxoSmithKline are three of the four pharmaceutical manufacturers (Sanofi is the other) which control the United States

vaccine market. Facebook and Zuckerberg personally have a substantial adverse motive to protect the brands and goodwill of their largest pharmaceutical advertising buyers from criticism, however legitimate and well-founded, at the hands of CHD.

### 3. Vaccine Development.

281. In December 2015, Zuckerberg and his wife Dr. Priscilla Chan co-founded the Chan Zuckerberg Initiative, LLC, ("CZI"), a for-profit corporation, of which he is chairman, chief executive officer, and co-managing member, with a pledge to "donate" (i.e., transfer) 99 percent of their Facebook shares, then valued at $45 billion. CZI and CZ Biohub, its wholly-owned subsidiary, have set as their "moon shot mission" the goal "to cure all disease on the planet within the Facebook executive's childrens' lifetimes." The CZI Infectious Disease Initiative seeks to develop new drugs, diagnostic tests and vaccines that could aid the fight against diseases like HIV, Ebola and newly emerging threats like Zika. *CZI Announces the Chan Zuckerberg Biohub*, CHAN ZUCKERBERG INITIATIVE (Sept. 23, 2016), https://chanzuckerberg.com/newsroom/czi-announces-the-chan-zuckerberg-biohub/. CZI purports that "[o]ur scientists and engineers will apply the most advanced technologies available today and work to invent new tools as well to support the global fight against infectious diseases. The work will be clustered around four key areas: diagnostic tests, new drugs, vaccines and rapid response."

282. With respect to vaccines specifically, CZI's online statement purports that:

> We're seeking new approaches to overcoming challenges that have stymied vaccine development for diseases like HIV/AIDS and tuberculosis. To push forward on vaccine development, we'll use recent advances emerging from structural biology, machine learning and computer-assisted protein design to establish a new approach for creating vaccine candidates. And we'll adopt "machine learning" strategies to develop powerful computer programs that can sort through large volumes of scientific data for insights.

> We believe machine learning technology, now used for things like driverless car and threat assessments, could be particularly effective for probing clinical trial data for insights existing analytical methods fail to find.

*Infectious Disease Initiative*, CHAN ZUCKERBERG BIOHUB, https://www.czbiohub.org/projects/ infectious-disease/ (last visited Aug. 15, 2020).

283.    In 2018, Zuckerberg purported to transfer 29 million of his Facebook shares, worth $5.3 billion, to CZI. Overall, the CZ Biohub (CZB) is expected to receive a transfer of $600 million over the course of ten years from Zuckerberg. The CZB provides $50 million in funding for researchers based in the San Francisco area at UC Berkeley, Stanford University, and the University of California at San Francisco (UCSF). 750 researchers applied for the grants, and 47 were awarded cash grants of up to $1.5 million, presumably in exchange for patent ownership transfers to CZB, and thereby to Zuckerberg as controlling co-owner and co-manager. *The Chan Zuckerberg Biohub*: *Seeking to Cure All Diseases*, BIOLEGEND BLOG, https://www.biolegend.com/ja-jp/blog/the-chan-zuckerberg-biohub-seeking-to-cure-all-diseases (last visited Aug. 15, 2020).

### 4.    5G Networks.

284.    Over the past five years, Facebook has made significant investments in developing 5G home systems, 60 GHz antenna infrastructure for cities ("Project Telegraph"), and 5G for rural areas ("Project Aries"), as well as satellites. Facebook purchased Inovi, a 5G company, which it used to build a trial 5G network in San Jose, California and on Facebook's "campus" to test the viability and cost-effectiveness of 5G for mass deployment. Facebook also spearheaded the Telecom Infrastructure Project ("TIP"). By building a network of companies focused on 5G, Facebook seeks to harmonize the technical and standardization challenges of rolling out the 5G network. Bijan Khosravi, *Facebook's New Focus On 5G and Golden Opportunity for Entrepreneurs*, FORBES (Apr. 30, 2018), https://www.forbes.com/sites/ bijankhosravi/2018/04/30/todays-black-clouds-over-facebook-will-part-look-at-their-golden-ideas-in-5g/#37c15fdd313b.

285.    Facebook also collaborates with Common Networks, a United States company, to deliver ultra high-speed gigabit internet service to residential customers. Common Networks is using Facebook's Terragraph technology, which employs high-frequency radio waves to speed up networks in locations with dense populations, as a replacement for standard home

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

broadband. Katie Collins, *Facebook and partners collaborate to bring 5G wireless internet to California homes*, CNET (Feb. 25, 2019), https://www.cnet.com/news/facebook-brings-faster-than-fiber-5g-wireless-connectivity-to-california/.

286.    Facebook's subsidiary PointView Tech has designed an internet satellite (called "Athena") to provide broadband access to unserved and underserved areas throughout the world. Facebook's designers intend that Athena will deliver data 10-times faster than SpaceX's Starlink satellites. Mark Harris, *Facebook May Have Secret Plans to Build a Satellite-Based Internet*, IEEE (May 2, 2018), https://spectrum.ieee.org/tech-talk/aerospace/satellites/facebook-may-have-secret-plans-to-launch-a-internet-satellite. To support this expansion, Facebook among other companies and governments have plans to launch collectively nearly 50,000 satellites to provide 5G and Wi-Fi services everywhere on Earth. *See*, *e.g.*, Henry, C., *Facebook willing to invest in satellite user equipment*, SPACE NEWS (March 8, 2017), https://spacenews.com/facebook-willing-to-invest-in-satellite-user-equipment/.

287.    Facebook recently announced its plan to construct an undersea cable circling the African continent ("Project Simba"), to complement its transatlantic cable "Marea." Facebook intends that this global wifi infrastructure will support its "Free Basics" project, which provides cheap internet services to the developing world. It currently operates in 63 countries.

288.    The greater bandwidth and lower latency (delay) of 5G will allow Facebook to display more advertising content to its users at faster browsing speeds, generating ever more ad revenue for Facebook. It also stands to benefit financially from expanded global Internet access to its social media platform through expanding 5G networks. *See*, *e.g.*, Jessi Hempel, *Inside Facebook's Ambitious Plan to Connect the Whole World*, WIRED (Jan. 19, 2016), https://www.wired.com/2016/01/facebook-zuckerberg-internet-org/.

289.    Facebook also profits from expanded 5G networks, which can leverage other substantial investments it has made in new technologies. In 2014, Facebook acquired the virtual reality company Oculus for $2 billion, and since then, Facebook has filed a number of related patents in the field of augmented reality technology (AR, VR, and home hardware products). *See*, *e.g.*, Christopher Yasiejko & Sarah Frier, *Facebook's Augmented Reality Push*

*Causes Leap in U.S. Patents*, BLOOMBERG (Jan. 14, 2020), https://www.bloomberg.com/news/articles/2020-01-14/facebook-s-leap-in-u-s-patents-hints-at-eye-on-virtual-reality (Zuckerberg opinion that "at some point in the 2020's, we will get breakthrough augmented reality glasses that will redefine our relationship with technology"); Leo Sun, *Will Facebook Redefine Augmented Reality With Stella and Orion*?, MOTLEY FOOL (Sept. 20, 2019), https://www.fool.com/investing/2019/09/20/will-facebook-redefine-augmented-reality-with-stel.aspx (With respect to augmented reality, Facebook plans to manufacture "smartglasses" which it has 'codenamed' 'Stella," set to launch between 2023 and 2025, and a more advanced model it has 'codenamed' 'Orion.'). The success of these AR and other products depends to a significant extent (if not entirely) on Facebook's capacity to exploit 5G networks' increased bandwidth and speed.

290.    Additionally, Facebook has solidified its position as a leading developer of artificial intelligence ("AI") technology. 5G helps enable both AI and drone technology. Tom Taulli, *Facebook AI (Artificial Intelligence): Will M&A Help*?, FORBES (Feb. 15, 2020), https://www.forbes.com/sites/tomtaulli/2020/02/15/facebook-ai-artificial-intelligence-will-ma-help/#104eed427664. Facebook purportedly has also been developing solar-powered drone technology. Jon Russell, *Facebook is reportedly testing solar-powered internet drones again — this time with Airbus*, TECHCRUNCH (Jan. 21, 2019), https://techcrunch.com/2019/01/21/facebook-airbus-solar-drones-internet-program/?guccounter=1.

291.    Finally, Facebook stands to benefit from its investments in the "Internet of Things" infrastructure that depends on 5G. At present, roughly 8.4 billion 'things' make up this 'universe,' – from cars to appliances to wearable tech – which represents a 31% increase in the past four years. By the year 2025, that number may increase to 55 billion internet-enabled devices. *The Internet of Things will thrive on 5G technology*, VERIZON (Jun. 12, 2018), https://www.verizon.com/about/our-company/5g/internet-things-will-thrive-5g-technology. Facebook's business plan contemplates widespread exploitation of 5G networks across the globe to drive its platform's profitability.

292.   While Facebook has faced criticism from Rep. Schiff regarding vaccine "misinformation" and while there have been calls from public health institutions to address to vaccine "misinformation," there have been little-to-no public calls regarding 5G. It would appear that censorship of CHD's 5G-critical content is directly related to Facebook's economic interests, quite possibly coming at the suggestion from Zuckerberg himself.

293.   The 5G CHD material does not violate any community guidelines. *Community Standards, supra*, FACEBOOK, https://www.facebook.com/communitystandards/. Rather, Facebook and Zuckerberg have censored, flagged, and demoted CHD's 5G-related posts in bad faith and for pretextual reasons to conceal their true motives in advancing 5G deployment globally, and suppressing any speech which increases 5G-"hesitancy," here and abroad.

**G.     No Affirmative Defense of CDA Section 230 Immunity.**

294.   The Communications Decency Act (CDA) states: "No provider or user of an interactive computer shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The affirmative defense of Section 230 immunity has been broadly construed as to information provided by third parties and hosted on Facebook. However, if an entity is "responsible, in whole or in part, for the creation or development of information" that forms the subject matter of the lawsuit, it is itself a content provider and is not protected. 47 U.S.C. § 230(f)(3).

295.   In publishing its false "warning label" and "fact-checks," Facebook has acted, and continues to act, both as an interactive computer service provider and as "content provider." Section 230(f)(3) defines an information content provider as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." Under Ninth Circuit law, as to content that a website service provider creates itself, or is responsible in whole or in part for creating or developing, the website is also a content provider. *Fair Housing Council v. Roommates.com, LLC*, 521 F.3d at 1162-63; *Fraley v. Facebook*, 830 F. Supp. 2d at 801-02. Under the CDA, 47 U.S.C. § 230(f)(3), Facebook's warning label and its other affirmative content-development and creation far exceed "a publisher's traditional editorial functions,"

*Batzel v. Smith*, 333 F.3d 1018, 1031 n.18 (9th Cir. 2003), and far exceed that content-creation of question-and-answer-sets which the Ninth Circuit found sufficient in the *Roommates.com* case. *See*, *e.g.*, *Roommates.com*, 521 F.3d at 1163 (Congress did not seek to immunize "the *creation* of content.") (emphasis added). Facebook has no immunity from liability for actionable harms arising from its fraudulent course of conduct.

