SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

ARI HOLTZBLATT (*pro hac vice*)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com
ALLISON SCHULTZ (*pro hac vice*)
 Allison.Schultz@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
1875 Pennsylvania Ave, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Defendants*
FACEBOOK, INC. and
MARK ZUCKERBERG

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CHILDREN'S HEALTH DEFENSE,<br><br>           Plaintiff,<br><br>   v.<br><br>FACEBOOK, INC., ET AL.,<br><br>           Defendants. | Case No.  3:20-cv-05787-SI<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hon. Susan Illston<br>Courtroom 1 – 17th floor<br>Date: March 19, 2021<br>Time: 10:00 a.m. |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND .....................................................................................................................3

    A.    Third-Party Fact-Checkers Identify Misinformation On The Facebook Platform ......3

    B.    Facebook Labels and Demotes CHD Content Identified By Third-Party Fact-Checkers As Containing False Information.................................................................5

ARGUMENT ...........................................................................................................................6

I.    CHD HAS NOT STATED A *BIVENS* CLAIM (COUNT 1) .................................................6

    A.    The SAC Does Not Allege Federal Action......................................................6

        1.    Many Of The SAC's Allegations Fail To Establish Any Connection To A Federal Actor ...................................................................................7

        2.    The SAC Fails To Allege Joint Action ............................................8

        3.    The SAC Fails To Allege A Sufficient Governmental Nexus......................10

    B.    Neither Facebook Nor Mark Zuckerberg Is A Proper *Bivens* Defendant..................11

    C.    The *Bivens* Claim Requires An Unwarranted Expansion Of *Bivens* Liability ..........12

II.    THE FIRST AMENDMENT BARS THE REMAINDER OF CHD'S CLAIMS (COUNTS 2 & 3).......................................................................................................12

    A.    The First Amendment Fully Protects Facebook's Statements and Content-Moderation Decisions ..................................................................13

    B.    CHD Cannot Recover For Alleged False Statements Absent Actual Malice...........14

III.    THE CDA ALSO BARS CHD'S LANHAM ACT AND CIVIL RICO CLAIMS (COUNTS 2 & 3).................................................................................................16

IV.    CHD HAS NOT STATED A CLAIM UNDER THE LANHAM ACT (COUNT 2) ...........20

    A.    CHD Lacks Standing Under The Lanham Act ......................................................20

    B.    The SAC Does Not Identify A Promotional Statement .............................................21

V.    CHD HAS NOT STATED A CIVIL RICO CLAIM (COUNT 3) .....................................22

    A.    CHD Has Not Pleaded Any Predicate Act Of Wire Fraud ........................................23

    B.    CHD Lacks Statutory Standing To Bring A Civil RICO Claim ................................25

C.      CHD Has Not Pleaded A RICO "Pattern" ................................................25

VI.    CHD HAS NOT STATED ANY CLAIM AGAINST MARK ZUCKERBERG ..................26

VII.   CHD STATES NO CLAIM WITH RESPECT TO 5G-RELATED CONTENT .................28

VIII.  CHD IS NOT ENTITLED TO DECLARATORY RELIEF (COUNT 4) ...........................28

CONCLUSION ..................................................................................................................28

# TABLE OF AUTHORITIES

**Cases**

*Animal Legal Defense Fund v. HVFG LLC*,
939 F. Supp. 2d 992 (N.D. Cal. 2013) ..........................................................................20

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006)............................................................................................................25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).......................................................................................11, 12, 19, 26

*Aviation Support International v. Northrop Grumman Corp.*,
221 F.3d 1347 (9th Cir. 2000) .........................................................................................26

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ...............................................................................................................11

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ....................................................................................16, 17

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) .........................................................................................18

*Belgau v. Inslee*,
975 F.3d 940 (9th Cir. 2020) ..............................................................................................6

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*,
403 U.S. 388 (1971).................................................................................................... *passim*

*Blumenthal v. Drudge*,
992 F. Supp. 44 (D.D.C. 1998) ........................................................................................19

*Brentwood Academy v. Tennessee Secondary School Athletic Asssociation*,
531 U.S. 288 (2001) .............................................................................................................10

*California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.*,
818 F.2d 1466 (9th Cir. 1987) .........................................................................................24

*Canyon County v. Syngenta Seeds, Inc.*,
519 F.3d 969 (9th Cir. 2008) ...........................................................................................25

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003) .........................................................................................19

*Carlson v. Green*,
446 U.S. 14 (1980).................................................................................................................12

*Chaiken v. VV Publishing Corp.*,
119 F.3d 1018 (2d Cir. 1997)...............................................................................16

*Coastal Abstract Service, Inc. v. First American Title Insurance Co.*,
173 F.3d 725 (9th Cir. 1999) .................................................................................21

*Comwest, Inc. v. American Operator Services, Inc.*,
765 F. Supp. 1467 (C.D. Cal. 1991) ......................................................................23

*Correctional Services Corp. v. Malesko*,
534 U.S. 61 (2001).............................................................................................6, 11

*County of Santa Clara v. Trump*,
267 F. Supp. 3d 1201 (N.D. Cal. 2017) .................................................................28

*Daniels-Hall v. National Education Association*,
629 F.3d 992 (9th Cir. 2010) ...................................................................................7

*Dex Media West, Inc. v. City of Seattle*,
696 F.3d 952 (9th Cir. 2012) .................................................................................21

*Dyroff v. Ultimate Software Group, Inc.*,
934 F.3d 1093 (9th Cir. 2019) ...............................................................................19

*Eastwood v. National Enquirer, Inc.*,
123 F.3d 1249 (9th Cir. 1999) ...............................................................................15

*Eller v. EquiTrust Life Insurance Co.*,
778 F.3d 1089 (9th Cir. 2015) ...............................................................................23

*Fair Housing Council v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) ...............................................................................18

*Farah v. Esquire Magazine*,
736 F.3d 528 (D.C. Cir. 2013) ...............................................................................20

*Fazaga v. Federal Bureau of Investigation*,
965 F.3d 1015 (9th Cir. 2020) .................................................................................6

*Federal Agency of News LLC v. Facebook, Inc.*,
432 F. Supp. 3d 1107 (N.D. Cal. 2020) ...........................................................17, 19

*Federal Deposit Insurance Co. v. Meyer*,
510 U.S. 471 (1994)...............................................................................................11

*Ferrari v. Mercedes-Benz USA, LLC*,
2016 WL 7188030 (N.D. Cal. Dec. 12, 2016) .......................................................27

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019)......................................................................................19

*Franklin v. Fox*,
  312 F.3d 423 (9th Cir. 2002) ..................................................................................8, 10

*Fyk v. Facebook, Inc.*,
  808 F. App'x 597 (9th Cir. 2020) ...................................................................................17

*Gallagher v. Neil Young Freedom Concert*,
  49 F.3d 1442 (10th Cir. 1995) ........................................................................................10

*Gordon & Breach Science Publishers S.A. v. American Institute of Physics*,
  859 F. Supp. 1521 (S.D.N.Y. 1994)................................................................................21

*Gorenc v. Salt River Project Agricultural Improvement & Power District*,
  869 F.2d 503 (9th Cir. 1989) ...............................................................................7, 8, 9, 10

*Harte-Hanks Communications, Inc. v. Connaughton*,
  491 U.S. 657 (1989)...............................................................................................15, 16

*Hollinger v. Titan Capital Corp.*,
  914 F.2d 1564 (9th Cir. 1990) ........................................................................................27

*Holmes v. Securities Investor Protection Corp.*,
  503 U.S. 258 (1992)........................................................................................................25

*Hurley v. Irish American Gay, Lesbian & Bisexual Group of Boston*,
  515 U.S. 557 (1995)........................................................................................................14

*In re Gilead Sciences Securities Litigation*,
  536 F.3d 1049 (9th Cir. 2008) ........................................................................................19

*Jackson v. Metropolitan Edison Co.*,
  419 U.S. 345 (1974)........................................................................................................10

*Jian Zhang v. Baidu.com Inc.*,
  10 F. Supp. 3d 433 (S.D.N.Y. 2014)...............................................................................14

*Jones v. Dirty World Entertainment Recordings, LLC*,
  755 F.3d 398 (6th Cir. 2014) ..........................................................................................18

*Kelly v. United States*,
  140 S. Ct. 1565 (2020)....................................................................................................23

*Kimzey v. Yelp!, Inc.*,
  836 F.3d 1263 (9th Cir. 2016) ...................................................................................18, 19

*Kirtley v. Rainey*,
  326 F.3d 1088 (9th Cir. 2003) ........................................................................................10

*Klayman v. Zuckerberg*,
  753 F.3d 1354 (D.C. Cir. 2014) ......................................................................................17

*Knievel v. ESPN*,
   393 F.3d 1068 (9th Cir. 2005) .......................................................................................3, 8

*La'Tiejira v. Facebook, Inc.*,
   272 F. Supp. 3d 981 (S.D. Tex. 2017) ...............................................................................12

*Langdon v. Google, Inc.*,
   474 F. Supp. 2d 622 (D. Del. 2007) ...................................................................................14

*Lansing v. City of Memphis*,
   202 F.3d 821 (6th Cir. 2000) .................................................................................................8

*Lee v. Nicholl*,
   197 F.3d 1291 (10th Cir. 1999) ..........................................................................................13

*Levitt v. Yelp! Inc.*,
   2011 WL 5079526 (N.D. Cal. Oct. 26, 2011)....................................................................19

*Lewis v. Google LLC*,
   461 F. Supp. 3d 938 (N.D. Cal. 2020) ..........................................................................8, 20

*Lexmark International, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014).............................................................................................................20

*Lugar v. Edmondson Oil Co.*,
   457 U.S. 922 (1982)...............................................................................................................6

*Makaeff v. Trump University, LLC*,
   715 F.3d 254 (9th Cir. 2013) ...............................................................................................14

*Manhattan Community Access Corp. v. Halleck*,
   139 S. Ct. 1921 (2019).............................................................................................................6

*Marshall's Locksmith Service, Inc. v. Google, LLC*,
   925 F.3d 1263 (D.C. Cir. 2019) .............................................................................................18

*Mathis v. Pacific Gas and Electric Co.*,
   75 F.3d 498 (9th Cir. 1996) ........................................................................................6, 9, 10

*Miami Herald Publishing Co. v. Tornillo*,
   418 U.S. 241 (1974)........................................................................................................12, 14

*Midwest Grinding Co. v. Spitz*,
   976 F.2d 1016 (7th Cir. 1999) ..............................................................................................22

