ROGER I. TEICH
California State Bar No. 147076
290 Nevada Street
San Francisco, CA 94110
Telephone: (415) 948-0045
E-Mail Address: rteich@juno.com

ROBERT F. KENNEDY, JR.
MARY HOLLAND
Children's Health Defense
1227 North Peachtree Parkway, Suite 202
Peachtree City, GA 30269
Telephone: (917) 743-3868
E-Mail Address: mary.holland@childrenshealthdefense.org

Attorneys for Plaintiff
CHILDREN'S HEALTH DEFENSE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CHILDREN'S HEALTH DEFENSE,<br><br>Plaintiff,<br><br>v.<br><br>FACEBOOK, INC., et al.,<br><br>Defendants. | Case No. 3:20-cv-05787-SI<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT THE POYNTER INSTITUTE FOR MEDIA STUDIES, INC.'S MOTION TO DISMISS PLAINTIFF'S VERIFIED SECOND AMENDED COMPLAINT**<br><br>Fed. R. Civ. P. 12(b)(6) |

**Plaintiff's Opposition to Defendant Poynter's Motion to Dismiss**
***CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI**

# TABLE OF CONTENTS

Page #

TABLE OF AUTHORITIES ........ ii

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT POYNTER'S MOTION TO DISMISS ........ 1

STATEMENT OF FACTS ........ 1

ARGUMENT ........ 6

I. CHD'S SAC IS SUFFICENT TO PRECLUDE DISMISSAL. ........ 6

II. CHD HAS FULLY AND ADEQUATELY PLEADED AN AGENCY OR COMPARABLE RELATIONSHIP BETWEEN FACEBOOK AND POYNTER. ........ 7

III. CHD HAS FULLY AND ADEQUATELY PLEADED ITS CONSTITUTIONAL CLAIMS (COUNTS 1 AND 4). ........ 9

A. Poynter Is Not Entitled to Dismissal on Grounds of Alleged Lack of State Action. ........ 9

B. Poynter's *Bivens* Arguments Misapprehend the Law. ........ 10

1. The Ninth Circuit Permits First Amendment *Bivens* Claims. ........ 11

2. CHD's Injunctive Claim Is Not a *Bivens* Claim. ........ 11

IV. CHD HAS ADEQUATELY PLEADED ITS RICO FRAUD CLAIM (COUNT 3). ........ 12

V. CHD HAS ADEQUATELY PLEADED ITS LANHAM ACT CLAIM (COUNT 2). ........ 14

A. CHD Has Sufficiently Pleaded Its Lanham Act Claim. ........ 15

B. Poynter's Claim that CHD and Poynter are Not Competitors is Both Erroneous and Irrelevant under Governing Law. ........ 15

C. CHD Has Adequately Alleged Promotion and Commercial Speech. ........ 16

VI. POYNTER'S AFFIRMATIVE DEFENSES FAIL AS A MATTER OF LAW. ........ 18

A. The First Amendment Does Not Bar Claims Based in Fraud. ........ 18

B. Poynter's Actual Malice Defense Fails as a Matter of Law and Fact. ........ 19

1. The Actual Malice Requirement Does Not Apply to CHD's RICO Claim (or to the Lanham Act Claim). ........ 19

2. In Any Event, CHD Has Adequately Pleaded Actual Malice. ........ 20

VII. POYNTER'S ARGUMENTS AGAINST INJUNCTIVE AND DECLARATORY RELIEF ARE OVERBROAD AND UNFOUNDED. ........ 20

CONCLUSION ........ 21

i

**Plaintiff's Opposition to Defendant Poynter's Motion to Dismiss**
***CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI**

# TABLE OF AUTHORITIES

**Federal Cases**

*Adams v. Johnson*, 355 F.3d 1179 (9th Cir. 2004) ....11

*AFGE Local 1 v. Stone*, 502 F.3d 1027 (9th Cir. 2007) ....11

*Ariix, LLC v. NutriSearch, Corp.*, 2021 U.S. App. LEXIS 1776 (9th Cir. Jan. 22, 2021) ....15, 16, 17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....6

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....6

*Birthright v. Birthright, Inc.*, 827 F. Supp. 1114 (D.N.J. 1993) ....16, 17

*Boule v. Egbert*, 980 F.3d 1309 (9th Cir. 2020) ....11

*Brill v. Correct Care Sols., LLC*, 286 F. Supp. 3d 1210 (D. Colo. 2018) ....9

*Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961) ....10

*Cal Pure Pistachios, Inc. v. Primex Farms, LLC*, 2010 U.S. Dist. LEXIS 148263 (C.D. Cal. 2010) ....16

*Camps Newfound/Owatonna v. Town of Harrison*, 520 U.S. 564 (1997) ....16

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980) ....18

*Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991) ....18

*Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814 (9th Cir. 1996) ....16

*Correctional Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) ....10

*Dreamstime.com, LLC v. Google, LLC*, 2019 U.S. Dist. LEXIS 94573 (N.D. Cal. 2019) ....7, 18

ii

**Plaintiff's Opposition to Defendant Poynter's Motion to Dismiss**
***CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI**

*Eastman Chemical Co. v. Plastipure, Inc.*,
775 F.3d 230 .....18

*Evans v. Valero Energy Corp.*,
No. CV F 07-0130 (E.D. Cal. Mar. 6, 2007) .....9

*Farah v. Esquire Magazine*,
736 F.3d 528 (D.C. Cir. 2013) .....17

*Feminist Women's Health Ctr. v. Roberts*,
1989 U.S. Dist. LEXIS 5837 (W.D. Wash. 1989) .....19

*Giboney v. Empire Storage & Ice Co.*,
336 U.S. 490 (1949) .....18

*Harte-Hanks Comms., Inc. v. Connaughton*,
491 U.S. 657 (1989) .....20

*Hartman v. Gilead Sciences, Inc.*,
536 F.3d 1049 (9th Cir. 2008) .....6

*Hoffman v. Capital Cities/ABC Inc.*,
255 F.3d 1180 (9th Cir. 2001) .....19

*Johnson v. Knowles*,
113 F.3d 1114 (9th Cir. 1997) .....10

*Kelly v. U.S.*,
140 S. Ct. 1565 (2020) .....13

*Larson v. Domestic & For. Comm. Corp.*,
337 U.S. 682 (1949) .....11

*Lauren Moshi LLC v. Fuentes*,
2020 U.S. Dist. Lexis 82920 (C.D. Cal. 2020) .....9

*Lexmark International, Inc. v. State Control Components, Inc.*,
572 U.S. 118 (2004) .....15

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
431 F.3d 353 (9th Cir. 2005) .....12

*Lona's Lil Eats, LLC v. Doordash, Inc.*,
2021 U.S. Dist. LEXIS 8930 (N.D. Cal. Jan. 18, 2021) .....20

*Mavrix Photographs, LLC v. LiveJournal, Inc.*,
873 F.3d 1045 (9th Cir. 2017) .....7

*Mimedx GRP., Inc. v. Osiris Therapeutics, Inc.*,
2017 U.S. Dist. LEXIS 114105 (S.D.N.Y. 2017) .....7, 17

*Ministerio Roca Solida v. McKelvey*,
820 F.3d 1090 (9th Cir. 2016) ....................................................................................11

*Minneci v. Pollard*,
565 U.S. 118 (2012)....................................................................................................11

*Mitchum v. Hurt*,
73 F.3d 30 (3rd Cir. 1995) ..........................................................................................11

*Morales v. Cate*,
757 F. Supp. 2d 961 (N.D. Cal. 2010) ..........................................................................7

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)....................................................................................................18

*Norwood v. Harrison*,
413 U.S. 455 (1973)......................................................................................................1

*Operating Eng'rs Local Union No. 3 v. Wilson*,
2019 U.S. Dist. LEXIS 234637 (N.D. Cal. 2019) ......................................................12

