ROGER I. TEICH
California State Bar No. 147076
290 Nevada Street
San Francisco, CA 94110
Telephone: (415) 948-0045
E-Mail Address: rteich@juno.com

ROBERT F. KENNEDY, JR.
MARY HOLLAND
Children's Health Defense
1227 North Peachtree Parkway, Suite 202
Peachtree City, GA 30269
Telephone: (917) 743-3868
E-Mail Address: mary.holland@childrenshealthdefense.org

Attorneys for Plaintiff
CHILDREN'S HEALTH DEFENSE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CHILDREN'S HEALTH DEFENSE,<br><br>    Plaintiff,<br><br>    v.<br><br>FACEBOOK, INC., et al.,<br><br>    Defendants. | Case No. 3:20-cv-05787-SI<br><br>**ROGER TEICH REPLY DECLARATION IN SUPPORT OF MOTION TO SUPPLEMENT SECOND AMENDED COMPLAINT** |

I, Roger Teich, declare as follows:

1.  I am a member of the State Bar of California and the Bar of the United States District Court for the Northern District of California, and counsel for Plaintiff Children's Health Defense ("CHD") in this action. This declaration is made in support of CHD's Reply re: Motion to Supplement Second Amended Complaint. If called as a witness, I could and would testify competently to the facts herein, except as to those matters stated on information and belief.

2.  Attached hereto as Exhibit "1" are true and correct copies of Mr. Kennedy's written offer to have his matter heard by Facebook's Oversight Board which was made on February 24, 2021, but only responded to by Facebook on March 16, 2021.

3. On information and belief, Mr. Kennedy attempted to lodge his submission with the Oversight Board earlier today. It remains far from clear whether he will be notified of its receipt, much less whether or not, or when his matter may be heard there.

4. On information and belief based on discussion with Ms. Michelle Ford, the third-party user, and examination of the warning notice, Facebook itself did not identify to Ms. Ford, the particular CHD post or posts she had "liked" or shared that purportedly violated Facebook's terms. Since Facebook has retroactively removed multiple CHD posts, the information sufficient to identify the specific post or posts in question remains in Defendants' sole possession, custody, or control.

5. Attached hereto as Exhibit 2 are true and correct copies of my preservation letters to Facebook's counsel, dated September 23, 2020 and March 24, 2021; Facebook's counsel letter, dated December 4, 2020, and an excerpt of the parties' Rule 26(f) telephonic meet and confer, dated November 2, 2020. Facebook has not responded to my March 24, 2021 letter.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and that this declaration was executed in San Francisco, California, on March 29, 2021.

ROGER I. TEICH

Counsel for Plaintiff
Children's Health Defense

# EXHIBIT 1

## Roger I. Teich
Attorney at Law
290 Nevada Street
San Francisco, California 94110

Telephone: (415) 948-0045
Email: rteich@juno.com

February 24, 2021

**<u>BY EMAIL ONLY</u>**

Ms. Sonal N. Mehta
WilmerHale, LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306

      Re:    <u>CHD v. Facebook, et al.</u>, 3:20-cv-05787-SI
             RFK, Jr. and Facebook/Instagram

Dear Sonal,

I am writing with regard to Facebook's decision to take down Robert F. Kennedy, Jr.'s Instagram account earlier this month. It's challenging not to view this decision as an escalation of Facebook's conduct underlying our existing dispute. We were particularly dismayed by Facebook's gratuitous and inaccurate statement that Mr. Kennedy has "repeatedly shared debunked claims about the coronavirus or vaccines" and we ask that you retract that. We also note the spate of recent articles that makes more explicit than ever the role of Facebook as a government surrogate in the censorship of Mr. Kennedy. *See e.g.,* Jesse O'Neil, *White House working with social media giants to silence anti-vaxxers,* NEW YORK POST (Feb. 19, 2021), https://nypost.com/2021/02/19/white-house-working-with-social-media-to-silence-anti-vaxxers/; Nandita Bose, *Exclusive: White House working with Facebook and Twitter to tackle anti-vaxxers*, REUTERS (Feb. 20, 2021), https://www.reuters.com/article/health-coronavirus-white-house-exclusive-idINKBN2AK0HP; Glenn Greenwald, *Congress Escalates Pressure on Tech Giants to Censor More, Threatening the First Amendment.* SUBSTACK (Feb. 20, 2021) (https://greenwald.substack.com/p/congress-escalates-pressure-on-tech).

