# EXHIBIT A

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MARSHALL DANIELS,<br><br>Plaintiff,<br><br>v.<br><br>ALPHABET INC., et al.,<br><br>Defendants. | Case No. 20-cv-04687-VKD<br><br>**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND**<br><br>Re: Dkt. No. 18 |

In this action against defendants Alphabet, Inc. ("Alphabet"), Google LLC ("Google"), YouTube, LLC ("YouTube"), and Does 1 through 10, plaintiff Marshall Daniels asserts the following claims: (1) violation of Mr. Daniels's First Amendment rights under 42 U.S.C. § 1983; (2) breach of the implied covenant of good faith and fair dealing; (3) conversion; (4) unjust enrichment; (5) breach of contract; (6) money had and received; (7) unfair competition under California Business and Professions Code §§ 17200, et seq.; (8) fraud in the inducement; and (9) wire fraud. Dkt. No. 1. Mr. Daniels asserts his First Amendment claim against all defendants and asserts the remaining claims against only YouTube and the Doe defendants. This Court has federal question jurisdiction over Mr. Daniels's § 1983 claim and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a). Dkt. No. 1 ¶ 36. The Court also has jurisdiction over this diversity action under 28 U.S.C. § 1332.[1]

Defendants move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and based on the immunity provided by Section 230 of the

---

[1] Although Mr. Daniels does not plead a specific amount in controversy, defendants agree that the amount in controversy exceeds $75,000. Dkt. No. 28 at 3:8-15.

Communications Decency Act ("CDA"), 47 U.S.C. § 230(c) and defendants' own First Amendment rights. Dkt. No. 18. The Court heard oral argument on defendants' motion on October 6, 2020.[2] Dkt. No. 24. Having considered the parties' briefs and the arguments made at the hearing, the Court grants defendants' motion to dismiss with leave to amend only as to Mr. Daniels's breach of contract claim.

## I.   BACKGROUND[3]

### A.   The Parties

Defendant Alphabet is a Delaware corporation with its principal place of business in Mountain View, California, and the parent of company of defendants YouTube and Google. Dkt. No. 1 ¶ 41. Defendant YouTube is a Delaware limited liability company with principal places of business in Mountain View and San Mateo, California. *Id.* ¶ 43. YouTube is an online video hosting platform. *See id.* ¶¶ 6, 8. Defendant Google is a Delaware corporation with a principal place of business in Mountain View, California. *Id.* ¶ 42. Among other things, Google provides support for and offers advertising and monetization services to YouTube users. *See id.* ¶¶ 9-10, 13, 30.

Mr. Daniels describes himself as a "teacher, scholar, musician, fighter, and father." *Id.* ¶ 5. He resides in New York. *Id.* ¶ 40. Under the name "Young Pharaoh," he has uploaded videos and live commentary concerning "social, political and educational" issues to YouTube since July 2015. *Id.* ¶¶ 5, 6.

### B.   YouTube's Service

Use of YouTube's service requires agreement to YouTube's Terms of Service.[4] *See id.*

---

[2] Mr. Daniels, Alphabet, Google, and YouTube have appeared and consented to magistrate judge jurisdiction. Dkt. Nos. 16, 17. However, none of the Doe defendants has been identified, and none has appeared or consented to magistrate judge jurisdiction.

[3] Unless otherwise noted, the following factual allegations are taken from the complaint and from documents that are incorporated by reference in the complaint.

[4] The complaint refers to the Terms of Service then in effect and the incorporated Community Guidelines and Policy, Safety, and Copyright Policies, and these documents serve as the basis for Mr. Daniels's claims. Dkt. No. 1 ¶ 85 ("A valid contract, to wit, YouTube's Terms of Service for content creators, exists between the parties . . . ."); Dkt. No. 1 ¶ 9 (describing the reason for

United States District Court
Northern District of California

¶¶ 85, 39, 54; *see also* Dkt. No. 18-2 at 2 ("Please read this Agreement carefully and make sure you understand it.  If you do not understand the Agreement, or do not accept any part of it, then you may not use the Service.").  The Terms of Service in operation at the time the complaint was filed state that "YouTube is under no obligation to host or serve Content," and that "[u]sing the Service does not give you ownership of or rights to any aspect of the Service . . . ."  Dkt. No. 18-2 at 3.  The Terms of Service further state with respect to removal of content:

> If we reasonably believe that any Content is in breach of this Agreement or may cause harm to YouTube, our users, or third parties, we may remove or take down that Content in our discretion. We will notify you with the reason for our action unless we reasonably believe that to do so: (a) would breach the law or the direction of a legal enforcement authority or would otherwise risk legal liability for YouTube or our Affiliates; (b) would compromise an investigation or the integrity or operation of the Service; or (c) would cause harm to any user, other third party, YouTube or our Affiliates.

*Id.* at 4.

The Terms of Service incorporate the YouTube Community Guidelines; YouTube's Policy, Safety, and Copyright Policies; and, where applicable, the Advertising on YouTube Policies.  *Id.* at 2.  The Terms of Service also include YouTube's COVID-19 Medical Misinformation Policy, which states:

> YouTube doesn't allow content that spreads medical misinformation that contradicts the World Health Organization (WHO) or local health authorities' medical information about COVID-19.  This is limited to content that contradicts WHO or local health authorities' guidance on:
> - Treatment
> - Prevention
> - Diagnostic
> - Transmission

Dkt. No. 18-8 at 1.

### C.    Mr. Daniels's Videos

On April 21, 2020, Mr. Daniels live-streamed a video entitled, "Fauci Silenced Dr. Judy

---

removing Mr. Daniels's video as violating the Community Guidelines); *see also* Dkt. No. 18-2. The Court may properly consider these documents even though they are not attached to the complaint.  *Khoja v. Orexigen Therapeutics*, 889 F.3d 988, 998 (9th Cir. 2018); *see also Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).

