Pages 1 - 84

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SUSAN ILLSTON, JUDGE

| | | |
|---|---|---|
| CHILDREN'S HEALTH DEFENSE, a Georgia nonprofit organization, | ) ) ) | |
| Plaintiff, | ) ) | |
| VS. | ) ) | **No. C 20-5787 SI** |
| FACEBOOK, INC., a Delaware corporation; MARK ZUCKERBERG, a California resident; SCIENCE FEEDBACK, a French corporation; THE POYNTER INSTITUTE FOR MEDIA STUDIES, INC., a Florida corporation; and DOES 1-20, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | San Francisco, California Wednesday, May 5, 2021 |

**TRANSCRIPT OF PROCEEDINGS VIA ZOOM WEBINAR**

**APPEARANCES:** (via Zoom Webinar)

For Plaintiff:
>            **ROGER I. TEICH, ESQ.**
>            290 Nevada Street
>            San Francisco, California 94110
>
>            **JED RUBENFELD, ESQ.**
>            1031 Forest Road
>            New Haven, Connecticut 06515

(Appearances continued on next page)

Reported By:   Katherine Powell Sullivan, CSR #5812, CRR, RMR
               Official Reporter - U.S. District Court

**APPEARANCES:** (via Zoom Webinar; continued)

For Defendants Facebook, Inc. and Mark Zuckerberg:
                    WILMER CUTLER PICKERING
                     HALE AND DORR LLP
                    2600 El Camino Real, Suite 400
                    Palo Alto, California 94306
            BY:  **SONAL N. MEHTA, ESQ.**


                    WILMER CUTLER PICKERING
                     HALE AND DORR LLP
                    1875 Pennsylvania Ave, NW
                    Washington, District of Columbia 20006
            BY:  **ARI HOLTZBLATT, ESQ.**

For Defendant The Poynter Institute for Media Studies, Inc.:
                    THOMAS & LOCICERO PL
                    601 South Boulevard
                    Tampa, Florida 33606
            BY:  **CAROL JEAN LOCICERO, ESQ.**
                 **MARK R. CARAMANICA, ESQ.**

| | |
|---|---|
| 1 | **Wednesday - May 5, 2021**                    **10:32 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---000--- |
| 4 | **THE CLERK:**  Court is now in session.  The Honorable |
| 5 | Susan Illston presiding. |
| 6 | Now calling case number 20-CV-5787, Children's Health |
| 7 | Defense versus Facebook, Incorporated. |
| 8 | Counsel, please state your appearances for the record, |
| 9 | starting with plaintiff. |
| 10 | **MR. TEICH:**  Roger Teich for plaintiff. |
| 11 | **THE COURT:**  Good morning. |
| 12 | **MR. RUBENFELD:**  And Jed Rubenfeld also for plaintiff. |
| 13 | Good morning, Your Honor. |
| 14 | **THE COURT:**  Say your name one more time, please. |
| 15 | **MR. RUBENFELD:**  It's Jed Rubenfeld. |
| 16 | **THE COURT:**  Rubenfeld.  Thank you.  Good morning. |
| 17 | **MR. RUBENFELD:**  Good morning. |
| 18 | **MS. MEHTA:**  Good morning, Your Honor.  Sonal Mehta for |
| 19 | defendants Facebook and Mr. Zuckerberg.  With me is my partner |
| 20 | Ari Holtzblatt.  And we have Ian Chen, in-house counsel at |
| 21 | Facebook, also listening on the public line. |
| 22 | **THE COURT:**  Good morning. |
| 23 | **MS. LOCICERO:**  Good morning, Your Honor.  My name is |
| 24 | Carol LoCicero, with Thomas and LoCicero, representing |
| 25 | defendant Poynter Institute for Media Studies, Inc.  And my |

1  partner Mark Caramanica is also on.

2        **THE COURT:**  Good morning.

3        Well, welcome to you all.  We have on today defendants' --

4  each defendant has moved to dismiss the Second Amended

5  Complaint filed by the plaintiffs.  There are three causes of

6  action in the complaint: the *Bivens* claim; the Lanham Act

7  claim; and the civil RICO claim.

8        Have you spoken with each other about how you'd like to

9  divvy up your time?  We have two hours total.  You have two

10  hours, an hour each.  So what's your plan?

11        **MS. MEHTA:**  Good morning, Your Honor.

12        **THE COURT:**  Or is there a plan?

13        **MR. TEICH:**  The plan, I think, is to receive a plan

14  from you.  But in the absence --

15        **THE COURT:**  Okay.  In the absence of anything from you

16  folks, I will tell you there are three claims.  It seems to me

17  it would make sense to argue the first claim back and forth and

18  then the second claim back and forth, and the third claim back

19  and forth.

20        I leave it up to you how to allocate your time on those

21  three claims.  I just know that we have two hours; we've got to

22  get done.  So I would suggest that we do it in that way.

23        Does that make sense?

24        **MR. TEICH:**  Yes, Your Honor.  This is Roger Teich for

25  plaintiff.  How and in what sequence would you like to hear

1     argument on the Rule 15(d) motion to supplement?

2              **THE COURT:**  We can do that at the end.  I don't know

3     if we'll need argument, but it seems to me that it blends in

4     actually a lot -- the issue is going to be futility, I think,

5     of the amendment, and that goes probably as much to the causes

6     of action as anything else --

7              **MR. TEICH:**  Sure.

8              **THE COURT:**  -- so I'm not concerned about that.

9              **MR. TEICH:**  Okay.

10             **THE COURT:**  Okay.  So it's defendants' motions.

11             **MS. MEHTA:**  Yes, Your Honor.  Thank you.

12        I'll start by addressing the motion on behalf of

13    defendants Facebook and Mr. Zuckerberg, and then the counsel

14    for Poynter may have some additional comments on the issues

15    that are specific to Poynter.

16        And as Your Honor just suggested, we'd like to start with

17    the *Bivens* claim, which is Count One; and then I'll pass it to

18    my colleague, Mr. Holtzblatt, who can address Counts Two and

19    Three after we ping-pong back and forth.

20             **THE COURT:**  That's fine.  Just remember that your

21    side, which includes both defendants; can talk for an hour,

22    their side can talk for an hour.  So keep track of that.

23             **MS. MEHTA:**  Understood, Your Honor.  And I think we

24    can be very efficient with your time here, Your Honor.

25        I want to start first by focusing in on the task at hand.

1    I think a lot of the briefing and a lot of the pleadings

2    attempt to raise issues that are really collateral to the

3    issues that are before the Court.

4        We're not here today to talk about extremely highly

5    politicized and controversial issues around vaccine science or

6    around misinformation generally.  I want to focus the Court's

7    attention and take our time today talking about the specific

8    allegations in the complaint and whether they have been

9    adequately pled.

10       With the -- with respect to the *Bivens* claim, there are

11   multiple independent reasons why the *Bivens* claim should be

12   rejected and should be rejected with prejudice based on the

13   pleading, which we now have, you know, at least three

14   pleadings, and, with the supplement, four attempts to plead a

15   *Bivens* claim.  And there are multiple threshold defects with

16   the *Bivens* claim that should independently support dismissal

17   with prejudice of the *Bivens* claim.

18       The first defect is that Facebook, as an entity, cannot be

19   liable under *Bivens* because it is not an individual federal

20   actor.  And we would cite Your Honor to the *Correctional*

21   *Services versus Malesko* case from the Supreme Court on that in

22   2001.

23       That case foreclosed inferring constitutional tort

24   liability against a private entity, and it explained that the

25   basis for *Bivens* liability is trying to correct the behavior of

1 an individual federal officer.

2    **THE COURT:**  Why don't we jump ahead.  I agree with you

3 on that.  So you don't need to argue that further.

4    **MS. MEHTA:**  Okay.

5    **THE COURT:**  What about Mr. Zuckerberg though?

6    **MS. MEHTA:**  And then with respect to Mr. Zuckerberg,

7 Mr. Zuckerberg has, at best, been alleged to be the CEO of the

8 company who sets policy for the company.

9    There is no allegation that is plausible on the Second

10 Amended Complaint that Mr. Zuckerberg was personally involved

11 in or directed the actual challenged acts here which are the

12 acts relating to CHD's post.

13    There is no allegation nor could there be any plausible

14 allegation that Mr. Zuckerberg was involved in labeling posts,

15 taking down posts, anything relating to CHD's post, which is

16 the challenged conduct at issue here.

17    So even if we were to read their allegations and take them

18 as true for purposes of this motion, which we have to, even

19 though we don't agree with them, what they've argued, at best,

20 is that, as the CEO, he's a hands-on CEO that is involved in

21 setting policy for the company.  That is not sufficient to

22 create liability for him as an individual.

23    And this is independent of all the other problems with the

24 *Bivens* theory, but just right out of the gate Mr. Zuckerberg

25 hasn't been challenged as an individual for actually taking any

1    of the challenged acts.  And that precludes *Bivens* liability

2    for him as an individual, independent of all the other problems

3    with the *Bivens* theory.

4        Unless Your Honor has any questions on that, I want to go

5    to point two, which is, second point, independent of that,

6    there's also a fundamental problem with the *Bivens* theory,

7    which is the attempt to create private liability under the

8    First Amendment.

9        I would point Your Honor to Judge DeMarchi's case --

10   opinion in the *Daniels* case, which we submitted as supplemental

11   authority, because Judge DeMarchi was addressing incredibly

12   similar allegations, allegations relating to the same set of

13   letters from Representative Adam Schiff to the CEOs of the

14   technology companies relating to these vaccine misinformation

15   questions.

16       And in that case she noted that it's far from clear that

17   under the Ninth Circuit precedent there can be any kind of

18   First Amendment liability for a private actor at all.  And she

19   cited the *Vega* case for that.

20       But even apart from that, the second defect with the

21   theory is that this would expand -- CHD's allegations here as

22   to Mr. Zuckerberg or as to Facebook would fundamentally expand

23   *Bivens* liability into a new context because this would hold a

24   private actor liable for alleged First Amendment violations.

25   And that is precisely what the Supreme Court and the Ninth

1  Circuit have both repeatedly cautioned is disfavored and has to

2  be undertaken with great care and only under very narrow

3  circumstances that don't resemble the claims here.

4          **THE COURT:**  Well, they have a Fifth Amendment claim.

5          **MS. MEHTA:**  Yes, Your Honor.  But even with respect to

6  the Fifth Amendment claim, that goes to the third defect,

7  actually, in their *Bivens* theory, which I'm happy to address

8  now --

9          **THE COURT:**  Oh, okay.  All right.

10          **MS. MEHTA:**  -- which is the lack of state action.

11  Right --

12          **THE COURT:**  As long as you're coming -- as long as

13  you're coming to it, fine.

14          **MS. MEHTA:**  I absolutely am, and it's a perfect time

15  to get to it.

16      So the third problem -- all of these are independent

17  problems with the theory.  The third problem with the theory is

18  that there is no viable claim of state action in this

19  particular case.  And there's multiple reasons for that, and

20  I'll quickly go through each of them.

21      The first is, if we look at the allegation, they don't

22  state any plausible inference of state action with respect to

23  the challenged conduct.  So if you look at all of the facts

24  that they've pled -- the Schiff letters, the Representative

25  Schiff letters, the alleged partnership or information between

1   the CDC and Facebook -- none of that is actually specifically

2   tied to the actual challenged conduct here.  And that, itself,

3   precludes any finding of state action independently.

4        That alone would be dispositive of the state action

5   question.  There's just nothing here that actually connects any

6   of the facts that they've pled to the actual CHD posts that

7   were labeled and that are challenged at issue here.

8        That's the first point -- or the first sub point, I should

9   say.

10        Then there's a second sub point, which is, if we look at

11   their actual legal theory as the state action, there's a bunch

12   of different flaws with that legal theory as a state action.

13        They cite to three different theories for how there could

14   be state action in this case.  The first is joint action.

15        On joint action, again, I would point Your Honor to Judge

16   DeMarchi's opinion in *Daniels*, where she addresses this point

17   and makes clear precisely why the kinds of allegations we're

18   talking about are insufficient.

19        There's just no plausible allegation that a letter from

20   Representative Schiff or some sort of alleged partnership with

21   the CDC would give rise to a joint action theory.

22        And she was addressing the same letters from

23   Representative Schiff in *Daniels* and addressed them and said

24   that's not sufficient to create joint action.  And, of course,

25   even if it were, they don't relate to the alleged -- the

1    challenged activity.

2        There's nothing in those letters, there's nothing in any

3    of the allegations that connects any of the supposed joint

4    actions to the actual challenged activity.  And under the

5    *Gorenc* case, which we cite -- G-O-R-E-N-C -- which we cite in

6    our briefing, that alone is insufficient because in order to

7    have state action there has to be joint participation in the

8    challenged activity.

