UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHILDREN'S HEALTH DEFENSE, | Case No. 20-cv-05787-SI |
| Plaintiff, | **ORDER GRANTING DEFENDANTS'** |
| v. | **MOTIONS TO DISMISS SECOND AMENDED COMPLAINT, DENYING PLAINTIFF'S MOTION TO** |
| FACEBOOK INC., *et al*., | **SUPPLEMENT AND DENYING LEAVE TO AMEND** |
| Defendants. | Re: Dkt. Nos. 68, 69, 75, 76, 103 |

On May 5, 2021, the Court held a hearing on defendants' motions to dismiss the second amended complaint and plaintiff's motion to supplement the complaint. After the hearing, plaintiff filed a request for judicial notice and another motion to further supplement the second amended complaint and for *in camera* inspection under the All Writs Act.

For the reasons set forth below, the Court GRANTS the motions to dismiss without leave to amend, GRANTS the request for judicial notice, DENIES the motions to supplement the second amended complaint as futile and DENIES the motion for an *in camera* inspection.

**INTRODUCTION**

On August 17, 2020, plaintiff Children's Health Defense ("CHD") filed this lawsuit against defendants Facebook, Inc. ("Facebook"), Facebook CEO Mark Zuckerberg ("Zuckerberg"), The Poynter Institute for Media Studies, Inc. ("Poynter"), and Science Feedback[1] alleging four causes of action: (1) violation of the First and Fifth Amendments pursuant to *Bivens v. Six Unknown Named*

---

[1] Science Feedback is a French non-profit organization providing fact-checking services for Facebook. *Id*. ¶ 20. It appears from the docket that Science Feedback has not yet been served.

*Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971); (2) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a); (3) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), 1964(c); and (4) declaratory relief.

CHD operates a social media page on Facebook's platform. CHD posts articles and opinion pieces about the harms of vaccines, including COVID-19 vaccines, as well as the dangers of pesticides and wireless technologies such as 5G. CHD alleges that the United States government — through Congressman Adam Schiff, the Centers for Disease Control ("CDC"), and the World Health Organization ("WHO"), as the CDC's "proxy" — has "privatized" the First Amendment by "teaming up" with Facebook to censor CHD's vaccine safety speech. Second Amended Compl. ("SAC") ¶ 1, Dkt. No. 65-1. CHD alleges that defendants have implemented this campaign by "purporting to flag misinformation" by identifying certain information on CHD's Facebook page as "false" or "misleading" when that information is, in fact, "valid and truthful," and through the posting of a Facebook advisory comment that is affixed to CHD's Facebook page which informs visitors that they can visit CDC.gov to obtain information about vaccines. *Id.* CHD alleges that Facebook, Zuckerberg, and the fact-checking organizations have engaged in a "smear campaign" and "multiple acts of fraud and deception in furtherance of their aggressive and heavy-handed campaign of censorship against Plaintiff's Facebook page" with the purpose of "stigmatizing CHD and its content regarding vaccines, and discouraging users from accessing this content." *Id.* ¶ 4.

CHD alleges it has suffered monetary and reputational harm, and CHD seeks damages and declaratory and injunctive relief, including an order directing Facebook to "remove its warning labels and misclassification of all content on [CHD's] Facebook page, and to desist from any further warnings or classifications" and an order "requiring defendants to make a public retraction of their false statements." *Id.* Prayer for Relief.

## BACKGROUND

The following facts are drawn from the SAC.[2] Plaintiff CHD is a not-for-profit "child health

---

[2] Plaintiff has twice amended the complaint in response to motions to dismiss filed by defendants and pursuant to stipulation. With each amendment, the complaint has grown in length,

protection and advocacy group" incorporated under the laws of the State of Georgia.  *Id.* ¶¶ 14, 25.  CHD is an "advocate for complete candor as to the risks of environmental toxins, vaccines, 5G and wireless networks, and the conflicts of interest that have compromised government oversight of those products and services."  *Id.* ¶ 6.  CHD operates the website, https://childrenshealthdefense.org, where it publishes research articles and opinion pieces.  *Id.* ¶ 15.  CHD receives all of its financial support from contributions, membership fees, and gross receipts from activities related to its tax-exempt functions.  *Id.*  Robert F. Kennedy, Jr. founded and leads CHD.  *Id.* ¶ 14.

Defendant Facebook, Inc. is a Delaware corporation with its principal place of business in Menlo Park, California.  *Id.* ¶ 16.  Facebook operates an online social media and social networking platform on which users like CHD can gather, advocate, and fundraise.  *Id.*  Facebook users' utilization of Facebook is governed by Facebook's Terms of Service that, if violated, may result in the deletion of users' Facebook account and pages.  *Id.* ¶¶ 36-39.  Facebook's Terms of Service "permit it to 'detect misuse of [its] Products, harmful conduct towards others and situations where [it] may be able to help support or protect [its] community.' Facebook retains limited rights, e.g., 'offering help, removing content, blocking access to certain features, disabling an account or contacting law enforcement[.] [and] shar[ing] data with other Facebook companies when [it] detect[s] misuse or harmful conduct[.]'"  *Id.* ¶ 37 (citing Terms ¶¶ 1, 3(2)(3)).

Defendant Mark Zuckerberg is a co-founder of Facebook and serves as Facebook's chairman, CEO, and controlling shareholder.  *Id.* ¶ 17.  In December 2015, Zuckerberg and his wife, Dr. Priscilla Chan, co-founded the Chan Zuckerberg Initiative ("CZI") to "donate" 99 percent of their Facebook shares in an effort to "develop new drugs, diagnostic tests and vaccines."  *Id.* ¶ 281.  Plaintiff alleges that both Zuckerberg and Facebook have significant financial interests in the vaccines programs that CHD warns against.  *Id.* ¶¶ 274-91.

Defendant The Poynter Institute for Media Studies, Inc. ("Poynter") is a Florida non-profit organization.  *Id.* ¶ 21.  Poynter also operates a branded news fact-checking service, PolitiFact.  *Id.*

---

if not substance.  The original complaint was 95 pages; the first amended complaint was 148 pages; the second amended complaint is 151 pages.

PolitiFact contracts with social media companies, such as Facebook, to fact-check content shared on social media platforms. *Id.* The SAC also alleges that International Fact-Checking Network ("IFCN"), a unit of Poynter, certifies Facebook's fact-checking "partners," including Science Feedback. *Id.* ¶¶ 105-06, 109.

On February 14, 2019, Congressman Adam Schiff, identifying himself as "a Member of Congress who is deeply concerned about declining vaccination rates around the nation," wrote a public letter addressed to Zuckerberg. *Id.* ¶ 60. In that letter, Rep. Schiff "urge[] that Facebook implement specific algorithms to identify, censor and remove all so-called 'vaccine misinformation.'" *Id.* Because the SAC repeatedly quotes portions of this letter, the Court has reproduced the entirety of the letter here:

February 14, 2019

Mark Zuckerberg
Chairman and Chief Executive Officer
Facebook Inc.
1 Hacker Way
Menlo Park, CA 94025

Dear, Mr. Zuckerberg:

As more Americans use the Internet and social media platforms as their primary source of information, it is important that we explore the quality of the information that they receive, particularly on issues that directly impact the health and well-being of Americans, as well as the billions who use your site around the world. Accordingly, I am writing out of my concern that Facebook and Instagram are surfacing and recommending messages that discourage parents from vaccinating their children, a direct threat to public health, and reversing progress made in tackling vaccine-preventable diseases.

The scientific and medical communities are in overwhelming consensus that vaccines are both effective and safe. There is no evidence to suggest that vaccines cause life-threatening or disabling diseases, and the dissemination of unfounded and debunked theories about the dangers of vaccinations pose a great risk to public health. In fact, the World Health Organization listed vaccine hesitancy – the reluctance or refusal to vaccinate despite the availability of vaccines – as one of the top threats to global health in 2019. In a dramatic demonstration of the dangers, Washington state declared a public health emergency due to a measles epidemic in Clark County, signaling the resurgence of a potentially fatal disease that was effectively eliminated from the United States decades ago by vaccines.

There is strong evidence to suggest that at least part of the source of this trend is the degree to which medically inaccurate information about vaccines surface on the websites where many Americans get their information, among them Facebook and Instagram. As I have discussed with you in other contexts, and as you have

4

acknowledged, the algorithms which power these services are not designed to distinguish quality information from misinformation or misleading information, and the consequences of that are particularly troubling for public health issues.  I acknowledge that it may not always be a simple matter to determine when information is medically accurate, nor do we ask that your platform engage in the practice of medicine, but if a concerned parent consistently sees information in their Newsfeed that casts doubt on the safety or efficacy of vaccines, it could cause them to disregard the advice of their children's physicians and public health experts and decline to follow the recommended vaccination schedule.  Repetition of information, even if false, can often be mistaken for accuracy, and exposure to anti-vaccine content via social media may negatively shape user attitudes towards vaccination.

Additionally, even parents and guardians who seek out accurate information about vaccines could unwittingly reach pages and videos with misinformation.  A report by the Guardian found that on both Facebook and YouTube, suggested searches related to vaccines often led users to pages or groups providing medically and scientifically inaccurate information.  Finally, I am concerned by the report that Facebook accepts paid advertising that contains deliberate misinformation about vaccines.

As a Member of Congress who is deeply concerned about declining vaccination rates around the nation, I am requesting additional information on the steps that you currently take to provide medically accurate information on vaccinations to your users, and to encourage you to consider additional steps you can take to address this growing problem.  I was pleased to see YouTube's recent announcement that it will no longer recommend videos that violate its community guidelines, such as conspiracy theories or medically inaccurate videos, and encourage further action to be taken related to vaccine misinformation.

Specifically, I request that you provide answers on the following questions:

•Does content which provides medically inaccurate information about vaccines violate your terms of service?

•What action(s) do you currently take to address misinformation related to vaccines on your platforms? Are you considering or taking additional actions?

•Do you accept paid advertising from anti-vaccine activists and groups on your platforms? How much has been spent in the past year on advertising on this topic?

•What steps do you currently take to prevent anti-vaccine videos or information from being recommended to users, either algorithmically or as a suggested search result?

I appreciate your timely response to these questions and encourage you to consider what additional steps you can take to address this growing problem. As more Americans rely on your services as their primary source of information, it is vital that you take that responsibility with the seriousness it requires, and nowhere more so than in matters of public health and children's health. Thank you for your attention to this important topic.

Sincerely,

Adam B. Schiff/Member of Congress

5

*Id.* ¶¶ 60, 62-63; https://schiff.house.gov/news/press-releases/schiff-sends-letter-to-google-facebook- regarding-anti-vaccine-misinformation.

The SAC alleges,

> The term "vaccine misinformation" (as Rep. Schiff defined it, and as Facebook implemented it) is a euphemism for *any* expression of skepticism toward government and industry pronouncements about vaccine safety and efficacy, or of reasons why parents or their children's physicians might decline to follow the CDC's full "recommended vaccine schedule," regardless of whether those expressions are true or not. Thus, Rep. Schiff provided a substantive standard – deference to CDC/WHO pronouncements conclusively presumed to be "authoritative" – by which Facebook should identify and censor vaccine "misinformation" on its platform. The term "vaccine misinformation" does not, for example, include erroneous, misinformed or fraudulent statements made by pharmaceutical companies, or the CDC, to promote vaccines.

*Id.* ¶ 61.