296.    47 U.S.C. § 230(c)(2)(A) grants immunity from civil liability to an interactive computer service provider for "any action voluntarily taken *in good faith* to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." (Emphasis added). Here, Facebook's application of fact-checking, demotion, and censorship against CHD are pretextual, and in truth are driven by Zuckerberg's ulterior profit motives and ideological interests, and government pressure and benefits, rather than the vague catch-all for "otherwise objectionable" speech within Facebook's community guidelines. For all the reasons alleged herein, Facebook and Zuckerberg have not acted in "good faith" with respect to CHD's page, as required by 47 U.S.C. § 230(c)(2)(A).

### H.    Section 230 Immunity Plus Pressure Equals State Action.

297.    There are very cogent reasons in law and public policy why some kind of constitutional scrutiny must be triggered when legislators, through an immunity statute, such as the Communications Decency Act ("CDA") deliberately seek to induce private conduct that would violate constitutional rights if state actors engaged in that conduct themselves.

298.    The U.S. Supreme Court has found state action in two cases where an immunity statute (or its equivalent) was coupled with official pressure on a private actor to address a specific issue: *Skinner v. Ry. Labor Execs.' Ass'n*,, 489 U.S. 602 (1989) and *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). In *Skinner*, the Supreme Court held that a federal agency regulation designed to induce private railroads to test their workers for drugs and alcohol subjected a subsequent search by a private railroad to Fourth Amendment protections.  The regulation immunized the railroad from all state law liability, and the government had made

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

plain its strong preference for testing. Accordingly, "the Government's encouragement, endorsement, and participation" "suffice to implicate the Fourth Amendment." *Skinner*, 489 U.S. at 615-616.

299.    Just as the agency regulation in *Skinner* immunized from state law liability railroads that administered specified tests, Section 230 immunizes from state law liability platforms that censor "lewd, lascivious, filthy, excessively violent, harassing or otherwise objectionable" material. Just as railway workers were not free to decline to submit to the tests, so too CHD cannot decline to submit to Facebook censorship; in both cases, individuals who refuse to comply can be excluded from service. And just as the government in *Skinner* had made plain its "strong preference" for the testing, Section 230 and its legislative history make plain the government's strong preference for the removal of "offensive" content. Moreover, the CDC, WHO, and Rep. Schiff have actively encouraged, endorsed, and participated in Facebook's conduct at issue here.

300.    In *Bantam Books*, *supra*, the Supreme Court held that informal governmental pressure and threats can turn private-party conduct into state action. *Bantam*, 372 U.S. at 68. In *Bantam Books*, a private bookseller had stopped selling certain books after receiving a letter from state commissioners listing those books as objectionable and suggesting that the bookseller might be referred to local prosecutors if he continued selling them. The court found "state action." *Bantam*, 372 U.S. at 72. The conceptual "bottom-line" is this: When governmental pressure is combined with a statutory provision like Section 230, the result must be state action. Immunity plus pressure has to trigger the Constitution's restraints. This case offers a paradigm of how government immunity (Section 230) plus pressure (Rep. Schiff) and benefits and various forms of collaboration (CDC/WHO), should turn Facebook and Zuckerberg's private-party conduct into state action.

## I.    The May 28, 2020 Executive Order.

301.    On May 28, 2020, President Donald J. Trump issued an Executive Order on Preventing Online Censorship. The Executive Order provides, in pertinent part:

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

> *Sec. 2.  Protections Against Online Censorship.* (a) [. . .] It is the policy of the United States to ensure that, to the maximum extent permissible under the law, this provision [47 U.S.C. § 230] is not distorted to provide liability protection for online platforms that — far from acting in "good faith" to remove objectionable content — instead engage in deceptive or pretextual actions (often contrary to their stated terms of service) to stifle viewpoints with which they disagree. [. . .] When an interactive computer service provider removes or restricts access to content and its actions do not meet the criteria of [47 U.S.C. § 230] subparagraph (c)(2)(A), it is engaged in editorial conduct. It is the policy of the United States that such a provider should properly lose the limited liability shield of subparagraph (c)(2)(A) and be exposed to liability like any traditional editor and publisher that is not an online provider.

*Executive Order on Preventing Online Censorship*, Executive Orders, THE WHITE HOUSE (May 28, 2020), https://www.whitehouse.gov/presidential-actions/executive-order-preventing-online-censorship/.

302.    The Executive Order's free expression principles are consistent with this lawsuit, and its statement of the policy of the United States may be informative for the Court. But, as set forth, *supra*, the Court need not rely upon the Executive Order to adjudicate this controversy because CHD's claims for relief are fully viable and warrant extraordinary relief under existing authorities.

## FIRST CAUSE OF ACTION

## (FIRST AND FIFTH AMENDMENTS — *BIVENS* VIOLATIONS)

### Defendants Facebook, Zuckerberg, Science Feedback, Poynter, and Does 1-20

303.    Paragraphs 1 through 302 are realleged and incorporated as if fully set forth herein.

304.    Plaintiff seeks an implied private damages remedy against private defendants who act jointly or in concert with federal government agencies or actors to deny Plaintiff's First Amendment speech and Fifth Amendment property rights. *Davis v. Passman*, 442 U.S. 228 (1979) (implied damages remedy under Fifth Amendment Due Process Clause); *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (Fourth

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

Amendment). The private cause of action is implied under 28 U.S.C. § 1331 to vindicate constitutional rights which would otherwise go unredressed. By analogy to 42 U.S.C. § 1983, Plaintiff must show both (1) the deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of [federal] law. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138 (9th Cir. 2012).

305.    The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations, and the constitutional tort remedy against private entities is foreclosed only where claimant has other effective remedies. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 71 (2001); *cf. Davis v. Passman*, 442 U.S. at 245 ("For Davis, as for Bivens, it is damages or nothing."). Here, too, a private remedy should be implied because Plaintiff has no other recourse to right the wrongs of all defendants, corporate and individual.

306.    The First Amendment protects Plaintiff's rights of free speech and association. Under the First Amendment, Americans have the right to hear all sides of every issue and to make their own judgments about those issues without government interference or limitations. Content-based restrictions on speech are presumptively unconstitutional, and courts analyze such restrictions under strict scrutiny. It is axiomatic that public agencies such as the CDC and WHO could not themselves directly censor or issue a prior restraint upon Plaintiff's online speech. *See*, *e.g.*, *Freedman v. Maryland*, 380 U.S. 51, 59 (1965) (motion picture exhibition censoring panel could prohibit screening of films only if it assured exhibitor "that the censor will, within a specified brief period, either issue a license or go to court to restrain showing the film"); *Speiser v. Randall*, 357 U.S. 513, 526 (1958) ("Where the transcendent value of speech is involved, due process certainly requires . . . that the State bear the burden of persuasion to show that the appellants engaged in criminal speech."). So, here, the judicial branch must affirm a bedrock principle of liberty that governmental agencies cannot legally "sub-contract" or "privatize" the role of public censor to Facebook as an end-run around the Constitution. Facebook's actions, taken "under color of" federal law, *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 954 (9th Cir. 2008) (en banc), constitute a violation of Plaintiff's constitutional free speech rights.

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

307.    Defendants' deprivation of Plaintiff's federal rights is "fairly attributable" to the government, *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982), as it was taken with significant encouragement from, and in close consultation with, governmental agencies and actors. *Franklin v. Fox*, 312 F.3d 423, 444-45 (9th Cir. 2002). Ultimately, joint action exists when the government has "'*so far insinuated itself into a position of interdependence with* [*the private entity*] *that it must be recognized as a joint participant in the challenged activity.*'" *Gorenc v. Salt River Project Agric. Improvement & Power Dist.*, 869 F.2d 503, 507 (9th Cir. 1989) (emphases added). Defendants' misconduct is a far cry from "merely hosting speech by others." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019); *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1124-1126 (N.D. Cal. 2020) (supplying information to the State alone does not amount to state action).

308.    Specifically, the corporate and individual defendants have acted in concert with Rep. Schiff, federal officials at the CDC and the CDC Foundation, and under the CDC's express consent, the WHO, a United Nations specialized agency, to deprive Plaintiff of its constitutional free expression rights. At all times relevant hereto, the United States was a member of the WHO. Under Article 71 of its Constitution, the WHO may only consult and cooperate with non-governmental national organizations *with the consent of the Government concerned*. *Basic Documents*, WORLD HEALTH ORGANIZATION, *supra*, https://apps.who.int/gb/bd/pdf_files/BD_49th-en.pdf#page=1 (emphasis added).

309.    Facebook willfully participated in joint action with Rep. Schiff, CDC and CDC Foundation, and/or WHO officials or their agents to enforce CDC and WHO policies through Facebook's signature algorithms and machine learning to define, identify, label as "false news" and/or censor Plaintiff's speech with respect to vaccine-related speech. For *Bivens* purposes, the WHO must be recognized as a public entity, particularly when its charter requires official consent for its involvement with Facebook.

310.    Rep. Schiff's February 14, 2019 public letter to Zuckerberg deployed the term "vaccine misinformation" as it has been used by the CDC and WHO, as a substantive standard by which to censor, flag, or demote any expression of skepticism toward government or

pharmaceutical industry pronouncements about vaccine safety or efficacy, regardless of its truth. Rep. Schiff also forcefully encouraged Facebook to refer users to "authoritative" sources of information, i.e., the CDC and/or WHO.

311.     On March 7, 2019, with flagrant disregard for CHD's nine-page letter rebuttal, Facebook publicly cited the CDC and WHO as *the* sources of Facebook's initiative to identify and "take action against verifiable vaccine hoaxes," including removing such content from its platform. Facebook also identified those governmental agencies as *the* sources of affirmative information which Facebook would instead provide to its members, by posting that content at the top of results for related searches, on pages discussing the topic, and on invitations to join groups about the topic. *Combatting Vaccine Misinformation*, FACEBOOK, *supra*, https://about.fb.com/news/2019/03/combatting-vaccine-misinformation/. The same day that Facebook published its Warning Label on CHD's page, the WHO publicly boasted that Facebook's effort was the product of "*several months of discussion*" between the two. *Vaccine Misinformation: Statement by WHO Director-General on Facebook and Instagram*, *supra*, https://www.who.int/news-room/detail/04-09-2019-vaccine-misinformation-statement-by-who-director-general-on-facebook-and-instagram (emphasis added). Unlike *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d at 1126, where no plausible "meeting of the minds" was alleged, Facebook's consultation and joint action with the CDC and WHO predates and provides the template by which Facebook has injured Plaintiff, and strongly suggest extensive willing collaboration between them toward that end..