*Ministry of Defense of the Islamic Republic of Iran v. Gould, Inc.*,
   969 F.2d 764 (9th Cir. 1992) ................................................................................................27

*Monterey Plaza Hotel L.P. v. Local 483*,
   215 F.3d 923 (9th Cir. 2000) .........................................................................................23, 25

*Morse v. North Coast Opportunities, Inc.*,
  118 F.3d 1338 (9th Cir. 1997) .................................................................................6, 9

*National Organization for Women, Inc. v. Scheidler*,
  510 U.S. 249 (1994)............................................................................................22

*NCAA v. Tarkanian*,
  488 U.S. 179 (1988)..............................................................................................7

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
  591 F.3d 250 (4th Cir. 2009) ...............................................................................18

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964)......................................................................................12, 15

*Openwave Systems Inc. v. Fuld*,
  2009 WL 1622164 (N.D. Cal. June 6, 2009) .........................................................27

*Ozeran v. Jacobs*,
  2018 WL 1989525 (C.D. Cal. Apr. 25, 2018), *aff'd*, 798 F. App'x 120 (9th Cir. 2020) ............25

*Pacific Gas and Electric Co. v. Public Utilities Commission of California*,
  475 U.S. 1 (1986)................................................................................................14

*Partington v. Bugliosi*,
  56 F.3d 1147 (9th Cir. 1995) ..........................................................................13, 14

*POM Wonderful LLC v. Purely Juice, Inc.*,
  362 F. App'x 577 (9th Cir. 2009) ..........................................................................26

*Pom Wonderful v. Coca-Cola Co.*,
  573 U.S. 102 (2014).............................................................................................20

*Prager University v. Google, LLC*,
  951 F.3d 991 (9th Cir. 2020) ................................................................................22

*Resolute Forest Products, Inc. v. Greenpeace International*,
  302 F. Supp. 3d 1005 (N.D. Cal. 2017) .................................................................15

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993).............................................................................................26

*Rice v. Fox Broadcastning Co.*,
  330 F.3d 1170 (9th Cir. 2003) ..............................................................................22

*Royce International Broadcasting Corp. v. Field*,
  2000 WL 236434 (N.D. Cal. Feb. 23, 2000) .....................................................22, 26

*RPost Holdings, Inc. v. Trustifi Corp.*,
  2011 WL 4802372 (C.D. Cal. Oct. 11, 2011)..........................................................28

*Savage v. Council on Am.-Islamic Relations, Inc.*,
  2008 WL 2951281 (N.D. Cal. July 25, 2008)..........................................................15

*Schreiber Distributing Co. v. Serv-Well Furniture Co.*,
  806 F.2d 1393 (9th Cir. 1986) ..............................................................................26

*Search King Inc. v. Google Technology, Inc.*,
  2003 WL 21464568 (W.D. Okla. May 27, 2003) ......................................................14

*Sever v. Alaska Pulp Corp.*,
  978 F.2d 1529 (9th Cir. 1992) ..............................................................................26

*Sheperd v. American Honda Motor Co.*,
  822 F. Supp. 625 (N.D. Cal. 1993) ........................................................................25

*Sikhs for Justice, Inc. v. Facebook, Inc.*,
  697 F. App'x 526 (9th Cir. 2017) ..........................................................................17

*Sikhs for Justice ("SFJ"), Inc. v. Facebook, Inc.*,
  144 F. Supp. 3d 1088 (N.D. Cal. 2015) ..................................................................17

*Skinner v. Railway Labor Executives' Association*,
  489 U.S. 602 (1989).........................................................................................10, 11

*Snyder v. Phelps*,
  562 U.S. 443 (2011)...............................................................................................13

*Sosa v. DIRECTV, Inc.*,
  437 F.3d 923 (9th Cir. 2006) ................................................................................24

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) ..............................................................................21

*Sugarman v. Muddy Waters Capital LLC*,
  2020 WL 633596 (N.D. Cal. Feb. 3, 2020) .........................................................23, 24

*Sutton v. Providence St. Joseph Medical Center*,
  192 F.3d 826 (9th Cir. 1999) ..................................................................................7

*Sybersound Records, Inc. v. UAV Corp.*,
  517 F.3d 1137 (9th Cir. 2008) ..............................................................................25

*Threshold Enterprises Ltd. v. Pressed Juicery, Inc.*,
  445 F. Supp. 3d 139 (N.D. Cal. 2020) ......................................................................3

*TransFresh Corp. v. Ganzerla & Associates*,
  862 F. Supp. 2d 1009 (N.D. Cal. 2012)..............................................................22, 26

*United States v. Alvarez*,
  567 U.S. 709 (2012)...............................................................................................13

*United States v. Lew*,
    875 F.2d 219 (9th Cir. 1989) ...........................................................................23, 24

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)......................................................................................................21

*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017)..................................................................................................12

**Statutes, Rules and Regulations**

Fed. R. Civ. P. 9(b) .......................................................................................22, 23, 26, 28

Fed. R. Civ. P. 12(b)(6) .......................................................................................................1

15 U.S.C. § 1127 ................................................................................................... *passim*

18 U.S.C. § 1951 ............................................................................................................23

18 U.S.C. § 1962 ............................................................................................................26

47 U.S.C. § 230 .................................................................................................... *passim*

**U.S. Constitution**

U.S. CONSTITUTION, amendment I ...................................................................... *passim*

U.S. CONSTITUTION, amendment IV .............................................................................10

**Miscellaneous**

134 Cong. Reg. 31,851 (Oct. 19, 1988) .........................................................................21

135 Cong. Rec. H1216-17135 (Apr. 13, 1989)...............................................................21

AXIOS on HBO: Mark Zuckerberg on Misinformation,
    https://tinyurl.com/y8gqvaxt (last accessed Dec. 21, 2020) .........................................9

InfraGard National, *InfraGard National Journal*,
    https://tinyurl.com/y47j345e (last accessed Dec. 21, 2020) .........................................8

InfraGard National, *Overview*,
    https://tinyurl.com/y5flz8ot (last accessed Dec. 21, 2020)...........................................7

Mark Jarrett & Christine Sublett, *The Anti-Vaxxers Movement and National Security*,
    2 InfraGard J. 24 (2019)..................................................................................................8

*Terms of Service*,
    https://tinyurl.com/64b26g (last accessed Dec. 21, 2020) ............................................3

World Health Organization, *About WHO*,
   https://tinyurl.com/y5ltbeaf (last accessed Dec. 21, 2020) ...........................................................7

NOTICE OF MOT. AND MOT. TO DISMISS
SECOND AM. COMPL.; MEM. ISO

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE THAT, on March 19, 2021 at 10:00am or as soon thereafter as the matter may be heard, in Courtroom 1 of the U.S. District Court for the Northern District of California, San Francisco Division, this Motion to Dismiss will be heard. Facebook, Inc. and Mark Zuckerberg move to dismiss the Second Amended Complaint ("SAC") pursuant to Federal Rule of Civil Procedure 12(b)(6). This Motion to Dismiss is based on this Notice of Motion, the Memorandum of Points and Authorities, and the supporting Declaration of Molly M. Jennings.

## STATEMENT OF REQUESTED RELIEF

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Facebook and Mark Zuckerberg request that the Court dismiss the Second Amended Complaint with prejudice.

## MEMORANDUM OF POINTS AND AUTHORITIES

This lawsuit asks the Court to step outside its role as adjudicator of legal disputes and instead become an arbiter of truth in what Children's Health Defense ("CHD") calls the "open controversy" over vaccine safety. SAC ¶ 149. According to CHD, "[u]nvaccinated kids are healthier" than vaccinated children, *id.* ¶ 131, and vaccines are responsible for infant deaths, *id.* ¶ 157. Third-party independent fact-checkers designated those and other vaccine-related posts as containing false information and provided explanations supporting those designations. Facebook labeled those posts according to the fact-checkers' conclusions, and provided its users with the fact-checkers' reasoning so that users could evaluate the conclusions for themselves. Facebook also restricted CHD's ability to share information identified as false and limited CHD's access to other functions.

CHD claims that Facebook's fact-checking program violated its First Amendment rights, restrained it from competing in the marketplace of vaccine "messages," SAC ¶ 333, and constituted a RICO enterprise. Those claims turn the First Amendment on its head. The First Amendment is a shield from government action—not a sword to be used in private litigation. It is therefore unsurprising that the SAC contains numerous independent and incurable defects.

*First*, the SAC does not state a *Bivens* claim because it does not allege federal action. Facebook and Mr. Zuckerberg are private actors. Facebook exercised its own editorial discretion to reduce the visibility of posts identified by independent fact-checkers as containing false or partially

false information. None of the challenged conduct is attributable to the federal government.

*Second*, far from violating the First Amendment, Facebook's decisions to label and limit the visibility of CHD's content are themselves protected by the First Amendment. This Court may not hold Facebook or Mr. Zuckerberg liable for exercising editorial discretion with respect to matters of public concern. And even if the First Amendment did not fully bar CHD's claims, it requires that CHD, at minimum, plausibly allege that Facebook acted with actual malice. The SAC fails to do so, even though Defendants' motions to dismiss unquestionably put CHD on notice of this defect.

*Third*, Section 230 of the Communications Decency Act ("CDA") shields Facebook from liability for publishing third-party fact checks or restricting access to CHD's content. None of the SAC's allegations concerning the relationship between Facebook and third-party fact-checkers strip Facebook or Mr. Zuckerberg of that protection.

*Fourth*, the Lanham Act claim fails because CHD has not identified a commercial injury that gives it standing under the Act. The Lanham Act protects those engaged in commerce against unfair competition. Because CHD's alleged injuries are to its interests as a *consumer* of Facebook's *free* service, not as a competitor, they are not cognizable under the Act. And CHD's allegations do not establish that the purportedly false statements are "promotional statements" covered by the Act.

*Fifth*, CHD has not stated a civil RICO claim because it has failed, even on its third bite at the pleading apple, to identify any predicate acts of wire fraud. And CHD has alleged neither a sufficiently "direct" injury to confer statutory standing nor a cognizable civil RICO "pattern."

*Sixth*, the SAC additionally does not state a claim against Mr. Zuckerberg because it does not allege that he was personally involved in any of the allegedly unlawful conduct. Nor has CHD pleaded the necessary prerequisites for any theory of agency liability.

*Seventh*, though the SAC contains many paragraphs describing CHD's views on 5G, CHD nowhere connects those views to an actionable theory of liability.