*P&G v. Amway Corp.*,
242 F.3d 539 (5th Cir. 2001) .......................................................................16, 19, 20

*Parks Sch. Of Bus. v. Symington*,
51 F. 3d 1480 (9th Cir. 1995) ........................................................................................6

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
2020 U.S. Dist. LEXIS 76374 (N.D. Cal. Apr. 29, 2020) ..........................................21

*Rawson v. Recovery Innovations, Inc.*,
2017 U.S. Dist. Lexis 176870 (W.D. Wash. 2017) ......................................................9

*Resolute Forest Prods. v. Greenpeace Int'l*,
2019 U.S. Dist. LEXIS 10263 (N.D. Cal. 2019) ..........................................................3

*Rodriguez v. Swartz*,
899 F.3d 719 (9th Cir. 2018) ......................................................................................11

*Savage v. Council on Am.-Islamic Relations, Inc.*,
2008 U.S. Dist. LEXIS 60545 (N.D. Cal. 2008) ........................................................19

*SEC v. Pirate Investor LLC*,
580 F.3d 233 (4th Cir. 2009) ......................................................................................19

*Smith v. United Healthcare Ins. Co.*,
2019 WL 3238918 (N.D. Cal. Jul. 18, 2019)................................................................7

*Threshold Enters. Ltd. v. Pressed Juicery, Inc.*,
445 F. Supp. 3d 139 (N.D. Cal. 2020) ..........................................................................6

iv

**Plaintiff's Opposition to Defendant Poynter's Motion to Dismiss**
***CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI**

*TransFresh Corp. v. Ganzerla & Assoc.*,
862 F. Supp. 2d 1009 (N.D. Cal. 2012) ....................15

*United Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001) ....................9

*United States v. Associated Press*,
52 F. Supp. 362 (S.D.N.Y. 1943) ....................11

*United States v. Hussain*,
972 F.3d 1138 (9th Cir. 2020) ....................12

*United States v. Rezko*,
2007 U.S. Dist. LEXIS 73517 (N.D. Ill. Oct. 2, 2007) ....................14

*United States v. Woods*,
335 F.3d 993 (9th Cir. 2003) ....................13

*Usher v. City of Los Angeles*,
828 F.2d 556 (9th Cir. 1987) ....................6

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*,
*425 U.S. 748* (1976) ....................18

*West Va. Bd. of Ed. v. Barnette*,
319 U.S. 624 (1943) ....................11

**California Cases**

*Castillo v. Glenair, Inc.*,
23 Cal. App. 5th 262 (2018) ....................8

*Ferlauto v. Hamsher*,
74 Cal. App. 4th 1394 (1999) ....................18

**United States Constitution**

First Amendment ....................1, 11, 18, 19, 20

**Federal Statutes**

Lanham Act.................... 1, *passim*
§ 43(a) ....................15
§ 43(a)(1)(B) ....................19

18 U.S.C.
§ 1962(c) ....................12

v

**Plaintiff's Opposition to Defendant Poynter's Motion to Dismiss**
***CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI**

**California Statutes**

LABOR CODE
§§ 2775-2776 ....................8
§ 2776 (a) ....................8

**Federal Rules of Civil Procedure**

Rule 9(b) ....................12, 15
Rule 12(b)(6)....................9, 16, 21

**Other Authorities**

Angie Drobnic Holan, *The Principles of the Truth-O-Meter: PolitiFact's methodology for independent fact-checking*, POLITIFACT (Last updated Oct. 27, 2020), https://www.politifact.com/article/2018/feb/12/principles-truth-o-meter-politifacts-methodology-i/ ....................2

*The commitment of the Code of Principles*, POYNTER.ORG, https://ifcncodeofprinciples.poynter.org/know-more/the-commitments-of-the-code-of-principles (last accessed Feb. 5, 2021 ....................4

Donate Button, https://www.politifact.com/factchecks/2020/jul/16/facebook-posts/2017-18-flu-season-study-does-not-include-covid-19/ ....................6, 14

Emily Venezky, *This 2017-18 flu season study does not include COVID-19*, POLITIFACT (Jul. 16, 2020), https://www.politifact.com/ factchecks/2020/jul/16/facebook-posts/2017-18-flu-season-study-does-not-include-covid-19/ ....................5

Facebook Post: *WHO finally Admits COVID-19 PCR Test Has a 'Problem'*, CHILDREN'S HEALTH DEFENSE, https://www.facebook.com/ChildrensHealthDefense/posts/2845524319028304 ....................4

*Fact-Checking on Facebook*, FACEBOOK FOR BUSINESS, https://tinyurl.com/y33wyhe2 (last accessed Dec. 21, 2020) ....................13

*How we determine Truth-O-Meter ratings*, POLITIFACT, https://www.politifact.com/article/2018/feb/12/principles-truth-o-meter-politifacts-methodology-i/#Truth-O-Meter%20ratings (last accessed Feb. 5, 2021) ....................5

Jeanne Lenzer, *Centers for Disease Control and Prevention: protecting the private good*? THE BMJ, BMJ 2015;350:h2362 (May 15, 2015), https://www.bmj.com/content/350/bmj.h2362 ....................2

Noah Y. Kim, *WHO did not say PCR tests grossly inflate positive test numbers*, POLITIFACT (Jan. 22, 2021), https://www.politifact.com/factchecks/2021/jan/22/gateway-pundit/who-did-not-admit-pcr-tests-grossly-inflate-positi/ ....................4

Restatement (Third) Of Agency (Am. Law Inst. 2006)....................7

*Support our Work*, SCIENCE FEEDBACK, https://sciencefeedback.co/donate/ ........ 6, 14

*The commitment of the Code of Principles*, POYNTER.ORG, https://ifcncodeofprinciples.poynter.org/know-more/the-commitments-of-the-code-of-principles (last accessed Feb. 5, 2021 ........ 4

*The International Fact-Checking Network*, POYNTER.ORG, https://www.poynter.org/ifcn/ (last accessed Feb. 3, 2020) ........ 4

vii

**Plaintiff's Opposition to Defendant Poynter's Motion to Dismiss**
***CHD v. Facebook* et al.; Case No. 3:20-cv-05787-SI**

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT POYNTER'S MOTION TO DISMISS**

Defendant The Poynter Institute for Media Studies, Inc. ("Poynter") moves to dismiss (Dkt. #68) this action, urging the Court to believe that it is an innocent third party "fact-checker" that merely fact-checked a single post on CHD's Facebook page. To the contrary, and as pleaded at length in Plaintiff Children's Health Defense's ("CHD") Verified Second Amended Complaint (the "SAC," Dkt. #65-1), Poynter – along with Co-Defendants Facebook, Zuckerberg, Science Feedback, and the unnamed defendants – was and continues to be a participant in the deliberate and systematic effort to degrade and destroy CHD by, among other things, fraudulently branding CHD's Facebook content as false, and fraudulently directing users to competitor sites. As alleged in detail in the SAC, federal actors and agencies encouraged, coerced, and jointly participated in the ongoing misconduct of Defendants, including Poynter, under well-established principles of agency liability. As a result, Poynter's conduct amounts to state action violating CHD's First Amendment rights. The threat to free speech is especially grave here because governmental agents have in essence deputized Facebook and its agents, employees, or surrogates such as Poynter to do what the government itself is "constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). Poynter's conduct also constitutes well-pleaded corporate fraud under RICO and the Lanham Act. Thus, Poynter's motion to dismiss should be denied in its entirety.