However, we understand that Facebook has recently implemented an internal appeals process. In an effort to reach a resolution of Mr. Kennedy's deplatforming from Instagram while avoiding escalation of this legal dispute, we believe it to be in the interests of all parties that Mr. Kennedy pursues Facebook's internal appeals process of his Instagram removal. Mr. Kennedy has attempted to commence that process. We would

**Exhibit 1**

Ms. Sonal N. Mehta
WilmerHale, LLP
February 24, 2020
Page 2 of 2

ask that you agree to a tolling agreement so that we may pursue this alternative to litigation without prejudice.

I also request your guidance and, if necessary, intervention, to assure that Mr. Kennedy has access to Facebook's internal appeal process. Presumably due to their novelty, the procedures for applying for an appeal to the Facebook Oversight Board are somewhat ambiguous. For example, Facebook's published procedures provide that the appeal's initial petition -- the "review request" -- should be filed on the Instagram account. However, because Instagram deactivated his account, Mr. Kennedy has no access to the function to submit that request. Mr. Kennedy has therefore tried to file his appeal using his Facebook account. However, Facebook has not given us the promised response to this review request. We cannot determine whether his request for review of that decision has been received. We request your help in confirming with your client that: (1) Mr. Kennedy's appeal is properly filed; and (2) that it will be heard.

We also are having trouble performing the data download of Mr. Kennedy's historic posts (including the flagged posts) in order to prepare Mr. Kennedy's appeal to the Oversight Board. The Facebook rules instruct that appellants have a right to a data download after deactivation, but Mr. Kennedy's download appears to be blocked.

Finally, we understand that Facebook has the capacity to refer particular cases to its Oversight Board on an automatic and expedited basis within 30-days. (Bylaws Art. 2, § 2.1.2.) We would ask you to urge your client that Mr. Kennedy's case warrants such expedited referral. His case is exceptional, and more than meets the criteria for selection set forth in the bylaws of the Oversight Board.

Because of tight deadlines set by Facebook's procedures, we would appreciate hearing from you within 48-hours. As to any and all of these matters, all rights are expressly reserved.

                                                Sincerely,

                                                Roger Teich

**Exhibit 1**

# WILMERHALE

March 16, 2021

**By E-mail**

Roger I. Teich, Esq.
290 Nevada Street
San Francisco, CA 94110
rteich@juno.com

**Sonal N. Mehta**

+1 650 600 5051 (t)
+1 650 858 6100 (f)
sonal.mehta@wilmerhale.com

Re:   *Children's Health Defense v. Facebook*, No. 3:20-cv-5787-SI (N.D. Cal.)

Dear Roger,

      I am writing in response to your February 24, 2021 letter concerning Facebook's decision to terminate Mr. Kennedy's Instagram account.

      At the outset, I note that your and Ms. Holland's repeated requests for information relating to Mr. Kennedy's Instagram account as somehow connected to the claims by CHD in this action are odds with your emphatic assertions on our March 15 teleconference that it is not CHD, but Mr. Kennedy, who intends to pursue action regarding his Instagram account. Are you representing Mr. Kennedy in his individual capacity as it relates to his Instagram account? Is Ms. Holland?  Given the nature of your requests, we would like to understand your role and who among you, if anyone, is representing Mr. Kennedy.  Subject to receiving that information, I provide preliminary responses to the questions you have raised.

      First, you asked us to help track down whether an appeal has been properly filed. We have not been able to determine the status of any appeal. Indeed, based on our investigation, our understanding is that Facebook is not given visibility into the status of user appeals to the Oversight Board (the "Oversight Board"). To the extent Mr. Kennedy believes he has submitted such an appeal, you may wish to follow-up with him directly on the status.

      Second, the Oversight Board is an independent body comprised of 40 members from around the world who review certain content-removal decisions and issue binding opinions on whether those decisions should be upheld or reversed.  The Oversight Board operates as a separate legal entity and is not administered by Facebook.  The Oversight Board accepts only a limited number of cases for review.  Facebook and Instagram account holders may appeal content-removal decisions to the Oversight Board within 15 days of the date that Facebook or Instagram issues its final content policy decision for a particular piece of content.  Additional information about the Oversight Board and instructions on how to submit a case for consideration may be found here: https://www.oversightboard.com/.