United States District Court
Northern District of California

Mikovits from Warning the American Public" ("the Fauci video"). Dkt. No. 1 ¶ 9. At some point, Mr. Daniels discovered from one of his subscribers that Google and YouTube removed the video. *Id.* Mr. Daniels says he learned that Google and YouTube removed the Fauci video for violating the YouTube Community Guidelines. He then contacted Google Support to appeal the removal decision, but "no information was provided about *what* in the video purportedly violated" the Community Guidelines. *Id.* (emphasis original). Mr. Daniels alleges that a Google Support representative whom he reached via YouTube's "chat" feature agreed to "'look into this so I can share more' and promptly terminated the 'chat' session after Mr. Daniels indicated that he felt his channel was being targeted and that there was nothing wrong with the video." *Id.* Mr. Daniels does not indicate whether he received further information from YouTube. Regardless, he uploaded the Fauci video again, and it was deleted again on the ground that "This video has been removed for violating YouTube's Community Guidelines." *Id.*

On May 28, 2020, Mr. Daniels live-streamed a video entitled, "George Floyd, Riots & Anonymous Exposed as Deep State Psyop for NOW" ("the George Floyd video"). *Id.* ¶ 10. Mr. Daniels says that in the George Floyd video he shared his belief that "the protests are the result of an operation to cause civil unrest, unleash chaos, and turn the public against the President." *Id.* He "urged African-Americans to stop contributing to social discord." *Id.* He also "criticized the mayor of Minneapolis, the police, and George Floyd, as well as questioning the motives of the Antifa movement." *Id.* After three days, YouTube removed the video for violating its policy on harassment and bullying. *Id.*; *see also* Dkt. No. 18, Exs. 3 and 4 (Community Guidelines and harassment and cyberbullying policies). Mr. Daniels says he has appealed YouTube's decision to remove the George Floyd video, but he does not describe the outcome of this appeal. Dkt. No. 1 ¶ 10.

Mr. Daniels says that YouTube has "shadowbanned" him and refuses to permit advertising on his videos or channels, even though he is a YouTube Partner entitled to be paid based on watch time and growth in the number of subscribers to his channel. *Id.* ¶ 11. He also says that YouTube has retained money that his fans and followers have donated to him through Google's SuperChat function. According to Mr. Daniels, Google represents to its users that "SuperChat and Super

4

Stickers are ways to monetize your channel through the YouTube Partner Program.  These features let your viewers purchase chat messages that standout and sometimes pin them to the top of a chat feed."  *Id.* ¶ 13.  The SuperChat and Super Stickers functions can only be used with videos that comply with YouTube's Community Guidelines.  *Id.*  Mr. Daniels maintains that Google and YouTube refuse to identify the policy or guideline they believe his videos violate.  *Id.*

**D.**     **Statements from Members of Congress**

Mr. Daniels alleges that Congressional representatives coerced defendants into taking action to remove content from the YouTube platform that resulted in YouTube's removal of his videos from the YouTube service.  The complaint cites a letter dated February 14, 2019 from Representative Adam Schiff on official letterhead ("the 2019 Schiff letter") to Google CEO Sundar Pichai in which Rep. Schiff states: "I am writing out of my concern that YouTube is surfacing and recommending messages that discourage parents from vaccinating their children, a direct threat to public health, and reversing progress made in tackling vaccine-preventable diseases. . . . There is strong evidence to suggest that at least part of the source of this [anti-vaccination] trend is the degree to which medically inaccurate information about vaccines surface[s] on the websites where many Americans get their information, among them YouTube and Google search."  *Id.* ¶ 20, Ex. A at 1.  In the letter, Rep. Schiff asks Google to provide additional information on its plans to provide medically accurate information on vaccinations to its users, and he approves of YouTube's announcement that it would no longer recommend videos that violate its Community Guidelines, including conspiracy theories or medically inaccurate videos.  *Id.*, Ex. A at 2.  Rep. Schiff also "encourage[s] further action to be taken related to vaccine misinformation."  *Id.*

Mr. Daniels says that on July 16, 2019, a Google representative testified before the Senate Judiciary Committee that Google had begun "targeting" anti-vaccination speech.  *Id.* ¶ 20.

The complaint also cites an April 29, 2020 letter from Rep. Schiff to Google executives on official letterhead ("the 2020 Schiff letter") in which Rep. Schiff commends Google for the steps it had already taken "to highlight information from official health sources and to remove or limit content that promotes harmful medical misinformation" related to the COVID-19 pandemic.  *Id.*

5

¶ 21, Ex. B at 1.  In the letter, Rep. Schiff states: "YouTube's commitment to remove videos with information that is medically unsubstantiated or contradicts World Health Organization (WHO) recommendations is an important action to protect the health and safety of billions of users."  *Id.*  Rep. Schiff urges Google to adopt a practice of showing messages to users who have engaged with harmful coronavirus-related misinformation that has been removed from the YouTube platform and connect them with resources from the WHO.  *Id.*

Rep. Schiff posted the 2020 Schiff letter on his official Twitter account.  *Id.* ¶ 21.  His tweet was retweeted by YouTube CEO Susan Wojcicki, who stated: "Thanks for reaching out. @YouTube, we're working every day to protect people from misinformation and help them find authoritative information.  We appreciate your partnership and will continue to consult with Members of Congress as we address the evolving issues around #COVID19."  *Id.* ¶¶ 21, 26, Ex. C.  Mr. Daniels alleges that Ms. Wojcicki appeared on CNN and stated that YouTube would "raise authoritative information" and identify, remove, and delete videos that were "medically unsubstantiated" or in conflict with the WHO.  *Id.* ¶ 21.

The complaint also cites statements from the Speaker of the House of Representatives, Nancy Pelosi.  Mr. Daniels says that during an interview (the date of which is unknown), Speaker Pelosi described immunity under Section 230 of the CDA as "a gift" that "could be removed."  *Id.* ¶ 23.  On June 16, 2020, Speaker Pelosi participated in an event hosted by the Georgetown University Institute on Data Democracy and Politics titled, "Forum on COVID-19 Social Media Disinformation."  *Id.* ¶ 24.  Mr. Daniels says that event participants included government officials and representatives from various social media platforms.  *Id.*  At the event, Speaker Pelosi stated,

> The American people, including social media platform employees, are demanding an end to the exploitation of the public's health, financial security, and lives.  Congress, employees, advertisers, and the public must work as one to shine a bright light on the division and the disinformation proliferating online. And together, we must send a message to social media executives. You will be held accountable for your misconduct.