9        The second reason, independently, that the state action

10   theory doesn't work or the joint -- the joint action theory

11   doesn't work is, even if we were to look at the points that are

12   in the supplement -- and this goes to the futility of the

13   supplement, even if you were to look at the points in the

14   supplement, none of those change the fundamental facts that the

15   challenged activity is in no way pled to be connected to the

16   state action.

17       So even if we were to look at that, looking at futility,

18   looking at all of the new allegations, they just don't connect

19   back to the actual challenged activity, and they would fail

20   under that.

21       I want to also address a second point, the coercion theory

22   that's been articulated by the plaintiffs.

23       With respect to the coercion theory, again, this is

24   something that Judge DeMarchi addressed in the context of the

25   Representative Schiff letters.  And she rejected the theory --

1    and we would respectfully submit that Your Honor should also

2    reject it -- because, again, at the gate, they don't tie back

3    to the actual challenged activity and that, itself, precludes

4    any finding of coercion.

5        But even beyond that, the letters that were being

6    challenged, the Representative Schiff letters, they suggest, as

7    Judge DeMarchi found -- and as Judge Contreras found in the

8    District of D.C. when he was actually addressing a case

9    involving the same letters, a case against Mr. Schiff -- what

10   he found was these are information-gathering letters.  And what

11   they do is they suggest that there is Congressional interest in

12   a problem.

13       And under the Ninth Circuit holding in *Mathis versus PG&E*,

14   which is 75 F.3d 498 at 503, that is insufficient to create

15   state action under a coercion theory.  Congressional interest

16   in solving a problem is not coercion.  And that is, at best,

17   what they've pointed to here with respect to that.

18       And then even aside from the pleading insufficiencies,

19   there's also the legal problem, which is under the *Sutton* case,

20   from the Ninth Circuit -- that's 192 F.3d 826 at 843 -- a truly

21   private entity cannot be liable solely because it is compelled

22   to act by the government.

23       So even if you set aside the pleading defects, we just

24   look at the legal theories, the coercion theory doesn't work

25   because of the Ninth Circuit's precedent in *Sutton*.

1        The final theory on state action I want to quickly address

2   is encouragement, which is the theory that CHD has pled -- I

3   would give them credit for being creative here, although it's

4   been pled by others as well, so they're not the only one.

5        This is a theory that's been pled that suggests that

6   somehow the combination of CDA 230 and the other acts, the

7   Representative Schiff letters, somehow that combination of

8   activity creates encouragement of the violative conduct that

9   would somehow give rise to a First Amendment violation.  And

10  that theory, again, has to be rejected out of the gate for a

11  whole host of reasons.

12       Judge DeMarchi also happened to address this in a

13  different case, which is the *Divino Group versus Google* case,

14  which is 2021 WL 51715 at star 6.  This is from January, in

15  which, again, these were letters from Representative Schiff,

16  and the theory was, well, Section 230 creates some sort of

17  encouragement on the part of the government that transforms

18  otherwise private conduct into government conduct.

19       She rejected that theory for exactly the same reasons that

20  Your Honor should reject them here.  First of all, nothing in

21  Section 230 in any way is connected to the specific actions

22  here.  In other words if we look at CDA 230 in the face of the

23  statute, it doesn't direct the particular conduct at issue, the

24  particular challenged conduct.  It is on its face a neutral

25  statute.

1        And she goes into that in the *Divino Group* case and

2    explains why that is the case and why that precludes the sort

3    of *Skinner*-type theory that we have from CHD here.  So that

4    itself would be a basis to reject that theory.

5        The other thing was, even if Your Honor were to get past

6    that, the problem with the theory is that it improperly

7    attempts to convert this permissive law into something beyond

8    that.  And I think that's based on a fundamental misreading of

9    the *Skinner* case and of the *Hanson* case and the other cases

10   that are cited by CHD.

11       Judge DeMarchi explains why in the opinion, but the bottom

12   line is it is a permissive law, and that permissive law itself

13   cannot give rise to this kind of encouragement or coercion

14   theory.

15       And when you add to it a letter of inquiry from a single

16   representative, or even individual letters from multiple

17   representatives of the House of Representatives, that doesn't

18   in any way constitute a threat, coercion, encouragement, let

19   alone something that could take a neutral permissive statute

20   and convert it into the kind of statute that, on very rare

21   occasions, has been found to support this kind if a theory.

22       So I know I've got gone through a lot of different reasons

23   why the *Bivens* claim doesn't work, but I think the reason for

24   that is the *Bivens* claim is just fundamentally a mismatch with

25   the allegations in this case.

1      And I think one thing that is -- I think is really

2  important not to lose sight of, that we're going to talk about

3  when we get to the rest of the argument, is that not only are

4  there all these pleading defects and all these legal defects

5  with the theory, but the theory itself creates really

6  substantial First Amendment concerns on Facebook -- on the part

7  of Facebook and the platforms.  And that's why the case law has

8  always cautioned that we take great care in extending *Bivens*

9  liability.

10      And here Your Honor would have to go through multiple

11  extensions of *Bivens* liability in order to find that the theory

12  that has been pled actually plausibly states a claim or that

13  they could ever plausibly state a claim under *Bivens*.

14      You would have to find that -- each of the different areas

15  where I said there was an independent problem, you would have

16  to expand *Bivens* liability in so many different ways.  And the

17  reason that the cases tell us that we don't do that is

18  precisely because we have to balance the other First Amendment

19  concerns that are at issue here, which are the First Amendment

20  concerns of Facebook and the platform.

21      Unless Your Honor has any other questions on *Bivens*, I

22  will stop there and reserve the time for the other issues.

23          **THE COURT:**  Okay.  Does the other defendant, Poynter,

24  want to be heard on *Bivens*, or just Facebook?

25          **MS. LOCICERO:**  Just briefly, Your Honor, for Poynter.

1          **THE COURT:**  Okay.

2          **MS. LOCICERO:**  Your Honor, I want to point out the

3     facts that Face- -- I'm sorry -- CHD alleges specifically

4     related to Poynter because they're very thin on the *Bivens*, and

5     all the counts, frankly, and important for the Court to

6     understand with respect to analyzing the *Bivens* claim as it

7     relates to Poynter.

8          Poynter is a journalism institution.  I won't belabor

9     *Malesko* because the Court has already expressed understanding

10    of the *Malesko* decision, of course.  And it's clear from the

11    complaint, just in paragraph 21, that Poynter, too, is a

12    private corporate defendant.  It's a nonprofit Florida entity.

13    And *Malesko* prohibits suing Poynter.

14         But what's important in this case to understand is that,

15    with respect to Poynter, Poynter, through its brand PolitiFact,

16    is providing fact-checking journalistic services on the

17    Facebook platform.

18         What is at issue here with respect to CHD's allegations is

19    primarily about a fact check that Poynter did that actually

20    involves a third party, that's not a party to this litigation,

21    called Collective Evolution.

22         And Collective Evolution wrote an article that CHD later

23    shares that connects a U.S. Armed Forces study about the flu

24    vaccine to whether there are higher incidents of Corona virus

25    in individuals getting that vaccine.  The PolitiFact service

1    rated that headline as false.

2          If the Court takes a look at DE 654, which is Exhibit B to

3    the Second Amended Complaint, the Collective Evolution

4    article -- which I'll point out has a corrected headline

5    because they apparently agreed with Poynter's criticism -- it

6    also contains a full-blown fact check, which is essentially an

7    11-paragraph news article about why Poynter and PolitiFact had

8    concerns about the Collective Evolution headline.

9          CHD may have shared the Collective Evolution article, CHD

10   may not like the journalism about the Collective Evolution

11   article, but the speech was about that article.

12         The only other allegations in the *Bivens* claim that seem

13   to relate to Poynter and the federal government would involve

14   funding.  And Poynter discloses -- it's no secret -- that there

15   is some direct and indirect government funding to Poynter as a

16   nonprofit that, I believe, CHD alleges it's about 10 percent of

17   Poynter's funding.

18         But those are really the facts that CHD attempts to allege

19   to state a *Bivens* claim against Poynter.

20         In addition to the *Malesko* problems that the *Bivens* claim

21   has, there's a fundamental claim with federal action related to

22   Poynter.  The only allegation that directly relates to Poynter

23   in federal action has to do with the funding that I mentioned.

24         And I wanted to point out the *Morse versus North Coast*

25   *Opportunities* case, 118 F.3d at 1338, in which the Ninth

1   Circuit analyzed a First Amendment retaliation *Bivens* claim

2   that involved an employee that wasn't rehired by a Head Start

3   Program.

4        And the claims in that case involved almost exclusive --

5   the Head Start Program was almost exclusively federally funded;

6   it was heavily regulated through federal regulations.  And even

7   in that situation, where you've got virtually all funding

8   coming from the federal government and extensive regulations

9   coming from the federal government, there wasn't sufficient

10  action -- federal action for a *Bivens* claim.

11       Here you have way, way less than that.  And I know that

12  Facebook sort of foreshadowed arguing the First Amendment

13  issues, but I want to point out here that what we're

14  fundamentally talking about is journalism by Poynter through

15  its PolitiFact fact-checking service.

16       And, essentially, what the plaintiffs are asking you to do

17  here is to censor Poynter's journalism.  And that's a

18  fundamental problem under the First Amendment as it relates to

19  Poynter and the *Bivens* claim.

20       So we also ask that the Court dismiss the *Bivens* claim

21  with prejudice.  Thank you, Your Honor.

22            **THE COURT:**  Okay.  Thank you.

23       Does -- do the plaintiffs wish to respond?

24            **MR. TEICH:**  Yes, please, Your Honor.  Roger Teich for

25  plaintiff.

1          And I'm going to say some things on the joint action

2     theory and then turn it over to my colleague, Jed Rubenfeld, to

3     discuss compulsion and the other theories.

4          **THE COURT:**  Okay.

5          **MR. TEICH:**  And I do want to say at the outset, there

6     is a fourth cause of action for declaratory injunctive relief,

7     and that is going to play in later.

8          **THE COURT:**  Okay.

9          **MR. TEICH:**  I'm sure the Court's aware of that.

10         Let me start by saying that plaintiff, Children's Health

11    Defense, publishes facts, data, and opinions that are critical

12    of the CDC, an executive agency, but none of those things --

13    none of the facts, data, or opinions are false.

14         But they are critical, highly critical of the CDC.  And

15    that may make CHD, Children's Health Defense, unpopular, but

16    that's the core value the First Amendment protects and never

17    more urgently than now, Your Honor.

18         In 2019, the CDC, the Center for Disease Control and

19    Prevention, unveiled what it called its *Vaccinate with*

20    *Confidence* strategic initiative.  And this is outlined in

21    paragraph 50 of our Second Amended Complaint.  And I think it's

22    a terribly important paragraph.

23         **THE COURT:**  You're going to get to joint action?

24         **MR. TEICH:**  Yes, I am.  This is the joint action.

25         The CDC initiative identified as its high priority to,

1  quote, stop myths and misinformation.  The term

2  "misinformation" is the euphemism they used, incredibly, for

3  any statement that conflicts with their own policy regardless

4  of its truth.

5      It reminds us of Humpty-Dumpty's line:  The word means

6  just what I choose it to mean, nothing more nor less.

7      And that term "misinformation" we will use today, but bear

8  in mind, in our allegations it is a euphemism for speech that's

9  critical of the CDC.  It is not -- that word is being misused

10  by the CDC, and they are directing Facebook to use it in that

11  same way.

12      The CDC said publicly -- and it's in paragraph 50 of our

13  complaint -- that it was engaging partners, that's a quote,

14  using trusted messengers, working with and collaborating with

15  Facebook to contain the spread of, quote --

16      **THE COURT:**  It didn't say Facebook, it said messengers

17  and partners; right?

18      **MR. TEICH:**  It said trusted messengers and partners.

19  And I believe they do identify Facebook as a partner.  Both the

20  CDC Foundation does and I believe the CDC does.

21      And collaborating with them to, quote, contain the spread

22  of misinformation on social media.  That's public record.

23      And, you know, in preparing for this I did a string of

24  analogies.  "Jointly conceived" is the legal standard for joint

25  action.  "Engaging partners" is the term they used.  "Working

with" is the phrase they used.  "Acting in concert," the legal standard.  "Using trusted messengers," encourage or direct by an informal policy; somehow reach an understanding.

The CDC's statements quoted to you in paragraph 50 are the same as *Adickes*, *Brentwood*, *Mathis*, the legal standard for making out joint action.  But that's just the tip of the iceberg.

There's the reading between the lines, the reasonable inferences and common sense that you can use to infer collusion from timing and *cui bono*.  Who benefits?  The CDC has reaped enormous benefits from this.

And we submit there's a triable issue of shared intent between Facebook and the Executive Branch through the CDC to suppress Children's Health Defense's speech and a triable issue as to when it was formed and how it was made manifest in actions directed against CHD.

I want to talk later about the timing issue because paragraph 50 is sourced to October 2019.  The adverse actions are in May, with the defunding of the button, the *Donate* button, June and ongoing through the present day on the fact checks, and September of 2019 for the first publication of the warning label on CHD's page.