Rep. Schiff subsequently made public statements that "if the social media companies can't exercise a proper standard of care when it comes to a whole variety of fraudulent or illicit content, then we have to think about whether [Section 230] immunity still makes sense." *Id.* ¶ 64.

In March 2019, Facebook officially announced it would "reduce the ranking of groups and Pages that spread misinformation about vaccinations in News Feed and Search" and "remove access to [] fundraising tools for Pages that spread misinformation about vaccinations." *Id.* ¶ 68. On September 4, 2019, the WHO Director-General issued a statement "welcom[ing] the commitment by Facebook to ensure that users find facts about vaccines across Instagram, Facebook Search, Groups, Pages and forums where people seek out information and advice."[3] *Id.* ¶ 69.

In 2020, Zuckerberg announced that Facebook would donate $10 million to the CDC Foundation's Combat Coronavirus Fundraiser, and $10 million to the WHO. *Id.* ¶ 46. As such, Facebook is listed as a "partner" on the CDC Foundation's website under the "partners." *Id.* ¶ 48.

---

[3] The statement further read:

> Facebook will direct millions of its users to WHO's accurate and reliable vaccine information in several languages, to ensure that vital health messages reach people who need them the most. The World Health Organization and Facebook have been in discussions for several months to ensure people can access authoritative information on vaccines and reduce the spread of inaccuracies on Facebook and Instagram.

*Id.* ¶ 69.

The CDC specifies its work with "social media partners" in its "*Vaccine With Confidence*" initiative:



**Stop Myths**
CDC is engaging local messengers and partners to contain the spread of misinformation and ensure key stakeholders have critical information about vaccines.

*New Investments and Partnerships*

- Work with social media companies to promote trustworthy vaccine information
- Provide accurate, accessible information on vaccines to state policy makers
- Engage state and local health officials to advance effective local responses to misinformation

*Id*. ¶ 49.

On or about November 2017, CHD agreed to Facebook's Terms of Service to create its Facebook page. *Id*. ¶ 33. CHD has since actively maintained its Facebook page. *Id*. On a daily (or more frequent) basis, CHD uploads articles and video posts on its Facebook page to "expose truths" about the severe health dangers of certain vaccines and technologies. *Id*. ¶ 26. Before publication, CHD conducts an internal fact-check to "ensure that every article cites sources for every fact it asserts." *Id*. ¶ 30. CHD currently has a Facebook community of 122,830 followers. *Id*. ¶ 33.

Beginning on or around January 15, 2019, Facebook began labeling certain content posted to CHD's Facebook page as "false," out of date, or unreliable. *Id*. ¶¶ 78-79, 115-18, 126, 131, 141, 157. The labels indicate that these determinations are reached by "independent," "third-party" "fact-checkers" who review potentially misleading information and rate it as false, altered, partly false, missing context, satire, or true. *Id*. ¶¶ 78, 217-218.

The SAC contains some examples of these labels:

United States District Court
Northern District of California





8

On or around May 1, 2019, Facebook permanently disabled the "dispute" function on CHD's account, barring CHD from challenging any actions taken by Facebook. *Id.* ¶ 200. Facebook also began to "demote and/or ban content ('shadow-ban') that CHD posted to its Facebook page" using its "patent on social media shadowbanning." *Id.* ¶ 201.

On or around May 2, 2019, Facebook deactivated the "donate" button on CHD's page and barred CHD from buying new Facebook advertisements. *Id.* ¶¶ 198-99. From January 2019 to May 2019, CHD generated $41,241 in user donations through its Facebook page. *Id.* ¶ 223. After Facebook's deactivation of CHD's donate function, CHD has not received any further donation revenue through Facebook. *Id.*

On September 4, 2019, after repeated violations, Facebook acted against CHD at the account level, posting a Warning Label at the top of CHD's Facebook page. *Id.* ¶ 81. The warning label, which remains on CHD's Facebook today, states, "This Page posts about vaccines. When it comes to health, everyone wants reliable, up-to-date information. The Centers for Disease Control (CDC) has information that can help answer questions you may have about vaccines. Go to CDC.gov." *Id.*



Poynter's inclusion in this lawsuit largely stems from one fact-check of content appearing

on CHD's Facebook page.[4]  On April 16, 2020, CHD shared on its Facebook page an article written by Collective Evolution, a third-party website.  *Id.* ¶ 151.  PolitiFact labeled the title of Collective Evolution's article as "false," noting that the title is "ambiguous and misleading."  *Id.*  Collective Evolution accepted PolitiFact's conclusion, correcting the article's title from "*New Study: The Flu Vaccine is 'Significantly Associated' With An Increased Risk of Coronavirus*" to "*Study: The Flu Vaccine Is 'Significantly Associated' With An Increased Risk of Coronaviruses—**Not COVID 19**.*"  Dkt. No. 65-4 at 60 (emphasis added).

## LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and a complaint that fails to do so is subject to dismissal pursuant to Rule 12(b)(6).  Fed. R. Civ. P. 8(a)(2).  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

In reviewing a Rule 12(b)(6) motion, courts must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the non-moving party.  *See Usher v. City*

---

[4] CHD's opposition to Poynter's motion to dismiss states that Facebook added a Politifact fact-check to a January 21, 2021 CHD post.  CHD's Opp'n to Poynter's Mtn. at 4 n.4 (Dkt. No. 70).  However, CHD's motions to supplement the SAC do not address the January 21, 2021 fact-check.

United States District Court
Northern District of California

*of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, courts are not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted).

If a court dismisses a complaint, it must decide whether to grant leave to amend.  The Ninth Circuit has repeatedly held that "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (citations and internal quotation marks omitted).

## DISCUSSION

**I.    First Cause of Action:  Violations of First and Fifth Amendments Pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971)**

Plaintiff alleges defendants have violated its First and Fifth Amendment rights and seeks damages for those violations pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389, 395-96 (1971).  In *Bivens*, the Supreme Court recognized an implied right of action for damages against federal officers for violating an individual's rights under the Fourth Amendment to be free from unreasonable searches and seizures.  "In making this finding, the United States Supreme Court 'created a remedy for violations of constitutional rights committed by federal officials acting in their individual capacities.'"  *Life Savers Concepts Ass'n of California v. Wynar*, 387 F. Supp. 3d 989, 997 (N.D. Cal. 2019) (quoting *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1173 (9th Cir. 2007)).

The SAC alleges that "the corporate and individual defendants have acted in concert with Rep. Schiff, federal officials at the CDC and the CDC Foundation, and under the CDC's express consent, the WHO, a United Nations specialized agency, to deprive Plaintiff of its constitutional free expression rights."  SAC ¶ 308.  The SAC alleges that "Facebook willfully participated in joint action with Rep. Schiff, CDC and CDC Foundation, and/or WHO officials or their agents to enforce CDC and WHO policies through Facebook's signature algorithms and machine learning to define, identify, label as 'false news' and/or censor Plaintiff's speech with respect to vaccine-related

speech." *Id.* ¶ 309.[5]  The SAC alleges that "Facebook and the other defendants violated Plaintiff's First Amendment rights by labeling CHD's content 'False Information,' and taking other steps effectively to censor or block content from users. . . . Facebook took these actions against Plaintiff in an effort to silence and deter its free speech solely on account of their viewpoint." *Id.* ¶ 318. CHD also asserts a First Amendment retaliation claim, alleging that after it filed this lawsuit, Facebook notified CHD that it "would modify the parties' contractual term of service § 3.2, effective October 1, 2020, to read: 'We also can remove or restrict access to your content, services, or information if we determine that doing so is reasonably necessary to avoid or mitigate adverse legal or regulatory impacts to Facebook.'" *Id.* ¶ 324.

CHD alleges that defendants violated the Fifth Amendment by permanently disabling the "donate" button on CHD's Facebook page and by refusing "to carry CHD's advertising of its fundraising campaigns." *Id.* ¶ 319.[6]  CHD alleges that "Defendants' actions amount to an unlawful deprivation or 'taking' of Plaintiff's property interests in its own fundraising functions. . . . without just compensation or due process." *Id.* ¶¶ 320, 322.

Defendants move to dismiss CHD's *Bivens* claims on several grounds.  Facebook and Poynter contend that private entities cannot be held liable under *Bivens*.  Defendants also contend that there are no allegations supporting a plausible inference of federal action by any defendant, and that allowing CHD's *Bivens* claims to proceed would run afoul of the Supreme Court's admonition that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity," *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017), because no court has recognized a *Bivens* damages remedy against a social media company, a corporate CEO, or fact-checking organizations for violations of the First or Fifth Amendments.

As set forth below, the Court concludes that CHD's claims against Facebook and Poynter

---

[5]  Although the SAC contains references to CHD's speech about 5G technology, the gravamen of CHD's complaint relates defendants' alleged censorship of CHD's vaccine-related speech.

[6]  As Poynter notes, although the SAC alleges that "defendants" engaged in various actions, most of the allegations, such as the disabling of the "donate" button, relate to acts taken by Facebook, not Poynter.

are foreclosed as a matter of law because a *Bivens* action may only be brought against individual federal actors and cannot be brought against private entities such as corporations or nonprofits.  In addition, the SAC fails to allege that Zuckerberg engaged in federal action, a necessary element of a *Bivens* claim.  As such, the Court finds it unnecessary to address the parties' arguments about the expansion of *Bivens*.

### A.  Private Entities Such as Facebook and Poynter May Not Be Sued Under *Bivens*

In *Correctional Services Corporation v. Malesko*, 534 U.S. 61, 66 (2001), the Supreme Court held that a plaintiff could not bring a *Bivens* action against a private corporation operating a halfway house under contract with the Bureau of Prisons.  The Court stated that "[t]he purpose of *Bivens* is to deter individual federal officers from committing constitutional violations," and that "the threat of suit against an individual's employer was not the kind of deterrence contemplated by *Bivens*." *Id.* at 71; *see also Minneci v. Pollard*, 565 U.S. 118, 127 (2012) (explaining that the holding in *Malesko* was based in large part on "the nature of the defendant, i.e., a corporate employer rather than an individual employee"); *see also Reid v. United States*, 825 F. App'x 442, 444 (9th Cir. 2020) (unpublished) ("A claim for damages based on individualized mistreatment by rank-and-file federal officers is . . . what *Bivens* was meant to address.").

CHD contends that "*Malesko* doesn't apply" "because no other law permits suit against Facebook [or Poynter] for its past acts of viewpoint discrimination against CHD."  CHD's Opp'n to Facebook's Mtn. at 9 (Dkt. No. 71); CHD's Opp'n to Poynter's Mtn. at 11 (Dkt. No. 70).  However, CHD does not cite any post-*Malesko* cases in which courts have permitted *Bivens* actions against private entities.  To the contrary, after *Malesko* courts have consistently held that plaintiffs may not pursue *Bivens* actions against private entities. *See, e.g.*, *Agyeman v. Corr. Corp. of Am.*, 390 F.3d 1101, 1103 (9th Cir. 2004) ("[T]o the extent that Agyeman sought to hold Corrections Corporation itself liable, the case could not be brought under *Bivens* . . . since Corrections Corporation is a private corporation."); *Riggio v. Bank of America Nat'l Trust & Saving Ass'n*, 31 Fed. App'x. 505, 505-06 (9th Cir. 2002) (unpublished) ("There is no private right of action for damages against

United States District Court
Northern District of California

1  private entities that are alleged to have engaged in constitutional deprivations, even if they are acting

2  under color of federal law."); *Rahieh v. Paragon Systems, Inc.*, 316 F. Supp. 3d 1103, 1107 (N.D.