312.     Moreover, defendants integrated CDC and WHO definitions of "vaccine hoax" into the algorithms and machine learning by which they have identified CHD's content, which is often flagged merely because it is critical of those same agencies as "biased", "unreliable", and "out-of-date." Science Feedback's "fact-checker" responses merely cite to those flawed CDC studies of which Plaintiff is justly critical. Essentially, the government furnished critical information to Facebook, which Facebook then willfully used to effectuate its misinformation and agitprop scheme. Defendants' behavior qualifies as "state action" under the joint action test due to their active cooperation and interdependence with the CDC and WHO. On the

public record, there is a "sufficiently close nexus" or symbiosis between the federal government and the challenged actions of defendants that the actions of the latter may be fairly treated as those of the government itself. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974). The CDC's and WHO's open and extensive coordination with Facebook shows "state action" in furtherance of an agreement between the government and a private party for purposes of Plaintiff's *Bivens* claim.

313.   Rep. Schiff also acted "under color of federal law" in issuing his pointed request to Facebook to censor and remove "vaccine misinformation" from its platform. Thus, Rep. Schiff's conditional notice to remove Facebook's Section 230 immunity also constitutes "significant encouragement, either overt or covert, that the [private actor's] choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

314.   It is well-established that, as a general rule, the government "may not suppress lawful speech as the means to suppress unlawful speech." *Ashcroft v. Free Speech Coalition*, 535 U. S. 234, 255 (2002). Facebook has closely coordinated with government actors in the design of its aims, and the technical means by which Facebook applies public agency definitions and literature to accomplish their jointly-held goals: to identify, warn against, purportedly "rebut," and censor so-called "vaccine hoax" speech. Facebook's actions in censoring CHD's protected speech amount to state action for purposes of the First Amendment. *See*, *e.g.*, *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983).

315.   In the typical case raising a state action issue, a private party has taken the decisive step that caused the harm to the Plaintiff, and the question is whether the State was *sufficiently involved* to treat that decisive conduct as state action. *Nat'l Collegiate Athletic Ass'n. v. Tarkanian*, 488 U.S. 179, 192, 102 L. Ed. 2d 469, 109 S. Ct. 454 (1988). Beyond the public record cited *supra*, the missing pieces of official "involvement" are within the Facebook defendants' possession, custody, and control. Plaintiff requires judicial process to obtain defendants' records and recollections of the "who, what, when, where, why, and how" of Facebook's collaboration with Rep. Schiff, the CDC and WHO, the CDC Foundation, and/or others under their supervision or control, to design, implement, and monitor Facebook's

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

1  "vaccine misinformation" algorithm for identifying anti-CHD content, and/or to supervise or

2  monitor Facebook "fact-checkers" opposition articles.

3      316.    Assessing whether conduct by Facebook and Zuckerberg constitutes action under

4  "color of law" is a "necessarily fact-bound inquiry," addressed on a case-by-case basis. *Lugar*

5  *v. Edmondson Oil Co., Inc.*, 457 U.S. at 939; *see also Skinner v. Ry. Labor Execs.' Assoc.*, 489

6  U.S. at 614 (holding that courts consider the totality of the circumstances to determine whether

7  conduct amounts to state action). There is no rigid formula for assessing whether there is a

8  sufficiently close nexus between the State and the challenged private conduct. "Only by sifting

9  facts and circumstances can the nonobvious involvement of the State in private conduct be

10 attributed its true significance." *Burton v. Wilminton Parking Auth.*, 365 U.S. at 722.

11     317.    Here, there are several overlapping features in the public record, which is the "tip

12 of the iceberg." First, the CDA Section 230 immunity statute plus the "informal policy" of

13 coercion and encouragement by which Rep. Schiff, the WHO (with express consent of the

14 CDC), and the CDC itself induced Facebook's censorship rises to the level of state action

15 under the *Skinner* and *Bantam Books* line of cases. Second, the CDC and CDC Foundation,

16 WHO, Facebook and Zuckerberg have formed a "symbiotic relationship" with one another,

17 from which the government benefits, and whose division of labor is that Facebook serves as

18 those public agencies' "content manager" on its platform. In other nonobvious ways, those

19 government agencies and Facebook "somehow reached an understanding," or quid pro quo, to

20 censor and demonetize CHD's page. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152

21 (1970) (conspiracy between private restaurant and policeman to arrest plaintiff schoolteacher

22 following her sitdown strike). "The mere fact that [Facebook] might have been willing to act

23 without coercion makes no difference if the government did coerce." *Carlin Communications*

24 *Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1295 (9th Cir. 1987), *cert. denied*, 483

25 U.S. 1029 (1988).

26     318.    Facebook and the other defendants violated Plaintiff's First Amendment rights

27 by labeling CHD's content "False Information," and taking other steps effectively to censor or

28 block content from users. With a mix of these and other nonobvious forms of governmental

119      **VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

coercion and encouragement, Facebook took these actions against Plaintiff in an effort to silence and deter its free speech solely on account of their viewpoint. The case raises an urgent wrong that will go unredressed absent a judicial remedy fitted to the high stakes of speech suppression in a free society.

319.    In addition, the Fifth Amendment provides that "[n]o person shall be . . . deprived of . . . property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. In May 2019, Facebook permanently disabled the "donate" button on CHD's Facebook page, for and in which action Facebook received significant encouragement from the government. *Cf. Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc.*, 795 F.2d 1344, 1346 (7th Cir. 1986) ("A state cannot avoid its obligations under the due process clause by delegating to private persons the authority to deprive people of their property without due process of law."). And, as Rep. Schiff requested, Facebook also refused to carry CHD's advertising of its fundraising campaigns.

320.    Facebook misrepresented to CHD as its rationale that CHD had violated its fundraising terms. But, in actuality, Facebook took these punitive actions to squelch CHD's viewpoint by cutting off its donations. Defendants' actions amount to an unlawful deprivation or "taking" of Plaintiff's property interests in its own fundraising functions.

321.    "[T]he existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164 (1998) (*quoting Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)). Certainly, by that measure, the funding button is a "thing of value" to CHD as its beneficial owner, and a valid property interest by means of which CHD raised $41,241 in user donations from January to May 2019 alone. *See*, *e.g.*, *Boston Chamber of Commerce v. Boston*, 217 U.S. 189, 195 (1910) (Holmes, J.) ("the question is what has the owner lost, not what has the taker gained"). Indeed, it may be said that Facebook's fundraising function is as much a lifeblood for CHD as it is for many other 501(c)(3) organizations, and that the power to remove it at the government's behest is the power to destroy these charitable organizations.

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

322.    Facebook violated Plaintiff's Fifth Amendment rights by confiscating its fundraising functions under color of law without just compensation or due process. Facebook took these actions against CHD in order to snuff out CHD's ability to raise funds, solely on account of CHD's viewpoint. Defendants' removal of the donate button is conduct suggesting that CHD is unworthy of monetary contributions and, thus, the object of special opprobrium, all damaging to CHD's reputation and its ability to sustain itself. This represents another urgent wrong that will go unredressed absent a judicial remedy fitted to the high stakes of officially sponsored viewpoint-suppression in a free society.

323.    Additionally, to establish a First Amendment retaliation claim, Plaintiff must show that: (1) it engaged in constitutionally protected activity; (2) the defendants' resulting actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and, (3) the protected activity was a substantial or motivating factor in the defendants' conduct. *See Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006); *Skoog v. County of Clackamas*, 469 F.3d 1221, 1235 (9th Cir. 2006) (plaintiff stated a claim for First Amendment retaliation by asserting that a police officer had obtained and executed a search warrant against him to punish him for filing a lawsuit against another police officer).

324.    On August 17, 2020, CHD filed this action against Facebook and Zuckerberg. On or about August 31, 2020, CHD received notice that Facebook would modify the parties' contractual term of service § 3.2, effective October 1, 2020, to read: "We also can remove or restrict access to your content, services, or information if we determine that doing so is reasonably necessary to avoid or mitigate adverse legal or regulatory impacts to Facebook."

325.    Essentially, the Facebook-CHD relationship has morphed over three stages: (1) the pre-2019 one in which Facebook did not interfere at all with CHD's truthful content; (2) the 2019 through August 17, 2020 one in which Facebook damaged CHD through flags, labels, and "fact-checks"; and (3) the post-August 17, 2020 one in which Facebook, still acting under "color of law," has damaged CHD in new and other ways by removing CHD's content or restricting accessing to the material to CHD principals. Section 3.2 purports to allow Facebook to do that simply to "avoid adverse legal or regulatory impacts to Facebook." And that is

precisely what Facebook has now done under its new § 3.2 in the ten weeks since the action was filed. This third paradigm states a clear case of retaliation by Facebook in the context of CHD's protected activity in filing this action, at least in part because the removal of this CHD content and the restriction of access to it, were not actions that Facebook deemed authorized under its prior terms.

326.   Close proximity in time between a protected activity and an adverse action alone establish a prima face case of retaliatory causation. Facebook's use of its newly-amended § 3.2 so close on the heels of CHD's lawsuit to demote or block CHD's previously "fact-checked" content is clear evidence that Facebook (in its role as a state actor) is also retaliating for CHD's protected conduct in filing the action.

327.   Plaintiff needs process to ascertain the full extent to which Facebook has demoted or blocked its posts since the filing of this action, and that Facebook has taken these steps, also, under "color of law." So far as Plaintiff can establish, it appears that, since August 17, 2020, Facebook has retaliated for CHD's protected activity by removing entirely at least six previously "fact-checked" CHD posts, which are no longer visible as of November 8, 2020 at the latest: (1) Epoch Times CDC vaccines/autism article (factchecked on or about March 13, 2020; (2) The Jewish Voice Luc Montagnier COVID article (fact-checked on or about April 16. 2020, but no longer visible); (3) RFK, Jr. Merck/Gardasil presentation (fact-checked on or about May 15, 2020, but no longer visible); (4) Brian Hooker vaxxed/unvaxxed article (fact-checked on or about May 28, 2020, but no longer visible); (5) Decreased Infant Deaths (fact-checked on or about June 20, 2020, but no longer visible); and (6) RFK, Jr./Dershowitz Debate (posted on or about July 23, 2020, but no longer visible).

328.   "[The plaintiff] must ultimately prove that [the defendant's] desire to cause the chilling effect was a but-for cause of [the defendant's] action." *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 900-01 (9th Cir. 2008) (citation omitted); *see also Vinatieri v. Mosley*, 787 F. Supp. 2d 1022, 1033 (N.D. Cal. 2011) *aff'd*, 532 Fed. Appx. 762 (9th Cir. 2013). "Because direct evidence of retaliatory intent rarely can be pleaded in a complaint, allegation of a chronology of events from which retaliation can be inferred is sufficient to survive

dismissal." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012); *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995) ("timing can properly be considered as circumstantial evidence of retaliatory intent").  It is also significant that, despite having removed the purportedly "harmful" content, Facebook has not restored CHD's fundraising tools. This suggests that CHD's posts were pretextually fact-checked in order to justify demonetization in the first place.