None of these deficiencies can be cured by giving CHD a fourth attempt to plead its case. Defendants identified these *same problems* in CHD's original complaint, and CHD responded by amending not once, but twice. Those amendments added almost 60 pages and almost 150 paragraphs—consisting primarily of legal conclusions and argument instead of relevant factual

1  allegations—without curing any of the original complaint's fundamental deficiencies. The SAC's

2  continued deficiencies prove that no amended allegations can convert Facebook and Mr. Zuckerberg

3  into federal actors subject to *Bivens* claims. No amended allegations can alter the defenses accorded

4  to Defendants by the First Amendment and Section 230. And no amended allegations could bring

5  CHD's Lanham Act claim within the zone of interests protected by the statute or turn Defendants'

6  actions here into an actionable RICO conspiracy. The SAC should be dismissed with prejudice.

7  **BACKGROUND**

8  **A.      Third-Party Fact-Checkers Identify Misinformation On The Facebook Platform**

9  CHD alleges that Facebook is a social media website with 2.2 billion users worldwide. SAC

10 ¶ 7. Facebook users can maintain Facebook profiles or create Pages; share status updates, photos,

11 videos, and stories on those profiles or Pages; and browse for content through their News Feed.

12 Facebook, *Terms of Service*, https://tinyurl.com/64b26g (last accessed Dec. 21, 2020).[1]

13 As part of its "commit[ment] to fighting the spread of misinformation," Facebook has

14 developed a fact-checking program to identify false or misleading information. Facebook for

15 Business, *Fact-Checking on Facebook*, https://tinyurl.com/y33wyhe2 (last accessed Dec. 21, 2020)

16 (Jennings Decl. Ex. 1 at 1).[2] Facebook "rel[ies] on independent fact-checkers"—like Defendants

17 Science Feedback and PolitiFact, SAC ¶¶ 217, 221—"to identify and review potential

18 misinformation" because it does "not believe that a private company like Facebook should be the

19 arbiter[] of truth." Facebook Journalism Project, *How Our Fact-Checking Program Works*,

20 https://tinyurl.com/y57sx6n3 (last accessed Dec. 21, 2020) (Jennings Decl. Ex. 2 at 2).[3] The third-

21 party fact-checkers "are certified through the non-partisan International Fact-Checking Network

22 (IFCN)." Jennings Decl. Ex. 1 at 1. Fact-checkers review potentially misleading information and

23

24

25 [1] The SAC incorporates the Terms of Service by reference; they therefore may be considered in deciding this Motion to Dismiss. *See* SAC ¶¶ 35-39; *Knievel v. ESPN*, 393 F.3d 1068, 1076-77 (9th Cir. 2005) (considering website under "'incorporation by reference' doctrine").

26 [2] The SAC also incorporates this webpage by reference. *See* SAC ¶ 218.

27 [3] The Court may take judicial notice of the existence and content of this website. *See Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020). It cannot reasonably
28 be disputed that Facebook made the quoted statement as that fact can be readily determined from sources whose accuracy cannot reasonably be disputed. *See id.* at 145.

rate it as false, altered, partly false, missing context, satire, or true. *Id.*; SAC ¶ 218.

When users share content identified as containing false information, Facebook responds by "surfacing fact-check articles … and showing labels on top of false stories." Jennings Decl. Ex. 2 at 2. When a user shares a link that fact-checkers have flagged as containing false information, the image previewing the link is covered by a transparent grey overlay identifying the link as containing "False" or "Partly False Information." *E.g.*, SAC ¶¶ 126, 133. The grey overlays allow the user to click to "See [the] Link" that fact-checkers identified as containing false information and also to click a button to "See Why" the link was so identified. *E.g.*, *id.* ¶ 157. Upon clicking "See Why," the user sees the fact-checker's summary describing the nature of the designation, such as "false" or "partly false"; a definition of that designation; the fact-checker responsible for the designation; and a brief explanation. *See, e.g.*, *id.* ¶¶ 143, 159. Users can click on the summary for more detail. *E.g. id.* ¶¶ 145, 160. Content rated "False, Altered or Partly False[ ] will [also] appear lower in News Feed … and be featured less prominently in Feed and Stories." Jennings Decl. Ex. 1 at 2.

Facebook also takes action against Pages that repeatedly share information fact-checkers rate as "False" or "Altered." Jennings Decl. Ex. 1 at 2. Facebook may, for example, reduce the distribution of such Pages or remove their ability to advertise or solicit donations on Facebook. *Id.*

 As relevant here, Facebook announced in March 2019 that it would "reduce the ranking of groups and Pages that spread misinformation about vaccinations in News Feed and Search" and "remove access to our fundraising tools for Pages that spread misinformation about vaccinations." Bickert, *Combatting Vaccine Misinformation*, FACEBOOK (Mar. 7, 2019), https://tinyurl.com/yyazbumc (Jennings Decl. Ex. 3 at 2-3).[4] Six months later, Facebook announced that it was "starting to roll out more ways to connect people with authoritative information about vaccines on Facebook," including links to the World Health Organization's ("WHO") website, "when people come across misinformation on this topic." *Id.*

---

[4] The SAC quotes this article at length, *see* ¶ 68, thereby incorporating it by reference.

**B.      Facebook Labels and Demotes CHD Content Identified By Third-Party Fact-Checkers As Containing False Information**

CHD uses its Page to share articles and videos, including pieces concerning "the risks and harmful effects of chemical exposure upon prenatal and children's health, including from particular vaccines." SAC ¶ 14; *see also id.* ¶¶ 30, 33.

Between January 15, 2019, and September 28, 2020, third-party fact-checkers labeled numerous CHD vaccine- and public-health related posts as containing false or partly false information, causing Facebook to apply various restrictions to the underlying content. *E.g.*, SAC ¶¶ 115, 118, 126, 131, 141, 157. For example, on May 28, 2020, Facebook displayed a grey overlay with the text "**False Information** Checked by independent fact-checkers" to a link to an article CHD shared claiming "[v]accinated children are more likely to have adverse health outcomes." *Id.* ¶ 134. Upon clicking the "See Why" button, users were informed that Science Feedback identified the article as containing false information because "[v]accinated children do not have greater risk of adverse health outcomes in comparison to unvaccinated." *Id.* ¶ 133. Users could click on the summary to further read that Science Feedback identified the claim as "unsupported" because it is "based on a single study which used highly biased methods"; "failed to control for confounding factors in its comparison of vaccinated and unvaccinated children," such as "healthcare-seeking behavior"; and "used patient data from handpicked pediatric clinics only." *Id.*¶¶ 134-135.

In addition to displaying overlays on individual posts, Facebook took action against CHD at the account level as a result of CHD's repeated violations of Facebook's policy against sharing misleading vaccine information, as identified by the fact-checkers. In May 2019, for example, Facebook deactivated the "donate" button on CHD's page, SAC ¶ 198, and barred CHD from buying new Facebook ads, *id.* ¶ 199. And on September 4, 2019, Facebook published the following text at the top of CHD's Facebook Page: "This Page posts about vaccines. When it comes to health, everyone wants reliable, up-to-date information. The Centers for Disease Control (CDC) has information that can help answer questions you may have about vaccines. Go to CDC.gov." *Id.* ¶ 70.

1

## ARGUMENT

2

## I.   CHD HAS NOT STATED A *BIVENS* CLAIM (COUNT 1)

3

CHD claims that Facebook and Mr. Zuckerberg violated its First Amendment rights by

4

labeling as "false," demoting, and removing its posts, SAC ¶¶ 309, 318, 325, and violated its Due

5

Process rights by disabling the "donate" button on its Facebook Page, *id.* ¶ 319. CHD seeks damages

6

for those alleged deprivations under *Bivens v. Six Unknown Named Agents of the Federal Bureau*

7

*of Narcotics*, 403 U.S. 388 (1971), which created "an implied private action for damages against

8

federal officers alleged to have violated a citizen's constitutional rights," *Correctional Servs. Corp.*

9

*v. Malesko*, 534 U.S. 61, 66 (2001). But *Bivens*'s "narrow" remedy, *Fazaga v. Federal Bureau of*

10

*Investigation*, 965 F.3d 1015, 1052 n.31 (9th Cir. 2020), does not apply here.[5]

11

### A.   The SAC Does Not Allege Federal Action

12

*Bivens* typically provides a remedy only against "individual *federal* officers." *Malesko*, 534

13

U.S. at 70 (emphasis added). It is applied to private actors only "sparingly," *Mathis v. PG&E Co.*,

14

75 F.3d 498, 501 (9th Cir. 1996), and only where their conduct is so intertwined with that of federal

15

actors that "it is fair to attribute the challenged actions" to the federal government, *Morse v. North*

16

*Coast Opportunities, Inc.*, 118 F.3d 1338, 1343 (9th Cir. 1997). Distinguishing private from federal

17

actors is no mere technicality; it is crucial to "preserv[ing] an area of individual freedom by limiting

18

the reach of federal law and federal judicial power." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922,

19

936 (1982). This is particularly so here, because using the First Amendment to sanction private

20

conduct "could eviscerate certain private entities' rights to exercise editorial control over speech

21

and speakers on their properties or platforms." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S.

22

Ct. 1921, 1932 (2019).

23

"The state action inquiry boils down to this: is the challenged conduct that caused the alleged

24

constitutional deprivation 'fairly attributable' to the state?" *Belgau v. Inslee*, 975 F.3d 940, 946 (9th

25

Cir. 2020) (citation omitted). The Supreme Court has outlined four tests to identify state action, only

26

two of which the SAC arguably attempts to invoke: (1) joint action, *see* SAC ¶¶ 307, 309, 312; and

27

28

---

[5] This brief addresses only the defects in CHD's claims against Facebook and Mr. Zuckerberg, but the claims against the fact-checker defendants are flawed for similar reasons.

(2) governmental nexus, *see id.* ¶¶ 312-313.[6] *See Gorenc v. Salt River Project Agric. Improvement & Power Dist.*, 869 F.2d 503, 506-509 (9th Cir. 1989). Here, Facebook made clear its own interest in reducing the spread of vaccine misinformation on its platform, *see* Jennings Decl. Ex. 3, and then took action—action attributable to Facebook and the fact-checkers, not the federal government—to prevent that content from spreading further. CHD alleges federal action on the basis of Facebook's purported connections with Representative Adam Schiff, the CDC, the CDC Foundation, the WHO, the State Department, the British Government, and InfraGard, a non-profit affiliated with the Federal Bureau of Investigations ("FBI"). But even after multiple amendments, CHD has not alleged facts showing that any of the challenged conduct is "fairly attributable" to the federal government. Indeed, many of its allegations fail to establish *any* connection whatsoever between any federal actor and the allegedly unlawful conduct.