**STATEMENT OF FACTS**

Plaintiff CHD, a nonprofit organization headquartered in Georgia, believes children are exposed to health- and life-threatening dangers from a variety of environmental toxins, including vaccines and 5G wireless technology.[1] Large pharmaceutical corporation reap hundreds of billions of dollars in revenue from vaccine sales and, similarly, internet and telecommunications companies stand to earn billions as they continue to roll out 5G. CHD further believes that the U.S. Centers for Disease Control

---

[1] While CHD's views challenge corporate and governmental orthodoxy, as shown in the SAC, CHD is not alone in sounding these alarms. The SAC and documents cited therein point to hundreds of peer-reviewed studies and other resources concerning serious health risks relating to both vaccines and 5G technology. SAC 27, 65-66, 245-59; Dkt. #65-3 (March 4, 2019 letter from Lyn Redwood, RN, MSN, of CHD to Zuckerberg).

and Prevention ("CDC") and other federal agencies, which should stand guard over these corporations in order to safeguard our children's health, instead are untrustworthy industry captives. In particular, having accepted millions of industry dollars in funding, CDC is beholden to industry interests at the expense of Americans' health, and many news outlets and "watchdogs" question whether CDC's information is up-to-date and trustworthy. SAC ¶¶ 5, 7-8, 14-15, 24-34, 40-59, 228-59, 281-93.[2]

To alert the public to these grave dangers, CHD posts links to articles and peer-reviewed studies in reputable scientific journals and publishes opinions expressed by doctors, scientists, and others, including its founder, Robert F. Kennedy, Jr. on its Facebook page. SAC ¶¶ 15, 27-34. No one, including Poynter, disputes that all of the material that CHD posted is constitutionally protected speech on matters of serious public concern. Contrary to Defendants' actions on CHD's posts and page, CHD's content is neither false, out of date, nor unreliable. *See, e.g.*, SAC ¶¶ 26-30, 32, 34 (describing CHD's process of vetting material for publication on its website and posting to Facebook). Rather, Poynter's affixing labels such as "false" to CHD's content is itself a falsehood.

Facebook represents to its users that independent, certified fact-checkers determine that CHD posts are false. *Id.* ¶ 9. Facebook further represents to its users that these "independent" "fact-checkers" do not evaluate matters of opinion, but only label content "false" when that content asserts provably false facts. *Id.* ¶¶ 90, 218-21; Facebook MTD Exh. 1. The truth, however, is that Poynter is not independent at all and, in fact, Poynter prominently highlights its partnership with Facebook and even admits that Facebook exercises at least some level of control over the fact-checking process (though not surprisingly, not to the extent alleged by CHD). *See, e.g.*, SAC ¶¶ 106-107; Angie Drobnic Holan, *The Principles of the Truth-O-Meter: PolitiFact's methodology for independent fact-checking*, POLITIFACT

---

[2] In 2015, the editors of the British Medical Journal, one of the world's oldest and most respected medical journals, wrote, "Despite the agency's disclaimer, the CDC does receive millions of dollars in industry gifts and funding, both directly and indirectly, and several recent CDC actions and recommendations have raised questions about the science it cites, the clinical guidelines it promotes and the money it is taking." The BMJ editorial continued, describing CDC's relationship with industry, as an example of private industry transforming a regulator into the vehicle for their own "classic stealth marketing in which industry puts their message in the mouths of a trusted third party." Jeanne Lenzer, *Centers for Disease Control and Prevention: protecting the private good*? THE BMJ, BMJ 2015;350:h2362 (May 15, 2015), https://www.bmj.com/content/350/bmj.h2362. SAC ¶ 44.

(Last updated Oct. 27, 2020), https://www.politifact.com/article/2018/feb/12/principles-truth-o-meter-politifacts-methodology-i/. Poynter and its various units – including its Politifact fact-checking unit and its International Fact-Checking Network ("IFCN") unit, charged with certifying fact-checkers (SAC ¶ 105) – receive substantial direct and indirect funding from Facebook and Zuckerberg as well as from the United States government. SAC ¶¶ 21, 94-104. As alleged in the SAC, the State Department made donations (including through the National Endowment for Democracy ("NED")) to Poynter to induce "fact-checker" censorship of criticism by CHD and others and to further government policies favoring the Global Health Security Agenda ("GHSA") and its goals of mandatory universal immunization and suppression of so-called vaccine "hesitancy." *See* SAC ¶¶ 98-104. Congressman Adam Schiff, who has played a central role in the federal government's pressure to censor what he deems "misinformation," including information challenging vaccine safety (*see, e.g.*, ¶¶ 60-67, 98), sits on the NED permanent advisory board. Discovery is necessary to further examine the relationship between the State Department and Poynter, as the GHSA's goals and Poynter's censorship activities neatly dovetail.

Moreover, Poynter's association with and control by Facebook go beyond money. Poynter is Facebook's agent, paid for and controlled by Facebook, which retains ultimate authority over Poynter's output. Poynter has taken orders from Facebook, both through express instructions and through Facebook algorithms that flag content for "fact-checking" review, to target those, like CHD, that dare to dispute CDC and WHO orthodoxy on vaccine safety – a view which aligns with Facebook's and Zuckerberg's corporate interests.[3] SAC ¶¶ 9, 20-21, 58, 68, 79(F), 87-94, 105-114, 210-21 311-12. Further, Facebook has partnered with IFCN to certify fact-checkers, a certification the Defendants held out to their users was a necessary and sufficient qualification to conduct Facebook fact-checks, and which lent a "ring of authenticity" to their posts as well as Facebook's other actions against CHD as alleged in the SAC.[4] *See, e.g.*, *Resolute Forest Prods. v. Greenpeace Int'l*, 2019 U.S. Dist. LEXIS 10263

---

[3]     Facebook and Zuckerberg have immense financial stakes (both corporate and personal) in vaccine and 5G technology development, and pharmaceutical industry ad revenue. SAC ¶¶ 260-93.

[4]     Interestingly, however, Politifact's own IFCN certification appears to have expired but IFCN and Facebook nonetheless continue to allow it to fact-check CHD (as recently as January 21, 2021). SAC ¶ 108. Not only does this recent fact-check show ongoing harm to CHD from Defendants' scheme but also shows the inherently misleading nature of the fact-check labeling. Facebook added Politifact and

at *18 (N.D. Cal. 2019) ("statement is more likely to be viewed as one of fact, as opposed to opinion, when the speaker might reasonably be perceived as an expert or authority on the topic of the statement." (Citations omitted.) SAC ¶¶ 105-06. Without Poynter's fact-checker certification program, other fact-checkers, such as Science Feedback, would not have the imprimatur of trustworthiness and independence to further the fraudulent scheme here.

Poynter and the fact-checkers it certifies, including Science Feedback, engage in actions at the direction of and in concert with Facebook that appear to run afoul of IFCN's principles, which state, among other things, that a signatory "does not unduly concentrate its fact-checking on any one side." *The commitment of the Code of Principles*, POYNTER.ORG, https://ifcncodeofprinciples.poynter.org/know-more/the-commitments-of-the-code-of-principles (last accessed Feb. 5, 2021). This appears to have been disregarded here, where fact-checkers, in concert with and at the direction of Facebook and Zuckerberg, focus their fact-checking on what the U.S. government and Defendants have pre-determined to be "false" information merely because it challenges the orthodoxy concerning vaccines and other potential environmental toxins. While such obvious bias violates IFCN principles, it does appear aligned with IFCN's mission to "help[ ] surface common positions among the world's fact-checkers." *The International Fact-Checking Network*, POYNTER.ORG, https://www.poynter.org/ifcn/ (last accessed Feb. 3, 2020). SAC ¶ 98. The fact-checker "common position" on vaccine issues, as aligned with the government's and Facebook's positions, appears to be that anything contrary to orthodoxy is "misinformation."