      With respect to your request that we urge Facebook to consider Mr. Kennedy's appeal on an expedited basis, that request is for the Oversight Board, not for Facebook.  *See* Oversight Board Charter, art. 3, § 7.2.  In any case, we note that we received your letter nearly two weeks

Wilmer Cutler Pickering Hale and Dorr LLP, 2600 El Camino Real, Suite 400, Palo Alto, CA 94306
Beijing    Berlin    Boston    Brussels    Denver    Frankfurt    London    Los Angeles    New York    Palo Alto    San Francisco    Washington

**Exhibit 1**

WILMERHALE

Roger I. Teich, Esq.
March 16, 2021
Page 2

after Mr. Kennedy's Instagram account was terminated.  In light of that delay, it is unclear how this issue constitutes the sort of urgent circumstances that your letter alludes to.

　　　　Third, we have consulted with Facebook with respect to your concern that Mr. Kennedy has had difficulty downloading the data associated with his Instagram account.  Facebook provides its users with tools to download their own posts, but those tools are not accessible if the user's account has been suspended.  Of course, Mr. Kennedy should have knowledge of his own posts.

　　　　Finally, as to your request for a tolling agreement, it is unclear what claims you believe may need to be tolled.  Indeed, although you have repeatedly stated that Mr. Kennedy is planning to file an original action, you have never articulated what Mr. Kennedy's claims are.  Without that information, we cannot evaluate whether any deadlines are approaching such that a tolling agreement may be necessary.

　　　　　　　　　　　　　　　　　　　Sincerely,

　　　　　　　　　　　　　　　　　　　Sonal N. Mehta

cc:　　Ari Holtzblatt

**Exhibit 1**

# EXHIBIT 2

## Roger I. Teich
Attorney at Law
290 Nevada Street
San Francisco, California 94110

Telephone: (415) 948-0045
Email: rteich@juno.com

September 23, 2020

**BY EMAIL ONLY**

Ms. Sonal N. Mehta
WilmerHale, LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306

      Re:      <u>CHD v. Facebook, et al.</u>, 3:20-cv-05787-SI
                Request for Meet and Confer

Dear Sonal,

I write to request a meet and confer within the next seven days to discuss two urgent matters in the above-entitled action.

1. <u>Updated § 3.2</u>

On August 17, 2020, Children's Health Defense ("CHD") filed this action against the Facebook, <u>et al.</u>, in the district court. On or about August 31, 2020, CHD received notice that Facebook intends to modify the parties' contractual terms of service §3.2, "effective October 1, 2020," to read: "We also can remove or restrict access to your content, services, or information if we determine that doing so is reasonably necessary to avoid or mitigate adverse legal or regulatory impacts to Facebook."

On September 9, 2020, I asked you to stipulate that Facebook will not seek to apply its purported amendment of §3.2 to CHD during the pendency of this litigation. I also expressed that CHD has concerns about Facebook's ESI retention protocols in this case for which the Local Rules contemplate a specific meet and confer. On September 14, 2020, your colleague Ari Holtzblatt responded that "[b]efore we schedule a call to discuss the update to Section 3.2 of Facebook's Terms of Service, it would help us if you could explain more specifically what about the update concerns you. In particular, could you explain why you believe CHD could run afoul of the new policy or why CHD otherwise fears that Facebook is likely to enforce this particular policy against CHD? "

**Exhibit 2**

Ms. Sonal N. Mehta
WilmerHale, LLP
September 23, 2020
Page 2 of 4

In its First Cause of Action, CHD alleges that Facebook, acting with significant encouragement from and in close consultation with governmental agencies and actors, denied CHD's First Amendment speech rights and Fifth Amendment property rights inter alia, by censoring, labeling, or blocking CHD content from users,. (Dkt. #1 at 67-73.) The Court is thus asked to adjudicate whether Facebook should be considered a "state actor" for purposes of the claim in light of its alleged joint action with the federal government. Within just two weeks of service of the lawsuit alleging this claim, Facebook recast §3.2 so that, as of October 1, 2020, it can remove or restrict access to content, services, or information "to avoid or mitigate adverse legal or regulatory impacts to Facebook." (Updated §3.2.)