*Id.*

Mr. Daniels alleges that these communications and statements from Rep. Schiff and Speaker Pelosi show that these members of Congress coerced and encouraged defendants to

engage in "reverse censorship," or the drowning out of disfavored content through the creation and dissemination of favored content—i.e., content from the WHO. *Id.* ¶¶ 25, 27. He notes that both Rep. Schiff and Speaker Pelosi represent California congressional districts, and that Ms. Wojcicki and Mr. Pichai regularly contribute to the Google LLC NetPac political action committee, which has donated to Rep. Schiff's and Speaker Pelosi's election campaigns. *Id.* ¶¶ 25-27. Mr. Daniels claims that the removal of the Fauci and George Floyd videos was done "at the behest of members of Congress." *Id.* ¶¶ 28-30.

## II.     LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The Court is not required to "'assume the truth of legal conclusions merely because they are cast in the form of factual allegations.'" *Prager Univ. v. Google LLC* ("*Prager I*"), No. 17-CV-06064-LHK, 2018 WL 1471939, at *3 (N.D. Cal. Mar. 26, 2018) (quoting *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam)). Nor does the Court accept allegations that contradict documents attached to the complaint or incorporated by reference, *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014), or that rest on "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

A court generally may not consider any material beyond the pleadings when ruling on a

Rule 12(b)(6) motion. Documents appended to the complaint, incorporated by reference in the complaint, or which properly are the subject of judicial notice may be considered along with the complaint when deciding a Rule 12(b)(6) motion. *Khoja v. Orexigen Therapeutics*, 889 F.3d 988, 998 (9th Cir. 2018); *see also Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).

## III. DISCUSSION

Mr. Daniels voluntarily dismisses his eighth and ninth claims for fraud in the inducement and wire fraud. Dkt. No. 19 at 18–19; *see also* Dkt. No. 28 at 29:9-13, 30:7-12. Defendants move to dismiss all remaining claims under Rule 12(b)(6) and based on the immunity provided by Section 230 of the CDA, as well as based on the exercise of their own First Amendment rights. Dkt. Nos. 18, 21. The Court first addresses Mr. Daniels's claims under Rule 12(b)(6), and then addresses defendants' argument that Section 230 of the CDA bars Mr. Daniels's claims. For the reasons explained below, the Court does not reach defendants' First Amendment defense.

### A. Claim 1: First Amendment Violation

Mr. Daniels asserts a violation of his First Amendment rights under 42 U.S.C. § 1983. Dkt. No. 20 ¶¶ 283-303. To state a claim under § 1983, Mr. Daniels must plead facts showing that a person acting under color of state law proximately caused a violation of his constitutional or other federal rights. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Defendants argue that Mr. Daniels's § 1983 claim necessarily fails because the complaint does not allege state action. Dkt. No. 18 at 7–11; Dkt. No. 21 at 2–6.

As an initial matter, defendants contend that Mr. Daniels cannot state a § 1983 claim because § 1983 applies only to action taken under color of *state* law—not *federal* law. Dkt. No. 18 at 11 n.7. Defendants are correct. A plaintiff asserting a claim for a federal violation of constitutional rights must seek relief under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *See Kali v. Bowen*, 854 F.2d 329, 331 (9th Cir. 1988) (noting that "[f]ederal officials who violate federal rights protected by § 1983 generally do not act under 'color of state law'") (internal quotation marks and citation omitted); *Lewis v. Google LLC*, 461 F. Supp. 3d 938, 955 (N.D. Cal. May 20, 2020) ("[E]ven if Plaintiff's allegations were

United States District Court
Northern District of California

sufficient to hold [Defendants] liable for conduct by the federal and by foreign governments, such allegations do not allege conduct under color of *state* law.") (emphasis original). Mr. Daniels does not plead a *Bivens* claim here. Moreover, the Ninth Circuit has recently observed that "[t]he Supreme Court has never explicitly recognized a *Bivens* remedy for a First Amendment claim." *Vega v. United States*, 881 F.3d 1146, 1153 (9th Cir. 2018).

Even if Mr. Daniels had pled a *Bivens* claim, and even if a *Bivens* remedy existed for a First Amendment violation, Mr. Daniels does not plausibly allege action by the federal government that deprived him of his First Amendment rights. While Mr. Daniels does not dispute that defendants are private entities, he argues that defendants should be considered "state actors" in view of the allegedly coercive statements of Rep. Schiff and Speaker Pelosi. *See* Dkt. No. 1 ¶¶ 20-30, 48, 56-57; Dkt. No. 19 at 4–7 (applying legal standards concerning private parties). Mr. Daniels correctly observes that, in some circumstances, a private entity may be considered a state actor for constitutional purposes. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) ("The Supreme Court has articulated four tests for determining whether a private party's actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test.") (internal citation omitted, alteration adopted). He relies on two theories of state action: the joint action test and the governmental nexus test. Dkt. No. 19 at 4–7. As explained below, Mr. Daniels does not allege cognizable government action under either test.

### 1. Joint action

Private entities may be considered government actors if they are "willful participant[s] in joint action with the state or its agents." *George v. Pac.-CSC Work Furlough*, 91 F.3d 1227, 1231 (9th Cir. 1996). "[J]oint action exists when the state has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity." *Tsao*, 698 F.3d at 1140 (internal quotation marks omitted). Joint action requires "a substantial degree of cooperative action." *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989).

Mr. Daniels does not plead any such willful participation by defendants jointly with the

9

federal government or with any individual member of Congress, nor does he plead any interdependence between defendants and the federal government or a substantial degree of cooperative action between them. The publicly expressed views of individual members of Congress—regardless of how influential—do not constitute "action" on the part of the federal government. Likewise, Google LLC NetPac's alleged donations to Speaker Pelosi's and Rep. Schiff's political campaigns do not suggest that the federal government "exercis[es] control over" over defendants' conduct. Mr. Daniels cites no authority for his contrary view, and at least one district court case, *Abu-Jamal v. Nat'l. Public Radio*, No. CIV. A. 96–0594, 1997 WL 527349 (D.D.C. Aug. 21, 1997), *aff'd* 159 F.3d 635 (D.C. Cir. 1998), specifically rejects the thesis that the official acts of elected representatives constitute "state action," much less joint action with a private entity.