And you might say, well, all of those are adverse actions, but the CDC's strategic initiative postdates them.  But I don't believe that's right, Your Honor, because the terms they use --

1    "engaging with," "using trusted messengers," "working with

2    Facebook," "collaborating with Facebook" -- they're all past

3    actions, uncompleted.  They're imperfect, I think is the

4    grammatical term for it.

5         They reference past action undertaken but not completed at

6    the time of the initiative, and conclude, on the face of that,

7    that that initiative only sprang into existence in October.  It

8    didn't.  I would submit it goes back at least as far as January

9    of 2019 and predates and encompasses the period in which

10   Facebook has taken these adverse actions.

11        The exigency here -- and the law must always meet the

12   exigency of the day, Your Honor.  The exigency here is CDC's

13   underhandedness in appointing Facebook not just as its

14   propagandist but as its censor.  That's what *Bivens* was aimed

15   at, the greater capacity for harm from actors acting as federal

16   actors.

17        And, you know, *Bivens* cites *Marbury*, and that's no

18   accident.  I think here, too, you're dealing with first

19   principles.

20        **THE COURT:**  So you're arguing that the CDC has

21   appointed Facebook as a propagandist and a censor?

22        **MR. TEICH:**  Correct.

23        Now, there is a role for affirmative government speech.  I

24   can call it propaganda, but, you know, that's a label.  But,

25   you know, appointing them as censor to demote, fact check,

1    censor, defund, all of those functions, that crosses a

2    constitutional line.

3         And the issue for you now, which is consequential, is will

4    we be permitted the discovery to show evidence that they did

5    reach an understanding, that there is an agreement?

6         **THE COURT:**  Oh, so you want to allege it and then find

7    facts afterwards?

8         **MR. TEICH:**  No, not at all, Your Honor.  It is in the

9    public record that they are working with, that they have

10   reached an agreement to dip into the -- I mean, Mark Zuckerberg

11   says that he's working with, you know, the CDC and the World

12   Health Organization to remove vaccine misinformation.

13        He has said that, and that's in the Second Amended

14   Complaint.  That's at paragraph 52 of the Second Amended

15   Complaint.  He has said that Facebook works with both agencies

16   to remove misinformation.  It seems to me that is a

17   plausible -- highly plausible allegation of an agreement.

18        And, dipping into the supplement, we allege that the Biden

19   Administration says it is, quote, directly engaging with

20   Facebook to, quote, clamp down on vaccine misinformation.  And

21   Facebook says it has reached out to the White House to offer

22   any assistance it can provide.

23        That's more than merely furnishing the government with

24   information.  That's a plausible case that there is an

25   agreement.

1          Again, I do want to say that I think an inference -- a

2    reasonable inference is that these things Facebook has done are

3    unlikely to be undertaken without an agreement; that they

4    benefit the CDC so directly, the warning label redirects users

5    to the CDC for, quote, reliable, up-to-date information.

6          The fact checks refer users to the CDC as, quote,

7    authoritative.  That's probably why CHD is still on Facebook at

8    all.  Facebook is helping the CDC, the government agency,

9    preach to the unconverted on CHD's page.

10          CDC, the government agency, benefits so directly that it's

11    reasonable to infer they are involved with Facebook in a shared

12    objective, a shared design, and means.

13          THE COURT:  "CDC benefits so directly"?  What do you

14    mean by that?

15          MR. TEICH:  What I mean by that is from warning labels

16    that refer -- that are on -- that are on CHD's page, Children's

17    Health Defense's page, the warning label says "The CDC has

18    reliable up-to-date information.  Go to cdc.gov," with a

19    button.

20          THE COURT:  That benefits CDC how exactly?

21          MR. TEICH:  It's referring Facebook users who are

22    visitors to Children's Health Defense fund's page.  It refers

23    them -- it's a form of advertising for the CDC.  It's saying

24    they're reliable, they're up-to-date, go there now.

25          THE COURT:  And that benefits CDC how again?

1          **MR. TEICH:**   It directs traffic to the CDC.

2          **THE COURT:**   Does that make money for CDC?

3          **MR. TEICH:**   It's more that it rechannels traffic there

4     from a group who has been highly critical of the CDC on their

5     page.   In the prime real estate at the top of their page, it

6     says, essentially, what you're looking at below, this warning

7     label, is unreliable and out of date; and if you want the

8     truth, quote-unquote, go to the Centers for Disease Control.   I

9     would say that does benefit them.

10          **THE COURT:**   Does it say that?   Does it say "truth"?

11          **MR. TEICH:**   Well, it says "reliable and up-to-date."

12    I think those are synonyms for -- I mean, one of the issues

13    that you'll need to confront is the core allegation that the

14    CDC, the government agency, has put forth the standards of

15    decision by which Facebook judges Children's Health Defense's

16    content.

17          And I would say to you that in Docket 69-4, attached to

18    their motion, is material Facebook put forth on how they handle

19    misinformation.   They say openly, Facebook, that the CDC --

20    that the CDC is doing this, is setting the standard.   They say,

21    quote, We defer to the CDC, slash, WHO for authoritative

22    judgments.

23          Now, they have lampooned our claim as a conspiracy theory.

24    It's not a conspiracy theory, but conspiracy law has a lot to

25    say about the interpretive rules here.

1          First, it's nearly always necessary to infer that two

2     parties, here the government agency, the CDC, and Facebook,

3     have acted in concert.  Almost always necessary to infer that

4     from circumstantial evidence.

5          It's not that we're seeking discovery in search of our

6     case, but it's very unusual to have as much of an agreement,

7     explicit, as we have here, but we believe that the censorship

8     is alluded to euphemistically but not spelled out.

9          But the existence or nonexistence of a conspiracy is

10    essentially a factual issue that the jury should decide.

11    That's *Adickes*, Justice Black's concurrence; and that's the

12    Earth First! case, *Mendocino Environmental Center*, from the

13    Ninth Circuit.

14         The other principle of conspiracy law that I think speaks

15    to this situation is that the participants in a conspiracy must

16    share the general objective, but they don't need to know all

17    the details of the plan or possess the same motives.

18         Here, Facebook has huge profit motives to censor

19    plaintiff.  What's --

20              **THE COURT:**  And that is what?

21         **MR. TEICH:**  Well, both their interest in diverting

22    Children's Health Defense users to their affiliated nonprofits,

23    the fact-checkers.

24         And it's also the adverse profit motives that are in the

25    Second Amended Complaint: vaccine development that Mark

1    Zuckerberg is heavily invested in; brand protection for their

2    pharmaceutical company advertisers, it's a billion-dollar

3    income stream a year; and 5G development, of which CHD,

4    plaintiff, has been critical.

5         So I can march through the timeline, but, as I said,

6    paragraphs 50, 51 about the CDC's 2019 *Vaccinate with*

7    *Confidence* initiative, we think is a significant marker, public

8    record marker, of ongoing cooperation and joint action with the

9    CDC.

10        We allege that the CDC, the government agency, deputized

11   the World Health Organization as its proxy.  And the same day

12   that the warning label was published, Facebook published on

13   CHD's page, the World Health Organization issued a press

14   release saying they had been in discussion with Facebook, with

15   Facebook, for several months to reduce the spread of

16   inaccuracies on Facebook.

17        And we allege that they are acting in this regard as a

18   proxy for the CDC under their charter.  As is alleged in the

19   complaint, the World Health Organization needs the express

20   consent of a U.S. Governmental entity for the World Health

21   Organization to cooperate with a domestic corporation.  And we

22   allege that they have done so here with the express consent of

23   the CDC.

24        So we feel like that's part of the mix you should consider

25   in determining that we have plausibly alleged a theory of joint

action.

Your Honor, I think with that, that -- I would say *Mathis*, we feel, is a case that strongly supports this joint action theory.  The crucial question in *Mathis* -- I mean, I would say Facebook is not using -- to back up a step -- its own independent medical judgment or its own legal judgment, as in *Polk County* or *Rendell-Baker*.  They're deferring to the CDC, the government agency, for the judgment.  They both emphasize their cooperative relationship in approaching these issues.

And similar to *Mathis*, the CDC is not shrinking from suggesting a standard of decision for the exclusion of speech from Facebook's platform.

And the crucial question, as in *Mathis*, is whether the government provides that standard of decision -- vaccine misinformation circularly defined as any speech that's critical of the CDC -- regardless of its truth.  That is the standard that Facebook has -- the mantle that they have taken to do what they're doing to censor speech.

Under *Mathis*, the crucial question is not that the government specifies particular individuals subject to the rule.  In *Mathis*, the particular plaintiff who is denied the security clearance didn't allege that the -- you know, that the nuclear regulatory had him, in particular, on its radar.

Here I would suggest to you, given the prominence of Mr. Kennedy and of Children's Health Defense in this scientific

dispute, I think it is plausible that they have been identified by the CDC.

But under *Mathis*, the issue is more is the CDC cooperating, directly engaging, working with trusted messengers, which it considers Facebook to be.

I think, with that, I would like to turn it over to Jed Rubenfeld to discuss some other aspects of state action.

**THE COURT:**  Thank you.

**MR. TEICH:**  Thank you.

**THE COURT:**  Mr. Rubenfeld.

**MR. RUBENFELD:**  Thank you, Your Honor.  I'm just trying to --

**THE COURT:**  There.

**MR. RUBENFELD:**  There.

Good afternoon, Your Honor.  Good morning, I guess, on the West Coast.  Thank you so much for devoting so much of your time to the --

**THE COURT:**  Mr. Rubenfeld, there's a sign on you that says your network bandwidth is low.  And, actually, your voice is cutting in and out.

(Discussion held off the record.)

**MR. RUBENFELD:**  Let me just ask you whether -- I'm so sorry to be causing so many problems.  Is that any better?  Can you not hear me?

**THE COURT:**  It's a little better, but it still cuts in

```
 1   and out.  It's the court reporter we're concerned about, so --

 2              MR. RUBENFELD:  Oh, this is a disaster.

 3              THE COURT:  It's not a disaster.  It's fine.

 4        Is there a way to cut off the vision part and just go with

 5   the sound?  Would that be better?

 6                    (Discussion held off the record.)

 7              THE COURT:  If there's some way just to get on the

 8   phone?

 9              MR. RUBENFELD:  Let me ask you, though, I have tried

10   to move my --

11              THE COURT:  No.

12              MR. RUBENFELD:  Why not?  Can I not do that?

13              THE COURT:  Can you -- it's still cutting out.  Can

14   you get on the phone?

15              MR. RUBENFELD:  So you're still having trouble hearing

16   me; is that right?

17              THE COURT:  Right then it's good.

18              MR. RUBENFELD:  I can get on the phone if I --

19              THE COURT:  Okay.  You're good now.  What you're doing

20   now is working.

21              MR. RUBENFELD:  I'm good now?

22              THE COURT:  Yeah.

23              MR. RUBENFELD:  Let me go ahead and try to start, and

24   I'm sure I'll be told if things are going haywire.

25        So, yes.  Thank you, Your Honor.
```

1          And let me begin by very briefly taking a step back and

2     broadening the lens, if I might, because this case, Your Honor,

3     from a free speech point of view and the present moment in the

4     United States, are genuinely unprecedented.

5          Today two or three companies, including Facebook, private

6     companies, private behemoth companies, act as gatekeepers for

7     what the Supreme Court has called the modern public square,

8     referring, of course, to the Internet.

9          And, as a result, these companies, including Facebook,

10    excise discourse that no entity, public or private, has ever

11    exercised in American history.  In the United States, no

12    governmental official, from the lowest to the highest, has the

13    power to excise a single fact or opinion from even the smallest

14    corner of the public square, public discourse.  Yet every day

15    Facebook, Your Honor, dictates for hundreds of millions of

16    Americans what facts, what opinions, what voices.

17         Now, this vast censorship power, of course, does not by

18    itself make Facebook a governmental actor.  That's not how

19    state action doctrine works.  We all know that.  But what it

20    does mean is that courts must stand ready to apply

21    well-established traditional state action doctrine whenever the

22    federal government seeks to harness that censorship power to

23    use it for its own purposes, because, Your Honor, it is

24    axiomatic.

25         And here I'm quoting the Supreme Court's *Norwood* opinion.

1    It is axiomatic that the government may not induce, promote, or

2    encourage private parties to accomplish what it, the

3    government, is constitutionally forbidden to accomplish or, as

4    the Ninth Circuit held in *George versus Edholm*, just a few

5    years ago, state action must be found whenever governmental

6    officials are deliberately -- and I'm quoting -- coercing,

7    inducing, or encouraging private parties to do what they

8    themselves, the government officials, cannot constitutionally

9    do.

10         Now, that simple principle is what this case is all about,

11   because since 2019 federal actors have precisely been

12   encouraging, promoting, coercing, and inducing Facebook to take

13   more and more aggressive censorship action against so-called

14   vaccine misinformation.