3  Cal. 2018) (citing *Malesko* and dismissing *Bivens* claim against private corporation that contracts

4  with federal government to provide security for offices); *Bender v. General Services Admin.*, 539 F.

5  Supp. 2d 702, 708 (S.D.N.Y. 2008) (same).

6         Accordingly, the Court concludes that as a matter of law, CHD cannot bring a *Bivens* action

7  against Facebook and Poynter because they are private entities.

8

9         **B.**    ***Bivens* Allegations against Zuckerberg**

10         The Court now turns to CHD's *Bivens* claims against Zuckerberg.  As the Ninth Circuit has

11  recognized, the Supreme Court has yet to "completely foreclose applying *Bivens* to private actors."

12  *Vega v. United States*, 881 F.3d 1146, 1153 (9th Cir. 2018).  "[T]he private status of [a] defendant

13  will not serve to defeat a *Bivens* claim, provided that the defendant engaged in federal action."

14  *Schowengerdt v. Gen. Dynamics Corp.*, 823 F.2d 1328, 1337-38 (9th Cir. 1987).  However, "[w]e

15  start with the presumption that conduct by private actors is not state action."  *Florer v. Congregation

16  Pidyon Shevuyim, N.A.*, 639 F.3d 916, 922 (9th Cir. 2011).

17         The Ninth Circuit applies "similar tests to determine whether federal action exists to support

18  a *Bivens* claim or to determine whether State action will permit a § 1983 cause of action."  *Morse v.

19  N. Coast Opportunities, Inc.*, 118 F.3d 1338, 1343 (9th Cir. 1997).  In either scenario, a private

20  actor's conduct must be "fairly attributable" to the government.  *Id*. at 1340.  The Ninth Circuit has

21  "recognize[d] at least four different criteria, or tests, used to identify state action: '(1) public

22  function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus.'"

23  *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003) (quoting *Sutton v. Providence St. Joseph

24  Med. Ctr.*, 192 F.3d 826, 835-36 (9th Cir. 1999)).

25         CHD asserts that Zuckerberg has engaged in federal action under the following theories: (1)

26  that Facebook/Zuckerberg and the federal government engaged in joint action based on, *inter alia*,

27  statements by the CDC, the WHO (as the CDC's "proxy"), and Zuckerberg that they were "in

28  discussion" or "working together" to remove vaccine "misinformation" and (2) that the  immunity

provided by Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c)(2), in combination with pressure from Congressman Schiff, coerced and/or encouraged Facebook/Zuckerberg to take the challenged actions against CHD's Facebook page.

### 1.    No plausible allegations of personal involvement

As an initial matter, Zuckerberg contends that the SAC does not plausibly allege that he was personally involved in or directed the acts challenged in this lawsuit, namely the posting of the warning label on CHD's Facebook page, the fact-checks of specific CHD posts, and the decision to "demonetize" and "shadow-ban" CHD.  The Court agrees.

The SAC alleges that Zuckerberg "is sued individually, and under theories of respondeat superior, alter ego, and agency liability."  SAC ¶ 17.  However, "[b]ecause vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own* actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676 (emphasis added).  Thus, CHD must allege that Zuckerberg himself has taken actions that violate CHD's constitutional rights.  *See id*.

The SAC alleges that "[i]t is highly probable that Zuckerberg has participated in, and personally directed 'vaccine misinformation' policy decisions at Facebook which directly harmed CHD" and that "[t]he decision to demonetize advertising and donations for organizations like CHD related to 'vaccine misinformation' is a decision that Zuckerberg likely would have known about, and approved, given his historical prominence in decisions related to content management generally, and vaccine information specifically."  SAC ¶ 260.  The SAC also alleges that after Congressman Schiff's February 14, 2019 public letter to Facebook and Zuckerberg urging Facebook to remove "vaccine misinformation," "[o]n information and belief, Zuckerberg met personally with Rep. Schiff . . . to discuss, *inter alia*, Facebook's compliance with Rep. Schiff's February 19, 2019 public letter and press release, and those specific standards which were or would be used to identify and censor vaccine 'misinformation.'" *id.* ¶ 64.  CHD also alleges that on March 4, 2019, CHD's president sent a letter to Zuckerberg offering a "rebuttal" of Rep. Schiff's letter, and:

*United States District Court*
*Northern District of California*

> From his public statements and adverse motives . . . it may be reasonably inferred that Zuckerberg was personally and directly involved in decisions and actions which Facebook took to censor and/or "fact-check" CHD's individual posts, and knowingly mislead users about the truthfulness of CHD's posts, and on the CHD account level, deliberately mislead users about CHD's page's reliability, and remove its advertising and fundraising tools.  Zuckerberg and/or the Doe defendants responsible for those actions either read CHD's March 4, 2019 letter or rejected it without reading, but in either event, they did no investigation of it and proceeded within days to publish their warning label and "fact-checks" [with knowledge that the warning label and fact-checks were false, or with reckless disregard as to the truth of the warning label and fact-checks].

*Id.* ¶ 65.

Similarly, in CHD's opposition to Facebook's motion, CHD asserts that "[s]hortly after Schiff's pressure on Zuckerberg, Facebook initiated its censorship and demonetization campaign against CHD" and "[t]he timing of this comprehensive campaign against CHD plausibly indicates that it was initiated in response to pressure that Congressman Schiff brought to bear in the course of personal communications with Zuckerberg."  CHD's Opp'n to Facebook's Mtn. at 28.  CHD's opposition brief also emphasizes that Zuckerberg is a "hands-on" CEO and "the public face of Facebook."  *Id.* at 27-28.  CHD's opposition cites Zuckerberg's testimony before Congress in which he stated that "what we do is try to focus on misinformation that has the potential to lead to imminent or physical harm," expressed his belief that "it's important that people get their vaccines," and that "If someone wants to post anti-vaccination content or they want to join a group where people are discussing that, we don't stop them from doing that . . . But . . . we don't go out of our way to make sure our group recommendation systems show people or encourage people to join these groups.  We discourage that."  SAC ¶ 268.  CHD argues that "[t]hese statements leave little doubt that Zuckerberg is personally involved in Facebook's campaign."  CHD's Opp'n to Facebook's Mtn. at 28.

Alleging that it is "highly probable" and "likely" that Zuckerberg participated in, personally directed, and approved the specific acts challenged in this lawsuit is not sufficient.  Similarly, it is not sufficient to allege that based on Zuckerberg's "public statements and adverse motives . . . it may be reasonably inferred that Zuckerberg was personally and directly involved."  CHD is required to allege facts showing that Zuckerberg actually participated in, directed, or approved any of the alleged constitutional violations.  At best, CHD has alleged that Zuckerberg has made general

United States District Court
Northern District of California

statements about removing "misinformation that has the potential to lead to imminent or physical harm" and discouraging "anti-vaccine" content on Facebook, and that "on information and belief" Zuckerberg met with Congressman Schiff to discuss the issue of vaccine misinformation on Facebook's platform. CHD speculates that Zuckerberg and Schiff discussed "specific standards" that would be used to identify and censor vaccine "misinformation," and CHD speculates that "Zuckerberg and/or the Doe defendants either read CHD's March 4, 2019 letter or rejected it without reading." None of these allegations contain facts showing personal involvement by Zuckerberg in deciding to post the warning label on CHD's Facebook page, the decisions to post fact-checks to particular CHD posts, or the decisions to "demonetize" or "shadow-ban" CHD.

Throughout the SAC, the briefing, and the hearing on these motions, CHD and its counsel repeatedly equate any references to "vaccine misinformation" with CHD's content, and therefore that any statements by Facebook, Zuckerberg, the CDC, or any other entity about removing "vaccine misinformation" from Facebook should be interpreted as statements about censoring CHD's vaccine-related speech. The Court cannot make such an inferential leap, as the phrase "vaccine misinformation" is a general one that could encompass many different types of speech and information about vaccines. Indeed, it is undisputed that there are numerous posts on CHD's Facebook page that are not flagged as "false" or "misleading" by Facebook or the fact-checkers, and thus that CHD is able to post some articles and other information about vaccines without those articles being deemed "vaccine misinformation" by Facebook or the fact-checkers.

Because CHD's bald and conclusory allegations regarding Zuckerberg's personal involvement in the decisions about CHD's Facebook page are unsupported by facts they "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680-81; *see also Soto-Torres v. Fraticelli*, 654 F.3d 153, 159-60 (1st Cir. 2011) (holding insufficient allegations in support of *Bivens* claim against FBI agent that agent "was the officer in charge during the incident," that he "participated in or directed the constitutional violations" and that defendant "knew of the violation[s] and failed to act to prevent them"); *see also OSU Student Alliance v. Ray*, 699 F.3d 1053, 1075 (9th Cir. 2012) ("[A]llegations of facts that demonstrate an immediate supervisor knew about the subordinate violating another's federal constitutional right to free speech, and acquiescence in that violation,

17

suffice to state free speech violations under the First and Fourteenth Amendments"; student newspaper adequately stated § 1983 claims against state college president and vice-president where newspaper alleged, *inter alia*, that president and vice-president oversaw subordinate's decision-making process and was kept informed of controversy and allegedly unconstitutional decisions through multiple emails).

Accordingly, the Court concludes that CHD's *Bivens* claim against Zuckerberg fails because CHD has not alleged any facts showing Zuckerberg's personal involvement in the alleged constitutional violations. As discussed below, the Court concludes that the *Bivens* claims fails for the additional and independent reason that CHD has not alleged that the challenged acts constitute federal action.

### 2. No Federal Action

#### a. Joint Action

The joint action test asks "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) (internal quotation marks omitted). This requirement can be satisfied "by showing that the private party was a willful participant in joint action with the State or its agents." *Id*. "Ultimately, joint action exists when the state has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity." *Id*.

CHD contends that it has demonstrated joint action because it has alleged,

[T]hat (1) the CDC, a federal agency, the WHO, as its proxy, and Zuckerberg stated repeatedly that they were "in discussion" or "working together" to "reduce [contain, or remove] the spread of [vaccine-related] inaccuracies, or "misinformation," and "reach individuals with [] targeted health information," which resulted in Facebook's actions against CHD (SAC ¶¶ 49-52, 69-70, 308); (2) Facebook promotes its "Preventive Health App" for universal vaccination as another form of ongoing collaboration with the CDC (*id*. ¶¶ 56-58); (3) Defendants are contributors to and partners with the CDC Foundation, a quasi-agency proxy that serves as the CDC's fundraising arm (*id*. ¶¶ 40-48); (4) under the Global Health Security Agenda ("GHSA"), the State Department recruits private sector partners – Facebook – to "neutralize vaccine hesitancy," and funds, through intermediaries both Poynter, and its IFCN (*id*. ¶¶ 98-101); (5) the FBI and its entity, InfraGard, and federal agents acting "in conjunction with" the British Government, actively encourage Facebook's

United States District Court
Northern District of California

participation in the GHSA to shape the public debate on vaccines through censorship and demonetization of CHD (*id.* ¶¶ 102-04); and (6) federal actors and Facebook benefit from these actions.

CHD's Opp'n to Facebook's Mtn. at 7-8.

These allegations are insufficient.  First, allegations involving non-federal actors, such as the WHO,[7] the British government, and government-affiliated nonprofits such as the CDC Foundation and InfraGard,[8] are irrelevant to determining whether CHD has plausibly alleged joint action.