### SECOND CAUSE OF ACTION
### (LANHAM ACT VIOLATIONS — 15 U.S.C. § 1125(A))

**Defendants Facebook, Zuckerberg, Science Feedback, Poynter, and Does 1-20**

329.    Paragraphs 1 through 328 are realleged and incorporated as if fully set forth herein.

330.    The elements of a false promotion claim under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), are: (1) in an advertisement or promotion, defendants made false statements of fact about its own or another's services; (2) the promotion actually deceived or has the tendency to deceive a substantial segment of their audience; (3) such deception is material, in that it is likely to influence the purchasing decision; (4) defendants caused their falsely promoted services to enter interstate commerce; and (5) Plaintiff has been or is likely to be injured as the result of the foregoing either by direct diversion of sales from themselves to defendants, or by lessening of the goodwill which its services enjoy with the buying public. *Rice v. Fox Broad Co.*, 33 F.3d 1170, 1180 (9th Cir. 2003). Facebook's warning label and "fact-checks" on CHD's page violate the Lanham Act in that these are (1) commercial speech; (2) by defendants who or whose privities are in commercial competition with Plaintiff; (3) for the purpose of influencing consumers to buy defendants' goods or services, or to lessen the goodwill which CHD's services enjoy with the contributing public; and (4) disseminated sufficiently to the relevant purchasing public to constitute "promotion" within that industry. *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999). Facebook and the individual defendants made, authored, and published the warning label and "fact-checks" on CHD's page in order to deter Plaintiff's followers and other consumers from

listening to, trusting, and relying on Plaintiff's content, and donating or contributing to Plaintiff. By warning consumers instead to "go to CDC.gov" for "reliable and up-to-date [vaccine] information," defendants intended to persuade consumers instead to follow the CDC's recommendations to get the vaccines produced by its major advertisers, Merck, GSK, Sanofi, and Pfizer, who buy $1 billion per annum in advertisements from Facebook.

331.   The Lanham Act is not strictly limited to conduct that is unfair to a direct competitor, if defendant is affiliated with a competitor. Here, it suffices that Facebook is engaged in promoting competitive products through its pharmaceutical manufacturer advertisers, and competitive services through its affiliation with the CDC and WHO. *See*, *e.g.*, *Grasshopper House, LLC v. Clean & Sober Media LLC*, 394 F. Supp. 3d 1073 (C.D. Cal. 2019) (finding liability where adverse reviewer was allied with competitor). Facebook's intention to lessen the goodwill which CHD's services enjoy is manifest from its false "warning label" and "fact-checks" and its disabling of CHD's fundraising function and advertising. Plaintiff has suffered a competitive injury under the Lanham Act.

332.   The false representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d at 735. Facebook's "warning label" and "fact-checks" are promotional in that these are all part of Facebook's ongoing "vaccine misinformation" public relations campaign. *See*, *e.g.*, *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 77 (1983) (mailing of informational pamphlets by non-profit organization can be classified as commercial speech). Facebook's "community initiatives" are promotional by definition because Facebook's business model is, always and in all things, to manufacture users' "trust" in Facebook – so Facebook can collect, manipulate, and market more of those trusting users' data. "Facebook's business model [] rests on the need to keep consumers engaged in its services on the one hand and the need to monetize the data it gathers by targeting those users with new services and advertising on the other. [. . .] Over the long term, Facebook's business model must evolve to center around trust, which means making user privacy and data security

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

as important as monetization." Adam Burt, *Can Facebook Ever Be Fixed*?, HARVARD BUSINESS REVIEW (April 8, 2019), https://hbr.org/2019/04/can-facebook-ever-be-fixed.

333.    Facebook and CHD may reasonably be considered commercial competitors with respect to the messaging regarding vaccines and 5G that they promulgate to Facebook users. That Facebook views CHD as a competitor is demonstrated by its comprehensive, carefully planned and aggressive campaign to falsely label CHD's website content, to marginalize and stigmatize CHD, and to subject it to severe commercial damage by cutting off CHD's advertising and deactivating its funding button. CHD depends on donor funds for its survival. Facebook — possessing commercial power which most businesses do not have with respect to their competitors — has engaged in the ultimate form of unfair commercial competition by unilaterally cutting off a major source of CHD's funding. This particular censorship technique is integrally linked with Facebook's false warning labels and false "fact-checks" which mischaracterize CHD's website content. All of these devices are part of Facebook's false advertising campaign directed against CHD for the overarching purpose of stigmatizing CHD's messages regarding vaccine transparency, oversight, and informed consent, diminishing CHD's ability to reach viewers and to advertise, and ultimately rendering it unable to sustain itself financially. The methods are false advertising in combination with other forms of censorship; Facebook's goal is the silencing of CHD, and, ultimately, its extinction.

334.    Facebook has engaged in unfair competition through the false and misleading nature of the content it has posted concerning CHD's content on its website concerning the potential dangers of vaccines and 5G. Facebook has conveyed to viewers that CHD's content and information concerning these dangers is false. As discussed in some detail herein, CHD's content is not false, and Facebook's content labelling it as such is false and misleading in violation of the Lanham Act.

335.    There are further aspects of Facebook's warning labels affixed to CHD's content that render them false and misleading. To the extent that Facebook has labelled some of CHD's material as "Partly False," this is inherently misleading. To label something as "partly false" is to concede that the material is also "partly true." Misleadingly, Facebook's "partly false" label,

which focuses only on the supposed falsity of CHD's content, omits to specify the information that is true, does not distinguish between the true and allegedly false information, and does not attempt to indicate the relative proportion between the admittedly true information and the allegedly false content. Instead, the essential message conveyed by CHD's warning labels is that all of CHD's material is false. Facebook has treated as "false" even information that it implicitly concedes is true — and, like all of CHD's content, even the concededly true content is subject to demotion by Facebook, prevented from obtaining advertising, and subject to Facebook's blanket deactivation of CHD's funding button. At the very least, Facebook's deliberate failure to distinguish in its messaging between what it alleges is "false" or "partly false" in CHD's posts and what it concedes is true reveals quite literally a reckless disregard for truth on Zuckerberg's and Facebook's part in their campaign against CHD.

336.   Additionally, to the extent that CHD's vaccine safety posts raise matters of open scientific dispute not susceptible of definite resolution or characterization as either "true" or "false, Facebook has misled users by conveying the impression that these issues are not, in fact, matters for open debate, that Facebook alone is capable of discerning "truth" in these matters, that its (and CDC's and WHO's) conclusions alone are true, and that CHD's materials are not only false, but should not even be read or considered. Facebook's touting of its use of "fact-checkers" underscores its misleading message that open or debatable scientific issues concerning vaccines and 5G are matters of resolved fact. It is not only the verbal content of Facebook's messaging that conveys this message. Its demotion of CHD's content, cutting off of CHD's advertising and the deactivation of CHD's funding mechanism collectively convey that CHD's content does not merit the viewership and the financial support that, before Facebook's censorship, flowed from such viewership. Facebook's stance, and its false certainty regarding open scientific controversies, is contrary to historical experience, which is replete with complex scientific issues that are never definitively resolved, but may be subject to continuous scientific debate and reevaluation. Indeed, what appears at a given time to represent the scientific "consensus" or to reflect the weight of "accepted" scientific authority is all too often subject to reevaluation and ultimate reversal in favor of a revised and very different

"consensus." Facebook's essential message that the issues concerning the efficacy and safety of vaccines are closed and settled is false and misleading. It has used this false message in an illegal scheme to damage CHD commercially, and ultimately to attempt to destroy it.

337.   The misleading nature of Facebook's campaign against CHD has another element: it fails in its messaging to disclose its own conflicts of financial interest that inform and propel its false labelling of CHD's content. Thus, Facebook's warning labels against CHD fail to warn users of Facebook's and Zuckerberg's own extensive forays in the Vaccine and 5G industries, the vast extent of advertising on Facebook engaged in by major pharmaceutical companies, or that such advertising has steadily increased each year since 2017. Nor is any disclosure made to viewers concerning the pressure exerted by powerful politicians, prominent among them Rep. Schiff, to have Facebook mount a campaign against alleged CHD misinformation, or Facebook and Zuckerberg's entanglements with the CDC, lest Facebook's CDA Section 230 immunity be jeopardized or lost — an immunity which Facebook considers vital to its current business model.

338.   Statements on websites are generally available to the public at large, and satisfy the commercial speech requirement. In addition, defendants published the "warning label" and "fact-checks" as part of its own promotional campaign to lobby government officials to preserve its immunity under the CDA, and to persuade consumers that its content-management process warrants their continued trust and patronage.

339.   The "warning label" and "fact-check" deceptions are "material" in that these are likely to lessen the goodwill that CHD's services enjoy with the public and to influence consumers' vaccine purchasing decisions. *Cook, Perkiss, and Liehe, Inc. v. N. Cal. Collection Serv.*, 911 F.2d 242, 244 (9th Cir. 1990). By affixing the "warning label" and "fact-checks" to CHD's Facebook page where these have been viewed hundreds of thousands of times since September 4, 2019 by members of Facebook's global community, defendants effectively disseminated their false statements widely within the relevant purchasing public.

340.   As alleged more specifically *infra*, on or about September 4, 2019 and continuously since then, defendants Facebook and Zuckerberg have made, authored, and/or

1   published and circulated false and unprivileged statements about CHD in the form of

2   Facebook's Warning Label on CHD's Facebook page. A warning label is, by definition, the

3   disclosure of facts concerning dangers inherent in the use of a product or service. *Black's Law*

4   *Dictionary* 1421 (5th ed. 1979) ("The purpose of a 'warning' is to apprise a party of the

5   existence of danger of which he is not aware to enable him to protect himself against it[.]").

6   Facebook has perverted the consumer-safety protection of a manufacturer's "duty to warn" into

7   a license to denigrate true speech where the truth conflicts with Facebook's economic interests,

8   business model, and/or relations with government, or Zuckerberg's own perception of what is

9   true or scientific fact.

10   341.   Facebook's warning label concerning CHD is false on its face and by clear

11   implication. Defendants knew that their warning label was untrue and perpetuated it to divert

12   users from CHD's Facebook page to the CDC's website. This was one of the tactics in

13   defendants' RICO fraud enterprise to damage CHD financially and marginalize it's health

14   advocacy work, and unjustly enrich themselves through their continued receipt of billions of

15   dollars in pharmaceutical advertising revenue, and billions more in future vaccine and 5G

16   network-related profits.

17   342.   Defendants' false statements have already harmed Plaintiff and likely will harm

18   it in the future, especially within the large community of CHD followers, and among countless

19   others who wish to be informed of true facts about vaccine safety risks. CHD's Facebook page

20   is both reliable and up-to-date, within the common meaning of those terms, as demonstrated by

21   the specific content at issue here, and the internal processes by which CHD fact-checks and

22   cite-checks all its posts, labels them unmistakably as articles or editorials, and updates content

23   multiple times a week. Plaintiff has been seriously damaged as a direct and proximate cause of

24   the falsity of the defendants' warning label, in an amount to be determined at trial. The false

25   statement attributes conduct, characteristics, and conditions incompatible with the proper

26   exercise of Plaintiff's trade and professional duties. The false statements were intended to hold

27   Plaintiff up to hatred, distrust, contempt, aversion, ridicule, and disgrace in the minds of a

28   substantial number in that community, and were calculated to harm, and have harmed their

1  business relationships and goodwill, and deterred others from associating or dealing with

2  Plaintiff. Defendants' warning label constitutes egregious conduct constituting malice.

3  Defendants' acts were willful and malicious. As such, in addition to compensatory damages

4  and/or presumed damages, Plaintiff demands punitive damages relating to defendants' making

5  of the above-referenced false statements and other willful misconduct, in an amount to be

6  determined at trial.