      *1.*    *Many Of The SAC's Allegations Fail To Establish Any Connection To A Federal Actor*

      It should go without saying that to state a *Bivens* claim, CHD must allege *some* connection to a federal actor, but many of CHD's allegations fail to meet even that most basic requirement. CHD claims "federal" action based on purported connections to the WHO, CDC Foundation, InfraGard, and British government, SAC ¶ 102, 103, 308, 311—none of which are *federal* actors.

- The WHO is an international organization comprised of representatives from 194 member states. *See* About WHO, World Health Organization, https://tinyurl.com/y5ltbeaf (last accessed Dec. 21, 2020).[7] Although the United States is a member of the WHO, a state's membership in a multilateral government body does not make that body's conduct state action. *See NCAA v. Tarkanian*, 488 U.S. 179, 183, 193 (1988).

- The CDC Foundation and InfraGard are non-profit organizations. SAC ¶ 40; InfraGard,

---

[6] To the extent that CHD invokes the government compulsion test, it is inapplicable here. That test applies only to claims directly against government actors for conduct carried out by private actors. *See Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 838 (9th Cir. 1999). Private actors cannot be held constitutionally liable for conduct compelled by the government. *Id.*

[7] Judicial notice is appropriate because this site is provided by a government entity and is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Daniels-Hall v. National Educ. Ass'n*, 629 F.3d 992, 999 (9th Cir. 2010).

*Overview*, https://tinyurl.com/y5flz8ot (last accessed Dec. 21, 2020).[8] Although they are government *affiliated* (the CDC Foundation with the CDC and InfraGard with the FBI), affiliation alone does not make a non-profit a state actor. *See, e.g.*, *Lansing v. City of Memphis*, 202 F.3d 821, 825, 828 (6th Cir. 2000) (applying state-action test to government affiliated non-profit). What's more, the InfraGard journal, on which CHD relies to draw a (tenuous) connection between InfraGard (and, by extension, the FBI) and the targeting of vaccine misinformation, *see* SAC ¶ 103, displays a bright red disclaimer stating: "The opinions in the InfraGard National Journal are those of the author(s) and not of the InfraGard *or of the Federal Bureau of Investigations*." InfraGard National Journal, InfraGard, https://tinyurl.com/y47j345e (last accessed Dec. 21, 2020) (emphasis added).[9]

- And as for the British government, "acts by a foreign government and its officials cannot constitute conduct under color of state law." *Lewis v. Google LLC*, 461 F. Supp. 3d 938, 956 (N.D. Cal. 2020) (quotation marks omitted).

### 2.    The SAC Fails To Allege Joint Action

Even where CHD identifies a federal actor, it still does not allege a connection sufficient to establish that Defendants' conduct is attributable to the federal government. CHD primarily relies on the "joint action" theory, *see* SAC ¶ 307, which applies only where government "officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002) (quotation marks and citation omitted). The test is narrowly focused, looking not at whether the private and federal actors simply have a "shared goal," *id.* at 445, but whether the federal government has "so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant *in the challenged activity*." *Gorenc*, 869 F.2d at 507 (alteration in original) (emphasis added).  In *Mathis*, for example, the Ninth Circuit held that PG&E's decision to bar a contractor from entering its plant

---

[8] This website is cited in the SAC (at ¶ 103) and is therefore incorporated by reference. *Knievel*, 393 F.3d at 1076-1077.

[9] The authors of the article cited, moreover, are the Chief Quality Officer at Northwell Health and a consultant at Sublett Consulting LLC, not federal actors. *See* Jarrett & Sublett, *The Anti-Vaxxers Movement and National Security*, 2 InfraGard J. 24 (2019). This article is cited in the SAC (at ¶ 103) and therefore incorporated by reference.

was not joint action, even where a state task force participated in the investigation leading to that decision because the task force was not specifically "involved in the decision to exclude [the contractor] from the plant." 75 F.3d at 503-504.

Applied here, the joint-action doctrine would require CHD to plausibly allege that federal actors worked with Defendants to demote, fact-check, or remove CHD's content. The SAC falls far short of this mark. As to the CDC and Representative Schiff, CHD alleges only that the CDC works with Facebook to deliver health and vaccine-related information, SAC ¶¶ 49-51, 54, and that Representative Schiff asked Facebook for information about its efforts to reduce the spread of vaccine misinformation, including whether Facebook did anything "to prevent anti-vaccine videos or information from being recommended to users," *id.* ¶ 63. These allegations suggest, *at most*, a general alignment to promote accurate vaccine-related information and not promote misinformation. The SAC contains no allegations of any agreement or coordination to remove, fact-check, or demote *any* content or restrict access to any fundraising tools, let alone to direct any such actions towards CHD in particular.[10]

CHD's allegations regarding the IFCN and the Global Health Security Agenda ("GHSA") are even further afield. CHD claims that the State Department provides some funding to the IFCN, SAC ¶ 98, but nowhere alleges that IFCN took any unlawful action. IFCN certifies the independent fact-checkers, *id.* ¶ 105, but is not alleged to have engaged in any fact-checking itself. And while Executive Order 13747 requires the State Department to implement the GHSA, the SAC does not allege that the GHSA engages in, promotes, or encourages the removal of vaccine misinformation. According to the SAC, the GHSA seeks to "improve immunization rates." SAC ¶ 100. Even assuming that Defendants shared that general goal, that is insufficient to allege federal action with

---

[10] CHD also relies (SAC ¶ 52) on an out-of-context statement from Mr. Zuckerberg to allege that Facebook "work[s] with" the CDC. In the cited video, Mr. Zuckerberg explains that Facebook "defer[s]" to fact-checkers and organizations like the CDC on "clear health guidelines on things that could lead to imminent harm if people don't follow them." AXIOS on HBO: Mark Zuckerberg on Misinformation, https://tinyurl.com/y8gqvaxt (last accessed Dec. 21, 2020). Deferring to government guidelines does not establish state action any more than following government regulation does. *See Morse*, 118 F.3d at 1341. Rather, joint action requires active government "insinuat[ion] … in the challenged activity," *Gorenc*, 869 F.2d at 507, and CHD never alleges that the CDC did anything at all, much less involve itself in any decision with respect to CDC's content.

respect to the specific conduct alleged here. *See Franklin*, 312 F.3d at 445; *see also Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1455 (10th Cir. 1995).

> 3.     The SAC Fails To Allege A Sufficient Governmental Nexus

The SAC also fails to allege state action under the "nexus" test. This test asks "whether there is a sufficiently close nexus between the State and the challenged action of the [private] entity so the action of the latter may be fairly treated as that of the state itself." *Gorenc*, 869 F.2d at 506 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974)). This generally requires "public entwinement in the management and control" of private entities. *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 296-297 (2001). Mere regulation, even if "extensive," is insufficient. *Jackson*, 419 U.S. at 350-351. For example, in *Kirtley v. Rainey*, the Ninth Circuit found no nexus between court-appointed guardians *ad litem* and the state to attribute the former's conduct to the latter, even where the guardians were appointed, paid, and regulated by the state. 326 F.3d 1088, 1094-1095 (9th Cir. 2003).

The SAC alleges no federal management or control over the conduct at issue. CHD would have this Court infer federal control from Representative Schiff's statements "that Congress could or should 'make changes'" to Section 230 immunity if social media companies do not address misinformation. SAC ¶ 366. But the statements of a single representative regarding what Congress might "have to think about," *id.*, establish *at most* "regulatory interest in a problem," which does not "transform[] any subsequent private efforts to address the problem (even those expressly designed to obviate the need for regulation) into state action." *Mathis*, 75 F.3d at 503.

And CHD is wrong that the immunities provided in Section 230 together with "official pressure" combine to create state action. SAC ¶¶ 297-300. CHD attempts to concoct a new state-action test by stitching together two unrelated and inapposite cases. It relies first on *Skinner v. Railway Labor Executives' Association*, where the Supreme Court held that breath and urine tests performed in accordance with federal regulations were government searches subject to Fourth Amendment scrutiny. 489 U.S. 602, 614-615 (1989). But the "official pressure" there went far beyond a letter from a single Congressperson. *Skinner* concerned *federal regulations* that not only authorized railroads to require employees to submit to the breath and urine tests, but also "set forth

procedures for the collection of samples" and precluded railroads from "divest[ing] [themselves] of, or otherwise compromis[ing] by contract, the authority conferred by [the regulation]." *Id.* at 611-612, 615. Nothing remotely similar is alleged here. Section 230 says nothing about the removal of vaccine misinformation. And CHD identifies no other affirmative legal obligations of the sort at issue in *Skinner*.

To fill the gap, CHD points to *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), for the proposition that "informal governmental pressure and threats can turn private-party conduct into state action." SAC ¶ 300. But *Bantam Books* says no such thing. That case concerned a First Amendment challenge directly to a *governmental* commission tasked with investigating violations of an obscenity law, 372 U.S. at 59-61, and holds that informal *governmental* sanctions—such as threatening to recommend prosecution—can give rise to a First Amendment violation. *Id.* at 66-67. It did not consider, much less hold, that informal pressure turns private conduct into state action. Neither *Skinner* nor *Bantam Books*—read together or separately—provide CHD the claim it seeks.

Finally, CHD cannot turn its pleading deficiencies into cause for discovery. Calling the government's purported role "non-obvious," SAC ¶ 104, neither excuses CHD's failure to allege a sufficient connection between any federal actor and the conduct at issue nor authorizes a fishing expedition. Despite multiple bites at the apple, CHD has not alleged any facts sufficient to "allow[] the court to draw the reasonable inference that the [government] is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Its *Bivens* claim must, therefore, be dismissed with prejudice.

## B.   Neither Facebook Nor Mark Zuckerberg Is A Proper *Bivens* Defendant

CHD's *Bivens* claim independently fails because Facebook and Mr. Zuckerberg are not proper *Bivens* defendants. *Bivens* is a remedy against individuals, not entities. *See FDIC v. Meyer*, 510 U.S. 471, 485 (1994). "The purpose of *Bivens* is to deter *individual federal officers* from committing constitutional violations." *Malesko*, 534 U.S. at 70 (emphasis added). Because claims against "corporate defendant[s]" do not serve that purpose, they are "foreclosed." *Id.* at 71.