In its motion to dismiss, Poynter ignores its important role as the entity that certified fact-checkers, and provided valuable cover to Facebook's false suggestion that its fact-checkers are "independent" "third parties." Instead, Poynter focuses on its role as a fact-checker, arguing that its role

---

Science Feedback (Health Feedback) fact-checks to a January 21, 2021 CHD post. The post included a link to an article on the CHD website concerning the WHO's PCR testing guidance for SARS-CoV-2. Facebook Post: *WHO finally Admits COVID-19 PCR Test Has a 'Problem'*, CHILDREN'S HEALTH DEFENSE, https://www.facebook.com/ChildrensHealthDefense/posts/2845524319028304. Politifact labeled the post "False" but had not fact-checked CHD's article. Poynter's fact-check is of a different article on a different website. Noah Y. Kim, *WHO did not say PCR tests grossly inflate positive test numbers*, POLITIFACT (Jan. 22, 2021), https://www.politifact.com/factchecks/2021/jan/22/gateway-pundit/who-did-not-admit-pcr-tests-grossly-inflate-positi/.

was *de minimis*, because it checked only one CHD post and, further, did not label CHD's post false but rather labeled as false the content of an article headline about a study showing significant association between influenza vaccination and coronavirus risks linked in the CHD post. Poynter's attempt to sidestep this activity and the harm it caused CHD should not be countenanced. Poynter ignores that the "False" label appeared on the CHD post on CHD's Facebook page, giving readers the deceptive impression that the CHD post was false. This impression was further reinforced because the text of CHD's post contains narrative similar to the purportedly "false" headline.

Moreover, as further alleged, Poynter's "False" label is itself a knowing and reckless falsehood. SAC ¶¶ 151-55. When one clicks through the "see why" link to Politifact's website, Politifact found that the headline did not specify that the study did not address COVID-19 specifically: "While this article did specify that the U.S. Armed Forces study was testing common coronaviruses and not COVID-19, the headline was ambiguous and misleading. We rate this headline False."  Emily Venezky, *This 2017-18 flu season study does not include COVID-19*, POLITIFACT (Jul. 16, 2020), https://www.politifact.com/factchecks/2020/jul/16/facebook-posts/2017-18-flu-season-study-does-not-include-covid-19/. However, according to Politifact's own Truth-O-Meter description, an item should be labeled false only where "the statement is not accurate." Here, Politifact does not claim that the headline stated that the flu vaccine was associated with a higher risk of COVID-19. Politifact merely complains about a purported lack of clarity regarding COVID-19. Thus, at most, according to its own standards, Politifact should have labeled the headline as either "**MOSTLY TRUE** – The statement is accurate but needs clarification or additional information" or "**HALF TRUE** – The statement is partially accurate but leaves out important details or takes things out of context." *How we determine Truth-O-Meter ratings*, POLITIFACT, https://www.politifact.com/article/2018/feb/12/principles-truth-o-meter-politifacts-methodology-i/#Truth-O-Meter%20ratings (last accessed Feb. 5, 2021). However, such a label would have defeated the purpose of the fact-checking scheme whereby content is presumed false.

In their campaign to block and discredit CHD content, Defendants, including Poynter, were not acting merely as private parties. Rather, due to a combination of factors – coercion, encouragement and joint participation – they were functioning as government actors in a targeted campaign of fact-checking

designed to silence and demonetize CHD for presenting facts and opinions that differed from what the government, Facebook, and Poynter determined were "facts."

At the same time, Poynter fraudulently promoted itself, in direct competition with CHD. Poynter and the other fact-checkers promote themselves – and are promoted by Facebook – as superior sources of health safety information, in part as a result of their Poynter/IFCN certification. When Facebook users clicked through fact-checks to Poynter and other fact-checker websites, which they were encouraged to do, they were presented with prominent invitations to donate to these fact-checkers. SAC ¶¶ 21, 94, 98, 100-01, 159 (donate button) 115-99 & Exh. "B"; *see also* https://www.politifact.com/factchecks/2020/jul/16/facebook-posts/2017-18-flu-season-study-does-not-include-covid-19/ (donate button); *Support our Work*, SCIENCE FEEDBACK, https://sciencefeedback.co/donate/.[5] These organizations are CHD's competitors because they are rival nonprofits offering health safety information to the online market, directly competing with CHD for donation dollars. In other words, Defendants, including Poynter, were deliberately seeking to stop users from donating to CHD, and instead diverting them to CHD's competitors.

## ARGUMENT

### I.  CHD'S SAC IS SUFFICENT TO PRECLUDE DISMISSAL.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court takes "all allegations of material fact as true and construe[s] them in the lights most favorable to the non-moving party[,]" including all reasonable inferences. *Parks Sch. Of Bus. v. Symington*, 51 F. 3d 1480, 1484 (9th Cir. 1995); *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).

CHD has met the plausibility pleading requirement here, which "'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of '" the facts alleged. *Hartman v. Gilead Sciences, Inc.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Thus Courts particularly disfavor motions to dismiss where, as here, a defendant

---

[5]     The Court may take judicial notice of the existence and content of these websites, in particular, their solicitation of donations from visitors to the fact-checked content at issue here. *See Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020).

argues that a complaint lacks sufficient detail, yet possesses or controls the information it claims is lacking. *See Smith v. United Healthcare Ins. Co.*, 2019 WL 3238918 *1, *6 (N.D. Cal. Jul. 18, 2019). Such circumstances "counsel[ ] towards allowing discovery" and denying such motions. *Id.*; *see also Dreamstime.com, LLC v. Google, LLC*, 2019 U.S. Dist. LEXIS 94573, at *6 (N.D. Cal. 2019); *Mimedx GRP., Inc. v. Osiris Therapeutics, Inc.*, 2017 U.S. Dist. LEXIS 114105 at *20-21 (S.D.N.Y. 2017). Given that significant information is in the possession or control of Poynter and the other Defendants, such should be the result here.

"The Court may dismiss a claim for failure to state a claim upon which relief can be granted for only two reasons: (1) lack of a cognizable legal theory; or (2) failure to allege sufficient facts under a cognizable legal theory." *Morales v. Cate,* 757 F. Supp. 2d 961, 964 (N.D. Cal. 2010) (citation omitted) (denying motion to dismiss). Poynter's motion to dismiss fails under this long-standing law.

## II. CHD HAS FULLY AND ADEQUATELY PLEADED AN AGENCY OR COMPARABLE RELATIONSHIP BETWEEN FACEBOOK AND POYNTER.

CHD has alleged that as Facebook's agent, Poynter has acted in concert with Defendants and state actors (including but not limited to Rep. Schiff, the State Department, the CDC, and the WHO). As plausibly alleged in the SAC, Facebook exercises substantial control over Poynter in many ways, including through its supervisory relationship to the fact-checking process, in its IFCN certification program, and via its purse strings. *See, e.g.*, SAC ¶ 21.

As described in *Mavrix Photographs, LLC v. LiveJournal, Inc.*, 873 F.3d 1045, 1053-55 (9th Cir. 2017), *quoting* the Restatement (Third) Of Agency (Am. Law Inst. 2006): "'Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.' For an agency relationship to exist, an agent must have authority to act on behalf of the principal and '[t]he person represented [must have] a right to control the actions of the agent.'" (reversing summary judgment and holding that genuine issues of fact existed as to agency, making website potentially liable for its moderators' posts, where website allegedly "selected moderators," gave them special authority to "review" posts, "provided them with specific directions," and led users to believe that moderators "acted on behalf" of website) (citations omitted); *see also*

*Castillo v. Glenair, Inc.*, 23 Cal. App. 5th 262, 278 (2018) (citations omitted) (emphasis added) (the right to control, not the exercise of that right, establishes an agency relationship).