We believe that any application of §3.2 to CHD during the pendency of this lawsuit will constitute unlawful retaliation for CHD's protected conduct in filing the action. Close proximity in time between a protected activity and an adverse action alone will establish a prima face case of retaliatory causation. Facebook's amendment of §3.2 so close on the heels of CHD's lawsuit will be viewed with great suspicion by the Court as evidence that Facebook is retaliating for filing the action.  Since Facebook has not removed CHD content under its current §3.2, we doubt that Facebook could rebut the inference that it would have done so on October 1 or thereafter in the absence of CHD's protected activity in filing the lawsuit. Absent a stipulation which removes this issue from doubt, CHD can show a sufficient chilling effect from the bare terms of amended §3.2 to warrant emergency relief.  Hopefully, resort to court will not be necessary.

    2. ESI-Retention Protocols

As you know, the Court expects cooperation on issues relating to the preservation, collection, search, review, and production of ESI. The Court emphasizes the particular importance of cooperative exchanges of information at the earliest possible stage of discovery, including (but not exclusively) during the parties' Fed. R. Civ. P. 26(f) conference. Moreover, parties are not required to use preservation letters to notify an opposing party of their preservation obligation. See Northern District ESI Guideline 1.02, 2.01(c); Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) (litigants are under a duty to preserve "what [they know], or should know, is relevant to the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request.").

**Exhibit 2**

Ms. Sonal N. Mehta
WilmerHale, LLP
September 23, 2020
Page 2 of 4

We maintain that Facebook's preservation obligation requires that it interdict and suspend any document destruction programs, such as ongoing erasures of e-mails, voicemails, and other electronically-recorded material, and specifically preserve:

(1) All design documents for all systems related to "misinformation," censorship, and boosting/reduction of traffic, including boosting sources deemed "authoritative";

(2) All related internal employee communications;

(3) All related internal tracking systems;

(4) All records for deployment of those designs;

(5) All web traffic measurements for CHD, CDC, and WHO;

(6) All internal employee communications regarding "misinformation" strategies, including communications with third-parties, external providers, and/or government/public health officials;

(7) All Chan-Zuckerberg Initiative and/or CZ-Biohub internal documents concerning vaccine strategy and revenue projections, and partnerships;

(8) All internal documents regarding 5G development and revenue projections;

(9) All internal weblog dialogue discussion groups concerning "misinformation," "vaccines," and "5G";

(10) All internal documents concerning GlaxoSmithKline ("GSK"), Sanofi S.A. ("Sanofi"), Pfizer, and Merck & Co. ("Merck"), pharmaceutical company partnerships, strategic initiatives, and revenue projections; and

(11) All source code for the relevant systems described above.

While not exhaustive, this list is intended to inform you of the types of documents that are potentially relevant to the litigation, and should be preserved.

**Exhibit 2**

Ms. Sonal N. Mehta
WilmerHale, LLP
September 23, 2020
Page 4 of 4

However, given the opaqueness of Facebook's policy statements, we cannot tell whether any of this or other material evidence in Facebook's possession will automatically be destroyed or become inaccessible if Facebook implements its amended §3.2 to CHD on or after October 1, 2020, or otherwise. This situation urgently needs to be addressed.

Assuming we can reach an agreement that obviates the potential for emergency relief referenced above, and concomitant expedited discovery and trial dates, we are willing to continue the case management conference and discovery until your motion to dismiss is resolved, provided also that we reach an agreement on ESI-retention protocols for the information referenced above which clearly bears on CHD's claims for relief.

Please let me know your availability to meet and confer by telephone by close of business next Wednesday, September 30, 2020. I look forward to speaking with you then.

                                                Sincerely,

                                                Roger Teich

**Exhibit 2**

1  for Poynter.
2        We haven't made a determination that there's
3  discoverable materials that would -- we would not
4  produce under the proportionality factors.
5        MR. TEICH:  One other question for Molly, I
6  guess, on this one, although maybe it is more
7  appropriate -- no, I think it is under this one.
8  Employee -- Facebook communications regarding
9  misinformation strategies, or I hope that's
10 understandable, what that misinformation strategy
11 relates to in the context of the lawsuit, but
12 communications with third parties, external
13 providers, government, public health officials.
14 This is the one where I may have jumped the gun and
15 been unduly concerned, but this category of
16 communications, employee communications, internal
17 and external, might not be preserved under a narrow
18 reading of information relating to the CHD page.  So
19 I was wondering if you could speak to that one.
20       MS. JENNINGS:  Yes, of course.
21       And so that -- on that category, that type
22 of stuff is encompassed in the litigation hold that
23 we sent out to our custodian.  So everyone knows,
24 like the folks who received the litigation hold, all
25 know that they should not be deleting materials