In *Abu-Jamal*, the plaintiff, who was then serving a sentence for the murder of a police officer, contracted with National Public Radio ("NPR") to create and record commentaries for broadcast by NPR. 1997 WL 527349 at *1. Shortly before the debut of his first broadcast, individual members of Congress (including Senator Robert Dole) and other federal and state officials contacted NPR to demand that NPR not broadcast plaintiff's commentaries, and NPR capitulated, cancelling the broadcasts. *Id.* at *1–2. Plaintiff sued NPR for breach of contract and for violation of his First Amendment rights, arguing that the cancellation was the improper result of pressure from Sen. Dole. *Id.* at *2. The district court found that plaintiff's allegations did not meet the joint action, nexus, or government compulsion tests. *Id.* at *5–6. In particular, the district court held that Congressmembers' and other government officials' public denunciations of NPR's decision to broadcast plaintiff's commentaries and efforts to persuade NPR to cancel the broadcasts did not constitute government compulsion because none of those individuals possessed any legal control over NPR's actions, even though NPR received federal funding. *Id.* at *6. Here, Mr. Daniels cannot plausibly allege that Speaker Pelosi and Rep. Schiff have legal control over defendants' actions, or that either of them ever contacted defendants about Mr. Daniels's Fauci or George Floyd videos.

Mr. Daniels also relies on *Heineke v. Santa Clara University*, 965 F.3d 1009 (9th Cir.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   2020), in arguing that the presumption that private conduct does not constitute state action may be

2   overcome in limited circumstances where the state has exercised coercive power or provided

3   significant encouragement. This argument is less about "joint action" than government

4   "compulsion"—a theory on which Mr. Daniels does not rely. In *Heineke*, the Ninth Circuit held

5   that a private university's receipt of federal funds and compliance with generally applicable laws

6   were insufficient to convert private conduct into state action, even if the private actor's conduct

7   subjected it to penalties like loss of funding. *Id.* at 1012 n.2, 1013–14. Similarly, Mr. Daniels

8   does not plead any facts that support his argument that the federal government "coerced" or

9   "significantly encouraged" defendants to remove his specific Fauci and George Floyd videos from

10  YouTube's platform. His speculative assertions about the possibility defendants will be

11  subpoenaed to testify before Congress or exposed to some other peril if they ignore letters from

12  Congressional representatives do not support a theory of government action. Notably, like the

13  unsuccessful plaintiff in *Heineke*, Mr. Daniels does not allege that the federal government directed

14  a particular result with respect to his Fauci and George Floyd videos. *Id.* at 1014; *accord Blum v.*

15  *Yaretsky*, 457 U.S. 991, 1010 (1982) (no state action where government regulations did "not

16  dictate the decision to discharge or transfer in a particular case").

17       To the extent Mr. Daniels argues that Congressional representatives may exert pressure on

18  an industry without passing a law that may then be deemed government action, none of the cases

19  he cites supports such a theory. Dkt. No. 19 at 6. *Trump v. Mazars USA, LLP* concerned the

20  House of Representatives' (as a body, not individual representatives) issuance of subpoenas for the

21  President's financial information. 140 S. Ct. 2019, 2026 (2020). In *Eastland v. U.S. Servicemen's*

22  *Fund*, the Supreme Court held that a subpoena to a bank for records was a valid use of

23  Congressional powers and that the Senators and others involved were immune from suit under the

24  Speech or Debate Clause of the Constitution. 421 U.S. 491, 492–93, 501 (1975). *United States v.*

25  *Biaggi* affirmed the bribery conviction of a Congressman who used his congressional stationery to

26  urge federal and city officials to take particular acts in favor of a party who paid for his vacation.

27  853 F.2d 89, 98 (1988). *Biaggi* holds only that the defendant's use of congressional stationery

28  was an "official act" within the meaning of the federal bribery statute, 18 U.S.C. § 201—not that

11

1    use of congressional stationery is government action within the meaning of 42 U.S.C. § 1983 or

2    *Bivens*. *Id.* at 97–98. None of these cases holds that a Congressional representative's statements

3    constitute state action under § 1983.

4         Mr. Daniels does not plead any facts that satisfy the joint action test for government action.

5                    **2.      Governmental nexus**

6         "[T]he nexus test asks whether 'there is a such a close nexus between the State and the

7    challenged action that the seemingly private behavior may be fairly treated as that of the State

8    itself.'" *Kirtley v. Rainey*, 326 F.3d 1088, 1094–95 (9th Cir. 2003) (quoting *Brentwood Academy*

9    *v. Tenn. Secondary School Athletic Ass'n*, 531 U.S. 288, 295(2001)). Under the governmental

10   nexus approach, the Court must consider whether the complaint sufficiently demonstrates "close

11   state involvement" in the removal of Mr. Daniels's videos. *George*, 91 F.3d at 1231.

12        Mr. Daniels cannot succeed under a nexus theory. He does not plead any facts suggesting

13   that Speaker Pelosi or Rep. Schiff were personally involved in or directed the removal of Mr.

14   Daniels's videos. He alleges only that they wanted certain kinds of videos removed and that his

15   videos fell within that category. These allegations are not plausible.[5] But even if they were, such

16   allegations do not reflect the kind of government involvement in the conduct of private entities

17   like defendants that is sufficient to support a nexus theory of government action. *See, e.g.*, *Lugar*

18   *v. Edmondson Oil Co., Inc.*, 457 U.S. 922 (1982) (private defendants who "invoke[ed] the aid of

19   state officials to take advantage of state-created attachment procedures" were liable as state

20   actors); *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742 (9th Cir. 2020) (private nonprofit

21   hospital was a state actor where hospital and doctors petitioned state court to commit plaintiff

22   involuntarily to hospital custody, hospital leased its facility from the state and operated on the

23   same campus alongside clearly marked state hospital); *Freedom Watch, Inc. v. Google, Inc.*, 368

24   F. Supp. 3d 30, 40 (D.D.C. 2019) (dismissing complaint for failure to allege nexus between

25

26   _____
     [5] The statements to which Mr. Daniels refers concerning COVID-19 misinformation post-date the
27   removal of his Fauci video, further undercutting his theory of any government involvement in the
     decision to remove the video. *Compare* Dkt. No. 1 ¶ 9 (alleging removal of the Fauci video on or
28   around April 21, 2020) *with* Dkt. No. 1 ¶¶ 21, 24 (discussing 2020 Schiff letter dated April 29,
     2020 and Speaker Pelosi's June 16, 2020 remarks).