15         And that's why this case, by the way, is different from

16   all other previously litigated cases concerning state action in

17   the online world.

18         **THE COURT:**  So can CDC publish a brochure that says

19   "We disagree with all the things that CHD is saying"?

20         **MR. RUBENFELD:**  Absolutely.

21         **THE COURT:**  So they can do that?

22         **MR. RUBENFELD:**  Yes, they can.

23         **THE COURT:**  So tell me again what they're harnessing

24   Facebook to do that they can't do?

25         **MR. RUBENFELD:**  Okay.  Let me go ahead and do that.

So my colleague, Mr. Teich, has gone through joint action.  And
I'll just say a word about that, and then I will go on to talk
about coercion and encouragement.

But on the joint action front, what CDC cannot do is
partner with a social media organization and decide, Look,
here's the speech that we want you to censor.  Will you do that
for us?  Facebook responds.  Sure, we'll do that.  You tell us
what's going to count as misinformation and we'll stamp --
we'll restrict it as long as, you know, it follows your
protocols, your guidelines.

That's exactly what we are alleging they're doing.  And
it's not that secret.  CDC calls Facebook its partner.  It says
it's "partnering with social media companies" -- who else is
that referring to other than Facebook?  Certainly plausible
inference -- "to curb the spread of vaccine misinformation."
It's partnering with them.  That's joint action.

For its part, Facebook says, "We're partnering with the
CDC to help curb the spread of vaccine misinformation."
Plausible inference?  They're working together.  Not even a
plausible inference; they're saying it to us.

We don't know the details of the partnership.  That's for
discovery.  But we're not alleging something and then seeing if
it's true.  They're saying it; we're quoting them saying it.
It's a plausible inference that they're working together
because they're telling us that they're working together.

1    And, similarly, the White House has said "We are directly

2    engaged with Facebook and other" -- Facebook particularly --

3    "and other social media companies."  Facebook replies, "Yes,

4    that's right.  And we called the White House and said we agreed

5    we would provide any assistance we could."

6        Again, they're telling us they're working together.

7    Working together is joint activity.  There's no space between

8    those two words or concepts.  So that's a plausible interest.

9        That's all I'm going to say on joint action.  With Your

10   Honor's permission, though, I'm happy to answer questions.  I

11   would now move on to coercion.

12        **THE COURT:**  Okay.

13        **MR. RUBENFELD:**  And I would just note, Your Honor,

14   these factors, these three factors -- joint action, coercion,

15   encouragement -- they are cumulative.  Each one is sufficient,

16   if strong enough, to base the finding of state action.

17        But the Court may use each one as a factor, if the Court

18   finds it, and use it cumulatively, additively, to tip the scale

19   in favor of state action.  That's exactly what the Ninth

20   Circuit did in last year's *Rawson versus Recovery Innovations*

21   case.  And Your Honor may do it as well, and we would encourage

22   that.

23        Now, as to coercion, since 2019, high-ranking members of

24   Congress have repeatedly threatened Facebook -- this is our

25   allegation, and it's based on statements in the public

1    record -- with catastrophic legal consequences, including loss

2    of their Section 230 immunity, which is worth billions of

3    dollars to them, and loss of Instagram and WhatsApp, their

4    crown jewels, through an antitrust breakup if Facebook refused

5    to do more to censor so-called vaccine misinformation.

6         Now, of course, congressmen are permitted to -- to

7    criticize private companies and to exhort them to take whatever

8    action they want.  We're not saying otherwise.  Of course, they

9    are.  But the test for deciding when such exhortation crosses

10   the line into coercion, the test -- the legal test was laid

11   down by the Second Circuit 40 years ago in a case called

12   *Hammerhead*, which has been quoted and followed all over the

13   country, including by the Ninth Circuit in the *American*

14   *Families* case.

15        And the *Hammerhead* test is objective, and I'm going to --

16   I'd like to quote it to the Court.  The test is this:

17            "Where comments of government officials can reasonably

18        be interpreted as intimating that some form of punishment

19        or adverse regulatory action will follow" -- failure to

20        accede to the officials' request -- "a valid First

21        Amendment claim can be stated."

22        And the Ninth Circuit has said squarely that such a threat

23   need not be explicit or --

24            **THE COURT:**  What were the facts in the *Hammerhead*

25   case?

1          **MR. RUBENFELD:**  The facts in *Hammerhead* -- I wish I

2     could answer that question better for Your Honor, and I'm just

3     going to tell you right now, they're not going to be analogous

4     to the facts in this case.

5          **THE COURT:**  Oh.

6          **MR. RUBENFELD:**  But I'm using *Hammerhead* as a test --

7     as a legal test, and the Ninth Circuit has reaffirmed that as

8     the test in the *American Families* case.  And there have been

9     repeated congressional statements that passed this test, the

10    *Hammerhead* test.

11         And let me also point out that the Ninth Circuit has said

12    that as long as a reasonable fact-finder, taking all inferences

13    in favor of plaintiff, could find that there was the intimation

14    or insinuation of a threat of governmental power or sanction --

15    that's the Ninth Circuit's phrase for it -- that's all the

16    District Court's job on motion to dismiss should be.  After

17    that it's discovery and for a jury.  And the Ninth Circuit has

18    said so explicitly in the *Brodheim* case.

19         **THE COURT:**  Now, you mean that's a threat from one

20    congressman?

21         **MR. RUBENFELD:**  Oh, absolutely not.  Although, I --

22    you know, we'd argue that Representative Schiff's comments pass

23    the *Hammerhead* test.

24         **THE COURT:**  I think he would be very proud if he knew

25    you were saying he could direct what the Congress does.  Nobody

1   seems to be able to do that these days.

2          MR. RUBENFELD:  I agree.  But when there are a half

3   dozen similar congressional statements, when there are four or

4   five public hearings, when CEOs from big tech, including

5   Mr. Zuckerberg, have been grilled about whether they're going

6   to do more to censor vaccine misinformation, even as

7   congressmen are introducing bills to take away Section 230

8   immunity or to break them up under Facebook, the Speaker of the

9   House of Representatives, last year, 2020, said the following.

10          Here's the exact statement, Your Honor, the exact

11   statement as Congress was holding one of the hearings that I

12   just described:  "Social media companies have utterly failed to

13   stop the spread of COVID disinformation on their platforms."

14   And she warned that Congress, quote, "must send a message to

15   social media executives 'you will be held accountable for your

16   misconduct.'"

17          Could a reasonable fact-finder see in that statement the

18   insinuation that some adverse legal action might be taken?  I

19   don't see how you could say that a reasonable fact-finder

20   couldn't so interpret that.

21          In fact, I think that's exactly what she was saying, but I

22   think it's surely a reasonable fact-finder could so determine.

23   And that's all that the *Hammerhead* test requires.

24          And, by the way, there are four or five statements like

25   this.  They're public statements.  They're in the public

1    record.  They're on the -- Congresswoman and Senator -- Senator

2    Klobuchar, just a few months ago, made a very similar

3    statement, and they're on their websites.  So it's not just

4    Schiff.

5         And, you know, I think it's important to say that, once

6    the statements have been made, it is actually not part of

7    plaintiff's proof to show or to allege that Facebook made the

8    decision in response to the threat.

9         The Ninth Circuit held that explicitly in the *Carlin

10   Communications* case, which we cite in our brief, and reaffirmed

11   that recently in the -- in the *Rawson* case.

12        Your Honor --

13        **THE COURT:**  Do you have any comments on the recent

14   cases from this district in -- that Judge DeMarchi wrote?

15        **MR. RUBENFELD:**  Absolutely.  So defendants make a lot

16   of the *Daniels* case.  And with all due respect to the

17   magistrate judge, she was not informed of the precedent.  She

18   rendered her decision explicitly on the ground that the

19   representative did not have legal control over Facebook.  Read

20   the opinion.  That's what she says.  That is not the test.

21        Every circuit court to have reached this question has held

22   to the contrary.  The Second Circuit explicitly said that it is

23   reversible error for a district judge to dismiss a case on the

24   ground that the person making the threat -- the official making

25   the threat did not have regulatory or legal control.

1          That's the *Okwedy* case quoted and followed by courts all

2     over the country.   Quoted and followed, by the way, in the

3     Ninth Circuit in *Brodheim*, although not on this exact issue.

4     But quoted on this exact issue by the Seventh Circuit, the

5     Fifth Circuit.

6          So with all respect to the magistrate judge, it was

7     simply -- the opinion --

8               **THE COURT:**  It was just wrong.

9               **MR. RUBENFELD:**  Yes.  It was based on a legal error.

10    She was not informed of the actual precedent.  I don't know why

11    the parties didn't inform her.  She didn't find it.  But she

12    rested on a ground that has been rejected by every circuit

13    court in the country.

14               **THE COURT:**  And that would be exactly what, that's

15    been rejected by every circuit court in the country?  The

16    idea --

17               **MR. RUBENFELD:**  The *Daniel* court's holding that the

18    reason why the statements made by the congressman did not

19    amount to state action was because the congressman did not

20    have, quote, legal control over the actor, the private party in

21    question.

22         And if you read the opinion, you'll see that the opinion

23    rests on that ground, and it is simply incorrect as a matter of

24    law.

25         In addition, I would point out that in the *Daniels* case,

1    as the judge expressly noted, no claim of compulsion had been

2    made.  So, in fact, the magistrate judge did not have reason to

3    apply the *Hammerhead* test.  So, you know, it wasn't her fault.

4    No claim of compulsion had been made.

5          We, on the contrary, make the claim of compulsion.  And

6    defendants' argument that *Sutton* somehow blocks that, as

7    anybody who reads *Sutton* and subsequent Ninth Circuit opinions

8    is aware, *Sutton* only applies when the sole claim of compulsion

9    is coming from a, quote, generally applicable law, a generally

10   applicable statute, like a speed limit that tells everybody

11   they've got to drive under the speed limit.  That doesn't turn

12   everybody into state actors, obviously.

13         When particular government officials are making comments

14   threatening the private party to do something unless they do

15   something, that's governed by the *Carlin* case, which is a Ninth

16   Circuit case where that happened.

17         And the *Sutton* case specifically says we're not overruling

18   *Carlin*.  That's a different case because there was that kind of

19   governmental official intervention.  And, also, it's also

20   governed by *Mathis*, same thing.

21         And Mr. Teich is absolutely correct, I want to really say

22   this explicitly, Your Honor, defendants make a great deal out

23   of the claim that the government did not specifically direct

24   the specific challenged conduct; that is, the restricting of

25   CHD's content.

1          The Ninth Circuit confronted that argument and rejected it

2     in *Mathis* and said it doesn't matter if they didn't direct this

3     particular action.  What matters is if they gave the private

4     party the standard of decision -- I'm quoting -- the standard

5     of decision, just what we're alleging here.

6          The CDC gives Facebook the standard decision.  Here are

7     the truths about COVID and the vaccine.  Here are the truths

8     about the treatments for COVID and the -- for COVID.  If

9     content departs from those then, please, do suppress it.

10          That's the standard of decision.  It makes no difference

11     that the CDC or the White House didn't specifically call for

12     the censoring of plaintiff's content; although they might have,

13     but it doesn't matter if they didn't.

14          **THE COURT:**  And it doesn't matter if what the CDC said

15     was true?

16          **MR. RUBENFELD:**  Well, uhm, false speech -- if Your

17     Honor were to reach the question and decide that CHD content is

18     false, which it's not, but if it were, it would still be

19     constitutionally protected.

20          But, in fact, we believe, if the Court looks at it or if

21     an ultimate fact-finder looks at it, you will find -- I'm going

22     to stop talking for a second because I'm worried that you can't

23     hear me.

24          **THE COURT:**  I can hear you.

25          **MR. RUBENFELD:**  Am I lost?

1      **THE COURT:**  No.

2      **MR. RUBENFELD:**  Great.  Oh, thank heavens.  Okay.

3      So false speech is, of course, constitutionally protected,

4  but here -- but I don't think Your Honor needs to reach the

5  question, on a motion to dismiss, whether our speech was false.

6  Our allegation is it's true.  I believe those allegations

7  should be accepted as true for purposes of this motion.

8      And so it -- CHD's speech is unquestionably

9  constitutionally protected even if it were false.  But on our

10  allegations it's not false, and I believe those allegations

11  should be taken as true here on this motion for -- for sure.

12      Unless Your Honor has further questions about coercion, I

13  believe that factor counts very strongly in favor of a finding

14  of state action here.

15      I will now turn to encouragement.

16      **THE COURT:**  Okay.  And just let me give everybody a

17  heads-up.  The defendants have used 20 minutes, and the

18  plaintiffs have used 40 minutes.  Just so you know.

19      **MR. RUBENFELD:**  Thank you, Your Honor.

20      **THE COURT:**  You're welcome.

21      **MR. RUBENFELD:**  No excuse, but I did have some

22  technical difficulties.