Second, general statements by the CDC and Zuckerberg about "working together" to reduce the spread of health or vaccine misinformation, or to promote universal vaccination do not show that the government was a "joint participant in the challenged activity," specifically the decision to put the warning label on CHD's Facebook page, the fact-checks, and Facebook's "demonetization" and "shadow-banning" of CHD's content and page.  For example, one of the allegations CHD relies upon is contained in Paragraph 52 of the SAC, which alleges, "Zuckerberg has stated publicly that Facebook is working with both the CDC and the WHO:  'We work with the [Centers for Disease Control and Prevention] and we work with [the World Health Organization] and trusted health organizations to remove clear misinformation about health-related issues that could cause an imminent risk of harm.'"  SAC ¶ 52.  This statement (and similar general statements by Zuckerberg, Facebook, the CDC, or other entities within the federal government about "working to remove misinformation") does not support the inference that Facebook (or Zuckerberg) worked in concert

---

[7]  The Court takes judicial notice of the fact that the WHO is an international organization comprised of representatives from 194 member states.  *See* "Our Structure," World Health Organization, https://www.who.int/about/who-we-are.  The United States' membership in the WHO does not transform the WHO into a federal entity, and CHD does not provide any authority holding otherwise.  *See NCAA v. Tarkanian*, 488 U.S. 179, 183, 193 (1988) (holding *inter alia* that state university's membership in NCAA did not make the NCAA's conduct state action).

[8]  The SAC alleges that the CDC Foundation is a nonprofit, SAC ¶ 40, and that InfraGard was formed in 1996 by the FBI's Office of Private Sector as part of a "public-private partnership." *Id.* ¶ 103; *see also* "About Us," InfraGard National, https://infraguardnational.org/about-us/overview/ (stating InfraGard "is an FBI-affiliated nonprofit organization").  Government-affiliated nonprofits are considered private entities.  *See Lansing v. City of Memphis*, 202 F.3d 821, 825, 828 (6th Cir. 2000) (applying state-action test to determine whether government-affiliated nonprofit "can be held to constitutional standards when its actions so approximate state action that they may be fairly attributed to the state.").

with the CDC to censor CHD's speech, retaliate against CHD, or otherwise violate CHD's constitutional rights.

The SAC's allegations about the State Department recruiting "private sector partners" are similarly devoid of any facts showing joint action: the SAC alleges that President Obama's 2016 Executive Order, *Advancing the Global Health Security Agenda [GHSA] to Achieve a World Safe and Secure from Infectious Disease Threats* "authorized the State Department to recruit private corporations – including social media platforms and their enablers, such as Facebook and Poynter/Science Feedback – to suppress speech such as Plaintiff's solely because ," and thus the CDC had provided the "standard of decision" for censorship of CHD's speech.it is critical of GHSA's agenda, or the risks that agenda poses to public health." SAC ¶ 100. That allegation is conclusory, and moreover, CHD does not actually allege that the State Department has a relationship with Facebook, much less that the State Department and Facebook have acted together to censor CHD's speech.

At the hearing on this matter, CHD's counsel asserted that under the Ninth Circuit's decision in *Mathis v. Pacific Gas & Electric Co.*, 75 F.3d 498 (9th Cir. 1966), CHD had adequately alleged joint action because Facebook is "deferring to the CDC" about what constitutes "vaccine misinformation," and thus the CDC has provided the "standard of decision" for censorship of CHD's speech. In *Mathis*, PG&E terminated employee Mathis after an undercover investigation revealed that Mathis had, in workplace conversations, agreed to sell marijuana offsite. *Id.* at 501. Mathis sued PG&E under *Bivens*[9] alleging that his firing violated his constitutional rights because PG&E terminated him pursuant to a Nuclear Regulatory Commission policy, and alleging the same constitutional violations under 42 U.S.C. § 1983 on the theory that PG&E had conducted the undercover investigation in close partnership with a county narcotics task force. The district court dismissed the case and the Ninth Circuit reversed, holding that Mathis should be permitted to proceed and that "to prove federal action for his *Bivens* claim, Mathis needed to show PG&E decided to exclude him pursuant to an NRC 'standard of decision for the exclusion of illegal drug users from

---

[9] *Mathis* was decided before the Supreme Court's decision in *Malesko* holding that a private entity could not be sued under *Bivens*.

United States District Court
Northern District of California

protected areas.'" *Id.* at 502 (quoting *Mathis v. Pacific Gas & Elec. Co.*, 891 F.2d 1429, 1434 (9th

Cir. 1989)).  The NRC pressure must so have influenced PG&E's decision "that the choice must in

law be deemed to be that of the [agency]."  *Mathis*, 75 F.3d at 502.

On remand, the case went to trial and the district court granted judgment in favor of PG&E.

On the second appeal, the Ninth Circuit held that Mathis failed to show that PG&E had engaged in

federal or state action.  On the *Bivens* claim, Mathis contended that although there was no published

NRC policy that compelled PG&E's decision to fire him, there was an informal policy that

controlled.  *Id.*  Mathis had submitted evidence that "the NRC was directly pressuring PG&E to

adopt strong anti-drug policies," including that "PG&E was seeking permission to start up its Diablo

Canyon reactor and was consequently trying to please the NRC," as well as documents showing that

an NRC inspector who visited Diablo Canyon "urged on PG&E a rule that would have excluded for

offsite drug involvement only '[p]eople in key assignments,' and then only until the company was

satisfied they wouldn't present a hazard on the job or otherwise affect the company."  *Id.* The Ninth

Circuit held this evidence was insufficient because Mathis failed to show that "the NRC was

promoting a rule that would have excluded someone involved in the type of conduct he was

suspected of."  *Id.*  The court rejected Mathis' argument that his evidence showed that "any measures

PG&E took against drug involvement at Diablo Canyon were designed to allay NRC concerns."  *Id.*

at 503.

> In essence, he asks us to hold that regulatory interest in a problem transforms any
> subsequent private efforts to address the program (even those expressly designed to
> obviate the need for regulation) into state action.  There was no hint of any such
> notion in *Mathis I* and we reject it now.  If the government is considering regulation,
> affected private parties can try to convince it there's no need to regulate without
> thereby transforming themselves into the state's agents.

*Id.*  The court further noted, "[t]he government policy doesn't have to be formal, but it does have to

compel the challenged action."  *Id*. at 503 n.2.  As to the plaintiff's claim that PG&E engaged in

"joint action" with the government task force, the Ninth Circuit held that Mathis "needed to prove

not merely that PG&E had a close relationship with the Task Force, but also that the relationship

encompassed PG&E's plant-access decisions."  *Id*. at 504.  The Ninth Circuit held that Mathis has

failed to do so because he only showed that PG&E conducted its investigation "in close cooperation"

1    with the task force but did not have any evidence that the task force was involved in the decision to

2    exclude Mathis from the plant.  *Id.*

3           *Mathis* does not support CHD.  Relying on Congressman Schiff's February 2019 letter to

4    Zuckerberg, CHD contends that Congressman Schiff "provided a substantive standard – deference

5    to CDC/WHO pronouncements conclusively presumed to be 'authoritative' – by which Facebook

6    should identify and censor vaccine 'misinformation' on its platform."  SAC ¶ 61.  However,

7    nowhere in the letter does Rep. Schiff direct Facebook to adopt any *specific* standard to follow when

8    it determines what speech constitutes vaccine misinformation or whether particular posts are false

9    or misleading.  Instead, Rep. Schiff's letter expressed his concern about the existence of "medically

10   inaccurate information about vaccines" on Facebook and other social media platforms, and he asked

11   Facebook for information about whether content that "provides medically inaccurate information

12   about vaccines" violates Facebook's terms of service and what actions Facebook "currently take[s]

13   to address misinformation related to vaccines on your platforms" and whether Facebook was

14   "considering or taking additional actions?"   https://schiff.house.gov/news/press-releases/schiff-

15   sends-letter-to-google-facebook-regarding-anti-vaccine-misinformation.   None of the general

16   statements or questions in Representative Schiff's letter can be interpreted as providing a specific

17   standard of decision that mandated the particular actions that Facebook took with regard to CHD's

18   Facebook page.  *See Mathis*, 75 F.3d at 502 ("It wasn't enough to show that PG&E was aware of a

19   generalized federal concern with drug use at nuclear power plants, or even that specific government

20   standards would have required exclusion on some materially different set of facts.  The NRC

21   pressure must so have influenced PG&E's decision 'that the choice must in law be deemed to be

22   that of the agency.'").  Indeed, the Court notes that the SAC alleges that Facebook began censoring

23   its speech starting on January 15, 2019, which was prior to Rep. Schiff's letter.  *See* SAC ¶ 78.

24          Nor does the fact that Facebook directs users to the CDC website for information about

25   vaccines mean that the CDC has supplied the "standard of decision" for Facebook's regulation of

26   content on its platform.  Similarly, simply alleging that Facebook and the CDC are "working

27   together" or "partnering" to curb the spread of "vaccine misinformation" does not allege that the

28   specific acts challenged in this lawsuit were made pursuant to a CDC policy.  Instead, what CHD

United States District Court
Northern District of California

United States District Court
Northern District of California

has plausibly alleged is that Facebook created its own algorithms and standards for detecting "vaccine misinformation," and that in doing so, Facebook may have relied on CDC information about vaccines to determine what information is "misinformation." That is not enough to show that Facebook's actions were "compelled" by any particular CDC "standard of decision." *See Mathis*, 75 F.3d at 502. CHD equates generalized statements about "working with the CDC" to "remove misinformation" or "vaccine misinformation," with the adoption of a CDC "standard of decision" about what content to remove. CHD's argument is akin to the plaintiff's losing assertion in *Mathis* that "any measures PG&E took against drug involvement at Diablo Canyon" were as a result of a federal policy. *Id.* As the Ninth Circuit held in *Mathis*, there is a "missing link" connecting the government "standard of decision" to the allegedly unconstitutional act.

Nor has CHD alleged that the government was actually involved in the decisions to label CHD's posts as "false" or "misleading," the decision to put the warning label on CHD's Facebook page, or the decisions to "demonetize" or "shadow-ban." In *Federal Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107 (N.D. Cal. 2020), Judge Koh addressed a similar *Bivens* claim challenging Facebook's removal of the Facebook account and page of Federal Agency of News ("FAN"). Judge Koh held that "there was no joint action because Plaintiffs fail[ed] to allege specific facts establishing the existence of an agreement or a meeting of the minds between Facebook and the government relating to Facebook's deletion of FAN's Facebook page or restriction of FAN's access to its Facebook account." *Id.* at 1126. Here too, CHD has failed to allege specific facts showing that Zuckerberg, or indeed anyone at Facebook, jointly acted with the federal government when Facebook took various actions regarding CHD's Facebook page. Such a "bare allegation of . . . joint action will not overcome a motion to dismiss." *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 900 (9th Cir. 2008); *see DeGrassi v. City of Glendora*, 207 F.3d 636, 647 (9th Cir. 2000) (holding that bare allegations of joint action between private persons and state officials will not overcome a motion to dismiss).

///

///

23

b.      Encouragement Through Section 230 of the CDA Coupled with Government Pressure

CHD also alleges that "government immunity [under Section 230 of the CDA] plus pressure (Rep. Schiff) . . should turn Facebook and Zuckerberg's private-party conduct into state action." SAC ¶ 300.  CHD asserts that Section 230, "by immunizing private parties against liability if they engage in conduct the government seeks to promote, constitutes sufficient encouragement to turn private action into state action."  CHD's Opp'n to Facebook's Mtn. at 6.  With regard to coercion, CHD alleges that Congressman Schiff pressured Facebook and Zuckerberg to remove "vaccine misinformation" through his February 2019 letter and his subsequent public statement that "if the social media companies can't exercise a proper standard of care when it comes to a whole variety of fraudulent or illicit content, then we have to think about whether [Section 230] immunity still makes sense."  SAC ¶ 64.