7      343.   California defamation law provides a reference point for establishing defendants'

8  false promotion liability for willfully publishing its false "warning label" on Plaintiff's page:

9  (1) defendants published the statements; (2) the statements were about Plaintiff; (3) they were

10  false; and (4) defendants failed to use reasonable care to determine the truth or falsity. CAL.

11  CIV. CODE § 45 (defining the tort of libel as a "writing" or "fixed representation," which

12  exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be

13  shunned or avoided, or *which has a tendency to injure him in his occupation*") (emphasis

14  added); *Hecimovich v. Encinal Sch. Parent Teacher Org.*, 203 Cal. App. 4th 450, 470 (2012).

15  Where Plaintiff is a public figure, the speech concerns a matter of public concern, *and*

16  defendants are media publishers, then Plaintiff must prove that defendants acted with "actual

17  malice." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 14 (1990). *Milkovich* left open the

18  question whether, in the case of a non-media publisher defendant, Plaintiff must show only that

19  defendants did not act with reasonable care "in checking on the truth or falsity of the

20  information before publishing it." *Carney v. Santa Cruz Women Against Rape*, 221 Cal. App.

21  3d 1009, 1016 (1990). By contrast, a public figure Plaintiff suing a media publisher defendant

22  must prove that defendant acted with "actual malice," which requires a showing that a

23  statement was made "with knowledge that it was false or with reckless disregard of whether it

24  was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964) (the "*New York

25  Times*" standard).

26      344.   Under California law, defamation is "the intentional publication of a statement of

27  fact which is false, unprivileged, and has a natural tendency to injure or which causes special

28  damages." *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 27 (2007). Facebook and Zuckerberg

1    "published" their Warning Label on CHD's Facebook page by inserting that "writing . . .  or

2    other fixed representation to the eye" in a place of prominence of the page where it appears

3    every time a user opens the page, except where that user has previously seen it and deleted it.

4    California recognizes two types of libel (CAL. CIV. CODE § 45a): libel per se, which is

5    defamatory on its face, when read *in context*, and libel per quod, which a reasonable reader

6    would be able to recognize only by knowledge of specific facts and circumstances *extrinsic* to

7    the publication. Libel per se permits recovery of general damages, including reputational harm

8    and punitive damages, while libel per quod requires proof of "special damages" which are

9    defined narrowly to encompass only economic damages. CAL. CIV. CODE § 48a; *Gomes v.*

10   *Fried*, 136 Cal. App. 3d 924, 939 (1982).

11        345.    The Second Restatement of Torts defines the "context" of a statement to "include

12   all parts of the communication that are ordinarily read with it." RESTATEMENT (2D) OF TORTS

13   § 563(d). For example, "the entire contents of a personal letter are considered as the context of

14   any part of it because a recipient of the letter ordinarily reads the entire communication at one

15   time." *Id.; Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (Ninth Circuit adopts the

16   Second Restatement of Torts' distinction between "context" and "extrinsic circumstance").

17   Defendants' defamatory statement must be read and considered in the context of the other

18   content of CHD's Facebook page where it appears, and to which it refers expressly and by

19   necessary implication.

20        346.    Here, the context in which Facebook's Warning Label on CHD's page would

21   ordinarily be seen and read includes: CHD's own mission statement on that same page that

22   vaccine safety should be taken away from the CDC; CHD's message, "Read about CDC &

23   WHO corrupt financial entanglements with vaccine industry, childrenshealthdefense.org/cdc-

24   who"; and that context incorporates by reference numerous articles on CHD's page which call

25   out and criticize the CDC's continued adherence to its "all vaccines for all children" policy.

26   *See, e.g., CDC Corruption, Deceit, and Cover-Up*; *CDC's Vaccine "Science"— A Decades*

27   *Long Trail of Trickery*; *Why You Can't Trust the CDC on Vaccines*; *CDC and WHO Corrupt*

28   *Financial Entanglements with the Vaccine Industry*; *Dr. Brian Hooker's Official Statement*

1    *Regarding Vaccine Whistleblower William Thompson*; *CDC & FDA Committee Members*

2    *Have Financial Conflict of Interest with Vaccine Pharmaceuticals*; *OSC Calls for Further*

3    *Review of Whistleblower Disclosures on Zika Testing*; *CDC Spider Letter*; *CDC: Off Center*;

4    *Real-Life Data Show that the CDC Vaccine Schedule is Causing Harm*; *Don't Fall for the*

5    *CDC's Outlandish Lies About Thimerosal*; *CDC and WHO Corrupt Financial Entanglements*

6    *with the Vaccine Industry*; *CDC Lies About, and Media Repeats, Risk of Dying from Measles*;

7    *CDC's 'Universal' Recommendations for Infant Hep B Vaccine Not Based on Science, But*

8    *Assumptions*; *CDC's Infant Hep B Vaccine Recommendations—No Proof of Safety*? *See*

9    *Children's Health Defense* page, FACEBOOK,

10   https://www.facebook.com/ChildrensHealthDefense (last visited Aug. 15, 2020); *Knievel v.*

11   *ESPN*, 393 F.3d at 1076-77 (considering surrounding web pages under the incorporation by

12   reference doctrine). But, Plaintiff need not prove that the CDC is nefarious to make its point

13   that the views of CHD are being unfairly misrepresented and censored, to the detriment of the

14   public which deserves to be able to consider alternative views and make up its own mind.

15        347.    **"This page posts about vaccines."** Under California law, Plaintiff must show

16   that the false statement was made "of and concerning" them, either by name or by "clear

17   implication." *Ferlauto v. Hamsher*, 74 Cal. App. 4th 1294, 1404 (1999). The specific reference

18   requirement is clearly met here as to CHD as an organization — by the text of the first

19   sentence ("*This page*"), by its large bolded font in the original, and, by its placement at the top

20   of CHD's Facebook page. Libel exists where the words used can be shown to have referred to

21   Plaintiff, and to have been so understood. *Vedovi v. Watson & Taylor*, 104 Cal. App. 80, 83

22   (1930).

23        348.    **"When it comes to health, everyone wants reliable, up-to-date information."**

24   This sentence, read alone, is undoubtedly true. But, it tees up the falsity of the next sentence

25   with which it should be read. "The publication in question […] must be read as a whole in

26   order to understand its import and the effect that it was calculated to have on the reader[.]"

27   *Selleck v. Globe International, Inc.*, 166 Cal. App. 3d 1123, 1131 (1985). The court applies a

28   "totality of the circumstances test" and "puts itself in place of an average reader [to] determine

the natural and probable effect of the statement." *Bently Reserve LP v. Papaliolios*, 218 Cal. App. 4th 418, 427-28 (2013).

349.    Merriam-Webster's Dictionary defines the adjective "reliable" as "suitable or fit to be relied on; dependable." *Reliable, Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/reliable (last visited Aug. 15, 2020). Merriam-Webster's Thesaurus lists synonyms for "reliable" to include "true, trustable, trusty, trustworthy, tried-and-true, good, responsible, safe, secure, sure." *Reliable, Merriam-Webster.com*, Thesaurus, https://www.merriam-webster.com/thesaurus/reliable (last visited Aug. 15, 2020). Merriam-Webster's Dictionary defines the adjective "up-to-date" as "(1) extending up to the present time; including the latest information. (2) abreast of the times; modern." *Up-to-date, Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/up-to-date (last visited Aug. 15, 2020). Merriam-Webster's Thesaurus adds the definition "having information especially as a result of study or experience," and lists synonyms for "up-to-date" which include "contemporary, current, modern, new, present-day, state-of-the-art, up-to-the-minute, informed, knowledgeable, well-informed." *Up-to-date, Merriam-Webster.com*, Thesaurus, https://www.merriam-webster.com/thesaurus/up-to-date (last visited Aug. 15, 2020).

350.    **"The Centers for Disease Control (CDC) has information that can help answer questions you may have about vaccines."** Read with the preceding "reliable, up-to-date information" sentence to which it refers, and which together make its essential point, this sentence is false, and provably so -- as CHD has devoted much of its organizational life to showing. Read in context, the fair meaning of the sentence is to equate the word "information" with "reliable and up-to-date information" in the preceding sentence. Any reasonable reader would read the second "information" as shorthand for the first, and apply the "reliable, up-to-date" modifiers to both. What else, if not the "reliable and up-to-date information," which Facebook says "everyone wants," and which Facebook claims to be in a position to discern and provide with respect to vaccines? By its terms of service and community standards incorporated therewith, Facebook purports to be viewpoint-neutral except for limited instances of speech, which poses an "imminent threat of harm or violence." Facebook's pretense of

neutrality only compounds the reputational harm of its libel to Plaintiff. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 513 (1991) (New Yorker article which purported to be non-fiction was actionable because it gave the reader no clue that fabricated quotations were being used other than to allow the subject to speak for himself, which made them all the more damning).

351. **"Go to CDC.gov."** Once more, the bolded and larger font size underscore that Facebook has singled out Plaintiff's Facebook page for negative comment. The very existence of Facebook's Warning Label on CHD's page, and its redirection link "Go to CDC.gov," are well understood as a "black mark" on that page among Facebook's community of 2 billion users worldwide. Facebook's highly-sporadic and selective exercise of its content-regulation authority as community moderator underscores its audience's reasonable expectation that, in this context, a Facebook warning label on a third party's page conveys an objective fact, not an expression of Facebook's opinion, or an undisclosed commercial interest and ambition. *See Knievel v. ESPN*, 393 F.3d at 1075 (analyzing the format, structure, the language used, and the expectations that the target audience would have with regard to the type of information that might be found in the context, and noting that such context might be "paramount," if not "dispositive"). For any reasonable reader, the "gist" or "sting" of Facebook's "warning label" misrepresentation is its unsubtle insinuation *as fact* that, in contrast with the CDC's information, **"what you see below on CHD's page is *not* reliable, up-to-date information. Rely on the CDC instead."** That is the only reasonable interpretation of Facebook's Warning Label in light of its specific wording, prominent placement on CHD's page, and the context of the CHD-created content on that page which features CHD's scathing factual exposé of the CDC.

352. Facebook's warning label on CHD's page states a classic imputation of CHD's dishonesty in dealing with its users, and a lack of integrity about its trade in the sphere in which it operates. That is how third-party readers understand it and, as such, it is falsely disparaging under the Lanham Act. Defendants are liable for what is insinuated, as well as for what is stated explicitly. *MacLeod v. Tribune Publishing Co.*, 52 Cal. 2d 536, 547 (1959).