As to Mr. Zuckerberg, the SAC does not plausibly allege that he, "through [his] own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. The SAC asserts in

conclusory fashion that "it may be reasonably inferred that Zuckerberg was personally and directly involved" in decisions to take action with respect to CHD, SAC ¶ 65, but does not allege the facts necessary to "allow[] the court to draw [that] inference," *Iqbal*, 556 U.S. at 678. The SAC alleges only that Mr. Zuckerberg has a personal interest in vaccines, SAC ¶¶ 8, 275, 277; that he is aware of and involved at a very high level with Facebook's efforts to remove misinformation, *id.* ¶¶ 74, 84, 206, 268; and that he has been personally involved in some *other* decisions about whether to remove content unrelated to vaccines, *id.* ¶¶ 216, 271. Those allegations do not permit any reasonable inference of personal constitutional liability.

### C.   The *Bivens* Claim Requires An Unwarranted Expansion Of *Bivens* Liability

CHD's *Bivens* claim also should be dismissed because applying *Bivens* here would be "different in a meaningful way from previous *Bivens* cases," *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1859 (2017). No court has applied *Bivens* to hold a social-media platform, much less its executives, liable for exercising editorial judgment. The absence of precedent is meaningful here because this case would raise First Amendment concerns not addressed in previous *Bivens* cases. *See infra* pp.12-16. That is a significant problem for CHD, because "expanding the *Bivens* remedy is now a 'disfavored' judicial activity," *id.* at 1857, and courts must not expand *Bivens* where "special factors counsel[] hesitation" and "alternative remed[ies]" are available, *Carlson v. Green*, 446 U.S. 14, 18 (1980).

## II.   THE FIRST AMENDMENT BARS THE REMAINDER OF CHD'S CLAIMS (COUNTS 2 & 3)

CHD has the relevant First Amendment interests exactly backwards. Whether "fair or unfair," content-related decisions by private actors—particularly regarding "treatment of public issues"—generally cannot be regulated "consistent with First Amendment guarantees." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *see also La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991 (S.D. Tex. 2017) (citing *Tornillo*, 418 U.S. at 258).

And just as the government may not punish private actors like Facebook and Mr. Zuckerberg for their editorial decisions, private citizens may not invoke civil law and the power of the courts to reach those same ends. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964). Yet that is precisely what CHD seeks to do here. CHD asks this Court to hold Facebook and Mr. Zuckerberg

liable for publishing a warning label on CHD's Facebook Page, allowing third parties to publish fact-checks in connection with several CHD posts, and for limiting CHD's visibility and reach on the platform by demoting or removing some of its content. *See, e.g.*, SAC ¶¶ 55, 114, 209. The First Amendment protects each of those challenged actions.

A.     **The First Amendment Fully Protects Facebook's Statements and Content-Moderation Decisions**

The First Amendment's protections are at their apex with respect to the kind of speech at issue here, i.e., speech related to "matters of public concern." *Snyder v. Phelps*, 562 U.S. 443, 452-453 (2011). Whether speech is of public or private concern is determined based on its "content, form, and context," *id.* at 453-454, and here each shows the public nature of Facebook's speech. The content of the speech at issue—the veracity of public-health information—is a matter of public concern. *See, e.g.*, *Lee v. Nicholl*, 197 F.3d 1291, 1296 (10th Cir. 1999). And the form and context of the speech—warnings and labels on CHD's Page, aimed at members of the public who may view CHD's Page and posts—further supports its public nature. *See Snyder*, 562 U.S. at 454. Accordingly, Facebook and Mr. Zuckerberg may not be held liable for the *content* of the challenged speech. *See id.* (government may regulate only time, place, and manner of protected speech).

Facebook denies that any of these statements or labels are false, but the alleged falsity of the speech acts described in the SAC does not make them any less protected. There is no "general exception to the First Amendment for false statements." *United States v. Alvarez*, 567 U.S. 709, 718 (2012). Rather, false speech may be regulated in only a few narrow circumstances, *id.* at 717, none of which are relevant here. The warnings and fact-checks are not false advertising, *see infra* pp.20-22, they are not fraudulent, *see infra* pp.23-25, and CHD does not assert a claim for defamation. Accordingly, the challenged speech is fully protected even if false.

Moreover, the labels on CHD's posts did not simply claim that those posts contained false information; they also provided detailed explanations from fact-checkers outlining the reasons for each label. Sharing a conclusion together with "the factual basis for [that] conclusion … is protected by the First Amendment." *Partington v. Bugliosi*, 56 F.3d 1147, 1156 (9th Cir. 1995). Each fact-check overlay contained a "See Why" button enabling readers to see who identified the relevant

post as containing false information and on what basis. *See, e.g.*, SAC ¶¶ 157-160, 193. It was thus clear to readers that the fact-check label "represent[ed] the [fact-checker's] interpretation of the facts presented," and readers were "free to draw [their] own conclusions based upon those facts." *Partington*, 56 F.3d at 1156. While CHD might disagree with the fact-checkers' conclusions, they are not actionable. *See id.* (interpretations of disclosed facts not actionable).

The First Amendment also protects the decision to remove or reduce the distribution of certain content or restrict access to certain features by those who repeatedly share misinformation. As to content moderation, the First Amendment protects the "exercise [of] editorial control and judgment," including the "choice of material" allowed on the Facebook platform. *Miami Herald*, 418 U.S. at 258. Accordingly, filtering or demoting content is protected speech activity, *see Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 443 (S.D.N.Y. 2014) (First Amendment protects decision to block content from search results); *accord Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629-630 (D. Del. 2007) (similar); *Search King Inc. v. Google Tech., Inc.*, 2003 WL 21464568, at *4 (W.D. Okla. May 27, 2003) (similar), as is removing content, *see Pacific Gas & Elec. Co. v. Public Utilities Comm'n of Cal.*, 475 U.S. 1, 16 (1986) (First Amendment protects "the choice of what not to say"). The same is true of decisions to restrict access to advertising or fundraising tools. Advertisements and fundraising solicitations carry messages—even if not always "narrow [and] succinctly articulable"—and private actors cannot be compelled to carry others' messages. *See Hurley v. Irish Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569-570 (1995).

**B.     CHD Cannot Recover For Alleged False Statements Absent Actual Malice**

The warnings and fact-checks described in the SAC are also not actionable because—despite notice of the defect and multiple attempts to remedy it—CHD has not alleged actual malice. CHD is a limited-purpose public figure for what it characterizes as the debate over vaccine safety because: (1) it alleges that a public controversy regarding vaccine safety existed when the statements at issue were made, *see, e.g.*, SAC ¶¶ 8, 26, 228-240; (2) the alleged false statements related to CHD's participation in that controversy, *see, e.g.*, *id.* ¶ 70; and (3) CHD voluntarily injected itself into that controversy for the purpose of influencing its resolution, *see, e.g.*, *id.* ¶¶ 14-15. *See Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 266 (9th Cir. 2013) (laying out test).

Because CHD is a limited public figure, it must allege actual malice (i.e., knowledge that the warning and fact-checks were false or reckless disregard for their truth or falsity) to hold Facebook or Mr. Zuckerberg liable here. *See Sullivan*, 376 U.S. at 279-280. This standard applies to both Lanham Act false-advertising claims, *see Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1250-1251 (9th Cir. 1999), and civil RICO claims based on fraud, *Savage v. Council on Am.-Islamic Relations, Inc.*, 2008 WL 2951281, at *12 (N.D. Cal. July 25, 2008). CHD therefore must allege with specificity that Defendants had "a 'high degree of awareness of … probable falsity' or must have … 'entertained serious doubts as to the truth of [the] publication.'" *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989).

Even after two amendments, CHD has not alleged facts sufficient to show actual malice. Indeed, the primary allegation regarding malice added to the SAC is the conclusory refrain that Facebook "w[as] aware, or acted in reckless disregard of, … specific falsities" in its statements. *See e.g.*, SAC ¶¶ 120, 128, 138, 149. Such conclusory allegations of malice must be disregarded. *See Resolute Forest Prods.. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1019 (N.D. Cal. 2017). Setting those allegations aside, CHD alleges malice only on the basis of its fantastical claim that Defendants were purportedly motivated "to profit from their unfettered development of vaccines and 5G networks, *id.* ¶ 359, and CHD's March 24, 2019 letter to Facebook, *id.* ¶ 65. Neither is sufficient.[11]

As to Defendants' alleged adverse motives, motive alone cannot establish the requisite knowledge of falsity. "[T]he actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte-Hanks Commc'ns*, 491 U.S. at 666. In particular, an alleged (but baseless) "profit motive" does not "somehow strip communications of the otherwise available constitutional protections." *Id.* at 667.

As for CHD's letter, nothing in it establishes that Facebook or Mr. Zuckerberg knew or harbored serious doubts as to the falsity of the warning label or fact-checks. The letter makes a

---

[11] To the extent CHD claims malice with respect to Facebook's decision to post text from CHD's Wikipedia entry because "Wikipedia's reliability has been questioned," SAC ¶ 124, that argument is undermined by CHD's *own* reliance on Wikipedia in its *verified* complaint, *id.* ¶ 244. And, even if Facebook was aware of Wikipedia's general reputation—which CHD does not allege—that reputation does not establish that Facebook knew that any information in CHD's Wikipedia entry was false.

number of claims about certain vaccines, most of which are wholly unrelated to the fact-checks at issue. *See, e.g.,* SAC Ex. A at 5 (claiming that 1976 swine flu vaccine—not otherwise referenced in the SAC—was associated with increased frequency of Guillain-Barre syndrome). And the few contentions in the letter relevant to the fact-checks identified in the SAC do not establish that those fact-checks were false. For example, the letter's claim that the live-virus oral polio vaccine was discontinued because it "can itself cause paralytic polio," SAC Ex. A at 6, does not establish that Facebook knew that it was false to label as "inaccurate" and "lacking context" a post claiming that the oral polio vaccine caused a polio outbreak in Africa. As the fact-check explained, "[t]he viruses that cause vaccine-derived polio cases are different from that contained in the oral polio vaccine" and vaccine-derived polio arises only in *unvaccinated* individuals exposed to viral shedding through poor sanitation. *See* SAC ¶ 193. None of that is refuted by CHD's letter.