In support of the agency relationship, CHD has alleged that, while Facebook tells users that fact-checkers are "independent" "third parties," and have special authority to evaluate the truth of users' posts and that these fact-checkers can be trusted to provide accurate information, Facebook has significant control over them, including Poynter, *in all aspects of their relationship*. Facebook:

- Selects and appoints fact-checkers;
- maintains extensive supervision and control of its fact-checker processes;
- directs content to fact-checkers prejudged as false by Facebook's own algorithms;
- trains its fact-checkers and provides manuals and cabined scoring options;
- subsidizes Poynter's IFCN "certification" and determines how the certification requirements will be imposed, if they will be adhered to, and if and how they will be monitored;
- determines what posts qualify as "protected opinion";
- pays its fact-checkers and provides their operating budgets (directly and through controlled entities), in ways that incentivize them to execute Facebook's prejudgment of falsity;
- retains final control of all fact-checker ratings and has in fact altered such ratings; and
- substantially funds Poynter, directly and indirectly.

SAC ¶¶ 5, 9, 20-21, 58, 72, 87-97, 94-114.

Indeed, given Facebook's extensive control over its fact-checkers' work and the lack of the fact-checkers' independence, CHD's allegations suggest that Facebook's fact-checkers – including Poynter – are its *employees*. *See* CAL. LAB. CODE, §§ 2775-2776 (deeming individuals who perform remunerated work employees unless defendant proves lack of control (*see id*. CAL. LAB. CODE, § 2776, subd. (a))). Notably, Facebook has not proved lack of control, and cannot prove lack of control on a Rule (12)(b)(6) motion.

Discovery will determine additional facts concerning the relationship between Facebook and Poynter. However, at this stage CHD has raised specific, plausible allegations to support agency or other

comparable relationship here which merit denying Poynter's motion to dismiss. Poynter's *ipse dixit* pronouncement (MTD at 11, n.12) that it is not controlled by Facebook is irrelevant where the Court must accept as true the facts alleged in the SAC, which alleges extensive non-conclusory facts about Facebook's control over Poynter, including Poynter's "fact-checking" mechanisms.

## III. CHD HAS FULLY AND ADEQUATELY PLEADED ITS CONSTITUTIONAL CLAIMS (COUNTS 1 AND 4).

### A. Poynter Is Not Entitled to Dismissal on Grounds of Alleged Lack of State Action.

Poynter's bald proclamation that it did not engage in state action because it, at most, received some government funding (MTD at 10), is insufficient to support dismissal here.[6] A state action determination is "necessarily a fact-bound inquiry." *United Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 298 (2001). Where the "true nature of the State's involvement may not be immediately obvious," and "detailed inquiry may be required in order to determine whether the test is met," a Rule 12(b)(6) dismissal on state action grounds is inappropriate. *Rawson v. Recovery Innovations, Inc*., 2017 U.S. Dist. Lexis 176870 at * 8 (W.D. Wash. 2017) (citation omitted) (denying motion to dismiss); *Brill v. Correct Care Sols., LLC*, 286 F. Supp. 3d 1210, 1217 (D. Colo. 2018). Here, the pleaded facts regarding (1) Facebook and Zuckerberg's relationship of compulsion and joint action with government actors; (2) Poynter's own relationship with government actors; and (3) the agency or similar relationship between Poynter and Facebook support an inference of state action. The Supreme Court has laid out three tests under which private party conduct can be state action: "when [the private party's conduct] results from the State's exercise of 'coercive power,' when the State provides 'significant encouragement, either overt or covert,' or when a private actor operates as a 'willful participant in joint activity'" with the government. *Brentwood*, 419 U.S. at 296 (citations omitted). These three tests are not exhaustive, *see id*., can be overlapping, and ultimately demand a "totality of the circumstances" analysis. *Evans v. Valero Energy Corp*., No. CV F 07-0130 (E.D. Cal. Mar. 6, 2007) at

---

[6] CHD responds only to arguments raised by Poynter. *See, e.g., Lauren Moshi LLC v. Fuentes*, 2020 U.S. Dist. Lexis 82920, at *18 (C.D. Cal. 2020) (arguments not raised in movant's opening brief are waived).

*9. As set forth in the accompanying opposition to Facebook's and Zuckerberg's motion to dismiss, these tests are all satisfied regarding those Defendants. Additionally, however, as pleaded in the SAC, Facebook brought those pressures to bear on Poynter as its agent to accomplish the censorship goals of federal actors. In fact, Facebook's purportedly independent fact-checkers and purportedly independent fact-checker certification process were critically important to lend a façade of legitimacy to these censorship activities.

In this same vein, CHD has adequately pleaded joint action by Poynter sufficient to preclude dismissal. Any final determination of joint action is necessarily fact-intensive. "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722 (1961). "The joint action test for state action is met where private parties are 'willful participants in joint activity with the [government] or its agents.'" *Johnson v. Knowles*, 113 F.3d 1114, 1119 (9th Cir. 1997) (citation omitted). The SAC shows, *inter alia*, that Facebook and Zuckerberg worked together with the CDC and its proxy the WHO to "reduce [contain, or remove] the spread of [vaccine-related] inaccuracies, or "misinformation," and "reach individuals with [] targeted health information," and that Facebook used Poynter as a fact-checker and as its certifying agent of other fact-checkers (including Co-Defendant Science Feedback) to target CHD. SAC ¶¶ 21, 49-52, 69-70, 105-07, 151-55, 308. Further, under the Global Health Security Agenda ("GHSA"), the State Department recruits private sector partners to "neutralize vaccine hesitancy," and funds, through intermediaries, both Poynter and its IFCN. *Id*,. at ¶¶ 98-101. Not only do Facebook and the federal actors benefit from this joint action, but Poynter benefits directly as well. Thus, the SAC plausibly alleges that federal actors actively participated in the program design and methods by which, among other things, Poynter and Facebook identified and labeled CHD speech as "false" and by which Facebook demonetized CHD's page. Accordingly, CHD's allegations of state action satisfy all three *Brentwood* tests—coercion, significant encouragement, and joint activity—and Poynter's attempt to dismiss CHD's constitutional claims on state action grounds should be denied.

### B. Poynter's *Bivens* Arguments Misapprehend the Law.

Poynter contends that, because it is a private corporation, it is not a proper *Bivens* defendant under *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) and that CHD's constitutional claims

cannot survive. (MTD at 10.) Poynter misapprehends the law.

**1. The Ninth Circuit Permits First Amendment *Bivens* Claims.**

Ninth Circuit precedent expressly permits *Bivens* claims for violations of "well-established First Amendment" doctrine, at least when no adequate remedies are available. *Boule v. Egbert*, 980 F.3d 1309, 1316 (9th Cir. 2020). No doctrine in First Amendment law is better established than the prohibition against censorship of opinion. *West Va. Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion"). The First Amendment, said Judge Learned Hand, "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943). Moreover, no law other than the First Amendment bars Poynter from engaging in viewpoint discrimination. "[E]ven though an alternative remedy need not be 'perfectly congruent' with *Bivens* or 'perfectly comprehensive,' it still must be 'adequate.'" *See Rodriguez v. Swartz*, 899 F.3d 719, 739 (9th Cir. 2018) (*quoting Minneci v. Pollard*, 565 U.S. 118, 120, 129 (2012); *Adams v. Johnson*, 355 F.3d 1179, 1185 n.3 (9th Cir. 2004)). Hence CHD has a First Amendment *Bivens* damages claim against Poynter, and because no other law permits suit against Poynter for its past acts of viewpoint discrimination against CHD, *Malesko* does not apply.

**2. CHD's Injunctive Claim Is Not a *Bivens* Claim.**

"*Bivens* is both inappropriate and unnecessary" for injunctive (as opposed to damages) claims against federal actors. *Ministerio Roca Solida v. McKelvey*, 820 F.3d 1090, 1094 (9th Cir. 2016). The federal courts' power to order injunctive relief against federal actors' ongoing constitutional violations is well established by case law long predating *Bivens*. *See Larson v. Domestic & For. Comm. Corp.*, 337 U.S. 682, 690 (1949); *Mitchum v. Hurt*, 73 F.3d 30, 35 (3rd Cir. 1995) (Alito, J.) ("The power of the federal courts to grant equitable relief for constitutional violations has long been established" and *Bivens* limitations do not apply to such claims); *see also AFGE Local 1 v. Stone*, 502 F.3d 1027, 1038 (9th Cir. 2007) (approving of *Mitchum*). Therefore Poynter's *Bivens* arguments do not apply to CHD's claim for injunctive relief against Poynter for its First Amendment violations. SAC ¶¶ 12, 388-91, Prayer for

Relief.