**Exhibit 2**

1  related to those topics, and the automatic
2  destruction of any e-mails or internal chats has
3  been stopped for those holds as well.
4          MR. TEICH:  And is that also encompassed
5  like in decks or materials that Facebook has
6  prepared either for internal or external use?
7          MS. JENNINGS:  So for the folks who received
8  the litigation hold have been instructed that they
9  are not to delete anything from any system related
10 to this information.  And so that includes both like
11 their e-mail and their tasks, but then also their
12 information that may be then saved on various files
13 through the file storage places that Facebook uses.
14 That includes things like One Drive, Google Drive,
15 and other file storage solutions.
16         MR. TEICH:  Great.
17         Anything else anyone else wants to carry out
18 or ask of anyone else around this category?
19         Okay.  Then I will move on to the next
20 category, which is whether or not to continue any
21 interdiction of any document destruction program,
22 such as ongoing erasures of e-mail, voicemail, and
23 other electronically recorded material.
24         Mary, do you want to speak to that one or
25 CHD --

**Exhibit 2**

# WILMERHALE

December 4, 2020

**Sonal N. Mehta**

+1 650 600 5051 (t)
+1 650 858 6100 (f)
sonal.mehta@wilmerhale.com

**By E-mail**

Roger I. Teich, Esq.
290 Nevada Street
San Francisco, CA  94110
rteich@juno.com

Re:   *Children's Health Defense v. Facebook*, No. 3:20-cv-5787-SI (N.D. Cal.)

Roger,

     I am writing in response to your November 18, 2020 email and to follow up on our October 30 and November 3, 2020 meet-and-confer telephone calls concerning Facebook's and Mark Zuckerberg's efforts to preserve information that may be relevant to Children's Health Defense's ("CHD") claims in the above-captioned action.

     At the outset, I want to be clear that my clients are taking the actions described below in the interest of avoiding burdening the Court at this early phase of the case, particularly in light of Judge Illston's expressed preference that the parties cooperate with each other to resolve disputes rather than seeking judicial intervention. *See* ECF No. 48 at 2. By preserving the information described below, neither Facebook nor Mr. Zuckerberg concedes that they are obligated under the Federal Rules of Civil Procedure or the Local Rules for the Northern District of California to preserve this information. Nor do my clients concede that such information is relevant to CHD's claims, that its production is proportionate to the needs of the case, or otherwise within the proper scope of discovery in this matter under Federal Rule of Civil Procedure 26. Furthermore, both Facebook and Mark Zuckerberg reserve all rights to object to any future preservation or production requests by CHD on any applicable ground.

     During our meet-and-confer calls, you asked us to confirm that Facebook is preserving information concerning advertising purchases by pharmaceutical companies and communications with pharmaceutical companies concerning vaccine hesitancy. The core relationship managers for the four companies you identified (Merck, Pfizer, Sanofi, and GlaxoSmithKline) are all on Facebook's litigation hold. Facebook is also taking reasonable steps to preserve available data concerning vaccine-related ads placed in the U.S. market by those companies.

     You also asked during our meet-and-confers that Facebook confirm that it was preserving documents relating to internal efforts to test the effectiveness of various efforts to address posts identified as containing vaccine misinformation.  These materials are within the categories of information covered by Facebook's litigation hold, which has been sent to appropriate individuals.

**Exhibit 2**

**WilmerHale**

Roger I. Teich
December 4, 2020
Page 2

Turning to your November 18 email, you asked for confirmation that Facebook was preserving web traffic information and analytics concerning CHD's Page. Facebook is taking reasonable efforts to preserve available information concerning traffic to CHD's Page and click-throughs to the CDC's website and to the various explainer articles drafted by Facebook's third-party fact-checkers.