*United States District Court*
*Northern District of California*

1    Google, Facebook, Twitter, and Apple's acts and functions traditionally reserved exclusively to

2    the state), *aff'd*, 816 F. App'x 497 (D.C. Cir. 2020).

3        Accordingly, Mr. Daniels cannot state a claim for violation of his First Amendment rights.

4      **B.**      **Contract Claims**

5          **1.**      **Claim 5: Breach of contract**

6        To state a claim for breach of contract under California law, a plaintiff must plead (1) the

7    existence of a contract with the defendant, (2) plaintiff's performance or excuse for

8    nonperformance, (3) defendant's breach, and (4) resulting damages to plaintiff. *Oasis W. Realty,*

9    *LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). Mr. Daniels contends that YouTube's Terms of

10    Services and the Community Guidelines incorporated therein comprise the contract at issue. *See*

11    Dkt. No. 1 ¶ 85.

12        As a threshold matter, Mr. Daniels suggests that YouTube's Terms of Service are

13    ambiguous because YouTube regularly updates its Terms of Service and it is unclear which

14    version was operative at the relevant times. Dkt. No. 19 at 11–12. This assertion lacks support.

15    The complaint states that the Fauci and George Floyd videos were removed in April and May

16    2020. Dkt. No. 1 ¶¶ 9-10. The parties agree that the Terms of Service in operation at that time—

17    and at the time of the filing of the complaint—are the Terms of Service dated December 10, 2019.

18    Dkt. No. 18-2; *see also* Dkt. No. 28 at 26:10-19.

19        Mr. Daniels says that defendants breached the Terms of Service and incorporated

20    Community Guidelines in four ways: (1) failing to inform Mr. Daniels when one of his videos was

21    flagged or removed; (2) failing to provide an appeals process; (3) not permitting Mr. Daniels to

22    post his videos, unless they violated the Community Guidelines; and (4) not paying Mr. Daniels

23    based on views and donations. Dkt. No. 1 ¶ 85. Defendants argue that the Terms of Service do

24    not impose the obligations that Mr. Daniels alleges as the bases for his breach of contract claim.

25    Dkt. No. 18 at 12–14.

26        With respect to defendants' alleged failure to inform Mr. Daniels when one of his videos

27    is flagged or removed, the Terms of Service state: "We will notify you with the reason for

28    [removal of content] unless we reasonably believe that to do so: (a) would breach the law or the

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1    direction of a legal enforcement authority or would otherwise risk legal liability for YouTube or

2    our Affiliates; (b) would compromise an investigation or the integrity or operation of the Service;

3    or (c) would cause harm to any user, other third party, YouTube or our Affiliates." Dkt. No. 18-2

4    at 4. This statement is not an unqualified promise to notify Mr. Daniels when one of his videos is

5    flagged or removed. Rather, YouTube expressly reserves the option to not provide notification of

6    the reason for removal of a video based on its reasonable belief that certain circumstances apply.

7    Mr. Daniels does not plead any facts suggesting that defendants were required to notify him of the

8    specific reasons for the removal of his content or that YouTube's alleged failure to provide such

9    advance notification was inconsistent with the highly discretionary policy described in the Terms

10   of Service quoted above. Moreover, Mr. Daniels acknowledges that YouTube did notify him that

11   his videos did not comply with its Community Guidelines and its harassment and cyberbullying

12   policies.

13          With respect to defendants' alleged failure to provide an appeals process, the Terms of

14   Service state: "You can learn more about reporting and enforcement, including how to appeal on

15   the Troubleshooting page of our Help Center" and includes a link to directions on how to appeal a

16   removal decision. *Id.* at 1, 4. This statement does not guarantee an appeals process in any

17   particular form. Even if it did, Mr. Daniels acknowledges that he engaged in an appeals process

18   for both the Fauci and George Floyd videos, even if those appeals did not resolve to his

19   satisfaction. Dkt. No. 1 ¶¶ 9-10. Notably, the Terms of Service state that "[u]sing the Service

20   does not give you . . . rights to any aspect of the Service"—including, presumably, an appeals

21   process that conforms to Mr. Daniels's preferences. *Id.* at 3.

22          With respect to defendants' alleged failure to permit Mr. Daniels to post his videos, the

23   Terms of Service state that "YouTube is under no obligation to host or serve Content." Dkt. No.

24   18-2 at 3. Additionally, the Terms of Service state that YouTube may remove content in

25   circumstances outside of a violation of the Community Guidelines. *Id.* at 4 ("If we reasonably

26   believe that any Content is in breach of this Agreement or may cause harm to YouTube, our users,

27   or third parties, we may remove or take down that Content in our discretion."). The express terms

28   of the alleged contract contradict Mr. Daniels's claim that the Terms of Service permit YouTube

to remove content only in the event that content violates the Community Guidelines.  Because "defendants were given the right to do what they did by the express provisions of the contract there can be no breach."  *Mishiyev v. Alphabet, Inc.*, 444 F. Supp. 3d 1154, 1159 (N.D. Cal. 2020) (quoting *Carma Dev. (Cal.) Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374 (1992)) (internal quotation marks omitted).