23      But, anyway, so I'm going to turn to encouragement and I'm

24  going to try to cover this briefly.

25      Here what's all important is Section 230, the famous

1   Section 230 of the Communications Decency Act, which is an

2   immunity statute.

3            **THE COURT:**  Right.

4            **MR. RUBENFELD:**  Section 230 immunizes Facebook if it

5   restricts constitutionally protected speech -- I'm quoting the

6   statute -- if Facebook finds it, quote, objectionable.

7            Why am I emphasizing it's an immunity statute?  Because

8   that's unusual and because under *Skinner*, the Supreme Court

9   *Skinner* case, an immunity statute plus in combination with

10  governmental involvement is a very strong factor weighing in

11  favor of state action as a form of encouragement and

12  inducement.

13           *Skinner*, as the Court, I'm sure, is aware, involved

14  federal regulations pertaining to drug tests performed by

15  private railway companies on their own employees, seemingly

16  totally private conduct.  But these regulations -- some of the

17  regulations mandated the drug tests.  And that, of course,

18  turned the drug tests, the mandated ones, into state action

19  under the compulsion test.  That was clear.

20           But one part of the regulation, subpart D, was not

21  mandatory.  It was permissive, just like Section 230.  It said

22  to the railway companies, you can do it, but you don't have to.

23  But what it did do was it immunized them from any state law

24  liability.

25           It preempted state law, cleared away legal obstacles, and

1  said you can't be sued, just like Section 230.  And the Supreme

2  Court said that, in combination with some evidence of joint

3  action, which I'll get to in a second, was sufficient to turn

4  the private drug tests, though permitted, not required, into

5  state action, because of the immunity.

6       Now, the other two factors the Court emphasized in

7  *Skinner*, number one, the government said the Court had

8  expressed a -- had made plain -- I'm quoting -- its strong

9  preference -- I'm quoting -- for the drug tests to be

10  conducted.

11       Well, here, Your Honor, governmental actors -- the White

12  House, the CDC, and congressmen -- have made plain their strong

13  preference for vaccine misinformation to be suppressed or

14  curbed online.  Exact same.

15       And the final element of *Skinner* was some evidence that if

16  the private railway companies chose to do the drug tests, that

17  the government would have some involvement if they chose to.

18  Way less than the involvement the government has here with the

19  CDC providing the standards of decision.

20       But in combination those three factors, the Court said,

21  were sufficient to turn private conduct into state conduct,

22  emphasizing the immunity statute.

23       And for that reason, Your Honor, we would argue that

24  Section 230, in combination with the other factors of this

25  case, is another strong factor of encouragement and inducement

1    weighing in favor of a state action finding.

2          Now, I'm happy to take questions, but what I'd like to do

3    is turn to defendants' *Bivens* arguments.  You'll remember that

4    the defendants had a number of arguments claiming that, even if

5    there is state action, we still have no constitutional claims

6    because of *Bivens*.

7          May I turn to that, Your Honor --

8                **THE COURT:**  Sure.

9                **MR. RUBENFELD:**  -- or I'm happy to say more about

10   *Skinner*.

11         So the *Bivens* arguments, Your Honor, are really very --

12   they're really misconstruing the law.

13         First of all, *Bivens* has nothing to do with our right to

14   equitable relief for ongoing constitutional violations.  This

15   is very important.

16         The Ninth Circuit has specifically held that *Bivens*,

17   because it's a damages remedy, is neither necessary nor

18   appropriate -- I'm quoting -- neither necessary or appropriate

19   when plaintiffs are seeking equitable relief.

20         Why?  Because equitable causes of action -- I'm quoting --

21   equitable causes of action arise directly under the

22   Constitution.

23         And the court, the Ninth Circuit, has singled out -- this

24   is *Sierra Club versus Trump*, cited just last year -- the First

25   Amendment as one of those provisions that generate a cause of

```
1    action, equitable cause of action directly, not the judge-made
2    Bivens cause of action that we all know about from the famous
3    Bivens case.
4         Second, defendants' Bivens arguments also have no
5    applicability to --
6         THE COURT:  Wait.  The equitable cause of action
7    directly against whom?
8         MR. RUBENFELD:  Oh, we have equitable causes of action
9    against Facebook as an entity.  So even if Your Honor were to
10   find that the damages action cannot run against Facebook
11   because of Malesko, the equitable cause of action, you've got
12   to put -- you've got to stop curbing CHD's speech.  You have to
13   stop stamping it with these unconstitutional fact checks.  You
14   have to stop shadow --
15        THE COURT:  Is that part of 1983 or something else?
16        MR. RUBENFELD:  It's a federal cause of action.  As
17   the Court, of course, is aware, 1983 is for state --
18        THE COURT:  So it's not 1983, it's something else?
19        MR. RUBENFELD:  No, it's a direct equitable cause of
20   action against individuals acting under color of federal law
21   when they are violating the Constitution.  1983 is, you know,
22   of course, when the actors operate under color of state law.
23        And the equitable cause of action does not arise under
24   Bivens; it arises directly under the Constitution.  Bivens has
25   nothing to say about it.
```

1    *Bivens* also has nothing to say about our takings claim,

2    which, similarly, arises directly under the Fifth Amendment

3    because of the Fifth Amendment's, quote, self-executing nature.

4    I'm quoting the Supreme Court from 50 years ago on this.

5        And *Bivens* claims, again, can be brought against corporate

6    entities.  So even if *Bivens* claims cannot, if the Court so

7    finds, takings claims undoubtedly can be.

8        The United States Supreme Court's *Loretto* decision is a

9    takings case brought against a private telephone company.  And

10   there are other cases of that sort that we cite in our brief.

11   As long as the state action, the federal action, requirement is

12   satisfied, you can bring a takings case against a private

13   corporation.

14       With respect, finally, to what are our *Bivens* claims, of

15   course, we are making *Bivens* claims.  Those are our damages

16   claims in particular against Mr. Zuckerberg, who we do allege

17   had a specific individual participatory decision-making

18   responsibility over the fundamental decision to, one,

19   deplatform Mr. Kennedy; and, two, to adopt the partnership with

20   the CDC that we've discussed.

21       The --

22           **THE COURT:**  Deplatform Mr. Kennedy?  That's what

23   you're calling it?

24           **MR. RUBENFELD:**  They terminated his Instagram account,

25   yes, Your Honor.  And we've so pled in the Rule 15(d)

1    supplement.

2        But the *Bivens* damages claim is a First Amendment claim.

3    But, Your Honor, the Ninth Circuit has squarely held that

4    *Bivens* claims in this circuit can be stated for First Amendment

5    violations and can be stated against private actors for -- that

6    that doesn't prevent a *Bivens* claim from being stated.

7        The Court so held in the *Schowengerdt* case back in '87,

8    and reaffirmed that in the *Vega* case.  That's the Ninth

9    Circuit, 2018.  *Bivens* First Amendment claims can be stated

10   against private actors.  The only key issue is -- in those

11   cases is whether there are adequate alternative remedies, the

12   famous, you know, *Bivens* factors.

13       And here, Your Honor, there are no alternative remedies,

14   whatsoever, for the conduct that we're alleging as the First

15   Amendment violation; viewpoint discrimination, prior restraint.

16   No law, federal or state, makes that unlawful.  Only the First

17   Amendment can make that unlawful.

18       We have alleged that CHD has suffered hundreds of

19   thousands of dollars in lost donations as a result of what

20   defendants have done.  And for that injury, Your Honor, there's

21   no -- nothing other than a *Bivens* damages claim.  It's *Bivens*

22   or nothing.

23           **THE COURT:**  But could the Congress enact a statute

24   that precluded Facebook from discriminating against what you're

25   calling this vaccine misinformation?

1          **MR. RUBENFELD:**  What an excellent question, Your

2     Honor.

3          I believe that the very large social media companies can,

4     as Justice Thomas suggested very recently in his *Knight*

5     concurrence, they can be regulated and treated as public

6     utilities or so-called common carriers.  Common carriers were

7     historically under the requirement that they not discriminate

8     on the basis of viewpoint but take all comers.

9          If you accept Justice Thomas's view about this, that

10    Congress or perhaps even the states can legislate -- by

11    legislation, regulate them as common carriers or -- yeah, I

12    guess, "common carriers" is the right word for that, then the

13    answer is yes.

14         Certainly, a question Your Honor does not have to reach in

15    this case, but I believe the answer to that would be yes.  And,

16    certainly, Justice Thomas indicated his approval of that

17    approach in his recent *Knight* concurrence.

18         **THE COURT:**  Okay.  So that'd be an alternative then?

19         **MR. RUBENFELD:**  It would be a potential alternative.

20    If it is constitutional, the court -- courts would have to

21    decide if it's constitutional, but it certainly doesn't exist

22    now.

23         The *Bivens* alternative remedy question does not ask could

24    Congress do something.  It asks, is there any remedy available

25    to the plaintiff now under state or federal law for the injury

1   he has suffered?  And the answer is that there is no

2   alternative remedy.  And the Ninth Circuit has specifically

3   held it must be an adequate remedy, not a, you know,

4   speculative or a remedy that might or might not happen in the

5   future.

6       So, Your Honor, with that, I will conclude my remarks.

7   And I know that Mr. Teich and I have only, I guess, about 10 or

8   15 minutes left to cover the statutory claims, but I'm sure we

9   can do that.

10          **THE COURT:**  Right.

11          **MR. RUBENFELD:**  I will now sit down, so to speak, and

12   let Mr. Teich handle the RICO claim, if that's all right.

13          **THE COURT:**  Well, I thought we were going to be back

14   and forth on these things.

15          **MR. RUBENFELD:**  Oh, I'm sorry.

16          **MR. TEICH:**  Your Honor, with permission, Roger Teich

17   for plaintiff as well.  I would just respond to two points that

18   came up there, if I may, and then --

19          **THE COURT:**  Sure.

20          **MR. TEICH:**  -- turn it back over to defendants to take

21   up the other -- the civil fraud claims.

22      Does that make sense?

23          **THE COURT:**  If you want.  It's your time.

24          **MR. TEICH:**  Sure.

25      On paragraph 50, you pointed out that the CDC is engaging

 1  local messengers and partners to contain the spread of

 2  misinformation, work with social media companies.  You're quite

 3  right.  They don't identify Facebook by name, although I think

 4  it's a highly plausible inference there.

 5      But in the next paragraph, the CDC does say Facebook, as

 6  with other social media tools, is intended to be part of a

 7  larger integrated health communications strategy.

 8      And in testimony that the CDC gave in December of 2019,

 9  they say:  "Stop myths.  We will work with local partners to

10  establish new partnerships and contain the spread of

11  misinformation.  To advance this, we've recently collaborated

12  with social media companies like Pinterest and Facebook."

13      And this is another point of distinction from the *Daniels*

14  case.  In *Daniels*, there was no plausible allegation of a

15  meeting of the minds.  Here, there's a highly plausible

16  allegation of a meeting of the minds between Facebook and the

17  CDC.

18      And with that, Your Honor, we would be prepared to move on

19  unless you have questions.

20          **THE COURT:**  So, in your view, the only misinformation

21  that the CDC is attempting to keep off the airwaves is your

22  views on vaccines?

23          **MR. TEICH:**  Well, what we allege has occurred here is

24  a systematic attempt to degrade and destroy CHD.  We have put

25  into the record, in Exhibit B, 15 fact checks that are driven

1    by an algorithm Facebook is alleged to have developed with the

2    CDC that spots speech that has terms like "vaccine hesitancy"

3    or "differential outcomes" or "unvaccinated children."

4        **THE COURT:**  I mean, are you okay with other

5    misinformation not being published?  It's only your particular

6    misinformation you don't want published?

7        **MR. TEICH:**  I'm confused by the question.  We allege

8    that it's not misinformation at all; it's true fact.  And if

9    you --

10       **THE COURT:**  I understand that.  But what you're --

11       **MR. TEICH:**  Yes.

12       **THE COURT:**  You've coined the "misinformation" word to

13   apply to what CDC is asking Facebook not to do; right?

14       **MR. TEICH:**  They coined it.

15       **THE COURT:**  What to look for.

16       **MR. TEICH:**  They coined it.

17       **THE COURT:**  So they may have a whole lot of ideas that

18   they think are misinformation.  But you're calling your

19   information -- there's more than just your information they

20   view to be wrong; right?

21       I just -- I'm having a hard time.  Let's say there was

22   something on the Internet that said if you take a COVID vaccine

23   you're going to grow a third head.  That's clearly not true.

24   Is it okay not to let that be published?

25       **MR. TEICH:**  Well, I don't think it's okay if the

1    government is calling the shot, which is the allegation here,

2    is one answer.  And the other answer is --

3          THE COURT:  Okay.  So you think it's inappropriate for

4    the government to say generally, boy, we would really like it

5    if all these private social media outlets didn't publish lies

6    about COVID vaccine.  That's not okay to just say that?