CHD relies on *Skinner v. Railway Labs Executives' Association*, 489 U.S. 602 (1989), as support for its contention that the immunity provided by Section 230 is sufficient encouragement to convert private action into state action.  In *Skinner*, railway labor organizations challenged two sets of Federal Railroad Administration ("FRA") regulations: (1) "Subpart C" regulations that required private railroad companies to administer blood and urine tests to employees involved in certain train accidents, and (2) "Subpart D" regulations that authorized, but did not require, railroads to administer breath and urine tests to employees who violate certain safety rules.  *Id.* at 606.  The Supreme Court held that both regulations constituted government action and were therefore subject to the Fourth Amendment.  The Court held that the Subpart C regulations requiring testing constituted government action because "[a] railroad that complies with the provisions of Subpart C of the regulations does so by compulsion of sovereign authority."  *Id.* at 614.  Regarding the Subpart D regulations which allowed but not mandate testing, the Court noted that there were "special features" that demonstrated that the government "did more than adopt a passive position toward the underlying private conduct."  *Id.* at 615.  Those "special features" included the facts that the regulations preempted all state laws and collective bargaining agreements covering the same subject matter; the FRA had the right to receive certain test results; railroads were prohibited from divesting themselves of the authority conferred by Subpart D; and covered employees were not free to decline

United States District Court
Northern District of California

1    an employer's request to submit to breath or urine tests under the conditions set forth in Subpart D.

2    *Id*.  The Court concluded,

3         In light of these provisions, we are unwilling to accept petitioners' submission that
         tests conducted by private railroads in reliance on Subpart D will be primarily the
4         result of private initiative.  The Government has removed all legal barriers to the
         testing authorized by Subpart D and indeed has made plain not only its strong
5         preference for testing, but also its desire to share the fruits of such intrusions.  In
         addition, it has mandated that the railroads not bargain away the authority to perform
6         tests granted by Subpart D. These are clear indices of the Government's
         encouragement, endorsement, and participation, and suffice to implicate the Fourth
7         Amendment.

8    *Id*. at 615-16.

9         *Skinner* does not aid CHD.  "Unlike the regulations in *Skinner*, Section 230 does not require

10   private entities to do anything, nor does it give the government a right to supervise or obtain

11   information about private activity."  *Divino Grp. LLC v. Google LLC*, No. 19-CV-04749-VKD,

12   2021 WL 51715, at *6 (N.D. Cal. Jan. 6, 2021).  In *Divino Group*, the plaintiffs asserted that the

13   "the availability of protections under Section 230 of the CDA amounts to government endorsement

14   of defendants' alleged discrimination," and thus that YouTube should be considered a state actor.

15   Judge DeMarchi rejected that contention, stating, "nothing about Section 230 is coercive" and

16   "Section 230 reflects a deliberate absence of government involvement in regulating online speech:

17   'Section 230 was enacted, in part, to maintain the robust nature of Internet communication, and

18   accordingly, to keep government interference in the medium to a minimum.'"  *Id.* (quoting *Batzel*

19   *v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003));  *see also* 47 U.S.C. § 230(b)(2) ("It is the policy of

20   the United States . . .  to preserve the vibrant and competitive free market that presently exists for

21   the Internet and other interactive computer services, unfettered by Federal or State regulation.").

22   The court held, "[a]t most, Section 230 provides protection from civil liability for interactive

23   computer service providers who elect to host information provided by another content provider, or

24   who in good faith act to restrict materials that the provider or user considers 'obscene, lewd,

25   lascivious, filthy, excessively violent, harassing, or otherwise objectionable,' regardless of whether

26   that material is constitutionally protected."  *Id.* at *7 (quoting 47 U.S.C. § 230(c)(2)(A)).  The Court

27   agrees with Judge DeMarchi's analysis and concludes that the immunity provided by Section 230

28   does not provide sufficient "encouragement" to convert Facebook's private acts into state action.

United States District Court
Northern District of California

25

CHD also relies on the coercion test.  Under the coercion test, state action is found "when the State 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'"  *Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982).  CHD alleges that Congressman Schiff's February 2019 letter to Zuckerberg and subsequent public statements coerced Facebook to take action on vaccine misinformation or risk losing certain immunities under Section 230 of the CDA.  SAC ¶ 64.  CHD contends that Schiff's statements could reasonably be interpreted as intimating that some form of adverse regulatory action would follow Facebook's refusal to suppress CHD's so-called "vaccine misinformation."  CHD's Opp'n to Facebook's Mtn. at 6.

As support, CHD cites *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291 (9th Cir. 1987).  In *Carlin*, Carlin Communications supplied "salacious telephone messages to the public," and Mountain Bell telephone company carried Carlin's messages on its "dial-a-message network."  *Id*. at 1292-93.  A deputy county attorney wrote a letter to Mountain Bell threatening to prosecute the company for violating an Arizona statute prohibiting the distribution of sexually explicit material to minors if the phone company continued to provide services to Carlin.  *Id.* at 1293.  Mountain Bell terminated Carlin's services, and Carlin sued Mountain Bell under 42 U.S.C. § 1983 alleging a violation of its First Amendment rights.  The Ninth Circuit held, "[w]ith this threat, Arizona 'exercised coercive power' over Mountain Bell and thereby converted its otherwise private conduct into state action."  *Id.* at 1295; *see also Okwedy v. Molinari*, 333 F.3d 339, 334 (2d Cir. 2003) (holding that letter written by city borough president to billboard company criticizing billboards displaying religious organization's signs proclaiming homosexuality to be a sin and requesting removal of the signs, resulting in signs being removed, could be found to contain implicit threat of retaliation and therefore could support First Amendment Free Speech claim).

The Court concludes that CHD has not alleged facts showing government coercion sufficient to deem Facebook or Zuckerberg a federal actor.  As a later Ninth Circuit decision noted, "[i]n *Carlin*," "the government directed a specific entity to take a specific (allegedly unconstitutional) action against a specific person." *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 843 (9th Cir. 1999).  CHD does not allege that Schiff (or anyone from the government) directed Facebook or

United States District Court
Northern District of California

Zuckerberg to take any specific action with regard to CHD or its Facebook page.  *See* SAC ¶¶ 60-64.  Instead, CHD alleges that Schiff pressured to Facebook remove "vaccine misinformation" and later told reporters that "if the social media companies can't exercise a proper standard of care when it comes to a whole variety of fraudulent or illicit content, then we have to think about whether [Section 230] immunity still makes sense." *Id.* ¶ 64.  These allegations are a far cry from the specific threats in *Carlin* or *Okwedy*; *see also Daniels v. Alphabet Inc.*, No. 20-CV-04687-VKD, 2021 WL 1222166, at *6 (N.D. Cal. Mar. 31, 2021) (holding "Mr. Daniels does not plead any facts that support his argument that the federal government 'coerced' or 'significantly encouraged' defendants to remove his specific Fauci and George Floyd videos from YouTube's platform" because "Mr. Daniels does not allege the federal government directed a particular result with respect to his Fauci and George Floyd videos.").[10]  Further, "[i]f the government is considering regulation, affected private parties can try to convince it there's no need to regulate without thereby transforming themselves into the state's agents." *Mathis*, 75 F.3d at 503.

Accordingly, the Court concludes that CHD has failed to allege the necessary elements of a *Bivens* claim and DISMISSES the first cause of action.

### C. "Takings Claims"

CHD also contends that, notwithstanding the fact that the SAC frames the Fifth Amendment claim as a *Bivens* claim, *see* SAC ¶¶ 303-05, 319-22, "Facebook's assertion that it cannot be sued for First Amendment damages under *Bivens* . . . has nothing to do with CHD's takings claims, because takings claims are not *Bivens* claims."  CHD's Opp'n to Facebook's Mtn. at 9 n.8.

However, regardless of how CHD chooses to characterize its Fifth Amendment claim, CHD

---

[10]  As discussed *infra* in Section V, many of CHD's proposed supplemental allegations involve similarly general statements by other politicians, such as Speaker Pelosi stating in June 2020 that Facebook had failed to remove "COVID-19 disinformation" from its platform and that Congress needed to "send a message to social media executives: You will be held accountable for your misconduct," or broader statements that Section 230 immunity could be "removed" if social media companies did not do more to restrict "dangerous" or "harmful" content – such as content related to white nationalism – from their platforms.  As with Congressman Schiff's statements, these statements are too general and amorphous to constitute coercive action with respect to the specific challenged actions in this case.

still needs to establish "sufficient government action" to assert a takings claim. *Broad v. Sealaska Corp.*, 85 F.3d 422, 430-31 (9th Cir. 1996) (holding that "takings generally require some government regulation," and "[w]ithout governmental encouragement or coercion, actions taken by private corporations pursuant to federal law do not transmute into government action under the Fifth Amendment"). For the reasons stated *supra*, CHD has not done so.

## II.    Second Cause of Action:  Lanham Act

The second cause of action alleges false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a). To state a false advertising claim under the Lanham Act, a plaintiff must allege "a 'false or misleading representation of fact' 'in commercial advertising or promotion' that 'misinterprets the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.'" *Prager Univ. v. Google LLC*, 951 F.3d 991, 999 (9th Cir. 2020) (quoting *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 & n. 2 (9th Cir. 1997)). The Lanham Act does not define "commercial advertising or promotion," but the Ninth Circuit has adopted the following definition: "(1) commercial speech, (2) by a defendant who is in commercial competition with plaintiff, (3) for the purpose of influencing consumers to buy defendant's goods or services, and (4) that is sufficiently disseminated to the relevant purchasing public." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021).[11] "Commercial speech is 'usually defined as speech that does no more than propose a commercial transaction.'" *Id.* (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)). "Courts view 'this definition [as] just a starting point,' however, and try to give effect to 'a common-sense distinction' between commercial speech and other varieties of speech.'" *Id.* (internal citations omitted).

The SAC alleges that defendants "made, authored, and published warning label[s] and 'fact-checks' on CHD's page in order to deter Plaintiff's followers and other consumers from listening to, trusting, and relying on Plaintiff's content, and donating or contributing to Plaintiff." SAC ¶ 330.

---

[11] In *Ariix*, the Ninth Circuit noted that the Supreme Court's decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, (2014), "likely abrogated" the element of "commercial competition." *Ariix*, 985 F.3d at 1120. This Court's analysis does not turn on whether the parties are in "commercial competition."

United States District Court
Northern District of California

"By warning consumers instead to 'go to CDC.gov' for 'reliable and up-to-date [vaccine] information,' defendants intend to persuade consumers instead to follow CDC's recommendations to get the vaccines produced by its major advertisers, Merck, GSK, Sanofi, and Pfizer, who buy $1 billion per annum in advertisements from Facebook." *Id.*[12]  CHD alleges that "Facebook and CHD may reasonably be considered commercial competitors with respect to the messaging regarding vaccines and 5G that they promulgate to Facebook users," *id.* ¶ 333, and "Facebook is engaged in promoting competitive products through its pharmaceutical manufacturer advertisers, and competitive services through its affiliation with the CDC and WHO." *Id.* ¶ 331.