Further, the determinative question is whether the 'gist or sting' of the statement is true or false, benign or defamatory, in substance. *Ringler Associates, Inc. v. Maryland Casualty Co.*, 80 Cal. App. 4th 1165, 1182 (2000). A statement is deemed false if it "would have a different effect on the mind of the reader (or viewer) from that which the pleaded truth would have produced." *Metabolife Int'l Inc. v. Wornick*, 264 F.3d 832, 849 (9th Cir. 2001) (*quoting Masson v. New Yorker Magazine, Inc.*, 501 U.S. at 517). Facebook's warning label is "reasonably susceptible of an interpretation which implies a provably false assertion of fact," *Couch v. San Juan Unified Sch. Dist.*, 33 Cal. App. 4th 1491 (1995); *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1063-64 (9th Cir. 1998). Here, the conclusion that CHD's vaccine-related information is "unreliable and out-of-date" is sufficiently factual to be verifiable as true or false, *Milkovich v. Lorain Journal Co.*, 497 U.S. at 19, and indeed, it is false. *See also Manufactured Home Communities, Inc. v. County of San Diego*, 544 F.3d 959, 964 (9th Cir. 2008) (defendant's statements that accused Plaintiff of lying without expressly disclosing a factual basis for the statements could be defamatory).

353.    An old, but instructive case is *Rosenberg v. J.C. Penney Co.*, 30 Cal. App. 2d 609 (1939). There, in 1924, the Rosenberg retail store sold the Healdsburg high school's gym uniform, and a competitor across the street, the J.C. Penney Co. department store, wanted that business. So, a J.C. Penney manager created a window display that purported to compare samples of the respective stores' gym shorts. The comparison included a placard with these comments: "Decide for Yourself. This Garment is either a poorly-made second or prison-made merchandise. Seams crooked. Slovenly made. Long Loose Stitches." *Id.* at 613. On appeal, the California court affirmed that the window display placard was libelous per se because it was an imputation against the honesty and integrity of the merchant in the sale of its goods, and essentially accused it of fraud and deception, and unfair dealing with its customers. "The reputation of a tradesman in the sphere in which he earns his living is a valuable asset and is entitled to the protection of the law." *Id.* at 620.

354.    Now fast forward nearly a century, and recast that small town America window display libel by a giant and overreaching department store against its small cross-street rival to

today's world where the libel is propagated online by a comparable Goliath on a global scale. That is, essentially, what Facebook has done. Like J.C. Penney's window display, Facebook's warning label on CHD's page draws an invidious comparison between the quality of the health-related information offered by two rivals, the CDC and CHD, for the public's trust and attention. As alleged *infra*, Facebook has "skin in the game" because its controlling individual and his related entities are in the vaccine development business, competing with CHD's educational materials, emphasizing informed consent and safety. Like the Rosenberg retail store, the "business integrity of the company [CHD] is at stake." *Rosenberg v. J.C. Penney Co.*, 30 Cal. App. 2d at 627.

355.    Facebook's warning label implies a provably false assertion of fact, whether or not the words used are termed "fact" or "opinion." *Milkovich*, 497 U.S. at 18-19. The "gist" or "sting" of the disparagement — **that CHD's page conveys "unreliable and out-of-date information"** — is objectively false in light of the totality of the circumstances: CHD's page-content and the fact-checking process by which it creates and curates such content, distinguishes between known and unknown scientific facts, and labels expressions of opinion on its page as such. *See supra*. Certainly the pleaded truth — that CHD's page in fact contains "reliable and up-to-date information" while CDC's page does not — would produce an effect on the mind of the reader 180-degrees different than the effect produced by Facebook's warning label. *Masson*, 501 U.S. at 516-17. Third-party readers understood Facebook's warning label as Facebook intended, namely as a statement of fact that the information on CHD's Facebook page is neither reliable nor up-to-date. *See*, *e.g.*, *Slaughter v. Friedman*, 32 Cal.3d 149, 154 (1982) (accusations of "excessive" fees or "unnecessary" work by professional dental plan administrators carry a "ring of authenticity" and reasonably might be understood as being based on fact). Facebook has sought after, and must answer for, its own "ring of authenticity."

356.    On March 4, 2019, in response to Representative Schiff's letter to Facebook, CHD sent Facebook a nine-page single-spaced letter providing CHD's detailed summary of the known and unknown scientific facts, and its most pressing concerns, with respect to vaccine

safety. See Exhibit A. Thus, Facebook was on notice that CHD was not promoting "misinformation" of any sort.

357.    Yet, just three days later, on March 7, 2019, Facebook announced in its online press release that it would take steps to eliminate "vaccine misinformation" on Facebook by reducing its distribution and providing people with "authoritative information" on the topic, and then Facebook proceeded to falsely disparage CHD. *See*, *e.g.*, *Masson*, 501 U.S. at 521 (unlike "hot news" journalist, defendant author had both time and practical ability to fact-check tapes in her possession). Here, with CHD's detailed presentation in hand, Facebook had "obvious reasons to doubt the veracity" of its warning label, but instead engaged in "purposeful avoidance of the truth." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); *Harte-Hanks Communication, Inc. v. Connaughton*, 491 U.S. 657. By reasonable inference, Facebook conducted no investigation whatsoever to confirm or dispel the material facts in CHD's March 4, 2019 letter, and Facebook intended to convey or, at the very least, endorsed the defamatory false innuendo. *Newton v. National Broadcasting Co., Inc.*, 930 F.2d 662, 681 (9th Cir. 1990). Facebook and Zuckerberg's apparent failure to respond in writing to the March 4, 2019 letter, much less to even attempt to refute the many points made in that letter (which was addressed to Zuckerberg personally), reveals their reckless disregard for the truth in this matter, and that their campaign against CHD was infected with legal malice. To the extent that there was a failure to deliver the March 4 letter to Zuckerberg (although we are aware of no evidence that he did not receive it), such a failure, and Facebook and Zuckerberg's ultimate failure to investigate the points raised in the letter and respond to them, also evinces a reckless disregard for truth and underscores that Facebook and Zuckerberg's conduct reflects the character of legal malice.

358.    *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767 (1986) left open the question whether non-media publisher defendants such as Facebook and Zuckerberg are entitled to the same level of protection that media publisher defendants receive under the *New York Times* standard. Either way, these defendants acted with the requisite mental state to be liable for defamation measured by the "actual malice" standard that they subjectively doubted

the veracity of the statement or purposely avoided the truth, or by the negligence standard applicable to non-media defendants. *Dodds*, 145 F.3d at 1060; *St. Amant v. Thompson*, 390 U.S. at 731 (stating test as whether defendant "in fact entertained serious doubts as to the truth of [his] publication"); *Garrison v. Louisiana*, 379 U.S. at 74 (whether defendant published the material while subjectively possessing a "high degree of awareness of the probable falsity of the publication").

359.   "Actual malice" can be shown by, *inter alia*, "subsequent defamations [and other] statements of defendants, circumstances indicating the existence of rivalry, ill will, or hostility between the parties, [and] facts tending to show a reckless disregard of the Plaintiffs' right[,]" *Herbert v. Lando*, 441 U.S. 153, 164 n.12 (1979) (*quoting* 50 Am. Jur. 2d, § 455), all of which are strongly present. In particular, defendants harbor an adverse motive to profit from their unfettered development of vaccines and 5G networks, in furtherance of which they have committed multiple other predicate acts of misrepresentation amounting to wire-fraud for purposes of RICO enterprise liability. And, crucially, they knew their published warning label was false or acted with reckless disregard to its falsity.

360.   Zuckerberg's public statements to TV audiences, to Congress, to his investors, and to Facebook users are replete with boasts that he works with government officials to identify and suppress "vaccine misinformation," and to redirect users to the government's authoritative "information," and that his "understanding of the scientific consensus is that it's important that people get their vaccines." He has also publicly boasted of his "outside interests in health." The three-day interval (March 4 to 7, 2019) from CHD's nine-page letter to Facebook's press release announcing its campaign suggests that Zuckerberg willfully chose not to test his "understanding" against actual facts, as brought to his attention by CHD.

361.   Zuckerberg has personally authorized, directed and participated in Facebook's campaign of false advertising and censorship directed against CHD and its website content. Zuckerberg holds, and has long held, a position of predominance at Facebook. He is the ultimate decision maker at the company. Zuckerberg is a co-founder of Facebook, Inc. and, at all times relevant to the claims set forth herein, has served and functioned as Facebook's

Chairman, Chief Executive Officer, and controlling shareholder. According to the company's 2018 Proxy Statement, Zuckerberg controls 53.3% of Facebook's total voting shares. He possesses the sole power to elect or remove any director from Facebook's Board.

362.    Zuckerberg's personal involvement in directing the operations and setting and implementing the policies of Facebook has only increased over the years. As one report has noted: "[After the 2016 election] Mr. Zuckerberg resolved to take control of the global superpower in which he already dominated the voting. [In July 2018,] Mr. Zuckerberg called a meeting with his top lieutenants. … Mr. Zuckerberg said he would be making more decisions on his own, based on his instincts and vision for the company. Mr. Zuckerberg also began to participate more directly in meetings that had previously been Ms. Sandberg's domain – from the nitty-gritty of taking down disinformation campaigns, to winding philosophical discussions on how Facebook ought to handle political ads. … Other board disagreements, specifically around political advertising and the spread of misinformation, always ended with Mr. Zuckerberg's point of view winning out." Mike Isaac, Sheera Frenkel & Celia Kang, *Now More Than Ever, Facebook Is a 'Mark Zuckerberg Production, supra,'* NEW YORK TIMES, https://www.nytimes.com/2020/05/16/technology/zuckerberg-facebook-coronavirus.html (emphasis added).

363.    As is well known, Zuckerberg is the public face of his company. He has testified many times before Congress, including with regard to Facebook's censorship policies generally and its approach to vaccine information posted by users in particular. He is well aware of the vaccine issue and is directly concerned with what he regards as Facebook's role in limiting the dissemination of material that he deems "misinformation." As Zuckerberg noted in response to a question from Representative Posey (R-FL) during a Congressional hearing conducted on October 22,2019: "[W]e hear consistently from our community that people want us to stop the spread of misinformation. So what we do is try to focus on misinformation. … If someone wants to post anti-vaccination content or they want to join a group where people are discussing that, we don't stop them from doing that. But[…] we don't go out of our way to make sure our group recommendation systems show people or encourage people to join those

1   groups. We discourage that." *Facebook CEO Testimony Before House Financial Services*
2   *Committee* [Video], C-SPAN (Oct.23, 2019),
3   https://www.c-span.org/video/?465293-1/facebook-ceo-testimony-house-financial-services-
4   committee (emphasis added). The above testimony is arguably self-contradictory and
5   disingenuous, and certainly understates the extraordinary aggressiveness of Zuckerberg and
6   Facebook's censorship campaign against CHD (and, as a consequence, against the potential
7   viewers who are deprived of access to the material and information that CHD wishes to
8   provide concerning the possible dangers posed by vaccines). The point here, however, is that
9   the above testimony clearly indicates Zuckerberg's direct interest and involvement in
10  Facebook's effort to censor what he regards as "anti-vaccination" content, and that Zuckerberg
11  has personally authorized, directed and participated in the false advertising campaign intended
12  and designed to implement that effort.