Moreover, Facebook did not create the fact-checks itself. It relied on the conclusions and detailed supporting analyses of independently certified third-party fact-checkers. And where a publisher "relies upon the integrity of a reputable author," it will "not be liable for an article later shown to be false" absent "'obvious reasons' to doubt the truth of [the] article." *Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1032 (2d Cir. 1997). As discussed, nothing in CHD's letter created such "obvious reasons" to doubt the fact-checks from IFCN-certified organizations.

CHD's real complaint is that Defendants took action on its posts despite their awareness of a difference of opinion regarding what CHD describes as an "open scientific controversy." SAC ¶ 161. But a "[d]ifference of opinion as to the truth of a matter" does not establish "that the defendant acted with a knowledge of falsity." *Harte-Hanks Commc'ns*, 491 U.S. at 681.

## III.   THE CDA ALSO BARS CHD'S LANHAM ACT AND CIVIL RICO CLAIMS (COUNTS 2 & 3)

Section 230 bars claims that seek to impose liability on decisions by platforms like Facebook to make available or restrict content created by third parties. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009). Section 230(c)(1) bars any claim that would treat a "provider" of an "interactive computer service" as the "publisher" of content "provided by another information content provider." 47 U.S.C. § 230(c)(1). It therefore protects Facebook and Mr. Zuckerberg from

claims based on making available third-party fact-checks and restriction of CHD's content, as both categories of content were created by third parties (either the fact-checkers or CHD).

Facebook and Mr. Zuckerberg are each "provider[s]" of an "interactive computer service." The Facebook platform is an "interactive computer service" that Facebook, Inc. provides. *See, e.g., Sikhs for Justice ("SFJ"), Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1093 (N.D. Cal. 2015). As for Mr. Zuckerberg, CHD's allegations against him stem from his role in "direct[ing] and control[ing] Facebook's business." SAC ¶ 19; *see also, e.g., id.* ¶¶ 52, 60, 84, 206. CHD, in other words, seeks to hold Mr. Zuckerberg liable for "his role in making [an interactive computer service] available." *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357-1358 (D.C. Cir. 2014). He is thus subject to the same Section 230 protections as Facebook itself.

Section 230(c)(1) bars both of CHD's primary theories. *First*, neither Facebook nor Mr. Zuckerberg can be held liable for allegedly restricting user access to articles shared by CHD. Those posts were either created by CHD or reposted by CHD from other non-Facebook websites, meaning they were created by "another information content provider." 47 U.S.C. § 230(c)(1). And imposing liability for restricting access to CHD's posts would treat Facebook and Mr. Zuckerberg as the publisher of those posts: "'[R]emoving content is something publishers do, and to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher.'" *Sikhs*, 144 F. Supp. 3d at 1095 (quoting *Barnes*, 570 F.3d at 1103); *see also Sikhs for Justice, Inc. v. Facebook, Inc.*, 697 F. App'x 526, 526 (9th Cir. 2017); *Fyk v. Facebook, Inc.*, 808 F. App'x 597, 598 (9th Cir. 2020); *Federal Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1119-1120 (N.D. Cal. 2020).[12]

*Second*, CHD cannot hold Facebook or Mr. Zuckerberg liable for the overlays, warnings, and explanations attached to CHD posts because those fact-checks were undisputedly created by third parties (i.e., the fact-checkers), not Facebook or Mr. Zuckerberg. Binding Ninth Circuit precedent draws a "crucial distinction between, on the one hand, taking actions (traditional to

---

[12] CHD's allegations about 5G-related content fall solely in this category—the only allegations concerning any action Facebook took with regard to a CHD 5G post is that Facebook did not permit CHD to "boost" a specific article about 5G's health effects, and that Facebook "constrained, demoted or shadowbanned CHD's 5G content" more generally. SAC ¶ 196.

publishers) that are necessary to the display of unwelcome and actionable content and, on the other hand, responsibility for what makes the displayed content illegal or actionable." *Kimzey v. Yelp!, Inc.*, 836 F.3d 1263, 1269 n.4 (9th Cir. 2016). *See also Jones v. Dirty World Entm't Recordings, LLC*, 755 F.3d 398, 413-414 (6th Cir. 2014); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 257-258 (4th Cir. 2009). This is because "the exercise of a publisher's traditional editorial functions … do not transform an individual into a 'content provider' within the meaning of § 230." *Batzel v. Smith*, 333 F.3d 1018, 1031 n.18 (9th Cir. 2003). Here, "responsibility for what makes the displayed content illegal or actionable," *Kimzey*, 836 F.3d at 1269 n.4, rests squarely with the fact-checkers, not Facebook or Mr. Zuckerberg, because it is the fact-checkers—not Facebook or Mr. Zuckerberg—who allegedly determined whether CHD's posts were false.

Facebook's alleged involvement in the fact-checking process, by contrast, consisted of providing a "neutral tool" that operated on the "voluntary inputs" of third parties. *Kimzey*, 836 F.3d at 1270. For example, Facebook allegedly developed technology that reproduced the results of fact-checks on gray overlays superimposed on the CHD posts to which they applied. *See, e.g.*, SAC ¶¶ 115-118. This type of automated display of content created by third parties—i.e., the combination of a "neutral means" with an "automated editorial act"—does not make Facebook the creator of the third-party content. *Marshall's Locksmith Service, Inc. v. Google, LLC*, 925 F.3d 1263, 1271 (D.C. Cir. 2019) (use of "automated algorithms" to convert "third party indicia of location into pictorial form" did not make Google the partial creator of resulting "map pinpoints"). It is instead analogous to Yelp's translation of user ratings into its proprietary star-rating system, which the Ninth Circuit has held does "not amount to content development." *Kimzey*, 836 F.3d at 1270 (quoting *Fair Housing Council v. Roommates.com, LLC*, 521 F.3d 1157, 1172 (9th Cir. 2008)). The same is true of the other actions that CHD challenges, including the disabling of CHD's ability to advertise or fundraise through Facebook and the addition of a header to CHD's page referring users to third-party sources of information about CHD and vaccines.[13]

---

[13] CHD repeatedly insists that *Roommates.com* compels a different result because there the Ninth Circuit held Section 230(c)(1) did not apply to a website that "creat[ed] … question-and-answer sets" for users to fill out. *E.g.*, SAC ¶ 295. But the key to *that* holding was that the website required users to provide information that assertedly violated fair housing laws. 521 F.3d at 1166. The

- 18 -

1   The alleged use of algorithms to identify posts that might be of interest to fact-checkers,

2   SAC ¶ 88, likewise does not take Defendants outside of Section 230(c)(1). "[R]ecommendations …

3   are tools meant to facilitate the communication and content *of others*. They are not content in and

4   of themselves." *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019)

5   (emphasis added); *see also Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019).

6   CHD's remaining arguments are equally meritless.  CHD vaguely alludes to the "evident[]"

7   substance of instructions Facebook provided to the third-party fact-checkers. SAC ¶¶ 89-90. But

8   this Court need not accept "allegations that are merely conclusory," *In re Gilead Sciences Securities*

9   *Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)—particularly given the far "more likely" explanation

10  that the fact-checkers independently determined that posts that contravened scientific consensus

11  were false or misleading, *see Iqbal*, 556 U.S. at 680.

12  Nor can CHD evade Section 230 by alleging that Facebook altered *other* fact-checks.  *See*

13  SAC ¶ 90. "Section 230 immunity can apply even if Facebook is responsible for other alleged

14  'content' on its website, as Section 230 'still bar[s] [Plaintiffs'] claims unless [Facebook] created or

15  developed the *particular information* at issue.'" *Federal Agency of News LLC*, 432 F. Supp. 3d at

16  1118 (quoting *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1125 (9th Cir. 2003)) (emphasis

17  added). CHD does not allege that any fact-checks on *its* posts were changed at all, much less at

18  Facebook's direction, *see* SAC ¶¶ 115-172, 176-197, and that is all that matters.

19  Moreover, neither Facebook's payment of the fact-checkers for their services, *see* SAC

20  ¶¶ 21, 91, nor its donations to the Silicon Valley Community Foundation (which is alleged to have

21  made donations to Poynter), *see id.* ¶¶ 47, 94-97, affects the analysis above. Paying someone to

22  create content does not strip an interactive service provider of Section 230(c)(1) immunity. *See*

23  *Blumenthal v. Drudge*, 992 F. Supp. 44, 51-52 (D.D.C. 1998); *see also Levitt v. Yelp! Inc.*, 2011

24  WL 5079526, at *8 (N.D. Cal. Oct. 26, 2011) ("traditional editorial functions often include

25  subjective judgments informed by political and financial considerations").

26

27

28  website's mandatory policy thus directly contributed to "what makes the displayed content illegal
or actionable." *Kimzey*, 836 F.3d at 1269 n.4. Here, by contrast, the judgement about what content
was false was made by the third-party fact-checkers alone, not by Facebook.

In sum, despite having notice of Defendants' Section 230(c)(1) defense and the benefit of multiple amendments, CHD has not alleged that Facebook's fact-checker program is anything more than a series of protected editorial decisions regarding third-party content.

## IV.   CHD HAS NOT STATED A CLAIM UNDER THE LANHAM ACT (COUNT 2)

Even absent immunity, the SAC fails to state a claim. CHD cannot shoehorn disagreement about an "ongoing scientific controversy" into a Lanham Act false advertising claim. The Lanham Act exists to "protect persons engaged in … commerce against unfair competition." 15 U.S.C. § 1127. It regulates false advertising in the interest of fair commercial competition, not disputes over the veracity of public-health claims between publishers and those who use their platforms.

### A.   CHD Lacks Standing Under The Lanham Act

"The Lanham Act creates a cause of action for unfair competition through misleading advertising or labeling." *Pom Wonderful v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014). "[T]he cause of action is for competitors, not consumers." *Id.* To come within its "zone of interests," therefore, "a plaintiff must allege an injury to a commercial interest in reputation or sales," *i.e.*, harm to its "position in the marketplace." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129, 131-132, 137 (2014). CHD does not and cannot allege such an injury because it does not compete with Facebook in any commercial "marketplace." It alleges only competition as to "messaging," but the Lanham Act is restricted to "business competitors." *Animal Legal Defense Fund v. HVFG LLC*, 939 F. Supp. 2d 992, 1000 (N.D. Cal. 2013). "A theoretical educational competition for the 'hearts and minds' of consumers is insufficient to give [CHD] Lanham Act standing." *Id.*; *accord Farah v. Esquire Magazine*, 736 F.3d 528, 541 (D.C. Cir. 2013).