## IV. CHD HAS ADEQUATELY PLEADED ITS RICO FRAUD CLAIM (COUNT 3).

The elements of a civil RICO claim are: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property." *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005). CHD has pleaded all these elements in detail, alleging that Defendants conducted a content-moderating enterprise through a pattern of multiple predicate acts of wire fraud detailed in the SAC, including Defendants' creation and posting of false fact-checking labels on CHD content and misleading "certifications," Facebook's fraudulent deactivation of CHD's donate button and ads, deceptive demotion of content, and concealment through material omissions. SAC ¶¶ 79(A)-(J), 222-26, 322, 332-33, 374-78, 383-85.

As an initial matter, contrary to Poynter's assertions, CHD's SAC clearly meets Fed. R. Civ. P. 9(b) particularity requirements. CHD has specifically alleged that Poynter played a key role in Facebook's overarching fraud and deception scheme through both its fact-checking and its fact-checker certification process. SAC ¶¶ 373-85. Poynter is mistaken that the SAC does not clearly define its specific activities, and the "who, when, where, and why" of what Poynter did in the scheme.

Poynter cannot seriously dispute CHD's allegations that Poynter used interstate wires to perpetrate a fraudulent scheme through numerous acts of intentional deception and misrepresentation, thus satisfying the "three elements of wire fraud." *United States v. Hussain*, 972 F.3d 1138, 1143 (9th Cir. 2020). As pleaded in the SAC, the fraudulent scheme was, through deception and artifice, to defund and damage CHD due to the immense financial interests Poynter's principals – Co-Defendants Facebook and Zuckerberg – have in the vaccines and technologies whose health dangers CHD exposes. SAC ¶¶ 374-80. Instead, Poynter simply tries to minimize its role in the fraudulent scheme. However, it cannot extricate itself from its participation. Poynter is chargeable with at least two predicate acts under 18 U.S.C. § 1962(c), *see* SAC ¶¶ 79(D), (F), (J), 98, 101, 109, 151-155, the accomplishment of which actively furthered Defendants' overall scheme. *Operating Eng'rs Local Union No. 3 v. Wilson*, 2019 U.S. Dist. LEXIS 234637 at *19 (N.D. Cal. 2019) (section 1962(c)'s requirements must be established as to each individual defendant). Thus, despite Poynter's arguments to the contrary, and as alleged in the

SAC, Poynter did more than fact-check a single CHD post[7] – it also certified other fact-checking organizations, creating the impression that these organizations are "independent," trustworthy experts, to further enable Defendants' scheme of censorship, deception, and destruction. In particular, Poynter certified Co-Defendant Science Feedback under its IFCN rubric. *See United States v. Woods*, 335 F.3d 993, 998 (9th Cir. 2003) (wire fraud encompasses entire fraudulent scheme, including all acts "calculated to deceive," not merely "misrepresentation[s] of . . . fact").

Poynter deliberately ignores its certification role and merely asserts that the RICO claim against it must fail because its labeling of CHD content as "false" was protected speech. MTD 16-17. This argument fails. The short answer to Poynter's "opinion" defense is that it is engaged in what it calls "*fact*-checking," not "opinion-checking."[8] As alleged in the SAC, Defendants "have weaponized the concept of scientific 'fact' in an effort to shut down the differing conclusions and viewpoint that CHD attempts to voice" and "are indeed censors and opponents of real science and open debate who believe that they alone are in possession of 'truth' and have the right to suppress anyone who disagrees." SAC ¶¶ 4, 5.

In determining this motion, the Court must assume that CHD's health warnings were true and accurate (as indeed they were); that the labeling of CHD content as "false" was itself false (as indeed it was); and that a reasonable Facebook user would have read those "False" labels as *factual* assertions that CHD was spreading misinformation (which CHD emphatically was not doing).

Poynter also mistakenly contends that the requirement that the perpetrator must seek to "obtain money or property" from the deceived party is unsatisfied here. MTD at 18-19 (*citing Kelly v. U.S.*, 140 S. Ct. 1565, 1571-73 (2020)). Defendants, including Poynter, sought to deceive visitors to CHD's Facebook page into giving their charitable dollars not to CHD, but to other, competing nonprofit organizations, *i.e.*, to fact-checkers like Poynter. As part of this goal, Poynter attempted to convince

---

[7] As noted *supra*, Poynter falsely "fact-checked" a second CHD post after the filing of this action.

[8] Poynter's claims also contradict Facebook's statements to its users that its fact-checkers target only "particularly clear hoaxes" and "provably false claims[,] not claims that . . . consist of minor inaccuracies[,] [or] individual expression, opinions and debate." *Fact-Checking on Facebook*, FACEBOOK FOR BUSINESS, https://tinyurl.com/y33wyhe2 (last accessed Dec. 21, 2020) (Facebook MTD Exh. 1 at 1) (Dkt. #69-2 at 2).

users that CHD was not deserving of donation dollars by falsely labeling CHD content as "false" and instead diverting CHD visitors through its false "fact-checking" click-through screens to its own website, which directly competes with CHD for donations and prominently invites visitors to make donations to support its work as an allegedly superior source of health information. SAC ¶¶ 21, 94, 98, 100-01, 159 (donate button), 115-99, & Exh. "B"; *see also* https://www.politifact.com/factchecks/2020/jul/16/facebook-posts/2017-18-flu-season-study-does-not-include-covid-19/ (donate button on fact-check page); *Support our Work*, SCIENCE FEEDBACK, https://sciencefeedback.co/donate/. Thus, accepting CHD's allegations as true and drawing all reasonable inferences in CHD's favor, Poynter, along with the other Defendants, was deliberately seeking to induce the victims of its deception (visitors to CHD's Facebook page) to donate to Poynter, rather than CHD. Such allegations plainly state a claim of wire fraud. *Cf, e.g., United States v. Rezko*, 2007 U.S. Dist. LEXIS 73517, at *13-14 (N.D. Ill. Oct. 2, 2007) (wire fraud adequately pleaded where defendant was alleged to have sought to cause money to go to defendant's "associates").

Poynter also states (in a footnote) that CHD failed to allege that Poynter intended to defraud. MTD, at 19, n.14. To the contrary, as shown above, Poynter's fact-check of the CHD post was clearly itself false, even based on its own "Truth-O-Meter" standards. Because Facebook requested Poynter to "fact-check" content Facebook had already deemed to be false, Poynter was operating under a predetermined conclusion of falsity, which Poynter then reinforced by purposefully mislabeling CHD's post as "false."[9]

CHD has adequately pleaded its RICO claim against Poynter and, therefore, Poynter's motion to dismiss must be denied.

## V. CHD HAS ADEQUATELY PLEADED ITS LANHAM ACT CLAIM (COUNT 2).

Poynter argues that CHD's Lanham Act claim against it fails as a matter of law because there was no "commercial or promotional activity" by Poynter and that its fact-check was directed at an entity other than CHD. MTD at 13.

---

9 While Poynter summarily claims that CHD has failed to adequately plead all elements of a RICO claim, it provides no support with respect to the additional elements, and thus its unsupported statement should be disregarded.