Your November 18 email also inquired about the status of preservation efforts at Chan-Zuckerberg Institute ("CZI") and Chan-Zuckerberg Biohub ("CZB"). In light of our discussions, we are sending a letter on behalf of Mr. Zuckerberg to both entities, requesting that they take reasonable steps to preserve information in their possession, dated January 1, 2017 to the present, related to (1) any internal development of vaccines, (2) any partnerships with or funding provided to third parties for purposes of development of vaccines, (3) any internal research into, or funding provided to third parties for the purpose of researching, vaccine hesitancy. As with the other information provided in this letter, the fact that we are sending such a letter should not be interpreted as a concession that these materials are relevant to or discoverable in this action. It remains Mr. Zuckerberg's position that he does not have sufficient control over these non-party entities for their materials to fall within the scope of his own discovery obligations, and that the activities of CZI and CZB are irrelevant to CHD's claims for relief in this case. We do not represent either CZI or CZB.

I hope this letter resolves any remaining concerns you have about the scope of Facebook's and Mr. Zuckerberg's preservation efforts.

Sincerely,

Sonal N. Mehta

cc: Ari Holtzblatt
    Molly Jennings

**Exhibit 2**

## Roger I. Teich
Attorney at Law
290 Nevada Street
San Francisco, California 94110

Telephone: (415) 948-0045
Email: rteich@juno.com

March 24, 2021

**BY EMAIL ONLY**

Ms. Sonal N. Mehta
WilmerHale, LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306

    Re:    <u>CHD v. Facebook, et al.</u>, 3:20-cv-05787-SI
             Meet and Confer Request re: Defendants' Preservation Agreement

Dear Sonal,

I write in response to your March 15, 2021 email concerning the scope of Defendant Facebook, Inc.'s and Mark Zuckerberg's ongoing duty to preserve all evidence in their possession, custody, or control concerning the facts and circumstances referred to in Plaintiff Children's Health Defense's ("CHD") Motion to File Supplement to Second Amended Complaint ("SAC") (Dkt. #76).

In answer to your query on Exhibit 6 (the third-party "unfollow CHD" warning label and icon), we set forth here our understanding of the context of that evidence and your clients' attendant preservation obligations. First, Facebook did not identify for the third-party user the particular CHD post or posts she had "liked" that purportedly violated its terms. Since Facebook has retroactively removed multiple CHD posts, the information sufficient to identify the specific post or posts in question remains in Defendants' sole possession, custody, or control, which have the obligation to preserve that information. This includes, but is not limited to, data linking particular CHD posts with control mechanisms that blacklist and warn third-party users who "like" or share such posts.

More broadly, CHD contends that Exhibit 6 is just the tip of the iceberg measured against the full extent to which Defendants have disseminated and are disseminating "unfollow CHD" warning labels and icons to third-party Facebook users on CHD's page and elsewhere.

**Exhibit 2**

Ms. Sonal N. Mehta
WilmerHale, LLP
March 24, 2021
Page 2 of 3

Indeed, this appears to be just the latest that we know about in a series of escalating Facebook attacks for which CHD seeks monetary and injunctive relief in its SAC. Thus, in answer to your request that we identify what information should be preserved, we refer you to our earlier itemization and Defendants' earlier agreements. *See e.g.,* my September 23, 2020 letter and your December 4, 2020 response. Additionally, regarding Defendants' underlying conduct of which the Exhibit 6 warning label is but one instance, Defendants must preserve all information and documents within the following categories:

1. Facebook's algorithms for identifying third-party users for any warning notifications, including all past iterations of such algorithms and warning labels that were used.

2. The corpus of data used to generate such algorithms and to measure their effectiveness.

3. All discussions, paper or electronic artifacts (*i.e.*, "change-sets"), and design documents related to Facebook's development of such algorithms.

4. All communications with government actors or outside private entities, including but not limited to public health officials, on the development of such algorithms, or related "misinformation" strategies, and development of infrastructure used to deal with purported "misinformation."

5. All source code used to generate such algorithms.

6. All statistical analyses, experiments, and any A/B testing concerning or used to validate such algorithms.

7. All third party user traffic reductions that were collected to validate or demonstrate that "vaccine misinformation" had been reduced.

8. All internal employee communications on Facebook's efforts to explain "vaccine misinformation" measures.

**Exhibit 2**

Ms. Sonal N. Mehta
WilmerHale, LLP
March 24, 2021
Page 3 of 3

We request that you confirm in writing your clients' agreement to preserve the information set forth in categories 1– 8 above.

Alternatively, this letter serves as a meet and confer request pursuant to Civil L.R. 37-1(a). Let us know your availability to meet and confer this week such that we can have any substantive discussion within the next seven days, or by Wednesday, March 31, 2021.

Sincerely,

Roger Teich

**Exhibit 2**