Finally, with respect defendants' alleged failure to pay Mr. Daniels based on SuperChat views and donations, the Terms of Service do not address any kind of arrangement to pay users based on views and donations.  *See* Dkt. No. 18-2.  Mr. Daniels does not dispute that the Terms of Service are silent on monetization, including SuperChat views and donations.  *See* Dkt. No. 19 at 11.  The complaint suggests that a different contract may govern monetization of YouTube accounts: the YouTube Partner Program.  *See* Dkt. No. 1 ¶ 13; Dkt. No. 28 at 22:18-21 (plaintiff's counsel describing breach of contract of "the terms of service that arise out of the YouTube Partner Program where YouTube has promised, and they use words in their terms of service that say 'shall pay'"); Dkt. No. 28 at 34:20-23 ("[O]n the alleged withholding of revenue and monetization, there is nothing in the Terms of Service that governs monetization.  Monetization is governed by a separate agreement, the YouTube Partner Program Terms.").  However, Mr. Daniels has not pled a breach of contract claim based on the YouTube Partner Program agreement, although he may be able to do so if given leave to amend.  *See infra* Section III.G.

Accordingly, the Court finds that Mr. Daniels has not stated a claim for breach of contract.

### 2.      Claim 2: Breach of implied covenant

Every contract imposes on each party a duty of good faith and fair dealing in performance and enforcement of the contract.  *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.,* 222 Cal. App. 3d 1371, 1393 (1990).  The implied covenant "imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose."  *Id.* (internal quotations omitted).  "A breach of the implied covenant of good faith and fair dealing involves something beyond the breach of the contractual duty itself."  *Id.* at 1394 (internal quotations omitted).  "[A]llegations which assert such a claim must show that the conduct of the defendant, whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or

United States District Court
Northern District of California

refusal to discharge contractual responsibilities . . . which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." *Id.* at 1395. While a plaintiff may bring claims for both breach of contract and breach of the implied covenant, when both claims rely on the same alleged acts and seek the same relief, the Court may disregard the breach of the implied covenant claim as superfluous. *Landucci v. State Farm Ins. Co.*, 65 F. Supp. 3d 694, 716 (N.D. Cal. 2014) (citing *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 327 (2007)).

Here, Mr. Daniels alleges that defendants "unfairly interfered with Plaintiff's right to receive the benefits of the contract by, inter alia, taking down Plaintiff's videos, demonetizing Plaintiff's YouTube channel, and keeping donations sent by Plaintiff's YouTube fans to him through the platform for itself." Dkt. No. 1 ¶ 68. These acts are the same acts that Mr. Daniels says are the basis for his breach of contract claim. *Id.* ¶ 85 (alleging breach of contract based on YouTube's failure to inform Mr. Daniels when one of his videos was flagged or removed, failure to provide an appeals process, not allowing Mr. Daniels to post his videos unless they violated the Community Guidelines, and not paying Mr. Daniels based on views and donations). Both claims seek the same relief. *Compare id.* ¶¶ 69-70 (seeking compensatory damages and costs of suit) *with id.* ¶¶ 89-91 (seeking compensatory damages, specific performance, costs of suit, and attorneys' fees). Accordingly, the Court dismisses Mr. Daniels's breach of implied covenant claim because it is based on precisely the same allegations as his purported breach of contract claim. *Landucci*, 65 F. Supp. 3d at 716.

### C.     Quasi-Contract Claims

Mr. Daniels's quasi-contract claims for conversion, unjust enrichment, and money had and received appear to be based on YouTube's alleged retention of donations that Mr. Daniels says should have gone to him. *See* Dkt. No. 1 ¶¶ 13, 73, 81, 93. Mr. Daniels does not state a claim for any of these quasi-contract claims.

#### 1.     Claim 3: Conversion

"Under California law, '[t]he elements of a conversion claim are (1) the plaintiff's ownership or right to possession of the property at the time of the conversion; (2) the defendant's

United States District Court
Northern District of California

conversion by a wrongful act or disposition of property rights; and (3) damages.'" *Mission Produce, Inc. v. Organic All., Inc.*, No. 15-CV-01951-LHK, 2016 WL 1161988, at *8 (N.D. Cal. Mar. 24, 2016) (quoting *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 601 (9th Cir. 2010)). However, the California Supreme Court has stated:

> [T]he simple failure to pay money owed does not constitute conversion. Were it otherwise, the tort of conversion would swallow the significant category of contract claims that are based on the failure satisfy mere contractual rights of payment. Contractual provisions may, of course, determine whether the plaintiff has a possessory right to certain funds in the defendant's hands. But to put the matter simply, a plaintiff has no claim for conversion merely because the defendant has a bank account and owes the plaintiff money.

*Voris v. Lampert*, 7 Cal. 5th 1141, 1151–52 (2019). "[A] mere contractual right of payment, without more, does not entitle the obligee to the immediate possession necessary to establish a cause of action for the tort of conversion." *In re Bailey*, 197 F.3d 997, 1000 (9th Cir. 1999). Here, Mr. Daniels has alleged that "his subscribers have donated monies earmarked for him, but YouTube has retained those monies despite its *contractual agreement* that it would share them with Mr. Daniels." Dkt. No. 1 ¶ 13 (emphasis added). Because Mr. Daniels has alleged nothing more than a failure to pay him what he is owed under the parties' agreement—whether that be the Terms of Service, the YouTube Partner Program, or another agreement—he has not stated a claim for conversion. Accordingly, the Court dismisses Mr. Daniels's conversion claim because it is based on the same allegations as his purported breach of contract claim.

### 2. Claim 4: Unjust enrichment

To state a claim for unjust enrichment under California law, a plaintiff must allege the receipt of a benefit and the unjust retention of the benefit at the expense of another. *Lopez v. Bank of Am., N.A.*, --- F. Supp. 3d ---, 2020 WL 7136254, at *9 (N.D. Cal. 2020) (internal quotation marks and citation omitted). "Courts have repeatedly held that a plaintiff may not plead the existence of an enforceable contract and simultaneously maintain a quasi-contract claim unless the plaintiff also pleads facts suggesting that the contract may be unenforceable or invalid." *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 133 (N.D. Cal. 2020) (listing cases) (internal quotation marks omitted). Here, Mr. Daniels's unjust enrichment claim is based on precisely the same allegations

United States District Court
Northern District of California

as his purported breach of contract claim, and he does not contend that the alleged contract is unenforceable or invalid. Accordingly, the Court dismisses the unjust enrichment claim. *Id.* at 134.