7          MR. TEICH:  Two answers to that.  One is, I think it's

8    the underhandedness of the CDC in using Facebook in this way,

9    which is problematic from a constitutional point of view.

10         And the other point is that's not what has happened here.

11   Children's Health Defense is a reputable nonprofit with Nobel

12   Prize laureates and reputable scientists on an advisory board

13   and an editorial process for determining what to publish, which

14   is alleged at length in the complaint.

15         And every one of those articles that's been fact checked

16   and censored is factual or is opinion on disclosed fact.  It's

17   not false.  It's not the three-headed cow, you know, thing

18   you're talking about.  That's not what happened.  That's not

19   this case.

20         THE COURT:  But --

21         MR. TEICH:  Yes.

22         THE COURT:  But the problem I have -- a problem I have

23   is you're talking about constraining misinformation, but by

24   that you mean constraining CHD information?  That's the bad

25   thing you're alleging?

1          **MR. TEICH:**   That is what has occurred here, and it has

2     occurred here because, long before the pandemic, Your Honor,

3     CHD, the plaintiff, was on Facebook from 2017, doing what they

4     do, criticizing the CDC for its capture by industry, you know,

5     for any number of things that they're critical of.

6          Facebook took no issue with that until 2019.   And the

7     question is why?   And the answer, we submit, is because that's

8     when the CDC, the government agency, decided that vaccine

9     hesitancy was public enemy number one, was public health issue

10    number one.

11         And in the service of that, they announced that in

12    April 2019.   And in the service of that they have worked with

13    Facebook to take CHD plaintiff down.   And that's -- that's what

14    we are alleging is unconstitutional.

15         **THE COURT:**   Okay.   Thank you.

16         **MR. TEICH:**   Thank you.

17         **THE COURT:**   Okay.   So do the plaintiffs wish to

18    discuss the other claims?

19         **MS. MEHTA:**   Your Honor, did you mean the defendants or

20    did you mean the plaintiffs?

21         **THE COURT:**   I'm sorry, the defendants.   I apologize,

22    yeah.

23         **MS. MEHTA:**   Yes, Your Honor.

24         If I could, I would hope to take just two minutes to very

25    quickly address a couple of the points that were just raised,

1   and then we'll move on.

2          **THE COURT:**  Sure.  You can use your time however you

3   like as long as you recognize you only have so much of it.

4   That's all.

5          **MS. MEHTA:**  Understood, Your Honor.  Thank you.

6      So I just want to briefly address a few of the points.  I

7   think the last question and answer with Mr. Teich reveals a

8   fundamental problem with the *Bivens* cause of action

9   irrespective of and sort of, you know, above and beyond all the

10  other problems that we went to, which is the lack of any

11  plausible allegation of any connection between any of the

12  things they allege; the CDC, Representative Schiff, antitrust

13  hearings, all of these things which seem completely orthogonal

14  to the issue at hand.

15     But even if you accept all of those allegations, none of

16  them go to the specific action requirement, which is that there

17  is nothing alleged that suggests that the CDC encouraged,

18  coerced, was jointly acting with Facebook or with the

19  third-party fact-checkers as to the specific challenged conduct

20  which is the CHD posts.

21     At best, they have alleged -- and this is giving them all

22  of the benefit of their allegations, which we don't agree with.

23  At best, they have alleged that what the CDC has done here is

24  said, "We would like social media companies to not have

25  misinformation on their platforms."

The CDC is not alleged to have taken any specific action, jointly or through coercion or through encouragement or otherwise, with respect to CHD.  There's no allegation that it said "you should find this particular post to be misinformation or label it as being potentially having inaccurate information in it."

Nothing is specifically tied to the actual conduct at issue, and that is a fundamental defect that permeates every theory that you just heard them talk about for the last hour.

And, separately from that, I want to talk briefly about the equitable relief claims because we didn't have a chance to touch on that before.  With respect to the equitable relief claim, a couple of things.

First, there still would have to be state action.  So they seem to acknowledge that they have a *Malesko* problem with respect to Facebook under *Bivens*.  They didn't have any meaningful response to Mr. Zuckerberg's actual personal involvement in these decisions as to a *Bivens* claim as to him personally.

So, instead, what you heard was, "Well, we still have our equitable relief claims."  They would still have to have state action.  And for all the reasons I talked about before, there is no allegation of state action here, including that there was nothing specific to CHD or nothing specific to the challenged conduct.  And because all of the theories that you heard with

 1   respect to coercion, encouragement, all of that, fundamentally

 2   are inconsistent with the Ninth Circuit's case law, including

 3   the *Gorenc* case, which I cited, including *Mathis*, which I

 4   cited, and as we've laid out in our briefing.

 5        And I'm happy to address, you know, specific points that

 6   he made -- that Mr. Rubenfeld made or Mr. Teich made, but at

 7   the end of the day it is a theory that takes existing precedent

 8   and would require the Court to extend it in multiple different

 9   ways but is fundamentally inconsistent of the whole framework

10   of liability under *Bivens*.

11        So with respect to the equitable relief, they would still

12   have to plead state action, and they haven't done that under

13   any of these theories.  The idea that the CDC is saying "We'd

14   like social media companies generally to not have

15   misinformation on their platform" is not joint action with

16   respect to the challenged conduct.

17        The idea that the CDC says, "Don't have misinformation on

18   your platform, but let's have truthful and accurate information

19   on your platform" is not encouraging Facebook to take any

20   action with respect to CHD's particular speech.

21        **THE COURT:**  What about if it's in connection with one

22   phenomenally powerful representative saying, "And if you don't,

23   we're going to take away your 230 immunity"?

24        **MS. MEHTA:**  So, first of all, I don't think it's

25   plausibly alleged that he actually made a threat that would

1    connect those two things directly.

2        But even if it were, one representative does not have the

3    power to do anything with respect to Facebook.  Even half a

4    dozen, which I think Mr. Rubenfeld said, well, there's a half a

5    dozen people who said that, that is not going to actually

6    create a threat that Congress is going to do anything with

7    respect to Facebook, because Congressional action requires a

8    lot more than a half a dozen statements from members of

9    Congress.

10        And I think if we actually look at the allegations, really

11    what they're doing is asking questions.  They're doing exactly

12    what, in *Mathis*, was found to be congressional inquiry into a

13    problem, not a threat.

14        But apart from all of that, even if we were to say somehow

15    that that's a threat, and even if we were to say one member of

16    the House of Representatives or half a dozen legislators had

17    the power as individuals to create government coercion, nothing

18    connects those allegations to the specific challenged conduct

19    here.

20        Nobody says, "You need to do something about CHD's posts

21    or we're going to come after you under Section 230."  Nobody --

22    I mean, it's the fanciful allegation that, you know, antitrust

23    inquiries that are happening in Congress are somehow connected

24    to CHD's posts here.  It doesn't hold together even if we read

25    every allegation and plausible inference in their favor.

1    And then with respect to the takings claim, which is

2    separate, the takings claim is specific to the *Donate* button,

3    the CHD *Donate* button, which they're saying was taken down.

4    There's no allegation that the CDC or Representative

5    Schiff or any member of Congress ever said anything with

6    respect to the *Donate* button.

7    So even if you were to buy into the theory they've

8    articulated that somehow, you know, in trying to create

9    truthful information on the platform is state action, the

10   *Donate* button has never come up.  And there's no suggestion

11   that anyone at the CDC or in Congress or otherwise had any

12   communications with respect to that.  So the takings claim sort

13   of independently fails for lack of state action on that basis,

14   and that goes to their equitable relief.

15   The final point I want to make on the equitable relief,

16   and then I'm going to turn it over because it's a natural

17   segue, is the First Amendment implications of their equitable

18   relief that they're asking for.

19   They are suggesting that this Court should restrain

20   Facebook's free speech rights by issuing an injunction as to

21   what Facebook can and can't do on its platform.  And that --

22   there is a First Amendment issue in this case, and that is the

23   issue that's raised with respect to the First Amendment.

24   This is not a *Bivens* issue.  This is not an equitable

25   relief based on state action restraining First Amendment as to

1    their speech, but there is a fundamental First Amendment

2    problem with what they're asking for in that equitable cause of

3    action.

4         So I think that's a nice segue to have me turn it over to

5    my partner, Mr. Holtzblatt, who's going to address causes of

6    action two and three, unless you had any questions, Your Honor.

7         **THE COURT:**  No.  I was just going to say, you say,

8    well, they're asking you to, yourself, impair Facebook's First

9    Amendment rights by claiming equitable relief.

10        I suppose in the old days we would just have a libel

11   action.  It would be a tort.  It would be, well, you have

12   impaired my business and reputation by telling a lie about me

13   when you post on my Facebook page that I'm spewing

14   misinformation.

15        That'd be an approach that both First Amendment -- both

16   First Amendment interests would be protected; right?  Because

17   if it's false, then there's no protection.  But each -- each

18   actor is entitled to say whatever he wants.  That would be a

19   way to approach it, I guess.

20        **MS. MEHTA:**  Yeah, it's true, Your Honor, that they

21   could have, I guess, theoretically, pled some sort of claim for

22   defamation or libel or something.  I don't want to presume why

23   they didn't do it other than that would raise a host of issues,

24   including, you know, Section 230 immunity.  There would be the

25   combating --

1          **THE COURT:**  Oh.

2          **MS. MEHTA:**  -- First Amendment claims.

3          **THE COURT:**  I got you there, yeah.

4          **MS. MEHTA:**  There might be anti-SLAPP issues.  I think

5    there's a lot of reasons why that claim would fail too.  But

6    they obviously made the decision not to plead it.

7          And, you know, instead they've pled theories, including

8    the *Bivens* claim, the RICO claim, the UCL claim, that all seem

9    to really have -- to be a fundamental mismatch with the core of

10   their allegations.

11         And -- but the fact that they chose not to plead

12   defamation or libel or something that's more traditional

13   doesn't resolve the problem that confronts the Court --

14   right? -- which is why they've pled what they pled and the

15   problems with what they've pled.

16         **THE COURT:**  Okay.  So you want someone else to speak

17   now?

18         **MS. MEHTA:**  Yes.  Thank you, Your Honor.

19         **MR. HOLTZBLATT:**  Thank you, Your Honor.  Ari

20   Holtzblatt.  I'm going to address counts two and three.  And

21   the hour is now late, and so my suggestion is that I address

22   them together --

23         **THE COURT:**  Okay.

24         **MR. HOLTZBLATT:**  -- because a number of our defenses

25   speak to both of them.

1      I'm going to start with two threshold defenses, the First

2  Amendment and Section 230 defenses, because they cut across

3  both of those claims.  And then I'll turn to specific defects

4  with respect to the Lanham Act and the RICO claim.

5      As my colleague, Ms. Mehta said, CHD is right that there

6  are significant First Amendment interests in this case, but

7  those significant First -- but it is wrong about the

8  consequence for this case of those significant First Amendment

9  interests.

10      By seeking to stop defendants from speaking and from

11  making their own editorial judgments on the way topics of the

12  safety and efficacy of vaccine misinformation, CHD's claims

13  intrude on defendants' own First Amendment rights.

14      Now, with respect to the First Amendment, I want to make

15  two points, Your Honor.  The first is that the First Amendment

16  protects the exercise of editorial control and judgment.

17  Whether that's the decision of a newspaper, in *Miami Herald*

18  *versus Tornillo*, about whether to run a politician's op-ed; or

19  the decision to parade organizers in *Hurley*, about who can

20  march in their parade; or the decision of an online platform to

21  filter or moderate third-party content, as *Zhang versus Baidu*

22  held at 10 F.Supp.3d 433, and numerous other courts have held

23  as well.

24      Now, this principle of editorial control and judgment

25  protects most of the conduct that CHD challenges in this case,

1  including the decision to remove or reduce the distribution of

2  CHD's posts or to restrict CHD's access to advertising or

3  fundraising tools.  Simply put, Your Honor, CHD may not invoke

4  the power of this court to compel defendants to override

5  defendants' own editorial judgments.

6      The second First Amendment principle that I want to

7  address, Your Honor, is the fact that CHD challenges fact

8  checks, all of which disclose not only the fact-checker's

9  conclusion that a post contains false information, but that

10  those fact checks also disclose the factual basis for that

11  conclusion.  That is significant.

12      As the Ninth Circuit held in *Partington v. Bugliosi*, when

13  a speaker outlines, quote, the factual basis for his

14  conclusion, his statement is protected by the First Amendment.

15  And the reason for that, Your Honor, is because in that

16  circumstance the reader remains, quote, free to draw his own

17  conclusions about the correctness of that conclusion based on

18  the disclosed underlying facts.  Now, that's at 56 F.3d at 1156

19  to 1157.

20      And to provide an example of that, Your Honor, in

21  paragraphs 129 to 138 of the complaint, CHD posted an article

22  by Dr. Brian Hooker, along with a note saying that the article

23  supports the view that, quote, unvaccinated kids are healthier.