Defendants contend, *inter alia*, that CHD's Lanham Act fails because CHD's alleged injuries are not within the Lanham Act's "zone of interests" and because the warning label and fact-checks are not "commercial advertising or promotion."  "[T]o come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales"  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131-32 (2014).  "Conduct that is not commercial, and does not involve the sale of goods and services, is outside the 'dangers that the Lanham Act was designed to address,' and consequently not actionable under Section 43(a)."  *Maffick LLC v. Facebook, Inc.*, Case No. 20-cv-05222-JD, 2021 WL 1893074, at *3 (N.D. Cal. May 11, 2021) (citing *Bosley Med. Inst., Inc., v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005)).

Here, CHD alleges that Facebook's "warning label" and the third-party fact-checks have caused injury to its "messaging" about vaccines and 5G technology, SAC ¶ 333, and CHD explicitly frames this case as one about censorship of its speech.  *See id.* ¶ 1 ("This case is about how an officer

---

[12] The SAC challenges as false and misleading the following specific statements which comprise the "warning label" that Facebook has posted on CHD's Facebook page:  "This page posts about vaccines.  When it comes to health, everyone wants reliable, up-to-date information.  The Centers for Disease Control (CDC) has information that can help answer questions you may have about vaccines.  Go to CDC.gov."  *Id.* ¶¶ 347-51.  The SAC alleges that "the context in which Facebook's Warning Label on CHD's page would ordinarily be seen and read includes: CHD's own mission statement on the same page that vaccine safety should be taken away from the CDC; CHD's message, 'Read about the CDC & WHO corrupt financial entanglements with vaccine industry, childrenshealthdefense.org/cdc-who'; and that context incorporates by reference numerous articles on CHD's page which call out and criticize the CDC's continued adherence to its 'all vaccines for all children' policy."  *Id.* ¶ 346.

and an agency within the U.S. Government 'privatized' the First Amendment by teaming up with Facebook to censor speech which, under the Bill of Rights, the Government cannot censor.").  CHD attempts to fit its claims under the rubric of the Lanham Act by arguing that "Defendants were seeking to influence consumers to buy the goods and/or services of Facebook's fact-checking partners."  CHD's Opp'n to Facebook's Mtn. at 19 n.18.

However, the warning label and fact-checks are not disparaging CHD's "goods or services," nor are they promoting the "goods or services" of Facebook, the CDC, or the fact-checking organizations such as Poynter.  In addition, the warning label and fact-checks do not encourage Facebook users to donate to the CDC, the fact-checking organizations, or any other organization. Instead, the warning label informs visitors to CHD's Facebook page that they can visit the CDC website to obtain "reliable up-to-date information" about vaccines, and the fact-checks identify that a post has been fact-checked, with a link to an explanation of why the post/article has been identified as false or misleading.  For example, the Poynter fact-check identified in the SAC consisted of an explanation of why the title of an article written by third party Collective Evolution and posted to CHD's Facebook page was "false."  Thus, all of the alleged misrepresentations – the warning label and the fact-checks – are simply providing information, albeit information with which CHD disagrees.

Indeed, CHD expressly equates "goods" and "services" with information:  CHD argues, "In particular, false fact-check labels expressly tout Poynter's *putatively superior information*, thus competing with CHD for donation revenue by actively 'promoting' their competing 'products and services.'"  CHDs Opp'n to Poynter's Mtn. at 17 (emphasis added).  Under CHD's expansive and novel theory of false advertising, any Facebook warning label identifying an alternative source of information and any fact-check with an explanation would constitute false advertising under the Lanham Act because of an injury to "messaging."

Judge Donato recently dismissed a similar Lanham Act false advertising claim challenging advisory comments posted by Facebook on a company's Facebook page.  In *Maffick LLC v. Facebook*, the plaintiff ran three social media pages on Facebook's platform focusing on "stories about social justice" "environmental issues and sustainability" and "political opinion and . . .

United States District Court
Northern District of California

expos[ing] hypocrisy across the political spectrum." *Maffick LLC*, 2021 WL 1893074, at *1. Facebook determined that Maffick was under the editorial control of the Russian government, and posted an advisory comment on the pages identifying them as "Russia state-controlled media." *Id.* Maffick alleged that the advisory was false and that it was injuring Maffick's reputation, ongoing business relationships, and the viability of current business development opportunities. *Id.* Maffick also alleged that "monetization of its social media content (through advertising, e-commerce and otherwise) is down" and that its "'reach,' a metric that measures the number of people who encounter its social media content, is down." *Id.* at *4.

After noting that the Lanham Act prohibits false advertising in connection with the sale of goods or services, Judge Donato stated that "[t]here is no obvious connection between [Maffick's] content and the sale of goods or services" and that "Maffick has not alleged that Facebook attached the 'Russia state-controlled media' label to 'penetrate the relevant market,' whatever that may be, not has Maffick alleged any facts that overcome the 'commonsense conclusion' that neither the label itself nor Facebook's 'campaign' around it constituted an advertisement or promotion as required by Section 43(a)(1)(B)." *Id.* at *3-4 (quoting *Prager Univ.*, 951 F.3d at 1000; *see also Prager Univ.*, 951 F.3d at 1000 (dismissing Lanham Act false advertising claim challenging YouTube's act of tagging PragerU's videos as appropriate for Restricted Mode because "PragerU did not allege any facts to overcome the commonsense conclusion that representations related to Restricted Mode, such as those in the terms of service, community guidelines, and contracts are not advertisements or a promotional campaign"); *see also Ariix*, 985 F.3d at 1119 (holding "informational part" of guide to nutritional supplements "that describes the benefits and science of nutritional supplements" was "fully protected speech" and not commercial speech, while "alleged rigged ratings" portion of guide was actionable as a "paid promotion" under the Lanham Act where nutritional supplement company alleged that "the defendants conceived the Guide to juice sales of [competitor] Usana products, actively misled the public about their supposed independence, and fiddled with their own ratings criteria to boost a favored company that lavishes them with hundreds of thousands of dollars in compensation").

Unsurprisingly, CHD does not cite any authority for the proposition that its "messaging"

31

United States District Court
Northern District of California

constitutes "goods" or "services" for purposes of the Lanham Act. Nor does CHD cite any support for its assertion that a defendant can be held liable under the Lanham Act based on speech that is untethered to the sale of goods or services. To the contrary, courts have held that "[t]he mere fact that the parties may compete in the *marketplace of ideas* is not sufficient to invoke the Lanham Act." *Farah v. Esquire Mag.*, 736 F.3d 528, 541 (D.C. Cir. 2013) (emphasis in original). In *Farah*, the D.C. Circuit dismissed a Lanham Act claim brought by a book publisher based on a satirical article posted on Esquire's politics blog. The court noted that "Farah and Corsi do not allege that *Esquire* is selling or promoting a competing book. Instead, they assert that 'generally' Esquire is their competitor, and maintain that they too 'write frequently about the birth certificate and 'natural born citizen' issues,' and that 'readers frequently [] read publications that contain 'points' and 'counterpoints.'" *Id*. The court held these allegations were insufficient to state a claim because they did not involve commercial speech actionable under the Lanham Act. *Id.*; *see also Bosley*, 403 F.3d at 679 (holding there was no liability under the Lanham Act where an unsatisfied hair transplant customer used Bosley's marks for criticism because the customer's "use of the Bosley mark [was] not in connection with a sale of goods or services—it [was] in connection with the expression of his opinion *about* Bosley's goods and services."); *Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 950-52 (11th Cir. 2017) (holding author's blog posts, which contained allegedly false and defamatory statements about physician's medical practice, did not constitute commercial speech subject to the Lanham Act where posts did not propose commercial transactions and where stated purpose of the blog was to provide objective analysis of questionable or controversial medical claims); *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1054 (10th Cir. 2008) (dismissing Lanham Act claims against the creators of a parody website that criticized religious bookstore's views because "[u]nless there is a competing good or service labeled or associated with the plaintiff's trademark, the concerns of the Lanham Act are not invoked.").

The cases CHD does cite are readily distinguishable in that they involve commercial speech and alleged misrepresentations made about products or services. *See, e.g.*, *Ariix*, 985 F.3d at 1119; *Mimedx Group, Inc. v. Osiris Therapeutics, Inc.*, 16 Civ. 3645, 2017 WL 3129799, at *1 (S.D.N.Y. July 1, 2017) (plaintiff and defendant were "rivals in the wound care biologics market" and plaintiff

alleged defendant issued false and misleading statements that its tissue-graft product was better in various ways than the plaintiff's).  In addition, CHD cites a number of cases for the general proposition that a non-profit can sue under the Lanham Act.  However, in each of those cases, the non-profit alleged an injury to a commercial interest in sales or reputation.  *See Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 818-19 (9th Cir. 1996) (nonprofit sued defendants for infringement of protected tradename under Lanham Act); *Birthright v. Birthright, Inc.*, 827 F. Supp. 1114, 1123 (D.N.J. 1993) (Canadian nonprofit provider of services to pregnant women sued American affiliate for false advertising in fundraising letters after organizations were disaffiliated because "the fundraising letters confused or were likely to confuse a potential donor as to the use of a contribution to Birthright, Inc., and this confusion was material in that the potential donor may not have wished to contribute to an entity no longer connected to the Birthright movement."); *Cal Pure Pistachios, Inc. v. Primex Farms, LLC*, No. CV 09-7874-GW(RCX), 2010 WL 11523590, at *1 (C.D. Cal. Jan. 7, 2010)  (nonprofit processor of pistachio nuts sued competitor under Lanham Act for false statements made by competitor about prices it would pay for nuts in order to attract business away from the plaintiff).

For these reasons, the Court concludes CHD's alleged injuries are not within the Lanham Act's "zone of interests" and that the warning label and fact-checks are not "commercial advertising or promotion."  Accordingly, the Court DISMISSES the Lanham Act claim.

### III.    Third Cause of Action:  RICO

The third cause of action asserts a claim under RICO's civil enforcement provision, 18 U.S.C. § 1964(c).  To state a civil RICO claim, a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property."  *Living Designs*, *Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005).  "Racketeering activity," within the RICO context, "is any act indictable under several provisions of Title 18 of the United States Code, and includes the predicate acts of mail fraud, wire fraud, and obstruction of justice."  *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 557 (9th Cir. 2010).

CHD alleges that "the Facebook content management team is an associated-in-fact enterprise," SAC ¶ 374, and that "all named defendants both inside Facebook's formal structure (Zuckerberg, Does 1-10) and out (Science Feedback, Poynter, Does 1-10) aided in one or another aspect of their common fraud scheme:  to label Plaintiff's page 'unreliable' and 'out-of-date' and redirect users to the CDC; to label Plaintiff's speech-content 'False' when it is critical of vaccine or 5G network safety, accomplishing this censorship through the sham machinations of 'content moderators' and 'independent fact-checkers'; and to conceal their true purposes of profiting from vaccine manufacturer advertising and from their own vaccine and 5G network development, all of which would be negatively affected by Plaintiff's ongoing public health-related speech." *Id.* ¶ 377.  CHD alleges that defendants have violated RICO by committing a pattern of racketeering activity through wire fraud in violation of 18 U.S.C. § 1343.  *Id.* ¶¶ 378-79, 381.