13       364.    As noted *supra*, on February 14, 2019 Congressman Schiff addressed a letter to
14  Zuckerberg pointedly specifying that Facebook take steps, including the implementation of
15  algorithms, to identify, censor and remove supposed "vaccine misinformation." In his letter's
16  conclusion, Mr. Schiff wrote that he encouraged Zuckerberg "to consider what additional steps
17  you can take to address this growing problem. As more Americans rely on your services as
18  their primary source of information, it is vital that you take that responsibility with the
19  seriousness it requires, and nowhere more so than in matters of public health and children's
20  health. Thank you for your attention to this important topic." *Schiff Sends Letter to Google,*
21  *Facebook Regarding Anti-Vaccine Misinformation, supra*, Press Releases, CONGRESSMAN
22  ADAM SCHIFF, https://schiff.house.gov/news/press-releases/schiff-sends-letter-to-google-
23  facebook-regarding-anti-vaccine-misinformation. By its terms, this letter is addressed
24  personally to Mark Zuckerberg, and its underlying assumption is that Zuckerberg personally
25  directs and is responsible for the conduct of the company — indeed, that he is the company.

26       365.    Whether Zuckerberg ever responded in writing to Rep. Schiff's letter is, at
27  present, information that is exclusively within Defendants' knowledge, disclosure of which
28  must await discovery in this matter. Plaintiff is not aware of any evidence indicating that

1    Zuckerberg disclaimed interest in the vaccine issue, or that he disclaimed or had delegated the

2    personal responsibility for the censorship of so-called vaccine "misinformation" which Mr.

3    Schiff understood as residing with Zuckerberg. On the contrary, Zuckerberg personally met

4    with Mr. Schiff after the issuance of Mr. Schiff's letter to discuss Facebook's response to

5    Schiff's demands. Zuckerberg's personal interaction with Rep. Schiff alone indicates

6    Zuckerberg's direct involvement with Facebook's response to the issue posed by so-called

7    "anti-vaccine" information. It is evident that Schiff himself understood that when he was

8    communicating on this subject with Zuckerberg, he was communicating with the figure at

9    Facebook who had the ultimate responsibility and the ultimate say in directing Facebook's

10   response.

11          366.    Reflected in Rep. Schiff's communications with Zuckerberg, and

12   communications from other powerful office holders, was an implicit — and sometimes very

13   explicit — threat that if Facebook failed to censor vaccine "misinformation," Facebook would

14   be subject to regulatory action, including the withdrawal of the CDA Section 230 so essential

15   to its business model. Thus, in June 2019, Rep. Schiff stated publicly, as Chairman of the

16   House Intelligence Committee, that Congress could or should "make changes" to the law that

17   currently does not hold social media companies liable for third party content on their

18   platforms. See, e.g., *Hearings by Congress on "deepfakes" and artificial intelligence* [Video],

19   GUARDIAN NEWS (June 13, 2019), https://www.youtube.com/watch?v=1ArPEDS0GTA.

20   Schiff emphasized that "if the social media companies can't exercise the proper standard of

21   care when it comes to a whole variety of fraudulent or illicit comment, then we have to think

22   about whether that immunity still makes sense." K. Waddell, *A new attack on social media's

23   immunity, supra*, AXIOS, https:// www.axios.com/social-media-immunity-section-230-

24   f15ac071-32e9-4e33-81e6-4c7ebadaea5e.html. Similar sentiments were echoed recently in

25   even more pointed and threatening remarks made by Senator Elizabeth Warren specifically

26   directed to Facebook: "During the global pandemic, Facebook is looking the other way while

27   disinformation about the coronavirus goes viral on its platform – a direct threat to the health

28   and safety of millions of people. No company should be too big to be held accountable for

distorting facts and spreading falsehoods, especially during a public health crisis." Alexandra Kelley, *Zuckerberg says Facebook won't remove anti-vaccine posts amid coronavirus pandemic*, THE HILL (Sept. 10, 2020), https://thehill.com/changing-america/well-being/prevention-cures/515844-mark-zuckerberg-says-facebook-wont-remove-anti.

367.    Zuckerberg is unlikely to have been unaware of the above remarks made publicly by two prominent and powerful politicians, and the implications that such statements carry for his company. That awareness is all the more reason that Zuckerberg would have been involved directly and personally in addressing the issues raised by Rep. Schiff and Senator Warren. The false advertising and censorship campaign against CHD is part of Zuckerberg's effort to appease these and other government officials, and to stave off threatened government regulation by complying with the demand that Facebook engage in severe censorship of so-called "anti-vaccine misinformation."

368.    While discovery may be necessary to demonstrate the full nature and extent of Zuckerberg's personal involvement in, and authorization and direction of, the false advertising and censorship campaign against CHD, his own statements and his interactions and communications with Rep. Schiff indicate his direct personal interest in the vaccine issue and his specific interest in ensuring that that issue is handled to the advantage of Facebook – i.e., in a manner that does not jeopardize its business model, its relationship with its pharmaceutical advertisers, or its regulatory immunity. Given Zuckerberg's position of predominance within Facebook, he unquestionably has possessed the authority and capacity at all relevant times to authorize, direct and actively participate in the illegal false advertising and fraud campaign against CHD described herein.

369.    Defendants have exclusive possession, custody and control of other evidence of falsity and/or Zuckerberg's actual malice, e.g., private records and testimony concerning when, with whom, how, and why Zuckerberg came to his "understanding" concerning "vaccine misinformation," which he confidently holds at "near 100%" certainty; his actual knowledge or serious doubt of the "warning label's" falsity; and what "deliberative process," if any,

occurred. *See*, *e.g.*, *Metabolife*, 264 F.3d at 846 (ordering discovery of information within defendants' exclusive control which may be highly probative of falsity).

370.    Plaintiff has suffered general and special damages as enumerated below. It is hornbook law that in measuring damages, the Court may consider Facebook's influence and that of Plaintiff, and Facebook's global footprint, "for the greater the circulation, the greater the wrong, and the more reason why greater care should be exercised in the publication[.]" *Graybill v. De Young*, 140 Cal. 323, 330 (1902).

371.    No retraction demand was made nor required prior to filing this action under California Civil Code section 48a, subdivision (a), because Facebook is not a "daily or weekly news publication" as that term is defined in subsection (d)(5) of that statute.

372.    Plaintiff is entitled to injunctive relief and to recover their damages, including for reputational harm and loss of business goodwill and revenue, and punitive damages resulting from defendants' intentional acts of false designation and false promotion under the Lanham Act.

**THIRD CAUSE OF ACTION**
**(RICO — WIRE FRAUD VIOLATIONS)**

**Defendants Facebook, Zuckerberg, Science Feedback, Poynter, and Does 1-20**

373.    Paragraphs 1 through 372 are realleged and incorporated as if fully set forth herein.

374.    18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") makes it illegal for any person associated with an alleged racketeering enterprise "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." To state a civil claim for violations of 18 U.S.C. § 1962(c), as authorized by 18 U.S.C. § 1964(c), Plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) that proximately causes (6) damages to the Plaintiff. Under 18 U.S.C. § 1961(1)(B), an act which is indictable under 18 U.S.C. § 1343 (relating to wire fraud) constitutes a predicate act. A "pattern" requires at least two related predicate acts that amount to or pose a threat of

continued criminal activity. A pattern does not require multiple schemes or multiple victims. "Enterprise," as defined in 18 U.S.C. § 1961(4), broadly includes "any individual, partnership, corporation, association, or other legal entity, or any union or group of individuals associated in fact although not a legal entity." The definition of a RICO enterprise has wide reach and is liberally construed to effectuate its remedial purpose. Here, the "persons" were Facebook, Zuckerberg, Science Feedback, Poynter, and Does 1 to 20, and the "enterprise" was that distinct group of persons who associated in fact (the Facebook "content management" team) as a coordinated group to effectuate their fraudulent scheme. *River City Mkts., Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458, 1461 (9th Cir. 1992) (concluding that "business relationship akin to a joint venture" was sufficient to establish an associated-in-fact RICO enterprise). As alleged *supra*, the Facebook content management team is an associated-in-fact enterprise in that it is an ongoing organization, formal or informal, and its various associates function as a continuing unit for a common purpose — to damage Plaintiff's trade and property interests, to divert users of their page to the CDC, and to unjustly enrich themselves – by fraudulent means.

375.    Defendants' motive to profit from vaccine ads and product development and 5G networks unconstrained by negative publicity on their platform is highly probative of their intent to commit RICO wire-fraud, even though economic motive itself is not an element of the claim. *See, e.g., National Organization for Women, Inc. v. Schiedler*, 510 U.S. 249, 252 (1994) (rejecting the argument that "RICO requires proof either the racketeering enterprise or the predicate acts of racketeering were motivated by an economic purpose"). Essentially, the task of the Facebook fraud enterprise was to "clear the field" of CHD's viewpoint for at least two market purposes that involve property or money, and lots of it: (1) brand protection for its vaccine maker ad buyers; and (2) its own future secured interest in vaccine patents and technical products and processes that depend on 5G-networks for their commercial viability. *See, e.g., United States v. Reyes*, 660 F.3d 454, 463 (9th Cir. 2011) (admitting evidence that defendant made money on a fraudulent scheme). In addition, as alleged *infra*, CHD's followers and others relied upon defendant's misrepresentation in ways that caused CHD to lose donations and membership fees, and injured CHD in its organizational trade.

376.    For his part, in addition to all else, Zuckerberg was active in managing with his wife the day-to-day affairs of CZI and CZ-Biohub, and he exercised specific control over their vaccine development efforts. By his public statements, Zuckerberg was directly responsible for Facebook's false and misleading statements about Plaintiff's posted content. He participated in the ongoing associated-in-fact enterprise to develop his for-profit vaccine and 5G products unconstrained by any public scrutiny of that effort by Plaintiff.

377.    Thus, all named defendants both inside Facebook's formal structure (Zuckerberg, Does 1-10) and out (Science Feedback, Poynter, Does 1-20) aided in one or another aspect of their common fraud scheme: to label Plaintiff's page "unreliable" and "out-of-date" and redirect users to the CDC; to label Plaintiff's speech-content "False" when it is critical of vaccine or 5G network safety, accomplishing this censorship through the sham machinations of "content moderators" and "independent fact-checkers"; and to conceal their true purposes of profiting from vaccine manufacturer advertising and from their own vaccine and 5G network development, all of which would be adversely affected by Plaintiff's ongoing public health-related speech.