Indeed, CHD's alleged injuries are those of a consumer. CHD claims that it was injured because Facebook limited the "visibility and reach" of its Facebook Page, which in turn reduced CHD's advertising revenue, website traffic, and goodwill. SAC ¶¶ 201, 225, 226. These alleged harms all purportedly resulted from Facebook's "enforcement of its policies to those who post on its website," and are therefore injuries "incurred by interacting with [Facebook] as a consumer, not as a competitor." *Lewis*, 461 F. Supp. 3d at 958. CHD accordingly lacks statutory standing under the Lanham Act.

1

### B.     The SAC Does Not Identify A Promotional Statement

2         CHD independently fails to state a claim under the Lanham Act because it has not alleged

3    the first element of a false advertising claim: "a false statement of fact by the defendant in a

4    commercial advertisement about its own or another's product," *Southland Sod Farms v. Stover Seed*

5    *Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997)—i.e., a "promotion[al]" statement, C*oastal Abstract Serv.,*

6    *Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999). To qualify as promotional, a

7    statement must be "encompassed within the 'commercial speech' doctrine developed by the United

8    States Supreme Court." *Gordon & Breach Science Pubs. S.A. v. American Inst. of Physics*, 859 F.

9    Supp. 1521, 1533-1534 (S.D.N.Y. 1994) (quoting 134 Cong. Reg. 31,851 (Oct. 19, 1988) (statement

10   of Rep. Kastenmeier)). This is a "constitutional requirement" that prevents the Act from burdening

11   "the type [of speech] which raise[s] free speech concerns, such as … reviews … [and]

12   misrepresentations made by interested groups which may arguably disparage a company and its

13   products." *Id.* at 1533, 1536 (second quoting 135 Cong. Rec. H1216-17135 (Apr. 13, 1989)

14   (statement of Rep. Kastenmeier)) (emphasis omitted).

15         The SAC does not identify any purportedly false commercial speech. CHD hangs its Lanham

16   Act claim on the "warning label and 'fact checks'" published on CHD's Page, SAC ¶ 330, but

17   neither provides the constitutionally required commercial hook. Commercial speech is that which

18   "does no more than propose a commercial transaction." *Virginia State Bd. of Pharmacy v. Virginia*

19   *Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976). The challenged warnings and fact

20   checks do not propose commercial transactions at all. Instead, they describe the content of CHD's

21   Page, SAC ¶ 70; direct viewers to additional information about vaccine safety, *id.*; and categorize

22   various CHD posts as containing "false" or "partly false" information, *e.g. id.* ¶¶ 115, 129.

23         That the warning and fact-checks were allegedly published as "part of Facebook's ongoing

24   'vaccine misinformation' public relations campaign," as part of "Facebook's business model" of

25   "manufactur[ing] users' 'trust,'" SAC ¶ 332, does not make them commercial in nature. First, even

26   if true that Facebook derived some financial benefit from the warning label and fact-checks,

27   "economic motive in itself is insufficient to characterize a publication as commercial." *Dex Media*

28   *W., Inc. v. City of Seattle*, 696 F.3d 952, 960 (9th Cir. 2012). Second, the SAC does not identify

anything in the warning label or fact-checks that relate to Facebook's alleged business model of building trust regarding "user privacy and data security." SAC ¶ 332. The warning label and fact-checks communicate information about CHD's posts, not Facebook own services. Faced with a similar claim regarding YouTube's designation of videos for its "Restricted Mode," the Ninth Circuit held that neither YouTube's statements about its content moderation policies nor its designation of certain videos for "Restricted Mode" constituted promotional speech cognizable under the Lanham Act. *See Prager Univ. v. Google*, LLC, 951 F.3d 991, 999-1000 (9th Cir. 2020).

And to the extent CHD alleges that the warning label and fact-checks are promotional because they are part of a vaccination-education campaign that Facebook separately promotes as key to its efforts to improve the reliability of information on Facebook, that, too, fails. Speech does not become promotional simply because it is the object of a promotion. For example, in *Rice v. Fox Broadcasting Co.*, the Ninth Circuit held that the statement "tonight, for the first time on television …," when made as part of a television broadcast, fell beyond the Lanham Act because it "was part of the show itself, and was not made in promotion or marketing of the [show]." 330 F.3d 1170, 1181 (9th Cir. 2003), *overruled on other grounds by Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020). Accordingly, CHD has not stated a Lanham Act claim.[14]

## V.   CHD HAS NOT STATED A CIVIL RICO CLAIM (COUNT 3)

The civil RICO statute "'was enacted with a goal of eradicating organized, long-term criminal activity.'" *Royce International Broadcasting Corp. v. Field*, 2000 WL 236434, at *4 (N.D. Cal. Feb. 23, 2000) (quoting *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1999)). This Court has thus recognized that plaintiffs "'fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions.'" *Id.* Courts should be particularly wary of extending civil RICO's "somewhat elastic" predicate acts to encompass "fully protected First Amendment activity." *National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 264 (1994) (Souter, J., concurring). That is what CHD has attempted here, by transforming a complaint about

---

[14] Setting aside these defects, CHD has not pleaded the falsity of the alleged false statements with Rule 9(b) specificity.  *See TransFresh Corp. v. Ganzerla & Assoc.*, 862 F. Supp. 2d 1009, 1017-1018 (N.D. Cal. 2012).

1    Defendants' protected First Amendment activity and enforcement of Facebook's terms of service

2    into a civil RICO claim subject to treble damages. Civil RICO does not stretch so far.

3         **A.      CHD Has Not Pleaded Any Predicate Act Of Wire Fraud**

4         To plead a civil RICO claim, a plaintiff must identify "racketeering activity (known as

5    predicate acts)." *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015). And because

6    CHD's civil RICO claim sounds in fraud, it must satisfy the specificity requirements of Rule 9(b).

7    *Comwest, Inc. v. American Operator Serv., Inc.*, 765 F. Supp. 1467, 1473 (C.D. Cal. 1991). CHD

8    identifies two sets of statements it calls "wire fraud"—statements made to visitors to CHD's Page

9    (i.e., fact-checks and warning labels) and statements made to CHD itself or its agents (e.g.,

10   concerning CHD's ability to purchase advertising). Both categories are hopelessly flawed.[15]

11        The first set of statements are not fraudulent at all because they neither aimed to, nor

12   succeeded in, obtaining money or property for Facebook or Mr. Zuckerberg from visitors to CHD's

13   Page. "The wire fraud statute … prohibits only deceptive 'schemes to deprive [the victim of] money

14   or property.'" *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (alteration in original). Binding

15   Ninth Circuit precedent accordingly establishes that a successful claim of wire fraud requires

16   showing that the defendant "obtain[ed] money or property from *the one who is deceived*." *United*

17   *States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989) (emphasis added); *see also Monterey Plaza Hotel*

18   *L.P. v. Local 483*, 215 F.3d 923, 926-927 (9th Cir. 2000). The SAC nowhere alleges that Defendants

19   obtained money or property from visitors to CHD's Page (despite acknowledging Defendants' prior

20   argument on this point, *see* SAC ¶ 384). That alone defeats its wire fraud claim. *See Sugarman v.*

21   *Muddy Waters Capital LLC*, 2020 WL 633596, at *3 (N.D. Cal. Feb. 3, 2020).

22        Nor can CHD sidestep these requirements that claiming that CHD itself was deprived of

23   money or property by the statements Facebook affixed to its Page, because CHD cannot credibly

24   claim that CHD itself was deceived by those statements. This entire lawsuit stems from CHD's

25

26   _____

27   [15] CHD also suggests (SAC ¶ 379) that Defendants violated 18 U.S.C. § 1951, but that provision
     applies only to one who "obstructs, delays, or affects commerce or the movement of any article or
     commodity in commerce, by robbery or extortion or attempts or conspires to do so, or commits or

28   threatens physical violence to any person or property" 18 U.S.C. § 1951(a).  Because CHD does
     not claim that Defendants threatened violence against or extorted CHD, Section 1951 is irrelevant.

1    vehement disagreement with the content of the fact-checks and warning labels—it cannot now assert

2    that those same statements somehow deceived it.  *See Sugarman*, 2020 WL 633596, at *3.

3          As for the second category of statements and omissions (i.e., statements to CHD and its

4    agents concerning CHD's ability to use certain Facebook functions and the reach of CHD's posts),

5    CHD has not pleaded that any of those statements or omissions were false or misleading. CHD

6    complains that Facebook lied when it told CHD that its "donate" button was deactivated because

7    CHD violated Facebook's terms of service "by posting 'false information' with respect to vaccines,"

8    SAC ¶¶ 79(A), 80, 192. But even assuming those statements were pleaded with particularity (they

9    are not), CHD has no reasonable argument that these statements misled it, especially given its

10   strongly held view that it was not, in fact, violating the terms of service. *See Sosa v. DIRECTV, Inc.*,

11   437 F.3d 923, 941 (9th Cir. 2006). CHD also complains that Facebook misled CHD's advertising

12   agency by saying that CHD "had repeatedly posted content that has been disputed by third-party

13   fact-checkers [for] promoting false content," *id.* ¶ 199; *see also id.* ¶ 79(B). But the SAC alleges

14   that, by April 2020 (when the agency purportedly received this message) CHD had been told

15   multiple times that third-party fact-checkers disputed its posts. *See* SAC ¶¶ 115-197. (And, in any

16   event, Facebook allegedly *prevented* the agency from buying Facebook ads—meaning Facebook

17   could not possibly have defrauded the agency of any money or property. *See Lew*, 875 F.2d at 221).

18         CHD additionally claims that Facebook misled it by misrepresenting that Facebook did not

19   use proprietary mechanisms to restrict the reach of CHD content deemed vaccine misinformation.

20   *See* SAC ¶ 79(E). But it nowhere identifies (certainly not with specificity) any particular false

21   misrepresentation Facebook made. And, to the extent CHD means to rely on an omission theory,

22   "[a]bsent an independent duty, such as a fiduciary duty or an explicit statutory duty, failure to

23   disclose cannot be the basis of a fraudulent scheme" giving rise to a civil RICO cause of action.

24   *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1472 (9th

25   Cir. 1987). CHD has identified *no* duty this purported failure to disclose breached—much less a

26   fiduciary duty or explicit statutory one.

27         Finally, even if CHD *could* claim that it was deceived by what it calls "wire fraud," it cannot,

28   as a logical matter, allege that Defendants diverted to themselves the web traffic, donations, or "trade

1   reputation and goodwill" CHD claims it lost. *See* SAC ¶¶ 225-226, 384-385. That, too, defeats their

2   civil RICO claims. *See Monterey Plaza Hotel*, 215 F.3d at 926-927.