**A. CHD Has Sufficiently Pleaded Its Lanham Act Claim.**

Poynter's argument that CHD has not pleaded with specificity required by Fed. R. Civ. P. 9(b) how Poynter's fact-check could have deceived a consumer "and otherwise alter purchasing behavior" is wrong. MTD at 13-14. The SAC meets Rule 9(b) requirements in that it is "specific enough to give the defendants notice of the particular misconduct which is alleged to constitute the fraud charged so they can defend against the charge and not just deny that they have done anything wrong." *TransFresh Corp. v. Ganzerla & Assoc.*, 862 F. Supp. 2d 1009, 1017 (N.D. Cal. 2012); *see* SAC ¶¶ 79, 151-55, 329-72, Ex. "B." Regarding the post at issue here, the SAC is very clear as to Poynter's alleged misconduct and, in attempting to rebut the facts alleged in the SAC, it is clear that Poynter understands the allegations against it. SAC ¶¶ 79, 151-55, 329-72; MTD at 13-14.

**B. Poynter's Claim that CHD and Poynter are Not Competitors is Both Erroneous and Irrelevant under Governing Law.**

Poynter's assertion that CHD's Lanham Act claim fails because CHD and Poynter are not commercial competitors (MTD at 13) fails as a matter of fact and law. First, as discussed above, CHD and Poynter are in competition for users' donations and Poynter, through its labeling of CHD content as false, holds itself out as an entity knowledgeable on health issues, in competition with CHD.

Second, in *Lexmark International, Inc. v. State Control Components, Inc.*, 572 U.S. 118 (2004), the Supreme Court unanimously rejected lower court rulings that had limited standing to sue for false advertising under Section 43(a) only to competitors of a defendant. "[A] rule categorically prohibiting suits by noncompetitors would read too much into the [Lanham] Act's reference to 'unfair competition'…. It is thus a mistake to infer that because the Lanham Act treats false advertising as a form of unfair competition, it can protect *only* the false advertiser's direct competitors." *Id.* at 136, 139. *See also Ariix, LLC v. NutriSearch, Corp.*, 2021 U.S. App. LEXIS 1776 at *32 (9th Cir. Jan. 22, 2021) ("The court [in *Lexmark*] rejected that limitation [the requirement of competitor status] because it could not be found in the text of the Lanham Act, nor could it be deduced from the limitations that are found in that text.").

Instead, Lanham Act standing merely requires a plaintiff to allege an injury within the "zone of interests" that the Act protects, such as damage to "reputation or sales." *Lexmark*, 572 U.S. at 132. And

it is well established that a nonprofit's reputational damage or loss of donation revenue constitutes actionable commercial injury under the Lanham Act. *See, e.g.*, *Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814 (9th Cir. 1996) (permitting Lanham Act suit by non-profit organization); *Cal Pure Pistachios, Inc. v. Primex Farms, LLC*, 2010 U.S. Dist. LEXIS 148263 at *11 (C.D. Cal. 2010) ("No legal authority is offered in support of Defendants' implicit contention that a non-profit corporation cannot sue for false advertising under the Lanham Act, and the Court will reject it."); *Birthright v. Birthright, Inc.*, 827 F. Supp. 1114, 1138-39 (D.N.J. 1993) (ruling in favor of nonprofit organization's Lanham Act false advertising claim); *cf. Camps Newfound/Owatonna v. Town of Harrison*, 520 U.S. 564, 585-86 (1997) (nonprofits' activities are "commercial" or "in commerce" for purposes of the Commerce Clause and federal statutes regulating commercial activity). Because CHD has alleged that Poynter's falsehoods damaged its reputation and caused significant loss of donation revenues, it has fully and adequately pleaded Lanham Act standing.

### C. CHD Has Adequately Alleged Promotion and Commercial Speech.

Poynter also asserts that CHD's claim should be dismissed because there is no "purely" commercial transaction at issue here. MTD at 15. Once again, Poynter misapprehends the law.

While commercial speech "*usually*" "does no more than propose a commercial transaction," "this definition," as the Ninth Circuit held just weeks ago, is "*just a starting point*." *Ariix*, 2021 U.S. App. LEXIS 1776 at *13 (emphasis added). Instead, the inquiry is case-by-case and "fact-driven," *id.*, with the critical factor being "economic motivation" and, specifically, whether "economic benefit was the primary purpose for speaking." *Id.* at *17. "[E]conomic motivation is not limited simply to the expectation of a direct commercial transaction with consumers." It can include "indirect benefits, such as . . . improvements to a brand's image, general exposure of a product, and protection of licensee's interests." *Id.* (citations omitted). Here, CHD has alleged Defendants' "economic motivation" in detail (both that of Poynter and Facebook/Zuckerberg) for disparaging, censoring, and deplatforming CHD's efforts to expose the truth about the dangers of mandatory universal vaccine programs. These interests make it eminently "plausible" that the "primary purpose" for falsely branding the opinions and accurate data posted on CHD's page as "false" was economic in nature. At the very least, this "fact-driven" issue cannot be resolved against CHD on a Rule 12(b)(6) motion. *See, e.g.*, *P&G v. Amway Corp.*, 242 F.3d

539, 552-53 (5th Cir. 2001) (remanding to trier of fact to determine on all relevant evidence if speech was economically motivated and thus commercial speech).

In particular, false fact-check labels expressly tout Poynter's putatively superior information, thus competing with CHD for donation revenue by actively "promoting" their competing "products and services". The false labels urged users to click through to Poynter's site, where there is a prominent invitation to donate to Poynter/Politifact — *i.e.*, to engage in commercial transactions.[10] *See, e.g.*, *Birthright*, *supra*, 827 F. Supp. at 1138-39 (treating nonprofits' solicitations as commercial transactions for Lanham Act purposes).

Moreover, Poynter's claim that it fact-checked CHD's post and the link contained therein as participation in the "marketplace of ideas" (MTD at 14) turns the idea of that "marketplace" on its head. What Poynter sought to do was to flatly and wrongly label CHD's content as false, and thereby facilitate Facebook's effort to shut down discourse through its "false fact" overlays *over* CHD's content. Poynter was not "communicating ideas or expressing a point of view." MTD at 15, *quoting Farah v. Esquire Magazine*, 736 F.3d 528, 530 (D.C. Cir. 2013). As the court in *Farah* emphasized, "[c]ontext is critical." *Id*. at 535. Rather than Poynter communicating ideas or opinions, just the opposite is the case here – Poynter sought to halt expression by use of its "False" label – a purported "fact," not an opinion (hence the term "**fact**-check") – placed on CHD's own Facebook post and page. As the court aptly pointed out in *Ariix*, "it is not controversial to conclude that 'liability can arise under the Lanham Act if websites purporting to offer reviews are in reality stealth operations intended to disparage a competitor's product while posing as a neutral third party.''' *Ariix*, 2021 U.S. App. LEXIS 1776 at *22; *see also Mimedx GRP., Inc. v. Osiris Therapeutics, Inc.*, 2017 U.S. Dist. LEXIS 114105 at *17 ("'Advertisements do not become immune from Lanham Act scrutiny simply because their claims are open to scientific or public debate. Otherwise, the Lanham Act would hardly ever be enforceable – many, if not most, products may be tied to public concerns with the environment, energy, economic policy, or individual health and

---

10 Poynter sought to influence consumers to buy their goods and services. As set forth above, Poynter is Facebook's agent, and an "agency relationship" can satisfy this requirement. *See Ariix*, 2021 U.S. App. LEXIS 1776 at *25 n.10 ("agency relationship" can satisfy requirement); *id.* at *39 (Collins, J., dissenting) (agency relationship would satisfy requirement).

safety.'") (*quoting Eastman Chemical Co. v. Plastipure, Inc.*, 775 F.3d 230, 236-37) (2014) (*quoting Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 n.5 (1980)). Nor, as shown below, is Poynter's speech entitled to First Amendment protections.

Thus, CHD has fully and adequately alleged commercial speech and commercial promotion.

In sum, Poynter's arguments are baseless, either misrepresenting the law or, at most, raising factual issues that cannot be resolved on a motion to dismiss.