### 3. Claim 6: Money had and received

"A cause of action for money had and received is stated if it is alleged that the defendant is indebted to the plaintiff in a certain sum for money had and received by the defendant for the use of the plaintiff." *Avidor v. Sutter's Place, Inc.*, 212 Cal. App. 4th 1439, 1454 (2013). "It may be brought wherever one person has received money which belongs to another, and which in equity and good conscience, or in other words, in justice and right, should be returned." *Mains v. City Title Ins. Co.*, 34 Cal. 2d 580, 586 (1949) (citations omitted). However, like a claim for unjust enrichment, a plaintiff cannot maintain a quasi-contract claim for money had and received where he also alleges a valid and enforceable contract. *Saroya v. Univ. of the Pac.*, --- F. Supp.3d ---, 2020 WL 7013598, at *7 (N.D. Cal. 2020). Again, Mr. Daniels's claim for money had and received is based on the same allegations as his purported breach of contract claim, and he does not contend that the alleged contract is unenforceable or invalid. Accordingly, the Court dismisses this claim. *Id.*

### D. Claim 7: Unfair Competition

California Business and Professions Code § 17200 prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Mr. Daniels alleges that YouTube engaged in an unlawful business act or practice by holding itself out "as a platform where content creators could exhibit their work in exchange for a share of any profits" but "[i]n reality, Defendant removed a portion of Plaintiff's content and refused to pay Plaintiff for the monies he had already earned." Dkt. No. 1 ¶ 97. He also alleges "fraudulent business acts or practices" of "depriv[ing] Plaintiff of money due to him from his fans and followers' donations." *Id.* ¶ 98. Because Mr. Daniels consents to dismissing his fraud-related claims and disavows his unfair competition claim to the extent it is based on fraudulent acts or practices (Dkt. No. 19 at 18–19 and n.12; Dkt. No. 28 at 29:9-13, 30:7-12), the Court considers only the unfair competition claim under the "unlawful" prong of the statute as pled in the

1    complaint.[6]

2           The "unlawful" prong of California's unfair competition statute "borrows violations of

3    other laws and treats them as unlawful practices that the unfair competition law makes

4    independently actionable." *Creative Mobile Techs., LLC v. Flywheel Software, Inc.*, No. 16-cv-

5    02560-SI, 2016 WL 5815311, at *4 (N.D. Cal. Oct. 5, 2016) (internal quotations omitted).  Thus,

6    where a plaintiff "has not pled sufficient facts to survive a motion to dismiss with respect to its

7    [underlying claim], it has not pled sufficient facts to meet the unlawful prong of its [unfair

8    competition claim]." *Id.* at *5.

9           Because Mr. Daniels states no other claim for relief in his complaint, he also fails to state a

10   claim of unlawful business act or practice under section 17200.

11          **E.      CDA Section 230 immunity**

12          Defendants argue that, in any event, Section 230 of the CDA immunizes any claim for

13   liability based on their removal of or restriction of access to Mr. Daniels's videos.  Dkt. No. 18 at

14   20–22.  Section 230 "immunizes providers of interactive computer services against liability arising

15   from content created by third parties." *Fair Hous. Council of San Fernando Valley v.*

16   *Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc).  Immunity under Section

17   230 "protect[s] websites not merely from ultimate liability, but [also] from having to fight costly

18   and protracted legal battles." *Id.* at 1175.  "When a plaintiff cannot allege enough facts to

19   overcome Section 230 immunity, a plaintiff's claims should be dismissed." *Dyroff v. Ultimate*

20   *Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019); *see also Kimzey v. Yelp! Inc.*, 836 F.3d

21   1263, 1265–66 (9th Cir. 2016) (affirming dismissal of claims barred by Section 230).

22          Section 230 expressly pre-empts state law causes of action in the event of an inconsistency

23   between such actions and Section 230.  47 U.S.C. § 230(e)(3); *Fed. Agency of News LLC v.*

24   *Facebook, Inc*, 432 F. Supp. 3d 1107, 1116 (N.D. Cal. 2020) ("Section 230 immunity extends to

United States District Court
Northern District of California

---

[6] In his opposition brief, Mr. Daniels argues that his unfair competition claim "will necessarily rise or fall with Daniels'[s] claims that Defendants violated his First Amendment rights, making their conduct *unlawful*, and that Defendants unlawfully appropriated Daniels'[s] earmarked donations, making their conduct an *unfair* business practice."  Dkt. No. 19 at 18 (emphases original). However, the complaint pleads neither of those things.  The Court will not consider claims or theories that are not included in the complaint.

1   causes of action under both state and federal law."). Defendants contend that Section 230(c)(1)

2   and (c)(2) protects them from liability with respect to all of Mr. Daniels's claims "based on

3   YouTube's decision to remove, demonetize, or restrict access to his videos." Dkt. No. 18 at 20–

4   22. Mr. Daniels does not address immunity under Section 230(c)(1), but he argues that Section

5   230(c)(2) immunity does not apply here. Dkt. No. 19 at 19–23. The Court considers immunity

6   under each subsection.

### 1.   Section 230(c)(1)

8       Subsection (c)(1) of the CDA protects a defendant from liability where (1) the defendant is

9   a provider or user of an interactive computer service, (2) the claim is based on information

10  provided by another information content provider, and (3) the claim treats the defendant as a

11  publisher or speaker. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009). "[C]ourts

12  have treated § 230(c) immunity as quite robust, adopting a relatively expansive definition of

13  'interactive computer service' and a relatively restrictive definition of 'information content

14  provider.'" *Carafano v. Metrosplash*, 339 F.3d 1119, 1123 (9th Cir. 2003); *Jane Doe No. 1 v.*

15  *Backpage.com, LLC*, 817 F.3d 12, 18 (1st Cir. 2016) ("There has been near-universal agreement

16  that section 230 should not be construed grudgingly.").

17      The parties do not dispute that YouTube is a provider of an interactive computer service or

18  that the information at issue is provided by another information content provider, i.e., Mr. Daniels.