24      This was reviewed by independent fact-checkers who

25  indicated that the post contains false information, and so

1    Facebook displayed a gray overlay on this particular post,

2    quote, False information checked by independent fact-checkers.

3         But, now, this is key, Your Honor.  There was also a

4    button that said *"See Why*."  And when a user might click on the

5    button *"See Why*," the button would lead to a page explaining a

6    number of things about how the fact-checker can reach that

7    conclusion.

8         That underlying post was, quote, unsupported because it

9    is, quote, based on a single study which used highly biased

10   methods, failed to control for confounding factors in

11   comparison to vaccinated/unvaccinated children, such as

12   healthcare-seeking behavior, and used patient data from

13   hand-picked pediatric clinics only.

14        Now, all of the fact checks -- and Mr. Teich mentioned the

15   15 fact checks that are included as an exhibit.  And Your Honor

16   can look at those, and you will see that all of those fact

17   checks have a similar structure.  There is a "*See Why*" button

18   that points to another page where the underlying facts that the

19   fact-checker was basing their ultimate conclusion on is

20   disclosed.

21        The First Amendment does not permit CHD to challenge the

22   fact-check label, just the conclusion which merely conveys how

23   the fact-checker interpreted underlying facts, which are not

24   challenged as false, that are made available to the reader.

25        So those are two initial points on the First Amendment,

 1    Your Honor.

 2         I'd like to then turn to Section 230, which, like those

 3    First Amendment defenses, applies to both the Lanham Act and

 4    RICO claims.

 5         And, Your Honor, just to pause, the reason that I want to

 6    start with the First Amendment defense and the Section 230

 7    defense is because, although I believe that all of the defects

 8    we have pointed out in our briefs would support dismissal with

 9    prejudice, we believe that is especially true with respect to

10    the First Amendment and the Section 230 defense, both of which

11    are intended to protect not only from liability but also the

12    burdens of litigation.

13         And the burdens of litigation in this case, Your Honor,

14    have been extraordinary as we are already through three

15    different complaints before Your Honor has even heard the

16    motion to dismiss, a motion to supplement the facts.  And if

17    there were to be another complaint in this case, it would be

18    the fifth bite at the apple.  And so that's one of the reasons

19    why it's so important, we believe, to emphasize these First

20    Amendment and Section 230 defenses.

21         Now, as to the Section 230 defense, Your Honor, as Your

22    Honor, I'm sure, knows, Section 230(c)(1) bars any claim that

23    would treat a provider of an interactive computer service as

24    the publisher of content, quote, provided by another

25    information content provider.

1          It, therefore, protects Facebook and Mr. Zuckerberg from

2     liability for treating Facebook as the publisher of content

3     created not by Facebook but by third parties, whether that's

4     third-party content created by third-party fact-checkers or by

5     CHD itself.

6          Now, many courts in this district have recognized this

7     principle applies when the claim is that the platform has

8     removed content because removing content is a traditional

9     publisher activity.  For example, the *Sikhs For Justice* case at

10    144 F.Supp.3d at 1088.  And that principle precludes, much like

11    the First Amendment principle that I started with, any theory

12    based on restricting access to or declining to boost CHD's

13    posts.

14         Second, Your Honor, Section 230, likewise, protects

15    distributing content created by third parties.  And the key

16    question for this application of Section 230 is who was, quote,

17    responsible for what makes displayed content illegal or

18    actionable?  And that's from the *Kimzey* case, *versus Yelp*, at

19    836 F.3rd 1263, from the Ninth Circuit.

20         Here, what makes the content allegedly unlawful is the

21    determination that CHD's posts contain false information.

22    That's the key component of the content that CHD is trying to

23    challenge.  And that determination, Your Honor, was not made by

24    Facebook or by Mr. Zuckerberg but by independent fact-checkers.

25         Facebook then translated that third-party determination

1   into gray overlays that were superimposed on CHD's posts in

2   much the same way that Yelp translates user ratings into its

3   proprietary star-rating system.

4        As the Ninth Circuit explained in the *Kimzey* decision,

5   which I just pointed Your Honor to, this is a neutral tool for

6   displaying user-generated content.  And when you use a neutral

7   tool to translate content generated by a third party into

8   display on the platform, it does not amount to content

9   development.

10       Now, CHD makes two points in response to the Section 230

11   defense that I want to touch very briefly on, Your Honor.

12       The first is to cite the *Enigma Software Group* case from

13  the Ninth Circuit, but that case involved Section 230(c)(2),

14  not Section 230(c)(1), and here Facebook invokes Section

15  230(c)(1).

16       The second point I would like to address, Your Honor, is

17  that CHD says that Facebook can be deemed vicariously

18  responsible for content created by third-party fact-checkers.

19       But the third-party fact-checkers are distinct and

20  independent corporate entities.  As counsel for Poynter has

21  already emphasized very strongly, Your Honor, they have their

22  own organizational operations and identities, and those

23  identities and operations predated this particular dispute.

24       The notion that this corporate separateness can be ignored

25  conflicts with the fundamental principle of Section 230, which

 1    is that an entity can only be held liable for their own

 2    content, not for the content created by another information

 3    content provider.

 4         And we think the *Blumenthal versus Drudge* case is

 5    illustrative of this, Your Honor.  That's at 992 F.Supp 44.

 6    There the Court held that AOL could not be held liable for an

 7    allegedly defamatory story published by Matt Drudge, even

 8    though AOL had contracted with and paid Drudge to provide the

 9    specific kind of material that was at issue: gossip and rumor.

10    They had touted Drudge to its subscribers.  It had actually

11    paid him and retained the contractual right to remove or

12    require changes to any of those articles.

13         Now, CHD invokes the law of agency, but all of the cases

14    it cites involves individual people acting as moderators, not

15    separate, distinct entities as we have here.  And we think that

16    to invoke the law of agency in a case like this would run

17    counter to the core principle of Section 230, which is that you

18    are only responsible for content that you, yourself, create.

19         When we're dealing with an entity, in any event, under

20    agency law there has to be evidence that Facebook has taken

21    over the day-to-day operations of the fact-checkers with

22    respect to the very fact checks at issue, and there is no

23    allegation remotely like that here.  At most, there's an

24    allegation that Facebook created a fact-check infrastructure.

25         Lastly, Your Honor, I'd like to address a couple of key

1    defects in their -- in CHD's Lanham Act and RICO claims and how

2    their allegations do not plausibly establish the elements of

3    those claims.

4         Starting with the Lanham Act, CHD asserts a false

5    advertising claim.  To establish a false advertising claim

6    under the Lanham Act there must be, quote, commercial

7    advertising or promotion.

8         Courts have emphasized the important constitutional

9    constraints on liability under the Lanham Act.  It was not

10   intended to and cannot constitutionally be applied to anything

11   other than commercial speech to avoid precisely the situation

12   we have here, which is using the Lanham Act to constrict fully

13   protected noncommercial speech.

14        Of course, the paradigmatic commercial speech is a paid

15   advertisement designed to promote one's own products or

16   services.  And that's obviously not what the fact-check labels

17   look like.  And that commonsense conclusion, Your Honor, is

18   confirmed by the formal test for commercial speech.

19        Ordinarily, commercial speech is speech that does no more

20   than propose a commercial transaction.  And, of course, in

21   close cases but only close cases -- and this is emphatically,

22   Your Honor, not a close case -- the *Bolger* factors are looked

23   at.  There are three of them.

24        And CHD emphasizes the first of those, which is that there

25   must be economic motivation.  But as the Ninth Circuit held in

1    the *Dex Media* case, at 696 F.3d 952, economic motive itself is

2    insufficient; the other two factors must also be satisfied.

3    They are not -- the fact-check labels do not refer to a

4    specific product and they were not made in the context of an

5    advertisement.

6       Very briefly, Your Honor, even aside from the commercial

7    speech limitation, the speech at issue here is not within the

8    zone of interest of the Lanham Act.  To be within the zone of

9    interest, it is not enough to be injured as a consumer nor is

10   it enough to be competing in the marketplace of ideas.  And

11   that's all we have here.

12       Finally, Your Honor, turning to RICO -- and I would start

13   by simply noting Justice Souter's admonition that it is

14   especially important not to extend civil RICO to

15   fully-protected First Amendment activity, which, again, is

16   exactly what CHD is attempting to do here.

17       There are numerous problems, including the failure to

18   allege the proximate cause or pattern requirements of RICO.

19   But let me address very briefly even the failure to allege the

20   elements of the predicate here, which is the wire fraud

21   statute.

22       Wire fraud requires an intent to obtain money or property

23   from the one who is deceived.  There is no allegation that CHD

24   itself was deceived even; in fact, quite the opposite.  The

25   fact checks are -- and labels -- the entire point of this

litigation, Your Honor, is that CHD vehemently disagrees with those fact checks, so they cannot possibly have been deceived by them.

But, more fundamentally, CHD is not alleged to have -- no defendant is alleged to have obtained or intended to obtain any money or property from CHD.  In fact, for example, Your Honor, one of the allegations is that CHD was prevented from buying ads on Facebook, which is the exact opposite of seeking to obtain money or property from CHD.

CHD offers an alternative theory that visitors to CHD's page were somehow deceived.  But, as has been emphasized even by CHD itself repeatedly this morning, Your Honor, the theory of this case, the entire theory that cuts across all 180 pages of the Second Amended Complaint, is an effort for the defendant to convey information to visitors to CHD's page or allegedly to divert their attention to other sources of information, such as the CDC, or to the fact-checker's pages where they can explain the factual basis for their conclusion.

There is nothing about that, not plausibly or even otherwise, Your Honor, that the intent, the purpose, or effect of the fact checks here was to separate visitors to the CHD page from their money, which is the requirement to assert wire fraud.

This is emphatically, Your Honor, not a criminal wire fraud scheme, which is what would be required to establish a

1    RICO claim.

2         So, Your Honor, we -- we have many other defects that

3    we've identified in our briefs, and we will leave you to pick

4    and choose from amongst the plethora of them that lead to

5    dismiss this case.

6         But I do want to again emphasize, Your Honor, there are

7    serious First Amendment and Section 230 stakes in this case for

8    defendants, and it is critically important to be able to

9    protect those interests.  To allow yet another complaint in

10   this case would not only, we think, not be consistent with

11   judicial economy, Your Honor, but would also burden those very

12   important interests.

13        And unless Your Honor has any further questions, I'll turn

14   it over to Poynter's counsel to address anything additional on

15   these claims.

16            **THE COURT:**  All right.  Thank you.

17        Just so you know, plaintiffs have now used -- I'm sorry --

18   defendants have used almost all their time.  Anyway, we have a

19   little bit left.

20        So, Mr. Holtzblatt?

21            **MS. LOCICERO:**  It's Ms. LoCicero, Your Honor.

22            **THE COURT:**  Oh, I'm sorry.

23            **MS. LOCICERO:**  That's okay.  For Poynter Institute.

24   And I will run at warp speed.

25            **THE COURT:**  Well, don't talk fast.

1          **MS. LOCICERO:**  Okay.  I'll hit the highlights.  The --

2     there have been comments about 15 fact checks in Exhibit B.  I

3     want to emphasize that, of the 15, Poynter did one.  And that's

4     the one that we've already talked about relating to the flu

5     vaccine study.

6          That speech is most emphatically for purposes of the

7     Lanham Act, not commercial speech.  There was no commercial

8     transaction proposed.  The very text of the article establishes

9     that it's the kind of speech about health information, vaccine

10    information, a government report, that's the kind of core

11    speech of public concern that the First Amendment protects and

12    that the Lanham Act does not address.

13         For -- you can even go back to the landmark case of *New*

14    *York Times versus Sullivan*.  That's cited for the actual malice

15    propositions in there, routinely, but that involved an ad that

16    the -- that *The New York Times* at the time would pay $4,800 for

17    Heed Their Rising Voices concerning the civil rights movement.

18    And the United States Supreme Court had no problem finding

19    that, even though an ad was paid for, that was not commercial

20    speech.

21         The same thing that Mr. Holtzblatt has already spoken

22    about, related to a profit motive, isn't enough.  There are

23    many, many cases that stand for the proposition that just

24    because there's a profit motive involved for newspapers and TV

25    stations and books and journalistic fact-checking services,

1   like Poynter, that does not convert their speech into

2   commercial speech.  So fundamentally, that's a problem that

3   plaintiff cannot overcome under the Lanham Act.

4        With respect to the RICO claim, a couple of points, Your

5   Honor.  The -- the allegations are often lumping all the

6   defendants together.  It's impossible to figure out what

7   Poynter is specifically accused of, and there are just

8   significant Rule 8 and Rule 9 pleading issues.

9        But to emphasize the point about a lack of any money or

10  property being acquired, which is fundamental for a wire fraud

11  predicate act, I would ask the Court to consider the *Monterey*

12  *Plaza Hotel* case, Ninth Circuit 215 F.3d 925.  There a hotel

13  complained about, sort of, picketing and union behavior that

14  the court said that the plaintiffs might have found to be

15  vexatious and harassing, but even that kind of behavior is not,

16  quote, acquisitive.