Defendants contend, *inter alia*, that CHD has failed to state a civil RICO claim because CHD has failed to identify any predicate acts of wire fraud.  "The federal wire fraud statute makes it a crime to effect (with use of the wires) 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'"  *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (quoting 18 U.S.C. § 1343)).  "The wire fraud statute . . . prohibits only deceptive 'schemes to deprive [the victim of] money or property.'"  *Id.*; *see also Monterey Plaza Hotel Ltd. P'ship v. Loc. 483 of Hotel Emps. & Rest. Emps. Union, AFL-CIO*, 215 F.3d 923, 926 (9th Cir. 2000) ("[T]he mail and wire fraud statutes . . . prohibit the use of the mails and wire to *obtain* money or property *from the one who is deceived*.") (emphasis in original).  As such, "to avoid a dismissal where the RICO claim is based on predicate acts of mail or wire fraud, the plaintiff must allege the defendant used the mails or wires to obtain money or property from the plaintiff or a non-party."  *Sugarman v. Muddy Waters Cap. LLC*, No. 19-CV-04248-MMC, 2020 WL 633596, at *3 (N.D. Cal. Feb. 3, 2020).

CHD asserts that it has alleged "at least fifteen predicate acts of wire fraud, including Defendants' posting of false fact-checking labels on CHD content, Facebook's fraudulent deactivation of CHD's donate button and ads, deceptive demotion of content, and concealment through material omission."  CHD's Opp'n to Facebook's Mtn. at 11 (citing SAC ¶¶ 79(A)-(J), 222-

26, 322-33, 374-78, 383-85).  For example, CHD alleges that defendants have engaged in wire fraud by:

- "Misrepresenting as fact to CHD that CHD's fundraising function was deactivated because CHD violated its terms of service with Facebook by posting 'false information' with respect to vaccines."

- "Misrepresenting as fact to CHD's outside ad agency that CHD's fundraising advertisements were rejected because CHD violated its terms of service with Facebook by posting 'false information' with respect to vaccines."

- "Misrepresenting as fact to all third-party Facebook users by means of a 'warning label' on CHD's page that the CDC has 'reliable, up-to-date information about vaccines,' and that such users should 'go to CDC.gov,' and, by classic imputation of dishonesty, falsely suggesting that the vaccine-related content on CHD's page is not reliable, up-to-date information."

- "Misrepresenting as facts to all third-party Facebook users that particular enumerated CHD-, RFK, Jr.- and third party-content posted on the CHD page contains 'False Information Checked by independent fact-checkers,' and to 'see why' users should instead accept the opposition content posted by Facebook's 'fact-checkers' on CHD's page as 'true' information on the same subjects."

- "Engaging in deceptive mechanisms and machine-learning algorithms, which secretly demote, hide, and/or limit the visibility and reach of CHD vaccine- and 5G network-related content (practices known as 'shadow-banning' or 'deboosting') from third party users whom Facebook psychologically profiles as 'undecided' (a practice known as 'sandboxing') in order to hide content from those it might sway, while misrepresenting to CHD and all third-party Facebook users that no such artificial processes or limitations have occurred."

- "Misrepresenting as fact to all third-party Facebook users that Facebook relies upon 'independent fact-checkers' to identify and tag 'false information' on CHD's Facebook page based on a set of objectively neutral, reliable, and up-to-date factual

criteria, when the criteria that is applied is neither neutral, reliable, nor up-to-date, and the 'fact-checkers' are in privity with, and controlled by Facebook.  The absurdity of these misrepresentations hits home when one considers that Facebook and Science Feedback created a 'fact-checking' exemption for climate science deniers by deeming climate disinformation ineligible for 'fact-checking,' because it is 'opinion.' . . ."

- "Misrepresenting as fact to third-party Facebook users that CHD's 5G-related content was demoted because it poses an 'imminent risk of physical harm,' when Facebook took this action solely to advance its own economic interests in 5G development and deployment."

- "Misrepresenting as fact to all third-party Facebook users that users such as CHD who have had content removed from or tagged on its platform can appeal that decision either to Facebook's content moderator panel, or to an 'independent' Oversight Board, and that in making such determinations, Facebook does not have any conflicts of interest that compromise its judgment. . . ."

- "Concealing the extent to which Facebook actively collaborated with Rep. Schiff, the CDC and the WHO, inter alia, to implement their overall scheme."

- "Concealing their overall scheme by these and other deceptions, including false and disparaging statements about CHD to users of CHD's Facebook page, and to other third parties."

SAC ¶ 79(A)-(J).  With regard to Poynter specifically, CHD asserts that Poynter engaged in wire fraud by fact-checking the post alleged in the SAC as well as by certifying other fact-checking organizations, including Science Feedback, thus "creating the impression that these organizations are 'independent,' trustworthy experts, to further enable Defendants' scheme of censorship, deception and destruction."  CHD's Opp'n to Poynter's Mtn. at 13.

Defendants contend that these alleged misstatements, omissions, and acts do not constitute wire fraud because CHD has not alleged how defendants are alleged to have obtained "money or property" from anyone who was allegedly deceived.  Defendants argue that nowhere in the SAC

1    does CHD allege that defendants obtained money or property from third-party Facebook users who

2    were deceived by any alleged misstatements, nor does the SAC allege that CHD or its ad agency

3    were somehow deceived by defendants' misrepresentations and defrauded of their property or

4    money.

5         In response, CHD asserts that defendants intended to "defund and damage" CHD and

6    "sought to deceive visitors to CHD's Facebook page into giving their charitable dollars not to CHD,

7    but to other competing nonprofit organizations," such as fact-checkers like Poynter.  *See* CHD's

8    Opp'n to Facebook's Mtn. at 12-13; CHD's Opp'n to Poynter's Mtn. at 12-13.  CHD argues that

9    defendants pursued their fraudulent scheme by "(a) convincing users that CHD was not deserving

10   of donation dollars by falsely labeling CHD content as 'false'; (b) fraudulently deactivating CHD's

11   donation button; (c) diverting CHD visitors through its false 'fact-checking' click-through screens

12   to web pages of organizations that compete directly with CHD for donations and whose pages

13   prominently invite visitors to make donations; and (d) fraudulently promoting those competitor

14   entities as champions of children's health, superior sources of health information, and hence more

15   deserving recipients of donation dollars." CHD's Opp'n to Facebook's Mtn. at 13.  CHD also asserts

16   that defendants "sought to obtain property from the victims of their deception (visitors to CHD's

17   Facebook page) by taking from them the right to control whether or how much of their property to

18   spend on CHD."  *Id*.  Finally, CHD argues that "while Facebook's services are free to its users . . .

19   Facebook profits directly, and in intangible goodwill and partner brand protection, by misleading

20   visitors to CHD's page to click through its false labels and fact-checks to view new prompts and

21   impressions under the deception that CHD's page contains false, unreliable, and out-of-date

22   information."  *Id*. at 14.

23        The Court concludes that CHD's allegations of wire fraud – both those actually plead in the

24   SAC and those unpled but asserted in CHD's opposition briefs – do not constitute wire fraud because

25   CHD has not alleged any facts showing that defendants engaged in a fraudulent scheme to obtain

26   money or property from Facebook visitors to CHD's page (or anyone else, including CHD[13]).

27   _____

28        [13] Indeed, as to CHD, the SAC alleges that CHD was prevented from giving Facebook money
     because Facebook rejected CHD's fundraising advertising.  SAC ¶ 79(B).

United States District Court
Northern District of California

Assuming *arguendo* that the various alleged misrepresentations, omissions and acts could constitute a fraudulent "scheme," neither the SAC nor CHD's oppositions asserts that any Facebook users actually donated to any other organization, much less donated to another organization because they were deceived by defendants' scheme. Instead, CHD advances a speculative theory that defendants engaged in wire fraud by deceiving visitors to CHD's Facebook page through the "false" fact-check labels, diverting those visitors to the websites of other organizations, and that those individuals, once diverted, *may* have donated to CHD's competitors as a result of defendants' deception. CHD's theory of wire fraud is unsupported by any factual allegations that "defendant[s] used the . . . wires to obtain money or property from the plaintiff or a non-party." *Sugarman*, 2020 WL 633596, at *3. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

In *Sugarman*, Judge Chesney dismissed a similar RICO claim for failure to allege wire fraud. There, the plaintiffs alleged that defendants "conspired to publish, and caused to be published on a 'blog,' false statements about plaintiffs." *Sugarman*, 2020 WL 633596, at *1. As a result, plaintiffs alleged "some readers"—not the plaintiffs themselves—were defrauded and "ceased to do business with Sugarman." *Id*. at *2. However, the court concluded that the alleged conduct did not constitute RICO wire fraud because "the complaint include[d] no facts to support a finding that the [m]oving [d]efendants, or any of them, obtained money or property from [the readers]." *Id*. at *3; *see also Monterey Plaza Hotel*, 215 F.3d at 926 (affirming dismissal of civil RICO claim where plaintiff hotel alleged defendant union engaged in mail and wire fraud by making misrepresentations about the hotel to its customers because "[t]he Union did not *obtain* property by deceiving the Hotel or its customers; the Union was simply carrying on a strategy in a protracted labor dispute."); *see also United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 2019) (reversing conviction for mail fraud where there was no evidence defendant obtained money or property from "one who [was] deceived" by his allegedly false statements).

The cases upon which CHD relies are inapposite and unavailing. CHD argues that a person could still be guilty of wire fraud even if the money fraudulently obtained went to "third parties" or "associates." *See United States v. Sorich*, 523 F.3d 702, 709 (7th Cir. 2008) (holding that the

38

"private gain" criterion of "honest services mail fraud" "simply mean[s] illegitimate gain," which does not necessarily have to go to defendant, but may instead go to another party); *United States v. Spano*, 421 F.3d 599, 603 (7th Cir. 2005) (holding that "[a] participant in a scheme to defraud is guilty [of honest services mail fraud] even if he is an altruist and all the benefits of the fraud accrue to other participants"); *United States v. Rezko*, No. 05 CR 691, 2007 WL 2904014, at *5 (N.D. Ill. Oct. 2, 2007) (rejecting the defendant's argument that indictment for mail and wire fraud was insufficient because it did not allege defendant personally gained where indictment alleged defendant's associates benefitted from fraud).  However, CHD has not alleged any facts to establish that defendants, their associates, or any third party obtained money or property from deceived Facebook users or from CHD.

### IV.     Fourth Cause of Action:  Declaratory Relief

CHD asserts that even if its *Bivens* claims for damages are dismissed, it can still pursue claims for injunctive relief against defendants "for their ongoing First Amendment violations" through its fourth cause of action for declaratory relief.  CHD's Opp'n to Facebook's Mtn. at 9.

While CHD is correct that "money damages is the remedy under *Bivens*," *Solida v. McKelvey*, 820 F.3d 1090, 1094 (9th Cir. 2016), claims for injunctive or declaratory relief based on a violation of the Constitution necessarily must be predicated on state or federal action because "[a] private party is generally not bound by the First Amendment, unless it has acted 'in concert' with the state 'in effecting a particular deprivation of constitutional right.'" *Labarrere v. Univ. Pro. & Tech. Emps.*, 493 F. Supp. 3d 964, 970 (S.D. Cal. 2020) (citing *United Steelworkers of Am. v. Sadlowski*, 457 U.S. 102, 121 n.16 (1982), and *Tsao*, 698 F.3d at 1140).  CHD's reliance on *AFGE Local 1 v. Stone*, 502 F.3d 1027 (9th Cir. 2007), is unavailing, as the plaintiffs in that case sought injunctive relief based on alleged First Amendment violations resulting from federal action, namely decisions made by the Transportation Security Administration.