378.    The wire fraud statute, 18 U.S.C. § 1343, prohibits schemes to defraud or to obtain money or property, or cause financial loss to another, by means of "false or fraudulent pretenses, representations, or promises" if interstate wire or electronic communications are used to execute the scheme. The concept of a misrepresentation is broad, reaching not only false statements of fact, but also all of Facebook's misleading half-truths, deceptive omissions, and knowingly false suggestions and promises as to the future. It is no defense that the intended victim was too gullible or, on the other hand, was too sophisticated to be taken in by the deception.

379.    Defendants also committed wire-fraud acts constituting "interference with interstate commerce by threat" under 18 U.S.C. § 1951 in that the residual 0.05% of users who — notwithstanding Facebook's false "warning label" and "fact-checks" — actually click-through to view Plaintiff's actual content, suffer particular adverse consequences in terms of "sandboxing," and other detriments to their accessible tools and information on Facebook. As

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

1  alleged *supra*, with respect to its active collaboration with government officers and agencies,

2  Facebook took such actions under "color of official right." 18 U.S.C. § 1951(2).

3      380.   Plaintiff further alleges that defendants caused a domestic injury to their business

4  or property. Where, as here, defendants specifically targeted their conduct at Plaintiff with the

5  aim of thwarting Plaintiff's rights in the United States, their activity results in a domestic

6  injury.

7      381.   Under Fed. R. Civ. P. 9(b), predicate acts of wire fraud must be alleged with

8  specificity as to the contents of the communications, who was involved, where and when they

9  took place, and why they were fraudulent. As alleged *supra*, defendants engaged in a scheme

10  to defraud and made use of electronic and internet transmissions, and/or telephone calls, emails

11  and texts in furtherance of the scheme, with the specific intent to deceive or defraud.

12      382.   Plaintiff reasonably relied on defendant Facebook to adhere to its terms of

13  service and community standards; not to engage in content creation on their Facebook pages;

14  and not to mislead them, their advertising agency, or the world of third-party users as to the

15  truth or falsity of content on their pages, or the visibility or reach of those pages. Plaintiff was

16  misled by defendants, and even now is misled by Facebook's product design as to which of

17  CHD's posts have been altered, demoted, or blocked from all third-party users. Moreover,

18  Plaintiff was substantially injured by Facebook's third-party users' reliance on defendants'

19  falsehoods. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. at 658 (Plaintiff alleging a

20  RICO violation may establish causation through first person or third-party reliance).

21      383.   As a direct and proximate result of Defendants' predicate acts in violation of 18

22  U.S.C. §§ 1961(1)(B), 1962(c), Plaintiff has been and is continuing to be injured by harm to its

23  specific property interests and financial losses, including by Defendants' denial of any third-

24  party donations to Plaintiff's organization; their refusal to accept Plaintiff's advertising

25  purchases aimed at promoting such third-party donations; and their concerted efforts to reduce

26  the visibility and reach of Plaintiff's page, to reduce traffic to that page, and to reduce

27  membership and speaker fees, and book and other sales that accrue to Plaintiff from such

28  traffic (*see Xcentric Ventures, LLC v. Borodkin*, 798 F.3d 1201, 1203 (9th Cir. 2015) (loss of

specific business opportunities are recoverable under RICO)); and, finally, by publishing false and disparaging warning labels, and censoring of content, which have caused damage to Plaintiff's professional reputation and other valuable tangible and intangible property rights resulting in financial loss.

384.    Defendants' actions have already injured Plaintiff, and will have the effect of further injuring them by damaging its trade reputation and goodwill, and those of their authors, diverting traffic from its site, and further curtailing its revenue and donations. *See*, *e.g.*, *Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 653 (9th Cir. 2019) (Plaintiff's lost sales as a direct result of the defendants' predicate acts cognizable under RICO); *Kaiser Foundation Health Plan, Inc. v. Pfizer, Inc.* (*In re Neurontin Mktg. & Sales Practices Litig.*), 712 F.3d 21, 29-30 (1st Cir. 2013) (statistical link between fraudulent marketing and off-label prescribing, without proof of any particular doctor-patient prescription, cognizable under RICO); *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1166 (9th Cir. 2002) (fraud on the market for labor, in that wages were depressed when defendants hired undocumented workers, cognizable under RICO); *United States v. Stockheimer*, 157 F.3d 1082, 1087-88 (7th Cir. 1998) ("An intent to defraud does not turn on personal gain … all that matters is that [the defendant] intended to inflict a loss."); *Resolute Forest Prods. v. Greenpeace Int'l.*, 2019 U.S. Dist. LEXIS 10263, *48 (N.D. Cal. 2019) (Plaintiff's lost revenue due to customers' reliance upon defendants' statements states a cognizable injury under RICO); *In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods. Liab. Litig.* 295 F. Supp. 3d 927, 961 (N.D. Cal. 2018) (statistical link between fraudulent marketing and Plaintiffs' overpayment may establish causation and injury to property). Facebook's diversion of users and removal of CHD's donate button caused a concrete RICO injury to CHD which had received $28,000 in May 2019 alone through that function, before it was deactivated through one of Facebook's predicate wire-fraud acts. *See Resolute Forest Prods*. *id*. Facebook may or may not take CHD's money from those third-party users it defrauds, but that is hardly a defense. Facebook profits illicitly from its users whenever those users are misled by false fact-checks to click through and see new prompts and paid ads. Facebook also profits illicitly by solidifying its relationship with its

pharmaceutical advertisers with duplicitous methods. There is a far greater societal good in holding Facebook to its duty to be honest and truthful with its users than in letting Facebook off the hook if its deceptions do not directly take money from those users. After all, Facebook and Zuckerberg intended to destroy CHD's donations, membership fees, and business goodwill through coordinated acts of wire-fraud, even if they did not "pocket" CHD's losses themselves. CHD has been injured in its "business or property by reason of" defendants' RICO violations. 18 U.S.C. § 1964(c).

385.    Facebook disabled CHD's donate button in order to inflict a loss to CHD's revenue. Facebook's proffered rationale that it was because fact-checkers disputed CHD's posts was pretextual. (For example, defendants have not restored the fundraising tools even after removing fact-checked content entirely.) Facebook's use of interstate wires to remove CHD's fundraising tools was closely entwined with its fraudulent activity, and the removal contributed to the success of the scheme. "This connection is not to be measured by a technical standard; rather, what is required is that the mailings somehow contribute to the success of the scheme." *United States v. Halbert*, 640 F.2d 1000, 1009 (9th Cir. 1981). The mail and wire-fraud statutes are identical in this regard. Under 18 U.S.C. § 1964(c), Plaintiff seeks to recover threefold the damages they have sustained, and the cost of this suit, including an award of their reasonable attorneys' fees.

## FOURTH CAUSE OF ACTION
## (DECLARATORY RELIEF)

### Defendants Facebook, Zuckerberg, Science Feedback, Poynter, and Does 1-20

386.    Paragraphs 1 through 385 are realleged and incorporated as if fully set forth herein.

387.    The Declaratory Judgment Act, codified in 28 U.S.C. § 2201(a), provides in pertinent part that, "[i]n a case of actual controversy within its jurisdiction [] any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or

could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

388.    An actual controversy has arisen and now exists between Plaintiff and defendants, concerning their respective rights and duties in that these defendants have published a false and misleading warning label on Plaintiff's Facebook page; have fraudulently misrepresented to third-party users of the page that Plaintiff has posted and is posting "false [factual] information" in violation of their terms of service; and refuse to permit Plaintiff to solicit donations or purchase advertisements on the social media platform. Defendants have used deceptive means to limit the reach and visibility of CHD's page. Finally, and within the past two months, Zuckerberg has threatened to ban, limit, warn, deboost, block or censor content regarding 5G network safety.

389.    Under Ninth Circuit law, "intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm," and weigh in favor of injunctive relief. *Continental Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099, 1105 (9th Cir. 1994); *Rent-A-Ctr., Inc. v. Canyon TV and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). Moreover, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Accordingly, Plaintiff has suffered – and continues to suffer – irreparable harm.

390.    Plaintiff seeks a judicial determination of its rights and remedies and a declaration as to the parties' respective rights and obligations with respect to CHD's Facebook page. A judicial declaration is necessary and appropriate at this time so that Plaintiff may ascertain its rights to publish content on those pages without any interference, censorship, warning labels, "shadowbanning," "deboosting," "sandboxing," or other deceptive means and methods employed by defendants, and with respect to other affirmative relief such as a public apology and entry on a First Amendment "shield list" by defendants.

391.    As a result of Facebook's unlawful conduct, Plaintiff has suffered substantial damages, including, but not limited to:

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

a.     Plaintiff was deprived of freedom of speech;

b.     Plaintiff was foreclosed from future opportunities to reach subscribers on Facebook;

c.     Plaintiff lost status and prestige amongst Facebook followers, the general public and the journalistic community;

d.     Plaintiff suffered reputational harm;

e.     Plaintiff lost third-party donations to Plaintiff's organization, speaker fees, and book and other sales that would have accrued to Plaintiff but for defendants' misconduct; and,

e.     These injuries are continuing in nature requiring injunctive relief.

WHEREFORE, Plaintiff CHD demands judgment against Facebook Inc. for damages and injunctive relief as set forth below.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

\*   \*   \*   \*   \*   \*

**VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Children's Health Defense respectfully requests:

A.    Compensatory damages in an amount to be determined by the Jury, but not less than $5,000,000.

B.    An award of treble damages to Plaintiff in an amount to be determined at trial.

C.    An injunction and declaratory judgment ordering Facebook to remove its warning labels and misclassification of all content on Plaintiff's Facebook page, and to desist from any further warnings or classifications.

D.    An award of attorneys' fees and costs to Plaintiff in an amount to be determined at trial.

E.    An award of punitive damages to Plaintiff in an amount to be determined at trial.

F.    An order requiring defendants to make a public retraction of their false statements.

G.    An award of such other and further relief as the Court may deem just and proper.

Date:  December 4, 2020

Respectfully submitted,

ROBERT F. KENNEDY, JR.
Founder and Chairman, Children's Health Defense

MARY S. HOLLAND
General Counsel, Children's Health Defense

ROGER I. TEICH

Counsel for Plaintiff
Children's Health Defense

150    **VERIFIED SECOND AMENDED COMPLAINT**
*CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI

1

## **VERIFICATION**

2     I, MARY HOLLAND, declare under penalty of perjury as follows:

3     1.     I am the general counsel for Children's Health Defense, a non-profit organization

4 and Plaintiff in this action.

5     2.     I have reviewed the foregoing Complaint and declare that the facts set out therein

6 are true to the best of my knowledge and belief, except those matters stated as upon

7 information and belief, which are true to the best of my belief.

8     I declare under penalty of perjury of the laws of the United States that the foregoing is

9 true and correct.

10     Executed this 4th day of December 2020, in Rockland County, New York.

11

12

13     _____
       MARY HOLLAND
14     General Counsel, Children's Health Defense

15     Attorney for Plaintiff
       Children's Health Defense
16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFIED SECOND AMENDED COMPLAINT**
       *CHD v. Facebook* **et al.; Case No. 3:20-cv-05787-SI**