3   **B.   CHD Lacks Statutory Standing To Bring A Civil RICO Claim**

4       CHD must also plead "some *direct* relation between the injury asserted and the injurious

5   conduct alleged," *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 981 (9th Cir. 2008) (quoting

6   *Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)) (emphasis added). This

7   requirement "is not easily met," *Sheperd v. American Honda Motor Co.*, 822 F. Supp. 625, 629

8   (N.D. Cal. 1993), because it requires a plaintiff to establish that the predicate acts constituting a

9   pattern of racketeering activity (here, wire fraud) "not only [were] a 'but for' cause of his injury,

10  but [were] the proximate cause as well," *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006).

11      CHD has not carried this burden. It claims that statements affixed to its Page dissuaded the

12  public from reviewing CHD's posts, which in turn decreased traffic to CHD's website, which in

13  turn caused CHD to lose donations and membership fees. *See, e.g.,* SAC ¶¶ 375, 383-385. That

14  multi-step theory of causation cannot be squared with "the general tendency of the law," including

15  in civil RICO cases, "not to go beyond the first step" in the causal chain. *Holmes*, 503 U.S. at 271.

16      That "general tendency" has special force here, because CHD's claimed injuries "could have

17  resulted from factors other than [Defendants'] alleged acts of fraud," *Anza*, 547 U.S. at 459,

18  including, for example: "the state of the economy," CHD's "quality of service," or "customer

19  satisfaction and referrals," *Ozeran v. Jacobs*, 2018 WL 1989525, at *9 (C.D. Cal. Apr. 25, 2018),

20  *aff'd*, 798 F. App'x 120 (9th Cir. 2020). Because "[b]usinesses lose and gain customers for many

21  reasons, and it would require a complex assessment to establish what portion" of CHD's lost

22  donations and membership fees were the direct result of alleged fraud and which portion were due

23  to other forces. *Anza*, 547 U.S. at 459. This Court should follow the lead of the many other courts

24  that have held that lost customers or lost business cannot support a civil RICO claim. *See, e.g., id.*

25  at 458-460; *Holmes*, 503 U.S. at 272-273; *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137,

26  1148 (9th Cir. 2008).

27  **C.   CHD Has Not Pleaded A RICO "Pattern"**

28      Finally, CHD's civil RICO claim fails for the additional reason that CHD has not identified

1    a cognizable "pattern" of criminal racketeering activity. *See* 18 U.S.C. § 1962(c). The "pattern"

2    requirement is not satisfied where, "although [the plaintiff] alleges a number of 'acts,' [the

3    defendant's] collective conduct is in a sense a single episode having the singular purpose of

4    impoverishing [plaintiff]." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1535 (9th Cir. 1992); *see*

5    *also Aviation Support International v. Northrop Grumman Corp.*, 221 F.3d 1347 (9th Cir. 2000).

6         But that is precisely what CHD has alleged here. At bottom, it complains that Defendants

7    worked together "to censor and suppress CHD's posting of material critical of [the CDC and WHO]

8    and voicing alternative views concerning the safety and efficacy of vaccines," SAC ¶ 1, and that

9    Defendants' actions caused CHD individualized harm, SAC ¶ 391. Thus, even if cognizable as

10   predicate acts, the multiple purported acts of wire fraud therefore collapse into "a single episode"

11   with a "singular purpose," and do not constitute a civil RICO "pattern." *Sever*, 978 F.2d at 1535.

12   Indeed, this Court reached a similar conclusion in *Royce International Broadcasting Corp.*, holding

13   that a purported scheme that targeted just one business, and that allegedly resulted in losses to that

14   business only, was not a civil RICO "pattern." 2000 WL 236434.

15   **VI.   CHD HAS NOT STATED ANY CLAIM AGAINST MARK ZUCKERBERG**

16        All else aside, the SAC states no claim against Mr. Zuckerberg because it does not plausibly

17   allege his personal involvement in the conduct at issue. Personal liability under each Count requires

18   direct involvement in the allegedly unlawful conduct: for *Bivens*, "a plaintiff must plead that each

19   Government-official defendant, through the official's own individual actions, has violated the

20   Constitution," *Iqbal*, 556 U.S. at 676; the Lanham Act imposes individual liability on corporate

21   officers only for conduct they "authorize[] or direct[] or in which [they] participate[]," *POM*

22   *Wonderful LLC v. Purely Juice, Inc.*, 362 F. App'x 577, 581 (9th Cir. 2009); and individual liability

23   under civil RICO requires "participat[ion] in the operation or management of the enterprise itself,"

24   *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). Moreover, the Lanham Act and civil RICO

25   claims must satisfy the heightened pleading standards of Rule 9(b) because they sound in fraud.

26   *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400-1401 (9th Cir. 1986) (civil

27   RICO); *TransFresh Corp.*, 862 F. Supp. 2d at 1014, 1017-1018 (Lanham Act). And Rule 9(b)

28   requires a plaintiff to "identify the role of each defendant in the alleged fraudulent scheme" when

pleading fraud-based claims. *Openwave Sys. Inc. v. Fuld*, 2009 WL 1622164, at *5 (N.D. Cal. June 6, 2009) (citation omitted).

The SAC does not plausibly allege that Mr. Zuckerberg was personally involved in any of the allegedly unlawful conduct. *See supra* pp.11-12. In lieu of particularized allegations, the SAC makes general allegations concerning Mr. Zuckerberg, describing his "commentaries on public heath," including public comments regarding the importance of vaccines, SAC ¶ 260, 266, 268; "CZI's for-profit vaccine development," *id.* ¶ 260; Mr. Zuckerberg's alleged donation of $25 million to the CDC Foundation, *id.* ¶ 267; and Mr. Zuckerberg's alleged reluctance for Facebook to fact-check political advertising, *id.* ¶ 271. These allegations do not plausibly add up to CHD's conclusion that "it is highly probable" Mr. Zuckerberg personally acted in concert with the federal government or otherwise denied CHD of its constitutional or competitive rights. *E.g.*, *id.* ¶ 260. Accordingly, Mr. Zuckerberg cannot be personally liable under either *Bivens*, *see supra* pp.11-12, or the Lanham Act, *see Openwave Sys., Inc.*, 2009 WL 1622164, at *5. And, as for civil RICO, to the extent the SAC alleges that Mr. Zuckerberg has some involvement in Facebook's "content management" decisions, that does not demonstrate that he operated or managed the alleged RICO enterprise. The SAC says only that Mr. Zuckerberg was personally involved in decisions whether to remove two instances of political speech unrelated to CHD, vaccines, or 5G. *See* SAC ¶ 271. Without an allegation that those decisions were unlawful, they cannot support RICO liability; personal involvement in decisions "separate and apart from any alleged racketeering acts" does not suffice. *Ferrari v. Mercedes-Benz USA, LLC*, 2016 WL 7188030, at *3 (N.D. Cal. Dec. 12, 2016).

Moreover, while CHD purports to state claims against Mr. Zuckerberg under theories of respondeat superior, alter ego, and agency liability, it has not established the prerequisites for any of those theories. First, Mr. Zuckerberg cannot be held liable under a theory of respondeat superior just because he is a controlling shareholder and corporate officer, SAC ¶ 17; "[C]ontrolling shareholders and corporate officers [are] not … liable under respondeat superior because they [are] not the actual employers," *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1577 (9th Cir. 1990). Second, CHD fails to allege alter ego liability because it has not alleged any disregard for corporate formalities. *See, e.g.*, *Ministry of Defense of the Islamic Republic of Iran v. Gould, Inc.*, 969 F.2d

764, 769 (9th Cir. 1992). Third, as to agency liability, CHD again fails to plead the requisite elements—including, for example, that the purported agents have the authority to alter legal relations between the Mr. Zuckerberg and third parties—let alone pleaded them with the specificity required by Rule 9(b). *See RPost Holdings, Inc. v. Trustifi Corp.*, 2011 WL 4802372, at *4 (C.D. Cal. Oct. 11, 2011) (Rule 9(b) applies to pleading agency theory of liability for fraud-based claims).

Even with the benefit of multiple amendments, the most CHD has been able to muster are conclusory assertions that "it is highly probable" that Mr. Zuckerberg was involved the allegedly unlawful conduct, SAC ¶ 260, and the incantation of various doctrines of vicarious liability, *id.* ¶ 17. None of that is sufficient to state a claim under Rule 12(b).

## VII.   CHD STATES NO CLAIM WITH RESPECT TO 5G-RELATED CONTENT

The SAC also addresses 5G network safety, SAC ¶¶ 241-259, Facebook's efforts to remove misleading information about 5G networks, *id.* ¶ 74, and Facebook's alleged interest in promoting 5G, *id.* ¶¶ 284-293, but does not even attempt to state any claim on the basis of efforts to remove misleading 5G information. CHD alleges only that Facebook did not allow it to "boost" a 5G-related post, *see id.* ¶ 196, but disclaims any governmental involvement in Facebook's treatment of 5G-related content, *id.* ¶ 292, thereby defeating any *Bivens* claim. And while CHD says that Facebook "misrepresent[ed] … that [CHD's] 5G-related [content was] more widely-available," *id.* ¶ 196, it does not identify any such statement, thereby precluding any Lanham Act or civil RICO claim.

## VIII.   CHD IS NOT ENTITLED TO DECLARATORY RELIEF (COUNT 4)

"[T]he Declaratory Judgment Act creates a remedy for litigants but is not an independent cause of action." *County of Santa Clara v. Trump*, 267 F. Supp. 3d 1201, 1215-1216 (N.D. Cal. 2017). As CHD has failed to state any claim, it is not entitled to declaratory relief.

### CONCLUSION

The Second Amended Complaint should be dismissed with prejudice.

1

2    Dated: December 21, 2020                    WILMER CUTLER PICKERING, HALE AND
                                                 DORR LLP
3
                                                 By:    */s/ Sonal N. Mehta*
4                                                       SONAL N. MEHTA

5                                                *Attorney for Defendants*
                                                 Facebook, Inc. and Mark Zuckerberg
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2020, I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered counsel.


Dated: December 21, 2020                    By:    */s/ Sonal N. Mehta*
                                                           Sonal N. Mehta

NOTICE OF MOTION & MOTION TO DISMISS
                                                           SECOND AM. COMPL.; MEMO. ISO