## VI. POYNTER'S AFFIRMATIVE DEFENSES FAIL AS A MATTER OF LAW.

### A. The First Amendment Does Not Bar Claims Based in Fraud.

The First Amendment does not protect Poynter from liability for knowing or reckless falsehoods, *e.g.*, speech that is "integral to criminal conduct," *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949), fraud, *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 771 (1976), or defamation. *See New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). Poynter has no special First Amendment immunity for its own actionable falsehoods or for other acts which furthered the scheme here. SAC ¶¶ 78-79, 323-28, 385; *see Cohen v. Cowles Media Co.*, 501 U.S. 663, 670 (1991) (newspaper publisher has "no special privilege to invade the rights and liberties of others."). As Judge Alsup observed in *Dreamstime.com, LLC v. Google, LLC*, 2019 U.S. Dist. LEXIS 94573, at *4-5 (N.D. Cal. 2019), "[j]ust like a fast-talking con-artist cannot hide behind the First Amendment, neither can Google." Nor should Poynter and the other Defendants here.

Nor should the Court countenance Poynter's argument that its speech was not "of or relating to" CHD. The fact-check appeared on a CHD post on CHD's Facebook page. Any reasonable user would understand that the "False" label was meant to convey that CHD was sharing false information, and the label would call into question CHD's reliability and trustworthiness in conveying accurate information. Moreover, the language labeled false in the article's headline is essentially the same as the language in the text of CHD's actual post, again implying that CHD's post is false. In sum, Poynter's "of and concerning" argument is unpersuasive (at best raising a question of fact, defeating its own motion) and should be rejected. *See Ferlauto v. Hamsher*, 74 Cal. App. 4th 1394, 1404 (1999) (false statement was made "of and concerning" them, either by name or by "clear implication.").

Finally, as shown herein, there is no question that the speech at issue was not protected

"opinion." Poynter holds itself out as a "**fact**-checker," not an opinion-generator, and its false label is intended to inform readers of its conclusion that the post at issue is affirmatively false. Neither the fact-check label nor the underlying "see why" explanation couch the "false" conclusion as opinion. Instead, Poynter affirmatively states "We rate this headline False," not "it is our opinion that this headline is false." Again, Poynter's argument that its speech is protected fails.

### B. Poynter's Actual Malice Defense Fails as a Matter of Law and Fact.

Poynter contends that CHD: (1) was required to plead actual malice for its RICO claim; and (2) that CHD has not done so. Both contentions are false.

#### 1. The Actual Malice Requirement Does Not Apply to CHD's RICO Claim (or to the Lanham Act Claim).

Poynter asserts that the actual malice standard applies to CHD's civil RICO claim. MTD at 17. That is emphatically not the law. A multitude of fraud cases, including RICO cases, have been decided without any mention of actual malice, because fraud claims are not subject to the actual malice standard. *See, e.g.*, *SEC v. Pirate Investor LLC*, 580 F.3d 233, 255 (4th Cir. 2009) (rejecting actual malice requirement for fraud claims); *Feminist Women's Health Ctr. v. Roberts*, 1989 U.S. Dist. LEXIS 5837, at *25 (W.D. Wash. 1989) (mail fraud statute); *cf*. *P&G v. Amway Corp*., 242 F.3d at 555, 565 (upholding fraud-based civil RICO claims in case where plaintiff had, on other claims, been deemed a public figure and had been found not to have pleaded actual malice).[11]

Similarly, a plaintiff "is not required to show actual malice in proving its Lanham Act claim"[12] where (as here) the Lanham Act claim is brought under Section 43(a)(1)(B), because that section applies only to "false commercial speech," which has no protection under the First Amendment. *P&G v. Amway Corp*., 242 F.3d at 557; *see Hoffman v. Capital Cities/ABC Inc.*, 255 F.3d 1180, 1185 (9th Cir. 2001) ("When speech is properly classified as commercial, a public figure plaintiff does not have to show that

---

11 The single case on which Poynter relies, *Savage v. Council on Am.-Islamic Relations, Inc.*, 2008 U.S. Dist. LEXIS 60545 (N.D. Cal. 2008), was decided on a standing issue and related to political speech. *Id.* at *34.

12 Poynter's motion was unclear on the standard Poynter argues is applicable on Plaintiff's Lanham Act claim.

the speaker acted with actual malice."). Determining if statements qualify as unprotected "commercial speech" raises substantial factual issues, including significantly whether defendant had an "economic motivation for publication," *Lona's Lil Eats, LLC v. Doordash, Inc*., 2021 U.S. Dist. LEXIS 8930, at *21 (N.D. Cal. Jan. 18, 2021), which CHD has plausibly alleged. If "the trier of fact determines that [defendant's] motives in spreading the [alleged false statements] were economic and that the speech was therefore commercial, this false commercial speech cannot qualify for the heightened protection of the First Amendment, so [plaintiff] is not required to show actual malice." *P&G v. Amway Corp.*, 242 F.3d at 557.

**2. In Any Event, CHD Has Adequately Pleaded Actual Malice.**

Actual malice exists where a defendant has made false statements either knowingly or with reckless disregard for the truth. *Harte-Hanks Comms., Inc. v. Connaughton*, 491 U.S. 657, 667 (1989). Here, CHD has more than plausibly pleaded knowing falsehood.

As alleged in the SAC (at ¶¶ 151-55), Poynter labeled as false a statement that influenza vaccination was significantly associated with an increased risk of coronaviruses generally – a statement in an April 16, 2020 CHD post as well as in the headline of an article that CHD linked to in that post. Poynter's use of the "False" label was itself a knowing falsehood. Poynter admitted that the study itself was clear and that COVID-19 was not addressed and described the headline merely as "ambiguous and misleading." Presuming that Politifact is familiar with its own "Truth-O-Meter" standards, it appears that Poynter ignored those standards and misapplied the "False" label, which should only be applied when a statement is not accurate. Here, the statement was an accurate reflection of the article – it did not imply or state that COVID-19 was part of the study discussed. At best, the statement warranted clarification, which is insufficient to justify a "False" label. Politifact's rating, therefore, should have been, if not "True," then "Half True" or "Mostly True."

**VII. POYNTER'S ARGUMENTS AGAINST INJUNCTIVE AND DECLARATORY RELIEF ARE OVERBROAD AND UNFOUNDED.**

In Count 4 of the SAC, CHD seeks narrowly-tailored injunctive relief, and declaratory judgment, upon a judicial determination that Defendants have engaged in unprotected false or misleading speech acts causing ongoing commercial injury to CHD. Further, and in particular, CHD seeks to enjoin

Facebook's placement of Poynter's and other fact-checkers' speech on CHD's page or over CHD's posts, as well as Facebook's other actions against CHD as alleged in the SAC.

As argued *supra*, this action is at its earliest stages, with no discovery having been had. Discovery and subsequent litigation will ultimately inform this Court's consideration of the many equitable factors, including the balance of hardships and the public interest, in fashioning the appropriate scope of an injunction and declaration. *See, e.g.*, *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 2020 U.S. Dist. LEXIS 76374 *41-42 (N.D. Cal. Apr. 29, 2020) (granting permanent injunction).

These determinations are beyond the scope of Poynter's Rule 12(b)(6) motion. Thus, Poynter's argument that any injunctive and declaratory relief in this case would constitute an impermissible prior restraint on speech is overbroad and unfounded. Poynter's motion must be denied.

**CONCLUSION**

Poynter's motion to dismiss is without merit. Therefore, Plaintiff respectfully requests that the Court denies Poynter's motion in its entirety.

Dated: February 5, 2021

Respectfully submitted,

ROBERT F. KENNEDY, JR.
Founder and Chairman, Children's Health Defense

MARY S. HOLLAND
General Counsel, Children's Health Defense

ROGER I. TEICH

Counsel for Plaintiff
Children's Health Defense