19  Dkt. No. 18 at 20–21; *see* Dkt. No. 19 at 19–23. Defendants assert that YouTube's removal of

20  Mr. Daniels's videos constitutes traditional publishing and editorial activity. Dkt. No. 18 at 20–

21  22; *see also Roommates.com*, 521 F.3d at 1170–71 ("[A]ny activity that can be boiled down to

22  deciding whether to exclude material that third parties seek to post online is perforce immune

23  under section 230."). The Court agrees with defendants. With one exception, the Court concludes

24  that Section 230(c)(1) immunity bars all of his other claims that are premised on YouTube's

25  removal of or restriction of access to Mr. Daniels's videos from its platform.

26      At the hearing, defendants acknowledged that Section 230(c)(1) immunity would not apply

27  to a properly pled breach of contract claim. Dkt. No. 28 at 3:23–5:8; *see Barnes*, 570 F.3d at 1107

28  (Section 230(c)(1) immunity does not apply to claim for breach of contract based on promissory

1    estoppel).  For this reason, to the extent Mr. Daniels may be able to state a claim for breach of

2    contract regarding the alleged withholding of donations owed to him, *see infra* Section III.G, the

3    Court is not prepared to concluded at this junction that defendants would be immunity from

4    liability for such a claim under Section 230(c)(1).

5                    **2.       Section 230(c)(2)(A)**

6            Subsection (c)(2) immunizes interactive computer providers from actions voluntarily taken

7    to block objectionable content:

8                    No provider or user of an interactive computer service shall be held
                     liable on account
9                    of —
                     (A) any action voluntarily taken in good faith to restrict access to or
10                   availability of material that the provider or user considers to be
                     obscene, lewd, lascivious, filthy, excessively violent, harassing, or
11                   otherwise objectionable, whether or not such material is
                     constitutionally protected;
12                   or
                     (B) any action taken to enable or make available to information
13                   content providers or others the technical means to restrict access to
                     material described in paragraph [A].
14

15   28 U.S.C. § 230(c)(2).  Defendants contend that Section 230(c)(2)(A) immunity applies here.  Dkt.

16   No. 18 at 21–22; Dkt. No. 21 at 13–15.  Mr. Daniels disagrees, arguing that YouTube's actions

17   were not taken in good faith to restrict content that was objectionable.  Dkt. No. 19 at 19–23.

18           Mr. Daniels acknowledges that defendants removed the Fauci video because that video

19   purportedly violates YouTube's Community Guidelines and removed the George Floyd video that

20   video purportedly violates YouTube's policy on harassment and bullying.  He even concedes that

21   the George Floyd video contained language that could be considered offensive.  Dkt. No. 1 ¶¶ 9,

22   10, n.3.  The complaint contains no plausible factual allegations suggesting that YouTube did not

23   consider the content of the Fauci and George Floyd videos objectionable and/or contrary to its

24   stated policies and guidelines, or that it removed, restricted access to, or demonetized the videos in

25   bad faith.  Mr. Daniels relies solely on conclusory assertions that YouTube acted in bad faith and

26   that its conduct does not qualify for protection under Section 230(c)(2)(A).

27           Mr. Daniels's allegations distinguish his complaint from the cases on which he principally

28   relies.  For example, in *Enigma Software Group USA, LLC v. Malwarebytes, Inc.*, the Ninth

United States District Court
Northern District of California

21

United States District Court
Northern District of California

1    Circuit held that Section 230(c)(2)(A) immunity does not apply to blocking or filtering a direct

2    competitor's software program for anticompetitive reasons. 946 F.3d 1040, 1049–52 (9th Cir.

3    2019). Mr. Daniels does not allege that he is in direct competition with defendants, or that

4    defendants' removal of his videos stemmed from an anticompetitive animus. Similarly, in *Song fi

5    Inc. v. Google, Inc.*, a court in this district declined to find immunity applied based on allegations

6    that YouTube removed a video not because its *content* was objectionable, but because YouTube

7    believed the plaintiff had artificially inflated the video's *view counts*. 108 F. Supp. 3d 876, 883,

8    884 n.3 (N.D. Cal. 2015). Mr. Daniels does not allege that YouTube removed or restricted access

9    to his videos for a reason unrelated to their content.

10        Accordingly, except to the extent Mr. Daniels may be able to state a claim for breach of

11   contract regarding YouTube's failure to pay him based on SuperChat views and donations, *see

12   infra* Section III.G, the Court concludes that Section 230(c)(2)(A) immunity applies to all of his

13   state law claims.

14        **F.    YouTube's First Amendment rights**

15        Defendants argue that requiring YouTube to host Mr. Daniels's videos as online publisher

16   would violate YouTube's own First Amendment Rights. Dkt. No. 18 at 22–23. Because the

17   Court dismisses all claims at this time for the many reasons described above, it does not reach the

18   issue of YouTube's First Amendment rights.

19        **G.    Leave to Amend**

20        While leave to amend generally is granted liberally, the Court has discretion to dismiss a

21   claim without leave to amend if amendment would be futile. *Manzarek v. St. Paul Fire & Marine

22   Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008); *Rivera v. BAC Home Loans Servicing, L.P.*, 756 F.

23   Supp. 2d 1193, 1197 (N.D. Cal. 2010) (citing *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996)).

24   Because the Court finds that amendment would be futile as to Mr. Daniels's claim for violation of

25   the First Amendment, whether brought under § 1983 or *Bivens*, that claim is dismissed with

26   prejudice. For the reasons stated above, the Court also concludes that amendment would be futile

27   as to Mr. Daniels's claims for breach of the implied covenant of good faith and fair dealing,

28   conversion, unjust enrichment, money had and received, and unfair competition. However, the

Court cannot say that amendment would be futile as to Mr. Daniels's breach of contract claim. Specifically, the record suggests that Mr. Daniels may be able to state a breach of contract claim based on obligations defendants owe to him for SuperChat views and donations under the YouTube Partner Program terms.

Accordingly, the Court grants Mr. Daniels leave to amend only his breach of contract claim.

## IV. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss. Mr. Daniels may file an amended complaint by **April 14, 2021**.

**IT IS SO ORDERED.**

Dated: March 31, 2021

VIRGINIA K. DEMARCHI
United States Magistrate Judge