17       CHD has not alleged, nor can it allege, that Poynter has

18  one nickel that belongs to CHD; and that's fundamental and

19  fatal to the wire fraud claim.

20       There's also a standing problem under the RICO theory of

21  plaintiffs -- of plaintiff that is illustrated by Judge Rogers'

22  recent decision in *Pacific Recovery Solutions versus United*

23  *Behavioral Health*, which there's a Westlaw cite for at the

24  moment.  But there what happened was a healthcare provider

25  complained, tried to bring a RICO claim because the insurance

 1    company would only pay that provider out-of-network benefits,

 2    so they were getting less than they deemed that their services

 3    were worth.

 4         And what the Court recognized in that recent decision is

 5    that, look, the damage, if there's any, is really to the

 6    patients who are not being fully reimbursed for the services

 7    that they are receiving.  And even though the healthcare

 8    provider in *Pacific Recovery* claimed that they were not

 9    receiving payments from some of the patients, the Court had no

10    problem finding that *Pacific Recovery* did not have standing to

11    bring a RICO claim.

12         So to the extent that CHD's claims here turn on some kind

13    of theory of donor fraud, that you can click through 500

14    screens and finally maybe make a donation to a fact-checker,

15    that donor fraud theory would not provide CHD standing.  It

16    would be -- provide standing, if to anyone, to the donors who

17    are allegedly defrauded.

18         And, again, CHD does not claim that it was defrauded in

19    any form or fashion because it doesn't believe any of the

20    things that the defendants are saying.

21         The last thing I will say is that in many ways CHD's

22    theories simply defy common sense.  This is not racketeering

23    behavior, organized crime behavior, drug cartel, the kinds of

24    things that RICO is designed to attack.

25         What is at issue here, as we've said in multiple times and

1    is particularly important to Poynter is its speech, its

2    journalistic right to criticize things that it believes are

3    inaccurate and being spread on social media, in accordance with

4    its journalistic practices and like what you will see in

5    Exhibit B to the Second Amended Complaint.

6         So, Your Honor, we would ask that you dismiss with

7    prejudice all the claims against Poynter and let us go home and

8    practice journalism.  Thank you.

9         **THE COURT:**  You're welcome.

10        The plaintiffs.

11        **MR. TEICH:**  Thank you, Your Honor.  I'm going to

12   address Section 230, the RICO fraud, Mark Zuckerberg's personal

13   liability quickly, and then turn it over to my colleague, Jed,

14   for a final word on Lanham Act.

15        This is, to my knowledge, the first --

16        **THE COURT:**  Okay.  Just a second.  I'm looking at the

17   clock, and I think you've got about 15 minutes total.  That's

18   actually generous.  So you can go ahead.

19        **MR. TEICH:**  Thank you.

20        First case to come to court on Facebook's responsibilities

21   for its fact-checkers.  Important case, Your Honor.  First of

22   all, though, what's not at issue?  Constitutional claims,

23   Section 230 offers no defense, just to be clear.

24        And what's not at issue is the -- on Section 230 are the

25   warning label, the go to the CDC for reliable info, what you

1    see below not reliable.

2        Facebook published that.  No fact-checker wrote that.  The

3    gray overlays that say "False information checked by

4    independent fact-checkers," Facebook wrote that.  No third

5    party wrote that.  And that's hardly neutral.

6        They're turning *Kimzey* and *Marshall's Locksmith*, the

7    Garland case from the D.C. Circuit, on their head.  Those cases

8    involve simple, you know, transforming data points like a

9    where's a locksmith located into a map with no representation

10   by Google that that locksmith is actually there; or Yelp

11   ratings into stars, no representation that, you know, it's an

12   accurate rating.

13       Facebook's making the determination that this stuff is

14   false and it's sticking that gray overlay on CHD's page.

15   Facebook's the author of that.

16       The other thing that's not at issue -- excuse me, Your

17   Honor -- on 230 is defunding the button.  That's not material

18   under Section 230 that they took down.

19       So what is at issue, though -- and it's vitally

20   important -- is Facebook's *pay no attention to the man behind*

21   *the curtain* defense here.  It should not fly at 12(b)(6), with

22   all due respect, Your Honor.

23       We've made these allegations about content development.

24   The definition of an information content provider in Section

25   230(f)(3) is an entity or person responsible in whole or in

1   part for the creation or development of the information.

2   Involved in part in the development is the -- is the standard

3   you're going to hold us to.

4        Here's what we've alleged:  That Facebook or, in fact, the

5   CDC with Facebook, direct content to the fact-checkers

6   prejudged as false by their algorithms.  Essentially, that they

7   tell the fact-checker this is false, you tell us why or, you

8   know, you come up with a strawman argument why.  That's our

9   allegation.

10       And the answer they provided is this blurb they created

11  about their apparatus, that these are independent third parties

12  and that they select material which may be false.  But you'd

13  have to believe that that's all they're doing, giving them a

14  great deal of material to sift through.

15       What we're alleging is, if CHD's content runs afoul of

16  this circular definition of misinformation because it runs

17  counter to CDC pronouncements or uses terms like

18  "unvaccinated," that it is prejudged as false by Facebook

19  itself.

20       Facebook pays, trains, supervises, and excludes opinion.

21  And that's important because other stuff gets a free pass from

22  Facebook.  Like, climate change scepticism is not fact-checked

23  because it's opinion.

24       We allege Facebook is telling the fact-checkers, "Whatever

25  you do, don't let this go, because it's opinion.  You're going

1    to find it false fact."  And if that is the case, as is

2    alleged, Facebook does not have Section 230 immunity.

3        Facebook tells the users that its fact-checkers are

4    trustworthy.  So Facebook is vouching for its agents.

5        And, of course, Facebook retains the right of control.

6    That's the point of agency.  Whether or not it's exercised,

7    Facebook has the right of control.  And there's no surer

8    evidence of that, Your Honor, than the bottom line here.

9        Facebook is posting the fact-checker content not on

10   fact-checker websites but on CHD's page.  So it's Facebook

11   who's pressing, you know, *submit* or *send* on that, not a

12   fact-checker.

13       So, you know, I think in all those ways we've alleged

14   agency, which makes Facebook at least responsible in part for

15   the creation or development of this content.

16       I want to turn briefly to Mark Zuckerberg.  Of course,

17   he's the founder, CEO, chairman of the board, majority

18   shareholder.  But that's true in all the cases, and that's not

19   the basis of these specific allegations.

20       What we're saying here is, he's the public face of

21   Facebook on this issue of vaccine misinformation.  He's

22   testified to Congress multiple times on that issue.  In answer

23   to Congressman Posey's question, he testified under oath:  "The

24   science is clear.  Vaccines are safe for everyone, and all

25   vaccines."  So he's taken a stand on this issue.

1    There's a reason why Representative Schiff communicated

2  with him personally as the control person responsible for this

3  issue, and we allege that they met to discuss this issue.

4  He -- it's undisputed that Mark Zuckerberg has been personally

5  involved in other Facebook censorship decisions, like letting

6  climate change skeptics get a pass for opinion.

7    This one involves prominent public figures; Mr. Kennedy,

8  Representative Schiff, and others.  It involves scientific

9  issues like vaccines and 5G, about which Zuckerman --

10  Zuckerberg has, you know, taken a deep personal interest.

11    And it's inconceivable to us that Zuckerberg, having been

12  directly involved in those other categories of content

13  regulation, is not personally involved here.

14    And then there is a panoply of personal motives that point

15  toward his involvement, including his own heavy investment in

16  vaccine development.  I mean, we're talking, like, billions of

17  dollars in his related for-profit entities, et cetera.

18    On the RICO fraud, it is true that the RICO fraud requires

19  the intent to deceive and to cheat.  Doesn't require that it be

20  successful, but it does require that intent.  And we do allege

21  that there is that intent to divert viewers and users to rival

22  nonprofits.

23    Nonprofits -- the law is clear, nonprofits do play in a

24  commercial game in that they compete for donations.  And to

25  that extent, CHD has suffered real losses.  They had 60,000 in

1    donations on the *Donate* button in the year 2019, until it was

2    terminated.

3          And so like *Resolute Forest* out of this district, if

4    plaintiff's customers relied on defendants' statements in a way

5    that caused plaintiff to lose money, there's RICO standing.  So

6    that's the standing issue.

7          And the intent wraps up the sort of congruence of the

8    deception and the cheating.  And we say that's met by deceiving

9    viewers to click elsewhere.

10         I think that I will leave it at that and turn it over to

11   my colleague, Jed, for comments on the Lanham Act, unless Your

12   Honor has questions.

13              **THE COURT:**  Thank you, no.

14              **MR. TEICH:**  Thank you.

15              **THE COURT:**  You're welcome.

16              **MR. RUBENFELD:**  Thank you, Your Honor.

17         Briefly, defendants, once again before Your Honor,

18   emphasized over and over that we were not alleging specific

19   governmental intervention with respect to the specific action

20   of, you know, restricting plaintiff's content.

21         But defendants simply are not coming to grips with the

22   *Mathis* case out of the Ninth Circuit that rejected that

23   requirement and said it's a matter of standards of decision

24   regardless of whether there is particular involvement with the

25   particular plaintiff.

1          Second, I mentioned the Pelosi statement as satisfying the

2     *Hammerhead* test.  You'll notice that defendants just simply

3     didn't come to grips with that; a statement that surely can be

4     reasonably interpreted as insinuating a threat of governmental

5     action.

6          Finally, with respect to the Lanham Act, Your Honor,

7     defendants are just making two arguments, so I'll briefly just

8     mention both.

9          First, they say we lack standing.  And what they argued in

10    their brief was, we weren't -- CHD is not a direct competitor

11    with Facebook and, therefore, we don't satisfy the direct

12    business competition requirement.  They cited a 2013 case from

13    this district saying so.

14         Unfortunately, they neglected to mention to Your Honor

15    that in 2014 the United States Supreme Court decided *Lexmark*,

16    expressly rejecting that standing requirement.

17         All *Lexmark* requires is zone of interests.  And there are

18    a dozen cases holding that nonprofit organizations, when

19    defendant promotes the services of a rival nonprofit and

20    plaintiff loses money, which is just what happened here, that's

21    within the zone of interests of the Lanham Act, and the

22    nonprofit can state a claim.

23         **THE COURT:**  And who's the competing nonprofit?

24         **MR. RUBENFELD:**  So Facebook's fact-checkers are

25    nonprofit organizations, as we allege.  Facebook promoted them.

1          And, by the way, they offer competing services; that is,

2     they purport to offer accurate health information on the very

3     topics that CHD does.  Facebook promoted their services.  They

4     called them accurate, reliable.  They directed users to their

5     sites where users will see prominently displayed a *Donate*

6     button.

7          So they promoted their services, and there are a dozen

8     cases holding, Your Honor, that, you know, even if it seems

9     counterintuitive with respect to the Lanham Act and commercial

10    transactions, that that -- promoting a rival nonprofit's

11    services is the proposal of a commercial transaction for Lanham

12    Act purposes.  That's the *Valley Forge* case, 24 F.Supp.3d 451.

13         With respect to the commercial speech, defendants just

14    don't come to grips with *Arrix*, decided just two months ago by

15    the Ninth Circuit, the Ninth Circuit's most thorough, most

16    recent decision on the commercial speech requirement.

17         The Ninth Circuit says, on the contrary, commercial speech

18    does not have to solely propose a commercial transaction.  It's

19    fact based.  And the most important single ingredient is

20    economic motivation.

21         We have alleged in detail Facebook and Zuckerberg's

22    massive financial interest in the vaccine industry, and we have

23    alleged that they were economically motivated.  And the other

24    factors, contrary to defendants' representations, are satisfied

25    here too.  But the most important is economic motivation.  And

1    the Ninth Circuit's very clear this is a jury question, and

2    it's a totality of the facts question.

3          Thank you, Your Honor.

4              **THE COURT:**  Thank you.

5          Well done, all of you.  We've come full circle on this.

6    Thank you for the arguments.  They're helpful.  You also have,

7    of course, provided me with substantial pleadings and

8    attachments and exhibits to go over.  So all of those things

9    will be incorporated.

10         And the matter is submitted.  You'll hear from me shortly.

11   Thank you very much.

12             **MR. HOLTZBLATT:**  Thank you, Your Honor.

13             **MS. MEHTA:**  Thank you, Your Honor.

14             **THE COURT:**  Thank you.

15         (At 12:37 p.m. the proceedings were adjourned.)

16

17                     <u>**CERTIFICATE OF REPORTER**</u>

18         I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter.

20   DATE: Sunday, May 23, 2021

21

22

23

24   _____

25         Katherine Powell Sullivan, CSR #5812, RMR, CRR
                     U.S. Court Reporter