Here, for all of the reasons stated *supra*, CHD has not plausibly alleged that defendants engaged in federal action and thus CHD may not seek injunctive relief based on alleged First Amendment violations.  In addition, as CHD has failed to state a claim under the Lanham Act or

United States District Court
Northern District of California

1    RICO, there is no "case or controversy" necessary to support a claim for declaratory relief.

2

3    **V.    Plaintiff's Motion to Supplement Its Second Amended Complaint, Request for
4         Judicial Notice, and Motion to Further Supplement Its Second Amended Complaint
         and for *In Camera* Inspection Under the All Writs Act**

5         On March 8, 2021, CHD filed a Motion to Supplement its Second Amended Complaint.

6    Dkt. No. 76 (Motion to Supplement).   CHD's motion seeks to add supplemental allegations

7    regarding: (i) a January 20, 2021 Executive Order by President Joseph Biden directing efforts to

8    "deter the spread of misinformation and disinformation," *see id.* at 4; (ii) the February 10, 2021

9    removal of Robert F. Kennedy, Jr.'s Instagram account, *id.* at 2-3; (iii) a February 19, 2021 statement

10   by a Facebook spokesperson stating, "the company has reached out to the White House to offer 'any

11   assistance we can provide,'" *id.* at 3; (iv) a February 19, 2021 White House press briefing stating

12   that the administration is "committed to working with state and local public health partners, as well

13   as partners in the private sector, to support getting people vaccinated as quickly and as safely as

14   possible," *id.* at 21; (v) a February 19, 2021 report that the Biden Administration was "talking to"

15   social media companies so "they understand the importance of misinformation and disinformation

16   and how they can get rid of it quickly," *id.* at 36; and (vi) a March 5, 2021 screenshot of a "warning

17   label" on an unidentified third-party user's Facebook account which noted that the user can

18   "Unfollow Children's Health Defense," *id.* at 4.

19        After the hearing on defendants' motions to dismiss, CHD filed a request for judicial notice

20   seeking judicial notice of 27 "facts" that CHD asserts are relevant to its claims.   Defendants object

21   to this filing, arguing that although it is styled as a request for judicial notice, CHD's submission

22   appears to be another effort to bolster the SAC and CHD's briefing in opposition to the motions to

23   dismiss.   While the Court agrees that the filing is procedurally improper, the Court will consider it

24   as a further proffer of how CHD would amend the complaint if given leave to do so.   CHD's filing

25   requests judicial notice of various congressional committee hearings from 2019-2021,[14] and

26

27        [14] Based on the Court's review of the cited materials, the Congressional hearings, some of
     which predated the COVID-19 pandemic, focused on a variety of topics related to social media
28   companies, including *inter alia*, competition, consumer privacy, and regulation of hate speech,
     white nationalist groups, political advertising.   Thus, many of the quoted statements about the need

*United States District Court*
*Northern District of California*

40

United States District Court
Northern District of California

statements made by different members of Congress in connection with those hearings, in which some members of Congress stated, *inter alia*, that social media companies, including Facebook, needed to "restrict" "harmful" and "dangerous" content and "misinformation" – or risk losing Section 230 immunity and/or being subject to regulation.  *See generally* Plaintiff's Request for Judicial Notice (Dkt. No. 97). CHD also seeks judicial notice of a June 2020 statement by Speaker Nancy Pelosi about Facebook failing to stop the spread of "COVID-19 disinformation" on its platform and the need for Congress to "send a message to social media executives: You will be held accountable for your misconduct." *Id*. at 3.  CHD also seeks judicial notice of the fact that on April 19, 2021, Senators Klobuchar and Lujan wrote a letter to Zuckerberg that – in CHD's characterization – demanded that Facebook do more to censor and silence "anti-vaccine" influencers, including Robert F. Kennedy Jr.[15]

CHD also requests that the Court take judicial notice of the facts that Senator Klobuchar has introduced antitrust legislation that could negatively impact Facebook; that on February 8, 2021, Facebook issued its "COVID-19 and Vaccine Policy Updates & Protections" which prohibit users from posting "any claims that COVID-19 vaccines are not effective in preventing COVID-19"; that Facebook maintains a "Coronavirus (COVID-19) Information Center" that contains links to the

---

to regulate "harmful" or "dangerous" content do not relate to "vaccine misinformation" but other types of speech.

[15]    The full text of the letter can be found at https://www.klobuchar.senate. gov/public/index.cfm/2021/4/klobuchar-lujan-urge-tech-ceos-to-take-action-against-disinforma-tion-dozen-combat-coronavirus-vaccine-disinformation.   In that letter, which was addressed to Zuckerberg and Twitter CEO Jack Dorsey, the senators ask that Twitter and Facebook "step up and take action against people that are spreading content that can harm the health of Americans" and they ask the CEOs the following four questions:
1.   Are your platforms aware of these twelve sources that appear to be repeatedly spreading false or misleading information about the coronavirus vaccine efficacy?
2.   What are your specific standards for removing accounts that repeatedly violate your policies on vaccine misinformation? Please address specifically whether the content shared on each of those twelve accounts violate those standards.
3.   Who at your company is responsible for (a) setting vaccine disinformation policies and (b) enforcing those policies? Please provide specific name(s).
4.   How are you ensuring your content moderation policies are effective for rural, minority, and non-English communities? Please provide proof of investment in these programs in terms of resource allocation, specific data on campaign efficacy, and number of full & contract level employees allocated exclusively to those efforts.

*Id*.

CDC website and "cross-links with posts from the CDC"; and that a "high-ranking Facebook officer" recently "admitted" that Facebook is "removing groups, pages and accounts that deliberately discourage people from taking vaccines, regardless of whether the information can bee verified as false or not." Plaintiff's Request for Judicial Notice at 9 (citing a May 10, 2021 bbc.com article).

Finally, on June 7, 2021, CHD filed a motion to "further supplement" the SAC and for *in camera* inspection under the All Writ's Act. This filing again cites the May 10, 2021 bbc.com article, and cites a May 24, 2021 Project Vertitas article for the assertion that a Facebook "whistleblower" went public with Facebook documents "showing that, notwithstanding the company's public declarations that it censored only 'false' vaccine-related claims, Facebook was (and is) in fact systematically and covertly censoring *true* vaccine-related content, as well as mere expressions of *opinion*, provided such content was (or is) deemed capable of leading to 'vaccine hesitancy.'" Plaintiff's Motion to Further Supplement at 3 (Dkt. No. 103). CHD also requests the Court to consider: (1) on or about May 25, 2021, Facebook reversed its pre-existing ban on content suggesting that COVID was "manmade or manufactured"; (2) on or about June 3-4, 2021, Zuckerberg and Facebook Vice-President Heidi Swarz "essentially admitted" that the whistleblower-leaked documents were authentic; (3) on or about June 1-5, 2021, a large number of previously undisclosed emails by or to Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases, were released to the public pursuant to a third party Freedom of Information Act request; those emails include an email from Zuckerberg to Fauci proposing a collaboration related to a COVID information "hub" on Facebook, as well as an "offer" by Zuckerberg, the details of which are redacted. *See id.* at 5; Schreffler Decl., Ex. 3. CHD requests that the Court order Facebook to produce the unredacted emails for *in camera* review.[16]

The Court concludes that none of the proposed supplemental allegations would cure the

---

[16] According to Facebook, public statements from Facebook's Policy Communications Director explain that the redacted portions of the emails do not relate to misinformation or factchecking, but rather that "Zuckerberg told Dr. Fauci of [Facebook's] plan … to share Facebook ad credits with government agencies to help them run coronavirus PSAs." *See* Facebook's Opp'n to CHD's Mtn. to Further Supplement at 5 (quotingTwitter, Andy Stone on Twitter (June 9, 2021), tinyurl.com/andystonetwitter.)).

United States District Court
Northern District of California

deficiencies in CHD's claims, and thus that leave to amend would be futile.  Many of the supplemental allegations – such as the allegation that the Biden Administration was "talking to" social media companies so "they understand the importance of misinformation and disinformation and how they can get rid of it quickly" – are very similar to allegations already contained in the SAC, and for the reasons discussed *supra*, they are insufficient.

As relevant to the *Bivens* claim against Zuckerberg, none of the proposed new allegations show that Zuckerberg was personally involved in any decisions regarding CHD's Facebook page. Nor do any of the supplemental allegations show any joint action with the federal government with regard to CHD's Facebook page.  Instead, some of the new allegations mention Robert F. Kennedy, Jr.'s Instagram account, but Mr. Kennedy is not a plaintiff in this litigation.  E-mails between Zuckerberg and Dr. Fauci about a COVID information "hub" on Facebook do not relate to any actions taken regarding CHD's Facebook page. The allegations about other members of Congress making statements about the need for social media companies to remove harmful or dangerous content from their platforms, including "vaccine misinformation," or about the possibility of legislation to remove Section 230 immunity are too general to support a claim of governmental coercion, as there are no allegations that any public official pressured Facebook to take any specific actions regarding CHD's page.

Similarly, none of the proposed supplemental allegations would enable CHD to state claims under the Lanham Act or RICO.  The supplemental allegations do not show that CHD has suffered an injury within the Lanham Act's "zone of interests" or that defendants have engaged in commercial speech actionable under that statute.  Nor do any of the proposed supplemental allegations establish the elements of wire fraud as is necessary for the RICO claim.

Thus, even if it were true that Facebook "embarked on a campaign to block speech and information according to a COVID 'vaccine hesitancy' algorithm regardless of the truth or falsity of that speech," CHD's Mtn. to Further Supplement at 2, those allegations do not address the necessary elements of any of CHD's causes of action.

CHD argues that its allegations are sufficient at the pleadings stage, and that it should be permitted to engage in discovery to explore issues such as Zuckerberg's personal involvement,

government contact with Facebook, and whether Facebook users were deceived by the warning label and fact-checks.  *See* CHD's Opp'n to Facebook's Mtn. at 6, 7 n.3, 12 n.10, 28.  Similarly, invoking the All Writs Act, CHD asserts that this is an "extraordinary" situation where the Court should lift the stay on discovery and order Facebook to produce unredacted emails between Zuckerberg and Dr. Fauci about Zuckerberg's "offer" to determine if there is any factual support for CHD's allegations.  However, that is not how federal litigation operates.  A plaintiff must plausibly allege a claim at the pleadings stage in order for the case to proceed.  *See Maffick*, 2021 WL 1893074, at \*5 (rejecting the plaintiff's argument that "Facebook's commercial motivations and the issue of whether the Notice and the promotion of the SCME policy of which it is a part constitute commercial speech are fact questions, on which Maffick is entitled to take discovery and present evidence before they are resolved on the merits" because "the Lanham Act does not confer a special license to shoot first, and ask questions later.").

Accordingly, because CHD has already amended the 151-page complaint three times in response to motions to dismiss filed by defendants, and because none of the proposed supplemental allegations (as articulated in the motion to supplement, the request for judicial notice, and the motion to further supplement) would cure the deficiencies in plaintiff's claims, the Court GRANTS defendants' motions to dismiss and DENIES plaintiff leave to amend.

///

///

1

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendants' motion to dismiss and DENIES plaintiff leave to amend.  CHD's claims against Facebook, Zuckerberg, and Poynter are DISMISSED WITHOUT LEAVE TO AMEND.  CHD's claims against Science Feedback, which has not yet been served and has not appeared in this action, are DISMISSED WITHOUT PREJUDICE.

**IT IS SO ORDERED**.

Dated: June 29, 2021    _____

SUSAN ILLSTON
United States District Judge